# EXHIBIT A

**AMENDED AND RESTATED**

**AGREEMENT OF LIMITED PARTNERSHIP OF**

**2013 TRAVIS OAK CREEK, LP**

**MAY 23, 2014**

TABLE OF CONTENTS

Page

ARTICLE I
NAME AND BUSINESS

1.1.    Name ................................................................................................................................. 1

1.2.    Place of Business; Registered Agent ................................................................................. 1

1.3.    General and Limited Partners; Time of Admission and/or Withdrawal ........................... 1

1.4.    Purposes ............................................................................................................................. 1

1.5.    Term ................................................................................................................................... 2

ARTICLE II

DEFINITIONS ............................................................................................................................... 2

ARTICLE III
CAPITAL

3.1.    Capital Contributions of the General Partner .................................................................. 15

3.2.    Capital Contributions of the Limited Partner .................................................................. 15

3.3.    Capital Account ............................................................................................................... 18

3.4.    Interest ............................................................................................................................. 18

3.5.    Tax Credit Covenants, Duties and Obligations; Adjustments to Capital Contributions ............... 18

3.6.    Security Interest ............................................................................................................... 21

ARTICLE IV
ALLOCATION OF PROFIT AND LOSS; DISTRIBUTIONS

4.1.    Allocation of Net Profit and Net Loss ............................................................................ 21

4.2.    Distribution of Net Cash Flow ........................................................................................ 23

4.3.    Allocation of Net Profit on Sale ..................................................................................... 24

4.4.    Allocation of Net Loss From Sale ................................................................................... 24

4.5.    Distribution of Net Cash Proceeds From a Sale or Refinancing .................................... 24

4.6.    Revaluation of Partnership Property ............................................................................... 25

4.7.    Consent to Allocations and Distributions ....................................................................... 25

4.8.    Allocations and Distributions Within a Class ................................................................ 25

4.9.    Miscellaneous .................................................................................................................. 25

ARTICLE V
PURCHASE OF LIMITED PARTNERS' INTERESTS

5.1.    Right To Require Repurchase .......................................................................................... 27

5.2.    Purchase Price .................................................................................................................. 29

5.3.    Notice ............................................................................................................................... 29

ARTICLE VI
RIGHTS, POWERS AND DUTIES OF GENERAL PARTNER

6.1.    Powers .............................................................................................................................. 29

6.2.    Restrictions on Authority of General Partner .................................................................. 30

6.3.     Single Purpose Entity ................................................................................................ 32

6.4.     [Reserved] ................................................................................................................... 33

6.5.     Duties, Covenants, Obligations, Representations and Warranties ............................. 33

6.6.     Limitation on Liability; Indemnification ................................................................... 40

6.7.     Development Duties, Covenants and Obligations ...................................................... 41

6.8.     Development and Other Fees ..................................................................................... 43

6.9.     Environmental Matters .............................................................................................. 45

6.10.    Partnership Manager and Tax Matters Partner .......................................................... 46

6.11.    Property Manager ....................................................................................................... 47

6.12.    Transactions With Lenders, Agencies and Affiliates of the SLP or the ILP ............. 49

6.13.    Applied Amounts ....................................................................................................... 50

ARTICLE VII
RIGHTS AND LIMITATIONS OF LIMITED PARTNERS

7.1.     Limited Assessment ................................................................................................... 50

7.2.     No Right To Manage; Right To Inspect ..................................................................... 50

7.3.     Priority ....................................................................................................................... 51

7.4.     Death, Disability, etc. of a Limited Partner .............................................................. 51

7.5.     Meetings ..................................................................................................................... 51

7.6.     Proposal and Adoption of Amendments Generally .................................................... 51

7.7.     Special Rights of the Limited Partners ...................................................................... 52

7.8.     Extraordinary Limited Partner Expenses ................................................................... 56

7.9.     Limited Partners as Lenders ...................................................................................... 56

7.10.    Sale; Purchase Option and Right of First Refusal ..................................................... 57

ARTICLE VIII
TRANSFER BY LIMITED PARTNERS

8.1.     Compliance With Securities Laws ............................................................................. 59

8.2.     Transfer and Substitution ........................................................................................... 59

8.3.     Status of Transferee ................................................................................................... 59

8.4.     SLP Consent ............................................................................................................... 60

ARTICLE IX
CHANGES AMONG GENERAL PARTNERS

9.1.     Withdrawal .................................................................................................................. 60

9.2.     Obligation To Continue ............................................................................................. 61

9.3.     Withdrawal of All General Partners ........................................................................... 61

9.4.     Interest of General Partner After Permitted Withdrawal ........................................... 61

9.5.     SLP Consent ............................................................................................................... 62

ARTICLE X
ACCOUNTING, RECORDS & FINANCIAL REPORTING

10.1.     Books and Records ...................................................................................................62

10.2.     Books of Account .....................................................................................................62

10.3.     Fiscal Year ...............................................................................................................62

10.4.     Special Basis Adjustments .......................................................................................62

10.5.     Bank Accounts ..........................................................................................................62

10.6.     Accountants ..............................................................................................................62

10.7.     Construction Draws, Audits, Tax Filings and Compliance......................................62

10.8.     Insurance ..................................................................................................................67

10.9.     Operating and Capital Expenditure Budgets............................................................67

10.10.    Other Management Reporting, Miscellaneous..........................................................68

10.11.    Reporting Defaults ....................................................................................................68

10.12.    Elections ...................................................................................................................69

10.13.    General Terms and Provisions of Article X .............................................................69

10.14.    Compliance With Other Interested Parties...............................................................69

## ARTICLE XI
## TERMINATION AND DISSOLUTION

11.1.     Dissolution ...............................................................................................................69

11.2.     Distribution of Assets ..............................................................................................70

## ARTICLE XII

AGENCY REGULATIONS ....................................................................................................70

## ARTICLE XIII
## MISCELLANEOUS

13.1.     Notices ......................................................................................................................71

13.2.     Entire Agreement ......................................................................................................71

13.3.     Joint and Several Obligations ...................................................................................71

13.4.     Consents and Approvals ...........................................................................................71

13.5.     Headings ...................................................................................................................71

13.6.     Certain Provisions ....................................................................................................71

13.7.     Saving Clause ...........................................................................................................71

13.8.     Pronouns and Plurals ................................................................................................71

13.9.     Binding Agreement ...................................................................................................71

13.10.    Remedies Not Exclusive ..........................................................................................71

13.11.    Counterparts ..............................................................................................................71

13.12.    Governing Law, Jurisdiction and Venue...................................................................72

13.13.    No Third-Party Beneficiary ......................................................................................72

EXHIBIT 1 REAL PROPERTY DESCRIPTION
EXHIBIT 2 PARTNERS' CAPITAL CONTRIBUTIONS AND INTERESTS

EXHIBIT 3  GENERAL PARTNER'S FUNDING CERTIFICATE

iii

4837-4545-8969.4

EXHIBIT 4 PLANS AND SPECIFICATIONS

EXHIBIT 5 AGREEMENT OF GUARANTY

EXHIBIT 6 REQUIRED INSURANCE

EXHIBIT 7 FORM OF TRANSFER AMENDMENT

EXHIBIT 8 PROJECT FORECAST

EXHIBIT 9 FORM OF ACCOUNTANT'S ADDENDUM

EXHIBIT 10 FORM OF QUARTERLY STATUS REPORT

4837-4545-8969.4

**AMENDED AND RESTATED**
**AGREEMENT OF LIMITED PARTNERSHIP OF**
**2013 TRAVIS OAK CREEK, LP**

THIS **AMENDED AND RESTATED AGREEMENT OF LIMITED PARTNERSHIP** (this "**Agreement**") is entered into as of May 23, 2014, by and among **2013 TRAVIS OAK CREEK GP, LLC**, a Texas limited liability company (the "General Partner"), **RENE O. CAMPOS**, in his individual capacity (the "**Original Limited Partner**"), **PNC BANK, NATIONAL ASSOCIATION**, a national banking association (the "**ILP**"), and **COLUMBIA HOUSING SLP CORPORATION**, an Oregon corporation (the "**SLP**").

W I T N E S S E T H :

WHEREAS, the Partnership was originally formed as a limited partnership under the laws of the State pursuant to the Original Certificate and Original Agreement; and

WHEREAS, this Agreement is entered into to amend and restate the Original Agreement to (i) admit the ILP and SLP as Limited Partners, (ii) provide for the withdrawal of the Original Limited Partner and (iii) set out more fully the rights, obligations, and duties of the General Partner and the Limited Partners.

NOW, THEREFORE, the parties agree to the continuation of the Partnership as a limited partnership pursuant to the Partnership Act upon the following terms and conditions which amend, restate and supersede those set forth in the Original Agreement. Capitalized terms shall have their meanings set forth in Article II.

**ARTICLE I**

**NAME AND BUSINESS**

1.1.     Name.  The name of the Partnership continues to be 2013 Travis Oak Creek, LP, and the federal tax identification number for the Partnership is 46-1682109.

1.2.     Place of Business; Registered Agent.   The principal place of business of the Partnership in the State is located at the address so identified in the Schedule, or such other place as the General Partner may hereafter designate upon written notice to the Limited Partners.  The Partnership's registered agent for service of process in the State shall be as identified in the Schedule.

1.3.     General and Limited Partners; Time of Admission and/or Withdrawal.

(a)     The names and addresses of the Partners are as set forth on Exhibit 2.

(b)     The ILP and the SLP shall be deemed to be admitted to the Partnership as such as of the Closing Date.

(c)     The Original Limited Partner hereby acknowledges the return of its capital contributions to the Partnership and withdraws from the Partnership and hereby represents that the Original Limited Partner's spouse, if any, has been notified of such withdrawal and return of capital contributions and further represents that neither the Original Limited Partner nor their spouse, if any, has any interest in or claims against the Partnership as a partner thereof or as a spouse thereof.

(d)     Any Partner admitted after the Closing Date in accordance with this Agreement shall be deemed to have been admitted to the Partnership as of the first day of the calendar month during which such Partner is admitted.

1.4.     Purposes.  The only purposes of the Partnership are to acquire, construct and/or rehabilitate as applicable, own, develop, operate, maintain, manage, lease, sell, mortgage or otherwise dispose of the Project.  The

1

Project shall be operated in accordance with Section 42 of the Code and applicable Lender and Agency requirements taking into account the overriding obligation to ensure the availability of Tax Credit to the Partnership as provided herein.

    1.5.    Term.  The Partnership shall continue until the Termination Date.

# ARTICLE II

## DEFINITIONS

Accountant Addendum means the addendum to the engagement letter entered into between the Partnership and the Accountants, the form of which is attached as Exhibit 9.

Accountants means the firm so identified in the Schedule, or such other certified public accountant firm with expertise in partnership tax and accounting and Section 42 of the Code as may be engaged by the General Partner at the expense of the Partnership and with the Consent of the SLP, which Consent shall not be unreasonably withheld.

Actual Tax Credit means, with respect to any Fiscal Year, the total amount of Tax Credit properly reported and available to be claimed by the Partnership and the ILP on the respective federal information and income tax returns for that Fiscal Year, and allowed to the Partnership and the ILP, taking into account any adjustments thereto by the Internal Revenue Service.

Additional Credit shall have the meaning set forth in Section 3.5(c).

Adjustment Amount shall have the meaning described in Section 3.5.

Affiliate means as to any Person (a) any other Person directly or indirectly controlling, controlled by or under common control with such initial Person, (b) any other Person controlling 10% or more of the outstanding voting securities of such initial Person, (c) any officer, director, trustee, manager, managing member or general partner of such initial Person, and (d) if such initial Person is an officer, director, trustee, manager, managing member or general partner of any company or entity, any other company or entity for which such Person acts in any such capacity.

Affiliate Loan means any loan or advance made to the Partnership by the General Partner, Developer or Guarantor and Affiliates thereof.

Agency means the Tax Credit Agency, and any other government or regulatory agency providing financial assistance or regulatory oversight to the Project or the Partnership.

Agency Set-Aside Test means the set-aside test whereby at least 18 of the units in the Project must be occupied by individuals with income equal to no more than 30% of area median income, as adjusted for family size, at least 70 of the units in the Project must be occupied by individuals with income equal to no more than 50% of area median income, as adjusted for family size, at least 85 of the units in the Project must be occupied by individuals with income equal to no more than 60% of area median income, as adjusted for family size and at least 9 units in the Project must be special needs units as defined by the Tax Credit Agency.

Agreement means this Amended and Restated Agreement of Limited Partnership, as it may be amended from time to time.

AIA means the American Institute of Architects.

ALTA Survey means a survey of the Project prepared in accordance with 2011 surveying standards of the American Land Title Association and the American Congress on Surveying and Mapping and certified to the Partnership, the ILP and the SLP and otherwise in form and substance satisfactory to the SLP.

Ancillary Income means any type of underwritten revenue (as specified in Exhibit 8) which is received by the Partnership and is not residential rental income.

Applicable Percentage means the percentage defined in Section 42(b) of the Code.

Applied Amounts shall have the meaning given to it in Section 6.13.

Architectural Contract means the agreement so identified in the Schedule entered into by and between the Partnership and the Project Architect.

Breakeven Operations means, for any specified period, the Operating Revenues (based on actual Project operations rather than underwritten) equal or exceed Operating Expenses (based on actual Project operations rather than underwritten), mandatory Debt Service, and any other obligation payable during such period under any of the Project Documents.

Bridge Loan means the loan so identified in the Schedule.

Builder means the company so identified in the Schedule.

Capital Account shall have the meaning given in Section 3.3.

Capital Contribution means the amount of money or the fair market value of other property contributed to the Partnership by a Partner as provided in Article III.

Capital Expenditures means customary and reasonable costs and expenses incurred by the Partnership in connection with certain major repairs, replacements and improvements of the Project which are normally capitalized under generally accepted accounting principles, including, but not limited to, the performance of work to the roofs, chimneys, gutters, downspouts, paving, curbs, ramps, driveways, balconies, porches, patios, exterior walls, exterior doors and doorways, windows, elevators, interior walls, appliances, carpeting, painting, vinyl flooring, plumbing, plumbing fixtures, countertops, cabinets, water heaters, electrical systems, electrical fixtures, clubhouse repairs, pool, spa, landscaping, fences, gates, parking areas, carports, garages, sidewalks, light fixtures, shingles, woods, bricks, stucco, security systems, smoke detectors, stairs, boilers, laundry room, window treatments, bath vanities, bathtubs and mechanical and HVAC equipment.

Carryover Allocation means a valid issuance of an allocation of Tax Credit to the Partnership in the amount set forth in the Schedule made pursuant to Section 42(h)(1)(E) of the Code.

Change in Law means an amendment to the Code or Treasury Regulations that is applicable to the Partnership and that provides for a change in the amount of the Tax Credit or that substantially changes the requirements for qualifying for the Tax Credit in a manner which Tax Counsel determines cannot be satisfied by the Partnership.

City Mortgage Loan means the loan so identified in the Schedule.

Closing Date means the date of this Agreement or, if later, the date the ILP and SLP are admitted to the Partnership.

Code means the Internal Revenue Code of 1986, as amended.

Completion Date means the date as identified in the Schedule.

Compliance Period shall have the meaning defined in Section 42(i) of the Code.

Consent means prior written approval in accordance with Section 13.4.

3

<u>Construction Consultant</u> means the firm so identified in the Schedule.

<u>Construction Contract</u> means the agreement so identified in the Schedule.

<u>Construction Loan</u> means the loan so identified in the Schedule.

<u>Construction Draw</u> shall have the meaning set forth in Section 10.7(a)(2).

<u>Controlling Interest</u> means the power to direct the management and policies of any Person as a result of holding directly or indirectly whether through the ownership of voting securities, by contract or otherwise (which shall include, without limitation, the Person(s) with the largest share of voting rights in such Person).

<u>Cost Certification</u> means the written certification of the Accountants, in form and substance reasonably satisfactory to the SLP, as to the itemized amounts of the construction and/or acquisition and rehabilitation costs, as applicable, together with all other development costs of the Project and the Eligible Basis and Applicable Percentage pertaining to each building in the Project.

<u>Credit Adjuster Obligation</u> shall have the meaning set forth in Section 3.5(b).

<u>Credit Period</u> shall have the meaning defined in Section 42(f)(1) of the Code.

<u>Debt Service</u> means principal, interest and other recurring charges and fees required to be paid monthly (but excluding monthly funding of the Replacement Reserve Account and escrows for taxes and insurance which are includible as Operating Expenses), quarterly or annually in connection with any Permitted Loan if payment is not contingent on available Net Cash Flow.

<u>Debt Service Coverage</u> means Operating Revenue less Operating Expenses expressed as a percentage of all mandatory Debt Service (including pro forma monthly principal and interest payments on the Permitted Loan if the month under consideration is prior to commencement of principal and amortization on the Permitted Loan or for any monthly period that the Partnership has agreed to a forbearance with any Lender). For the purposes of the foregoing calculation, actual Debt Service shall be modified to reflect the maximum possible monthly debt service payment amounts during the life of the relevant Permitted Loan (absent default or maturity), even if such maximum amounts are not then accruing or being charged.

<u>Deferred Development Fee</u> shall have the meaning set forth in Section 6.8(a).

<u>Delivery Percentages</u> means the percentages on the Schedule.

<u>Developer</u> means the entity so identified in the Schedule. In the event that there is more than one Developer, then the term "Developer" will include all such Developers.

<u>Development Agreement</u> means the agreement so identified in the Schedule.

<u>Development Completion Obligation</u> shall bear the meaning set forth in Section 6.7(j).

<u>Development Costs</u> means, at any point in time, all costs, liabilities and expenses associated with acquiring, constructing/rehabilitating, developing or operating the Project, including, but not limited to, those costs reflected in the Project Forecast and including payment of the Development Fee (net of any Deferred Development Fee), which have been incurred to (i) acquire the Project, (ii) achieve Final Construction Completion, (iii) remedy any defects in the construction of the Project and/or any variance in construction from the Plans and Specifications that is discovered within one (1) year after initial occupancy of all of the dwelling units or should have been discovered within such time period and is actually discovered not later than three (3) years after initial occupancy of all of the dwelling units, (iv) achieve Stabilized Occupancy (including all Operating Expenses and Debt Service attributable to the period prior to achievement of Stabilized Occupancy), (v) fund the reserves (including, without limitation, the

<div align="center">4</div>

reserves specified in Section 6.5(c) herein) and escrows required hereunder and (vi) achieve Mortgage Loan Commencement.

Development Fee means the fee described in Section 6.8(a).

Development Funds means, at any point in time, the aggregate of (i) proceeds of the Permitted Loan and Capital Contributions which have been funded to the Partnership, (ii) Operating Revenue of the Partnership and (iii) available insurance proceeds of the Partnership, but only to the extent the foregoing are permitted to be used to satisfy Development Costs.

Distributions means any money or other property distributed to Partners with respect to their interests in the Partnership without consideration therefor, but shall not include any payments permitted by Section 6.8.

DRO Notice shall have the meaning set forth in Section 11.2.

Economic Occupancy means, for a given period of time, the actual gross rental revenues (including payments under the HAP Contract) received from the Project less rent concessions, rebates and credit loss divided by contracted rents under written leases.

8609 Application Filing means the filing by the Partnership of all required documents with the Tax Credit Agency for purposes of the 8609 Issuance, which documents must be reasonably satisfactory to the SLP.

8609 Issuance means the valid issuance by the Tax Credit Agency of Internal Revenue Service Form(s) 8609 for each residential building in the Project.

Eligible Basis shall have the meaning set forth in Section 42(d) of the Code.

Environmental Laws means all local, state, and federal laws, ordinances, regulations, orders, and reported state or federal court decisions thereunder relating to:  environmental protection, the use, storage, generation, production, treatment, emission, release, discharge, remediation, removal, disposal, or transport of any Hazardous Substance, or any other environmental matter, including, but not limited to, any of the following statutes:

(a)   Federal Resource Conservation and Recovery Act of 1976, as amended, 42 U.S.C. §§ 6901-6991k;

(b)   Federal Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended, 42 U.S.C. §§ 9601-9675;

(c)   Federal Clean Air Act, as amended, 42 U.S.C. §§ 7401-7642;

(d)   Federal Hazardous Material Transportation Control Act of 1970, as amended, 42 U.S.C. §§ 1801-1812;

(e)   Federal Clean Water Act of 1977, as amended, 33 U.S.C. §§ 1251-1387;

(f)   Federal Insecticide, Fungicide, and Rodenticide Act, as amended, 7 U.S.C. §§ 136-136y;

(g)   Federal Toxic Substances Control Act, 15 U.S.C. §§ 2601-2671;

(h)   Federal Safe Drinking Water Act, 42 U.S.C. §§ 300f-300i-26;

(i)   Federal Atomic Energy Act, 42 U.S.C. §§ 2011-2297g-4;

(j)   Federal Occupational Safety and Health Act of 1970, as amended, 19 U.S.C. §§ 651 et seq.; and

(k)   Federal Oil Pollution Act of 1990, as amended, 33 U.S.C. §§ 2701 et seq.

Environmental Reports means those certain reports so identified in the Schedule.

Event of Bankruptcy means, with respect to the Partnership, a Guarantor, or a Person with a Controlling Interest in the General Partner (i) the voluntary or involuntary filing of a petition in bankruptcy by or against any of the foregoing parties under the Bankruptcy Code (11 U.S.C. §§ 1101 et seq.), as amended, or any successor statute thereto, or the commission of an act of bankruptcy (except if the filing of the petition in bankruptcy or act of bankruptcy is susceptible to cure or dismissal and is so cured or dismissed within sixty (60) days of the filing or act thereof); (ii) the voluntary or involuntary commencement of an assignment for the benefit of creditors, a

receivership or other insolvency proceeding pursuant to state law or as determined by court proceedings; or (iii) with respect to any General Partner, any of the following:

   (a)  The making of an assignment for the benefit of creditors or the filing of a voluntary petition in bankruptcy by any General Partner;

   (b)  The filing of an involuntary petition in bankruptcy against any General Partner which is not dismissed within sixty (60) days after filing or the adjudication of a General Partner as a bankrupt or insolvent;

   (c)  The filing by any General Partner of a petition or answer seeking for such General Partner any reorganization, arrangement, composition, readjustment, liquidation, dissolution or similar relief under any statute, law or rule;

   (d)  The filing by any General Partner of an answer or other pleading admitting or failing to contest the material allegations of a petition filed against such General Partner in any proceeding of a nature described under subparagraph (c) above;

   (e)  The seeking, consenting to or acquiescing in the appointment of a trustee, receiver or liquidator by any general partner, manager, or managing member of a General Partner or of all or a substantial part of such General Partner's properties;

   (f)  The commencement of a proceeding against any General Partner seeking reorganization, arrangement, composition, readjustment, liquidation, dissolution or similar relief under any statute, law or rule not dismissed within sixty (60) days after commencement of the proceeding;

   (g)  The appointment, without a General Partner's consent, of a trustee, receiver or liquidator, either of such General Partner or of all or a substantial part of such General Partner's properties, which is not vacated or stayed on or before the sixtieth (60th) day after such appointment and, if stayed, is not vacated on or before the sixtieth (60th) day after expiration of the stay;

   (h)  The admission by any General Partner of its inability to pay its debts as they become due; or

   (i)  Any General Partner becoming "insolvent" by the taking of any action or the making of any transfer or otherwise, as insolvency is or may be defined pursuant to the Bankruptcy Code, the Uniform Fraudulent Transfers Act, any similar state or federal act or law, or the ruling of any court.

  Event of Default shall have the meaning set forth in Section 7.7(a).

  Event of Withdrawal shall have the meaning set forth in Section 9.1.

  Exit Taxes means the amount of applicable federal income taxes, state income taxes, sales and franchise taxes, transfer fees and related government assessments payable by the partners/owners of the ILP (taking into account all applicable deductions and credits attributable to such taxes in each taxing jurisdiction) in connection with a specified sale of the Project or liquidation of the Partnership, in each case assuming each such partner is a corporation that is not a closely-held corporation, pays taxes at the highest applicable marginal tax rate generally applicable to corporations and is not subject to the alternative minimum tax, and taking into consideration, on a reiterative basis, the payment of such Exit Taxes as part of such sale or liquidation.

  Extended Low Income Housing Use Commitment means the agreement by and between the Tax Credit Agency and the Partnership which meets the requirements of Section 42(h)(6) of the Code and Rev. Rul. 2004-82.

  50% Construction Completion shall mean the first time 50% of the construction and/or rehabilitation of the Project is physically completed including completion of all grading and site work (other than paving, parking, sidewalks and landscaping) in accordance with the Plans and Specifications as determined by the Project Architect

and confirmed in writing by the Construction Consultant pursuant to an inspection report and the related construction costs associated with such stage of completion have been incurred and paid for pursuant to funded draw requests submitted to and approved by the SLP.

Final Construction Completion means construction and/or rehabilitation of the Project, as applicable, has been completed without lien (unless such liens have been bonded over to the satisfaction of the SLP) or defect in accordance with the Plans and Specifications based on the receipt and acceptance by the SLP of each of the following items:

(a)     an "AIA Form G704 Certificate of Substantial Completion" issued by the Project Architect with a copy of any punch list items not yet completed;

(b)     a final inspection report by the Construction Consultant acceptable to the SLP and confirming:

(1)     all incomplete punch list items do not exceed 2% of the fixed price set forth in the Construction Contract, and

(2)     the punch list items can be completed in the ordinary course of business;

(c)     final unconditional certificates of occupancy (or local equivalent) for all units in the Project;

(d)     final lien waivers from the Builder and from each subcontractor with contracts of $300,000 or more engaged to complete work on the Project conditioned only to the extent payment has not been received on any incomplete punch list items or to the extent that payment will be received from the equity Installment that will be funded in connection with Final Construction Completion;

(e)     evidence, reasonably satisfactory to the SLP, that an amount equal to not less than 150% of the expected costs to complete all outstanding punch list items has been held back from the current Installment funding solely as an escrow for such costs; and

(f)     evidence of radon test results satisfactory to the SLP, but only to the extent the Property is located in a Radon Zone 1 or 2.

Final Determination shall have the meaning set forth in Section 6.7(k).

First Mortgage Loan means the loan so identified in the Schedule.

Fiscal Year means the fiscal year of the Partnership, as determined in accordance with Section 10.3.

Forecasted Tax Credit shall have the meaning set forth in the Schedule.

Funding Certificate means the certification of the General Partner, the form of which is attached hereto as Exhibit 3. The Funding Certificate shall be delivered with respect to all Installments (including draws of First Installment proceeds) following closing.

General Partner means the entity so identified in the recitals of this Agreement and any other Person or Persons who succeed it in its capacity as a general partner of the Partnership, and any additional general partner of the Partnership admitted as provided herein. If at any time the Partnership shall have more than one general partner, the term "General Partner" shall mean each such general partner.

GP Predevelopment Loan means the loan so identified in the Schedule.

4837-4545-8969.4

Governmental Regulations means all present and future statutes, regulations, rules, ordinances, codes, licenses, requirements, resolutions, policy statements, standards and orders (including, without limitation, those relating to land use, subdivision, permitting, building code, zoning, environmental, toxic or hazardous waste, occupational health and safety, mold, water, earthquake, hazard reduction and building and fire codes) of any federal, state or local authority, and all applicable judicial, administrative and regulatory decrees, judgments and orders relating to the ownership, construction, alteration, rehabilitation, maintenance, use, operation, sale or other disposition of the Project.

Guarantor means each party so identified in the Guaranty in the capacity as guarantor of the obligations of the General Partner and Developer.  If at any time there shall be more than one such guarantor, the term "Guarantor" shall mean each such guarantor.

Guaranty means the Agreement of Guaranty executed by the Guarantor and of even date herewith, the form of which is attached hereto as Exhibit 5.

HAP Contract shall mean the contract so identified in the Schedule.

Hazardous Substance means any hazardous mold or fungus, and any other hazardous or toxic substance, material or waste which is regulated by any local governmental authority, the state in which the Property is located or the United States government.  The term "Hazardous Substance" shall include, without limitation, any material or substance which is (A) defined as a solid waste, hazardous waste, extremely hazardous waste, restricted hazardous waste, toxic waste, radioactive material or substance, or a hazardous substance under the laws of the state or locality in which the Property is located or any regulations or orders now promulgated or hereinafter promulgated thereunder, or (B) designated or becomes designated as a "hazardous substance" pursuant to any Environmental Laws.  Notwithstanding anything herein to the contrary, Hazardous Substance shall not include items used in the ordinary course of operation of a multifamily residential property, so long as such use is in compliance with the applicable law.

HUD shall mean the United States of America acting through the Department of Housing and Urban Development.

ILP means the entity so identified in the recitals of this Agreement, and those Persons who replace it as Substitute Limited Partner(s).

Incentive Management Fee shall have the meaning set forth in Section 6.8(d).

Indemnitees means, collectively, the ILP and the SLP, their respective Affiliates, partners, members, shareholders, directors, officers, managers, agents, representatives and employees, and each of their successors and assigns.

Installment(s) shall have the meaning set forth in Section 3.2.

Investor Services Fee shall have the meaning set forth in Section 6.8(b).

Lender means any Person who makes a Permitted Loan to the Partnership for so long as such loan remains outstanding.

Licenses and Permits means (A) all zoning and other licenses, permits, certificates of occupancy, approvals, dedications, subdivision maps and entitlements required, issued, approved or granted by any Agency or otherwise required in connection with the Project; (B) documents pertaining to any and all development rights and other intangible rights, titles, interests, privileges and appurtenances owned by the Partnership and in any way related to or used in connection with the Project; and (C) all licenses, consents, easements, rights of way and approvals required from private parties and required in connection with the operation, development and the construction and/or rehabilitation of the Project.

8

Limited Partner means any ILP, SLP or Substitute Limited Partner.

Low Income Unit shall have the meaning set forth in Section 42(i)(3) of the Code.

Minimum Set-Aside Test means the set-aside test selected by the Partnership pursuant to Section 42(g) of the Code whereby at least 40% of apartment units in the Project must be occupied by individuals with income equal to no more than 60% of area median income, as adjusted for family size.

Mortgage Loan Commencement means the first date on which all of the following shall have occurred:

(a)     Following Final Construction Completion and lease-up of the Project, the Lender has determined the final principal amount and maturity date of the Permitted Loan, which principal amount shall not exceed that which would result in a Debt Service Coverage of not less than 120% for ninety (90) days prior to commencement as confirmed in writing by the SLP;

(b)     All interest which shall have accrued during construction of the Project under any Permitted Loan shall have been either paid or capitalized and added to the principal amount due thereunder;

(c)     All fees due and payable to the Lender by the Partnership have been paid;

(d)     Written evidence reasonably satisfactory to the SLP indicating full repayment of the Construction Loan and the lien securing the Construction Loan has been discharged;

(e)     The Bridge Loan has been repaid in full; and

(f)     Evidence the conditions to closing and funding the First Mortgage Loan, as set forth in the First Mortgage Loan Documents, have been satisfied.

Net Cash Flow means Operating Revenue less (a) Operating Expenses (including Replacement Reserve Account required amounts), (b) Debt Service and (c) Capital Expenditure payments to the extent not paid from any applicable reserve or other source in the Project Budget.

Net Cash Proceeds means the net cash (including collection of both principal and interest on any deferred payments) received by the Partnership from a Sale or Refinancing, after payment of all expenses related thereto.

Net Loss means the net loss of the Partnership from its activities, other than a Sale, as determined in accordance with the regulations under Section 704(b) of the Code using the method of accounting used by the Partnership for regular federal income tax purposes.

Net Loss From Sale means the net loss of the Partnership recognized from a Sale, as determined in accordance with the regulations under Section 704(b) of the Code using the method of accounting used by the Partnership for federal income tax purposes.

Net Profit means the net profit of the Partnership from its activities, other than a Sale, as determined in accordance with the regulations under Section 704(b) of the Code using the method of accounting used by the Partnership for regular federal income tax purposes.

Net Profit From Sale means the net profit of the Partnership recognized from a Sale, as determined in accordance with the regulations under Section 704(b) of the Code using the method of accounting used by the Partnership for regular federal income tax purposes.

ODG Cap means the amount provided in the Schedule.

ODG Period means the period commencing on Stabilized Occupancy and ending on the ODG Period End Date.

ODG Period End Date means the first day upon which, for a period of two (2) consecutive quarters (commencing not earlier than six (6) months prior to the 60-month anniversary of Stabilized Occupancy), the achievement of the following for each such quarters: (a) monthly Debt Service Coverage of 120% or greater, (b) monthly average physical occupancy of at least 90% of the units by tenants (who must be Qualified Tenants in the case of the Low Income Units) paying contract rents under written leases, and (c) monthly average Economic Occupancy of at least 80%; provided the balance in the Operating Reserve Account must be an amount not less than the Operating Reserve Amount on the last day of such two (2) consecutive quarter period.  For purposes of the foregoing calculations, the calculation of Debt Service Coverage shall be based on then current Project operations, provided that such operations accurately reflect historic operating history and trends, current actual taxes and insurance, and an economic vacancy of 5% gross potential rents.  Evidence of ODG Period End Date shall be subject to review and reasonable approval by the SLP to confirm that the calculations conform to the requirements herein.

100% Occupancy Date means the first date upon which not less than 100% of the Low Income Units shall have been leased to and physically occupied at least once by Qualified Tenants at rents meeting the requirements of the Rent Restriction Test, provided that on the "100% Occupancy Date" not less than 93% of the units in the Project shall be physically occupied by tenants (who must be Qualified Tenants in the case of Low Income Units).  Evidence of the eligibility of each tenant shall have been provided to and approved by the SLP on a tenant certification form (which form shall include a copy of each tenant's executed lease) approved by the SLP in accordance with Section 10.7(b) and, if required, by each Lender and Agency.

Operating Deficit means for any period the total amount by which (i) the sum of the Partnership's Operating Expenses and Debt Service exceeds (ii) Operating Revenue during such period.

Operating Deficit Obligations shall bear the meaning set forth in Section 4.9(e).

Operating Expenses means for a specified period (using the accrual basis of accounting and ensuring that costs and expenses are paid on a current basis) all of the costs and expenses incident to the ownership and operation of the Project in accordance with the provisions of this Agreement, including, without limitation, monthly deposits required to fund the Replacement Reserve Account and required deposits to fund any other reserves required hereunder or by any Lender or Agency, reasonable monthly reserves for real estate taxes (based on the appraisal district's full assessed value of the Project once fully completed), and insurance premiums, costs of maintenance (including any deferred maintenance) and utilities, costs of administration of the Partnership (including the fees of the Accountants), all property management fees, supportive service expenses, leasing fees, compliance monitoring fees, all sales, excise and other taxes payable by the Partnership (but excluding income taxes of the Partners) and all other costs, expenses, and payments by the Partnership (except as actually reimbursed by tenants) in connection with the ownership, management, leasing, operation, and administration of the Project and/or any other assets of the Partnership; provided, however, that Operating Expenses shall exclude depreciation and other non-cash charges, Debt Service, initial funding or replenishment of the Operating Reserve Account, Development Costs, and any other fees or payments contingent on available Net Cash Flow or that are paid from a permitted reserve already included in the calculation of Operating Expenses.  For purposes of determining Stabilized Occupancy, all Operating Expenses will be calculated for each month on an individual expense line-item basis at the higher of (i) actual monthly operating expense for such line item, or (ii) the annual "Base Expenses" outlined in the Project Forecast for such line item divided by 12.  If the Lender requires a reappraisal, the SLP reserves the right to adjust the "Base Expenses" accordingly.  Furthermore, the SLP shall adjust Operating Expenses on a line-item basis in its discretion to reflect a ratable share of any seasonal expenses.  Notwithstanding the foregoing adjustments to Operating Expenses, the SLP shall use actual expenses with respect to the following expense line items:

(a)      real estate taxes, provided such taxes reflect the appraisal district's assessed value and tax rates of the fully completed Project;

(b)      insurance, provided that the actual expense reflects a monthly prorated share of the annual premium and the insurance premiums reflect insurance coverages for the Project complying in all respects with the requirements of Section 6.5(b) and Exhibit 6; and

(c)      property management fees, provided the actual expense is no less than 2.72% of monthly Operating Revenue.

Operating Reserve Account means the reserve account required pursuant to Section 6.5(c)(2).

Operating Reserve Amount means the amount stated on the Schedule.

Operating Revenue means actual collected rental revenue (except Section 8 payments and voucher certificates payable by the U.S. Department of Housing and Urban Development and rural development rental subsidies provided by the U.S. Department of Agriculture which will be included on an accrual basis) received from the operations of the Project, plus all collected Ancillary Income and the proceeds of any rental loss insurance paid to the Partnership.  Operating Revenue shall exclude Net Cash Proceeds, Capital Contributions, proceeds of any Permitted Loan, insurance or condemnation proceeds (except rental loss insurance), tenant security and other deposits (unless forfeited in accordance with the tenant's lease), prepaid items of income (provided, such prepaid items shall no longer be considered prepaid on or after the date in which payment of such item is due), and interest income not available for distribution.  For purposes of determining Stabilized Occupancy, the SLP shall adjust Operating Revenue in its discretion to:

(a)      exclude rent which is paid by any tenant of a Low Income Unit who is not a Qualified Tenant which is in excess of rents charged for comparable Low Income Units;

(b)      adjust rental income by any concessions or other incentives at the Project;

(c)      reflect economic vacancy (physical vacancy and bad debt) at the higher of actual or 5% of gross potential rents;

(d)      unless otherwise included in the Limited Partners' underwriting, reduce actual gross potential rental income on each residential unit to the extent any rental subsidy, voucher payment or other excess rent or subsidy exceeds the lesser of (i) rents being charged to other non-rent assisted units of similar size in the Project and (ii) low income restrictions required by the Minimum Set-Aside Test, the Agency Set-Aside Test, the Rent Restriction Test, any rent restriction required by any applicable federal, state or local subsidy program, and/or any restrictive covenant or regulatory agreement; provided that the foregoing shall not be deemed to exclude income relating to the HAP Contract, as such income was included in the Limited Partner's underwriting; and

(e)      reduce actual gross potential rental income on each residential unit to the extent any accrued rental subsidy payment has not been subsequently collected or the unpaid subsidy exceeds three months of subsidy payment for such residential unit.

Original Agreement means the agreement so identified in the Schedule.

Original Certificate means the certificate so identified in the Schedule.

Original Limited Partner means the Person so identified in the recitals of this Agreement in the capacity as an original limited partner of the Partnership, withdrawing as such pursuant to this Agreement.

Out-Of-Balance means at any point in time that Development Costs for the Project exceed available Development Funds.

Partner means any General Partner or Limited Partner.

Partnership means the limited partnership continued under this Agreement.

Partnership Act means the applicable limited partnership act of the State.

Partnership Management Fee shall have the meaning set forth in Section 6.8(c).

11

Partnership Manager means the Partner designated to perform certain management services as provided in Section 6.10.

Permitted Loan means the loan(s) so identified in the Schedule and any other financing for which the SLP has provided Consent. At any time when there is more than one Permitted Loan, the term "Permitted Loan" as used herein shall refer to each such Permitted Loan (individually and collectively, as circumstances may require).

Person means an individual, proprietorship, trust, estate, partnership, joint venture, association, corporation, limited liability company, limited liability partnership or other entity.

Placement In Service means the placement in service of all dwelling units in the Project for purposes of Section 42 of the Code.

Placement In Service Date means the date as identified in the Schedule.

Plans and Specifications means all plans and specifications or scope of work (for rehabilitations only) for the Project prepared by the Project Architect and/or Builder, as applicable, reviewed by the Construction Consultant, and approved by the SLP, a listing of which is attached hereto as Exhibit 4 including Qualifications and Clarifications included in the Construction Contract. Unless it has received Consent from the SLP, the General Partner shall not permit the Builder to use any other plans and specifications to build the Project and all change orders, revisions and other modifications (other than the Qualifications and Clarifications included in the Construction Contract) shall not become part of the Plans and Specifications unless the Consent of the SLP has been received in accordance with Section 10.7.

Prime Rate means the "prime rate" of interest as published in *The Wall Street Journal* from time to time.

Project means the Property, together with the improvements existing or to be constructed or rehabilitated on the Property.

Project Architect means the firm so identified in the Schedule, or such other architect for the Project as may be selected by the Partnership with the Consent of the SLP.

Project Budget means the final detailed budget for the development and construction/rehabilitation of the Project which is reflected in the sources and uses section of the Project Forecast as said budget may be modified with the Consent of the SLP and, to the extent required under any Permitted Loan, each Lender.

Project Documents means all documents, instruments and agreements that the Partnership is bound to comply with and which have previously received the Consent of the SLP and shall include, but is not limited to, the Permitted Loan documents and other agreements entered into by the Partnership with any Lender or Agency, the Guaranty, the Development Agreement, the Property Management Agreement, the Plans and Specifications, the Architectural Contract, the Construction Contract, the Project Budget, the HAP Contract, Extended Low Income Housing Use Commitment and all material documents relating to the construction, development and operation of the Project and by which the Partnership is bound, as amended or supplemented from time to time.

Project Forecast means the financial forecast attached hereto as Exhibit 8.

Property means the real property described on Exhibit 1 attached hereto.

Property Management Agreement means the agreement by and between the Partnership and the Property Manager providing for the management of the Project.

Property Manager means the party so identified in the Schedule, and its successors and assigns, which has contracted or will contract with the Partnership to manage the Project.

Qualified Basis shall have the meaning defined in Section 42(c) of the Code.

12

Qualified Tenants means tenants meeting the income and eligibility requirements imposed by Section 42 of the Code, the Agency Set-Aside Test and the Tax Credit Agency.

Quarterly Status Report shall bear the meaning set forth in Section 10.7(c)(1)(iv).

Refinancing means the refinancing or obtaining of any loan secured by Partnership property, other than the refinancing of or the obtaining of the Permitted Loan.

Relinquished Interests shall bear the meaning set forth in Section 9.1.

Rent Restriction Test means the test under Section 42 of the Code pursuant to which the gross rent, including utility allowances, charged to tenants of each Low Income Unit in the Project is not allowed to exceed 30% of the qualifying income levels of such tenants and the applicable area median income levels under the Minimum Set-Aside Test.

Rental Subsidy Reserve Account shall mean the reserve account required pursuant to Section 6.5(c)(3).

Replacement Reserve Account means the account established in accordance with Section 6.5(c)(1).

Reporting Damages shall bear the meaning set forth in Section 10.11.

Reporting Default shall bear the meaning set forth in Section 10.11.

Sale means the sale, exchange, condemnation or similar eminent domain taking, casualty or other disposition of all or any portion of the Project which is not in the ordinary course of business, and the sale of easements, rights of way or similar interests in the Property or any other similar items which in accordance with the accounting methods used by the Partnership are attributable to capital; provided, however, that Sale shall not refer to any transaction to the extent gain or loss is not recognized, or is elected not to be recognized, under any applicable section of the Code.

Schedule means the Schedule attached hereto.

Seller Loan means the loan so identified in the Schedule.

Service Contracts shall bear the meaning set forth in Section 6.5(aa).

SLP means the entity so identified in the recitals of this Agreement, and any Person who becomes an SLP as provided herein, in its capacity as a limited partner of the Partnership.

Stabilized Occupancy means, for the period of three (3) consecutive months commencing immediately prior to Mortgage Loan Commencement, the achievement of (a) monthly Debt Service Coverage of 120% (or such greater Debt Service Coverage if necessary to achieve a projected 120% Debt Service Coverage throughout the Compliance Period), (b) monthly average physical occupancy of at least 90% of the units by tenants (who must be Qualified Tenants in the case of the Low Income Units) paying contract rents under written leases, and (c) monthly average Economic Occupancy of at least 80%. Evidence of Stabilized Occupancy shall be subject to the reasonable review and approval by the SLP to confirm that the calculations conform to the requirements herein.

State means the state in which the Partnership was formed.

Subordinated Loan means any loan made by the General Partner (or by the Guarantor for a General Partner obligation) to the Partnership as provided herein, but specifically excludes the GP Predevelopment Loan and the Seller Loan.

Substitute Limited Partner means a Person admitted to the Partnership as a Substitute Limited Partner pursuant to Article VIII.

13

Supplemental Limited Partner means the holder of an interest in the Partnership designated as an interest of a Supplemental Limited Partner pursuant to Section 9.4.

Tax Counsel means the law firm selected by the SLP to serve as tax counsel for the Limited Partner.

Tax Credit means the low income housing tax credit pursuant to Section 42 of the Code which is anticipated to be available to the Partnership.

Tax Credit Agency means the authorized agency of the state in which the Property is located with respect to the allocation and monitoring of Tax Credit.

Tax Credit Price means the amount provided in the Schedule.

Tax Dispute shall bear the meaning set forth in Section 6.10(b)(5).

Tax Matters Partner means the General Partner designated as the tax matters partner of the Partnership for purposes of Code Section 6231(a)(7)(B) or the designated successor, as described in Section 6.10.

10% Test Certification means the written certification of the Accountants, indicating the Partnership had incurred capitalizable costs with respect to the Project of at least 10% of the Partnership's reasonably expected basis in the Project as of the Placement In Service Date.  The 10% Test Certification shall be accompanied by detailed calculations and supporting documentation reasonably acceptable to the SLP and Tax Counsel and, to the extent available, written confirmation from the Tax Credit Agency that the 10% test has been satisfied.

Termination Date means December 31, 2100, unless the Partnership is otherwise earlier dissolved and terminated by law or in accordance with the provisions of this Agreement.

Timing Adjuster Additional Credit shall have the meaning set forth in Section 3.5(c)(2).

Title Policy means an owner's extended title insurance policy or an endorsement thereto issued to the Partnership pursuant to title commitment no. 82913000800A with an effective date not earlier than the Closing Date, in the insured amount of at least $56,328,130 from Chicago Title of Texas, LLC, as agent for Chicago Title Insurance Company evidencing the Partnership's ownership of the Project subject only to such exceptions, conditions, exclusions, or stipulations as shall be satisfactory to the SLP, in its reasonable discretion, and including to the extent available in the State, non-imputation, Fairway, survey/identicality, comprehensive, environmental liens, mechanic's liens, maximum loss, access, location, contiguity, separate tax lot, subdivision, future advance and such other endorsements as shall be required by the SLP in its reasonable discretion, with such policy and such endorsements being acceptable to the SLP, in its reasonable discretion, both as to form and as to content. Affirmative coverage will be required for any easement which cannot be plotted on the survey. All "pre-printed" or "standard" exceptions must be deleted from the Title Policy and any property tax exceptions should be limited to taxes that are "not yet due and payable." Any tenant's rights exception must contain a qualification that such rights are "to leaseholds of parties in possession, as tenants only, under unrecorded leases."

Title Policy Update means a date-down endorsement of the Title Policy bearing a then-current effective date and the deletion of all standard survey exceptions unless previously provided, and, if necessary, a current ALTA Survey showing the location of any easements appearing on such date-down endorsement; provided, however, that to the extent the Property is located in a state in which date-down endorsements are unavailable, a "title report" or "title update" shall be required.

Transfer Amendment means, if applicable, an amendment to this Agreement evidencing a transfer by the ILP of its interest in the Partnership, the form of which is attached hereto as Exhibit 7.

Treasury Regulations means the regulations promulgated under the Code.

14

## ARTICLE III

## CAPITAL

3.1.    Capital Contributions of the General Partner.  On or prior to the Closing Date, the General Partner has made Capital Contributions totaling $100 to the Partnership.  The General Partner shall be obligated to make additional Capital Contributions to the Partnership in an amount equal to amounts owed on each Affiliate Loan on the maturity date thereof.  The General Partner shall also be obligated to make additional Capital Contributions to the Partnership no later than the 13th anniversary of Final Construction Completion in the event that any portion of the Development Fee remains unpaid on such date as further described in Section 6.8.  In no event shall the General Partner make any additional Capital Contributions to the Partnership without the Consent of the SLP except as otherwise required herein.

3.2.    Capital Contributions of the Limited Partner.

(a)    Capital Contributions.  Except as otherwise provided in Section 3.5, the ILP's obligation to make Capital Contributions shall be limited to $18,698,130.  The SLP's obligation to make Capital Contributions shall be limited to $10, which shall be contributed on behalf of the SLP by the ILP as part of the First Installment.  The SLP shall reimburse the ILP for such Capital Contribution.  The ILP's Capital Contributions shall be due and payable in Installment(s) as follows:

(1)    $2,804,720 (the "**First Installment**") shall be paid on an "as needed" draw basis (which may be a single draw) in accordance with Section 10.7, with the first draw paid on or about the Closing Date and subsequent draws paid within ten (10) business days of a draw request submitted by the General Partner in accordance with Section 10.7, that indicates the Partnership has paid or incurred Development Costs in the amount requested to be disbursed from such Installment.

(2)    $11,443,256 (the "**Second Installment**") shall be paid on an "as needed" draw basis in accordance with Section 10.7 after the prior Installment has been fully disbursed and within ten (10) business days after receipt and acceptance by the SLP of evidence that each of the following conditions has been satisfied:

(i)    Final Construction Completion;

(ii)    as-built ALTA Survey; and

(iii)    permanent property insurance bound in accordance with Exhibit 6;

(iv)    10% Test Certification;

(v)    Title Policy Update;

(vi)    Full funding of amounts intended to be drawn on the Construction Loan and full funding of the Seller Loan, the GP Predevelopment Loan and the City Mortgage Loan;

(vii)    Evidence the Bridge Loan will be fully paid upon funding of the Second Installment; and

(viii)    January 5, 2016.

Upon satisfaction of the above conditions, the Second Installment shall be funded first to repay the Bridge Loan in full in accordance with the terms of the Bridge Loan documents and notwithstanding any other condition or restriction otherwise set forth in this Agreement or any default occurring hereunder.  Said capital shall be paid by the ILP directly to the Bridge Lender on behalf of the Partnership.  In no event shall any portion of the Second Installment be used to satisfy any obligation of the Partnership until the Bridge Loan is repaid in full.

(3)     $3,982,702 (the "**Third Installment**") shall be paid after the prior Installment has been fully disbursed and within ten (10) business days after receipt and acceptance by the SLP that each of the following conditions have been satisfied:

    (i)     Stabilized Occupancy;

    (ii)     Mortgage Loan Commencement;

    (iii)     satisfactory completion of all punch list items previously determined at Final Construction Completion, as certified by the Project Architect and verified in writing by the Construction Consultant, and receipt of all final unconditional lien waivers from the Builder and all subcontractors;

    (iv)     permanent property insurance bound in accordance with Exhibit 6;

    (v)     100% Occupancy Date;

    (vi)     Cost Certification;

    (vii)     Title Policy Update;

    (viii)     8609 Application Filing; and

    (ix)     April 5, 2016.

(4)     $467,453 (the "**Final Installment**") shall be paid after the prior Installment has been fully disbursed and within ten (10) business days after receipt and acceptance by the SLP that each of the following conditions have been satisfied:

    (i)     8609 Issuance;

    (ii)     Final Determination has been made by the SLP in accordance with Section 6.7(k) and all Development Completion Obligations, if any, have been satisfied by the General Partner and/or Developer;

    (iii)     delivery of the Partnership's tax return and Schedule K-1 thereto for the first year of the Credit Period to the ILP;

    (iv)     recordation of the Extended Low Income Housing Use Commitment; and

    (v)     Title Policy Update.

(b)     _General Conditions to Capital Contributions_.   Notwithstanding satisfaction of the conditions in Section 3.2(a), the ILP shall have no obligation to fund an Installment or any portion thereof as follows:

(1)     Unless the funding conditions to all previous Installments continue to be satisfied.  If a funding condition is not satisfied at the time an Installment is contributed, such condition shall be a condition to the subsequent Installment or draw.  No funding condition shall be waived with respect to any Installment unless a written notice expressly waiving such condition is issued by the SLP to the General Partner;

(2)     Unless the SLP has received and accepted the Funding Certificate executed by the General Partner (which shall be accepted if such certificate is in the form and substance as the certificate attached hereto as Exhibit 3);

4837-4545-8969.4

(3)     Unless all construction and development work completed as of the date of any funding request shall have been done in accordance with the Plans and Specifications;

(4)     If a Transfer Amendment has been requested, the General Partner has not provided the SLP with its (and its Affiliates) signature pages thereto, provided, that the Transfer Amendment is substantially in the form attached hereto as Exhibit 7;

(5)     If any reports or insurance required by Article X have not been submitted to and accepted by the SLP;

(6)     If any Event of Default has occurred and is continuing;

(7)     If a Lender or Agency has (i) failed to timely fund any portion of any Permitted Loan or grant to the Partnership when due, (ii) provided notice of a default under any financing document entered into with the Partnership, or (iii) provided a notice of denial or termination of any financing commitment to the Partnership;

(8)     If the Project is Out-Of-Balance (as determined by the Lender or SLP); or

(9)     If any Adjustment Amount has not been satisfied (or will not be satisfied from the requested Installment) whether or not the payment or cure period provided herein has lapsed.

(c)     <u>Funding Priority of Each Installment</u>.  Each Installment shall be funded in accordance with the following requirements:

(1)     The SLP and the ILP shall have the right to offset any Installment with any unpaid Adjustment Amount, Investor Services Fees, Reporting Damages and any other amounts levied by the SLP or ILP in accordance with this Agreement; and

(2)     (A) Any portion of the First Installment funded at Closing shall be funded by the ILP to the Partnership by depositing all such funds with the title company for disbursement to the Partnership and any remaining funds not disbursed by the title company to the Partnership shall be deposited into a Partnership bank account established with the Construction Lender, which bank account shall be subject to a security interest in favor of the Construction Lender (the "Construction Escrow"); (B) any portion of the First Installment funded after Closing pursuant to a construction draw request shall be funded by the ILP to the Partnership by depositing all such funds into the Construction Escrow; and (C) any portion of the Second Installment shall be funded by the ILP directly to the Bridge Lender on behalf of the Partnership and any remaining funds after the full repayment of the Bridge Loan shall be deposited into the Construction Escrow, with all Installments or portions thereof funded only upon:

(i)     approval by the SLP pursuant to Section 10.7, and

(ii)    approval by each Lender and any Agency with approval rights thereover, including satisfaction of any draw conditions as may be imposed by any Lender or Agency.

(d)     Notwithstanding the conditions in this Section 3.2, if the Partnership has incurred third party obligations which could be satisfied from the proceeds of an unfunded Installment, then, in the sole discretion of the Limited Partners, such Installment or any portion thereof may be advanced to the Partnership or disbursed directly to pay such outstanding third party obligations of the Partnership, provided in all events such advances or disbursements shall be treated as capital contributions to the Partnership.  Any such advance of an Installment by the Limited Partners shall accrue simple (not compounded) interest at an annual rate equal to the Prime Rate plus 4% commencing on the date on which such Installment proceeds or portion thereof is advanced and ending upon satisfaction of the conditions for such Installment.

3.3.     Capital Account.  A capital account shall be maintained for each Partner (a "**Capital Account**"). The Capital Accounts shall be determined and maintained in accordance with Treasury Regulation Section 1.704-1(b)(2)(iv).

3.4.     Interest.  Except as may be explicitly provided in this Agreement, no Partner shall be entitled to interest on a Capital Contribution or Capital Account.

3.5.     Tax Credit Covenants, Duties and Obligations; Adjustments to Capital Contributions.

(a)     Tax Credit Covenants, Duties and Obligations.  The General Partner shall, or shall cause the Partnership to, timely satisfy each of the following covenants, duties and obligations pertaining to the Tax Credit:

(1)     The General Partner shall ensure that the ILP receives the full amount of the Forecasted Tax Credit (as may be adjusted pursuant to Section 3.5), including, but without limitation: (i) making an election to begin the Credit Period for each building in the Project in the year Placement In Service unless the Consent of the SLP is received to defer the beginning of the Credit Period, (ii) ensuring the rental of Low Income Units to Qualified Tenants, including renting the next available unit to a Qualified Tenant if any Low Income Unit becomes nonqualifying, (iii) obtaining tenant certifications and recertifications as required pursuant to Section 10.7, (iv) leasing all dwelling units in the Project under leases having original terms of not less than six (6) months, and (v) complying with all of the Tax Credit Agency's compliance monitoring procedures.

(2)     The Partnership shall timely submit all applications, cost certifications, 10% test certifications, elections and filings necessary and appropriate to qualify for the maximum amount of the Tax Credit. If temporary and/or final Treasury Regulations have been issued relating to Tax Credit, the General Partner shall execute an amendment to this Agreement to comply with such regulations, if requested to do so by the SLP, to ensure the maximum availability of Tax Credit to the Partnership and the ILP.

(3)     The Project will be constructed and operated in conformance with the Tax Credit application, including any amendments thereto approved by the Tax Credit Agency and the SLP, and other documents submitted to the Tax Credit Agency.

(4)     The allocation of Tax Credit is not pursuant to the "non-profit set-aside" provisions of Section 42 of the Code.

(5)     Carryover Allocation occurred by December 31, 2013.  8609 Issuance shall occur by December 31st of the year following the first year of the Credit Period unless the delay is caused by the Agency and the General Partner is using commercially reasonable efforts to obtain the same.

(6)     The Partnership's basis in the Project (including costs attributable to land and depreciable basis which are not eligible for the Tax Credit) as of the date no later than the earlier of (a) the date required by the Tax Credit Agency and (b) the twelve (12) month anniversary of the Carryover Allocation will exceed 10% of the Partnership's reasonably expected basis in the Project as of the Placement In Service Date.  The General Partner shall provide a draft of the 10% Test Certification to the SLP at least twenty (20) days prior to the earlier of (a) and (b).  General Partner covenants it will not file the 10% Test Certification with the Tax Credit Agency until the draft 10% Test Certification has been approved by the SLP and Tax Counsel in their reasonable discretion; except that the General Partner shall be permitted to file the 10% Test Cost Certification with the Tax Credit Agency if the SLP and/or Tax Counsel have not responded to the draft documents by the deadline for submission to the Tax Credit Agency.

(7)     The Partnership will properly incur and capitalize costs in connection with the construction and/or rehabilitation and development of the Project in an amount needed to generate sufficient Eligible Basis to support the Forecasted Tax Credit (as may be adjusted pursuant to Section 3.5).

(8)    No portion of the Development Fee shall be allocable to services that relate to items not includable in Eligible Basis and 20% of such Development Fee shall be earned as of the date hereof.  All services relating to the acquisition of the Project, the organization of the Partnership, the syndication of interests in the Partnership, and obtaining permanent financing of the Project were and/or will be performed exclusively by the General Partner in its capacity as a General Partner.

(9)    No grants or federal subsidies (within the meaning of Section 42(i)(2)(A) of the Code) will be received by the Partnership.

(10)    No portion of the cost of the acquisition, construction or operation of the Project has been (or will be) funded with obligations the interest on which is exempt from taxation under Section 103 of the Code.

(11)    The Project has no commercial space.

(12)    The General Partner shall submit to the SLP the completed final draft of the Extended Low Income Housing Use Commitment at least ten (10) business days prior to the required date for execution and recording thereof, and shall obtain the Consent of the SLP prior to executing and recording the same. Notwithstanding the foregoing the General Partner may file the Extended Low Income Housing Commitment by the deadline therefor under Section 42 if the SLP has not provided a timely response.

(13)    The Project shall satisfy the Minimum Set-Aside Test and the Rent Restriction Test by the end of the first year of the Credit Period and throughout the balance of the Compliance Period and the Agency Set-Aside Test for the time period required by the Agency.

(14)    The Partnership will rent the Low Income Units only to Qualified Tenants and in compliance with any additional restrictions set forth in the Project Documents.  The General Partner will promptly advise the ILP and the SLP if any Low Income Unit is rented to a non-qualifying tenant.

(15)    The Project is located in an area designated by HUD as a "qualified census tract" or "difficult development area" for the purpose of computing Eligible Basis of the Project.

(b)    Downward Adjustments to Capital Contributions.

(1)    Downward Basis Adjuster.  If at any time at or prior to 8609 Issuance the SLP determines in its reasonable judgment that the ILP will not be eligible to be allocated the aggregate amount of Forecasted Tax Credit during the Credit Period (the aggregate amount of such shortfall being referred to herein as the "**8609 Credit Shortfall Amount**"), then (a) the Capital Contribution obligation of the ILP shall be reduced by an amount (an "**Adjustment Amount**") equal to the product of (i) the 8609 Credit Shortfall Amount and (ii) the Tax Credit Price and (b) the Forecasted Tax Credit for each Fiscal Year shall thereafter be adjusted to mean 99.99% of the total amount of Tax Credit allocated and available to the Partnership over the Credit Period, assuming for these purposes that the Delivery Percentages do not change regardless of the actual delivery schedule.

(2)    Downward Timing Adjuster.  In the event that the ILP is entitled to claim Tax Credit for 2015, 2016 and/or 2017 with respect to the Project in an amount less than the Forecasted Tax Credit for such year (after the Forecasted Tax Credit is revised to take into account any adjustment made pursuant to Section 3.5(b)(1) and/or Section 3.5(c)(1), as applicable) as the result of a later-than-anticipated delivery of Tax Credit and the shortfall will be deferred pursuant to Section 42(f)(2)(B) of the Code, then (a) the Capital Contribution obligation of the ILP will be reduced by an amount (an "**Adjustment Amount**") equal to the difference between (i) the shortfall in the Forecasted Tax Credit to the ILP in 2015, 2016 and/or 2017 and (ii) the present value of the increase in the Forecasted Tax Credit for Fiscal Year 2025, 2026 and/or 2027 to the ILP computed as of December 31, 2015, 2016 and/or 2017, as applicable, attributable to the shortfall in Tax Credit for Fiscal Year 2015, 2016 and/or 2017 using a discount factor of 10% compounded annually and (b) the Forecasted Tax Credit shall be correspondingly updated.

(3)    Compliance, Recapture and 2/3rd Adjuster.  If, with respect to any year during the Compliance Period, the Actual Tax Credit allocated to the Limited Partner is, will be or was less than the Forecasted

19

Tax Credit (after the Forecasted Tax Credit has been revised in accordance with Section 3.5), for any reason, including, but not limited to, any breach of any of the covenants, duties or obligations set forth in Section 3.5(a), any reduction in Qualified Basis and/or Eligible Basis, any application of 2/3rds credits, any further delay in the timing and delivery of Tax Credit beyond what is provided for in Section 3.5(b)(2) (regardless of whether such Tax Credit may be available in later years) and/or any disallowance or recapture of any Tax Credit, then the Capital Contribution obligation of the ILP shall be reduced by an amount (an "**Adjustment Amount**") equal to (a) the shortfall in Forecasted Tax Credit for such year, plus (b) the amount of any Tax Credit previously allocated to the ILP that is recaptured or otherwise disallowed (to the extent not otherwise taken into account in determining the Adjustment Amount pursuant to this subsection), plus (c) the amount of interest and penalties payable by the ILP (or its Partners) as a result of such shortfall or recapture such calculation to be made assuming that each limited partner of the ILP used all of the Tax Credit allocated to such limited partner in the year of allocation and that each such limited partner was subject to interest at the rate set forth in Section 6621(a)(2) of the Code and the penalty for understatement of tax set forth in Section 6662(d) of the Code, plus (d) an amount sufficient to pay any tax liability (calculated at an assumed tax rate of 40%) owed by the ILP (or its partners) resulting from the receipt of the amounts specified in the foregoing clauses (a), (b) and (c) and this clause (d). The General Partner shall require the Accountants to make their determination of the amount of the Actual Tax Credit with respect to each year of the Credit Period within thirty (30) days following the end of such Fiscal Year.

(4)  Payment of Adjustment Amounts.  Any Adjustment Amount shall be applied to the Installment or portion thereof next due to be paid by the ILP (other than the portion of the Second Installment required to be paid to the Bridge Loan), with any portion of such Adjustment Amount in excess of the amount of such Installment then being applied to the next succeeding Installment(s), provided that if no further Installments remain to be paid or if the Adjustment Amount exceeds the sum of the amounts of the remaining Installments, then the General Partner shall immediately make a Capital Contribution to the Partnership in the amount of the entire Adjustment Amount or the balance of the Adjustment Amount, as the case may be (a "**Credit Adjuster Obligation**"), and the entire Credit Adjuster Obligation shall be immediately distributed to the ILP and shall neither constitute nor be limited by Net Cash Flow or Net Cash Proceeds.  Provided, if the Accountants determine that the Capital Contribution and distribution contemplated by the immediately preceding sentence, or applying any Adjustment Amount against the ILP's next due Installments, would at any time prevent the ILP from being allocated 99.99% of Net Losses, Net Losses From Sale, and Tax Credit, then the General Partner shall pay such portion of the Credit Adjuster Obligation as is determined by the Accountants to be necessary to avoid the reallocation directly to the ILP as a payment for damages (and the remaining portion of the Credit Adjuster Obligation shall be applied to the next due Installment or contributed by the General Partner as a Capital Contribution, as provided in the immediately preceding sentence).

(5)  Notwithstanding anything to the contrary contained in this Agreement, the General Partner shall not be responsible: (i) for the ILP's inability to utilize any Tax Credit allocated to it; (ii) for any recapture of Tax Credit arising solely as a result of the ILP's sale, transfer or assignment of its interest in the Partnership; or (iii) to the extent that any Credit Adjuster Obligation is solely attributable to a Change in Law.  Any portion of a Credit Adjuster Obligation solely attributable to a Change in Law shall be payable to the ILP pursuant to Section 4.2 and Section 4.5.

(c)  Upward Adjustments to Capital Contributions.

(1)  Upward Basis Adjuster.  In the event that the Partnership receives an amount of Tax Credit with respect to the Project in addition to the aggregate of the Forecasted Tax Credit, as updated as provided herein (such additional amount being referred to hereinafter as the "**Additional Credit**"), the ILP agrees that it will make additional Capital Contributions to the Partnership in an amount equal to the product of the Tax Credit Price and the aggregate Additional Credit allocable to the ILP over the Credit Period.  Upon application of this Section 3.5(c)(1), the Forecasted Tax Credit for each year shall be redefined to mean 99.99% of the total amount of Tax Credit, including the Additional Credit to be allocated and available to the Partnership over the Credit Period, assuming for these purposes that the Delivery Percentages do not change regardless of the actual delivery schedule. Notwithstanding the foregoing, there shall be no additional Capital Contributions due under this Section 3.5(c)(1) unless the increase is supported by appropriate documentation and by a certification of the Accountants, all in form and substance reasonably acceptable to the SLP, and the support documentation shall have been received by the SLP no later than the three-year anniversary of the Closing Date.

20

(2)     Upward Timing Adjuster.  In the event that the Partnership allocates on Schedule K-1 to Form 1065 to the ILP Tax Credit for 2015 in an amount greater than the Forecasted Tax Credit (after the Forecasted Tax Credit is revised to take into account any adjustment made pursuant to Section 3.5(b)(1) and/or 3.5(c)(1)) as the result of an earlier-than-anticipated delivery of Tax Credit (such additional amount being referred to hereinafter as the "**Timing Adjuster Additional Credit**"), the ILP agrees that it will make additional Capital Contributions to the Partnership in an amount equal to the present value of the Timing Adjuster Additional Credit computed as of December 31, 2015, of receiving the Timing Adjuster Additional Credit on December 31, 2025 using a discount factor of 10% compounded annually.  Upon any application of this Section 3.5(c)(2), the Forecasted Tax Credit shall be correspondingly updated.

(3)     In no event will the ILP be obligated to make additional Capital Contributions pursuant to Section 3.5(c) in an amount in excess of 10% of the total Capital Contributions set forth in Section 3.2(a).  Any additional Capital Contributions determined pursuant to Section 3.5(c) shall be added to the Final Installment or such earlier date determined by the ILP in its sole discretion; and provided, further, that if the Final Installment has been paid, then the entire amount of such additional Capital Contributions shall be made by the ILP to the Partnership within thirty (30) days after the determination of the amount thereof.

3.6.     Security Interest.

(a)     Each of the ILP and the SLP hereby grants to the Partnership a security interest in their respective interests in the Partnership, together with all of their right, title and interest in and to the Tax Credits, any tax credits available pursuant to Section 48 of the Code, all comparable state or local tax credit or tax incentives available to be allocated by the Partnership to the ILP and/or the SLP, all tax benefits and other property rights and distributions, and all of the proceeds and products thereof that would be available for distribution or allocation to the ILP and/or the SLP, on account of such interests, and all payments due or paid to the ILP and/or the SLP or any of either of their Affiliates by the Partnership as fees, returns of capital, distributions, repayments of loans or advances or for any other purpose, all in order to secure the ILP's obligations to fund the Installments of its Capital Contributions hereunder, and all on the express condition that the Partnership assign such security interests to PNC Bank, National Association as contemplated in Section 3.6(c) and Section 3.6(d).  The General Partner shall register the pledge of the ILP's and the SLP's interests in the Partnership to the Partnership, as set forth in this Section 3.6, upon the books of the Partnership.  The security interests granted under this Section 3.6 shall terminate automatically upon repayment in full of the Bridge Loan.

(b)     The General Partner hereby consents to the pledge by the ILP and the SLP of their Partnership interests to the Partnership, as set forth in Section 3.6(a).

(c)     The Partners hereby consent to the pledge by the General Partner of its Partnership interest to PNC Bank, National Association and consent to the assignment of Capital Contribution proceeds by the Partnership to PNC Bank, National Association and to the assignment by the Partnership to PNC Bank, National Association of the Partnership's security interests in the Partnership interests of the ILP and the SLP, as set forth in Section 3.6(a).

(d)     The Partners hereby consent to the pledge by the Partnership and the General Partner of all of their respective right, title and interest in and to the Tax Credits, any tax credits available pursuant to Section 48 of the Code, all comparable state or local tax credit or tax incentives available to the Partnership, the Project or the Partners thereof, all tax benefits and other property rights and distributions, and all of the proceeds and products thereof that would be available for distribution or allocation to any of the Partners of the Partnership.

**ARTICLE IV**

**ALLOCATION OF PROFIT AND LOSS; DISTRIBUTIONS**

4.1.     Allocation of Net Profit and Net Loss.

(a)     Except as otherwise provided herein, all Net Profit and Net Loss, and each item of income, gain, loss, deduction and/or credit, shall be allocated 0.01% to the General Partner and 99.99% to the ILP.

(b)        In no event shall any Partnership loss or deduction, or item thereof, be allocated to the ILP or the SLP if, or to the extent, such allocation would cause or increase a deficit balance in such Limited Partner's Capital Account (in excess of any limited dollar amount of such deficit balance that such Limited Partner is obligated to restore under Treasury Regulation Section 1.704-1(b)(2)(ii)(c)) or pursuant to a DRO Notice, if applicable, as of the end of the Partnership taxable year to which such allocation relates, unless such loss, deduction or item constitutes a "nonrecourse deduction" as defined in Treasury Regulation Section 1.704-2(c). For purposes of this limitation, each such Limited Partner's share (determined in accordance with Treasury Regulation Section 1.704-2(g)(1)) of the Partnership's "minimum gain," as defined in Treasury Regulation Section 1.704-2(d), shall be treated as an amount that such Limited Partner is obligated to restore. Any loss or deduction to such a Limited Partner, the allocation of which is disallowed by the foregoing restriction, shall be reallocated first to other Limited Partners, to the extent such allocation is not limited by this subparagraph, and then to the General Partner.

(c)        In determining the extent to which an allocation of loss or deduction (other than an allocation attributable to nonrecourse debt) would otherwise reduce a Limited Partner's Capital Account below zero for purposes of Section 4.1(b), such Limited Partner's Capital Account shall first be reduced (but only for purposes of this subparagraph) for:

(1)        any allocations of loss and deduction that, as of the end of such Fiscal Year, reasonably are expected to be made to such Limited Partner under Sections 704(e)(2) and 706(d) of the Code and Treasury Regulation Section 1.751-1(b)(2)(ii); and

(2)        any cash distributions that, as of the end of such Fiscal Year, reasonably are expected to be made to such Limited Partner, to the extent that such distributions exceed offsetting increases to such Limited Partner's Capital Account that reasonably are expected to occur during (or prior to) the Fiscal Years in which such distributions reasonably are expected to be made.

For purposes of determining the amount of expected distributions and Capital Account increases described above, the rules of Treasury Regulation Section 1.704-1(b)(2)(ii)(d) shall apply.

(d)        In the event there is a net decrease in Partnership "minimum gain" (as defined in Treasury Regulation Section 1.704-2(d)) during any Partnership taxable year, each Partner will be allocated items of income and gain, including gross income if necessary (in such year and, if necessary, subsequent years), in proportion to, and to the extent of, such Partner's share of the net decrease in Partnership minimum gain before any other allocation of Partnership items for such taxable year. A Partner is not subject to this mandatory allocation of income or gain to the extent that any of the exceptions provided in Treasury Regulation Section 1.704-2(f)(2)-(5) apply. Such allocations pursuant to this subsection shall be in accordance with Treasury Regulation Section 1.704-2(f). This provision is a "minimum gain chargeback" within the meaning of Treasury Regulation Section 1.704-2(f) and shall be construed as such.

(e)        If the ILP or the SLP unexpectedly receives an adjustment, allocation, or distribution described in any of subdivisions (4), (5), and (6) of Treasury Regulation Section 1.704-(b)(2)(ii)(d) for any Fiscal Year which causes or increases a deficit balance in such Limited Partner's Capital Account in excess of any limited dollar amount of such deficit that such Limited Partner is obligated to restore, as adjusted in the manner provided in or is deemed obligated to restore, under Treasury Regulation Sections 1.704-1(b)(2)(ii)(c), 1.704-2(g) and 1.704-2(i), such Limited Partner shall be allocated items of Partnership income and gain (consisting of a pro rata portion, in accordance with the deficit Capital Account balances of all Limited Partners, of each item of Partnership income, including gross income, and gain for such year) in an amount and manner sufficient to eliminate such Limited Partner's deficit Capital Account balance as quickly as possible. This provision is a "qualified income offset" within the meaning of Treasury Regulation Section 1.704-1(b)(2)(ii)(d)(3) and shall be construed as such.

(f)        In the event there is a decrease in "partner nonrecourse debt minimum gain" (as defined in Treasury Regulation Section 1.704-2(i)) during any Partnership taxable year, each Partner shall be allocated items of income and gain (including gross income) in proportion to and to the extent of such Partner's share of the net decrease in partner nonrecourse debt minimum gain. A Partner is not subject to this Section 4.1(f) to the extent that any of the exceptions provided in Treasury Regulation Section 1.704-2(i)(4) applied consistently with Treasury Regulation Section 1.704-2(f)(2)-(5) apply. All allocations pursuant to this Section 4.1(f) shall be in accordance

22

with Treasury Regulation Section 1.704-2(i).  This provision is a "partner nonrecourse debt minimum gain chargeback" within the meaning of Treasury Regulation Section 1.704-2(i)(4) and shall be interpreted as such.

(g)     Nonrecourse Deductions shall be allocated 99.99% to the ILP and 0.01% to the General Partner.

(h)     Net Profit and Net Loss and specific items of income, gain, loss, deduction and/or credit shall be allocated to a Partner only for that portion of the Fiscal Year for which such Person is a Partner in accordance with applicable Treasury Regulations.

4.2.   Distribution of Net Cash Flow.  Net Cash Flow shall only be distributed in accordance with this Agreement, the Project Documents and any applicable Lender or Agency requirement and only with the Consent of the SLP (which Consent shall not be unreasonably withheld to the extent the proposed distribution is in accordance with the foregoing).  Net Cash Flow shall not be distributed prior to Stabilized Occupancy.  Upon the achievement of Stabilized Occupancy and only if the SLP determines that the Project Budget is not Out-of-Balance and there are no outstanding Development Completion Obligations, cumulative Net Cash Flow (up to the lesser of: (A) $350,000 and (B) 10% of effective gross income from Closing until Stabilized Occupancy) may be released and distributed to the General Partner as an incentive lease-up fee, but only to the extent permitted by HUD, the First Mortgage Lender, the City Loan Lender and the Tax Credit Agency, provided that there is no uncured Event of Default outstanding or other current or anticipated cash shortage; provided, further, to the extent the cumulative Net Cash Flow described above would be sufficient to satisfy any outstanding Development Completion Obligations, such cumulative Net Cash Flow may be released and distributed to the General Partner as an incentive lease-up fee less the amount of any outstanding Development Completion Obligation with such difference being applied toward the satisfaction of the Development Completion Obligation.  Thereafter commencing upon Stabilized Occupancy, Net Cash Flow shall be distributed annually in the order set forth below within forty-five (45) days after the end of each Fiscal Year, but only to the extent permitted by HUD, the City Loan Lender, the First Mortgage Lender and the Tax Credit Agency, and provided that there is no uncured Event of Default outstanding or other current or anticipated cash shortage.  For each Fiscal Year following Stabilized Occupancy, Net Cash Flow (including Net Cash Flow accumulated from all Fiscal Years prior to Stabilized Occupancy and not distributed to the General Partner as an incentive lease-up fee pursuant to this paragraph) shall be distributed in the following order:

(a)     To the ILP as payment of the Investor Services Fee and then to any other amounts owed to the ILP, the SLP or any Affiliates thereof;

(b)     If the balance in the Operating Reserve Account is below the Operating Reserve Amount, to the replenishment of such account until the balance is restored to the Operating Reserve Amount;

(c)     To the Developer as payment of the Deferred Development Fee until payment in full, second, to the repayment of the GP Predevelopment Loan, and third, to the repayment of the Seller Loan;

(d)     To payment of the Partnership Management Fee (including any unpaid amounts accumulated from prior years);

(e)     To the ILP, an amount equal to 40% of the taxable income allocated to the ILP with respect to such year and any amount which would have been distributed under this subclause in any prior year but for there being insufficient Net Cash Flow to do so;

(f)     To the General Partner for any fees, debts or liabilities owed to it (or to the Guarantors as reimbursement of advances made to satisfy General Partner obligations hereunder), including repayment of Subordinated Loans; and

(g)     To payment of the Incentive Management Fee;

(h)     Any remaining Net Cash Flow shall be distributed 10% to the ILP and 90% to the General Partner.

In no event shall more than 90% of Net Cash Flow distributable to Partners for any year be paid or distributed to the General Partner and the foregoing distributions shall be modified to the extent necessary so that the General Partner will receive no more than 90% of such Net Cash Flow, after (c) above, in any year.

4.3.    Allocation of Net Profit on Sale.  Subject to allocations required by Sections 4.1(d), 4.1(e), 4.1(f), and 4.1(g), any Net Profit realized by the Partnership as a result of any of the transactions described in Section 4.5 shall be allocated to the Partners (after having given effect to charges and credits to Capital Accounts resulting from allocations pursuant to Section 4.1 for the Fiscal Year in which the gain is recognized for federal income tax purposes, and to all distributions for such year under Section 4.2 but before giving effect to any distributions under Section 4.5) as follows and in the following order:

(a)    First, if any of the Partners have negative balances in their Capital Accounts, to such Partners on a pro rata basis in proportion to such negative balances until such negative balances have been eliminated.

(b)    Second, any remaining gain shall be allocated so that the Capital Accounts of all Partners equal as nearly as possible the amount of cash each Partner would receive if the aggregate amount of all Capital Account balances were cash available to be distributed pursuant to Section 4.5 (other than distributions to pay debts, fund reserves and pay fees).

4.4.    Allocation of Net Loss From Sale.  Any Net Loss From Sale shall be allocated as follows:

(a)    First, if the Capital Account of any Partner or Partners is a positive number, such loss shall be allocated to those Partners whose Capital Accounts are positive in proportion to the positive balances of each of them, until the balance of each such Partner's Capital Account is equal to zero.

(b)    Then, subject to Section 4.1(b), any remaining loss shall be allocated to the Partners as Net Losses are allocated under Section 4.1.

4.5.    Distribution of Net Cash Proceeds From a Sale or Refinancing.  Except as provided in Section 11.2 in the event of a liquidating distribution, the Net Cash Proceeds shall be distributed and applied in the following order of priority:

(a)    To the payment or provision for payment of the expenses of liquidation and the debts and liabilities of the Partnership then due, excluding obligations to any Partner (but including PNC Bank, National Association as lender) or Affiliates thereof.

(b)    As agreed to between the General Partner and the SLP, to the setting up of a reserve reasonably necessary for any contingent, conditional, or unmatured liabilities or obligations of the Partnership; provided, however, that said reserves shall be for the purpose of disbursing for the payment of any of the aforementioned contingencies and, at the expiration of such period as the SLP and the General Partner shall deem advisable, for the purpose of distributing the balance remaining thereafter as provided for hereinafter.

(c)    To the payment of any accrued but unpaid Investor Services Fees and to any other amounts owed to the ILP, the SLP, or any Affiliates thereof.

(d)    To the ILP, an amount equal to the Exit Taxes and any amounts due to the ILP pursuant to Section 7.7(h) with respect to tax consequences resulting from forgiveness of the Seller Loan and/or GP Predevelopment Loan.

(e)    To the Developer as payment of the Deferred Development Fee until payment in full, second, to the repayment of the GP Predevelopment Loan, and third, to the repayment of the Seller Loan;

(f)    To the payment of any accrued but unpaid Partnership Management Fee (including any unpaid amounts cumulated from prior years) and to any other amounts owed to the General Partner (or to the

24

Guarantors as reimbursement or repayment of advances made to satisfy General Partner obligations under this Agreement), including repayment of Subordinated Loans.

(g)     Finally, any remaining Net Cash Proceeds shall be distributed 10% to the ILP, 0.01% to the SLP and 89.99% to the General Partner.

4.6.     Revaluation of Partnership Property.  Upon the occurrence of (i) a contribution of money or property to the Partnership (after the Closing Date) by a new or existing Partner as consideration for an interest in the Partnership, (ii) a distribution of money or property by the Partnership to a retiring or continuing Partner as consideration for an interest in the Partnership, or (iii) the liquidation of the Partnership, the respective Capital Accounts of all Partners shall be adjusted to reflect a revaluation of Partnership property on the books of the Partnership in the following manner:

(a)     Such adjustments must be based on the fair market value of the property on the date of adjustment;

(b)     The adjustments must reflect the manner in which the unrealized income, gain, loss or deduction inherent in such property (that has not been reflected in the Capital Accounts of the Partners previously) would be allocated among the Partners under this Article IV if there were a taxable disposition of such property for such fair market value on the adjustment date;

(c)     Thereafter, the Capital Accounts of the Partners are adjusted in accordance with Treasury Regulation Section 1.704-1(b)(2)(iv)(g) for allocations to them of depreciation, depletion, amortization and gain or loss, as computed for book purposes, with respect to such property; and

(d)     Thereafter, the Partners' distributive shares of depreciation, depletion, amortization and gain or loss, as computed for tax purposes, with respect to such property shall be determined so as to take account of the variation between the adjusted tax basis and the book value of such property in the same manner as under Section 704(c) of the Code and the Treasury Regulations thereunder and Treasury Regulation Section 1.704-1(b)(4)(i).

4.7.     Consent to Allocations and Distributions.  Each Partner expressly consents to the methods set forth in this Article IV for determining the allocations and distributions of Net Profit, Net Loss, Net Profit From Sale, Net Loss From Sale and Distributions.

4.8.     Allocations and Distributions Within a Class.

(a)     Allocations and Distributions Among Limited Partners.  Whenever Net Profit or Net Loss, Net Profit From Sale, Net Loss From Sale or any item of income, gain, loss, deduction or credit is allocated or an item of cash is distributed to a class of Limited Partners, without regard to the capital account balances of the members of such class, such Net Profit, Net Loss or item shall be allocated or distributed to all members of such class of Limited Partners (treating for purposes hereof the ILP and SLP as separate classes of Limited Partners) in proportion to the amounts of their respective Capital Contributions.

(b)     Allocations and Distributions Among General Partners.  If there should be at any time more than one General Partner, any Net Profit or Net Loss, Net Profit From Sale, Net Loss From Sale or any item of income, gain, loss, deduction or credit shall be allocated and each item of cash shall be distributed, between or among the General Partners as a class, pro rata in accordance with the ratio of the percentage interests of the members of such class, as set forth on Exhibit 2.

4.9.     Miscellaneous.

(a)     Guaranteed Payments.  Notwithstanding anything to the contrary in this Article IV, to the extent that any amounts which are paid or accrued to a Partner for services or for the use of capital by the

25

Partnership are treated as distributions of Partnership income to the Partners receiving such payment, an equal amount of gross income of the Partnership shall be specially allocated to such Partner.

(b)     Tax Elections.  Except as otherwise expressly provided in this Agreement, any federal, state or local tax elections relating to such allocations shall be made by the General Partner with the Consent of the ILP in such manner as will be most advantageous to the ILP so long as such elections are not materially inconsistent with the purposes of the Partnership as set forth in this Agreement.

(c)     Creditors.  Except as otherwise expressly provided in this Agreement, a creditor who makes any loan to the Partnership, including any nonrecourse loan, shall not have or acquire at any time as a result of making such loan any interest in the profits, capital or property of the Partnership other than as a secured creditor if such loan is secured by Partnership assets.

(d)     Imputed Interest.  In the event that there is a determination that interest on any loan between a Partner and the Partnership is imputed at a rate higher than the rate actually charged on such loan, the excess income or deduction of the Partnership attributable to such imputed interest shall be allocated solely to that Partner to whom or from whom such loan was made.

(e)     Special Allocation of Operating Deficit Obligation.  If (1) the General Partner advances funds to the Partnership pursuant to Section 6.5(d) or otherwise advances funds to or makes loans to the Partnership for purposes of paying operating expenses of the Partnership or, if the Partnership incurs losses from extraordinary events which are not recovered from insurance, or if funds are advanced from the Operating Reserve Account, the amount, if any, of funds contributed to such reserve by the General Partner or its Affiliates or otherwise (collectively, "**Operating Deficit Obligations**") in respect of any Partnership taxable year, and (2) the Accountants determine that the ILP will likely have an adjusted Capital Account deficit in any year during the Credit Period in excess of the sum of the ILP's share of Partnership minimum gain plus any amount of its negative Capital Account that the ILP has agreed to restore, then, to the extent of such projected excess deficit Capital Account, the calculation and allocation of Net Profit and Net Loss pursuant to Section 4.1(a) shall be adjusted as follows: first, an amount of deduction attributable to the Operating Deficit Obligations consisting of operating expense deductions and not cost recovery deductions shall be allocated to the General Partner, and, second, all remaining deductions and all gross revenues shall be allocated as provided in Section 4.1; provided that the General Partner shall be specially allocated an amount of gross income (before Net Profit and Net Loss are computed under Section 4.1) equal to the amount of any principal repayment in any year of a Subordinated Loan or any repayment or return of a General Partner Capital Contribution (but in no event shall the aggregate amount of gross income allocated pursuant to this clause exceed the aggregate amount of deductions or losses allocated to the General Partner under this Section 4.9(e)).

(f)     Distributions In-Kind.  With respect to assets distributed in kind to the Partners in liquidation or otherwise, (1) any unrealized appreciation or unrealized depreciation in the values of such assets shall be deemed to be Net Profit From Sale and Net Loss From Sale realized by the Partnership immediately prior to the liquidation or other distribution event, and (2) such Net Profit From Sale and Net Loss From Sale shall be allocated to the Partners in accordance with Sections 4.3 and 4.4, and any property so distributed shall be treated as a distribution of an amount in cash equal to the excess of its fair market value over the outstanding principal balance of and accrued interest on any debt by which such property is encumbered.  For purposes of this Section 4.9(f), "unrealized appreciation" or "unrealized depreciation" shall mean the difference between the fair market value of such assets, taking into account the fair market value of the associated financing (but subject to Section 7701(g) of the Code), and the Partnership's adjusted basis for such assets as determined under Treasury Regulation Section 1.704-1(b).  This Section 4.9(f) is intended to provide a rule for allocating unrealized gains and losses upon liquidation or other distributions, and nothing contained in this Section 4.9(f) or elsewhere herein is intended to treat or cause such distributions to be treated as sales for value.  The fair market value of such assets shall be determined by an appraiser to be selected by the General Partner and the SLP.  Any dispute as to the fair market value shall be submitted to a committee composed of three (3) MAI or SRE appraisers, one chosen by the General Partner, one chosen by the SLP, and the third chosen by the other two so chosen.  The proceedings of such committee shall conform to the rules of the American Arbitration Association, as far as appropriate, and its decision shall be final and binding upon the parties hereto and any successor General Partner.

4837-4545-8969.4

(g)     Additional Interest.  To the extent that interest is imputed on the unpaid balance of Development Fee, but is not paid, the deduction attributable to such unpaid interest shall be allocated to the General Partner.

(h)     Reportable Transactions.  The Partnership and its Partners shall be permitted to disclose to any and all Persons, without limitation of any kind, the "tax treatment and tax structure" (as defined in Treasury Regulation Section 1.6011-4(c)) of the transaction contemplated by this Agreement and all materials of any kind (including opinions or other tax analyses) relating to such tax treatment and tax structure.  The General Partner will promptly notify the Partners of any "reportable transaction" under Treasury Regulation Section 1.6011-4 in which the Partnership shall engage.  The General Partner hereby notifies the other Partners that the transactions provided for in this Agreement may constitute a "reportable transaction".

(i)     Special Allocation With Respect to Donations, Grants and Similar Items.  Any taxable income of the Partnership resulting from the receipt of donations, contributions (including income arising from recharacterization of any Capital Contribution, debt or financing), grants, substantial modification, cancellation or forgiveness of any Partnership indebtedness, subsidies and similar items will be allocated 100% to the General Partner.  Further, in the event any financing provided to the Project is recharacterized as a grant and required for federal income tax purposes to be recognized as taxable income, any income arising from such characterization shall be allocated to the General Partner and the General Partner agrees to cause the Accountants to prepare and file federal and state income tax returns that are consistent with this allocation provision.  The General Partner agrees to recognize the allocation of income from any grant on its respective federal and state income tax returns, and the General Partner and Guarantors jointly and severally agree to indemnify and hold the ILP harmless from the reduction in tax benefits and the income tax consequences attributable to any recharacterization of any financing as a grant and any income that is required to be allocated to the ILP or loss in tax benefits sustained by the ILP as a result of any grant, this special allocation notwithstanding.  Such special allocation of income to the General Partner related to grants includes, but is not limited to, an allocation of income for state franchise or income tax purposes, and the indemnification obligation set forth herein shall be construed to encompass any adverse state franchise or income tax consequences of allocation of income to any Limited Partner.

(j)     Distributions.  Except as otherwise provided in this Agreement, each Partner shall look solely to the assets of the Partnership for all distributions and for such Partner's share of Net Profit or Net Loss and shall have no recourse therefor (upon dissolution or otherwise) against the General Partner or the Limited Partners, except, however, that this limitation shall not impair the right of the Partnership to enforce its rights against a General Partner or a Limited Partner.  No Partner shall have any right to demand or receive property other than money upon dissolution and termination of the Partnership.

## ARTICLE V

## PURCHASE OF LIMITED PARTNERS' INTERESTS

5.1.    Right To Require Repurchase.  The Limited Partners shall have the right to require the General Partner to purchase the ILP's and the SLP's respective interests in the Partnership upon the occurrence of any one of the following events:

(a)     Agency or Lender Disapproval.  At any time after the Closing Date, any Agency or Lender does not grant consent, if such consent is so required, to an amendment of this Agreement intended to transfer the ILP's or SLP's interest in the Partnership and/or admit the SLP or its designee as a substitute or additional General Partner pursuant to this Agreement.

(b)     Construction.  Any of the following construction-related conditions shall be triggered:

(1)     Construction-related work on the Project does not occur for more than a thirty (30) consecutive day period;

(2)     50% Construction Completion shall not have occurred by May 1, 2015; or

(3)    Placement in Service shall not have occurred by December 31, 2015; or

(4)    Final Construction Completion shall not have occurred by the earlier of (i) the date by which construction completion is required by any Lender, as such date may be extended in accordance with the Permitted Loan documents, and (ii) the Completion Date.

(c)    <u>Financing</u>. Prior to Stabilized Occupancy, any of the following shall have occurred:

(1)    a default shall have been declared by any Lender which default shall not have been cured within any applicable cure period;

(2)    a non-judicial foreclosure of the Project has been completed or judicial proceedings shall have commenced to collect on any Permitted Loan or a foreclosure proceeding shall have commenced with respect to any mortgage and such proceedings shall not have been dismissed within sixty (60) days; or

(3)    any financing commitment of any Lender or Agency to provide a Permitted Loan or any rate lock relating thereto shall expire or be in default, modified, terminated or withdrawn and not reinstated or replaced within sixty (60) days with comparable terms which shall have received the Consent of the SLP and, if required, the approval of any other Agency or Lender.

(d)    <u>Stabilization</u>.

(1)    Stabilized Occupancy has not occurred by the two (2) year anniversary of Final Construction Completion;

(2)    Achievement of monthly Breakeven Operations for a three (3) consecutive month period has not occurred by the one (1) year anniversary of Final Construction Completion; or

(3)    Mortgage Loan Commencement has not occurred by the earlier of (i) the date required in the Permitted Loan documents, including any Permitted Loan commitment, and (ii) the 36-month anniversary of the date of this Agreement.

(e)    <u>Noncompliance With Tax Credit Requirements</u>.  Any of the following Tax Credit-related requirements shall be triggered:

(1)    [Reserved].

(2)    10% Test Certification shall not have occurred by the earlier of (i) the date required by the Tax Credit Agency and (ii) twelve (12) months after the Carryover Allocation is executed by the Tax Credit Agency and evidence thereof shall not have been delivered to the SLP within thirty (30) days of the earlier of said dates;

(3)    Placement In Service has not occurred by the earlier of any date required by the Agency or the Placement in Service Date and evidence thereof shall not have been delivered to the SLP within thirty (30) days of the earlier of said dates;

(4)    Cost Certification shall not have been delivered to the SLP within ninety (90) days of Placement in Service;

(5)    8609 Issuance shall not have occurred and evidence thereof shall not have been delivered to the SLP by December 31st of the year following the first year of the Credit Period unless the delay is caused by the Agency and the General Partner is using commercially reasonable efforts to obtain the same;

(6)      a valid Extended Low Income Housing Use Commitment as required pursuant to Section 42 of the Code has not been executed and recorded prior to December 31st of the first year of the Credit Period and evidence thereof shall not have been delivered to the SLP within thirty (30) days of said date;

(7)      the Actual Tax Credit is less than 80% of the Forecasted Tax Credit (other than with respect to the first year of the Credit Period (so long as adjusters are paid as provided in Section 3.5); or

(8)      The Partnership fails to meet the Minimum Set-Aside Test or the Agency Set-Aside or the rents charged to tenants in dwelling units designated to meet the Minimum-Set-Aside Test or the Agency Set-Aside Test fail to meet the Rent Restriction Test prior to the end of the first year of the Credit Period, or at any time thereafter through the Compliance Period the Partnership fails to cause 80% of the Low Income Units to meet the foregoing tests.

(f)      <u>General Partner or Guarantor Breach</u>.  Prior to funding the Final Installment, an Event of Default occurs and is not cured within any applicable notice or cure period.

5.2.      <u>Purchase Price</u>.  The purchase price of the Limited Partners' partnership interests shall be an amount equal to (i) all Capital Contributions previously paid by the Limited Partners to the Partnership, plus (ii) interest on such Capital Contributions at an annual interest rate of 10% calculated from the date each Capital Contribution was paid through the payment date of the purchase price; plus (iii) the amount of costs and expenses incurred by any Limited Partner in connection with the repurchase; plus (iv) any amount the ILP is obligated to fund or repay under the Bridge Loan; less (v) the value of any Tax Credit previously allocated to the ILP and not subject to recapture, the value of which shall be the lesser of the Tax Credit Price or $1.00.  The Partnership and General Partner shall also be obligated to provide a full release of the Limited Partners from any further obligation to make Capital Contributions and an indemnification against any claims of creditors of the Partnership.

5.3.      <u>Notice</u>.  Within five (5) days of the occurrence of an event in Section 5.1, the General Partner shall give notice of the event to the SLP; provided that the delivery or receipt of such notice is not a condition to the effectiveness of the rights and remedies hereunder.  No purchase shall be required until the ILP or the SLP shall have given the Partnership and General Partner thirty (30) days' written notice demanding the repurchase.  The full amount of the purchase price as set forth in Section 5.2 shall be paid by the General Partner to the ILP and the SLP at the conclusion of the thirty (30) day notice period.  The Partnership hereby guarantees the obligation of the General Partner under this Article V.

## ARTICLE VI

## RIGHTS, POWERS AND DUTIES OF GENERAL PARTNER

6.1.      <u>Powers</u>.  The General Partner shall be responsible for the management of the Partnership business. Subject to Section 6.2 and any other specific provisions contained in this Agreement, the General Partner shall have all authority, rights and powers generally conferred by law, including the authority, rights, and powers of a general partner in a partnership without limited partners, and shall have all authority, rights and powers which they deem necessary or appropriate to effect the purposes of the Partnership, including, but not limited to, the following:

(a)      To acquire, hold, sell, transfer, assign, lease or otherwise deal with any real, personal, or mixed property, interest therein or appurtenance thereto.

(b)      To borrow money or incur any purchase money mortgage or similar obligations and, if security is required therefor, to mortgage or subject to any other security device any portion of the assets of the Partnership, including any assets acquired with the proceeds of such borrowing, to obtain replacements of any mortgage or other security device, and to prepay, in whole or in part, refinance, increase, modify, consolidate or extend any mortgage or other security device and including, specifically, the authority, right, and power to borrow money for working capital purposes to acquire, rehabilitate and operate the Project and to engage in related activities.

29

(c)     To purchase, at Partnership expense, liability and other insurance to protect the Partnership business and property.

(d)     Subject to Section 6.8, to employ, contract and deal with Persons (including any Partner or Affiliate of any Partner) in connection with the management, operation, and disposition of the Partnership business and assets, on such terms as the General Partner shall determine.

(e)     To establish reserve funds pursuant to Section 6.5 to provide for future requirements of the Project.

(f)     To bring or defend, pay, collect, compromise, arbitrate, resort to legal action or otherwise adjust claims or demands of or against the Partnership.

(g)     To pay as a Partnership expense any and all expenses associated with the formation of the Partnership and the development, construction and/or rehabilitation as applicable, organization, and operation of the Project.

(h)     To deposit, withdraw, pay, retain and distribute the Partnership's funds in a manner consistent with the provisions of this Agreement.

(i)     To require in any or all Partnership contracts that the General Partner shall not have any personal liability thereon but that the Person contracting with the Partnership shall look solely to the Partnership and its assets for satisfaction.

(j)     To execute, acknowledge and deliver any and all instruments, including the Project Documents available at closing, to effectuate the foregoing.

(k)     To cause the Partnership to accept the grant of a security interest in the Partnership interests of the ILP and SLP pursuant to Section 3.6(a) and to assign those security interests to the Bridge Lender pursuant to Section 3.6(c).

6.2.     <u>Restrictions on Authority of General Partner</u>.  The General Partner shall be bound by all Project Documents.  In addition, without the prior Consent of the SLP, no General Partner shall:

(a)     Dissolve or wind up the Partnership, or cause or permit the occurrence of any event that would have the foreseeable result of the voluntary or involuntary dissolution of the Partnership whether under this Agreement or otherwise.

(b)     Sell, exchange, lease (other than lease of dwelling units to individual tenants as required hereunder), mortgage, pledge or otherwise transfer any of the assets of the Partnership except for mortgages, assignments and pledges of collateral required with respect to the Permitted Loan.

(c)     Change the nature or purposes of the Partnership's business.

(d)     Borrow money (except for the Permitted Loan closed on or before the date hereof, the Bridge Loan, the Seller Loan, the GP Predevelopment Loan, and the Subordinated Loans and other Partner loans permitted under this Agreement) or refinance, recast, modify or extend any loan to the Partnership or which affects or is secured by the assets of the Partnership, except that the General Partner shall have the right and power without such Consent to borrow additional funds on behalf of the Partnership to meet current cash needs of the Partnership, provided such amounts so borrowed that are outstanding at any given time under this clause (d) shall not exceed $10,000 and such amounts are not used to repay (i) any obligations owed to the General Partner, Developer or Guarantor or any Affiliate of any such Persons or (ii) any obligations which are to be paid by the General Partner, Developer or Guarantor or any Affiliate of any such Persons;

(e)      Borrow from the Partnership or commingle Partnership funds with funds of any other Person.

(f)      Rent apartments in the Project in such a manner that the Project would not meet the requirements of the Minimum Set-Aside Test, the Agency Set-Aside Test or the Rent Restriction Test.

(g)      On behalf of the Partnership, (i) file or cause to be filed a voluntary petition in bankruptcy under the Bankruptcy Code or (ii) file or cause to be filed a petition or answer seeking any reorganization, arrangement, composition, readjustment, liquidation, dissolution or similar relief under any statute, law or rule.

(h)      Cause the Partnership to commence, settle, compromise, mediate or otherwise relinquish any claim (actual or prospective), or to release, waive or diminish any material Partnership rights in any litigation or arbitration matter involving a claim of in excess of $10,000, or to do so as to any claim regardless of amount against the General Partner, Guarantor, Developer, Builder or Property Manager or any Affiliate thereof.

(i)      Cause the Partnership to close or convert or refinance any loan, including any Permitted Loan.

(j)      Amend any Project Document, or permit any party thereunder to waive any provision thereof, to the extent that the effect of such amendment or waiver: (i) would be to eliminate, diminish, or defer any obligation or undertaking of the Partnership, the General Partner, the Developer or the Guarantor, or any of their Affiliates, that accrues, directly or indirectly, to the benefit of, or provides additional security or protection to, the ILP (notwithstanding that the ILP is neither a party to nor an express beneficiary of such provision or was not a Partner when such provision became effective), or (ii) might have a material adverse effect on the Project, the Partnership or the Limited Partners.

(k)      Except as provided in Section 3.6, pledge or assign any of the Capital Contributions of the ILP or the proceeds thereof.

(l)      Following Final Construction Completion of the Project, construct any new capital improvements, or replace any existing capital improvements if construction or replacement would substantially alter the use or value of the Project.

(m)      Acquire any real property in addition to the Property (other than easements or similar rights necessary or customary for the development and operation of the Project).

(n)      Cause the Partnership to make any loan or advance to any Person (other than accounts receivable in the ordinary course of business from Persons other than the General Partner and Affiliates thereof).

(o)      Permit the merger or termination of the Partnership.

(p)      Lease the Property in such a manner as to cause the Property or any part thereof to be treated as "tax-exempt use property" within the meaning of Section 168(h) of the Code.

(q)      Take any action or fail to take any action which would cause the recapture or reduction of the Tax Credit under Section 42(g) of the Code.

(r)      Enter into any agreement (exclusive of the Project Documents entered into on or about the Closing Date or third-party service contracts for maintenance, landscaping, security and other service providers necessary to maintain operations of the Project with terms not exceeding one year, a tree maintenance agreement (anticipated to be for a term of five years) required for tree mitigation as required for the site plan permit, and agreements with cable, date, and phone providers (which are anticipated to exceed one year in term) which benefits or burdens (i) the Project or the Partnership, or its assets, or (ii) the property of a third party (including the separate property of the General Partner, Guarantor, or Developer, or their respective Affiliates).

31

6.3.     Single Purpose Entity.  The nature of the General Partner as being a "single purpose entity" separate and distinct from its members, partners and/or shareholders, as applicable, is a material inducement to the ILP and SLP becoming Limited Partners of the Partnership and agreeing to make the Capital Contributions provided for in this Agreement.  To ensure compliance with the restrictions on the General Partner, the General Partner represents, warrants and covenants as follows:

(a)     The General Partner has not and will not engage in any business other than being the General Partner of the Partnership.

(b)     The General Partner shall not enter into and has not entered into any contract or agreement with any Affiliate of the General Partner, the Developer or Guarantor, except upon terms and conditions that are substantially similar to those that would be available on an arm's length basis.

(c)     The General Partner has paid and shall continue to pay its taxes, debts and liabilities from its own assets as the same shall become due.  No Affiliate of the General Partner has paid any debts or liabilities on behalf of the General Partner other than those related to the Partnership or pursuant to the Guaranty as contemplated herein.

(d)     The General Partner has maintained and shall continue to maintain books, financial records and bank accounts that are separate and distinct from any other Person.

(e)     The General Partner has maintained and shall continue to maintain separate annual financial statements showing its assets and liabilities separate and distinct from those of any other entity; in the event the financial statements of the General Partner are consolidated with the financial statements of any other entity, the General Partner has included and shall continue to cause to be included in such consolidated financial statements: (i) a narrative description of the separate assets, liabilities, business functions, operations and existence of the General Partner to ensure that such items are readily distinguishable; and (ii) a statement that the General Partner's assets and credit are not available to satisfy the debts of such other entity or any other person.

(f)     The General Partner has previously and shall continue to (i) hold itself out as an entity separate and distinct from any other Person; (ii) not identify itself as a division or part of any other Person; and (iii) correct any known misunderstanding regarding its separate status.

(g)     The General Partner has and shall continue to conduct its business in its own name so as to avoid or correct any misunderstanding on the part of any creditor concerning the fact that any invoices and other statements of account from creditors of the General Partner are to be addressed and mailed directly to the General Partner, though this provision shall not prohibit such mail to be delivered to the General Partner c/o any other entity.

(h)     The General Partner has and intends to maintain adequate capital for the normal obligations reasonably foreseeable in a business of its size and character and in light of its contemplated business operations.

(i)     The General Partner has not commingled and shall not commingle with any Person, any of its assets, funds or liabilities.

(j)     Except as may be required under the Bridge Loan or a Permitted Loans, the General Partner has not and shall not: (i) assume or guaranty the debts of any other Person in a manner that includes a pledge, encumbrance, transfer or hypothecation (whether by operation of law or otherwise) of any assets or interests of the Partnership or, (ii) hold itself out to be responsible for the debts of another Person in a manner that includes the pledge, encumbrance, transfer or hypothecation of any assets or interests of the Partnership (whether by operation of law or otherwise), or (iii) otherwise pledge, encumber, transfer or hypothecate the assets of the Partnership for the benefit of another Person or permit the same to occur except as specifically provided in the Project Documents executed on or before the Closing Date, or (iv) hold the Partnership's credit as being available to satisfy the obligations of any other Person.

(k)     All transactions carried out by the General Partner have been and will be, in all instances, made in good faith and without intent to hinder, delay or defraud creditors of the General Partner.

6.4.    [Reserved].

6.5.    Duties, Covenants, Obligations, Representations and Warranties.  The General Partner hereby agrees to undertake the following duties, covenants and obligations and further represents, warrants and covenants to the Limited Partners and to Tax Counsel that the following are presently true and will be true throughout the term of this Agreement, unless otherwise indicated:

(a)     The General Partner shall devote to the Partnership such time as may be necessary for the proper performance of its duties.  The General Partner shall cause the Partnership to promptly pay all Partnership debts when they become due and to perform all other Partnership obligations under all agreements and legal requirements of any kind or nature to which the Partnership, the Project or the General Partner may be subject.  The General Partner shall cause all accounts payable by the Partnership to be paid within sixty (60) days of their respective due dates.  Subject to this Agreement, the General Partner shall at all times act and exercise its discretion hereunder in a reasonable manner consistent with its fiduciary duties to the other Partners.

(b)     During the term of the Partnership, the General Partner shall cause the Partnership to obtain and keep in force, at Partnership expense, the insurance described in Exhibit 6 or such higher standard or amount of insurance coverage required under the Project Documents.  All policies evidencing such required insurance shall: (i) be issued by a company or companies acceptable to the SLP; (ii) include endorsements requiring at least thirty (30) days' prior written notice to the SLP of any cancellation, termination, premiums due, or reduction of coverage therein; (iii) not be written for a term of less than one (1) year; (iv) not permit a waiver of subrogation by the insured prior to a loss; and (v) not exclude coverage as a result of the presence of moisture and/or mold, unless either (A) separate coverage is obtained in form and substance acceptable to the SLP or (B) the General Partner provides evidence acceptable to the SLP that upon Final Construction Completion the Project will not be susceptible to moisture and/or mold issues.

(c)     The General Partner shall cause the Partnership to establish and maintain reasonable reserves to provide for working capital needs, Capital Expenditures, Operating Deficits and any other contingencies of the Partnership, and, at a minimum, shall:

(1)     Commencing six (6) months after Placement In Service, cause the Partnership to deposit monthly an amount of not less than $20.83 per apartment unit into the Replacement Reserve Account, which amount shall be adjusted annually to reflect a 3% increase over the previous year's required deposit or such higher amount as may be required in any Project Document.  The Replacement Reserve Account must be maintained in an account which shall be separate from the Partnership's operating account(s) in compliance with all Lender and Agency requirements.  Pursuant to Section 10.9, the General Partner shall submit to the SLP for approval an annual budget of Capital Expenditures for the subsequent Fiscal Year.  The SLP's approval of the annual budget of Capital Expenditures shall be considered Consent for the Replacement Reserve Account disbursements for the purposes and in the amounts identified on such approved budget.  Any disbursements from the Replacement Reserve Account shall be subject to all Lender or Agency requirements, and any disbursement in excess of the amounts identified on the approved budget of Capital Expenditures for such year shall be made only with the Consent or upon the direction of the SLP (except for any disbursements in the event of an emergency and which is necessary to protect the safety of tenants or the structural and/or mechanical integrity of the Project, and the General Partner provides the SLP notice of such disbursement no later than the first business day following the emergency event).  In no event shall disbursements be made from the Replacement Reserve Account for ordinary and customary repairs and maintenance that do not constitute Capital Expenditures without the prior Consent of the SLP.  After each disbursement, the General Partner shall submit to the SLP the invoices showing:  the item or service purchased; the purchase date; the quantity purchased and per unit cost; the total purchase amount and reason for the expenditure.  If disbursements are made from the Replacement Reserve Account for items that do not constitute Capital Expenditures or in amounts in excess of the limits established hereunder without Consent of the SLP, the SLP shall have the right (in addition to other remedies under this Agreement, including, but not limited to, Section 7.7(b)) to require the General Partner to place the funds held in the Replacement Reserve Account into an account that requires the signatures of both the SLP and the General Partner for any disbursements.

33

(2)      The General Partner shall cause the Partnership to deposit into the Operating Reserve Account, at the time of the payment of the Third Installment, not less than the Operating Reserve Amount, which account shall be maintained in an account at PNC Bank, National Association in the name of the Partnership under the sole control of the SLP.  The General Partner may reduce or eliminate any Operating Deficit prior to making an advance pursuant to Section 6.5(d)(1) by requesting funds in the Operating Reserve Account but in no event shall any such funds be used while an Event of Default has occurred and is outstanding (unless the sole Event of Default is payment and expenditure of the funds for the Operating Deficit is otherwise permitted and would cure such Event of Default) or to pay any Development Costs.  Disbursements from the Operating Reserve Account (including any interest earned thereon) shall be requested in writing by the General Partner to the SLP (except for any disbursements in the event of an emergency and which is necessary to protect the safety of the tenants or the structural and/or mechanical integrity of the Project, and the General Partner provides the SLP with notice regarding such disbursements no later than the first business day following the disbursement).  The Operating Reserve Account shall be maintained until expiration of the Compliance Period at which time any remaining balance shall be disbursed as Net Cash Flow in accordance with Section 4.2.  Any remaining balance in the Operating Reserve Account upon sale of the Project shall be disbursed as provided in accordance with Section 4.5.

(3)      The General Partner shall cause the Partnership to deposit, at the time of the payment of the Third Installment not less than $3,000,000 (the "RSRA Amount"), into the Rental Subsidy Reserve Account, which shall be maintained in an escrow account at PNC Bank, National Association in the name of the Partnership under the sole control of the SLP.  The General Partner may reduce or eliminate an Operating Deficit resulting from the decrease or loss of funding under the HAP Contract (or any failure to enter into, a termination, an expiration or a lapse of the HAP Contract (including a failure to renew)) (a "Loss Event") by expending funds in the Rental Subsidy Reserve Account prior to making an advance pursuant to Section 6.5(d)(2), but in no event shall any such funds be used while an Event of Default has occurred and is outstanding or to pay any Development Costs.  Disbursements from the Rental Subsidy Reserve Account (including any interest earned thereon) shall be requested in writing by the General Partner to the SLP, approval of which shall not be unreasonably withheld, conditioned or delayed.  Any remaining balance in the Rental Subsidy Reserve Account shall be released, subject to the Release Restrictions (other than a Loss Event), in the priority set forth below, upon the first date upon which the Project is fully re-tenanted (if applicable upon complete loss, termination, or lapse of the HAP Contract) and determination by the SLP that the Project will maintain a Debt Service Coverage of 120% or greater through the Compliance Period (which calculation shall be performed in the same manner as for purposes of Stabilized Occupancy).  Except as set forth in the foregoing sentence, the Rental Subsidy Reserve Account shall be maintained until expiration of the Compliance Period at which time any remaining balance shall be disbursed subject to the Release Restrictions (other than a Loss Event), in the priority set forth below.  Any remaining balance in the Rental Subsidy Reserve Account upon sale of the Project shall be disbursed subject to the Release Restrictions (other than a Loss Event), in the priority set forth below.  Notwithstanding the foregoing, if the Rental Subsidy Reserve Account has not otherwise been released as set forth above and beginning upon the last day of the eleventh year of the Compliance Period and each anniversary thereafter any balance remaining in the Rental Subsidy Reserve Account in excess of the amount as follows shall be disbursed in the priority set forth below:

| | |
|---|---|
| End of year 11 | 80% of the RSRA Amount |
| End of year 12 | 60% of the RSRA Amount |
| End of year 13 | 40% of the RSRA Amount |
| End of year 14 | 20% of the RSRA Amount |
| End of year 15 | 0% of the RSRA Amount |

Any funds released hereunder shall be disbursed in the following priority: (A) first to fund any unfunded reserves of the Partnership, including, but not limited to the Operating Reserve Account and the Replacement Reserve Account and (B) then to the General Partner as a distribution, but in no event shall any such funds be disbursed (i) while an Event of Default has occurred and is outstanding, (ii) if the balance of the Operating Reserve Account is below the Operating Reserve Amount (unless the SLP otherwise determines sufficient funds from will be available from other sources to fully fund the Operating Reserve Account to the Operating Reserve Amount, including through release of

4837-4545-8969.4

the Rental Subsidy Reserve Account funds, if necessary), (iii) if there is a Loss Event or (iv) if any amounts are due and owing to the ILP, SLP or any Affiliates thereof unless the General Partner has provided such amount will be paid upon any release (the "Release Restrictions").

(d)     (1)     The General Partner shall be obligated, without the requirement of notice or demand, to advance, or cause to be advanced by the Guarantor, all funds necessary during the ODG Period up to the ODG Cap (exclusive of any amounts funded from the Operating Reserve Account) in order to enable the Partnership to pay and satisfy Operating Deficits.

(2)     In addition to the obligations set forth in Section 6.5(d)(1) and notwithstanding any limitations set forth therein, in the event of a loss or reduction of the rental assistance provided under the HAP Contract for any reason, including, but not limited to, a loss or reduction caused by (i) a failure to enter into, a termination, an expiration or a lapse of the HAP Contract (including a failure to renew), or (ii) a failure of HUD to fully fund the HAP Contract due to a loss or reduction of appropriations, and such loss or reduction results, in whole or in part, in an Operating Deficit, then the General Partner, for the period commencing on the Closing Date and ending upon the termination of the Compliance Period, agrees and guarantees to advance or cause to be advanced by the Guarantor, without the requirement of notice or demand by the Partnership, any Partner or other party, an amount equal to the lesser of (i) the funds that would have been received under the HAP Contract with respect to the period of the Operating Deficit but for such loss or reduction of the rental assistance; and (ii) the amount of the Operating Deficit.  If amounts are due under both (1) and (2) of this Section 6.5(d), advances made shall be treated as made first in satisfaction of the obligations under this paragraph until the obligations of this paragraph are satisfied in full and then in satisfaction of the obligations under Section 6.5(d)(1).  Any amounts advanced under this paragraph shall not be credited toward the ODG Cap.

(3)     All advances pursuant to this Section 6.5(d) shall be Subordinated Loans repayable without interest in accordance with the provisions of Section 4.2 and Section 4.5; provided, however, that if the Accountants or the SLP determine that such treatment as Subordinated Loans would prevent the ILP from being allocated 99.99% of Net Losses, Net Losses from Sale and/or Tax Credit, then the advances shall be treated as payment of damages for breach of warranty.

(e)     The General Partner shall provide the Limited Partners, for purposes of seeking the Consent thereto, with a copy of any proposed new documents and/or any proposed amendment to any Project Document at least ten (10) days prior to the scheduled execution thereof.  In no event shall any such documents be executed by or on behalf of the Partnership without obtaining the Consent of the SLP as to the form and substance of such documents.

(f)     The Partnership is and will continue to be a duly organized limited partnership, validly existing under the laws of the State and has complied and will continue to comply with all filing requirements necessary for the protection of the limited liability of the Limited Partners.  Upon execution of this Agreement, the only partners of the Partnership are the General Partner, the ILP and the SLP.  The Partnership has not made, and will not make, an election to be taxable as a corporation.  The General Partner will not take any action that would result in the Partnership being treated as a corporation under Code Section 7701 or as a "publicly traded partnership" within the meaning of Code Section 7704.  The Partnership has properly elected the accrual method of accounting.  The profits, gains, losses and credits for tax and book accounting purposes, cash flow from operations, and sale or refinancing proceeds will be allocated among the Partners as set forth herein.  No Partner will make any capital contributions to the Partnership other than the capital contributions provided for in this Agreement.  The Partnership (i) is not an investment company within the meaning of the Investment Company Act of 1940 (referred to herein as the "**Act**") and (ii) is not relying on the exceptions contained in Section 3(c)(1) or Section 3(c)(7) of the Act in making such determination.  In addition, at all times during the term of this Agreement, the Partnership (i) will not be an investment company within the meaning of the Act and (ii) will not rely on the exceptions contained in Section 3(c)(1) or Section 3(c)(7) of the Act in making such determination.

(g)     The execution and delivery of all instruments and the performance of all acts heretofore or hereafter made or taken pertaining to the Partnership or the Project by each of the General Partner and Affiliates of a General Partner have been duly authorized and the Partnership and the General Partner have active status for the right to transact business in the State, and the consummation of any such transactions with or on behalf of the

Partnership will not constitute a breach or violation of, or a default under, (i) the organizational documents of such entity, (ii) any agreement by which such entity or any of its property or assets are bound, or (iii) any law, regulation or court decree.

(h)     No default, Event of Default or event which, with the giving of notice or the passage of time or both, would constitute a default, has occurred and is continuing under this Agreement or any of the Project Documents, and the same are in full force and effect.  Neither the General Partner nor the Partnership is in violation of any Lender or Agency requirements.

(i)     The Partnership is not liable for any expense, debt, cost, liability, or other charge other than costs incurred in connection with the acquisition of the Property and construction and/or rehabilitation of the Project as reflected in the Project Budget and operating expenses arising in the ordinary course of business.

(j)     The General Partner, the Developer, the Guarantor, any partner, member or officer thereof (which officer has a Controlling Interest in any of the foregoing Persons) is not the subject of any governmental or private inquiry, proceeding or litigation, the outcome of which could be materially adverse to any such Person, the Project or the Partnership.

(k)     No Event of Bankruptcy has occurred, is pending or to the best of the General Partner's knowledge after due inquiry is threatened against the Partnership, the General Partner, the Original Limited Partner, the Developer, or the Guarantor, and no event that would constitute an Event of Withdrawal has occurred with respect to any General Partner.

(l)     To the extent not previously transferred, the General Partner hereby transfers and assigns to the Partnership all of the General Partner's (and its Affiliates) right, title and interest in and to the Project and in and to all Project Documents (excluding its right to receive payments and distributions in accordance with this Agreement and its Affiliates rights under the Seller Loan and the Developer's right to receive payment of the Development Fee).

(m)     The General Partner shall provide to the SLP written notice, within three (3) business days of the occurrence, of any event which would likely result in an Event of Default after passage of any cure period.

(n)     The General Partner and Guarantor collectively have and shall maintain an aggregate net worth exclusive of the General Partner's interest in the Partnership or any sums owed to the General Partner or Guarantor by the Partnership equal to at least $5,000,000, of which at least $2,500,000 shall be liquid assets until Stabilized Occupancy and thereafter the minimum liquidity requirement shall be $2,000,000 and then until the ODG Period End Date and thereafter the minimum liquidity requirement shall be $1,000,000 throughout the Compliance Period.

(o)     There are no agreements relating to and no claims filed, pending or to the best of the General Partner's knowledge after due inquiry is threatened against or concerning the Partnership by any Person not an Affiliate of the ILP in regard to any syndication or the sale or issuance of any limited partner interest in the Partnership.  The General Partner has or will have timely complied or will cause the timely compliance with all applicable securities laws in connection with the offer and sale of the Partnership interests in the Partnership to the ILP and SLP.

(p)     The General Partner has not received notice from the Internal Revenue Service that it has considered the General Partner or any Affiliate thereof to be involved in any abusive tax shelter and is not aware of any facts which, if known to the Internal Revenue Service, would cause such notice to be issued.

(q)     No General Partner, Developer or Guarantor, nor any Affiliate of any of the preceding or any of the General Partner's, Developer's, or Guarantor's respective officers, directors, principals, members or managers:

4837-4545-8969.4

(1)     Has been convicted within the past ten (10) years of any felony or misdemeanor in connection with the purchase or sale of any security involving the making of a false filing with the Securities and Exchange Commission, or arising out of the conduct of the business of an underwriter, broker, dealer, municipal securities dealer or investment adviser;

(2)     Is or has been subject to any order, judgment or decree of any court of competent jurisdiction, temporarily or preliminary enjoining or restraining, within the past five (5) years, such person from engaging in or continuing any conduct or practice in connection with the purchase or sale of any security or involving the making of a false filing with the Securities and Exchange Commission, or arising out of the conduct of the business of an underwriter, broker, dealer, municipal securities dealer or investment adviser;

(3)     Is or has been subject to a United States Postal Service false representation order entered under Section 3005 of Title 39, United States Code, within the past five (5) years; or is or has been subject to a restraining order or preliminary injunction entered under Section 3007 of Title 39, United States Code, with respect to conduct alleged to have violated Section 3005 of Title 39, United States Code;

(4)     Has acted as underwriter of any securities:

(5)     Is covered by a registration statement which is the subject of any pending proceeding or examination under Section 8 of the Securities Act of 1933, as amended (the "**1933 Act**"), or is the subject of any refusal order or stop order entered thereunder within the past five (5) years; or

(6)     Is covered by any filing which is subject to any pending proceeding under Rule 261 or any similar rule promulgated under the provisions of Section 3(b) of the 1933 Act, or to an order entered thereunder, within the past five (5) years.

(r)     No Partner in the Partnership will be a tax-exempt entity, and no Partner in the Partnership will be controlled by a tax-exempt entity.  Further, no portion of the Project will be leased to a tax-exempt entity.

(s)     The recipient of the Partnership Management Fee is an accrual basis taxpayer for federal income tax purposes.

(t)     The General Partner has prepared its own financial analysis of the Project and is not relying on any financial analysis, projection or forecast prepared by the ILP or any Affiliate thereof of the costs associated with the development, construction and/or rehabilitation of the Project or the Project's operations.  There are sufficient sources of Development Funds to complete the Project in accordance with the Plans and Specifications and the Project Budget.  The General Partner has reviewed the Project Forecast and believes it to be correct in all material respects and is not aware of any facts that are inconsistent therewith.

(u)     The Partners and their respective Affiliates acknowledge that the Partnership interest of the ILP may be transferred to an Affiliate of the ILP or the SLP.  In connection therewith, the ILP and the SLP may disclose to prospective investors in such Affiliate such information previously supplied to the ILP and/or its Affiliates about the transaction, the Partnership, the Project, the General Partner, each of the other Partners, the Developer, the Guarantor, the Property Manager and Affiliates thereof, and the Partners, the Guarantor, the Developer and Affiliates thereof hereby agree to supply such further information as reasonably requested in order to effectuate such a transaction.  The Partnership, the Partners, the Developer, the Guarantor, and their Affiliates each further agree to promptly execute and/or provide such documents and agreements as may be reasonably necessary to facilitate and expedite such transfer, including any amendments and supplements to this Agreement, legal opinions, title policy endorsements and other Project Documents, and to otherwise cooperate with the ILP and the SLP in this regard.  Specifically, and without limitation, the Partnership, the Partners, the Developer, and the Guarantor shall promptly execute an amendment to this Agreement and a Guarantor Acknowledgement and Consent in the form of the attached Exhibit 7, as such form may be revised as required by the Affiliate transferee (the "**Transfer Amendment**"); provided that such amendment that contains material terms beyond the form contemplated in Exhibit 7 shall be proposed in accordance with Section 7.6(a)(2) of this Agreement.  The ILP shall bear its own out-

of-pocket costs, expenses, fees, taxes and similar charges arising in connection therewith and further agrees to reimburse the Partnership, the General Partner, the Developer and the Guarantor for their reasonable out-of-pocket costs, expenses, fees, taxes and similar charges in connection therewith up to an aggregate maximum reimbursement of (i) $2,500 for transfers to PNC Bank, National Association and/or any fund entity sponsored or managed by PNC Bank, National Association or its affiliates and (ii) $10,000 for transfers to any entity other than as referenced in (i).

(v)     The Partnership owns a fee simple interest in the Project, and the Project is not subject to an option or right of first refusal except as provided herein or as required by the Tax Credit Agency and the Extended Low Income Housing Use Commitment.  No title exception, other than the lien(s) securing the Permitted Loan or Seller Loan, constitutes a material lien, exclusion, exception, condition or stipulation or refers to rights, the existence or exercise of which could have a material adverse effect on the ownership, development, operation or value of the Project.  There is no official action of any governmental authority, pending or to the best of the General Partner's knowledge after due inquiry threatened, which in any way would involve any intended public improvements, which public improvements may result in any charge being levied against the Project or any special assessment being levied against the Property.  There is no existing, proposed or, to the best of the General Partner's knowledge after due inquiry, contemplated, plan to widen, modify or realign any street or highway contiguous to the Project.  The General Partner shall promptly notify the SLP of any official actions or plans, if and as they arise.  No Person or entity other than the Partnership and those Persons holding indirect interests through the Partnership holds any equity or ownership interest in the Project.  No Person except the Partnership has the right to any proceeds, after payment of all indebtedness, from the sale, refinancing or leasing of the Project, and the Partnership, except to the extent protected by insurance and excluding any risk borne by the lenders, shall bear the risk of loss if the Project is destroyed, condemned or diminished in value.  Other than specifically provided in this Agreement, a creditor who makes a loan to the Partnership shall not at any time have or acquire, as a result of making the loan, any interest in the profits, capital or property of the Partnership other than as secured or unsecured creditor.  No restrictions on the Sale or Refinancing of the Project exist, other than restrictions under Section 42 of the Code, the Extended Low Income Housing Use Commitment and this Agreement, and no such restrictions shall be placed upon the Project without the Consent of the SLP.  The Partners acknowledge that notwithstanding anything in this Agreement to the contrary, any sale of the Project will be subject to the terms of the Extended Low Income Housing Commitment, including any rules, policies, or procedures promulgated by the Tax Credit Agency relating thereto.

(w)     No charges, liens, claims, covenants, conditions, restrictions, easements, rights of way, options, judgments, special assessments or encumbrances exist against the Project other than those which are created or permitted by the Project Documents or are noted or excepted in the Title.  There is no reassessment (except for real estate property taxes), reclassification, rezoning, proceeding, ordinance or regulation (including amendments and modifications to any of the foregoing) pending or to the best of the General Partner's knowledge after due inquiry proposed to be imposed, by any authority or any public or private utility having jurisdiction over the Project which would have a material adverse effect upon the use or occupancy of the Project.  No special assessments have been levied or to the best of the General Partner's knowledge after due inquiry are proposed to be levied against the Project and the General Partner will promptly notify the SLP of any such actions if and as they arise.  Except as previously approved by the SLP, the completion of the construction or rehabilitation of the Project will not require the dedication of any portion of the Project.

(x)     No event, proceeding, adverse action, commission, suit, arbitration, or claim, including, but not limited to, judicial, municipal or administrative proceedings, unlawful detainer or tenant evictions, collections, alleged building code, health and safety or zoning violations, employment discrimination or unfair labor practices, workers' compensation, personal injuries or property damages, is pending, has occurred, or, to the best of the General Partner's knowledge after due inquiry, is threatened, the continuing effect of which could:  (i) materially or adversely affect the operation of the Partnership or the Project; (ii) materially or adversely affect the ability of the General Partner or Guarantor to perform their obligations hereunder, under the Guaranty or under any other Project Document; or (iii) prevent Final Construction Completion or Mortgage Loan Commencement in substantial conformity with the Project Documents, unless any of the foregoing have been bonded against (or as to which other adequate financial security has been issued without recourse to Partnership assets) in a manner as to indemnify the Partnership against loss.

(y)     Except as otherwise disclosed in writing to the SLP, the General Partner has no knowledge of (i) any opposition to the Project, or (ii) any investigation or inquiry of the Partnership, the General

38

Partner, the Developer, the Guarantor, or any partner, member or officer thereof, which has or may have a material adverse impact on the Project or the Partnership or which would result in a delay in the development of the Project.

(z)      If the Property or Project is eligible for a property tax exemption, abatement, or other relief and such exemption or abatement requires periodic filings or reporting to the taxing authority, the General Partner shall cause the Partnership to timely file same and provide copies of such filings to the SLP within ten (10) business days of filing.

(aa)      The Partnership has the primary obligation to pay all maintenance and operating costs, including all taxes levied upon, and all insurance costs attributable to, the Project.  There are no service or maintenance contracts, warranties, guarantees or bonds which are or will be obligations of the Partnership or the Project, other than which the General Partner has provided to the Limited Partners upon the request of the Limited Partners (collectively, the "**Service Contracts**").  All Service Contracts are or will be on an arm's-length basis with parties not affiliated with the General Partner, except as Consented to by the SLP.  There is no current default of any of the Service Contracts.  The Service Contracts have not been, and will not be, amended or modified except as permitted herein.  All fees paid to the General Partner or any Affiliate thereof in connection with the Partnership will be reasonable in amount for services actually performed.

(bb)      The fair market value of the Project currently exceeds, and throughout the term of the Permitted Loan is reasonably expected to exceed, the aggregate outstanding balance of the Permitted Loan.  Each Permitted Loan has a fixed maturity date which is prior to the end of the anticipated economic life of the Project, and the Partnership is reasonably expected to be able to repay each Permitted Loan as it matures.

(cc)      The General Partner is not related in any manner to the ILP or the SLP, nor is the General Partner acting as an agent of the ILP or the SLP.

(dd)      Other than the Seller Loan Lender and the Bridge Loan Lender, no Partner, nor any related person (within the meaning of Treasury Regulation Section 1.752-4(b)) of any Partner, has or will have any personal liability with respect to, or has personally guaranteed or will personally guarantee the payment of, the permanent phase of any Permitted Loan nor bears or will bear the economic risk of loss (within the meaning of Treasury Regulation Section 1.752-2) for the repayment of any permanent phase of a Permitted Loan.

(ee)      If the SLP directs the General Partner to do so or if required by the Agency or Lender or by law or regulation, or if recommended by a licensed environmental engineering firm preparing a third-party report for the Project, the General Partner will promptly cause to be implemented on behalf of the Partnership a moisture management and control program for the Project that will comply with all applicable requirements and recommendations set forth in any applicable report obtained by the Partnership or Partners at any time (the costs and expenses incurred by any Limited Partner in connection therewith to be reimbursed by the Partnership on demand); provided, that to the extent of any conflicting requirements or recommendations among such reports, the General Partner and SLP shall reasonably agree as to the requirements and the recommendations that should be implemented based on the benefits compared to the cost thereof; provided, however, in the event the General Partner and SLP do not reach an agreement, the SLP shall be permitted to make the final determination, in its sole discretion, as to which recommendations shall be implemented.

(ff)      The General Partner shall cause all leases of dwelling units to tenants to include a provision obligating such tenants to notify the Property Manager immediately of any suspected water leaks, moisture problems, or mold in dwelling units or common areas of the Project.

(gg)      The General Partner shall cause the Partnership to maintain tenant deposits in a separate account which must be used solely to hold tenant deposits as security for tenant rents and for no other purpose.

(hh)      Except as otherwise required by the Declaration of Covenants, Condtions, and Restrictions entered into by the seller of the Project in connection with the redevelopment thereof (the "Declaration"), the community and common area portions of the Project will be held exclusively for use by tenants and the Partnership will not charge a separate fee for the use of tenant facilities at the Project, and such tenant

facilities will be available on a comparable basis to all tenants. Notwithstanding the foregoing, upon the recordation of the Extended Low Income Housing Use Commitment, the General Partner shall cause the Declaration to be terminated of record pursuant to Section 3.7 of the Declaration. The General Partner shall cause the Partnership to provide any supportive services as required by the Project Documents and all services provided to tenants will be optional and will not be required as a condition of occupancy.

(ii)     The General Partner agrees that the Partnership shall not obtain any financing which requires the approval of HUD until such HUD 2530 approval is obtained from HUD. If the Partnership intends to obtain HUD assistance or insurance or any other type of financing that necessitates the filing of a Form 2530 Previous Participation Certificate with HUD, the General Partner shall so notify those Partners from which information is required for such Certificate and shall provide adequate information to such Partner to enable it to file any additional documents with HUD.

(jj)     The General Partner shall notify the ILP and invite a representative of the ILP to attend any groundbreaking, ribbon-cutting or other public relations ceremony relating to the Project. To the extent requested by the ILP, the General Partner shall cause the Partnership, at the ILP's cost, to display a sign on the Property during construction/rehabilitation which clearly states the name of PNC as the arranger of equity funds for the Project. The sign shall be erected in a prominent place on the site within 10 days of receipt by the General Partner of the PNC image and directions. The General Partner agrees to remove such sign or reference to PNC if requested. The General Partner hereby gives permission to the ILP and any Affiliate lender of the Limited Partners to issue press releases and advertising relating to the equity commitment and the ILP's participation in the transaction; provided that the General Partner reviewed and approved any press release or advertising that references the General Partner or its Affiliates. Such media and marketing materials may include, among other things, photos, information about the location of the Project, the number of units, the amenities associated with the Project and the terms of the equity commitment.

(kk)     If the SLP directs the General Partner to do so, the Partnership shall elect out of any/all available bonus depreciation under the Code; provided that the foregoing shall not include cost segregation analysis done by the Accountants as previously disclosed to the Limited Partner.

6.6.     <u>Limitation on Liability; Indemnification</u>.

(a)     Except as provided in Section 6.6(b) and Section 6.6(d) below, the General Partner shall be indemnified by the Partnership, and shall have no liability to the Partnership or to any Partner for any loss suffered by the Partnership, for any losses, judgments, liabilities, expenses and amounts paid in settlement of any claims sustained by the General Partner in connection with the proper performance of its obligations under this Agreement in its capacity as a General Partner (and not in any other capacity, whether as Developer or otherwise), provided that (1) the General Partner, in good faith, determined that such course of conduct in its capacity as a General Partner was in the best interest of the Partnership, and (2) the matters for which the General Partner is seeking indemnification were not the result of or otherwise did not directly or indirectly arise out of or in connection with (A) any negligence or misconduct on the part of the General Partner or any Affiliate thereof, (B) any Event of Default, or any efforts to cure or mitigate any such Event of Default, (C) any removal of the General Partner pursuant to the exercise by a Limited Partner of its rights under Section 7.7 of this Agreement, (D) any exercise of a Limited Partner's right to demand repurchase under Article V herein, or (E) the performance or nonperformance of any of the General Partner's or any Affiliate's monetary obligations under this Agreement or any other obligation the General Partner or any Affiliate may have under this Agreement to pay any amounts to or on behalf of the Partnership or any Partner. Furthermore, without limiting the foregoing, the General Partner shall not be indemnified for any such losses, judgments, liabilities, expenses or settlement amounts unless and until (1) the General Partner becomes subject to a final and non-appealable order, judgment or ruling by a court of competent jurisdiction with respect to all matters with respect to which indemnification is being sought, (2) all such claims have been dismissed with prejudice on the merits by a court of competent jurisdiction in favor of the General Partner, or (3) a court of competent jurisdiction approves a settlement with respect to the General Partner fully covering all matters with respect to which indemnification is being sought; provided, to the extent it is reasonably likely that the General Partner will be entitled to reimbursement pursuant to the foregoing provisions, the General Partner may be reimbursed prior to such time by the Partnership for reasonable attorneys' fees and other reasonable costs in defending or pursuing the matter unless such reimbursement would cause an Operating Deficit and provided

further, that in the event it is ultimately determined that the General Partner is not entitled to be indemnified as provided in this Section 6.6(a), it shall repay an amount equal to such attorneys' fees and other reasonable costs to the Partnership within thirty (30) days of such determination.

(b)     Notwithstanding Section 6.6(a), the General Partner shall not be indemnified for any losses, liabilities or expenses arising from or out of any alleged violation of federal or state securities laws unless (1) there has been a successful adjudication on the merits of each count involving alleged securities law violations in a manner favorable to the General Partner, or (2) such claims have been dismissed with prejudice on the merits by a court of competent jurisdiction as to the General Partner, or (3) a court of competent jurisdiction approves a settlement of the claims against the General Partner and such settlement concludes that the General Partner was not liable.

(c)     The Partnership shall not incur the cost of that portion of any insurance, other than public liability insurance, which insures any party against any liability, the indemnification of which is herein prohibited.

(d)     Without limiting any other indemnification obligations of the General Partner set forth in this Agreement, the General Partner shall indemnify, defend and hold harmless the Indemnitees from and against, and shall upon demand reimburse the Indemnitees for any and all, losses, claims, liabilities, damages, injunctive relief, injuries to person, property or natural resources, costs, actions or causes of action, fines, penalties, judgments, taxes, charges, assessments, damages (including consequential damages suffered by a third-party claimant), costs and expenses (including reasonable attorneys' fees and expenses), of every kind and nature whatsoever, whether direct or indirect, realized, suffered or incurred by or imposed upon any of the Indemnitees before, during or after the term of the Partnership, arising, accruing, relating to or in connection with (i) any Event of Default, or the existence of any circumstance which would give rise to an Event of Default following any required notice and expiration of any cure period, (ii) any representation, warranty or statement of the General Partner in this Agreement or in any document, certificate or schedule furnished or to be furnished to the Limited Partners pursuant hereto that contains any untrue statement of a material fact or omits to state a material fact necessary to make the statements or facts contained therein not materially misleading which has a material adverse effect on the Partnership, the Project or a Limited Partner, or (iii) any act or omission, including, without limitation, any negligence or misconduct, of the General Partner or any of its Affiliates which has a material adverse effect on the Partnership, the Project or a Limited Partner.

6.7.    Development Duties, Covenants and Obligations.  The General Partner shall promptly take all action which may be necessary or appropriate for the timely and proper development, construction and/or rehabilitation as applicable, maintenance and operation of the Project in accordance with the provisions of this Agreement, the Project Documents and all applicable laws and regulations.  Specifically and without limitation the General Partner does hereby agree to undertake the following duties, covenants and obligations and further represents, warrants and covenants to the Limited Partners the following:

(a)     The General Partner shall provide in the Project Budget for a hard cost contingency exclusive of any contingency line item set forth in the Construction Contract of at least 5% of the contract sum set forth in the Construction Contract for new construction or 10% for acquisition/rehabilitation.  Use of such hard cost contingency shall require the Consent of the SLP.  Neither the General Partner nor the Developer shall authorize any change orders or make any changes in the Plans and Specifications except as provided in Section 10.7.  All Builder fees will comply with the Tax Credit Agency limits and any amounts due over the limits will be the responsibility of the General Partner.

(b)     The General Partner shall cause the Plans and Specifications to comply with all requirements of the Agency, the Lender, each License and Permit issued in connection with the Project, all Governmental Regulations and all required recommendations in the Environmental Reports.

(c)     Prior to the submission of any draw requests for vertical construction costs of the Project's buildings, the General Partner shall obtain from a surveyor licensed to practice in the state in which the Property is located, an updated ALTA Survey in form and substance reasonably acceptable to the SLP and the Construction Consultant and including the physical location of all utility easements (either of record or planned to be placed of record as required by the Plans and Specifications) and the building foundations and any zoning setback

41

requirements.  Furthermore, the General Partner shall make all required building foundation adjustments which are necessary to cure any building setback violation and/or encroachments over easements and underground utility lines as evidenced by the updated ALTA Survey.  The SLP shall have no obligation to approve a draw request for vertical construction costs related to any building until such time as the SLP has received and approved the updated survey in compliance with the above requirements and any defects or deficiencies in the foundations have been corrected in accordance herewith.

(d)     The Plans and Specifications approved by the SLP listed on Exhibit 4 were used to obtain all permits to construct and/or rehabilitate the Project and were approved by all applicable authority.  Neither the General Partner nor the Developer shall authorize any change orders or make any changes in the Plans and Specifications except as provided in Section 10.7.

(e)     All material Licenses and Permits (including building permits) necessary for the ownership, construction and/or rehabilitation and development of the Project have been obtained or will be obtained in a timely manner (and will be maintained in full force and effect) by the Partnership.  The Project will be improved, constructed, and developed to completion substantially in accordance with (1) all such Licenses and Permits (and all required certificates of occupancy shall be obtained upon completion of any such improvement, construction or development on or of the Project), (2) all Governmental Regulations, (3) accepted standards of good materials and workmanship, (4) all material covenants, conditions, restrictions, assessments and agreements of any kind or nature affecting the Project, including any in any existing documents, (5) the Plans and Specifications, and (6) the terms of this Agreement.  Any conditions to any Licenses and Permits have been satisfied or will be satisfied upon Final Construction Completion.

(f)     The Partnership is not in violation of any zoning or similar regulations applicable to the Project.  From and after Final Construction Completion, the Project will not endanger public health or the environment, and will conform with all applicable zoning, building, health, fire and environmental rules, regulations, ordinances or requirements of all governmental authorities having jurisdiction over the Project.  There are no violations of any Governmental Regulations, and there will be no such violations (not promptly addressed and corrected) for the term of the Partnership.  The General Partner has received no notices with respect to any violations of federal or state law or municipal ordinances or orders or requirements of any governmental body or authority within whose jurisdiction of the Project is located.  If the General Partner receives such notices, it will promptly so notify the Limited Partners.

(g)     Final Construction Completion shall occur by the Completion Date.  Upon Final Construction Completion, there will be no physical or mechanical defects or deficiencies in the condition of the Project which would materially and adversely affect the Project or any portion thereof.  Upon Final Construction Completion the Project will be free from infestation by termites or other pests, insects, animals or other vermin and is free from mold or mildew, and the General Partner will undertake all commercially reasonable efforts to keep it so.  Upon Final Construction Completion, the Project will be connected to and served by water, solid waste and sewage disposal, drainage, telephone, gas as applicable, electricity and other utility equipment facilities and services required by law, which will be (i) adequate for the proposed use and operation of the Project, (ii) installed and connected pursuant to valid permits, and (iii) in compliance with all material Governmental Regulations.  No fact or condition exists which would result in the termination or impairment in the furnishing of the foregoing.

(h)     To the best of the General Partner's knowledge after due inquiry, there are no defects or conditions of the soil that would have a material adverse effect upon the construction and/or rehabilitation, development, use, occupancy or operation of the Project.  The soil condition of the Property is such that it will support all of the improvements located or to be located thereon for the foreseeable life of the Project, without the need for unusual or new subsurface excavations, fill, footings, caissons or other installations, other than such excavations, fill, footings, caissons or other installations contemplated in the Plans and Specifications and in the Project Budget.

(i)     The General Partner agrees to diligently pursue remediation of any construction related issues prior to expiration of the warranty period under the Construction Contract.

(j)        The General Partner hereby unconditionally guarantees to the Partnership and the Limited Partners the due and punctual performance of all of the obligations under this Section 6.7 and all obligations of the Developer under the Development Agreement.  Furthermore, the General Partner and Developer hereby unconditionally jointly and severally agree to promptly pay any Development Costs to the extent available Development Funds are insufficient to pay such Development Costs when due (such obligations are referred to herein as the "**Development Completion Obligation**").  Prior to making any payment, the General Partner may require the Developer to defer payment of any outstanding balance of the Development Fee to the extent: (1) Development Funds would otherwise be available to pay such Development Fee at the time of the occurrence of a Development Completion Obligation but for the Development Fee then due, and (2) the SLP determines that there is a reasonable expectation that the Deferred Development Fee (as increased) can be paid by the 13th anniversary of Final Construction Completion.  Nothing contained in the preceding sentence shall create any duty or obligation on the part of the ILP to advance capital or fund any Installment prior to the satisfaction of all conditions thereto.

Any funds paid by the General Partner or Developer to satisfy a Development Completion Obligation (not including a deferral of Development Fee pursuant to the preceding paragraph) may be reimbursed to the General Partner or Developer, as applicable, from excess Development Funds which thereafter become available on or before the Final Determination is made in accordance with Section 6.7(k) below.  Any amounts paid by the General Partner or Developer (not including deferral of Development Fee) in connection with this Section 6.7(j) that are not reimbursed from Development Funds shall be accounted for as an indemnity payment to the Partnership and shall not be reimbursable or credited to the Capital Account of any Partner or may be treated as a Subordinated Loan repayable in accordance with Article IV only with the prior written Consent of the SLP.

(k)        Prior to funding the Final Installment, the SLP shall make a final determination (the "**Final Determination**") regarding all amounts the General Partner and/or Developer are obligated to pay pursuant to this Section 6.7.  Notwithstanding the above, in the event the Partnership is, or becomes, obligated to pay (i) any cost properly characterized as a Development Cost which is incurred after the Final Determination is made and/or (ii) any Development Cost which is not properly reflected on the Partnership records on the date of the Final Determination, then the General Partner and Developer shall immediately pay to the Partnership an amount equal to such additional Development Costs and such amounts shall be treated as Subordinated Loans repayable pursuant to Sections 4.2 and 4.5 of this Agreement.

(l)        It is expressly acknowledged that any failure of the General Partner or the Developer to fully perform obligations under this Section 6.7 (following a fifteen (15) business day notice and cure period for monetary defaults) constitutes adequate grounds for the removal of the General Partner pursuant to Section 7.7 and that any failure of the Developer to fully perform its obligations under this Section 6.7 or the Development Agreement (subject to a fifteen (15) business day notice and cure period) constitutes grounds for the immediate termination of the Development Agreement by the General Partner or the SLP, any provision of the Development Agreement notwithstanding.  Further, upon the removal of any General Partner pursuant to Section 7.7 or the withdrawal of any General Partner pursuant to Article IX, the new General Partner and the SLP shall have the option to immediately and without further cause terminate the Development Agreement, any provision of the Development Agreement notwithstanding, as well as any other contract between the Partnership and any Affiliate of the removed or withdrawing General Partner.  All amounts due to be paid in accordance with Section 6.8 and/or the Development Agreement are subject to offset and reduction in accordance with the terms of this Agreement; provided that the General Partner or the Developer has failed to fully perform the obligations under this Section 6.7 after expiration of the cure period set forth above.

6.8.      Development and Other Fees.  Except as specifically provided in this Agreement, the General Partner, the Developer, the Guarantor and all Affiliates thereof shall not be entitled to receive any salary, compensation or other fees paid by or on behalf of the Partnership, and any prior agreement, document or instrument purporting to create any obligation to pay the same shall be expressly superseded, amended and/or terminated to reflect only the following fees and compensation:

(a)        Development Fee.  The Partnership shall accrue and pay a Development Fee of $5,175,000 (or such other amount permitted by the Agency and ILP) to the Developer for services set forth in the Development Agreement.  The Development Fee shall be capitalized to the depreciable basis of the Project and earned in accordance with the Development Agreement.  The Development Fee is anticipated to be paid from the

available proceeds of the following Installments or otherwise at the time of the payment of such Installments after payment of all other Development Costs and amounts owing to the Limited Partners then due:

| INSTALLMENT | AMOUNT |
|---|---|
| First Installment | $283,500 |
| Third Installment | $1,456,869 |
| Final Installment | $467,453 |
| TOTAL | $2,207,823 |

The Development Fee is subject to reduction, offset or application in accordance with the terms of this Agreement. The Developer acknowledges that payment of the Development Fee, whether payable under this Agreement or the Development Agreement, is subordinate in all respects to any obligations owing to (i) the ILP and/or SLP pursuant to this Agreement and the Guaranty, and/or (ii) any third-party creditor of the Partnership. The Developer shall not assign its right to receive the Development Fee to any party without the prior Consent of the SLP. Any unpaid balance of the Development Fee after payment of Final Installment (the "**Deferred Development Fee**") shall bear interest at 6% per annum and shall be paid in accordance with Article IV, but in no event later than the 13th anniversary of Final Construction Completion; in the event that any portion of the Deferred Development Fee remains unpaid on the 13th anniversary of Final Construction Completion, such amount shall be paid by the Partnership on said date from the proceeds of the additional Capital Contribution made by the General Partner pursuant to Section 3.1. Any cost savings in the Project Budget (including contingency) upon Final Determination (not including cost savings paid to the Contractor pursuant to the Construction Contract) may be applied to payment of Development Fee so long as there are no outstanding Development Costs or uncured Events of Default under this Agreement. To the extent of any conflict or inconsistency between the provisions of the Development Agreement and this Agreement, the provisions of this Agreement shall control.

(b)     Investor Services Fee. The Partnership shall pay to the ILP an annual cumulative fee equal to $8,650 per year, commencing with the year in which the first unit in the Project is occupied (the "**Investor Services Fee**"). The Investor Services Fee shall be payable pursuant to Section 4.2 and Section 4.5 and shall be increased annually by 3%.

The Investor Services Fee shall be paid for the following services: (1) monitoring the General Partner's reporting of operational results of the Project in the periodic reports required under this Agreement and other books of account of the Partnership; (2) reviewing the audited financial statements and tax returns prepared by the Accountants; (3) performing an annual review and physical inspection of the Project; (4) reviewing the annual operating budget and projected rental rates for the Project for each fiscal year during the term of this Agreement; (5) reviewing the occupancy/rental report for the Project; and (6) reviewing all other information available to the Partnership requested by the Limited Partner with respect to the Project.

(c)     Partnership Management Fee. The Partnership shall pay to the General Partner an annual cumulative fee equal to $34,600 per year, commencing in the year in which the first unit in the Project is occupied (the "**Partnership Management Fee**"). The Partnership Management Fee shall be payable pursuant to Section 4.2 and Section 4.5 and shall be increased annually by 3%. The Partnership Management Fee shall be for managing the affairs of the Partnership, which duties and responsibilities include: (1) the administration, management and direction of the business of the Partnership; (2) the monitoring of the management and operations of the Project and the making of recommendations with respect thereto; (3) the supervision of the Property Manager; (4) the maintenance of books and records of the Partnership; (5) the safekeeping and use of all funds and assets of the Partnership, including the maintenance of bank accounts; (6) the furnishing of all reports required by this Agreement; (7) consultation with and coordination of the activities of attorneys, Accountants and other professionals for the benefit of the Partnership; (8) the development and maintenance of favorable community relations between the Partnership and various social and community organizations; and (9) the maintenance of effective communication and necessary coordination with all governmental bodies having jurisdiction over the Project.

(d)     Incentive Management Fee. The Partnership shall pay to the General Partner an annual non-cumulative fee only to the extent of available funds pursuant to Section 4.2 of the Partnership Agreement (the

"**Incentive Management Fee**") equal to 10% of Operating Revenue for such year for ensuring the satisfaction of each of the following: (1) the timely preparation and delivery of all financial and other reports required by this Agreement and by each Lender and Agency; (2) the performance of all compliance and monitoring covenants, duties and responsibilities pertaining to the Tax Credit; and (3) the performance of an annual review and physical inspection of the Project by the ILP by providing reasonable assistance to the ILP or its designee in performing such review. As used in this Agreement, a "non-cumulative fee" means that if funds are not available to pay such fee in a given year, then the fee for such year does not accrue and will not be subsequently paid, and a "cumulative fee" means if funds are not available to pay such fee in a given year, then the fee for such year will accrue and will be subsequently paid when funds are available.

   (e) <u>Incentive Lease-Up Fee</u>.  The Partnership shall pay to the General Partner the Incentive Lease-Up Fee pursuant to the terms set forth in Section 4.2 of this Agreement.

  6.9. <u>Environmental Matters</u>.

   (a) <u>Environmental Representations and Warranty</u>.  To the best of the General Partner's knowledge after due inquiry and based upon review of the Environmental Reports, except as disclosed in the Environmental Reports, no Hazardous Substance was ever or is now stored on, transported to or from, or disposed of on the Property except to the extent any such storage, transport or disposition was at all times in compliance with all laws, ordinances, and regulations pertaining thereto and fully disclosed to the SLP. All operations or activities upon, or use of, the Project, or any portion thereof, by the Partnership, or, to the best of the General Partner's knowledge, by any tenant or occupant of the Project or any portion thereof, are, have been and will continue to be in compliance with all Governmental Regulations, including, without limitation, all Environmental Laws as now or at any time hereafter in effect relating to the generation, handling, manufacturing, treatment, storage, use, transportation, spillage, release, leakage, dumping, discharge or disposal (whether accidental or intentional) of any toxic or hazardous substances, materials or wastes, including, but not limited to, Hazardous Substances, the violation of which Governmental Regulations and Environmental Laws would have a material adverse effect, and no person has engaged in or permitted any dumping, discharge, disposal, spillage or leakage (whether legal or illegal, accidental or intentional) of Hazardous Substances, at, on, in or about, the Project or any portion thereof, which would have a material adverse effect on the Project or the Property. Except as disclosed in the Environmental Reports, there is not present upon the Project, the Property, or any portion thereof, any asbestos, or any structures, fixtures, equipment or other objects or materials containing asbestos. To the General Partner's knowledge, there is not any radon present on, in or about the Project or any portion thereof, in an amount sufficient to create a material hazard or violate local Governmental Regulations relating to radon. No General Partner, Affiliate of a General Partner or Person for whose conduct any General Partner is or was responsible has ever received notification from any federal, state or other governmental authority of (i) any potential, known, or threatened release of any Hazardous Substance from, at, or to the Project or (ii) the incurrence of any expense or loss by any such governmental authority or by any other Person in connection with the assessment, containment or removal of any release or threat of release of any Hazardous Substances from, at or to the Project. If any proceeding, inquiry or notice is commenced or received, the General Partner will promptly so notify the Limited Partners.

   (b) <u>Environmental Covenants and Obligations</u>.  The General Partner shall (i) not store (except in the ordinary course of business and in compliance with all laws, ordinances, and regulations pertaining thereto), dispose, dump, leak, treat, or discharge or permit the storage, disposal, treatment, dumping, leakage, seepage or discharge of any Hazardous Substance at the Project; (ii) neither directly nor indirectly transport or arrange for the transport of any Hazardous Substance (except in compliance with all laws, ordinances, and regulations pertaining thereto), and (iii) provide the ILP and the SLP with written notice (1) upon any General Partner obtaining knowledge of any potential or known release, or threat of release, of any Hazardous Substance at, from or to the Project; (2) upon any General Partner's receipt of any notice to such effect from any federal, state, or other governmental authority; and (3) upon any General Partner's obtaining knowledge of any incurrence of any expense or loss by any such governmental authority in connection with the assessment, containment, or removal of any Hazardous Substance for which expense or loss any General Partner may be liable or for which expense or loss or lien may be imposed on the Project.

   (c) <u>Environmental Indemnification</u>.  The General Partner hereby agrees to defend, indemnify and hold harmless the Indemnitees from and against, and shall upon demand reimburse Indemnitees for, any and all

losses, claims, liabilities, damages, injunctive relief, injuries to person, property or natural resources, costs, actions or causes of action, fines, penalties, judgments, damages (including consequential damages suffered by a third party claimant) and expenses (including reasonable attorneys' fees and expenses) of every kind and nature whatsoever that are caused (whether before, during or after the term of the Partnership) by any or all of the following:

(1)      a threatened release or release of any Hazardous Substance at, on, to, from, in, under, affecting or otherwise related to any portion of any of the Project, whether foreseeable or unforeseeable, regardless of the source of such threatened release or release or when such release occurred or when its presence is discovered. The foregoing indemnity includes, without limitation, all costs in law or in equity of removal, remediation of any kind, and disposal of such Hazardous Substances, all costs of determining whether the Project is in compliance with, and causing the Project to be in compliance with, all applicable Governmental Regulations and Environmental Laws, all costs associated with claims for damages to persons, property, or natural resources, and the Indemnitees' reasonable attorneys' and consultants' fees and court costs in connection with the foregoing. This indemnity shall include the costs to the Indemnitees of removing and reducing the levels of any Hazardous Substance (i) to the levels required by Environmental Laws if permissible levels of such substances have been established by Environmental Laws, and (ii) to the extent necessary so that the Project is fit for its originally intended use, as determined by Indemnitees' consultant, if permissible levels have not been specifically established by applicable Environmental Laws. The foregoing indemnity also shall include all costs incurred by the Indemnitees necessary to restore the Project or otherwise enable the Project to be fit for the originally intended use; and

(2)      the enforcement of this environmental indemnity.

6.10.      Partnership Manager and Tax Matters Partner.

(a)      Partnership Manager. The General Partner is hereby appointed the Partnership Manager. In the event that the General Partner is comprised of more than one Person, the General Partner shall in writing appoint one of the Persons who is a General Partner as the Partnership Manager, subject to approval by the SLP. Such Partnership Manager shall exercise all the rights, powers and duties of the General Partner hereunder, and the other General Partner shall not exercise the same. Notwithstanding the foregoing, in the event the SLP or its designee becomes a substitute or additional General Partner in accordance with this Agreement, the SLP or its designee shall automatically and without further action become Partnership Manager and any designation or delegation of such function to any other General Partner shall be null and void. In no event shall the designation of the SLP as the Partnership Manager be revoked or terminated by any General Partner without the Consent of the SLP.

(b)      Tax Matters Partner.

(1)      The General Partner is hereby designated the Tax Matters Partner. The Tax Matters Partner shall take no action in its capacity as such without the Consent of the SLP, other than such action as the Tax Matters Partner may be required to take by law. The Tax Matters Partner shall comply with the responsibilities set forth in Sections 6221 through 6234 of the Code and in doing so shall incur no liability to the other Partners. The Tax Matters Partner shall be reimbursed for any expenses reasonably incurred in connection with the preparation for or pursuance of administrative or judicial proceedings, subject to the Consent of the SLP as to the amount of the expenditure. Notwithstanding the foregoing, in the event the SLP or its designee becomes a substitute or additional General Partner in accordance with this Agreement, the SLP or its designee shall automatically and without further action become the Tax Matters Partner and any designation or delegation of such function to any other General Partner pursuant to this Section shall be null and void. In no event shall the designation of the SLP as the Tax Matters Partner be revoked or terminated by any General Partner without the Consent of the SLP and ILP.

(2)      The Tax Matters Partners shall not enter into any extension of the period of limitations for making assessments on behalf of the ILP or the SLP without first obtaining the Consent of the affected Limited Partner.

(3)      The Tax Matters Partner shall not bind any Limited Partner to a settlement agreement without obtaining the written concurrence of such Limited Partner. For purposes of this subsection, the term "**settlement agreement**" shall include a settlement agreement at either an administrative or judicial level. Any

Partner who enters into a settlement agreement with respect to any Partnership items (within the meaning of Section 6231(a)(3) of the Code)) shall notify the other Partners of such settlement agreement and its terms within thirty (30) calendar days from the date of settlement.

(4)     The Tax Matters Partner agrees that it will choose the United States Tax Court for litigation of all tax issues involving the Partnership, unless the Tax Matters Partner obtains the Consent of the ILP or the SLP to litigate in another forum.

(5)     The Tax Matters Partner shall keep the Limited Partners advised of any dispute the Partnership may have with any federal, state or local taxing authority (a "**Tax Dispute**"), and shall afford the Limited Partners the opportunity to participate directly in the negotiation of the Tax Dispute, to the extent permitted by law and shall not settle a Tax Dispute without the Consent of the SLP.  If, at any time, the Limited Partners desire to accept a settlement offer or other proposed resolution of a Tax Dispute, and the General Partner does not, then the Limited Partners shall either (i) permit the General Partner to continue protesting the adjustment at issue in the Tax Dispute; or (ii) advise the General Partner that the Limited Partners elect to resolve the Tax Dispute as proposed by the taxing authority, in which case the General Partner shall facilitate the resolution of the Tax Dispute favored by the Limited Partners; provided, if the Limited Partners elect this clause (ii), the General Partner shall resolve such Tax Dispute or may continue protesting the adjustment at issue in the Tax Dispute if the General Partner has a reasonable basis to do so and only after the General Partner deposits in an account at PNC Bank, National Association (which account shall be subject to a pledge agreement and account control agreement in favor of the SLP) an amount reasonably determined by the SLP which is sufficient to resolve the Tax Dispute as favored by the Limited Partners and cover additional costs and/or damages that may occur from the continued protest.  Upon a resolution of such Tax Dispute amounts in the reserve shall first be applied to satisfy obligations of the Tax Dispute, and to the extent obligations of the Tax Dispute are in excess of the reserve amount the General Partner shall pay all such amounts to the Partnership as damages for breach of warranty, provided if there is excess amounts in such reserve after resolution and satisfaction of the Tax Dispute as confirmed in writing by the SLP, such amounts shall be returned to the General Partner.  Legal fees incurred in connection with any Tax Dispute shall be paid by the Partnership.

(6)     If an Event of Withdrawal occurs with respect to the General Partner designated as the Tax Matters Partner, the Partnership shall, subject to the requirements of Section 6.10(b), designate a successor Tax Matters Partner in accordance with Treasury Regulation Section 301.6231(a)(7)-1 or any successor Regulation.  The Partnership shall notify the Internal Revenue Service of the designation of a successor Tax Matters Partner for such year as well as for all prior years that the withdrawn General Partner was serving as Tax Matters Partner.  In addition, at any time the SLP or an Affiliate thereof becomes a General Partner of the Partnership, the Partnership shall designate the SLP or its Affiliate as the successor Tax Matters Partner in accordance with the Treasury Regulation Section 301.6231(a)(7)-1 or any successor Regulation.  The Partnership shall then notify the Internal Revenue Service of the designation of the successor Tax Matters Partner for such year as well as for all prior years that neither the SLP nor an Affiliate thereof was serving as Tax Matters Partner.

(7)     The provisions of this Section 6.10 shall survive the termination of the Partnership or the termination of any Partner's interest in the Partnership and shall remain binding on the Partners for the period of time necessary to resolve with the Internal Revenue Service or the United States Department of the Treasury any and all matters regarding the United States federal income taxation of the Partnership.

6.11.     Property Manager.

(a)     The Partnership shall enter into a Property Management Agreement with the Property Manager pursuant to which the Property Manager will manage, operate and maintain the Project on a day-to-day basis and rent the apartment units in the Project in compliance with all of the regulations, requirements and restrictions of the Lender, the Agency and any other regulatory agency.  The Property Manager shall perform the services set forth in the Property Management Agreement and in consideration therefor the Partnership shall agree to pay to the Property Manager a monthly management fee in an amount not to exceed 2.72% of gross rents collected for the preceding month, as approved by HUD.  Any increase in said fee will require the Consent of the SLP, as well as the consent of any Lender and Agency, whose consent shall be required.  The General Partner and Property Manager hereby agree and acknowledge that the Partnership's budgeted line item in any year for "management fee"

47

shall not be increased without the prior written Consent of the SLP. In addition, in the event the Property Manager is an Affiliate of the General Partner, Developer or Guarantor, the Property Manager agrees to defer its fee and payment of any operating expenses (including, but not limited to, administrative expenses, salaries, fees expenses, reimbursement of costs or allocation of overhead) of the Property Manager and/or any Affiliate thereof to the extent necessary for the Partnership to prevent either (i) the occurrence of an Operating Deficit or (ii) a default under any Permitted Loan. Such deferral of payment in accordance with the preceding sentence shall not be taken into account for purposes of any limit or cap established in Section 6.5(d).

(b)     The Property Manager shall submit to the Partners the necessary periodic reports with respect to the operations of the Project, as described in Section 10.7. The Property Manager shall comply with all Environmental Laws pertaining to lead-based paint, including, but not limited to, the regular maintenance, inspection, risk assessment, remediation and notice to tenants. The Property Manager further agrees to implement regular property management maintenance, inspection, risk assessment, and remediation efforts to address moisture and/or mold issues occurring with respect to the Project or any dwelling unit. Each tenant's lease shall contain an affirmative covenant on the part of the tenant to report moisture, mold and/or leaks to the Property Manager and the Property Manager shall promptly address and remediate any such issues.

(c)     The Property Management Agreement shall be for a one (1) year term (which may include automatic renewals) and shall be terminable upon thirty (30) days' notice from the General Partner to the Property Manager without cause, and shall also be terminated immediately at the request of the SLP upon the occurrence of any of the following.

(1)     an Event of Bankruptcy with respect to the Property Manager;

(2)     the Property Manager shall commit misconduct or negligence in its conduct of its duties and obligations as the Property Manager;

(3)     the Property Manager is cited by any Lender or Agency for a violation or alleged violation of any applicable rules, regulations, covenant or requirements, including, but not limited to, noncompliance with the Minimum Set-Aside Test, the Rent Restriction Test, the Agency Set-Aside Test or any other Tax Credit-related provision and such violation is not cured within any applicable cure or grace period;

(4)     the Partnership has not achieved by the one (1) year anniversary of Final Construction Completion monthly Breakeven Operations for a three (3) consecutive month period or thereafter the Project fails to maintain Breakeven Operations on a monthly basis unless the General Partner and/or Guarantor is otherwise advancing funds to pay Operating Deficits;

(5)     the Property Manager fails to submit to the ILP or the SLP any periodic reports required under Sections 10.7(b), 10.7(c)(1), 10.7(c)(2), 10.7(c)(3) and 10.10 within the time periods required for two (2) consecutive time periods for each applicable report and the SLP has given notice to the Property Manager and the General Partner in accordance with Section 10.11;

(6)     the Property Manager leases a unit to a tenant who does not meet the income limitations under the Minimum Set-Aside Test or Agency Set-Aside Test, as applicable, or charges rents in excess of allowable rents for such units unless the foregoing relates to tenant fraud and the Property Manager is diligently working to correct the same;

(7)     if the Property Manager is a General Partner or an Affiliate of any General Partner or the Developer, the Project shall be subject to a substantial building, fire or safety code violation which shall not have been cured within six (6) months after notice from the applicable agency, other than with respect to safety code violations which must be cured within thirty (30) days of any such notice;

(8)     if the Property Manager is a General Partner or an Affiliate of any General Partner and an Event of Default has occurred pursuant to Section 7.7 which is not cured within any applicable cure or grace period,

48

or if the Property Manager is the Developer or an Affiliate of the Developer and the Development Agreement is terminated by the Partnership; or

(9)     if the Property Manager is an Affiliate of the General Partner and there is any change in the identity or control of any General Partner.

(d)     The selection or appointment of the Property Manager, or a replacement or successor thereto, shall be subject to the Consent of the SLP.  In the event the SLP and the General Partner cannot mutually agree to a successor or replacement Property Manager, the General Partner shall cause the Partnership to appoint the Property Manager selected by the SLP.  The Partnership shall not enter into any future management arrangement unless such arrangement is terminable without penalty upon the occurrence of the events described in this Section 6.11.

(e)     Any personnel to be employed in the management of the Project will be employees of the Property Manager, and not the Partnership, and will be hired, paid, supervised and discharged by the Property Manager.

(f)     The terms of the Property Management Agreement and any modifications or amendments thereto (including any extension of the term) shall be subject to the prior Consent of the SLP.

(g)     The Property Manager agrees that if it becomes subject to an Event of Bankruptcy that it will not oppose the General Partner's proceedings in bankruptcy court to accomplish a termination of the Property Management Agreement.

(h)     Upon 24 hours prior notice by the ILP, the SLP or its agents, the Property Manager shall provide access to the Project to the requesting Partner or its agent in order to make a physical inspection of the exterior, the common areas and all units in the Project.  Such inspections shall take place during normal business hours unless otherwise agreed to between the SLP and the Property Manager be generally conducted on an annual basis and shall include the right to review the operating, maintenance and tenant records, as well as an interview of on-site staff and their supervisors.

(i)     Upon written notice from the ILP and/or SLP that an Event of Default has occurred under the Partnership Agreement and the election by the Limited Partners to exercise the rights set forth in Section 7.7(g), the Property Manager shall comply with the instructions from the SLP regarding all Project accounts, including deposits and withdrawals from such accounts.

In the event of any conflict between the provisions of the Property Management Agreement and this Agreement, the provisions of this Agreement shall govern.  The General Partner shall either (i) cause the provisions of this Section 6.11 to be included in the Property Management Agreement or (ii) cause the Property Manager to acknowledge the provisions of this Section 6.11 in writing in a form satisfactory to the SLP.

(j)     For purposes of this Section 6.11 only, each General Partner hereby grants to the SLP an irrevocable (to the extent permitted by applicable law) power of attorney coupled with an interest to take any action, including the right to cause the Partnership to terminate the Property Management Agreement with the Property Manager and to execute and deliver any and all documents and instruments on behalf of such General Partner and the Partnership as the SLP may deem to be necessary or appropriate in order to effectuate the provisions of this Section 6.11.  The SLP agrees to refrain from exercising such power of attorney until the earlier of an Event of Default or the failure by the General Partner to terminate the Property Manager as provided in this Section 6.11.

6.12.   <u>Transactions With Lenders, Agencies and Affiliates of the SLP or the ILP</u>.  The Partnership may secure loans, credit facilities and financial services from PNC Bank, National Association ("**PNC Bank**") and other Affiliates of the SLP, the partners of the ILP or their respective Affiliates.  The General Partner acknowledges that its decisions to cause the Partnership to deal with PNC Bank, other Affiliates of the SLP, the partners of the ILP or their respective Affiliates shall be made based upon the General Partner's good faith determination that such dealings are in the best interest of the Partnership and in accordance with the General Partner's rights and powers

under the terms of this Agreement.  The General Partner and the Developer each acknowledge and agree that the SLP, the ILP and their respective partners and Affiliates shall have no liability to the Partnership, the General Partner, or the Developer, as a result of any such loans, credit facilities, and other financial services and that none of the obligations of the General Partner, the Partnership, or the Developer to the SLP, the ILP and their respective partners and Affiliates shall be excused, limited or otherwise adversely affected as a result of any such loans, credit facilities or other financial services.  The General Partner, the Developer and their Affiliates each further acknowledge and expressly agree that the SLP, the ILP, PNC Bank and their respective partners and Affiliates may (i) share or disclose information with or to PNC Bank and other Affiliates of the SLP, the ILP, its respective partners and their Affiliates, investors, proposed investors, their agents and representatives, regulators and Agencies, and (ii) discuss matters related to the Project and Partnership and share or disclose information with Lenders, parties to Project Documents, prospective lenders, the Tax Credit Agency and other regulatory agencies, and any such disclosures and discussions are expressly permitted and agreed to and shall not constitute a breach of any duty or obligation, fiduciary or otherwise, owed to the Partnership, the General Partner, the Developer, or any Affiliate thereof by the SLP, the ILP, their respective partners and Affiliates, or PNC Bank.

6.13.    _Applied Amounts_.  Any amounts due by the General Partner hereunder which are not paid within fifteen (15) business days after demand is made therefor shall bear simple interest, from the due date therefor through the date of payment (including payment through application of Applied Amounts as set forth herein), equal to the lesser of (i) the Prime Rate plus 4% or (ii) the maximum permissible interest rate.  In the event that the General Partner shall fail to make any payment required pursuant to this Agreement, within fifteen (15) business days after demand is made therefor, then, in addition to any other remedies at law or in equity which may be available to the ILP, the General Partner shall be obligated to cause the Partnership to utilize amounts payable to the General Partner, the Developer and the Guarantor and their respective Affiliates under Section 4.2, Section 4.5, Section 6.8, Section 6.11, the Development Agreement, the Affiliate Loan, the Property Management Agreement (if the Property Manager is an Affiliate of the General Partner, the Guarantor or the Developer) and the other Project Documents (the "**Applied Amounts**") to meet the obligations of the General Partner.  Such utilization of Applied Amounts constitutes payment and satisfaction of the corresponding amounts with the proceeds thereof being applied to such obligations of the General Partner, and the obligation of the Partnership to make such payments is deemed satisfied to the extent thereof.  Each of the General Partner, the Developer, the Guarantor and the Property Manager if an Affiliate of the General Partner, the Guarantor or the Developer covenant and agree that the General Partner, the Guarantor, the Developer, the Property Manager, if applicable, and all Affiliates of the General Partner, the Guarantor and the Developer will recognize as income any Applied Amounts for federal and state income tax purposes.  Notwithstanding the foregoing, failure to make any payment required under this Agreement shall be an Event of Default, the provisions for collecting such outstanding amounts through the mechanism of Applied Amounts notwithstanding.

## ARTICLE VII

## RIGHTS AND LIMITATIONS OF LIMITED PARTNERS

7.1.    _Limited Assessment_.  Except as may otherwise be provided under applicable law, the Limited Partners shall not be bound by, or personally liable for, the expenses, liabilities or obligations of the Partnership and no Limited Partner shall be required to make any Capital Contributions (including if such Limited Partner becomes a general partner pursuant to the terms of this Agreement) other than the Capital Contributions required to be made by such Limited Partner pursuant to this Agreement.  The Partnership shall indemnify and hold harmless the SLP and the ILP, and their Affiliates, employees and representatives, from and against all losses, liabilities, damages, judgments, settlements and expenses (including legal fees) incurred as a result of actions against such Limited Partners in their capacity as partners of the Partnership.  The indemnification provided herein is in addition to and not a limit on any other right of contribution or indemnity by the Partnership or General Partner which otherwise might exist in favor of any of the Limited Partners.

7.2.    _No Right To Manage; Right To Inspect_.  Except as specifically provided in this Agreement, no Limited Partner shall take part in, or interfere in any manner with, the management, control, conduct or operation of the Partnership, or have any right, power or authority to act for or bind the Partnership.  Notwithstanding the foregoing limitation, the Limited Partners and their respective employees, agents and consultants shall have the right upon 24 hours prior notice to the General Partner to access all of the books and records of the Partnership and the

Project, and physical access to the Project including all buildings and improvements thereof. These rights may be exercised by the Limited Partners at any time, though the Limited Partners shall endeavor to conduct such inquiries and inspections on weekdays between 9:00 a.m. and 5:00 p.m. Furthermore, the Limited Partners shall have the right, without the Consent of the General Partner, to contact, make inquiries of, and receive information from any third party directly or indirectly engaged by, or which have contracted with, or which are considering contracting with or becoming engaged by, the Partnership, or the General Partner or Property Manager on behalf of the Partnership, including, without limitation, any Lender, the Agency or Property Manager. All physical inspections of the Project and inquiries made to third parties by the Limited Partners in accordance with this paragraph shall not constitute a breach of any fiduciary or other duty that may be owed by the Limited Partners to the Partnership or to the General Partner. The General Partner shall cooperate with any request made to a third party and, if requested, shall aid the Limited Partners in identifying, contacting and obtaining any information from a third party in accordance with this Section 7.2.

7.3.    Priority. No member of any class of Limited Partners shall have priority over any other member of such class of Limited Partners, either as to the return of Capital Contributions or as to Net Profit, Net Loss, Net Profit From Sale, Net Loss From Sale or Distributions, unless otherwise specifically provided herein.

7.4.    Death, Disability, etc. of a Limited Partner. The Partnership shall not be dissolved by the death, insanity, adjudication of incompetency, bankruptcy, insolvency or withdrawal of any Limited Partner; by the assignment by any Limited Partner of its Partnership interest; or by the admission of a Substitute Limited Partner or a Supplemental Limited Partner.

7.5.    Meetings. A meeting of the Partners may be called by any Partner. Meetings of Partners may be held in such place mutually agreed upon by the Partners. Meetings may be held via teleconference.

7.6.    Proposal and Adoption of Amendments Generally.

(a)    Amendments to this Agreement to reflect the addition or substitution of a Limited Partner, the designation of an additional or successor General Partner, or the removal or withdrawal of a General Partner shall be made at the time and in the manner otherwise provided herein. Any other amendments to this Agreement may be proposed in the following manner:

(1)    By the General Partner, who shall give to the Limited Partners via written notice the text of the proposed amendment, and if requested by the SLP, other information to evaluate the terms of the amendment which may include an opinion of counsel to address any state law or federal tax matters associated with such proposed amendment; or

(2)    By either the ILP or SLP, who shall submit to the General Partner via written notice the text of the proposed amendment, and if requested by the General Partner, other information to evaluate the terms of the amendment which may include an opinion of counsel to address any state law or federal tax matters associated with such proposed amendment.

(b)    Amendments proposed pursuant to Section 7.6(a)(1) above, subject to the provisions of Section 7.7, shall be adopted if the Consent of both the ILP and the SLP is obtained thereto. Amendments proposed pursuant to Section 7.6(a)(2) above shall be adopted if approved by the General Partner, which approval shall be deemed to have been obtained if, after thirty (30) days from the date the proposal is received by the General Partner, neither the SLP nor the ILP has received via written notice notification of the General Partner's objection to the proposal. Each General Partner hereby grants to the SLP an irrevocable (to the extent permitted by applicable law) power of attorney coupled with an interest to execute and deliver any amendment to this Agreement which is proposed pursuant to Section 7.6(a)(2) and which the General Partner is deemed to have approved pursuant to the immediately preceding sentence. Notwithstanding anything to the contrary contained herein, the Partners agree not to amend this Agreement without the prior written consent of the First Mortgage Lender prior to Mortgage Loan Commencement, if the effect of such amendment is to affect the Capital Contributions of the ILP or the amount, timing or conditions to the funding of such Capital Contribution Installments; provided however, that the application of the provisions of Section 3.5 in accordance with the terms thereof shall not be deemed an amendment to this Agreement, which shall not be unreasonably withheld.

(c)     The General Partner shall, within a reasonable time after the adoption of any amendment to this Agreement, make any official filings, recordings and publications required or desirable to reflect such amendment.

(d)     Any amendment to admit a Substitute Limited Partner shall be adopted if compliance with the conditions specified in Section 8.2 shall have been satisfactorily achieved by the Person to be substituted or added, and, if a Limited Partner is to be substituted, by the assigning Limited Partner or its attorney-in-fact.

(e)     Amendments to reflect the designation of an additional or successor General Partner shall be adopted if the conditions specified in Section 7.7 and/or Article IX shall have been satisfactorily achieved and the amendment shall have been signed by such additional or successor General Partner.

(f)     Subject to Section 6.3, amendments for the removal or withdrawal of a General Partner, if the business of the Partnership is continued, shall be adopted if the conditions specified in Section 7.7 and/or Article IX, as applicable, shall have been satisfactorily achieved and the amendment shall have been signed by the successor General Partner and/or the SLP General Partner.

7.7.     Special Rights of the Limited Partners.  Upon the occurrence of an Event of Default (as defined below) that has not been timely cured as permitted herein, the SLP shall have the right, but not the obligation, to (i) cause itself or its Affiliate to be admitted to the Partnership as an additional General Partner as provided in Section 7.7(b), and/or (ii) remove each General Partner as provided in Section 7.7(c).  Each General Partner hereby makes, constitutes, and appoints the SLP, with full power of substitution, the true and lawful attorney of, and in the name, place and stead of, such Partner, with power from time to time to take all action and do all things necessary or appropriate to implement and carry out the provisions of this Section 7.7.  Such appointment shall constitute a power of attorney coupled with an interest, shall be irrevocable, shall survive the death, incompetence or dissolution of any Partner and shall be binding on any assignee of all or any portion of the Partnership interest of any Partner.  Each Partner agrees that the SLP or any Person it causes to be admitted as a General Partner pursuant to Section 7.7(b) and/or Section 7.7(c) may withdraw as a General Partner (while retaining its rights as the SLP, if applicable) without the consent of any Partner other than the ILP and SLP.

Notwithstanding anything to the contrary in this or any other agreement, neither the SLP nor its designee (in their respective capacities as an additional or replacement General Partner) shall assume or otherwise become liable for any of the removed General Partner's payment or indemnification obligations to the Partnership and its Partners, Lenders, or other creditors, or any of the representations, warranties, duties, covenants or obligations attributed to the General Partner in this Agreement unless specifically agreed to in writing.  Nothing in this Section 7.7 shall reduce or otherwise limit the rights, remedies or other actions available to the Partnership, the ILP and/or the SLP against the removed General Partner or the Guarantor.

(a)     An "**Event of Default**" shall be the occurrence at any time of any one or more of the following events unless expressly waived in writing by the SLP in its sole discretion;

(1)     20% or more of the anticipated Low Income Units in the Project shall not be in compliance with Section 42 of the Code;

(2)     The Partnership fails to achieve Final Construction Completion by the Completion Date or fails to achieve Placement in Service by December 31, 2015;

(3)     An Event of Bankruptcy occurs with respect to any General Partner, the Developer or Guarantor or an Event of Withdrawal occurs with respect to any General Partner;

(4)     A General Partner, the Guarantor or the Developer or any Affiliate thereof has, in connection with the Partnership or the Project, performed an act or failed to perform any act constituting fraud, misconduct, negligence (unless such negligence is cured within fifteen (15) business days of notice thereof), a violation of law, a breach of fiduciary duty (unless such violation or breach (except for deceit or dishonesty) is cured

within fifteen (15) business days of notice thereof), misappropriation or comingling of funds, dishonesty or misrepresentation or nondisclosure of material facts;

(5)     Any event with respect to which the ILP and/or the SLP become entitled to exercise any right or remedy under Article V;

(6)     Any default or breach by a General Partner (whether in its capacity as a General Partner or in any other capacity), the Guarantor or the Developer and/or any of their Affiliates of any covenant, representation, warranty, duty or obligation under this Agreement, the Guaranty, or any Project Document which is not cured within any applicable notice or cure period;

(7)     Any default under any Permitted Loan is declared which is not cured within any applicable notice or cure period;

(8)     A failure of the General Partner to (i) enforce the terms of the Property Management Agreement and/or the Construction Contract within five (5) days of a request from the SLP, (ii) cause the Partnership to terminate the Property Manager as provided in Section 6.11 or (iii) cause the Partnership to terminate, upon the request of the SLP, the Project Architect or, as provided in Section 10.11, the Accountant;

(9)     Any violation or noncompliance by the Partnership, the General Partner, the Developer, the Guarantor and/or their respective Affiliates with any applicable law, statute, ordinance, code, rule, regulation, judgment, order, ruling, condition or other requirement of a statutory, regulatory, administrative, judicial or quasi-judicial nature or any other legal or governmental requirement of whatever kind or nature that has or is likely to have an adverse effect on the ILP, the SLP, the Tax Credit, the Project or the Partnership as the SLP may determine, and such violation or noncompliance is not (or is unlikely to be) cured in all respects within the earlier of fifteen (15) business days or such time period allowable under the applicable laws or regulations;

(10)    The failure to obtain the Consent of the SLP and/or ILP where such Consent is required under the terms of this Agreement;

(11)    Any General Partner shall have conducted its own affairs or the affairs of the Partnership in such a manner as would (i) cause the termination of the Partnership for federal income tax purposes, or (ii) cause the Partnership to be treated as an association taxable as a corporation for federal income tax purposes;

(12)    Any (i) failure to maintain the net worth and liquidity covenants required pursuant to Section 6.5(n) and/or (ii) material adverse change in the financial condition of the General Partner, the Developer and/or the Guarantor;

(13)    The occurrence of a Reporting Default, unless the Reporting Default is cured in accordance with Section 10.11;

(14)    The criminal conviction of the General Partner, the Developer or the Guarantor or any Affiliate thereof for fraud or any felony; or

(15)    At any time after Stabilized Occupancy, Breakeven Operations is not attained during any six (6) month period, unless the General Partner and/or Guarantor is otherwise advancing funds to pay any Operating Deficits.

The SLP shall determine in its sole discretion whether any Event of Default has occurred and whether such default has been cured or is likely to be cured within any grace period allowed within this Agreement upon expiration of which the SLP may exercise its rights set forth in this Section 7.7.

With respect to any Event of Default set forth in Section 7.7(a)(1) and Sections 7.7(a)(5) through 7.7(a)(8), Section 7.7(a)(10) and Section 7.7(a)(12)  and to the extent that such default is capable of being cured, the General Partner shall have the greater of fifteen (15) business days or the cure period provided in any Project Document to

cure such default upon receipt of notice from the SLP or any party to a Project Document if the Event of Default pertains to a Project Document (all notice/cure periods to run concurrently).  Any cure of any default by a Limited Partner whether by the acceleration of capital, advance of money, consent to release funds from reserves or otherwise shall not constitute a cure of any Event of Default, nor shall such actions on the part of the Limited Partners relieve any General Partner, Guarantor or Developer of its respective obligations under this Agreement, the Guaranty, or the Project Documents.

If an Event of Default is not cured within any applicable cure period or is not susceptible of being cured, then in addition to all of the other rights and remedies under this Agreement, including the right to remove a General Partner pursuant to this Section 7.7, the SLP shall have the right, but not the obligation, to terminate or assign without penalty all contracts or agreements entered into between the Partnership and any General Partner, the Developer or the Guarantor and/or their Affiliates who were engaged to provide services to the Partnership or the Project and each Partner hereby consents to any such action.  If the foregoing provision is held to be invalid by any court of competent jurisdiction or if such terminated Persons seek recovery against the Partnership or the Limited Partners in connection with such termination, then the General Partner (excluding the SLP or its designee if it elects to become an additional or substitute General Partner) shall indemnify the Partnership and its Partners from such expenses or liabilities.  All amounts then owing to the General Partner, the Developer and/or the Guarantor and/or their Affiliates at the time of termination or assignment shall automatically be assigned to the SLP without the necessity of any further action.

(b)     If, after an Event of Default that is not timely cured as set forth herein, the SLP elects to admit itself or its designee as an additional General Partner ("**SLP General Partner**"), such admission shall occur automatically and without further action by any Partner upon the giving of notice thereof by the SLP to the Partners, and each of the Partners hereby agrees and consents in advance to the foregoing admission, including the designation of the SLP General Partner as Partnership Manager and Tax Matters Partner pursuant to Section 6.10.  Upon admission of the SLP General Partner it shall have all power and authority of the General Partner under this Agreement (including, without limitation, all right to deposit to, withdraw from and otherwise control all Partnership bank accounts) and no other General Partner shall have any such right.  Notwithstanding its admission to the Partnership, the SLP General Partner shall not undertake or assume, or be deemed to have undertaken or assumed, any obligations or liabilities imposed on the General Partner, the Developer and/or the Guarantor pursuant to this Agreement, the Guaranty, the Development Agreement or the Project Documents, and/or those which arise in any other manner with respect to the Partnership or the Partners.

The economic rights interest of the SLP as the SLP shall continue unaffected by the new status of the SLP or its designee as a General Partner.

(c)     If, after an Event of Default that is not timely cured as set forth herein, the SLP elects to remove a General Partner, then such removal shall occur automatically and without further action by any Partner upon the giving of notice thereof by the SLP to the Partners.  Upon the removal of the General Partner, each of the following shall occur automatically:

(1)     The removed General Partner's Partnership interest shall be sold to the SLP or its designee for an amount equal to the lesser of (i) $100, or (ii) the amount of the removed General Partner's Capital Account, less any damages incurred by the Partnership in connection with the General Partner's removal;

(2)     Any and all rights and powers of the removed General Partner under this Agreement and the Project Documents shall transfer automatically to the SLP or its designee, including the designation of the SLP or its designee as Partnership Manager and Tax Matters Partner pursuant to Section 6.10;

(3)     The removed General Partner shall pay any and all damages suffered by the Partnership relating to each Event of Default; and

(4)     Any and all rights and claims the General Partner or any of its Affiliates may have against the Partnership for fees, repayment of any loan (specifically excluding the Seller Loan and GP Predevelopment Loan), and other payments owed by the Partnership shall terminate, inclusive of those payments, Distributions and fees that have been assigned pursuant to the terms of this Agreement.

(d)    All of the General Partner's and Guarantor's obligations and liabilities under this Agreement (including all indemnification obligations) shall survive such General Partner's whole or partial loss of powers, removal or withdrawal from the Partnership for any reason whatsoever, whether under this Section 7.7 or otherwise, and such General Partner shall not be excused to any extent from the payment or performance thereof, except that the removed General Partner shall not be liable for any liabilities and obligations first arising after the effective date of such removal or withdrawal unless such liabilities or obligations are:  (i) a result of an event occurring before such removal or withdrawal or the event giving rise to such removal or withdrawal; (ii) a reasonable consequence of such removal or withdrawal; (iii) a contractual obligation entered into prior to the effective date of such withdrawal or removal even though the time for performance or satisfaction of such obligation may not have yet occurred (including, without limitation, making capital contributions to enable the Partnership to pay Affiliate Loans or Deferred Development Fee); and/or (iv) attributable in any part to events occurring prior to the effective date of such withdrawal or removal. The General Partner shall fully indemnify and hold harmless the Partnership, the ILP, and the SLP (and its designee in regards to this Section 7.7, if applicable) from any and all losses, judgments, liabilities, expenses and amounts paid in settlement of any claims sustained, to the extent that any such liabilities and expenses relate to, arise from, or are attributable to claims, actions, omissions or events occurring in whole or in part prior to the date of the whole or partial loss of powers, removal or withdrawal from the Partnership for any reason whatsoever, whether under this Section 7.7 or otherwise.

(e)    Effective prior to the date of the removal or withdrawal of the General Partner, such General Partner shall be obligated to make a Capital Contribution to the Partnership in the amount of the then outstanding balance of any Affiliate Loan with said Capital Contribution to be paid by the Partnership (subject to the rights of other creditors of the Partnership and the application of Applied Amounts pursuant to Section 6.13) to the satisfaction of the Affiliate Loan; provided, however, that if (1) such loans are secured by a mortgage and (2) Tax Counsel concludes that such loans "should" or "will" be included in the computation of the ILP's minimum gain, then the General Partner shall not be obligated to make a Capital Contribution immediately prior to the effective date of the removal to satisfy the outstanding balance of the Affiliate Loan but the General Partner hereby acknowledges and agrees that any Affiliate Loan shall, in the sole and absolute discretion of the SLP, be subject to offset by any amounts owed by such removed General Partner, Developer, or Guarantor or Affiliates thereof to the Partnership.  The balance, if any, remaining to be paid with respect to an Affiliate Loan shall be subordinate in all respect to amounts needed to induce a replacement General Partner to assume the role thereof and the distribution of Net Cash Flow and Net Cash Proceeds shall be adjusted accordingly to accomplish such purpose.

(f)    The parties hereto acknowledge and agree that this Agreement is a contract under which the SLP and the ILP are excused from accepting performance from a General Partner, the Developer, and/or the Guarantor (or from their respective assignees, receivers or trustees) in the event that the General Partner, Developer, and/or Guarantor is granted relief under the Bankruptcy Code.  The parties agree that the effect of Section 7.7(b) and Section 7.7(c) is to make this Agreement subject to the exceptions to assumption and assignment of contracts set forth in Sections 365(c)(1) and 365(e)(2) of the Bankruptcy Code and the General Partner (i) shall not seek any assumption or assignment of this Agreement without the Consent of the SLP and the ILP; and (ii) will not oppose any application or motion to enforce the provisions of the foregoing Section of the Bankruptcy Code, even if the effect of such motion or application is to remove the General Partner from its position; provided, however, that such removal shall be pursuant to the provisions of this Section 7.7.

If removal of the General Partner is as a result of the occurrence of an Event of Bankruptcy, and, in the sole discretion of the SLP, the exercise of the rights and remedies under this Agreement would require permission of a bankruptcy court or other court of applicable jurisdiction, then the General Partner, for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, agrees not to oppose any action that the SLP, or any other Partner acting with the approval of the SLP, may take to obtain relief from any automatic stay imposed by Section 362 of the Bankruptcy Code or other similar statute, law or rule under which the General Partner is provided relief from its creditors, in order to exercise the rights and remedies available under this Agreement.

In the event that the General Partner files a petition for relief under the Bankruptcy Code in a jurisdiction other than a venue agreed upon by the parties in Section 13.12, the SLP may seek from the bankruptcy court with jurisdiction over said petition a change of venue to a bankruptcy court (and division, if applicable) in a district

4837-4545-8969.4

located in a venue set forth in Section 13.12, and each Partner and the Partnership hereby agree not to oppose or object to such application or motion.

(g)      Upon the occurrence of an Event of Default (or an event which, with the giving of notice or passage of time or both, would constitute an Event of Default), prior to exercising any other rights available to the SLP in this Agreement, the SLP may, but shall be under no obligation to (1) require that all Partnership and Project accounts be transferred into bank accounts held for the benefit of the Partnership which accounts shall require dual signatures for payment or transfer from all such accounts (one of which must be a representative of the SLP), (2) direct the Property Manager (or replacement or successor thereto) to deposit all income from the Partnership and the Project into the accounts described in the preceding clause (1) and/or (3) require the prior written Consent of the SLP to the payment or disbursement of any Partnership or Project funds.

(h)      Notwithstanding anything to the contrary contained herein, upon the removal or withdrawal of the General Partner, the Seller Loan and GP Predevelopment Loan shall not be transferred but shall be subject to offset as determined by the SLP.  In addition, notwithstanding anything in Section 4.2 or Section 4.5 herein, any payments toward the Seller Loan and GP Predevelopment Loan otherwise owed pursuant to Section 4.2(c) or Section 4.5(e) shall be subordinated and only paid immediately following payment of all amounts under Section 4.2(g) and/or Section 4.5(f), as applicable herein.  Furthermore, in the event the Net Cash Proceeds are insufficient to repay the Seller Loan and GP Predevelopment Loan upon a sale of the Project the balance of such loans shall be forgiven and, notwithstanding any provision to the contrary contained in this Agreement, the original General Partner and Guarantors jointly and severally agree to indemnify and hold the ILP harmless from the reduction in tax benefits and the income tax consequences attributable to any cancelation or forgiveness of such Partnership indebtedness and agree such obligation survives the removal/withdrawal of the General Partner notwithstanding anything to the contrary herein.

7.8.      Extraordinary Limited Partner Expenses.

(a)      Any and all costs and expenses incurred by or on behalf of the ILP and/or the SLP in connection with protecting and/or enforcing their respective rights and remedies against the Partnership, the General Partner, the Developer or the Guarantor or any Affiliate thereof with respect to this Agreement or any Project Document whether or not the General Partner is removed, withdrawn or otherwise, including, without limitation, attorneys' and/or other professionals' fees and expenses, shall be paid by the General Partner on demand whether or not a legal action is actually commenced.  In the event that it is ultimately determined by a court of competent jurisdiction that no basis exists for actions taken by the ILP and/or the SLP in connection with the exercise of its rights and remedies against the General Partner, the ILP and/or the SLP will not be entitled to be reimbursed for expenses under this Section 7.8 and they hereby agree to repay all amounts paid by the General Partner pursuant to this Section 7.8 together with costs and expenses incurred by the General Partner relating to the same.

(b)      The Partnership shall pay (or the General Partner shall pay if the Partnership has insufficient funds), on demand, any and all costs and expenses incurred by or on behalf of the Limited Partners, including reasonable attorneys' fees (which may include a new, updated, or revised tax opinion), in connection with any of the following: (1) Project or Partnership financing that is documented or otherwise closed anytime after the Closing Date, including the conversion of any forward-committed permanent loan that is made by a Lender other than PNC Bank, National Association and its Affiliates; (2) any Project refinancing or amendment of any Permitted Loan; or (3) any amendments to this Agreement or such other amendments to the Project Documents requiring the Consent of the Limited Partners (but excluding those relating to a transfer of the interest of the ILP, or such other amendments required or requested for the benefit of the SLP or ILP).  In addition, the Partnership shall pay (or the General Partner shall pay if the Partnership has insufficient funds), on demand, an administrative fee of $2,000 payable to the SLP in connection with the foregoing except for financing with respect to (1) which was contemplated on the Closing Date.

7.9.      Limited Partners as Lenders.  Subject to provisions of this Agreement with respect to related party loans, a limited partner of the ILP, including, without limitation, a bank, insurance company, or other financial institution (such limited partner being referred to, for purposes of this Section 7.9 only, as a "**Mortgagee**"), at any time may make, guarantee, own, acquire, or otherwise credit enhance, in whole or in part, a loan secured by a mortgage, deed of trust, trust deed, or other security instrument encumbering the Project owned by the Partnership

(for purposes of this Section 7.9 only, any such loan being referred to as a "**Mortgage Loan**").  Under no circumstances will a Mortgagee be considered to be acting on behalf or as an agent or the alter ego of such ILP.  A Mortgagee may take any actions that the Mortgagee, in its discretion, determines to be advisable in connection with a Mortgage Loan (including in connection with the enforcement of a Mortgage Loan).  By acquiring an interest in the Partnership, each Partner acknowledges that to the extent permitted by applicable law no Mortgagee owes the Partnership or any Partner any fiduciary duty or other duty or obligation whatsoever by virtue of such Mortgagee being a limited partner in the ILP.  Neither the Partnership nor any Partner will make any claim against a Mortgagee, or against the ILP in which the Mortgagee is a limited partner, relating to a Mortgage Loan and alleging any breach of any fiduciary duty, duty of care, or other duty whatsoever to the Partnership or to any Partner based in any way upon the Mortgagee's status as a limited partner of the ILP.

     7.10.    Sale; Purchase Option and Right of First Refusal.

     (a)    Purchase Option.  For a period of twelve (12) months immediately following the end of the Compliance Period for the last building in the Project (the "**Option Period**"), the General Partner (if it is then serving as general partner of the Partnership) will have an option to purchase the Project (the "**Asset Option**") or the Limited Partners' entire interest in the Partnership (the "**Interest Option**").  Notwithstanding the foregoing, the Option Period with respect to the Interest Option shall begin six (6) months immediately following the end of the Credit Period for the last building in the Project; provided, however, to the extent the Interest Option is exercised prior to the expiration of the Compliance Period, the General Partner shall provide a bond or collateral in favor of the ILP and/or SLP in an amount covering 100% of the recapture risk, adjusted annually, in form and substance satisfactory to the ILP and SLP.

     (1)    The purchase price of the Project (the "**Project Purchase Price**") if acquired pursuant to the Asset Option shall be the greater of: (A) the fair market value of the Project, and (B) the sum of one dollar ($1.00) plus (i) the amount of the outstanding debt secured by deeds of trust or mortgages on the Project and any other obligations of the Partnership, including, but not limited to, any loans from any Partner or any of their affiliates plus (ii) an amount sufficient to enable the Partnership to distribute cash to the Limited Partners pursuant to the liquidation provisions of the Partnership Agreement in an amount equal to the sum of (a) the amount of Exit Taxes payable by the Limited Partners in connection with the sale and receipt of any corresponding cash and (b) any amount owed to the Limited Partners under any provision of this Agreement (including all Adjustment Amounts owed under Section 3.5, inclusive of amounts payable only pursuant to Article IV of this Agreement), to the extent that such amounts are not otherwise paid from the proceeds of (A).  The Project Purchase Price shall be payable by the General Partner by taking the Project subject to the existing debt (but only to the extent permitted by all Lenders), and if not permitted by any Lender, or if the purchase price exceeds such debt, the Project Purchase Price (or the balance thereof) shall be payable in readily available funds which shall be distributed pursuant to the liquidation provisions of the Partnership Agreement.

     (2)    The purchase price of the Limited Partners' Partnership interest (the "**Interest Purchase Price**") if acquired pursuant to the Interest Option shall be the sum of: (A) the fair market value of the Limited Partners' Partnership interest and (B) the amount of Exit Taxes payable by the Limited Partners in connection with the sale and receipt of any corresponding cash and any amount owed to the Limited Partners under any provision of this Agreement (including all credit adjustments owed under Section 3.5, inclusive of amounts payable only pursuant to Article IV of this Agreement), to the extent such amounts are not otherwise paid from proceeds of (A).  The Interest Purchase Price shall be paid to the Limited Partners at closing in cash, unless otherwise mutually agreed to by the parties hereto.  The fair market value pursuant to (A) above shall be the amount the Limited Partners would receive in liquidation of the Partnership if the Project were sold for fair market value on such date.

     (3)    The fair market value of the Project pursuant to Section 7.10(a)(1) and/or Section 7.10(a)(2) shall be determined by mutual agreement of the parties or, in the absence of such agreement, as follows: the General Partner and the Limited Partners shall select a mutually acceptable appraiser who shall determine the fair market value of the Project.  In the event the parties are unable to agree upon an appraiser, the General Partner and the Limited Partners shall each select an appraiser.  If the difference between the two appraisals is within 10% of the lower of the two appraisals, the fair market value shall be the average of the two appraisals.  If the difference between the two appraisals is greater than 10% of the lower of the two appraisals, then the two appraisers shall jointly select a third appraiser.  If the two appraisers are unable jointly to select a third appraiser, either the General

4837-4545-8969.4

Partner or the Limited Partners may, upon written notice to the other, request that the appointment be made by the American Arbitration Association or its designee. If the third appraisal is less than either of the first two, then fair market value shall be the average of the two lowest appraisals. If the third appraisal is greater than the first two, then fair market value shall be the average of the two highest appraisals. If the third appraisal falls between the previous two appraisals, the fair market value shall be the value established by the third appraisal.

(4)     The General Partner and the Limited Partners shall share the cost equally of any appraiser jointly selected or shall pay the costs of the appraiser they each select and shall share the cost equally of any third appraiser. Any appraiser selected pursuant to this section shall be an MAI appraiser with at least five (5) years of experience in valuing income-restricted multifamily rental property. In determining the fair market value of the Project, the appraisal shall take into account (among other factors) any title restrictions and the requirement that the Project remain dedicated for the use of low income households pursuant to any restrictions under any loan agreements or regulatory agreements and shall additionally take into account any bond or collateral provided by the General Partner to the ILP and/or SLP for recapture risk, if any, as set forth in Section 7.10(a) above.

(5)     The closing pursuant to the purchase option shall occur within ninety (90) days after the Limited Partners' receipt of the General Partner's written notice of exercise of a specified option (such closing date may occur after the Option Period, provided that the Limited Partners receive such notice on or before the last day of the Option Period). As a condition to closing, the General Partner shall remain the General Partner and obtain all consents from any lessor, governmental agency and holder of a mortgage or deed of trust on the Project, or other person or entity whose consent to a sale is required. Except as provided above with respect to appraisal costs, all costs associated with the sale of the Project (or the Limited Partners' Partnership Interest) to the General Partner, including, without limitation, any transfer taxes, title policy premiums, recordation costs and costs related to the assumption of the underlying loans, shall be shared by the General Partner and the Partnership in accord with local custom. The Partners acknowledge that notwithstanding anything in this Agreement to the contrary, any sale of the Project will be subject to the terms of the Extended Low Income Housing Use Commitment and any rules, policies or procedures promulgated by the Tax Credit Agency relating thereto, including but not limited to any requirements for a right of first refusal to a qualified non-profit organization.

(b)     <u>Limited Partner Right To Require Sale.</u>

(1)     The General Partner shall be obligated to consider any reasonable offer by the Limited Partners to purchase the Project, or any reasonable third-party offer communicated to the Limited Partners or to resyndicate the Limited Partners' interests in the Partnership. In addition, at any time after the end of the Option Period, the SLP may, at its sole discretion, require the General Partner to commence marketing the Project with a broker selected by the General Partner approved by the SLP. If the Partnership, General Partner or SLP receives a bona fide written offer to purchase the Project which the Limited Partners desire to have the Partnership accept, then the SLP shall send notice to the General Partner that the SLP desires the Partnership to accept the offer. Within sixty (60) days of its receipt of any such notice, the General Partner must notify the SLP of the General Partner's decision either to accept such offer on behalf of the Partnership or to refuse such offer. If the General Partner elects to accept such offer, the General Partner shall be required to proceed promptly to close such transaction in accordance with the terms of the offer unless otherwise instructed by the SLP at any point prior to the closing of such transaction. If the General Partner refuses the offer, the General Partner shall be obligated to purchase all of the Limited Partners' interests in the Partnership within ninety (90) days for a purchase price equal to the amount of Net Cash Proceeds which the Limited Partners would have been entitled to receive pursuant to Section 4.5 hereof if the sale of the Project had been completed under the terms of the refused offer.

(2)     [Reserved].

(c)     <u>Limited Partner Put.</u> Notwithstanding anything to the contrary contained herein, the ILP and SLP shall have the right exercisable in their sole and absolute discretion to put their respective interests in the Partnership at any time following the end of the Credit Period to the General Partner or its designee for a price equal to the sum of the following: (i) one thousand and No/100ths Dollars ($1,000.00); (ii) the Limited Partners' costs and expenses incurred in connection with the transfer of their interests in the Partnership; and (iii) all amounts due and owing to the Limited Partners. Such transfer shall be made pursuant to an assignment and assumption agreement reasonably acceptable to the Limited Partners (which will address such matters as mutual release of the Partners and

<div align="center">58</div>

Guarantors (subject to ongoing obligations for recapture a set forth below)) and indemnity of the Limited Partners from and after the effective date of such assignment and assumption and, if during the Compliance Period, the continuation and ratification of the guarantees of the General Partner and Guarantors for Tax Credit recapture in accordance with Section 3.5 and certain ongoing compliance reporting obligations with respect to the Tax Credit).

(d)      Special Considerations Applicable to Future Developments.  To the extent a General Partner or the Developer or any Affiliates thereof (the "**Proposed Developer**") plan to develop a low income housing tax credit project within three (3) miles of the Project, the ILP, or its designee, shall have the right of first refusal for thirty (30) days beginning on the date the ILP, or its designee, receives the bid package for such development with a tax credit award issued by the Agency to commit to become the tax credit investment limited partner (or member) of such proposed project (with terms of such investment being consistent with those set forth in this Agreement and pricing based on that paid by PNC for similar transactions in the past 12 months), and the Proposed Developer shall negotiate in good faith to allow such opportunity to invest; provided, however, such right of first refusal shall expire if no agreement is reached within such thirty (30) day period.  In addition, the Proposed Developer shall not take any action with respect to the development of any Tax Credit rental housing within three (3) miles of the Project without the Consent of the SLP, which shall not be unreasonably withheld, delayed or conditioned.

## ARTICLE VIII

## TRANSFER BY LIMITED PARTNERS

8.1.      Compliance With Securities Laws.  No Partnership interest has been registered under the Securities Act of 1933, as amended, or under any state securities law.  Except as set forth in this Article VIII, a Limited Partner may not transfer all or any part of its Partnership interest.  Any transfer shall be in compliance with applicable federal and state securities laws.  A transfer, for purposes of this Agreement, shall be deemed to include, but not be limited to, any sale, transfer, assignment, pledge, creation of a security interest or other disposition, other than a pledge or creation of a security interest contemplated under the terms of this Agreement; provided, however, that no transfer shall be deemed to have occurred for purposes of the restrictions on transferability under this Article VIII, as a result of any change in the partners of the ILP.

8.2.      Transfer and Substitution.  The ILP and/or the SLP may transfer or assign all or any part of its interest in the Partnership to an Affiliate of the ILP without the consent of any other Partner.  Any transferee of such Limited Partner's interest shall promptly execute any documents reasonably necessary to effect the transfer in order to become a Substitute Limited Partner.  The General Partner shall cooperate as requested by the transferor Limited Partner in facilitating such transfer.

Transfers to non-affiliates of the Limited Partners prior to payment of all Installments owed by the ILP will require General Partner consent, which consent shall not be unreasonably withheld.  A transferor of a Limited Partner interest may give its transferee the right to become a Substitute Limited Partner without the consent of any other Partner only after the transferee (a) adopts and approves in writing all the terms and provisions of this Agreement then in effect; and (b) assumes the obligations, if any, of the transferor to the Partnership.  Any transfer in contravention of this Article VIII shall be void and ineffectual and shall not bind the Partnership.  In the event of a proposed transfer of the SLP's or ILP's interest to a non-Affiliate of such Limited Partner, the General Partner shall not be required to make any material revisions to this Agreement or any ancillary documents and such Limited Partners shall reimburse the General Partner, Guarantor, and/or the Partnership for their reasonable out-of-pocket expenses incurred with respect to the transfer as provided herein.

8.3.      Status of Transferee.  A transferee of a Limited Partner interest in the Partnership who is not admitted to the Partnership as a Substitute Limited Partner shall be entitled to receive only that share of Distributions, and the return of Capital Contribution, to which its transferor would otherwise have been entitled with respect to the interest transferred, and shall have no right to obtain any information on account of the Partnership's transactions, to inspect the Partnership books or to vote with the Limited Partners on any matter.  However, if a transferee and transferor jointly advise the General Partner in writing of a transfer of a Limited Partner or other interest in the Partnership, the Partnership shall furnish the transferee with pertinent tax information at the end of each Fiscal Year.

8.4.    SLP Consent.  From and after the Closing Date, no Limited Partner shall be admitted to the Partnership without the Consent of the SLP which Consent shall be in the SLP's sole discretion.

## ARTICLE IX

## CHANGES AMONG GENERAL PARTNERS

9.1.    Withdrawal.

(a)    Each of the following acts shall constitute an "**Event of Withdrawal**":

(1)    Without the prior Consent of the SLP, the voluntary or involuntary (including, without limitation, by operation of law) sale, disposition, transfer, conveyance, assignment, relinquishment, withdrawal, or other event (removal, pledge, hypothecation, creation of Partnership security interest not otherwise permitted by this Agreement, etc.) of the General Partner's interest in the Partnership or any Controlling Interest in such General Partner or of an interest which results in a new Person holding a Controlling Interest in such General Partner;

(2)    The death, adjudication of incompetency or other circumstance the result of which Rene O. Campos is no longer supervising the Project on behalf of the General Partner unless within ninety (90) days after such event a proposed successor and/or replacement shall have received the Consent of the SLP;

(3)    Without the prior Consent of the SLP, the voluntary or involuntary dissolution of a General Partner;

(4)    Without the prior Consent of the SLP, an Event of Bankruptcy with respect to any General Partner or with respect to the holder of any Controlling Interest in any General Partner; or

(5)    The SLP's removal of the General Partner  as General Partner of the Partnership.

(b)    Upon the occurrence of an Event of Withdrawal, such General Partner shall automatically cease to be a Partner of the Partnership and, unless expressly waived in writing by the SLP at the time of the withdrawal and by specific reference to this provision, in addition to any and all other legal remedies which may be pursued by the Partners, shall automatically and without notice or action of the Partners, relinquish to the SLP or its designee, the following, collectively, the "**Relinquished Interests**":

(1)    such General Partner's entire economic interest in the Partnership;

(2)    all unpaid fees, distributions, loans, profits or other amounts actually or allegedly due and owing by the Partnership and its Partners to such General Partner, the Developer, or any other Affiliate of such General Partner; and

(3)    any and all other rights, interests, credits, advantages, preferences, opportunities, priorities or other benefits arising from or relating to, in whole or in part (1) or (2) herein.

Further, to the extent the Developer is an Affiliate of the withdrawn General Partner, the Developer shall relinquish all of its economic interest in the Partnership and the Project, including, but not limited to, the right to receive any Development Fee payable pursuant to Section 6.8 and/or the Development Agreement, and the same shall be included as Relinquished Interests.

The Relinquished Interests shall be automatically transferred to the SLP or its designee and shall thereafter be fully and freely assignable and/or transferable in whole or in part (subject to applicable law) by the SLP (no Consent from any other Partner being required).  The withdrawn General Partner shall remain liable for any and all duties and obligations such General Partner had under this Agreement even after their Partnership interest has been transferred to the SLP, its designee or any subsequent transferee, provided that the withdrawn General Partner shall

60

not be liable for any duties and obligations arising subsequent to the withdrawal of the withdrawn General Partner and solely attributable to events occurring after the withdrawal of the withdrawn General Partner.

Except as otherwise required by law, the SLP or its designee shall have the right, but not the obligation, to automatically be admitted as a General Partner upon the occurrence of such Event of Withdrawal without any further notice or action other than filing any required amendment to a document on file with the State and each remaining Partner hereby expressly consents to such transfer and to the admission of the SLP or its designee as a General Partner.

(c)      Moreover, if the Partnership is required by law to recognize a transfer of a General Partner's Partnership interest not otherwise Consented to by the Limited Partners, the transferee shall not have the rights of a Partner, and the Partnership interest transferred shall be strictly limited to the transferor's rights to allocations and distributions as provided by this Agreement with respect to the transferred interest, if any, which allocations and distributions may be applied in the Partnership's sole discretion (without limiting any other legal or equitable rights of the Partnership) to satisfy in whole or in part the debts, obligations, or liabilities for damages, of whatever kind or nature, that the transferor or transferee of such interest may have to the Partnership, including, without limitation, any such debts, obligations, or liabilities for damages arising under or pursuant to this Agreement or any other Project Documents.

9.2.      Obligation To Continue.  Upon the occurrence of an Event of Withdrawal as to a General Partner, each remaining General Partner, if any, shall have the right and obligation to continue the business of the Partnership, employing its assets and name, all as contemplated by the Partnership Act.  Within thirty (30) days after they obtain knowledge of the occurrence of an Event of Withdrawal as to a General Partner, the remaining Persons who comprise the General Partner, if any, shall notify the SLP and the ILP of such Withdrawal.

9.3.      Withdrawal of All General Partners.  If, following the occurrence of an Event of Withdrawal as to a General Partner, there is no remaining General Partner, the ILP and the SLP may elect to reconstitute the Partnership and continue the business of the Partnership by selecting a successor General Partner.  If the ILP and the SLP elect to reconstitute the Partnership pursuant to this Section 9.3 and admit the designated successor General Partner, the relationship among the then Partners shall be governed by this Agreement.

9.4.      Interest of General Partner After Permitted Withdrawal.  In the event the SLP has Consented to an occurrence of an Event of Withdrawal as to a General Partner (for the purposes of this Section 9.4, the "**Withdrawing General Partner**"), and except as otherwise provided in Section 7.7, the Withdrawing General Partner hereby covenants and agrees to transfer to the remaining General Partner, if any, to an SLP General Partner or a successor General Partner selected in accordance with Section 9.3, as the case may be, such portion of the Partnership interest of the Withdrawing General Partner as such remaining SLP General Partner or successor General Partner may designate, such transfer to be made in consideration of the payment by the transferee of either the agreed value of such Partnership interest or, if such value is not agreed to, the fair market value of such Partnership interest as determined by a committee of three qualified real estate appraisers, one selected by the Withdrawing General Partner, one selected by the transferee and the third selected by the other two appraisers so chosen.  The portion of the Withdrawing General Partner's Partnership interest designated to be transferred in accordance with the provisions of this Section 9.4 shall be sufficient to ensure the continued treatment of the Partnership as a partnership under the Code and as a limited partnership under the Partnership Act and, for the purposes of Article II, shall be deemed to be effective as of the date of the Event of Withdrawal, but the Partnership shall not make any Distributions to the designated transferee until the transfer shall have been made.  Any holder of any portion of the Partnership interest of a Withdrawing General Partner which is not designated to be transferred to the remaining or successor General Partner pursuant to the provisions of this Section 9.4 shall become a Supplemental Limited Partner, (i) with the same share of the Net Profits, Net Loss, Net Loss from Sale, Tax Credit, Net Cash Flow, Net Cash Proceeds and other Distributions to which the holder of such Partnership interest was entitled when held as a General Partner interest, (ii) which shall not participate in the votes, approvals or Consents of the Limited Partners hereunder and (iii) to the extent required by the SLP, this Agreement shall be amended in form and substance satisfactory to the SLP, to reflect the forgoing.  The admission of any successor or additional General Partner shall be subject to any required Consent of any Lender or Agency and to the Consent of each of the ILP and the SLP.

9.5.     SLP Consent.  Except as provided in Sections 7.7(b) and 9.3, from and after the Closing Date, no General Partner shall be admitted to the Partnership without the Consent of the SLP, which Consent shall be in the SLP's sole discretion and until such Person shall have agreed to be bound by this Agreement (and assume the obligations of a General Partner hereunder) and by all Project Documents to the same extent and under the same terms as each other General Partner.

# ARTICLE X

## ACCOUNTING, RECORDS & FINANCIAL REPORTING

10.1.     Books and Records.  The General Partner shall keep the Partnership's accurate and complete books and records, which shall include the list of names and addresses for all Partners, this Agreement, any and all amendments to this Agreement, all loan documents and all first-year tenant and income certifications and lease documents that support the initial qualified basis.  Such books and records shall be kept at the Partnership's principal office or at the Project or at the Property Manager's office and shall be maintained in accordance with sound accounting practices, the Partnership Act, and any applicable requirements of the Lenders and Tax Credit Agency through the later of (a) six (6) years following the expiration of the Compliance Period, or (b) the Termination Date, and such books and records shall be open to inspection and examination by any Limited Partner or its duly authorized representatives at all reasonable times upon 24 hours notice to the General Partner.  All books and records pertaining to the first year of the Credit Period, including, but not limited to, supporting documentation for tenant eligibility as Qualified Tenants shall be kept in fireproof storage at the Partnership's principal office or at the Project or at the Property Manager's office for the period described in the preceding sentence.

For any loan closings or conversions that occur on or after the Closing Date, the General Partner shall cause complete transcripts and binders (including all signatures and recording information) to be sent to the SLP within thirty (30) days of such closing.  Such transcripts and binders may be sent on any standard electronic storage medium in lieu of paper documents.

10.2.     Books of Account.  The General Partner shall ensure that the Partnership's books of account are kept and maintained safely, accurately, completely, and on the accrual basis.

10.3.     Fiscal Year.  The Fiscal Year shall be the calendar year (twelve (12) calendar months ending on December 31st annually).

10.4.     Special Basis Adjustments.  In the event of a transfer of the ILP's Partnership interest or in the event of a transfer by a partner or member of the ILP of such partner's or member's interest in the ILP, the Partnership shall elect, upon the request of the ILP, to adjust the basis of Partnership property pursuant to Section 754 of the Code.  Any adjustments under Section 743 of the Code resulting from such Section 754 election shall affect only the successor in interest to the transferring ILP or the transferring partner(s) or member(s) of the ILP.  Each Partner will furnish to the Partnership all information necessary to give effect to any such election.

10.5.     Bank Accounts.  The Partnership shall establish and maintain an operating (checking) account for the Project's daily routine operations in an FDIC-insured account.  Withdrawals from such account shall be made only in the regular course of business on such procedures deemed prudent by the General Partner, subject to the requirements of Articles IV and VI of this Agreement.  Other accounts and reserves of the Partnership shall be established and maintained as specified in Section 6.5.

10.6.     Accountants.  The Accountants shall prepare the audits, tax returns and other documents required herein and as required by the Lender and Agency.  The General Partner shall furnish a copy of the accounting services agreement to the SLP which shall include the Accountant Addendum.

10.7.     Construction Draws, Audits, Tax Filings and Compliance.  The General Partner shall cause to be prepared and delivered to the SLP and ILP the following information and reports, all in form and substance satisfactory to the SLP:

(a)     Construction Matters and Reporting.

(1)     Construction Consultant.  The General Partner shall timely cooperate with (and cause the Builder, Project Architect and Property Manager to cooperate with) the Construction Consultant in the fulfillment of the Construction Consultant's inspection and reporting services conducted for the benefit of the Limited Partners and Lender (as applicable).

(2)     Construction Draws.  A "**Construction Draw**" shall be any request for the use of Development Funds occurring after the Closing Date until Final Construction Completion, and any request of Development Funds or casualty insurance proceeds for construction-related activities occurring after Final Construction Completion.  The General Partner shall provide to the SLP a copy of each and every Construction Draw, regardless of whether the ILP's Capital Contribution is a requested source of funding for such Construction Draw.  The General Partner shall send each Construction Draw to the SLP at the same time it is sent to any other Partner, Lender, Agency or other source of Development Funds.  Construction Draws may be submitted no more frequently than once per calendar month and may not include costs which have previously been reimbursed.  Upon receipt by the SLP of a complete Construction Draw submission (see below), the SLP shall have ten (10) business days to review and either Consent and/or comment upon the Construction Draw.  If the SLP issues comments on the Construction Draw that require action by other parties, the General Partner shall cause such actions to be taken as requested by the SLP within thirty (30) days of the SLP making such comments, and the General Partner shall receive the Consent of the SLP prior to the General Partner's submittal of any further Construction Draws.

At a minimum, Construction Draws must include the following:

(i)     A reconciled sources and uses Project Budget in form and substance satisfactory to the SLP and reflecting all Development Funds and Development Costs detailed on a line-item basis;

(ii)    An AIA document G702 and G703 or similar HUD form for all construction costs, signed by the General Partner and Builder, accompanied by all change orders (discussed below), and certified by the Project Architect;

(iii)   A completed inspection report from the Construction Consultant approving the work completed and costs requested on the G702 and G703 or similar HUD form;

(iv)    Receipts, invoices and other supporting documents for any "soft" costs that are outside of the Construction Contract;

(v)     A date-down endorsement to the owner's Title Policy (if not available in the State, then a limited title search will be acceptable); and

(vi)    For the first draw following completion of all building pads or foundations, a foundation survey for any newly constructed improvements as described in Section 6.7(c).

Other items the General Partner may be required to furnish to the SLP with the Construction Draw include, but are not limited to, copies of contracts and insurance policies for subcontractors, lien waivers, invoices related to purchases of construction materials, soil compaction testing results, concrete foundation cylinder test results and such other documentation as may be requested pursuant to Section 10.9.

(3)     Change Orders.  Without the prior Consent of the SLP, neither the General Partner nor the Developer shall authorize the Partnership, the Project Architect or the Builder to make any change to the Plans and Specifications or modification of or reallocation of any budgeted line item (either within or outside of the Construction Contract) that would:

(i)     expend or reallocate funds on any line item in the Project Budget in excess of (A) for any single line item, the lesser of $75,000 or 10% of the original Project Budget amount for such line item, or (B) $250,000 in the aggregate when combined with all prior or current changes; and/or

(ii)    diminish the quality of materials, finishes or workmanship of the Project, or cause a change in the Project amenities from those set forth in the Project Documents.

Upon receipt by the SLP of any such change order request, the SLP shall have ten (10) days to review and either issue Consent, denial, or comment upon the requested change.  The General Partner shall provide a copy of the fully executed change order to the SLP within ten (10) days of receiving such Consent.

If at any point, the General Partner or the Developer believes that there is a probability that the funds approved by the SLP for any line item of the Project Budget will be insufficient to ensure completion in accordance with the Project Documents or the Project is or will be Out-Of-Balance or any change order may have an adverse effect on the Project Budget, then the General Partner and/or the Developer shall immediately provide written notice thereof to the SLP and there shall be no payment of Development Fee until such time as the Project is back on schedule and budget, as determined by the SLP.

(b)     Tenant Files and Compliance.

(1)     The General Partner shall provide a copy of each initial tenant file and shall cooperate with and assist (and shall cause the Property Manager to so cooperate with and assist) in the initial tenant file review, and shall cause the Property Manager to promptly cure any deficiencies in tenant files or practices and procedures identified during the initial tenant file review.  Neither such reviews nor the existence of the right to make such reviews shall relieve the General Partner of its obligation (or constitute a defense against breach of such obligation) to maintain the Project in compliance with all rules and requirements under the Code and of the Tax Credit Agency.

(2)     The General Partner shall cooperate with and assist (and shall cause the Property Manager to so cooperate with and assist) the SLP in making periodic reviews of the Partnership's tenant files for the purpose of assessing compliance with respect to the Property's leasing practices under the Code and the requirements of the Tax Credit Agency.  During each review, the General Partner and the Property Manager shall make available to the SLP (either at the office of the Property Manager during regular business hours or, if so requested by the SLP, by sending photocopies to the SLP) all or a portion of the tenant files and leasing practices and procedures of the Property.  Such reviews (or sending of photocopies) shall occur within three (3) business days following written notice by the SLP to the General Partner.  The SLP expects to make reviews periodically during initial leasing of the Property and thereafter on an annual basis, but shall have the right to make more frequent reviews in its reasonable discretion.  Neither such reviews nor the existence of the right to make such reviews shall relieve the General Partner of its obligation (or constitute a defense against breach of such obligation) to maintain the Property in compliance with all rules and requirements under the Code and of the Tax Credit Agency.  The General Partner shall cause the Property Manager to cure all deficiencies in tenant files or practices and procedures identified by the SLP as a result of such reviews.

(3)     If applicable, the General Partner shall furnish to the SLP copies of any and all documentation required by any Agency in order to establish or reestablish tenant eligibility (for example, USDA-RD Form 1944-8).

(4)     If requested by the SLP, the General Partner shall furnish to the SLP copies of any and all documentation to reestablish tenant eligibility resulting from the annual recertification of tenants, which documentation shall be a tenant recertification.  As long as no Event of Default has occurred and remains uncured, the SLP will make such requests no more frequently than once per Fiscal Year.

(c)     <u>Financial and Operating Reports</u>.  As further described below, the following financial and operating reports shall be required during the periods described.  Each reference to an "audit" shall mean an annual audited financial statement prepared by the Accountants in full compliance with GAAP.  Each reference to "certified" means the Person who is the subject of the statement shall certify in writing to the Limited Partners that the information is current, accurate, and complete.

(1)     <u>Partnership</u>.  The General Partner shall cause the Partnership to submit to the SLP, the following reports and information:

(i)     "Tax Credit Qualification Schedule" to be submitted monthly and not more than five (5) days in arrears commencing when the first unit in the Project is occupied and continuing until the 100% Occupancy Date is achieved; once the 100% Occupancy Date is achieved, such report shall be submitted quarterly within thirty (30) days of the end of the applicable quarter until the Termination Date. The "Tax Credit Qualification Schedule" shall report for each apartment unit the following information:  unit number, tenant name, number of bedrooms, household size, initial move-in date, current lease expiration date, tenant annual gross income, the tenant rent contribution, and the approved utility allowance, together with the total number of Low Income Units qualified and the overall occupancy of the Low Income Units.

(ii)    "Occupancy Report and Rent Roll" to be submitted monthly and not more than five (5) days in arrears commencing when the first unit in the Project is occupied and continuing until the 100% Occupancy Date is achieved; thereafter, such report shall be due monthly within twenty five (25) days of the applicable month-end until Stabilized Occupancy is achieved; once Stabilized Occupancy is achieved, such report shall be submitted quarterly, within thirty (30) days of the end of the applicable quarter until the Termination Date.  The "Occupancy Report and Rent Roll" shall contain the following information: the total number of units in service, the number of physically occupied and vacant units, and all known move-ins and move-outs (including dates).  The rent roll must provide all information customarily included in this type of report in the industry, and must also specify which units are receiving Section 8 rental assistance or the like (and state both the total collected rent and the amount of rent paid by the tenant), which units are designated Low Income Units, and the utility allowance for each Low Income Unit.

(iii)   "Income Statement and Balance Sheet" to be submitted monthly within twenty (20) days of the applicable month-end commencing when the first unit in the Project is occupied and continuing until Stabilized Occupancy is achieved and thereafter, such report shall be submitted quarterly, within thirty (30) days of the end of the applicable quarter until the Termination Date.  The General Partner and/or Property Manager shall prepare a month-end Income Statement and Balance Sheet on the accrual basis for each calendar month; the Income Statement shall include the account detail described in Section 10.9, and the Balance Sheet shall be supported upon request of the SLP by bank and/or brokerage statements for cash accounts not held in PNC Bank, National Association.

(iv)    "Quarterly Status Reports" to be submitted quarterly within thirty (30) days of the end of the applicable quarter commencing when the first unit in the Project is occupied and continuing until the Termination Date.  The "Quarterly Status Reports" shall be in form and content acceptable to the SLP and shall contain the information requested in <u>Exhibit 10</u>, attached hereto, as such Quarterly Status Report may be amended or modified from time to time by the SLP.

(v)   "Partnership Audit" for each Fiscal Year to be submitted annually by March 1st of the succeeding Fiscal Year; provided, however, to the extent the Partnership does not have operating income in such Fiscal Year, a modified report acceptable to the SLP which includes certification of each Partnership account shall be permitted. The Accountants shall prepare a draft of the Partnership's audited financial statements in accordance with the Accountant Addendum (the "**Partnership Audit**"). The General Partner shall cause the Accountants to send a complete copy of the Partnership Audit directly to the SLP within the time period described in the preceding sentence. The General Partner shall cause the Accountants to finalize and resend the Partnership Audit within five (5) business days upon receiving Consent thereto from the SLP.

(vi)   "Partnership Tax Returns" for each Fiscal Year to be submitted annually by February 15th of the succeeding Fiscal Year. The General Partner shall cause the Accountants to send directly to the SLP a complete draft of the Partnership's federal and state tax returns for the previous calendar year and all accompanying schedules, which must include the K-1s presented on a tax basis and any state analogs thereto. The tax returns must be prepared by the Accountants in compliance with the Accountant Addendum. The General Partner shall not file such tax return until the SLP shall have given Consent to the specific documents for filing.

(2)   <u>General Partner</u>. The General Partner shall submit to the SLP, the following reports and information:

(i)   "Certified Annual Financial Statements" for each General Partner to be submitted annually by March 1st commencing with the Fiscal Year in which the Closing Date occurs and continuing thereafter until the Termination Date. Such statements shall include sufficient details about the accounts underlying those shown on the statements, together with a balance sheet and reasonable supporting documentation as the SLP may request, which may include, but is not limited to, copies of bank and/or brokerage statements, promissory notes, and payment schedules for receivables.

(ii)   "Certified Schedule of Contingent Liabilities" for each General Partner to be submitted annually by March 1st commencing with the Fiscal Year in which the Closing Date occurs and continuing thereafter until the Termination Date.

(3)   <u>Guarantor</u>. The General Partner shall cause each Guarantor to submit to the SLP, the following reports and information:

(i)   "Certified Annual Financial Statements" for each Guarantor to be submitted annually by June 1st commencing with the Fiscal Year in which the Closing Date occurs and continuing thereafter until the Termination Date. For a corporate Guarantor, such Annual Financial Statement shall be an Audited Financial Statement and for each individual Guarantor, such Annual Financial Statement shall be certified. Such statements shall include sufficient details about the accounts underlying those shown on the statements, together with a balance sheet and reasonable supporting documentation as the SLP may request, which may include, but is not limited to, copies of bank and/or brokerage statements, promissory notes, and payment schedules for receivables.

(ii)   "Certified Schedule of Contingent Liabilities" for each Guarantor to be submitted annually by June 1st or within sixty (60) days of request by the SLP commencing with the Fiscal Year in which the Closing Date occurs and continuing thereafter until the Termination Date.

(iii)     "Schedule of Real Estate Owned" for each Guarantor to be submitted annually by June 1st or within sixty (60) days of request by the SLP commencing with the Fiscal Year in which the Closing Date occurs and continuing thereafter until the Termination Date.   Each required schedule of real estate owned shall be prepared using a form similar to that accepted by the Limited Partners on or before the Closing Date.

(d)     Projected Distributions.   By October 1st of each Fiscal Year, the General Partner shall send to the SLP an estimate prepared by the General Partner or the Accountants of each Limited Partner's respective share of Distributions, Tax Credit, Net Cash Flow, and Net Profit or Loss and, if applicable, Net Profit from Sale, Net Loss from Sale and Net Proceeds from Sale, of the Partnership for income tax purposes for the current Fiscal Year.

(e)     Tax Credit Reporting.   In addition to the other reporting requirements set forth in this Agreement, the General Partner shall send to the SLP copies of any material correspondence or filings sent to or received from any Lender, Agency or governmental authority pertaining to the Partnership or the Property, including, but not limited to, the following items:

(1)     A copy of any Tax Credit monitoring report forwarded to the Tax Credit Agency, including, but not limited to, any certification in accordance with Treasury Regulations 1.42-g and any other annual Tax Credit compliance certificate which makes representations as to the status of Tax Credit compliance of the Partnership or the Project, or to the extent such a compliance certificate is not required by the Tax Credit Agency, an annual statement representing the status of Tax Credit compliance in a form acceptable to the SLP;

(2)     Copies of any notices  pertaining to Governmental Regulations or Environmental Laws, notices of any default by the Partnership under any Project Document, any site inspection reports from any Lender or Agency, notices of any noncompliance on Form 8823 or similar forms, or notices of default in payment of any Permitted Loan, taxes, interest or any other obligation; and

(3)     Copies of any Real Estate Assessment Center (REAC) inspection reports received with respect to the Partnership or the Project as well as any notices from HUD, including, but not limited to, any management review findings, Section 8 HAP contract inspections, and/or notices pertaining to HUD regulatory agreements, if any.

(f)     Lender & Agency Reporting.   With respect to any correspondence or filings sent by or on behalf of the Partnership to any Lender, Agency or governmental authority, final drafts of such correspondence or filings shall be submitted to the SLP at least fifteen (15) business days prior to the required submission or filing date thereof, and the General Partner shall obtain the Consent of the SLP prior to submitting or filing the same, except as otherwise permitted in Section 3.5(a)(6) and Section 3.5(a)(12); provided, however, that any such submissions or filings that are already required to be submitted to both the SLP and the Lender, Agency or governmental authority, as applicable, under this Agreement shall be subject to the timeframes set forth in the applicable provisions of this Agreement.

10.8.     Insurance.   Prior to the expiration date for each Partnership insurance policy required to be maintained pursuant to Exhibit 6 and Section 6.5(b), the General Partner shall deliver (or shall cause its insurance agent to deliver) evidence of a comparable new or replacement insurance policy to the SLP by certificates of insurance on ACORD forms (ACORD 28 version 2003/10 for casualty; ACORD 25 for general liability) and evidence of premium payment.   Upon request by the SLP, the General Partner shall also provide a copy of any insurance policy, including all endorsements thereto, bound by the General Partner on behalf of the Partnership.

10.9.     Operating and Capital Expenditure Budgets.   By November 1st of each Fiscal Year, the General Partner shall deliver to the SLP an annual operating budget of revenues and expenses for the Partnership for the following Fiscal Year that shall include all operating revenues and expenses applicable to the Project, including the following accounts detailed in the Accountant's Addendum.   By November 1st of each year, the General Partner shall send to the SLP a budget of Capital Expenditures for the subsequent Fiscal Year which shall include a

description of the item or service, anticipated date of purchase or completion of service, total cost, reason for expenditure and anticipated source of funds (e.g., operations or replacement reserves).

10.10.   Other Management Reporting, Miscellaneous.  Within ten (10) days after each of the following becomes available to the Partnership, the General Partner shall send to the SLP:

(a)   a copy of any updated, renewed or new Project management plan, including any new or revised operating and maintenance plan for environmental conditions;

(b)   notification of any fact which has or may have a material adverse effect upon the Project, the Partnership, the General Partner, the Limited Partner or Guarantor, or which could materially and adversely affect Distributions of cash or allocations of profits, losses or Tax Credit to any Limited Partner, or any other such matters as may be material to the existence or operation of the Partnership, its business or the Project, including, but not limited to, events adversely affecting habitability, safety, occupancy or the use and enjoyment of the Project by tenants;

(c)   copy of any notice of audit, inspection, management or financial review report, inquiry or investigation of the Partnership or Project by the Tax Credit Agency or other regulatory body and copies of all subsequent correspondence with respect to such audit, inquiry or investigation;

(d)   any update of applicable utility allowances for the computation of maximum-allowable Tax Credit rents paid by the tenants; and

(e)   not more than ten (10) business days after the later of (i) the real property tax due date, or (ii) the date the real property taxes are paid, written evidence in a form acceptable to the SLP that the real property taxes for the Project have been paid.

10.11.   Reporting Defaults.

(a)   If the General Partner fails to deliver, or cause to be delivered, to the SLP the documents required by Section 10.7(a), Section 10.7(c), Section 10.7(e), Section 10.7(f) or Section 10.9 within the time periods set forth in said Sections, or fails to perform (or cause to be performed) any requirement made under Section 10.13(b) (individually and collectively, a "**Reporting Default**"), the General Partner and/or Guarantor shall, upon receipt of an invoice from the SLP and assuming that no Limited Partner has caused such delay, pay as damages the sum of $100 per day per report due pursuant to Section 10.7(c), commencing on the first day after the date the report was due and ending on the date the report in question is received by the SLP (the "**Reporting Damages**").  No notice or warning of such reporting delinquency shall be required and, if notice or warning is given by the SLP, such notice shall not affect the date the report in question was due or the amount of Reporting Damages owed to the ILP. If the General Partner and/or Guarantor fail to pay, any amount of such Reporting Damages not so paid shall be deducted against such Section 4.2 and/or 4.5 payments or distributions otherwise due to the General Partner, the Guarantor and/or their Affiliates.  Further, all Partners hereby expressly consent to the exercise by the SLP of collecting payment of such Reporting Damages from any Capital Contributions to be funded by the ILP and/or from Partnership reserves.

(b)   If a Reporting Default occurs with respect to Section 10.7(c) and such default is not cured within fifteen (15) days, the SLP may by written notice instruct the General Partner to change the Accountants, and the General Partner shall cause the Partnership to promptly terminate the Partnership's engagement of the Accountants and appoint a replacement acceptable to the Limited Partners.  If the SLP notifies the Partnership that the Accountants are to be replaced, and if within thirty (30) days of such notice the General Partner fails to cause the Partnership to replace the Accountants with a firm satisfying the terms of the preceding sentence, then the SLP shall appoint replacement Accountants of its own choosing.  All Partners hereby grant to the SLP a special power of attorney, irrevocable to the extent permitted by law, coupled with an interest, to so appoint replacement Accountants and to do anything else which in the view of the SLP may be necessary or appropriate to accomplish the purposes of this Section 10.11.  The General Partner shall immediately furnish to such replacement Accountants all documentation and other information necessary to prepare such statements, returns, forms and reports.

(c)      Any failure of the Partnership and General Partner to provide documents or other information required according to Section 10.7 to the ILP and/or the SLP for two (2) consecutive periods for each applicable report by the due dates therefor and the General Partner shall not have cured such default within ten (10) business days following notice thereof from the ILP or the SLP, shall constitute grounds for the removal of the Property Manager pursuant to Section 6.11.

10.12.   Elections.

(a)      With respect to all depreciable assets for which cost recovery deductions are permitted, the Partnership shall, so far as permitted by the provisions of the Code, depreciate its residential rental property, site improvements and personal property costs, respectively, over 27.5 years (straight-line), 15 years (150% declining balance) and 5 years (200% declining balance).  For purposes of financial accounting in accordance with generally accepted accounting principles, the Partnership shall depreciate its residential rental property, site improvements and personal property costs, respectively, over 40 years, 20 years and 10 years.

(b)      Subject to the provisions of Section 10.4, all other elections required or permitted to be made by the Partnership under the Code shall be made by the General Partner in such manner as will, in the opinion of the Accountants and the SLP, be most advantageous to the ILP but shall not create additional obligations on the part of the General Partner.

10.13.   General Terms and Provisions of Article X.

(a)      Expenses.  All books, records, reports and other such duties and obligations of the Partnership, General Partner, Guarantor and their Affiliates set forth in this Article X shall be completed in form and substance reasonably acceptable to the SLP, and the costs related thereto shall be an expense of the Partnership unless otherwise stated therein.

(b)      Other Requests of the SLP.  In addition to the stated requirements of this Article X, the General Partner shall be required to provide any other information or documentation reasonably requested by the SLP related to the Project, the Partnership or its Partners.  The General Partner shall cause any applicable Person to cooperate as necessary in order to fulfill any such requests of the SLP, and such cooperation includes access to and cooperation of their respective employees, agents, representatives, books and records during normal business hours.

10.14.   Compliance With Other Interested Parties.  The requirements of this Article X are specific to the needs and requirements of the Limited Partners.  If the reporting requirements herein are different than requirements imposed by any Lender or Agency, compliance with the requirements of this Agreement does not nullify the obligation of the Partnership, the Partners and their Affiliates to comply with the distinct and enforceable requirements of each Lender and Agency.

## ARTICLE XI

## TERMINATION AND DISSOLUTION

11.1.   Dissolution.  The Partnership shall be dissolved upon the earliest to occur of the following:

(a)      An Event of Withdrawal with respect to a sole General Partner, unless the Partnership is continued in accordance with Section 9.3;

(b)      The Termination Date; or

(c)      The Sale of the Project other than pursuant to a contract of sale in which the purchase is to be paid over a period of more than one (1) year.

In no event shall the Partnership terminate if such termination would result in a violation of any law, regulation or regulatory agreement to which the Partnership is bound.

11.2.    Distribution of Assets.  Upon dissolution of the Partnership, the General Partner (or, if there is no General Partner then remaining, such other Person(s) designated by the Limited Partners or the Person(s) designated by the court in a judicial dissolution) shall take full account of the Partnership's assets and liabilities, shall liquidate the assets as promptly as is consistent with obtaining the fair value thereof, and shall apply and distribute the proceeds therefrom, after payment of the debts and obligations of the Partnership (including fees and any interest owed to the Partners), in accordance with the Capital Account balances (after taking into account all adjustments to Capital Accounts).  In the event that a General Partner has a negative balance in its Capital Account following the liquidation of the Partnership or such General Partner's interest therein, after taking into account all Capital Account adjustments for the Partnership taxable year in which such liquidation occurs, such General Partner shall pay to the Partnership in cash an amount equal to the negative balance in such General Partner's Capital Account (unless applicable State laws do not require such payments from a General Partner upon liquidation of the Partnership).  Such payment (if required) shall be made by the end of such taxable year (or, if later, within ninety (90) days after the date of such liquidation) and shall, upon liquidation of the Partnership, be paid to recourse creditors of the Partnership or distributed to other Partners in accordance with the positive balances in their Capital Accounts.

Upon liquidation of the Partnership, the ILP shall not be obligated to restore any deficit balance in its Capital Account.  However, if an allocation of Net Losses, or any item thereof, to the ILP would cause the ILP to have a Capital Account deficit in excess of its share of Partnership Minimum Gain plus its share of Partner Nonrecourse Debt Minimum Gain in any Fiscal Year, the ILP may elect in its sole discretion by written notice (the "**DRO Notice**") to the Partnership to obligate the ILP to restore a negative balance in its Capital Account in accordance with the prior paragraph up to the amount specified in such DRO Notice; provided, however, the ILP's obligation to restore any deficit balance in its Capital Account shall be adjusted at the end of each year, following delivery of the DRO Notice, to an amount equal to the lesser of (a) the dollar amount set forth in the DRO Notice, or (b) the difference between (i) the ILP's deficit Capital Account balance at the end of such year and (ii) any Minimum Gain then allocable to the ILP.  The DRO Notice automatically shall be deemed to constitute a duly adopted amendment to the Partnership Agreement without any further action by any party.  Such DRO Notice must be delivered to the Partnership on or before the last date on which such DRO Notice will create a valid restoration obligation for the Fiscal Years(s) for which it is intended to be effective under the provisions of Sections 1.704-1(b)(2)(ii)(c), 1.704-1(b)(2)(ii)(h), or any other applicable section(s) of the allocation regulations under Section 704 of the Code.  Nothing contained herein shall obligate the ILP to issue a DRO Notice.

Notwithstanding anything to the contrary contained herein, any fee payments, loan repayments, return of capital or distributions otherwise payable or distributable to the General Partner or any Affiliate thereof under Sections 4.2, 4.5, and/or 11.2 shall be paid to the ILP to the extent of any unpaid amounts (including accrued interest thereon) owed under Section 3.5, and shall be treated as being first paid or distributed to the General Partner, and then paid by the Partnership on behalf of the General Partner to the ILP.

If at the time of liquidation the General Partner or other liquidating Person(s) shall determine that an immediate sale of part or all of the Partnership assets would cause undue loss to the Partners, the liquidating Person(s) may, in order to avoid loss, either defer liquidation and retain all or a portion of the assets or distribute all or a portion of the assets to the Partners in kind.  In the event that the liquidating Person(s) elect to distribute such assets in kind, the assets shall first be assigned a value (by appraisal of a professionally qualified appraiser) and the unrealized appreciation or depreciation in value of the assets shall be allocated to the Partners' Capital Accounts, as if such assets had been sold, in the manner described in Article IV, and such assets shall then be distributed to the Partners as provided herein.

## ARTICLE XII

## AGENCY REGULATIONS

In addition to the obligations and commitments contained in this Agreement and so long as any of the Agency obligations or commitments is in effect, the General Partner covenants to act in accordance with the Project Documents and to cause the Partnership to comply with the rules imposed by the Tax Credit Agency, to the extent such rules or requirements do not conflict with the requirements under Section 42 of the Code.

# ARTICLE XIII

## MISCELLANEOUS

13.1.   <u>Notices</u>.   Notices to any Partner shall be sent to the address(es) of that Partner set forth in <u>Exhibit 2</u>.  Any Partner may require notices to be sent to a different address by giving notice thereof to all of the other Partners.  All notices or other communication required or permitted hereunder shall be in writing, and shall be deemed to have been given on (i) the third (3rd) day after deposit in the United States mail, postage prepaid, (ii) the first (1st) day after deposit with Federal Express or similar overnight delivery service, or (iii) delivery if delivered personally.

13.2.   <u>Entire Agreement</u>.   This Agreement constitutes the entire agreement among the parties and supersedes any prior agreement or understanding among them respecting the subject matter of this Agreement.  In addition, nothing in this Agreement is meant to nor shall be deemed to, create an agency relationship between the Limited Partners.

13.3.   <u>Joint and Several Obligations</u>.   If there shall be more than one General Partner at any time, the obligations of the General Partner hereunder shall be the joint and several obligations of each Person comprising the General Partner.   Except as provided herein, such obligations shall survive the removal of, or an Event of Withdrawal by, a General Partner from the Partnership.

13.4.   <u>Consents and Approvals</u>.   Unless otherwise expressly provided to the contrary in this Agreement, under any circumstance in which a provision of this Agreement requires or otherwise contemplates the approval, consent, election, requirement or determination of the ILP or the SLP with respect to any matter, such approval, consent, election, requirement or determination shall be at the sole discretion of the ILP or the SLP, as the case may be, and shall be effective only if given or made in writing.

13.5.   <u>Headings</u>.   All Article and Section headings in this Agreement are for convenience of reference only and are not intended to qualify the meaning of any Article or Section.

13.6.   <u>Certain Provisions</u>.   If the operation of any provision of this Agreement would contravene the provisions of the Partnership Act, or would result in the imposition of general liability on the Limited Partner, such provision shall be void and ineffectual.

13.7.   <u>Saving Clause</u>.   If any provision of this Agreement, or the application of such provision to any Person or circumstance, shall be held invalid or unenforceable, neither the remainder of this Agreement nor the application of such provision to Persons or circumstances other than those as to which it is held invalid or unenforceable shall be affected thereby.

13.8.   <u>Pronouns and Plurals</u>.   All pronouns and any variations thereof shall be deemed to refer to the masculine, feminine, neuter, singular, or plural as the identity of the Person or Persons may require.

13.9.   <u>Binding Agreement</u>.   This Agreement shall be binding upon, and inure to the benefit of, the parties hereto, their successors, heirs, legatees, devisees, assigns, legal representatives, and personal representatives, except as otherwise provided herein.

13.10.   <u>Remedies Not Exclusive</u>.   The General Partner and Guarantor acknowledge and agree that the ILP's and/or SLP's exercise or restraint from exercising their respective rights and remedies under any provision hereof shall in no way impair, impede, modify, or delay the duties, obligations, or liabilities of the Partnership, General Partner or Guarantor under any other provision of this Agreement.

13.11.   <u>Counterparts</u>.   This Agreement may be executed in several counterparts, and all so executed shall constitute one agreement, binding on all the parties hereto, even though all parties are not signatories to the original or the same counterpart.  Any counterpart which has attached to it separate signature pages, which altogether contain the signatures of all parties whose signature thereon are required, shall for all purposes be deemed a fully executed

instrument.  Delivery of a manually executed counterpart to this Agreement or delivery of a copy of such manually executed counterpart by email or facsimile transmission shall each constitute effective delivery of such counterpart. Any party delivering a copy of such manually executed counterpart of this Agreement by email or facsimile transmission shall promptly thereafter deliver the manually executed counterpart, provided that any failure to do so shall not affect the validity of the copy of the manually executed counterpart delivered by email or facsimile transmission.

13.12.  <u>Governing Law, Jurisdiction and Venue</u>.  This Agreement shall be governed by and construed in accordance with the laws of the State, exclusive of its conflict of laws principles.  Each of the undersigned (i) agrees that any suit, action or other legal proceeding arising out of this Agreement or any of the transactions contemplated hereby shall be brought in the courts of either the State of Texas or the Commonwealth of Pennsylvania; (ii) consents to the jurisdiction of each such court in any suit, action, or proceeding; and (iii) waives any objection which he or it may have to the laying of venue of any such suit, action or proceeding in each of such courts.  Each of the undersigned expressly agrees that the right to remove any suit, action or other legal proceedings arising out of this Agreement or any of the transactions contemplated hereby to federal court has not been waived. Each of the undersigned waives any right it may have to assert the doctrine of forum non conveniens or similar doctrine with respect to any such suit, action or proceeding in each of such courts and such provisions are intended to be mandatory and not permissive thereby precluding the possibility of any such suit, action or proceeding in any jurisdiction other than as specified in this paragraph.

13.13.  <u>No Third-Party Beneficiary</u>.  No creditor or other third party having dealings with the Partnership, other than the Bridge Lender, shall have the right to enforce the right or obligation of any Partner to make Capital Contributions or loans or to pursue any other right or remedy hereunder or at law or in equity, it being understood and agreed that the provisions of this Agreement shall be solely for the benefit of, and may be enforced solely by, the parties hereto and their respective successors and assigns.  None of the rights or obligations of the Partners herein set forth to make Capital Contributions or loans to the Partnership shall be deemed an asset of the Partnership for any purpose by any creditor or other third party, other than the Bridge Lender, until such Capital Contribution is made or loan is advanced nor may such rights or obligations be sold, transferred or assigned by the Partnership or pledged or encumbered by the Partnership to secure any debt or other obligation of the Partnership or of any of the Partners, other than the Bridge Lender.  Without limiting the generality of the foregoing, a deficit Capital Account of a Partner shall not be deemed to be a liability of such Partner nor an asset or property of the Partnership.

[SIGNATURE PAGE TO FOLLOW]

4837-4545-8969.4

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first above written, and declare under penalty of perjury that they have examined the foregoing Amended and Restated Agreement of Limited Partnership, and, to the best of their knowledge and belief, it is true, correct and complete.

GENERAL PARTNER:

2013 Travis Oak Creek GP, LLC

By: _____
Rene O. Campos, Manager

ORIGINAL LIMITED PARTNER:

By: _____
Rene O. Campos, individually

DEVELOPER (for the purposes of acknowledging and agreeing to this Agreement and not as a partner):

2013 Travis Oak Creek Developer, Inc.

By: _____
Rene O. Campos, President

4837-4545-8969.4

STATE OF _TEXAS_         )
                         ) ss.
COUNTY OF _DALLAS_       )

      This instrument was acknowledged before me on the _20th_ day of May, 2014 by Rene O. Campos, as (a) Manager of 2013 Travis Oak Creek GP, LLC, the General Partner, (b) the Original Limited Partner, and (c) President of Travis Oak Creek Developer, Inc., the Developer.

                            Notary Public in and for the

REED A STANDLY
My Commission Expires
April 23, 2018

                            State of _TEXAS_
                            My Commission Expires: _4-23/2018_

4837-4545-8969.4

ILP:

PNC BANK, NATIONAL ASSOCIATION

By: *Wendy Bade*
    Wendy Bade, Senior Vice President

SLP:

COLUMBIA HOUSING SLP CORPORATION

By: *Wendy Bade*
    Wendy Bade, Senior Vice President


STATE OF Kentucky    )
                     ) ss.
COUNTY OF Jefferson  )


This instrument was acknowledged before me on the 23 day of May, 2014 by Wendy S. Bade, as Senior Vice President of (a) PNC Bank, National Association, and (b) Columbia Housing SLP Corporation.

*Stacy Z.*
Notary Public in and for the
State of Kentucky
My Commission Expires: 8-30-15

4837-4545-8969.4

PROPERTY MANAGER ACKNOWLEDGMENT

The undersigned Property Manager for the Project acknowledges and agrees to be bound by the terms of Sections 6.11, 6.13 and 10.7 of the Amended and Restated Agreement of Limited Partnership of 2013 Travis Oak Creek, LP, dated as of May 23, 2014 (the "**Agreement**"), and, additionally, if and to the extent the undersigned Property Manager is an Affiliate of a General Partner of the Partnership, then the undersigned Property Manager also acknowledges and agrees to be bound by the provisions of the Agreement which specifically reference and relate to the Property Manager.

Capitalized terms used but not defined shall have the meanings set forth in Article II of the Agreement.

PROPERTY MANAGER:

EUREKA MULTIFAMILY GROUP, L.P.

By: Eureka Multifamily Group GP, Inc.

By: _____
      Rene O. Campos, Jr., its President

4837-4545-8969.4

SCHEDULE TO
AMENDED AND RESTATED
AGREEMENT OF LIMITED PARTNERSHIP

| Term | Description |
|---|---|
| Accountants | CohnReznick LLP |
| Architectural Contract | The Standard AIA Form Agreement between Owner and Architect dated July 15, 2013, entered into by and between the 2007 Travis Heights, LP and the Project Architect, as assigned to the Partnership on or about the date hereof. |
| Bridge Loan | The loan obligation incurred by the Partnership from PNC Bank, National Association (the "Bridge Lender") in the maximum principal amount of $11,425,000 on such terms and conditions which shall have received the Consent of the SLP. |
| Builder | Weis Builders, Inc. |
| Carryover Allocation | $2,000,000 per annum |
| City Mortgage Loan | The mortgage loan to the Partnership from the Austin Housing Finance Corporation (the "**City Mortgage Lender**") in the maximum principal amount of $2,000,000, to be secured by a mortgage or deed of trust and on such terms and conditions as are set forth in the documents related thereto (collectively, the "**City Mortgage Loan Documents**"), all of the terms of which shall have received the Consent of the SLP. |
| Completion Date | March 1, 2016 |
| Construction Consultant | Betzler and Company |
| Construction Contract | The Standard AIA Form of Agreement between Owner and Contractor dated May 21, 2014, by and between the Partnership and the Builder which provides for a guaranteed maximum price of $32,703,003, in form and substance acceptable to the SLP.  The Construction Contract must be secured by 100% payment and performance bonds in form and substance acceptable to the SLP from a bonding company reasonably acceptable to the SLP. |
| Delivery Percentages | 2015          29.82%<br>2016-2024    100%<br>2025          100% less first year percentage |
| Developer | 2013 Travis Oak Creek Developer, Inc. |
| Development Agreement | Development Agreement dated on or about the date hereof by and between the Partnership and the Developer. |
| Environmental Reports | The phase I environmental report prepared by Terracon Consultants, Inc. dated March 28, 2014; the geotechnical report prepared by ECS Texas, LLP dated April 3, 2014. |
| First Mortgage Loan | The mortgage loan to the Partnership from PNC Bank, National Association (the "**First Mortgage Lender**") in the maximum principal amount of $27,300,000, to be secured by a mortgage or deed of trust and on such terms and conditions as are set forth in the documents related thereto (collectively, the "**First Mortgage Loan Documents**"), all of the terms of which shall have received the Consent of the SLP. |
| Forecasted Tax Credit | 2015          $596,279<br>2016-2024    $1,999,800<br>2025          $1,403,521 |

| | |
|---|---|
| GP Predevelopment Loan | The loan to the Partnership from the General Partner in the maximum principal amount of $1,000,000, for payment of certain predevelopment expenses, on such terms and conditions as are set forth in the documents related thereto (collectively, the "**GP Predevelopment Loan Documents**"), all of the terms of which shall have received the Consent of the SLP. |
| HAP Contract | The 20-year Housing Assistance Payments Contract executed by HUD, as assigned to (or assumed by) the Partnership, providing rental assistance to 170 Low Income Units in the Project with an effective term through June 1, 2034. |
| ODG Cap | $3,080,542 |
| Operating Reserve Amount | $1,529,143 |
| Original Agreement | Agreement of Limited Partnership dated January 3, 2013. |
| Original Certificate | Certificate of Limited Partnership filed with the Secretary of State of Texas on January 3, 2013. |
| Permitted Loan | Collectively, the First Mortgage Loan and the City Mortgage Loan, as described in this Schedule. |
| Place of Business | 3001 Knox Street, Suite 400 Dallas, TX 75205 |
| Placement In Service Date | December 31, 2015 |
| Project Architect | Craycroft McElroy Hendryx LLC (or Bercy Chen Studio LP, with respect to the Project pavilion only) |
| Property Manager | Eureka Multifamily Group, L.P. |
| Registered Agent | 2001 Agency Corporation 14160 Dallas Parkway, Suite 800 Dallas, TX 75254 |
| Seller Loan | The mortgage loan to the Partnership from the 2007 Travis Oak Creek, LP (the "**Seller Lender**") in the maximum principal amount of $7,330,000, to be secured by a mortgage or deed of trust and on such terms and conditions as are set forth in the documents related thereto (collectively, the "**Seller Loan Documents**"), all of the terms of which shall have received the Consent of the SLP. |
| Tax Credit Price | $0.9350 |

3

**EXHIBIT 1**

**REAL PROPERTY DESCRIPTION**

The property is that which is listed in the Title Policy.

EXHIBIT 1

## EXHIBIT 2

### PARTNERS' CAPITAL CONTRIBUTIONS AND INTERESTS

As of May 23, 2014

| General Partner | Capital Contributions | Percentage Interest in Class of Partners |
|---|---|---|
| 2013 Travis Oak Creek GP, LLC<br>3001 Knox Street, Suite 400<br>Dallas, TX 75205 | $100 | _____% |

| SLP | Capital Contributions | Percentage Interest in Class of Partners |
|---|---|---|
| Columbia Housing SLP Corporation<br>121 S.W. Morrison Street, Suite 1300<br>Portland, Oregon 97204-3143 | $10 | 100% |

| ILP | Agreed-to Capital Contribution | Paid-In Capital Contribution* | Percentage Interest in Class of Partners |
|---|---|---|---|
| PNC Bank, National Association<br>121 S.W. Morrison Street, Suite 1300<br>Portland, Oregon 97204-3143 | $18,698,130 | $2,804,720 | 100% |

*Paid-in Capital Contribution as of the date of this Exhibit 2.  Future Capital Contributions are subject to adjustment and are due at the times and subject to the conditions set forth in the Agreement to which this Exhibit 2 is attached.

EXHIBIT 2

**EXHIBIT 3**

**GENERAL PARTNER'S FUNDING CERTIFICATE**

For **[draws subsequent to closing for First] [Second] [Third] [Final]** Installment.  **[Must be on Partnership letterhead]**

STATE OF _____)
                                              ) ss.
COUNTY OF _____)

**AFFIDAVIT**

      I, Rene O. Campos, as Manager of the General Partner defined below, being first duly sworn on oath, depose and say that:

**[to be included in each Affidavit delivered]**

      1.     I am the Manager of 2013 Travis Oak Creek GP, LLC (the "**General Partner**"), a Texas limited liability company and the sole general partner of 2013 Travis Oak Creek, LP (the "**Partnership**"), a limited partnership organized and existing under the laws of the State of Texas.

      2.     I am fully familiar with all of the General Partner's and the Partnership's business and financial affairs, including, without limiting the generality of the foregoing, all of the matters herein described.

      3.     This Affidavit is made and delivered for the purpose of, among other things, inducing the Columbia Housing SLP Corporation and PNC Bank, National Association (collectively, the "**Limited Partners**") to fund their respective Capital Contribution Installments to the Partnership in connection with the development of that certain project known as Oak Creek Village (the "**Project**").

      4.     The representations and warranties contained herein and in the Partnership's Amended and Restated Agreement of Limited Partnership of the Partnership (the "Agreement") are true and correct, in all material respects, and are not in any way misleading.

      5.     The covenants contained in the Agreement that were to have been performed and completed by the date of this Affidavit have been fully and completely performed, as of this date, except as otherwise Consented to in advance by the Limited Partners, in writing.

      6.     No default, breach or violation of the terms of the Agreement or any of the Project Documents on the part of the General Partner or the Partnership has occurred and is uncured as of this date.

      7.     Neither the General Partner nor the Partnership is in default of any obligation relating to the business of the Partnership or the Project, as of the date hereof, and all obligations of the General Partner and the Partnership will be satisfied when due.

      8.     No actions or proceedings of any kind or nature are pending or to the best of the General Partner's knowledge threatened against the General Partner or the Partnership, except as may be described in an exhibit attached hereto and made a part hereof.  Such actions or proceedings are fully covered by insurance or, if adversely determined, would not have a material adverse effect on the General Partner's, or the Partnership's, as applicable, ability to pay when due any amounts that may become payable in respect of the Agreement or in connection with the Project, or to continue with the development and operation of the Project.

EXHIBIT 3 – Page 1

9.      As of the date of this Affidavit, the General Partner (a) is solvent; (b) is able to pay its debts as they mature; (c) has capital sufficient to carry on the businesses in which it is engaged; and (d) has assets the present fair saleable value of which is greater than the amount of its liabilities.  The General Partner will not be rendered insolvent by performing the currently foreseeable obligations on its part to be performed in respect of the Project, or by conducting the transactions contemplated under the Agreement.

10.     All insurance requirements of the Agreement have been met and satisfied in all respects.

11.     As of the date of this Affidavit, all of the conditions and prerequisites for funding the **[subsequent construction draw for First] [Second] [Third] [Final]** Installment, as set forth in the Agreement, have been fully and completely performed and all representations and warranties contained in the Agreement are true and correct and not in any way misleading.

12.     There have been no changes to the Plans and Specifications except as permitted in the Agreement.

13.     As of the date of this Affidavit, the Guarantor meets the minimum net worth and liquidity requirements as set forth in Section 6.5(n) of the Agreement.

14.     There has been no material adverse change in the Project or the Partnership since delivery of the last Funding Certificate.

The foregoing matters are certified and agreed to by the undersigned General Partner as of the date of this Certificate, and you may rely hereon in consummating your investment in the Project/Partnership or in advancing your Capital Contribution Installment.  All certifications made herein shall constitute representations and warranties of the undersigned.  In the event of any material and adverse inaccuracy in any of the foregoing certifications, or failure to perform any of the foregoing agreements, the Limited Partners shall be entitled to any and all remedies under the Partnership Agreement and applicable law, including remedies for breach of warranty, representation, or agreement, and the undersigned shall defend and indemnify the Limited Partners against any liability or damages therefrom.

Capitalized terms used but not defined herein shall have the meaning given them in the Agreement.

GENERAL PARTNER:

2013 Travis Oak Creek GP, LLC
a(n) Texas limited liability company

By: _____
        Rene O. Campos, Manager


Sworn to before me on
this _____ day of
_____, 20___

_____
Notary Public

EXHIBIT 3 – Page 2

4837-4545-8969.4

**EXHIBIT 4**

**<u>PLANS AND SPECIFICATIONS</u>**

.

EXHIBIT 4

May 13, 2014

# Exhibit "A" - List of Documents

☒ ☒ ☒ ☒

Oak Creek Village Phase 1
2324 Wilson Street
Austin, Texas 78704

| Document Type | Labeled | Description | Dated |
|---|---|---|---|
| SITE | 01 OF 11 | DURWOOD STREET IMPROVEMENTS | 03.06.14 |
| | 02 OF 11 | GENERAL NOTES | 03.06.14 |
| | 03 OF 11 | EXISTING CONDITIONS AND DEMOLITION PLAN | 03.06.14 |
| | 04 OF 11 | SITE PLAN AND EROSION/SEDIMENTATION CONTROL PLAN | 03.06.14 |
| | 05 OF 11 | GRADING AND TEMPORARY TRAFFIC CONTROL PLAN | 03.06.14 |
| | 06 OF 11 | DRAINAGE PLAN | 03.06.14 |
| | 07 OF 11 | WATER LINE PROFILE PLAN | 03.06.14 |
| | 08 OF 11 | GENERAL DETAILS | 03.06.14 |
| | 09 OF 11 | GENERAL DETAILS | 03.06.14 |
| | 10 OF 11 | GENERAL DETAILS | 03.06.14 |
| | 11 OF 11 | TEMPORARY TRAFFIC CONTROL DETAILS | 03.06.14 |
| | 01 OF 47 | COVER SHEET | 03.11.14 |
| | 02 OF 47 | GENERAL NOTES | 03.11.14 |
| | 03 OF 47 | EXISTING CONDITIONALS & SITE DEMOLITION PLAN | 03.11.14 |
| | 04 OF 47 | UTILITY DEMOLITION AND RELOCATION PLAN | 03.11.14 |
| | 05 OF 47 | OVERALL SITE PLAN | 03.11.14 |
| | 06 OF 47 | SITE PLAN TABLES & NOTES | 03.11.14 |
| | 07 OF 47 | BUILDING ELEVATIONS PLAN | 03.11.14 |
| | 08 OF 47 | DETAILED SITE PLAN – NORTH | 03.11.14 |
| | 09 OF 47 | DETAILED SITE PLAN – SOUTH | 03.11.14 |
| | 10 OF 47 | DIMENSION CONTROL PLAN | 03.11.14 |
| | 11 OF 47 | PAVING PLAN | 03.11.14 |
| | 12 OF 47 | OVERALL UTILITY PLAN | 03.11.14 |
| | 13 OF 47 | DETAILED UTILITY PLAN – NORTH | 03.11.14 |
| | 14 OF 47 | DETAILED UTILITY PLAN – SOUTH | 03.11.14 |
| | 15 OF 47 | EXISTING DRAINAGE AREA PLAN | 03.11.14 |
| | 16 OF 47 | PROPOSED DRAINAGE AREA PLAN | 03.11.14 |
| | 17 OF 47 | OVERALL GRADING PLAN | 03.11.14 |
| | 18 OF 47 | DETAILED GRADING PLAN – NORTH | 03.11.14 |
| | 19 OF 47 | DETAILED GRADING PLAN – SOUTH | 03.11.14 |
| | 20 OF 47 | OVERALL STORM DRAIN PLAN | 03.11.14 |
| | 21 OF 47 | DETAILED STORM DRAIN PLAN – NORTH | 03.11.14 |



May 13, 2014

# Exhibit "A" - List of Documents

|  |  |  |
|---|---|---|
| 22 OF 47 | DETAILED STORM DRAIN PLAN - SOUTH | 03.11.14 |
| 23 OF 47 | DETAILED STORM DRAIN PLAN – WEST | 03.11.14 |
| 24 OF 47 | BIOFILTRATION POND PLAN | 03.11.14 |
| 25 OF 47 | BIOFILTRATION POND DETAILS PLAN | 03.11.14 |
| 26 OF 47 | EROSION AND SEDIMENTATION CONTROL PLAN | 03.11.14 |
| 27 OF 47 | GENERAL DETAILS | 03.11.14 |
| 28 OF 47 | GENERAL DETAILS | 03.11.14 |
| 29 OF 47 | GENERAL DETAILS | 03.11.14 |
| 30 OF 47 | GENERAL DETAILS | 03.11.14 |
| 31 OF 47 | GENERAL DETAILS | 03.11.14 |
| 32 OF 47 | GENERAL DETAILS | 03.11.14 |
| 33 OF 47 | GENERAL DETAILS | 03.11.14 |
| 34 OF 47 | GENERAL DETAILS | 03.11.14 |
| 35 OF 47 | GENERAL DETAILS | 03.11.14 |
| 36 OF 47 | TEMPORARY TRAFFIC CONTROL PLAN | 03.11.14 |
| 37 OF 47 | TEMPORARY TRAFFIC CONTROL PLAN DETAILS | 03.11.14 |
| 38 OF 47 | TEMPORARY TRAFFIC CONTROL PLAN DETAILS | 03.11.14 |
| 39 OF 47 | TEMPORARY TRAFFIC CONTROL PLAN DETAILS | 03.11.14 |
| 40 OF 47 | TEMPORARY TRAFFIC CONTROL PLAN DETAILS | 03.11.14 |
| 41 OF 47 | LANDSCAPE DEMOLITION PLAN | 03.11.14 |
| 42 OF 47 | LANDSCAPE PLAN | 03.11.14 |
| 43 OF 47 | BIOFILTRATION POND LANDSCAPE PLAN | 03.11.14 |
| 44 OF 47 | LANDSCAPE NOTES & DETAILS | 03.11.14 |
| 45 OF 47 | EROSION & SEDIMENTATION CONTROL DETAILS | 03.11.14 |
| 46 OF 47 | SUBDIVISION PLAT | 03.11.14 |
| 47 OF 47 | PARKING GARAGE PLAN | 03.11.14 |
| ARCHITECTURAL   A0.00 | COVER PAGE | 04.15.14 |
| A0.01 | DATA SHEET | 04.15.14 |
| A0.02 | FIRE RESISTANCE RATED ASSEMBLY PLAN | 04.15.14 |
| A0.03 | FIRE RESISTANCE RATED ASSEMBLY DETAILS | 04.15.14 |
| A0.04a | LIFE SAFETY PLAN – LEVELS 5 & 6 | 04.15.14 |
| A0.04b | LIFE SAFETY PLAN – LEVELS 2 & 3 EXIT DISCHARGE LEVELS | 04.15.14 |
| A0.06 | GA.F.R.R. ASSEMBLY GA-RC #2601 & UL U905 1-HR F.R.R. TEXT | 12.16.13 |
| A0.07a | UL L528 1-HR F.R.R. FLOOR/CEILING ASSEMBLY TEXT | 12.16.13 |
| A0.07b | UL L528 1-HR F.R.R. FLOOR/CEILING ASSEMBLY TEXT | 12.16.13 |



May 13, 2014

# Exhibit "A" - List of Documents

| | | |
|---|---|---|
| A0.08 | UL L528 1-HR F.R.R. FLOOR/CEILING ASSEMBLY TEXT | 12.16.13 |
| A0.09 | UL M500 2-HR F.R.R. FLOOR/CEILING ASSEMBLY TEXT | 12.16.13 |
| A0.10 | UL U301 2-HR F.R.R. ROOF ASSEMBLY TEXT | 12.16.13 |
| A0.11a | UL U305 1-HR F.R.R. WALL ASSEMBLY TEXT | 12.16.13 |
| A0.11b | UL U305 1-HR F.R.R. WALL ASSEMBLY TEXT | 12.16.13 |
| A0.12 | UL U341 1-HR F.R.R.ROOF ASSEMBLY TEXT | 12.16.13 |
| A0.13 | UL U356 1-HR F.R.R. WALL ASSEMBLY TEXT | 12.16.13 |
| A0.14 | UL V455 – SYSTEM B 2-HR F.R.R. TEXT | 12.16.13 |
| A0.15 | UL LISTED F.R.R ASSEMBLY | 04.15.14 |
| A1.01a | ARCHITECTURAL SITE PLAN – NORTH END & SITE PLAN – SOUTH PORTION | 04.15.14 |
| A1.01b | ARCHITECTURAL SITE PLAN – SOUTH END | 04.15.14 |
| A1.01c | PHASING PLAN & C.O.A. REQUIREMENTS FOR A TCO | 04.15.14 |
| A2.00a | GARAGE PLAN – LEVEL G1 | 04.15.14 |
| A2.00b | GARAGE PLAN – LEVEL G2 | 04.15.14 |
| A2.00c | GARAGE PODIUM DRAINAGE PLAN AND DETAILS | 04.15.14 |
| A2.00d | PODIUM PAVER PLAN | 04.15.14 |
| A2.01 | 1 BEDROOM ADAPTABLE FLOOR AND RCP PLANS | 04.15.14 |
| A2.02 | 2 BEDROOM ADAPTABLE FLOOR AND RCP PLANS | 04.15.14 |
| A2.02a | 2 BEDROOM ADAPTABLE FLOOR CANTILEVER | 04.15.14 |
| A2.03 | 3 BEDROOM ADAPTABLE FLOOR AND RCP PLANS | 04.15.14 |
| A2.03a | 3 BEDROOM ADAPTABLE FLOOR CANTILEVER | 04.15.14 |
| A2.04 | 4 BEDROOM ADAPTABLE FLOOR AND RCP PLANS | 04.15.14 |
| A2.05 | 1 BEDROOM – BF FLOOR AND RCP PLANS | 04.15.14 |
| A2.06 | 2 BEDROOM – BF FLOOR AND RCP PLANS | 04.15.14 |
| A2.07 | 3 BEDROOM – BF FLOOR AND RCP PLANS | 04.15.14 |
| A2.08 | 4 BEDROOM – BF FLOOR AND RCP PLANS | 04.15.14 |
| A3.01 | RESIDENTIAL UNIT INTERIOR ELEVATIONS | 04.15.14 |
| A3.02 | RESIDENTIAL UNIT INTERIOR ELEVATIONS | 02.20.14 |
| A3.03 | RESIDENTIAL UNIT INTERIOR ELEVATIONS | 04.15.14 |
| A3.04 | RESIDENTIAL UNIT INTERIOR ELEVATIONS | 04.15.14 |
| A4.01 | BUILDING FLOOR PLANS & TYP. PLAN DETAILS | 04.15.14 |
| A4.02 | BUILDING FLOOR PLANS & TYP. PLAN DETAILS | 04.15.14 |
| A4.03 | BUILDING FLOOR PLANS & TYP. PLAN DETAILS | 04.15.14 |
| A4.04 | BUILDING FLOOR PLANS & TYP. PLAN DETAILS | 04.15.14 |
| A4.05 | BUILDING FLOOR PLANS & TYP. PLAN DETAILS | 04.15.14 |
| A4.06 | BUILDING ROOF PLANS & TYP. PLAN DETAILS | 04.15.14 |



# Exhibit "A" - List of Documents

May 13, 2014

| | | |
|---|---|---|
| A4.06a | BUILDING ROOF PLANS & TYP. PLAN DETAILS | 04.15.14 |
| A4.06b | BUILDING ROOF PLANS & TYP. PLAN DETAILS | 02.20.14 |
| A5.01 | S.E. AND N.W. EXTERIOR ELEVATIONS & RELATED DETAILS | 02.20.14 |
| A5.02 | S.E. AND N.W. INT. COURTYARD EXTERIOR ELEVATIONS | 02.20.14 |
| A5.03 | S.W. AND N.E. EXTERIOR ELEVATIONS | 02.20.14 |
| A6.01 | BUILDING SECTIONS AND DETAILS | 04.15.14 |
| A6.02 | BUILDING SECTIONS AND DETAILS | 04.15.14 |
| A6.06 | ENLARGED STAIR SECTIONS & DETAILS | 04.15.14 |
| A6.07 | ENLARGED ENCLOSED STAIR SECTIONS AND RELATED DETAILS | 12.16.13 |
| A6.08 | ENLARGED ELEVATOR A SECTIONS AND RELATED DETAILS | 12.16.13 |
| A7.01 | DOOR & DOOR HARDWARE SCHED. & RELATED DTLS | 04.15.14 |
| A7.02 | WINDOW SCHEDULE AND RELATED DETAILS | 04.15.14 |
| A8.01 | ENLARGED COMMUNITY BUILDING FLOOR PLANS | 04.15.14 |
| A8.02 | ENLARGED COMMON AREAS – ROOF DECK PLANS | 04.15.14 |
| A8.03 | ENLARGED COMMON AREAS | 02.20.14 |
| A8.04 | ENLARGED COMMON AREAS | 04.15.14 |
| A8.06 | ENLARGED STAIR PLANS & DETAILS | 02.20.14 |
| A8.07 | ENLARGED STAIR PLANS & DETAILS | 04.15.14 |
| A8.08 | ENLARGED STAIR PLANS & DETAILS | 04.15.14 |
| A8.09 | ENLARGED STAIR PLANS & DETAILS | 02.20.14 |
| STRUCTURAL | | |
| S0.00 | STRUCTURAL COVER SHEET | 12.19.13 |
| S0.01 | STRUCTURAL DESIGN CRITERIA | 12.19.13 |
| S0.02 | CONCRETE SPECIFICATIONS | 04.15.14 |
| S0.03 | CONCRETE SPECIFICATIONS | 12.19.13 |
| S0.04 | ELEVATED POST TENSION SLAB NOTES | 12.19.13 |
| S0.05 | GENERAL SPECIFICATIONS | 12.19.13 |
| S0.06 | GENERAL SPECIFICATIONS | 12.19.13 |
| S0.07 | GENERAL SPECIFICATIONS | 12.19.13 |
| S1.10 | OVERALL FOUNDATION PLAN | 02.20.14 |
| S1.10A | FOUNDATION PLAN – A | 12.19.13 |
| S1.10AN | FOUNDATION PLAN | 02.20.14 |
| S1.10AS | FOUNDATION PLAN | 02.20.14 |
| S1.10B | FOUNDATION – B | 04.15.14 |
| S1.10C | FOUNDATION – C | 02.20.14 |
| S1.10D | FOUNDATION – D | 04.15.14 |



# Exhibit "A" - List of Documents

| | | |
|---|---|---|
| S1.10E | FOUNDATION – E | 12.19.13 |
| S1.11B | POST TENSION CABLE PLAN – B | 02.20.14 |
| S1.11D | POST TENSION CABLE PLAN – D | 02.20.14 |
| S.111E | POST TENSION CABLE PLAN – E | 12.19.13 |
| S2.00 | OVERALL LEVEL 2 FORMING PLAN | 02.20.14 |
| S2.00A | LEVEL 2 FORMING PLAN - A | 12.19.13 |
| S2.00AN | LEVEL 2 FORMING PLAN | 02.20.14 |
| S2.00AS | LEVEL 2 FORMING PLAN | 04.15.14 |
| S2.00B | LEVEL 2 FORMING PLAN - B | 12.19.13 |
| S2.00C | LEVEL 2 FORMING PLAN – C | 02.20.14 |
| S2.01 | OVERALL LEVEL 2 ELEVATED P.T.PLAN | 02.20.14 |
| S2.01A | LEVEL 2 ELEVATED P.T. PLAN – A | 12.19.13 |
| S2.01AN | LEVEL 2 ELEVATED P.T. PLAN | 02.20.14 |
| S2.01AS | LEVEL 2 ELEVATED P.T. PLAN | 02.20.14 |
| S2.01B | LEVEL 2 ELEVATED P.T. PLAN – B | 12.19.13 |
| S2.01C | LEVEL 2 ELEVATED P.T. PLAN – C | 02.20.14 |
| S2.02 | OVERALL LEVEL 2 ELEVATED REINFORCING PLAN | 02.20.14 |
| S2.02A | LEVEL 2 ELEVATED REINFORCING PLAN – A | 12.19.13 |
| S2.02AN | LEVEL 2 ELEVATED REINFORCING PLAN | 02.20.14 |
| S2.02AS | LEVEL 2 ELEVATED REINFORCING PLAN | 02.20.14 |
| S2.02B | LEVEL 2 ELEVATED REINFORCING PLAN – B | 12.19.13 |
| S2.02C | LEVEL 2 ELEVATED REINFORCING PLAN – C | 02.20.14 |
| S2.10 | OVERALL LEVEL 3 ELEVATED FORMING PLAN | 02.20.14 |
| S2.10A | LEVEL 3 FORMING PLAN – A | 12.19.13 |
| S2.10AN | LEVEL 3 FORMING PLAN | 04.15.14 |
| S2.10AS | LEVEL 3 FORMING PLAN | 04.15.14 |
| S2.10B | LEVEL 3 FORMING PLAN – B | 12.19.13 |
| S2.10C | LEVEL 3 FORMING PLAN – C | 04.15.14 |
| S2.11 | OVERALL LEVEL 3 P.T. PLAN | 02.20.14 |
| S2.11A | LEVEL 3 ELEVATED P.T. PLAN - A | 12.19.13 |
| S2.11AN | LEVEL 3 ELEVATED P.T. PLAN | 02.20.14 |
| S2.11AS | LEVEL 3 ELEVATED P.T. PLAN | 02.20.14 |
| S2.11B | LEVEL 3 ELEVATED P.T. PLAN – B | 12.19.13 |
| S2.11C | LEVEL 3 ELEVATED P.T. PLAN – C | 02.20.14 |
| S2.12 | OVERALL LEVEL 3 ELEVATED REINFORCING PLAN | 02.20.14 |
| S2.12A | LEVEL 3 ELEVATED REINFORCING PLAN - A | 12.19.13 |
| S2.12AN | LEVEL 3 ELEVATED REINFORCING PLAN | 02.20.14 |
| S2.12AS | LEVEL 3 ELEVATED REINFORCING PLAN | 02.20.14 |
| S2.12B | LEVEL 3 ELEVATED REINFORCING PLAN – B | 12.19.13 |



May 13, 2014

# Exhibit "A" - List of Documents

| | | |
|---|---|---|
| S2.12C | LEVEL 3 ELEVATED REINFORCING PLAN – C | 02.20.14 |
| S3.10A | STUD LAYOUT PLAN – A | 12.19.13 |
| S3.10AN | STUD LAYOUT PLAN | 02.20.14 |
| S3.10AS | STUD LAYOUT PLAN | 02.20.14 |
| S3.10B | STUD LAYOUT PLAN – B | 02.20.14 |
| S3.10C | STUD LAYOUT PLAN – C | 02.20.14 |
| S3.10D | STUD LAYOUT PLAN – D | 02.20.14 |
| S3.10E | STUD LAYOUT PLAN – E | 12.19.13 |
| S4.10B | FLOOR & ROOF FRAMING PLAN – LEVEL 3 | 04.15.14 |
| S4.10D | FLOOR & ROOF FRAMING PLAN – LEVEL 3 | 04.15.14 |
| S4.10E | FLOOR & ROOF FRAMING PLAN – LEVEL 3 | 12.19.13 |
| S4.20A | FLOOR & ROOF FRAMING PLAN – LEVEL 4 | 12.19.13 |
| S4.20AN | FLOOR & ROOF FRAMING PLAN – LEVEL 4 | 04.15.14 |
| S4.20AS | FLOOR & ROOF FRAMING PLAN – LEVEL 4 | 04.15.14 |
| S4.20B | FLOOR & ROOF FRAMING PLAN – LEVEL 4 | 04.15.14 |
| S4.20C | FLOOR & ROOF FRAMING PLAN – LEVEL 4 | 02.20.14 |
| S4.20D | FLOOR & ROOF FRAMING PLAN – LEVEL 4 | 04.15.14 |
| S4.20E | FLOOR & ROOF FRAMING PLAN – LEVEL 4 | 12.19.13 |
| S4.21A | FLOOR & ROOF FRAMING PLAN – LEVEL 5 | 12.19.13 |
| S4.21AN | FLOOR & ROOF FRAMING PLAN – LEVEL 5 | 04.15.14 |
| S4.21AS | FLOOR & ROOF FRAMING PLAN – LEVEL 5 | 04.15.14 |
| S4.21B | FLOOR & ROOF FRAMING PLAN – LEVEL 5 | 04.15.14 |
| S4.21C | FLOOR & ROOF FRAMING PLAN – LEVEL 5 | 02.20.14 |
| S4.21D | FLOOR & ROOF FRAMING PLAN – LEVEL 5 | 04.15.14 |
| S4.21E | FLOOR & ROOF FRAMING PLAN – LEVEL 5 | 12.19.13 |
| S4.22A | FLOOR & ROOF FRAMING PLAN – LEVEL 6 | 12.19.13 |
| S4.22AN | FLOOR & ROOF FRAMING PLAN – LEVEL 6 | 02.20.14 |
| S4.22AS | FLOOR & ROOF FRAMING PLAN – LEVEL 6 | 04.15.14 |
| S4.22B | FLOOR & ROOF FRAMING PLAN – LEVEL 6 | 12.19.13 |
| S4.22C | FLOOR & ROOF FRAMING PLAN – LEVEL 6 | 02.20.14 |
| S5.10A | BRACING PLAN – A | 12.19.13 |
| S5.10AN | BRACING PLAN | 02.20.14 |
| S5.10AS | BRACING PLAN | 02.20.14 |
| S5.10B | BRACING PLAN – B | 02.20.14 |
| S5.10C | BRACING PLAN – C | 02.20.14 |
| S5.10D | BRACING PLAN – D | 02.20.14 |
| S5.10E | BRACING PLAN – E | 12.19.13 |
| S6.10A | ROOF FRAMING PLAN | 12.19.13 |
| S6.10AN | ROOF FRAMING PLAN | 02.20.14 |



May 13, 2014

# Exhibit "A" - List of Documents

| | | | |
|---|---|---|---|
| | S6.10AS | ROOF FRAMING PLAN | 02.20.14 |
| | S6.10B | ROOF FRAMING PLAN | 02.20.14 |
| | S6.10C | ROOF FRAMING PLAN | 02.20.14 |
| | S6.10D | ROOF FRAMING PLAN | 02.20.14 |
| | S6.10E | ROOF FRAMING PLAN | 12.19.13 |
| | S7.01 | FOUNDATION DETAILS | 04.15.14 |
| | S7.02 | FOUNDATION DETAILS | 12.19.13 |
| | S7.03 | FOUNDATION DETAILS | 02.20.14 |
| | S7.10 | ELEVATED POST TENSION DETAILS | 12.19.13 |
| | S7.11 | ELEVATED POST TENSION DETAILS | 12.19.13 |
| | S7.12 | ELEVATED POST TENSION DETAILS | 12.19.13 |
| | S7.13 | STUD RAIL SCHEDULES | 12.19.13 |
| | S7.14 | COLUMN, RCB & SHEARWALL SCHEDULE | 12.19.13 |
| | S7.20 | ELEVATED CONCRETE DETAILS | 12.19.13 |
| | S7.21 | ELEVATED CONCRETE DETAILS STEEL BASE PLATE | 12.19.13 |
| | S8.00 | ROOF UPLIFT SECTIONS | 12.19.13 |
| | S8.01 | ROOF UPLIFT SECTIONS | 12.19.13 |
| | S8.02 | ROOF UPLIFT SECTIONS | 12.19.13 |
| | S8.10 | TYPICAL 2 STORY G.T. UPLIFT DETAILS | 12.19.13 |
| | S8.11 | TYPICAL 3 STORY G.T. UPLIFT DETAILS | 12.19.13 |
| | S8.12 | TYPICAL 4 STORY G.T. UPLIFT DETAILS | 12.19.13 |
| | S8.20 | TYPICAL FRAMING DETAILS | 12.19.13 |
| | S8.21 | TYPICAL FRAMING DETAILS | 12.19.13 |
| | S8.40 | FLOOR FRAMING DETAILS | 04.15.14 |
| | S8.41 | FLOOR FRAMING DETAILS | 04.15.14 |
| | S8.42 | FLOOR FRAMING DETAILS | 04.15.14 |
| | S8.43 | STAIR LANDING FRAMING | 04.15.14 |
| | S8.50 | ROOF FRAMING DETAILS | 02.20.14 |
| | S8.60 | WOOD SHRINKAGE DETAIL | 12.19.13 |
| | S9.01 | 2 STORY ANCHORAGE ELEVATIONS | 12.19.13 |
| | S9.02 | 3 STORY ANCHORAGE ELEVATIONS | 12.19.13 |
| | S9.03 | 4 STORY ANCHORAGE ELEVATIONS | 12.19.13 |
| | S9.04 | SHEARWALL SCHEDULE & DETAILS | 12.19.13 |
| MECHANICAL | M0.01 | MECHANICAL COVER SHEET | 04.15.14 |
| | M1.01 | MECHANICAL PLAN - PARTIAL GARAGE PLAN | 01.06.14 |
| | M1.02 | MECHANICAL PLAN - PARTIAL GARAGE PLAN | 01.06.14 |
| | M1.03 | MECHANICAL PLAN - PARTIAL GARAGE PLAN | 04.15.14 |
| | M2.01 | MECHANICAL PLAN - THEATER & MAINTENANCE AREAS | 04.15.14 |



May 13, 2014

# Exhibit "A" - List of Documents

| | M2.02 | MECHANICAL PLAN - FITNESS AREA | 04.15.14 |
|---|---|---|---|
| | M2.03 | MECHANICAL PLAN - FITNESS AREA | 04.15.14 |
| | M2.04 | MECHANICAL PLAN - LEVEL 6 | 04.15.14 |
| | M2.10 | MECHANICAL PLAN - PARTIAL ROOF | 04.15.14 |
| | M2.11 | MECHANICAL PLAN - PARTIAL ROOF | 04.15.14 |
| | M2.12 | MECHANICAL PLAN - PARTIAL ROOF | 04.15.14 |
| | M3.01 | MECHANICAL PLAN – UNIT PLANS | 02.20.14 |
| | M3.02 | MECHANICAL PLAN – UNIT PLANS | 02.20.14 |
| | M3.03 | MECHANICAL PLAN – UNIT PLANS | 02.20.14 |
| | M3.04 | MECHANICAL PLAN – UNIT PLANS | 02.20.14 |
| | M3.05 | MECHANICAL PLAN – UNIT PLANS | 02.20.14 |
| | M3.06 | MECHANICAL PLAN – UNIT PLANS | 02.20.14 |
| | M4.01 | MECHANICAL DETAILS | 01.06.14 |
| | M5.01 | MECHANICAL SPECIFICATIONS | 01.06.14 |
| ELECTRICAL | E0.01 | ELECTRICAL COVER SHEET | 04.15.14 |
| | E0.02 | SITE KEY PLAN | 01.06.14 |
| | E0.03 | SITE LIGHTING PLAN | 01.06.14 |
| | E0.04 | SITE LIGHTING PLAN | 01.06.14 |
| | E0.05 | SITE PHOTOMETRIC PLAN | 01.06.14 |
| | E0.06 | SITE PHOTOMETRIC PLAN | 01.06.14 |
| | E1.01 | ELECTRICAL BUILDING 1AW – LEVEL 2 PLANS | 04.15.14 |
| | E1.02 | ELECTRICAL BUILDING 1AW – LEVEL 3 PLANS | 04.15.14 |
| | E1.03 | ELECTRICAL BUILDING 1AW – LEVEL 4 PLANS | 04.15.14 |
| | E1.04 | ELECTRICAL BUILDING 1AW – LEVEL 5 PLANS | 04.15.14 |
| | E1.05 | ELECTRICAL BUILDING 1AE – LEVEL 2 PLANS | 04.15.14 |
| | E1.06 | ELECTRICAL BUILDING 1AE – LEVEL 3 PLANS | 04.15.14 |
| | E1.07 | ELECTRICAL BUILDING 1AE – LEVEL 4 PLANS | 04.15.14 |
| | E1.08 | ELECTRICAL BUILDING 1AE – LEVEL 5 PLANS | 04.15.14 |
| | E1.09 | ELECTRICAL BUILDING 1BW – LEVEL 3 PLANS | 04.15.14 |
| | E1.10 | ELECTRICAL BUILDING 1BW – LEVEL 4 PLANS | 04.15.14 |
| | E1.11 | ELECTRICAL BUILDING 1BW – LEVEL 5 PLANS | 04.15.14 |
| | E1.12 | ELECTRICAL BUILDING 1BW – LEVEL 6 PLANS | 04.15.14 |
| | E1.13 | ELECTRICAL BUILDING 1BW – LEVELS 3, 4 & 5 PLANS | 04.15.14 |
| | E1.14 | ELECTRICAL BUILDING 1BE – LEVEL 3 PLANS | 04.15.14 |
| | E1.15 | ELECTRICAL BUILDING 1BE – LEVELS 3 & 4 PLANS | 04.15.14 |
| | E1.16 | ELECTRICAL BUILDING 1BE – LEVEL 4 PLANS | 04.15.14 |
| | E1.17 | ELECTRICAL BUILDING 1BE – LEVEL 5 PLANS | 04.15.14 |
| | E1.18 | ELECTRICAL BUILDING 1BE – LEVELS 5 & 6 PLANS | 04.15.14 |



May 13, 2014                                    Exhibit "A" - List of Documents

| | E1.19 | ELECTRICAL BUILDING 1BE – LEVEL 6 PLANS | 04.15.14 |
|---|---|---|---|
| | E1.20 | ELECTRICAL ROOF PLANS | 04.15.14 |
| | E1.21 | ELECTRICAL ROOF PLANS | 04.15.14 |
| | E2.01 | ELECTRICAL PARKING GARAGE PLANS | 04.15.14 |
| | E2.02 | ELECTRICAL PARKING GARAGE PLANS | 04.15.14 |
| | E2.03 | ELECTRICAL PARKING GARAGE ENLARGED PLANS | 04.15.14 |
| | E2.04 | ELECTRICAL THEATER/MAINTENANCE/TRASH ROOMS PLANS | 04.15.14 |
| | E2.05 | ELECTRICAL FITNESS/COMMUNITY ROOMS PLANS | 04.15.14 |
| | E2.06 | ELECTRICAL ROOF DECK | 04.15.14 |
| | E3.01 | TYPICAL UNIT PLANS | 04.15.14 |
| | E3.02 | TYPICAL UNIT PLANS | 02.20.14 |
| | E3.03 | TYPICAL UNIT PLANS | 02.20.14 |
| | E3.04 | TYPICAL UNIT PLANS | 02.20.14 |
| | E3.05 | TYPICAL UNIT PLANS | 02.20.14 |
| | E3.06 | TYPICAL UNIT PLANS | 02.20.14 |
| | E4.01 | ELECTRICAL SERVICE RISER DIAGRAMS | 04.15.14 |
| | E4.02 | ELECTRICAL SERVICE RISER DIAGRAMS | 04.15.14 |
| | E4.03 | ELECTRICAL SERVICE RISER DIAGRAMS | 04.15.14 |
| | E4.04 | ELECTRICAL SERVICE RISER DIAGRAMS | 04.15.14 |
| | E5.01 | ELECTRICAL LOAD SUMMARIES AND PANEL SCHEDULES | 04.15.14 |
| | E5.02 | ELECTRICAL LOAD SUMMARIES AND PANEL SCHEDULES | 04.15.14 |
| | E5.03 | ELECTRICAL LOAD SUMMARIES AND PANEL SCHEDULES | 04.15.14 |
| | E5.04 | ELECTRICAL LOAD SUMMARIES AND PANEL SCHEDULES | 04.15.14 |
| | E6.01 | ELECTRICAL SPECIFICATIONS | 01.06.14 |
| | | LOW VOLTAGE HAND DRAWN SITE SCHEMATIC – POE – AT & T | NO DATE SIGNED |
| | | POE – GRANDE HAND DRAWN ON OVERALL SITE PLAN | 03.11.14 |
| | | POE – TIME WARNER | 02.21.14 |
| VOICE VIDEO DATA | 01-25 OF 25 | VOICE VIDEO DATA | 03.17.14 |
| PLUMBING | P0.01 | PLUMBING COVER SHEET | 04.15.14 |
| | P0.02 | PLUMBING SITE PLAN | 04.15.14 |
| | P0.03 | PLUMBING SITE PLAN | 04.15.14 |
| | P1.01 | PLUMBING BUILDING 1A – W LEVEL 2 PLANS | 04.15.14 |
| | P1.02 | PLUMBING BUILDING 1A – W LEVEL 3 PLANS | 04.15.14 |



May 13, 2014

# Exhibit "A" - List of Documents

| | | |
|---|---|---|
| P1.03 | PLUMBING BUILDING 1A – W LEVEL 4 PLANS | 04.15.14 |
| P1.04 | PLUMBING BUILDING 1A – W LEVEL 5 PLANS | 04.15.14 |
| P1.05 | PLUMBING BUILDING 1A – E LEVEL 2 PLANS | 04.15.14 |
| P1.06 | PLUMBING BUILDING 1A – E LEVEL 3 PLANS | 04.15.14 |
| P1.07 | PLUMBING BUILDING 1A – E LEVEL 4 PLANS | 04.15.14 |
| P1.08 | PLUMBING BUILDING 1A – E LEVEL 5 PLANS | 04.15.14 |
| P1.09 | PLUMBING BUILDING 1B – W LEVEL 3 PLANS | 04.15.14 |
| P1.10 | PLUMBING BUILDING 1B – W LEVEL 4 PLANS | 04.15.14 |
| P1.11 | PLUMBING BUILDING 1B – W LEVEL 5 PLANS | 04.15.14 |
| P1.12 | PLUMBING BUILDING 1B – W LEVEL 6 PLANS | 04.15.14 |
| P1.13 | PLUMBING BUILDING 1B – E LEVEL 3 PLANS | 04.15.14 |
| P1.14 | PLUMBING BUILDING 1B – E LEVEL 3 & 4 PLANS | 04.15.14 |
| P1.15 | PLUMBING BUILDING 1B – E LEVEL 4 PLANS | 04.15.14 |
| P1.16 | PLUMBING BUILDING 1B – E LEVEL 5 PLANS | 04.15.14 |
| P1.17 | PLUMBING BUILDING 1B – E LEVEL 5 & 6 PLANS | 04.15.14 |
| P1.18 | PLUMBING BUILDING 1B – E LEVEL 6 PLANS | 04.15.14 |
| P1.19 | PLUMBING BUILDING 1B – S LEVEL 3, 4 & 5 PLANS | 04.15.14 |
| P2.01 | PARTIAL GARAGE LEVEL G1 | 04.15.14 |
| P2.02 | PARTIAL GARAGE LEVEL G2 | 04.15.14 |
| P3.01 | COMMUNITY AND FITNESS ROOMS | 04.15.14 |
| P3.02 | BUSINESS CENTER AND CLASSROOM | 04.15.14 |
| P3.03 | MAINTENANCE/SPLASH WATER AND VENT | 04.15.14 |
| P3.04 | BREAKROOM AND TOILET WASTE AND VENT | 04.15.14 |
| P4.01 | UNIT PLANS PLUMBING | 04.15.14 |
| P4.02 | UNIT PLANS PLUMBING | 04.15.14 |
| P4.03 | UNIT PLANS PLUMBING | 04.15.14 |
| P5.01 | PLUMBING SCHEDULES | 04.15.14 |
| P5.02 | PLUMBING DETAILS | 04.15.14 |
| P5.03 | PLUMBING DETAILS | 01.06.14 |
| P6.01 | PLUMBING AND FIRE SUPPRESSION SPECIFICATIONS | 01.06.14 |
| P7.01 | TYPICAL STACK DETAILS | 04.15.14 |
| P7.02 | TYPICAL STACK DETAILS | 04.15.14 |
| P7.03 | TYPICAL STACK DETAILS | 04.15.14 |

INTERIOR DESIGN

| | | |
|---|---|---|
| 1SF | ONE BEDROOM INTERIOR FINISH SCHEDULE – FINISHES | 03.19.14 |
| 1SH | ONE BEDROOM INTERIOR FINISH SCHEDULE – HARDWARE | 03.19.14 |
| 2SF | TWO BEDROOM INTERIOR FINISH SCHEDULE – FINISHES | 03.19.14 |



# Exhibit "A" - List of Documents

| | | | |
|---|---|---|---|
| | 2SH | TWO BEDROOM INTERIOR FINISH SCHEDULE – HARDWARE | 03.19.14 |
| | 3SF | THREE BEDROOM INTERIOR FINISH SCHEDULE – FINISHES | 03.19.14 |
| | 3SH | THREE BEDROOM INTERIOR FINISH SCHEDULE – HARDWARE | 03.19.14 |
| | 4SF | FOUR BEDROOM INTERIOR FINISH SCHEDULE – FINISHES | 03.19.14 |
| | 4SH | FOUR BEDROOM INTERIOR FINISH SCHEDULE – HARDWARE | 03.19.14 |
| | AC-SFH | AUDITORIUM-CLASSROOM INTERIOR FINISH SCHEDULE – FINISHES – SCHEDULE – HARDWARE | 03.19.14 |
| | BFM-SF | BUSINESS CTR-FITNESS-MAIL – INTERIOR FINISH SCHEDULE – FINISHES | 03.19.14 |
| | BFM-SH | BUSINESS CTR-FITNESS-MAIL – INTERIOR FINISH SCHEDULE – HARDWARE | 03.19.14 |
| | KML-SF | PUBLIC KITCHEN-MANAGER-LEASING OFFICES – INTERIOR FINISH SCHEDULE – FINSHES | 03.19.14 |
| | KML-SH | PUBLIC KITCHEN-MANAGER-LEASING OFFICES – INTERIOR FINISH SCHEDULE – HARDWARE | 03.19.14 |
| | PRR-SFH | PUBLIC RESTROOMS INTERIOR FINISH – SCHEDULE – FINISHES – SCHEDULE - HARDWARE | 03.19.14 |
| COLOR SCHEME | 1-2 OF 2 | OAK CREEK VILLAGE – PHASE 1 – COLOR SCHEME PER BCS | 04.01.14 |
| PROJECT MANUAL | | PROJECT MANUAL FOR OAK CREEK VILLAGE – PHASE 1 | 12.16.13 |
| GEOTECHNICAL | | GEOTECHNICAL ENGINEERING REPORT | 04.03.14 |



May 13, 2014

# Exhibit "E" – Contractor's Clarifications and Exclusions

■ ■ ■ ■

Eureka Development
Oak Creek Village Phase I
Austin, Texas

## DIVISION 2: Sitework

1. Removal of all above grade items identified in the plans such as existing buildings, pavement, sidewalks, and walls identified in Exhibit A documents.
2. Removal and disposal of any buried structures, debris or trash not currently identified in Exhibit A documents is not included.
3. An allowance per Exhibit F is included for shoring and maintaining the structure in the existing leasing office around the boilers.
4. Cost associated with tree relocations is by owner.
5. An allowance per Exhibit F is included for a temporary sediment basin structure.
6. Building pad construction is prepared per the Geotech provided by ECS dated April 3, 2014.
7. All site dry utilities are direct buried or in conduit (concrete encasement not included).
8. An allowance per Exhibit F is included for existing utility modifications of electrical, gas, water and irrigation.
9. Dewatering of site is not included.
10. All existing on-site materials are considered to be "unrestricted re-use".
11. Parking lot striping is included with wheel stops.
12. All concrete flatwork shall receive broom finish.
13. Concrete pavers on pedestals are included for the corridors, splash pad and roof top deck.
14. Site retaining walls are included as a stone gravity wall with a mosaic pattern.
15. An Allowance per Exhibit F is included for site furnishings.
16. A 6' painted wrought iron picket fence along Wilson Street and the north property line along Phase I is included.
17. Pedestal pavers provided at the splash pad area and corridors of area (A) & (C) for a total of 6,220sf. Pedestal pavers and Mexican beach rock are not included in the court yard of area (A) & (C); accepted VE.
18. Tree pruning of existing trees to remain is not included.
19. Landscaping and irrigation per landscape drawing sheet # 42 of 47 of the civil plans.

## Division 3: Concrete

1. Integral concrete waterproofing admixture for the concrete is not included.
2. Building slab on grade is based on a 4" post-tension slab with grade beams over a 10 mil poly for areas B & D.
3. Area A & C includes interior columns supported on piers with a min length of 8' and a spread footing for the basement walls.
4. The garage slab on grade is a 5" slab over 6" of rock with #4 bars at 15" o.c.e.w.
5. The courtyard area of the elevated podium slab is finished with slopes to drains
6. The courtyard area of the elevated podium slab includes a 2" topping slab.
7. 3/4" cementitious underlayment flooring by Maxxon (or equal), 2.1 mix design with a 2,000 psi with sound mat under all hard surface areas is included at the wood elevated floors.
8. Level 3 of areas A & C includes 8" of EPS board with drilled pier holes and a 2" gypsum topping.
9. Minimum of 1-1/2" pea gravel mix concrete for the balconies and breezeways with a drain board and 60 mil waterproofing. All concrete topping shall receive broom finish.



May 13, 2014

# Exhibit "E" – Contractor's Clarifications and Exclusions

### Division 4: Masonry

1. CMU elevator shafts are included.
2. CMU stair shafts are included in the garage and at stair A north to the 6th level.

### Division 5: Steel

1. 180 degree stairs of C-channel metal stringers with precast treads and closed risers are included with precast concrete treads
2. 42" high guardrail with punched circles through plated material is included at stairs, balconies and corridors.
3. Guard rails along low parapets are not included.
4. All stairs, handrails and guardrail are pre-primed and field painted.

### Division 6: Woods & Plastics

1. Lumber is priced per current "Random Links" market conditions
2. Studs – 2x4 & 2x6, grade and species per structural design.
3. Plates – 2x4 & 2x6, grade and species per structural design.
4. 2x4 & 2x6 pressure treated plate on the first floor.
5. Radiant Barrier Roof Decking. 4x8 – 23/32" OSB for flat roof areas.
6. Floor Decking: 4x8 – 23/32" T&G OSB.
7. Exterior sheathing and shear walls: 15/32" OSB at UL356 and 5/8" dens glass at UL305 assemblies.
8. Prefabricated roof, floor trusses per manufacturer's design.
9. Unit interior trim is based on MDF material for the 2" casing base and window stools.
10. Theater, Classroom, Office, Leasing, Break room and common area trim labor and material allowance per Exhibit F is included.

### Division 7: Thermal & Moisture Protection

1. Attic: (R-38) fiberglass batt insulation in the attic attached to roof deck.
2. Ext. Walls: R19 batts unfaced.
3. Party Walls: R11 batts for sound attenuation.
4. Roofing includes a 60mil TPO membrane over mechanical attached 1" polyiso insulation w/ a 20yr warranty.
5. A fluid applied air barrier system is included.
6. An air barrier is not included at the roof per detail 9/A0.03.
7. Fire stopping per codes & governing authority.
8. Polyguard Underseal below grade waterproofing system is included as blindside waterproofing of garage walls.
9. Polyguard total flow drain system in lieu of below grade drain tile system is included.
10. Podium deck waterproofing system includes drain board and a 60mil waterproofing membrane topping.

### Division 8: Doors & Windows

1. Unit entry doors are included as a Flat slab Metal Insulated doors.
2. Interior doors are a Flat slab hollow core hardboard prehung unit.
3. Provide 3068 hollow core bedroom doors at (A) unit in lieu of barn doors; accepted VE
4. Provide hollow core unit bedroom doors in lieu of solid core doors; accepted VE
5. Single hung and horizontal sliding thermal break aluminum windows with ½ screens are included.
6. Fire rated windows are included for all windows facing and adjacent to breezeways.



May 13, 2014

# Exhibit "E" – Contractor's Clarifications and Exclusions

7. Door hardware is included as grade 3 hardware by BHP or Kwickset.
8. Vanity mirrors are included.

## Division 9: Finishes

1. EIFS is included for 100% of the building exterior skin.
2. Drywall material.
   a) 5/8" fire-resistant type "X" gypboard on fire rated walls.
   b) 5/8" moisture resistant gypboard at tubs surround, bath walls and ceiling, trash room and fire riser rooms.
   c) 5/8" fire-resistant type "C" on RC channel at ceilings.
3. Unit shower and tub surrounds are 6" x 6" semi-gloss tile with bullnose edge in lieu of 12" x 24" standard tile; accepted VE
4. Vinyl plank wood look flooring 6" x 36" x 6mil is included in kitchens, baths, living rooms, bedrooms and closets in lieu of specified material.
5. Interior painting is based on typical apartment standards; semi-gloss on millwork & doors, kitchen & baths walls and ceiling; all other surfaces will be flat.
6. Exterior elastomeric accent paint is included per the Color Scheme dated: 04.01.2014 provided by Bercy Chen Studio.

## Division 10: Special Conditions

1. Signage is by owner.
2. Toilet partitions are not included.
3. Fire extinguishers included in each kitchen & provided per building code.
4. Mailboxes and parcel boxes as per applicable codes.
5. Flag poles are not included.
6. Bath accessories per plan include:
   - Towel bar.
   - Toilet paper holder.
   - Shower Rod.
   - Mirrored medicine cabinets

## Division 11: Equipment

1. Black and Stainless standard apartment grade appliances in lieu of appliance package specified; accepted VE.
   - 2009 Whirlpool 18TFA SS - W8RXEGMWS
   - 30" FS Range Elec Coil Slf Cln SS - WFC310S0AS
   - 1.7 cu. ft. Microwave Hood, Non Sensor - WMH31017AS
   - Dishwasher - WDF310PAAS
   - Whirlpool 18 cu.ft. XL SS - WRT138TFYS (ADA)
   - 30" FS Range Elec Coil Front Controls SS - WFC340S0AS (ADA)
   - 1.6 cu. ft. Countertop Microwave Oven - WMC30516AS (ADA)
   - Dishwasher - WDF550SAAS (ADA)
2. Stacked front load washer and dryer in lieu of combo washer & dryer appliance; accepted VE
   - 27" Axial Flow - Elec Alpha - WED70HEBW
   - 27" FL - Alpha NAR - WFW70HEBW

## Division 12: Furnishings



May 13, 2014                 Exhibit "E" – Contractor's Clarifications and Exclusions

1. Resident kitchens, vanities and office break room casework upper, lower & vanity cabinets are the Italia cabinet line with espresso finish and standard hardware in lieu of the Monza cabinet line from Master wood craft; accepted VE
2. Full extension drawer guides and magnetic catches for the cabinets are not included.
3. 2cm eased edge Group 1 Granite tops at kitchens and vanities are included in lieu of Quartz tops; accepted VE
4. 2" faux wood horizontal mini blinds on windows and patio doors.

## Division 13: Special Construction

1. Fire alarm system per IBC requirements.
2. Unit security pre-wire is not included; Accepted VE.
3. Pre-wire of future controlled access allowance per Exhibit F is included.
4. A controlled access system to the site, buildings or the garage is not included.
5. A splash pad allowance per Exhibit F is included.
6. Abatement of the existing structures is by owner.

## Division 14: Conveying Systems

1. Electric traction elevators in locations per plans with standard cab finishes are included.
2. Trash chute with sound damping coating included.
3. Trash compactor and carts are by owner.

## Division 15: Mechanical

1. NFPA 13 fire sprinkler system with standpipes and booster pump is included.
2. Residential white sprinkler heads with white escutcheons are included.
3. Sprinkler protections of the attic and floor trusses is included.
4. PVC waste and vent piping is included.
5. C.P.V.C. domestic water piping is included.
6. Washing machine drain pans are not included.
7. Plumbing fixtures provided per MEP plans dated: 01.06.2014 in lieu of ID schedule; accepted VE
8. Timers for the water heaters are not included.
9. Individual remote read domestic water meters in the units are not included. Plumbing for future meters is included.
10. Garage and courtyard deck drains are included
11. Insulation of water systems is per minimum code requirements only.
12. The sewer ejector pump is not included.
13. Each unit includes individual programmable thermostats.
14. Split DX HVAC systems by Goodman with condensers located on the roof, SEER ratings per plans.
15. Anti-microbial duct board with flex duct for all supply ducting is included.
16. Garage ventilation system with $CO2/NO2$ detection systems is included.
17. 50 cfm bath exhaust vented horizontally to exterior wall. Fans are mounted on the bathroom walls in lieu of the ceiling.
18. Ducting of the kitchen vent-a-hood is included.
19. HVAC allowance per Exhibit F included for office, lease, break room and IDF rooms.



May 13, 2014            **Exhibit "E" -- Contractor's Clarifications and Exclusions**

### Division 16: Electrical

1. Site trenching and conduit for primary electrical service with a max distance of 300' is included. Conductors to be furnished and installed by utility provider.
2. Site trenching, conduit, conductors for secondary electrical service are included.
3. Cost associated with an "In Network" system by Austin Energy is not included.
4. Sub-feeders are aluminum cable sized per code and not in conduit.
5. Romex cable for all branch and lighting circuits in all buildings is included.
6. Smoke detectors are 110v with battery backup.
7. Unit security pre-wire is not included; accepted VE
8. Allowance per Exhibit F for pre-wire of future access control locations; accepted VE
9. Allowance per Exhibit F for CCTV in 4 locations; accepted VE
10. Two (2) conduit to IDF rooms in lieu of three (3) conduit; accepted VE
11. Unit low voltage conduit is not included; accepted VE
12. Site lighting is included utilizing wall packs, 2ea parking lot light poles and 3ea pedestrian light bollards.
13. Allowance per Exhibit F is included for structured wire for Phone, Data and CATV.
14. Dry utility underground conduit allowance per Exhibit F included.
15. Equipment in the main communication and secondary rooms is by the service provider.

### General Notes:

1. GMP does not include Weis Builders or its subcontractors achieving any specific work force goals/requirements, wage requirements, or participation goals/requirements (such as those related to disadvantaged or minority owned businesses).
2. Cost associated with the Landscape/Hardscape plans by Bercy Chen is not included; no plans provided.
3. Cost associated with 3rd party inspections for the requirements of the Austin Green Buildings Program are not included.
4. Offsite Civil permit, Onsite Civil permit, Building permits, impact fees, and utility provider fees and costs will be paid directly by owner.
5. Traffic control and trade permits costs are included.
6. Cost associated with the shutdown and rework of the existing chilled water and boiler systems are by owner.
7. Payment and Performance bonds is included.
8. Builders Risk insurance is included.
9. Contractor's controlled insurance program is included. Weis Builders will be responsible for all deductibles.
10. All warranties for labor, material, and equipment are for one year from substantial completion except when manufacturer's standard warranty for material and/or equipment is greater.
11. All testing will be performed and directly paid for by the owner.
12. The work does not include any FF& E items i.e. furniture, televisions, computers, telephones, fax machines, photocopiers, or office equipment of any sort.
13. Contractor guarantees to build, per the plans and specifications. In doing so, Contractor does not guarantee specific STC or IIC sound ratings.
14. GMP is based on a continuous build out from the notice to proceed.
15. Water proofing, pedestal pavers and Mexican beach rock is not included in area B & D corridors.
16. City Comment No. 2 plans dated 04.15.2014 are included as an allowance per Exhibit F for the following scope changes:

**WEIS builders**

# Exhibit "E" – Contractor's Clarifications and Exclusions

   a.   Temporary fence for levels G1 and G2 of the parking garage.
   b.   Concrete curb on the podium deck located at the North edge.
   c.   9" tall x 8" wide pedestal footing base of column walls.
   d.   Additional ½" gypsum topping on holly board.
   e.   Stair shaft (A) tower increased length additional 2ft.
   f.   Trash room area (A) 2hr construction.
   g.   ADA open shelves in BF units.
   h.   Roof bridge extension level 6 roofs.
   i.   Window opening control devices.
   j.   Fixed (C) windows in lieu of operable (G) windows.
   k.   Barn door at theater location.
   l.   Stair shaft (A) podium level added a wall and door.
   m.   Common wall between building A & C revised UL assembly UL375.
   n.   South facing wall of building B & D added UL assembly UL301.
   o.   UL301 assembly revised.
   p.   Stair (A) Shaft wall UL905 revised.
   q.   Community ceiling defined to be new ULM500 assembly.
   r.   Secondary weeps add to podium level deck drains.
   s.   Public restrooms added in maintenance area, business center and
        classroom areas.
   t.   HVAC revisions and addition to classroom, fitness, and business center.
   u.   Added oil separators and sanitary sewer injector.
   v.   Floor drains and trap primer added in trash rooms and existing common bath.
   w.   Floor drains and trap primers in unit restroom are excluded.
   x.   Fire department connections on the roofs are included per code minimum.
   y.   Low frequency sound fire alarms are included.
   z.   Electrical fixtures and circuit revisions.
17. Future community pavilion structures and all associated green space features located in the
    southeast corner of development are not included.



# EXHIBIT 5

## AGREEMENT OF GUARANTY

THIS AGREEMENT OF GUARANTY ("**Guaranty**") is made as of the 23rd day of May, 2014, by the undersigned (whether one or more, referred to as the "**Guarantor**"), for the benefit of 2013 Travis Oak Creek, LP, a Texas limited partnership (the "**Partnership**"), and PNC Bank, National Association, a national banking association, and Columbia Housing SLP Corporation, an Oregon corporation (collectively, the "**Limited Partners**"), which are limited partners in the Partnership governed pursuant to the Amended and Restated Agreement of Limited Partnership of the Partnership dated as of the date hereof (the "**Agreement**") for the purposes of acquiring, developing, owning and operating a multifamily residential rental apartment project (the "**Project**") located in the State of Texas (the "**State**"), and where 2013 Travis Oak Creek GP, LLC, a Texas limited liability company (the "**General Partner**"), is the general partner and 2013 Travis Oak Creek Developer, Inc., a Texas corporation, is the developer of the Project (the "**Developer**").

NOW, THEREFORE, in consideration of the foregoing recitals and other valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Guarantor, for the benefit of the Partnership and the Limited Partners, hereby irrevocably and unconditionally guarantees and agrees as follows:

1.     <u>Reliance</u>.  The Guarantor agrees and acknowledges that this Guaranty is given to induce the Limited Partners to invest in and become limited partners in the Partnership.  Absent execution and delivery of this Guaranty, the Limited Partners would not have invested in the Partnership as limited partners and would not have agreed to make capital contributions to the Partnership.  The Guarantor acknowledges that Guarantor was and will be directly benefited by the Limited Partners becoming limited partners in the Partnership.

2.     <u>Guaranteed Obligations</u>.  The Guarantor hereby unconditionally, jointly and severally guarantees to the Partnership and the Limited Partners the full and prompt payment, performance, observance, compliance, and satisfaction of all obligations, covenants, representations, and warranties on the part of the General Partner to be paid, performed, observed, complied with, or satisfied with respect to the Agreement, as and when due.  The Guarantor also unconditionally, jointly and severally guarantees to the Partnership and the Limited Partners full prompt payment, performance, observance, compliance and satisfaction of all obligations, covenants, representations, and warranties on the part of the Developer to be paid, performed, observed, complied with, or satisfied with respect to Section 6.7 of the Agreement and with respect to the Development Agreement.  All obligations of the General Partner and the Developer herein guaranteed are referred to as the "**Guaranteed Obligations**."

3.     <u>Guaranty of Payment</u>.  The guaranty made hereunder is of payment and not of collection, and Guarantor waives any right to require that any action be brought against the General Partner or any other Person liable for performance or payment of any of the Guaranteed Obligations or that resort first be had to any other security therefor.

4.     <u>Effect of Payment by Guarantor to Partnership and/or Limited Partners</u>.  No payment by the Guarantor to the Partnership and/or the Limited Partners under the terms of this Guaranty shall constitute a Capital Contribution, loan, or advance to the Partnership or change in any interest of any of the Partners in the Partnership, except as expressly provided for under the terms of the Agreement.  The Guarantor shall not have any rights in or to the Partnership or its assets as a creditor or a Partner by virtue of any payments made hereunder.

5.     <u>Continuing Guaranty</u>.  This Guaranty shall be unconditional, continuing, absolute and irrevocable, and shall continue until all Guaranteed Obligations have been fully performed, paid, and satisfied, and shall not be affected or impaired by: (a) any modification, extension, or amendment of the Agreement or any other agreement now or hereafter executed by the Partnership, the General Partner, or a Limited Partner, or any of them; (b) any modification, extension of time for the payment of, forbearance, settlement, release, surrender, exchange, or discharge of any Guaranteed Obligations, any collateral therefor, or any party liable or to become liable, primarily, secondarily, or otherwise, with respect to any Guaranteed Obligations (herein "**Other Obligors**"); (c) payment of additional Capital Contributions by the Limited Partners after default or the release of any security after default

EXHIBIT 5 – Page 1

4837-4545-8969.4

whether material or otherwise; (d) death, dissolution, or insolvency of the Partnership, the General Partner, the Guarantor, or any Other Obligors; (e) release of the General Partner, or any Other Obligors from the performance or observance of any of the Guaranteed Obligations, arising by operation of law or otherwise, whether made with or without notice to the Guarantor; (f) the fact that the Partnership and/or the General Partner may or may not be personally liable under the Agreement or the Project Documents to pay any money judgment; (g) any act done, suffered, or left undone by a Limited Partner, the Partnership, or the General Partner or the Developer relating to the Agreement, the Project Documents, this Guaranty, or any other instrument or thing, including, without limitation, any delay or failure on the part of the Partnership or Limited Partners in exercising any right, power or privilege under the Agreement, this Guaranty, or any other instrument or document executed by the Partnership, the General Partner, the Developer or any Other Obligors; (h) any failure to give any notices of acceptance, notices of default, or other notices; (i) the execution of any guaranty by any personal corporation, partnership, or other entity relating to the Agreement, the Project Documents or otherwise; (j) any sale, transfer, pledge, surrender compromise, realization upon, release renewal, extension, exchange, or other hypothecation of any kind of this Guaranty, all or any part of the Agreement, and all or any part of any security or collateral given to secure any of the obligations thereunder; (k) any failure, invalidity, or unenforceability of, or any defect in, the Agreement or any security or collateral given to secure any of or all the obligations thereunder; (l) any change in the manner, place, or terms of payment of, or any change or extension of time of payment of, or any renewal of alteration in any of the Guaranteed Obligations, any security therefor, or any liability incurred directly or indirectly in respect thereof; (m) the Limited Partners' exercise or forbearance from exercising any rights or remedies against the Partnership, the General Partner, the Developer or Other Obligors, or any other act, or failure to act in any manner, which may deprive the Guarantor of any rights of subrogation, contribution, or indemnity against the Partnership, the General Partner, the Developer, or any Other Obligors; (n) any change in any of the Partners of the Partnership; or (o) any removal of any General Partner of the Partnership; provided, the obligations of the Guarantor shall not extend to provisions for which the General Partner is not liable under the Agreement.

6.   Direct Liability.   The liability of the Guarantor hereunder is direct and unconditional and may be enforced without requiring the Limited Partners or the Partnership, as the case may be, first to exercise, enforce, or exhaust any right or remedy against the Partnership, the Developer or any General Partner, or against any Other Obligors. Upon any default by the Partnership or the General Partner or the Developer or Other Obligors relating to any obligation under the Agreement, the Limited Partners may, at either of their option, proceed directly and at once against the Guarantor to collect the full amount of the Guarantor's liability hereunder, or any portion thereof, without first proceeding against the Partnership, the General Partner, the Developer, any Other Obligors, or any person, corporation, partnership, or other entity.

7.   Waivers.   The Guarantor hereby waives: (a) presentment, demand, protest, and notice of acceptance, notice of demand, notice of protest, notice of dishonor, notice of default, notice of nonpayment, and all other notices to which the Guarantor might otherwise be entitled; (b) any and all claims or defenses relating to lack of diligence or delays in collection or enforcement, or any other indulgence or forbearance whatsoever with respect to any obligations relating to the Agreement, the Project Documents, or the Guaranteed Obligations and any defense which the Guarantor may have by reason of any defense which the Partnership, any General Partner, the Developer or any Other Obligors may have against the Limited Partners, other than payment, satisfaction, and performance of the Guaranteed Obligations; (c) notice of any advances or Capital Contributions made under the Agreement or Project Documents; (d) any right, title, or interest in, or claim to, whether by subrogation or otherwise, any collateral or assets of the Partnership, the Developer or the General Partner, or Other Obligors until all Guaranteed Obligations have been fully paid, satisfied, and performed; and (e) any defense or claim relating to the marshaling of assets or any requirement to proceed against any parties or collateral in any particular order; and (f) all other suretyship defenses, rights, and claims.

8.   Costs and Attorney Fees.   The Guarantor agrees, in addition to the liability for the Guaranteed Obligations, to reimburse the Limited Partners and the Partnership for all costs and expenses, including reasonable attorney fees, which the Limited Partners or the Partnership, as the case may be, may incur (a) in the collection of any amounts owing under this Guaranty, the Agreement or any part thereof, (b) for the enforcement of this Guaranty, the Agreement or any term, agreement, covenant, provision, obligation, or duty arising thereunder, (c) in the realization of any collateral obligation or duty hereunder, and/or (d) in connection with any bankruptcy or similar proceeding wherein the Partnership, the General Partner, the Guarantor, or any Other Obligors are the "debtor". In the event of litigation or other proceeding in connection with this Guaranty, the Limited Partners shall

EXHIBIT 5 – Page 2

be entitled, in addition to all other sums and relief, to reasonable attorney fees, costs, disbursements, including all such fees, costs, and disbursements incurred both at and in preparation for trial and any appeal or review, said amount to be set by the courts before which the matter is heard.  Notwithstanding the foregoing, the ILP and the SLP shall not be entitled to any reimbursement hereunder in the event of a determination by applicable authority that the ILP or the SLP acted wrongfully or negligently in its collection efforts hereunder, and such acts had a material adverse impact on the undersigned.

9.     <u>Statute of Limitations; Bankruptcy</u>.  The Guarantor shall remain liable with respect to the payment, performance, observance, compliance, or satisfaction of the Guaranteed Obligations or any part thereof irrespective of whether a recovery upon the same may have been barred by any statute of limitations.  Any payment made on any obligations under the Agreement that may thereafter be required to be refunded, as a preference or otherwise, under any state or federal law shall not be considered payment for purposes hereof, nor shall it have the effect of reducing the amount of the Guaranteed Obligations or the liability of the Guarantor hereunder.

10.     <u>Actions Regarding Other Obligors</u>.  The Guarantor hereby represents and warrants that the Guarantor was not induced to give this Guaranty by the fact that there are or may be Other Obligors, or by the fact that there may be other collateral securing the Guaranteed Obligations.  No election to proceed in one form of action or proceeding or against any party, or on any obligation, shall constitute a waiver of the Limited Partners' or Partnership's, as the case may be, right to proceed in any other form of action or proceeding or against any other parties.  Without limiting the generality of the foregoing, no action or proceeding by the Limited Partners or the Partnership, as the case may be, against the General Partner, Developer or any Other Obligors, shall serve to diminish the liability of the Guarantor hereunder except to the extent that the Limited Partners or the Partnership, as the case may be, realizes payment by such action or proceeding, notwithstanding the effect of any suit or proceeding upon the Guarantor's rights of subrogation or contribution against the Partnership, the General Partner, Developer or such Other Obligors.  The Limited Partners and the Partnership, as the case may be, shall, at its option, have the right to join the Partnership, the General Partner, the Developer, the Guarantor, and any Other Obligors, in any action or proceeding related to the Guaranteed Obligations.

11.     <u>Investigation</u>.  The Guarantor delivers this Guaranty based solely upon the Guarantor's own independent investigation of the financial condition of the Partnership, other Guarantors, Developer, the Other Obligors, and the General Partner and in no part upon any representation or statement of the Limited Partners with respect thereto.  The Guarantor is in a position to and does hereby assume full responsibility for obtaining any additional information concerning the financial condition of the Partnership other Guarantors, the Other Obligors, the Developer and the General Partner as the Guarantor may deem material to Guarantor's obligations hereunder, and the Guarantor is not relying upon, nor expecting the Limited Partners to furnish, any information in the Limited Partners' possession concerning the financial condition of such parties.  The Guarantor agrees that the Guarantor hereby knowingly accepts the full range of risks encompassed within this Guaranty, which risks include, without limitation, the possibility that the Partnership, the General Partner, the Developer, other Guarantors and/or Other Obligors may incur additional obligations for which the Guarantor may be liable hereunder after the financial condition of the Partnership, the Developer, other Guarantors, Other Obligors and/or the General Partner, or ability to pay their lawful debts when they are due has deteriorated, and the Guarantor understands that the amount of the obligations may be increased or decreased and the ratio of obligations to collateral, if any, may be changed adversely to the Guarantor.  This Guaranty will be effective when delivered to the Partnership and the Limited Partners without need for acceptance or any other formality.

12.     <u>Representation and Warranty of Financial Condition</u>.  The Guarantor hereby represents and warrants that all financial statements of the Guarantor heretofore delivered to the Limited Partners by or on behalf of the Guarantor are true and correct in all material respects and fairly present the financial condition of the Guarantor as of the respective dates thereof, and remain true and correct and not in any way misleading, as of the date hereof.  The Guarantor agrees to provide by June 1st of each year a certified financial statement of the Guarantor as of the end of the Partnership's previous Fiscal Year, including, but not limited to, a balance sheet and income statement with supporting schedules or exhibits.  The Guarantor also agrees to provide at any time upon the request of any Limited Partner bank statements and brokerage statements, together with any other appropriate documentation evidencing to the satisfaction of such Limited Partner the liquidity of the Guarantor for the purposes of Section 6.5(n) of the Agreement.  The Guarantor hereby expressly agrees to the release of such financial information by the

EXHIBIT 5 – Page 3

4837-4545-8969.4

Limited Partner to their Affiliates, agents and representatives, partners of the Limited Partners and proposed investors of the Limited Partners.

13.    Partnership's and Limited Partners' Rights.  The Partnership and/or any Limited Partner may, at any time and from time to time, with or without the consent of, or notice to, the Guarantor, and without incurring responsibility or liability to the Guarantor or impairing or releasing the obligations of the Guarantor hereunder:

(i)    change the manner, place, or terms of performance or payment of, or renew, replace, extend, or otherwise modify any document now or hereafter creating, securing, or governing the disbursement of any of the Guaranteed Obligations (including, without limitation, the Agreement) other than this Guaranty;

(ii)    sell, exchange, release, surrender, realize upon, or otherwise deal with, in any manner and in any order, any property by whomsoever and whenever pledged to secure, or howsoever securing, any of the Guaranteed Obligations or any liability (including, without limitation, any of those hereunder) incurred directly or indirectly in respect thereof or hereof, or any offset there against;

(iii)    exercise or refrain from exercising, for any period of time whatsoever, any rights against the General Partner, the Developer, other Guarantors or Other Obligors (including, without limitation, the Guarantor) available to the Partnership by law or under any document now or hereafter creating any of the Guaranteed Obligations, any other security therefor, or any liability (including, without limitation, any of those hereunder) incurred directly or indirectly in connection therewith or herewith (including, without limitation, failing to attempt to collect any of the Guaranteed Obligations);

(iv)    settle or compromise any of the Guaranteed Obligations, any security therefor, or any liability (including, without limitation, any of those hereunder) incurred directly or indirectly in connection therewith or herewith;

(v)    accept any further security for payment of the Guaranteed Obligations in addition to this Guaranty; and

(vi)    perform such other acts as may be permitted under the Agreement.

14.    Subrogation.  Until the Guaranteed Obligations have been performed and paid in full, the Guarantor shall have no right of subrogation against the General Partner, the Developer, or any Other Obligor in connection with this Guaranty nor any right to participate in realization upon any security for any of the Guaranteed Obligations.

15.    Subordination.  Any indebtedness of the General Partner, the Developer, or any Other Obligor to the Guarantor now or hereafter existing is hereby subordinated to the Guaranteed Obligations.  Any such indebtedness of the General Partner, the Developer, or any Other Obligor to the Guarantor, upon written demand of the Partnership, shall be collected (by action or proceeding, if required by the Partnership) and received by the Guarantor in trust for the Partnership and shall be paid over to the Partnership on account of the Guaranteed Obligations without impairing or releasing the obligations of the Guarantor hereunder; provided, however, that while no default exists in the payment of the Guaranteed Obligations, the Guarantor may apply to its own account any payments made to it on account of any indebtedness of the General Partner to the Guarantor.

16.    Successors.  This Guaranty shall be binding upon the Guarantor, the Guarantor's heirs, personal representatives, successors, and assigns, and shall inure to the Limited Partners' benefit and to the benefit of the Limited Partners' successors and assigns, and to the benefit of anyone claiming title to any collateral sold by the Limited Partners pursuant to any rights, powers, and privileges it or they now have or may hereafter possess.

17.    Integration; Waiver.  This Guaranty contains the sole and entire understanding and agreement of the parties hereto with respect to the subject matter hereof, and supersedes all prior negotiations and understandings. This Guaranty may not be terminated or otherwise amended, changed, or modified, nor shall there by any waiver or

EXHIBIT 5 – Page 4

estoppel by the Limited Partners or the Partnership, except by a written instrument signed by the Limited Partners and the Partnership. No waiver, express or implied, by the Limited Partners or Partnership of any default hereunder shall be deemed a waiver of any other or succeeding default hereunder.

18.  Interpretation.  This Guaranty and the rights and obligations of the Guarantor shall be governed and construed in accordance with the internal laws of the State of Texas. If for any reason any provision of this Guaranty does violate any such laws or is not fully enforceable in accordance with the terms and provisions hereof, this Guaranty shall be limited or construed to comply with such laws and shall be enforced to the full extent permitted by such laws. If there is more than one Guarantor, the liability of each Guarantor shall be joint and several. Capitalized terms used in this Guaranty shall have the meanings specified herein or in the Agreement.

19.  Personal Jurisdiction and Venue.  The Guarantor hereby submits to personal jurisdiction as provided in this Section 19 for the enforcement of this Guaranty and waives any and all personal rights to object to such jurisdiction for the purposes of litigation to enforce this Guaranty. The Guarantor hereby consents to the jurisdiction of the courts of either the State of Texas or the Commonwealth of Pennsylvania or the courts of the United States of America for the District of Texas or the District of Pennsylvania, in any action, suit, or proceeding which any Limited Partner may at any time wish to file in connection with this guaranty or any related matter. The Guarantor hereby agrees that an action, suit, or proceeding to enforce this Guaranty may be brought in any state or federal court in the State of Texas or the Commonwealth of Pennsylvania and hereby waives any objection which the Guarantor may have to the laying of the venue of any such action, suit, or proceeding in any such court; provided, however, that the provisions of this Paragraph 19 shall not be deemed to preclude any Limited Partner from filing any such action, suit, or proceeding in any other appropriate forum. The Guarantor hereby agrees that any process or notice of motion or other application to any such court in connection with any such action or proceeding may be served upon the Guarantor by registered or certified mail to or by personal service at the last known address of the Guarantor, whether such address be within or without the jurisdiction of any such court.

20.  Effect of Certain Events.  Guarantor further covenants that this Guaranty shall remain and continue in full force and effect as to and notwithstanding any amendment of the Agreement, or transfer of the Interest of any Partner thereunder, or withdrawal or removal of any Partner thereunder, and that indulgences or forbearance may be granted under the Agreement, with or without notice to or further consent of Guarantor, except as otherwise specifically stated in the Agreement.

In conjunction with any sale, transfer or assignment by the ILP of all or any part of its Interest in accordance with the provisions of the Agreement, the ILP is hereby authorized to obtain updated UCC, judgment and tax lien searches and updated financial statements with respect to the Guarantor and the Guarantor represents and agrees that it will take all actions reasonably necessary (or requested by the ILP) to cooperate with the ILP and facilitate the ILP's disposition of its Interest, provided that any such items shall be done at the ILP's expense. In addition, in conjunction with any such sale, transfer or assignment, the ILP is hereby authorized, and the Guarantor hereby consents to the disclosure and/or release of the Guarantor's financial statements and any other information relating to the Guarantor which is relevant to such sale, transfer or assignment.

21.  Security Interest.  In order to ensure the timely payment and performance by the Guarantor of the Guaranteed Obligations, each Guarantor hereby grants to the Partnership and the Limited Partners a security interest in all of their respective right, title and interest in the Partnership, including any and all fees, distributions, and payments due or paid to the Guarantor or any of their Affiliates by the Partnership as fees, returns of capital, distributions, repayments of loans or advances or for any other purpose, together with any and all tax benefits and other property rights and distributions, and all of the proceeds and products thereof, all in order to secure the Guarantor's obligations hereunder. Each Guarantor acknowledges and agrees that any amounts owed by the Partnership to a Guarantor is subject to offset and reduction in the event of the Guarantor's failure to satisfy any Guaranteed Obligation. Further, the termination of the Development Agreement or removal of the General Partner for cause under the terms of the Agreement shall result in the termination of any payment or distribution obligation of the Partnership owing to any Guarantor regardless of whether such fee was fully earned prior to the effective date of the termination of the Development Agreement or removal of the General Partner.

22.  Counterparts.  This Guaranty may be executed in several counterparts, and all so executed shall constitute one agreement, binding on all the parties hereto, even though all parties are not signatories to the original

EXHIBIT 5 – Page 5

or the same counterpart.  Any counterpart which has attached to it separate signature pages, which altogether contain the signatures of all parties whose signature thereon are required, shall for all purposes be deemed a fully executed instrument.  Delivery of a manually executed counterpart to this Guaranty or delivery of a copy of such manually executed counterpart by email or facsimile transmission shall each constitute effective delivery of such counterpart.  Any party delivering a copy of such manually executed counterpart of this Guaranty by email or facsimile transmission shall promptly thereafter deliver the manually executed counterpart, provided that any failure to do so shall not affect the validity of the copy of the manually executed counterpart delivered by email or facsimile transmission.

     **23.**    <u>**WAIVER OF TRIAL BY JURY**</u>.  THE GUARANTOR, THE PARTNERSHIP, AND THE LIMITED PARTNERS EACH HEREBY WAIVE ANY RIGHT TO A TRIAL BY JURY IN ANY ACTION OR PROCEEDING TO ENFORCE OR DEFEND ANY RIGHT UNDER THIS GUARANTY OR THE AGREEMENT OR RELATING THERETO OR ARISING FROM THE TRANSACTION WHICH IS THE SUBJECT OF THIS GUARANTY AND AGREE THAT ANY SUCH ACTION OR PROCEEDING SHALL BE TRIED BEFORE A COURT AND NOT BEFORE A JURY.

**[Signature Page Follows]**

EXHIBIT 5 – Page 6

4837-4545-8969.4

This Guaranty has been executed and delivered effective as of the date first written above.

**GUARANTOR:**

2013 Travis Oak Creek Developer, Inc.
a Texas corporation

By: _____
Name: _____Rene O. Campos_____
Title: _____President_____


Chula Investments, Ltd.
a Texas limited partnership

By: Chula Management, L.L.C., the sole General Partner

By: _____
Name: _____Rene O. Campos_____
Title: _____Manager_____


_____
Name: _____Rene O. Campos_____
in his individual capacity as
guarantor

EXHIBIT 5 – Page 7

4837-4545-8969.4

**EXHIBIT 6**

**REQUIRED INSURANCE**

**PNC Real Estate**

**A.  General Requirements**
**All policies or documents evidencing the required insurance shall:**
1.  Be provided at least ten (10) days prior to equity closing to ensure adequate lead time for PNC to engage its consultant and receive its Final Insurance Due Diligence Report prior to closing; updates must be provided as required for each capital contribution.
2.  Be maintained throughout the term of the loan(s) and the term of ownership for all borrowers/owners/investment partners.
3.  Clearly identify the property location or description on each certificate.
4.  Be provided in the following form, with all forms and endorsements noted:
    •   Accord 25 - Ink-signed Certificate of Liability Insurance
    •   Accord 28 (2003/10 edition)  - Ink-signed Evidence of Property Insurance
    •   A full copy of the policy when available
5.  Name the Operating Partnership as the First Named Insured on each policy provided by the Owner, or on behalf of the Owner, and name the following entities as Additional Insureds on all policies required of any party under these guidelines (with the exception of auto liability , professional liability (E&O) and Workers' Compensation:
    •   ILPs and their successors and assigns,
    •   SLPs and their successors and assigns and
    •   All Additional Investors (the equity providers)
6.  All liability insurance policies provided by parties other than the Owner shall name the Partnership and/or the entities that comprise it as Additional Insureds.  Professional liability coverage shall indicate the Partnership as certificate holder
7.  Binders may be accepted for a 30-day period only.
    •   Continuous binders are acceptable if issued by the insurance company's underwriter.  Continuous binders must be replaced with certificates or policies within 30 days of receipt.
    •   Facsimile copies are acceptable as temporary evidence of coverage.  Hard copies must be promptly delivered to confirm evidence.
8.  Be issued/written by insurance carrier or carriers acceptable to the lender and investor and having:
    •   A rating of A: Class VII or better (a couple of investors require A-/X or better) by A.M. Best's Key Rating guide (*note*: the insurance company's NAIC number is needed in addition to their name), **or**
    •   A rating of "A" or higher from Standard & Poor's.
9.  Be written on a per occurrence basis (, professional liability coverage and Environmental Impairment Liability including contractor's pollution legal liability insurance coverage, which may be written on a claims-made basis).
10. Have a cancellation provision requiring the carrier to notify the parties (Partnerships, GP, ILP, SLP, Lenders and equity providers) at least thirty (30) days in advance ,(10) days for nonpayment of premium, of any policy reduction, cancellation, premiums due, any lapse expiration, material change, amendment or non-renewal intent. Notice should be advance *written* notice via certified mail return receipt requested.
11. Be written for a term of not less than one year, with premiums prepaid and evidence of premium payment accompanying the binders and policies.

**The following requirements apply to Property policies:**
12. Name the Lender and its successors and assigns (collectively, the Lender) as Mortgagee and  Loss Payee..
13. Name the SLP and its successors and assigns as Loss Payee
14. Contain a deductible or self insured retention (SIR) not greater than $10,000 (except when a separate wind-loss deductible applies, then the amount must not exceed 3% of the face amount of the policy).
15. Builders Risk policies must be on a non-reporting basis.
16. Not contain any effective co-insurance provisions.

EXHIBIT 6 – Page 1

17. Not use a blanket or package policy unless it provides the same or better coverage as a single property insurance policy, **and**:
   - All other projects must be listed and identifiable in the policy and associated schedules. Note: The Declaration page listing each appropriate Endorsement /Form and copies of each Form will be accepted as evidence.
   - Total coverage must be based on 100% replacement value of all properties covered . Coverage limits other than replacement cost are generally not acceptable and any variations from an amount less than replacement cost must be pre approved by the SLP.

**B.   Insurance to be Maintained During Construction**
**The following coverages must be maintained on all properties, on a per project basis, during construction and until permanent insurance is placed, and are required by all investors (unless noted) though amounts may vary.**

1. **Owner's Commercial General Liability and Excess/Umbrella Liability Insurance**: General Partner shall carry, for the benefit of the Partnership and General Partner, covering the premises and operations by independent contractors, Commercial General Liability Insurance of the real estate development class against claims for bodily injury, personal injury and products and completed operations..
   - 
   - Form should remain silent on assault & battery, sexual assault and punitive damages (no exclusions or limitations).
   - Environmental Liability Insurance will be required for existing Apartment Complexes that are being substantially rehabilitated.
   - The minimum amount of primary coverage is $1 million per occurrence / $2 million general aggregate and contain a deductible no greater than $10,000.
   - The minimum Umbrella/Excess Liability Insurance ranges from $4 million per occurrence and $4 million general aggregate to $30 million per occurrence and $30 million general aggregate (depending on investor and the guidelines shown below):

      Garden Apts 1-3 stories, SF, & other non-elevator buildings:
         < 50 Units: $4 million as noted above
         51 - 300 Units: $5 million
         > 300 Units: $5 -$10 million, depending on location/conditions

      Mid-rise Apartment Building (4-10 stories):
         < 50 Units: $5 million as noted above
         51 - 300 Units: $5 -$10 million , depending on location/etc.
         > 300 Units: $10 -$20 million, depending on location/conditions

      High-rise Apartment Building (11-40 stories):
         1 - 300 Units: $10 -$30 million , depending on location/conditions
         > 300 Units: $30 million and above, depending on location/etc.

2. **All-Risk Builder's Risk Insurance**: Insurance providing 100% replacement cost coverage (including a 5% contingency), in an amount equal to the completed construction value plus personal property and shall include coverage for Soft Costs including 12 months Business Interruption (Loss of Rents) or actual loss sustained, loan interest, real estate taxes, architect's & engineer's fees, legal & accounting fees, insurance premiums, and advertising and promotional expenses.  Additional coverage requirements are as follows:
   - If any of the units will be turned over and occupied prior to completion, policy shall include a Permission for Partial Occupancy Endorsement.
   - No coinsurance or coinsurance offset by an Agreed Amount Endorsement
   - Ordinance & Law Coverage (See **Section C**. for coverage requirements).
   - The maximum deductible is $10,000 per occurrence.
   - Windstorm, earthquake, and flood exclusions are generally acceptable exclusions provided that a separate policy is obtained for these risks.  See **Section C**. for details regarding coverage requirements for these separate perils.

EXHIBIT 6 – Page 2

3. **General Contractor's General Liability and Excess/Umbrella Liability Insurance**: The General Contractor shall provide the following insurance coverages:

    A) **Commercial General Liability Insurance**: The General Contractor (and each prime contractor having a direct contract with the Partnership) shall provide Commercial General Liability Insurance covering claims for bodily injury,  property damage and personal injury arising out of the Contractor' operations, independent contractors, and products/completed operations.

- Coverage limits of the construction exposure class shall be in an amount not less than $5 million combined single limits (per occurrence / per project aggregate).  This requirement can be met through any combination of primary and excess insurance, such as the standard $1 million/ $2 million primary with $4 million/ $4 million umbrella.  If the primary coverage applies to other locations or activities, then the primary aggregate must apply to each insured location separately.
- $1 million per occurrence /$2 million general aggregate shall be required for prime contractors other than the GC.  If the primary coverage applies to other locations or activities, then the primary general aggregate must apply to each insured project separately.

    B) **Pollution/Environmental Coverage Insurance**: Providing defense and indemnity coverage for bodily injury, property damage and environmental investigation and clean-up costs for pollution conditions.  Coverage limits of the construction exposure class shall be in an amount not less than $1 million combined single limits (per occurrence/per location and in the aggregate).

    C) **Automobile Liability Insurance**: Commercial Automobile Liability with coverage for owned, hired, and non-owned autos with no less than $1 million combined single limit per occurrence.

    D) **Workers' compensation and Employers' Liability Insurance**: Coverage shall be in statutory amounts with Employers Liability limits of $1 million bodily injury by accident for each accident, bodily injury by disease for each employee and policy limit for bodily injury by disease ($500,000 fallback).

    E) **Payment and Performance Bonds**: The Construction Contract must be secured by one of the following:

- A letter of credit in an amount not less than fifteen (15%) of the Construction Contract amount, or
- 100% payment and performance bonds in a form and substance acceptable to the SLP, or
- Each major subcontractor, as identified by the SLP, being bonded in a form and substance acceptable to the SLP.

4. **Construction Manager's Commercial General Liability Insurance (If applicable)**: If a construction manager is utilized, Commercial General Liability Insurance is to be and the amount of coverage shall be no less than $500,000 combined single limits.  $500,000 combined single limits Automobile Liability (including coverage for liability assumed under contract), statutory Workers' Compensation and $500,000 Employers' Liability shall also be maintained.

5. **Architect's & Engineer's Professional Liability / Errors & Omissions Insurance**: Professional Liability (E & O) Insurance shall be provided covering each professional entity for the greater of $500,000 or 10% of the construction contract amount each claim and in the aggregate ($1 million or 10% for high-rises), in a form satisfactory to the Investor.  Coverage shall remain in effect for three years from acceptance of the Project by Owner.

- Comprehensive General Liability insurance with a minimum of $500,000 in combined single limits shall be provided.

**C.  Insurance to be Obtained Upon Completion (or on Existing Buildings) & Maintained Thereafter**
Commencing from the earliest of (i) Receipt of final Certificates of Occupancy for all buildings in the Property, (ii) Final Construction Completion or (iii) the lapse in Builders Risk Coverage; and continuing until no longer required by the SLP, the Partnership shall maintain the following insurance coverage:

1. **General Contractor's Commercial General Liability Insurance**: General Contractor must continue to carry Products and Completed Operations insurance for a minimum of three (3) years following completion of construction.

2. **Architect's & Engineer's Professional Liability / Errors & Omissions Insurance**: Each entity must continue to carry the same Professional Liability insurance coverage as required in B.6 for a minimum of three (3) years following completion of construction.

3. **Owner's Commercial General Liability Insurance**: The General Partner shall cause the Partnership to continue to carry the same insurance coverages as required in B.1. with the following additional loss control requirement to be implemented:

EXHIBIT 6 – Page 3

- Contains a deductible of no greater than $10,000.

4. **Property (Special Cause of Loss Form) Insurance**: Insurance on the project covering risks of direct physical loss.
   - Such insurance shall be in an amount equal to 100% replacement value of the property.
   - The policy shall provide Replacement Cost coverage.
   - The policy shall include an Agreed Amount Clause or Waiver of Coinsurance.
   - The maximum deductible is $10,000 per occurrence (except when a separate wind-loss deductible applies, then the amount must not exceed 3% of the face amount of the policy).

5. **Business Interruption Insurance** - Loss of income insurance shall be carried in an amount equal to 12 months anticipated gross rental income from tenant occupancy (including any commercial portion) of the property plus Tax Credit..

6. **Windstorm Coverage** - If the Special Causes of Loss Form property damage insurance excludes wind-related events, a separate windstorm insurance policy shall be obtained for 100% replacement cost of the property.  The policy must include business interruption.  The maximum deductible is 3%.

7. **Flood** - PNC Real Estate requires flood insurance if any property is, or planned to be located, in a Special Flood Hazard Area designated by FEMA as Zone A or V in an amount equal to the full replacement cost and 12 months Business Income coverage .  The maximum deductible is 2% of the total insured value per building.  If this coverage amount is more than the maximum amount of insurance available under the National Flood Insurance Program, an excess flood or difference in conditions policy may be required for the difference.

8. **Earthquake** - Where the Property is located in an area prone to seismic activity (zones 3 & 4) and has a PML greater than 20%, earthquake insurance is required for the life of the investment.  Coverage must equal 100% of the full replacement cost, include Business Interruption, and have a maximum deductible of 5%-10% of the total insured value.

9. **Ordinance and Law Coverage** - Where the Property represents an non-conforming use under current building, zoning, or land use laws or ordinances, insurance shall be obtained in the following amounts: * Loss of Undamaged Portion of the Building - Full replacement cost of the structure minus the local threshold; * Demolition Cost - Minimum of 10% of replacement cost; and * Increased Cost of construction - Minimum of 10% of the replacement cost.

10. **Extended Period of Indemnity** - Business Interruption (Loss of Rents) coverage shall be extended for a minimum of three months after property is ready for occupancy following a casualty.

11. **Owner's Boiler & Machinery Insurance**: Required where any centralized HVAC equipment is in operation at the Property or where the Property contains boilers or other pressure-fired vessels that are required to be regulated by the State as follows:
   - Boiler and Machinery Insurance shall be required for the full replacement cost of the building that houses the equipment.
   - Coverage against loss or damage from steam boiler explosion, electrical breakdown or mechanical breakdown which can include refrigeration equipment, air conditioning equipment, various types of piping, turbines, engine's pumps, compressors, electric motors, transformers and other assorted types of apparatus now or hereafter installed on the Property.
   - Coverage shall be extended to include Business Income.
   - Deductibles must be equal or lower than the deductibles on the Property Insurance Policy

12. **Property Manager's Insurance Requirements**: Project Manager (i.e., the property management company) shall maintain and provide evidence of insurance for the following:
   - Worker's Compensation Coverage pursuant to statutory limits required by law.
   - Automobile Liability Coverage covering owned, hired and non-owned auto for limits no less than $1MM combined single limited per occurrence for bodily injury, property damage and physical damage (collision and comprehensive).
   - **Fidelity Bond** in an amount equivalent to the lesser of $1 million or six month's gross income.

13. **Other Insurance (as needed)**:- Such other insurance in such amounts, and with such companies as the SLP may require, including but not limited to, insurance coverage covering wind, mudslide (as needed), acts of terrorism, toxic mold, fungus, moisture, microbial contamination, pathogenic organisms or covering other parties such as the Project Architect, the Builder, any other prime contractors, the construction manager, if applicable, and the Project Manager to the extent such insurance can be acquired on a commercially reasonable basis in the sole discretion of the SLP.

EXHIBIT 6 – Page 4

**EXHIBIT 7**

**FORM OF TRANSFER AMENDMENT**

FIRST AMENDMENT
TO
AMENDED AND RESTATED
AGREEMENT OF LIMITED PARTNERSHIP OF
2013 TRAVIS OAK CREEK, LP

THIS FIRST AMENDMENT TO AMENDED AND RESTATED AGREEMENT OF LIMITED PARTNERSHIP (the "**First Amendment**") of 2013 TRAVIS OAK CREEK, LP, a Texas limited partnership (the "**Partnership**"), is entered into effective as of **[DATE]**, by and among PNC BANK, NATIONAL ASSOCIATION, a national banking association (the "**Original ILP**"), PNC REAL ESTATE TAX CREDIT CAPITAL INSTITUTIONAL FUND **[#]** LIMITED PARTNERSHIP, a **[Delaware]** limited partnership (the "**Substitute ILP**"), and COLUMBIA HOUSING SLP CORPORATION, an Oregon corporation (the "**SLP**"), and is acknowledged by 2013 Travis Oak Creek GP, LLC, a Texas limited liability company ("the **General Partner**").

Immediately prior to the effective date hereof, the Partnership has been governed by that certain Amended and Restated Agreement of Limited Partnership of the Partnership dated as of May **[#]**, 2014 (the "**Agreement**"). The parties hereto now desire to modify the terms of the Agreement to acknowledge the withdrawal of the Original ILP as the ILP of the Partnership, to recognize the admission of the Substitute ILP as the sole ILP of the Partnership, and to otherwise modify the terms of the Agreement, as set forth below.

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

      (1)     Capitalized terms used but not defined herein shall have the meanings given to them in the Agreement.

      (2)     The Original ILP hereby: (i) withdraws as the ILP of the Partnership; (ii) acknowledges repayment in full of all amounts owed to it by the Partnership and the other Partners; (iii) acknowledges that it has no further rights as an ILP of the Partnership; and (iv) acknowledges the receipt of payment of **[$AMOUNT]** from the Substitute ILP on the date hereof and agrees that the amount paid by the Substitute ILP to the Original ILP is fair and adequate consideration for the Original ILP's interest in the Partnership.

      (3)     The Substitute ILP hereby:  (i) is admitted as the sole ILP; (ii) adopts and approves all of the terms of the Agreement (as amended hereby); (iii) assumes the rights and obligations of the ILP under the Agreement; (iv) succeeds to the Capital Account of the Original ILP; and (v) has agreed to fund the remaining unpaid Capital Contribution obligations of the ILP in the amount of **[$AMOUNT]**, as and when due under the Agreement, subject to adjustment and reduction as set forth therein.

      (4)     The General Partner hereby acknowledges and the SLP hereby consents to the withdrawal from the Partnership of the Original ILP and the admission to the Partnership of the Substitute ILP, as set forth herein.

      (5)     [Reserved].

      (6)     Exhibit 2 to the Agreement which is entitled "Partners' Capital Contributions and Interests" is hereby deleted in its entirety and replaced with Exhibit 2, which is entitled "Partners' Capital Contributions and Interests," attached hereto and incorporated herein by this reference.

      (7)     This First Amendment may be executed in counterparts, each of which shall be deemed an original, but all of which shall constitute one and the same instrument.

EXHIBIT 7 – Page 1

4837-4545-8969.4

(8)        Except as amended hereby, the Agreement is hereby ratified and confirmed and continues in full force and effect.

**[SIGNATURE PAGES FOLLOW]**

EXHIBIT 7 – Page 2

IN WITNESS WHEREOF, the undersigned have signed this First Amendment as of the dates set forth below their respective signatures.

ORIGINAL ILP:

**PNC BANK, NATIONAL ASSOCIATION**

By: _____
       Name:
       Title:
       Date:

SUBSTITUTE ILP:

**PNC REAL ESTATE TAX CREDIT CAPITAL
INSTITUTIONAL FUND [#] LIMITED
PARTNERSHIP**

By:    **[PNC Real Estate Tax Credit Capital
       Fund [#], Inc., its general partner]**

By: _____
       Name:
       Title:
       Date:

**ACKNOWLEDGED BY:**

GENERAL PARTNER:

**2013 TRAVIS OAK CREEK GP, LLC**

By: _____
       Name: Rene O. Campos
       Title: Manager
       Date:

SLP:

**COLUMBIA HOUSING SLP CORPORATION**

By: _____
       Name:
       Title:
       Date:

EXHIBIT 7 – Page 3

4837-4545-8969.4

EXHIBIT 2

PARTNERS' CAPITAL CONTRIBUTIONS AND INTERESTS

As of **[DATE]**

| General Partner | Capital Contribution | Percentage Interest in Class of Partners |
|---|---|---|
| 2013 Travis Oak Creek GP, LLC<br>3001 Knox Street, Suite 400<br>Dallas, TX 75205 | $100 | 100% |

| SLP | Capital Contribution | Percentage Interest in Class of Partners |
|---|---|---|
| Columbia Housing SLP<br>  Corporation<br>121 S.W. Morrison Street, Suite 1300<br>Portland, OR  97204-3143<br>Facsimile No: (503) 808-1301 | $10 | 100% |

| ILP | Agreed-to Capital Contribution | Paid-in Capital Contribution* | Remaining Capital Contribution** | Percentage Interest in Class of Partners |
|---|---|---|---|---|
| PNC Real Estate Tax Credit Capital<br>  Institutional Fund [#] Limited<br>  Partnership<br>121 S.W. Morrison Street, Suite 1300<br>Portland, OR  97204-3143<br>Facsimile No:  (503) 808-1301 | **[$AMOUNT]** | **[$AMOUNT]** | **[$AMOUNT]** | 100% |

_____

\* Amount reflects the paid-in Capital Contribution as of the date of this Exhibit 2, including any amounts contributed by the withdrawing Original ILP, to whose Capital Account the Substitute ILP has succeeded as of the date hereof.

\*\*Future Installments of Capital Contribution are subject to adjustment and are due at the times and subject to the conditions set forth in the Amended and Restated Agreement of Limited Partnership to which this Exhibit 2 is attached.

EXHIBIT 7 – Page 4

GUARANTOR ACKNOWLEDGEMENT AND CONSENT
TO FIRST AMENDMENT TO THE AMENDED AND RESTATED AGREEMENT OF
LIMITED PARTNERSHIP OF
2013 TRAVIS OAK CREEK, LP

The undersigned Guarantors (i) acknowledge that pursuant to the Agreement of Guaranty, dated as of May **[#]**, 2014 (the "**Guaranty**"), they have guaranteed the performances of the Guaranteed Obligations (as defined in the Guaranty) to 2013 Travis Oak Creek, LP, a Texas limited partnership (the "**Partnership**"), Columbia Housing SLP Corporation, an Oregon corporation (the "SLP"), and PNC Bank, National Association, a national banking association; (ii) acknowledge the terms of the First Amendment, effective **[DATE]** (the "**First Amendment**"), to Amended and Restated Agreement of Limited Partnership of the Partnership attached hereto, dated **[DATE]** (the "**Original Agreement**"); (iii) acknowledge that from and after the effective date of the First Amendment, the beneficiaries under the Guaranty are the Partnership, the SLP and PNC Real Estate Tax Credit Capital Institutional Fund **[#]** Limited Partnership; and (iv) confirm that the Guaranty remains in full force and effect as the same may have been modified pursuant to the First Amendment.

This Acknowledgement and Consent to First Amendment has been executed and delivered effective as of [_____, 201__].

GUARANTOR:

2013 Travis Oak Creek Developer, Inc.,
a Texas corporation

By: _____
Name: ___Rene O. Campos_____
Title: _____President_____

Chula Investments, Ltd.,
a Texas limited partnership

By: Chula Management, L.L.C., its general partner

By:_____
Name:___Rene O. Campos_____
Title: _____Manager_____

_____
Name: __Rene O. Campos_____
in his individual capacity as
guarantor

EXHIBIT 7 – Page 5

**EXHIBIT 8**

**PROJECT FORECAST**

EXHIBIT 8

4837-4545-8969.4

STEPHEN BEIKMAN

STEPHEN BEIKMAN

REVIEWED

FUND FLOW ANALYSIS

**FUND FLOW ANALYSIS**

FUND FLOW ANALYSIS

| TOTAL PROJECT COSTS | 48,446,475 | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| PROJECT SOURCES | Total | May-16 | Jun-16 | Jul-16 | Aug-16 | Sep-16 | Oct-16 | Nov-16 | Dec-16 | Jan-17 | Feb-17 | Mar-17 | Apr-17 |
| **SOURCES DURING CONSTRUCTION** | | | | | | | | | | | | | |
| GP Equity | 100 | | | | | | | | | | | | |
| LLP Equity | 2,834,725 | | | | | | | | | | | | |
| Indic. Fees | 3,350,059 | | | | | | | | | | | | |
| GP Contribution Note | 1,000,000 | | | | | | | | | | | | |
| City of Austin | 3,700,000 | | | | | | | | | | | | |
| Client | 16,300,282 | | | | | | | | | | | | |
| PNC | 21,357,418 | | | | | | | | | | | | |
| **TOTAL SOURCES DURING CONSTRUCTION** | 20,492,334 | | | | | | | | | | | | |
| **SOURCES AFTER COMPLETION** | Total | May-16 | Jun-16 | Jul-16 | Aug-16 | Sep-16 | Oct-16 | Nov-16 | Dec-16 | Jan-17 | Feb-17 | Mar-17 | Apr-17 |
| Interest Rate Lock Deposit | 109,500 | | | | | | | | | | | | |
| LLP Equity | 23,833,133 | | | | | | | 463,653 | | | | | |
| Deferred Fees | 2,963,133 | | | | | | | 2,963,133 | | | | | |
| Seller Note | 7,330,000 | | | | | | | | | | | | |
| GP Contribution Note | 1,000,000 | | | | | | | | | | | | |
| City of Austin | 3,700,000 | | | | | | | | | | | | |
| PNC | 67,512 | | | | | | | | | | | | |
| PNC - FHLB | 27,300,000 | | | | | | | | | | | | |
| Seller Note Repayment | (7,330,000) | | | | | | | | | | | | |
| GP Contribution Note Repayment | (1,000,000) | | | | | | | | | | | | |
| City of Austin Repayment | (3,700,000) | | | | | | | | | | | | |
| Client Repayment | (16,300,282) | | | | | | | | | | | | |
| PNC Repayment | (21,357,418) | | | | | | | | | | | | |
| **TOTAL SOURCES AFTER COMPLETION** | 5,422,109 | | | | | | | 3,426,621 | | | | | |
| **TOTAL PROJECT SOURCES** | 48,614,445 | | | | | | | 3,426,621 | | | | | |
| CUMULATIVE SOURCES/USES | 25,943 | 25,992 | 25,992 | 25,992 | 25,992 | 25,992 | 25,992 | 25,992 | 25,992 | 25,992 | | | |

1,500,000
850,000
215,000

$105,992



2013 Travis Oak Creek, LP                                      5/21/2014

Oak Creek Village                                              3:59 PM

## INTEREST RESERVE ANALYSIS

| | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | May-14 | Jun-14 | Jul-14 | Aug-14 | Sep-14 | Oct-14 | Nov-14 | Dec-14 | Jan-15 | Feb-15 | Mar-15 | Apr-15 |

### SELLER NOTE CONVERSION LOAN

**Forward Funding Balance**

| | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Beginning Balance | $ | $ - | $ | $ - | $ | $ - | $ | $ - | $ | $ | $ - | $ |
| less Draw Amount | | | | | | | | | | | | |
| less Repayment | | | | | | | | | | | | |
| Ending Balance | - | - | - | - | - | - | - | - | - | - | - | - |
| Interest Income on End Bal at 0.00% | | | | | | | | | | | | |
| Interest Cost on Beg Bal at 0.00% | $ | $ - | $ | $ - | $ | $ - | $ | $ - | $ | $ | $ - | $ |

**Outstanding Balance**

| | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Beginning Balance | $ | 7,330,000 | 7,330,000 | 7,330,000 | 7,330,000 | 7,330,000 | 7,330,000 | 7,330,000 | 7,330,000 | 7,330,000 | 7,330,000 | 7,330,000 |
| add Draw Amount | 7,330,000 | | | | | | | | | | | |
| less Repayment | | | | | | | | | | | | |
| Ending Balance | 7,330,000 | 7,330,000 | 7,330,000 | 7,330,000 | 7,330,000 | 7,330,000 | 7,330,000 | 7,330,000 | 7,330,000 | 7,330,000 | 7,330,000 | 7,330,000 |
| Interest Cost on Beg Bal at 0.00% | $ | $ - | $ | $ - | $ | $ - | $ | $ - | $ | $ | $ - | $ |

**Total Interest Cost**

| | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Building PIS % | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% |
| Eligible Interest Cost | $ | $ | $ | $ | $ | $ | $ | $ | $ | $ | $ | $ |
| Ineligible Interest Cost | | | | | | | | | | | | |
| Total Interest Cost | $ | $ - | $ | $ - | $ | $ - | $ | $ - | $ | $ | $ - | $ |

| | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | May-14 | Jun-14 | Jul-14 | Aug-14 | Sep-14 | Oct-14 | Nov-14 | Dec-14 | Jan-15 | Feb-15 | Mar-15 | Apr-15 |

### GP CONTRIBUTION NOTE CONVERSION LOAN

**Forward Funding Balance**

| | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Beginning Balance | $ | $ - | $ | $ | $ | $ | $ | $ | $ | $ | $ - | $ |
| less Draw Amount | | | | | | | | | | | | |
| less Repayment | | | | | | | | | | | | |
| Ending Balance | - | - | - | - | - | - | - | - | - | - | - | - |
| Interest Income on End Bal at 0.00% | | | | | | | | | | | | |
| Interest Cost on Beg Bal at 0.00% | $ | $ - | $ | $ | $ | $ | $ | $ | $ | $ | $ - | $ |

**Outstanding Balance**

| | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Beginning Balance | $ | 1,000,000 | 1,000,000 | 1,000,000 | 1,000,000 | 1,000,000 | 1,000,000 | 1,000,000 | 1,000,000 | 1,000,000 | 1,000,000 | 1,000,000 |
| add Draw Amount | 1,000,000 | | | | | | | | | | | |
| less Repayment | | | | | | | | | | | | |
| Ending Balance | 1,000,000 | 1,000,000 | 1,000,000 | 1,000,000 | 1,000,000 | 1,000,000 | 1,000,000 | 1,000,000 | 1,000,000 | 1,000,000 | 1,000,000 | 1,000,000 |
| Interest Cost on Beg Bal at 0.00% | $ | $ - | $ | $ | $ | $ | $ | $ | $ | $ | $ - | $ |

**Total Interest Cost**

| | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Building PIS % | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% |
| Eligible Interest Cost | $ | $ | $ | $ | $ | $ | $ | $ | $ | $ | $ | $ |
| Ineligible Interest Cost | | | | | | | | | | | | |
| Total Interest Cost | $ | $ - | $ | $ | $ | $ | $ | $ | $ | $ | $ - | $ |

| | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | May-14 | Jun-14 | Jul-14 | Aug-14 | Sep-14 | Oct-14 | Nov-14 | Dec-14 | Jan-15 | Feb-15 | Mar-15 | Apr-15 |

### CITY OF AUSTIN CONVERSION LOAN

**Forward Funding Balance**

| | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Beginning Balance | $ | $ - | $ | $ | $ | $ | $ | $ | $ | $ | $ - | $ |
| less Draw Amount | | | | | | | | | | | | |
| less Repayment | | | | | | | | | | | | |
| Ending Balance | - | - | - | - | - | - | - | - | - | - | - | - |
| Interest Income on End Bal at 0.00% | | | | | | | | | | | | |
| Interest Cost on Beg Bal at 0.00% | $ | $ - | $ | $ | $ | $ | $ | $ | $ | $ | $ - | $ |

**Outstanding Balance**

| | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Beginning Balance | $ | 2,000,000 | 2,000,000 | 2,000,000 | 2,000,000 | 2,000,000 | 2,000,000 | 2,000,000 | 2,000,000 | 2,000,000 | 2,000,000 | 2,000,000 |
| add Draw Amount | 2,000,000 | | | | | | | | | | | |
| less Repayment | | | | | | | | | | | | |
| Ending Balance | 2,000,000 | 2,000,000 | 2,000,000 | 2,000,000 | 2,000,000 | 2,000,000 | 2,000,000 | 2,000,000 | 2,000,000 | 2,000,000 | 2,000,000 | 2,000,000 |
| Interest Cost on Beg Bal at 0.00% | $ | $ - | $ | $ | $ | $ | $ | $ | $ | $ | $ - | $ |

**Total Interest Cost**

| | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Building PIS % | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% |
| Eligible Interest Cost | $ | $ - | $ | $ | $ | $ | $ | $ | $ | $ | $ | $ |
| Ineligible Interest Cost | | | | | | | | | | | | |
| Total Interest Cost | $ | $ - | $ | $ | $ | $ | $ | $ | $ | $ - | $ | $ |

| 2013 Travis Oak Creek, LP | | | | | | | | | | | | | 5/21/2014 |
| Oak Creek Village | | | | INTEREST RESERVE ANALYSIS | | | | | | | | | 2:59 PM |

|  | 13 | 14 | 15 | 16 | 17 | 18 | 19 | 20 | 21 | 22 | 23 | 24 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
|  | May-15 | Jun-15 | Jul-15 | Aug-15 | Sep-15 | Oct-15 | Nov-15 | Dec-15 | Jan-16 | Feb-16 | Mar-16 | Apr-16 |

**SELLER NOTE CONVERSION LOAN**

**Forward Funding Balance**

| Beginning Balance | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| less Draw Amount | - | - | - | - | - | - | - | - | - | - | - | - |
| less Repayment | - | - | - | - | - | - | - | - | - | - | - | - |
| Ending Balance | - | - | - | - | - | - | - | - | - | - | - | - |
| Interest Income on End Bal @ 0.00% | - | - | - | - | - | - | - | - | - | - | - | - |
| Interest Cost on Beg Bal @ 0.00% | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |

**Outstanding Balance**

| Beginning Balance | $ 7,150,000 | $ 7,110,000 | $ 7,330,000 | $ 7,330,000 | $ 7,330,000 | $ 7,330,000 | $ 7,330,000 | $ 7,330,000 | $ 7,330,000 | $ 7,330,000 | $ 7,110,000 | $ 7,330,000 |
| add Draw Amount | | | | | | | | | | | | 7,330,000 |
| less Repayment | | | | | | | | | | | | |
| Ending Balance | 7,330,000 | 7,330,000 | 7,330,000 | 7,330,000 | 7,330,000 | 7,330,000 | 7,330,000 | 7,330,000 | 7,330,000 | 7,110,000 | | |
| Interest Cost on Beg Bal @ 0.00% | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |

**Total Interest Cost**

| Building PIS % | 0.00% | 41.62% | 41.62% | 41.62% | 41.62% | 41.62% | 100.00% | 100.00% | 100.00% | 100.00% | 100.00% | 100.00% |
| Eligible Interest Cost | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| Ineligible Interest Cost | - | - | - | - | - | - | - | - | - | - | - | - |
| Total Interest Cost | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |

|  | 13 | 14 | 15 | 16 | 17 | 18 | 19 | 20 | 21 | 22 | 23 | 24 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
|  | May-15 | Jun-15 | Jul-15 | Aug-15 | Sep-15 | Oct-15 | Nov-15 | Dec-15 | Jan-16 | Feb-16 | Mar-16 | Apr-16 |

**GP CONTRIBUTION NOTE CONVERSION**

**Forward Funding Balance**

| Beginning Balance | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| less Draw Amount | - | - | - | - | - | - | - | - | - | - | - | - |
| less Repayment | - | - | - | - | - | - | - | - | - | - | - | - |
| Ending Balance | - | - | - | - | - | - | - | - | - | - | - | - |
| Interest Income on End Bal @ 0.00% | - | - | - | - | - | - | - | - | - | - | - | - |
| Interest Cost on Beg Bal @ 0.00% | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |

**Outstanding Balance**

| Beginning Balance | $ 1,000,000 | $ 1,000,000 | $ 1,000,000 | $ 1,000,000 | $ 1,000,000 | $ 1,000,000 | $ 1,000,000 | $ 1,000,000 | $ 1,000,000 | $ 1,000,000 | $ 1,000,000 | $ 1,000,000 |
| add Draw Amount | | | | | | | | | | | | 1,000,000 |
| less Repayment | | | | | | | | | | | | |
| Ending Balance | 1,000,000 | 1,000,000 | 1,000,000 | 1,000,000 | 1,000,000 | 1,000,000 | 1,000,000 | 1,000,000 | 1,000,000 | 1,000,000 | | |
| Interest Cost on Beg Bal @ 0.00% | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |

**Total Interest Cost**

| Building PIS % | 0.00% | 41.62% | 41.62% | 41.62% | 41.62% | 41.62% | 100.00% | 100.00% | 100.00% | 100.00% | 100.00% | 100.00% |
| Eligible Interest Cost | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| Ineligible Interest Cost | - | - | - | - | - | - | - | - | - | - | - | - |
| Total Interest Cost | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |

|  | 13 | 14 | 15 | 16 | 17 | 18 | 19 | 20 | 21 | 22 | 23 | 24 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
|  | May-15 | Jun-15 | Jul-15 | Aug-15 | Sep-15 | Oct-15 | Nov-15 | Dec-15 | Jan-16 | Feb-16 | Mar-16 | Apr-16 |

**CITY OF AUSTIN CONVERSION LOAN**

**Forward Funding Balance**

| Beginning Balance | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| less Draw Amount | - | - | - | - | - | - | - | - | - | - | - | - |
| less Repayment | - | - | - | - | - | - | - | - | - | - | - | - |
| Ending Balance | - | - | - | - | - | - | - | - | - | - | - | - |
| Interest Income on End Bal @ 0.00% | - | - | - | - | - | - | - | - | - | - | - | - |
| Interest Cost on Beg Bal @ 0.00% | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |

**Outstanding Balance**

| Beginning Balance | $ 2,000,000 | $ 2,000,000 | $ 2,000,000 | $ 2,000,000 | $ 2,000,000 | $ 2,000,000 | $ 2,000,000 | $ 2,000,000 | $ 2,000,000 | $ 2,000,000 | $ 2,000,000 | $ 2,000,000 |
| add Draw Amount | | | | | | | | | | | | 2,000,000 |
| less Repayment | | | | | | | | | | | | |
| Ending Balance | 2,000,000 | 2,000,000 | 2,000,000 | 2,000,000 | 2,000,000 | 2,000,000 | 2,000,000 | 2,000,000 | 2,000,000 | 2,000,000 | | |
| Interest Cost on Beg Bal @ 0.00% | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |

**Total Interest Cost**

| Building PIS % | 0.00% | 41.62% | 41.62% | 41.62% | 41.62% | 41.62% | 100.00% | 100.00% | 100.00% | 100.00% | 100.00% | 100.00% |
| Eligible Interest Cost | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| Ineligible Interest Cost | - | - | - | - | - | - | - | - | - | - | - | - |
| Total Interest Cost | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |

2013 Travis Oak Creek, LP

Oak Creek Village

**PRICING**

| | NEW CONSTREHAB CREDITS | ACQUISITION CREDITS | HISTORIC CREDITS | STATE CREDITS |
|---|---|---|---|---|
| Eligible Development Costs | $ 40,791,841 | $ - | $ - | $ - |
| Less Historic Credit | | | | |
| Add Development Fee | 5,175,000    13% | - | | |
| Add Acquisition Fee | | - | | |
| Less Federal Funds | | | | |
| Eligible Basis | $ 45,966,841 | $ - | $ - | $ - |
| 130% Basis Increase | 13,790,064 | | | |
| Total | $ 59,756,945 | $ - | $ - | $ - |
| Applicable Fraction | 100.00% | 0.00% | 100.00% | 100.00% |
| QUALIFIED BASIS | $ 59,756,945 | $ - | $ - | $ - |
| Applicable Percentage | 9.00% | 0.00% | 9.00% | 0.00% |
| Annual Tax Credit Generated | $ 5,378,125 | $ - | $ - | $ - |
| Annual Tax Credit Reserved | $ 2,000,000 | $ - | $ - | $ - |

TOTAL $ 2,000,000

| | | | | |
|---|---|---|---|---|
| x # of years Credit Avail | x 10 | 0 | 0 | 0 |
| x % to ILP | x 99.99% | 0.00% | 0.00% | 0.00% |
| Total Tax Credits to ILP | $19,998,000 | $0 | $0 | $0 | $19,998,000 |
| Price per Credits | 93.50% | 0.00% | 0.00% | 0.00% |
| Total $ Paid to OP | $18,698,130 | $0 | $0 | $0 |

TOTAL $18,698,130

---

**ILP CAPITAL CONTRIBUTION SCHEDULE FROM TAX CREDIT CALCULATION**

| Installment Number | First | Second | Third | Fourth | Fifth | Sixth | Seventh | TOTAL |
|---|---|---|---|---|---|---|---|---|
| Projected Payment Date | 05/15/14 | 01/01/16 | 04/01/16 | 01/01/17 | 01/01/17 | 01/01/17 | 01/01/17 | |
| Conditions of Payment (Refer to the Partnership Agreement for Detailed Condition Descriptions) | Admission | Date Certain Compl | PIS CC | 8609 | | | | |
| Development Costs | $ 2,521,220 | $ 12,443,236 | $ 996,889 | $ - | $ - | $ - | $ 14,961,344 |
| Development Fee | 243,500 | | 1,456,869 | 467,453 | | | | 2,307,823 |
| Acquisition Fee | - | | | | | | | - |
| Operating Reserve | - | | 1,529,343 | | | | | 1,529,343 |
| Total Investment | $ 2,804,720 | $ 12,443,236 | $ 3,982,702 | $ 467,453 | $ - | $ - | $ - | $ 18,698,130 |
| % of Total ILP Equity | 15.00% | 61.20% | 21.30% | 2.50% | 0.00% | 0.00% | 0.00% | 100% |
| Cumulative Payments | $ 2,804,720 | $ 14,247,975 | $ 18,230,677 | $ 18,698,130 | $ 18,698,130 | $ 18,698,130 | $ 18,698,130 | $ 18,698,130 |
| Cumulative % | 15.00% | 76.20% | 97.50% | 100.00% | 100.00% | 100.00% | 100.00% | 100% |
| Developer Fee | 5.48% | 0.00% | 28.25% | 9.03% | 0.00% | | | 42.46% |

**SUMMARY OF CAPITAL CONTRIBUTIONS**

| | |
|---|---|
| Development Costs | $ 14,961,344 |
| Development Fee | 2,307,823 |
| Acquisition Fee | - |
| Operating Reserve | 1,529,343 |
| TOTAL | $ 18,698,130 |

| | New Rehab | Acq | State |
|---|---|---|---|
| Qual. Basis Cushion (%) | 158.91% | | |
| Qual. Basis Cushion ($) | $ 12,934,725 | | |
| App. Rate Locked? | YES | | NO |

| | |
|---|---|
| Total Development Cost (less Fees) | $ 54,939,402 |
| Less: Total field and Grant Sources | 36,440,800 |
| Costs to be Funded with ILP Equity | $ 18,498,602 |
| Total Paid to Operating Partnership | $ 18,698,130 |
| Plus: Excess Existing ILP Capital | |
| Less: Costs to be Funded with ILP Equity | $ (16,490,307) |
| Fundable at Face | $ 2,207,823 |
| PRICE PAID FOR TAX CREDITS | $ 18,698,130 DK |



STABILIZED NET OPERATING INCOME

| 2013 Travis Oak Creek, LP | | | | | | | NET OPERATING INCOME | | | | | | | | | | | | 5/21/2014 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Oak Creek Village | | | | | | | | | | | | | | | | | | | 2:59 PM |

Scenario Name: Base Case

INFLATION INDEX:
Weighted Average Income Escalation: 2.00%
Weighted Average Expense Escalation: 3.00%
Hold Income Flat Years 1 - 12: NO   NO
Hold Expenses flat Years 1 - 3?: NO   NO

Average Physical Occ. (Yrs 1-3): 99.82%   100.00%   100.00%
Month of 100% Physical Occ. (Yr 1-3): 1   11   12

| YEAR | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 17 | 18 | 19 | 20 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 | 2025 | 2026 | 2027 | 2028 | 2029 | 2030 | 2031 | 2032 | 2033 | 2034 |

GROSS RENTAL INCOME
less Rental Vacancy (5.00%)
Net Rental Income

OTHER INCOME
Miscellaneous
less Other Vacancy (5.00%)
Net Misc Income

less Other Vacancy (5.00%)
Net

less Other Vacancy (5.00%)
Net

Net Other Income

EFFECTIVE GROSS INCOME

OPERATING EXPENSES
Uncontrolled Expenses
  Real Estate Taxes
  Property Insurance
  Utilities

Management Fee

Controlled Expenses
  General & Administrative
  Payroll - Administrative
  Repairs & Maintenance
  Payroll - Maintenance
  Supportive Services
TOTAL OPERATING EXPENSES

Net Operating Inc (before Rep. Reserves)

REPLACEMENT RESERVES

NET OPERATING INCOME

Total Op. Expenses per Unit (annualized)
Operating Expenses (as % of EGI)

2015 Travis Oak Creek, LP | CASH FLOW | [illegible]

Oak Creek Village | 2:59 PM

| Scenario Name | Base Case |
|---|---|
| Income Index | 2.00% |
| Expense Index | 3.00% |
| Rental Vacancy | 5.00% |
| Other Vacancy | 5.00% |

| Lender | Principal | Interest | Amort | Term | Var Rate | Int Change | Change/Yr | Max Rate |
|---|---|---|---|---|---|---|---|---|
| Seller Note | $ 7,110,000 | 6.50% | 0 | 35 | NO | 2016 | 0.00% | 0.00% |
| GP Cash Flow Note | 1,100,000 | 8.50% | 0 | 30 | NO | 2016 | 0.00% | 0.00% |
| City of Austin | 2,000,000 | 0.00% | 0 | 45 | NO | 2016 | 0.00% | 0.00% |
| | - | 0.00% | 0 | 0 | 0 | 1900 | 0.00% | 0.00% |
| | - | 0.00% | 0 | 0 | 0 | 1900 | 0.00% | 0.00% |
| HUD / FNMA | 31,700,000 | 5.20% | 420 | 180 | NO | 2016 | 0.00% | 0.00% |
| | - | 0.00% | 0 | 0 | 0 | 2000 | 0.00% | 0.00% |
| | - | 0.00% | 0 | 0 | 0 | 2000 | 0.00% | 0.00% |
| | - | 0.00% | 0 | 0 | 0 | 1900 | 0.00% | 0.00% |
| | | 0.00% | 0 | 0 | 0 | 1900 | 0.00% | 0.00% |

| | 1 | 2 | 3 |
|---|---|---|---|
| Breakeven Occupancy (Years 1 - 3) | | | |
| With Reserves | 7.34% | 88.08% | 82.64% |
| Without Reserves | 7.36% | 81.83% | 81.47% |
| Physical Occupancy % (Years 1 - 3) | 29.82% | 100.00% | 100.00% |

| YEAR | | 1<br>2015 | 2<br>2016 | 3<br>2017 | 4<br>2018 | 5<br>2019 | 6<br>2020 | 7<br>2021 | 8<br>2022 | 9<br>2023 | 10<br>2024 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Net Operating Income (before reserves) | | 862,357 | 2,538,801 | 2,370,228 | 2,622,169 | 2,661,571 | 2,705,492 | 2,745,912 | 2,788,837 | 2,832,746 | 2,876,164 |
| REPLACEMENT RESERVES (3.00% ann growth) | | - | 43,250 | 46,548 | 45,884 | 47,260 | 48,678 | 50,139 | 51,643 | 53,192 | 54,788 |
| NET OPERATING INCOME | | 862,117 | 2,495,551 | 2,324,674 | 2,574,285 | 2,614,311 | 2,656,814 | 2,695,774 | 2,737,030 | 2,779,057 | 2,821,376 |
| DEBT SERVICE | 5.87 | | | | | | | | | | |
| | | - | - | - | - | - | - | - | - | - | - |
| HUD - FNMA | NO | - | 1,434,111 | 1,912,148 | 1,912,148 | 1,912,148 | 1,912,148 | 1,912,148 | 1,912,148 | 1,912,148 | 1,912,148 |
| | | - | - | - | - | - | - | - | - | - | - |
| TOTAL DEBT SERVICE | | $ - | $ 1,434,111 | $ 1,912,148 | $ 1,912,148 | $ 1,912,148 | $ 1,912,148 | $ 1,912,148 | $ 1,912,148 | $ 1,912,148 | $ 1,912,148 |
| Net Cash Flow | | 862,117 | 1,061,440 | 412,531 | 662,138 | 702,163 | 742,667 | 783,626 | 825,081 | 866,909 | 909,228 |
| OPERATING DEFICIT GUARANTY PAYMENTS | | - | - | - | - | - | - | - | - | - | - |
| Operating Reserve | $ 1,529,143 | 1,529,143 | 1,529,143 | 1,529,143 | 1,529,143 | 1,529,143 | 1,529,143 | 1,529,143 | 1,529,143 | 1,529,143 | 1,529,143 |
| DISTRIBUTABLE CASH FLOW | | $ 862,117 | $ 1,061,440 | $ 412,531 | $ 662,138 | $ 702,163 | $ 742,667 | $ 783,626 | $ 825,081 | $ 866,909 | $ 909,228 |
| DEVELOPMENT COSTS | | - | - | - | - | - | - | - | - | - | - |
| CUMULATIVE SURPLUS/(DEFICIT) RELEASED | | - | - | 13,391 | - | - | - | - | - | - | - |
| DEVELOPMENT COSTS OVERRUNS | | - | - | - | - | - | - | - | - | - | - |
| Cash Flow Available for Fees | | 852,117 | 1,061,440 | 646,521 | 662,138 | 702,163 | 742,667 | 783,626 | 825,081 | 866,909 | 909,228 |
| INVESTOR SERVICES FEE | | fee due | | | | | | | | | |
| Annual Amount | | - | 8,650 | 8,415 | 9,177 | 9,452 | 9,736 | 10,028 | 10,329 | 10,639 | 10,958 |
| Amount Paid | | $ - | $ 8,650 | $ 8,415 | $ 9,177 | $ 9,452 | $ 9,736 | $ 10,028 | $ 10,329 | $ 10,639 | $ 10,958 |
| Accrued - YES, Annual Growth - 3.00% | | - | - | - | - | - | - | - | - | - | - |
| DEFERRED FEES | $ 2,667,177 | 852,117 | 1,052,306 | 637,616 | 653,961 | 129,992 | - | - | - | - | - |
| Seller Note | YES | - | - | - | - | 96,723 | 733,931 | 773,599 | 814,513 | 856,771 | 898,371 |
| GP Cash Flow Note | YES | - | - | - | - | - | - | - | - | - | - |
| PARTNERSHIP MGMT FEE | | fee due | | | | | | | | | |
| Annual Amount | | - | 34,691 | 35,736 | 36,707 | 37,809 | 38,943 | 40,121 | 41,314 | 42,554 | 43,830 |
| Amount Paid | | - | - | - | - | - | - | - | - | - | - |
| Accrued - NO, Annual Growth - 3.00% | | - | - | - | - | - | - | - | - | - | - |
| PRIORITY TO GP FOR TAX LIABILITY | | fee due | | | | | | | | | |
| 40% of Taxable Income | | - | - | - | - | - | - | - | - | - | - |
| City of Austin | YES | - | - | - | - | - | - | - | - | - | - |
| INCENTIVE MANAGEMENT FEE | | fee due | | | | | | | | | |
| 10% of EGI, Max = (80% x Dist. CF) - PMF | | - | - | - | - | - | - | - | - | - | - |
| RESIDUAL CASH FLOW | | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| 100% Residual CF to GP until Note | | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| Residual Cash Flow to ILP (10.00%) | | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| Residual Cash Flow to GP (90.00%) | | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| DEBT COVERAGE RATIO (hard debt) | | | | 1.33 | 1.35 | 1.37 | 1.39 | 1.41 | 1.43 | 1.45 | 1.48 |
| DEBT COVERAGE RATIO (total debt) | | | | 1.33 | 1.35 | 1.37 | 1.39 | 1.41 | 1.43 | 1.45 | 1.48 |
| % Dist. Cash Flow to ILP (w/o Def. Fee) | | 0.00% | 0.61% | 1.76% | 1.35% | 1.35% | 1.31% | 1.28% | 1.25% | 1.23% | 1.21% |
| % Dist. Cash Flow to GP (w/o Def. Fee) | | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% |
| % Dist. Cash Flow to Deferred Fees | | 100.00% | 99.39% | 98.63% | 98.61% | 17.98% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% |

| YEAR | 11<br>2025 | 12<br>2026 | 13<br>2027 | 14<br>2028 | 15<br>2029 | 16<br>2030 | 17<br>2031 | 18<br>2032 | 19<br>2033 | 20<br>2034 |
|---|---|---|---|---|---|---|---|---|---|---|
| Net Operating Income (before reserves) | 2,921,595 | 2,965,461 | 3,010,805 | 3,056,731 | 3,103,148 | 3,150,011 | 3,197,354 | 3,245,176 | 3,293,464 | 3,342,21[illegible] |
| REPLACEMENT RESERVES (3.00% ann growth) | 56,431 | 58,124 | 59,868 | 61,664 | 63,514 | 65,419 | 67,382 | 69,404 | 71,486 | 73,630 |
| NET OPERATING INCOME | 2,864,744 | 2,907,337 | 2,951,012 | 2,995,106 | 3,039,634 | 3,084,591 | 3,129,972 | 3,175,772 | 3,221,984 | 3,268,600 |
| DEBT SERVICE | | | | | | | | | | |
| | - | - | - | - | - | - | - | - | - | - |
| HUD - FNMA | 1,912,148 | 1,912,148 | 1,912,148 | 1,912,148 | 1,912,148 | 1,912,148 | 1,912,148 | 1,912,148 | 1,912,148 | 1,912,148 |
| | - | - | - | - | - | - | - | - | - | - |
| TOTAL DEBT SERVICE | $ 1,912,148 | $ 1,912,148 | $ 1,912,148 | $ 1,912,148 | $ 1,912,148 | $ 1,912,148 | $ 1,912,148 | $ 1,912,148 | $ 1,912,148 | $ 1,912,148 |
| Net Cash Flow | 951,596 | 995,203 | 1,038,865 | 1,082,958 | 1,127,486 | 1,172,444 | 1,217,825 | 1,263,624 | 1,309,836 | 1,356,453 |
| OPERATING DEFICIT GUARANTY PAYMENTS | - | - | - | - | - | - | - | - | - | - |
| Operating Reserve | 1,529,143 | 1,529,143 | 1,529,143 | 1,529,143 | 1,529,143 | 1,529,143 | 1,529,143 | 1,529,143 | 1,529,143 | 1,529,143 |
| DISTRIBUTABLE CASH FLOW | $ 951,596 | $ 995,203 | $ 1,038,865 | $ 1,082,958 | $ 1,127,486 | $ 1,172,444 | $ 1,217,825 | $ 1,263,624 | $ 1,309,836 | $ 1,356,453 |
| DEVELOPMENT COSTS | - | - | - | - | - | - | - | - | - | - |
| CUMULATIVE SURPLUS/(DEFICIT) RELEASED | - | - | - | - | - | - | - | - | - | - |
| DEVELOPMENT COSTS OVERRUNS | - | - | - | - | - | - | - | - | - | - |
| Cash Flow Available for Fees | 951,596 | 995,203 | 1,038,865 | 1,082,958 | 1,127,486 | 1,172,444 | 1,217,825 | 1,263,624 | 1,309,836 | 1,356,453 |
| INVESTOR SERVICES FEE | | | | | | | | | | |
| Annual Amount | 11,286 | 11,625 | 11,974 | 12,333 | 12,703 | 13,084 | 13,476 | 13,881 | 14,297 | 14,726 |
| Amount Paid | $ 11,286 | $ 11,625 | $ 11,974 | $ 12,333 | $ 12,703 | $ 13,084 | $ 13,476 | $ 13,881 | $ 14,297 | $ 14,726 |
| Accrued - YES, Annual Growth - 3.00% | - | - | - | - | - | - | - | - | - | - |
| DEFERRED FEES | - | - | - | - | - | - | - | - | - | - |
| Seller Note | 940,183 | 983,584 | 1,026,891 | 1,070,626 | 1,114,784 | 1,159,156 | 1,204,348 | 1,249,764 | 1,295,535 | 1,341,727 |
| GP Cash Flow Note | - | - | - | - | - | - | - | - | - | - |
| PARTNERSHIP MGMT FEE | | | | | | | | | | |
| Annual Amount | 45,145 | 46,500 | 47,894 | 49,331 | 50,811 | 52,336 | 53,906 | 55,523 | 57,189 | 58,904 |
| Amount Paid | - | - | - | - | - | - | - | - | - | - |
| Accrued - NO, Annual Growth - 3.00% | - | - | - | - | - | - | - | - | - | - |
| PRIORITY TO GP FOR TAX LIABILITY | | | | | | | | | | |
| 40% of Taxable Income | - | - | - | - | - | - | - | - | - | - |
| City of Austin | - | - | - | - | - | - | - | - | - | - |
| INCENTIVE MANAGEMENT FEE | | | | | | | | | | |
| 10% of EGI, Max = (80% x Dist. CF) - PMF | - | - | - | - | - | - | - | - | - | - |
| RESIDUAL CASH FLOW | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| 100% Residual CF to GP until Note | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| Residual Cash Flow to ILP (10.00%) | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| Residual Cash Flow to GP (90.00%) | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| DEBT COVERAGE RATIO (hard debt) | 1.50 | 1.52 | 1.54 | 1.57 | 1.59 | 1.61 | 1.64 | 1.66 | 1.69 | 1.71 |
| DEBT COVERAGE RATIO (total debt) | 1.50 | 1.52 | 1.54 | 1.57 | 1.59 | 1.61 | 1.64 | 1.66 | 1.69 | 1.71 |
| % Dist. Cash Flow to ILP (w/o Def. Fee) | 1.19% | 1.17% | 1.15% | 1.14% | 1.13% | 1.12% | 1.11% | 1.10% | 1.09% | 1.09% |
| % Dist. Cash Flow to GP (w/o Def. Fee) | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% |
| % Dist. Cash Flow to Deferred Fees | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% |

2015 Travis Oak Creek, LP

Oak Creek Village

**TAXABLE INCOME (LOSS)**

| YEAR | 1 2015 | 2 2016 | 3 2017 | 4 2018 | 5 2019 | 6 2020 | 7 2021 | 8 2022 | 9 2023 | 10 2024 | 11 2025 | 12 2026 | 13 2027 | 14 2028 | 15 2029 | 16 2030 | 17 2031 | 18 2032 | 19 2033 | 20 2034 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Net Operating Income | 862,757 | 2,538,901 | 2,579,226 | 2,626,149 | 2,661,571 | 2,701,402 | 3,745,261 | 1,780,881 | 2,832,544 | 2,876,164 | 2,920,535 | 2,965,491 | 3,010,906 | 3,056,770 | 3,103,148 | 3,150,011 | 3,197,354 | 3,245,176 | 3,293,469 | 3,342,231 |
| Construction Interest Income | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| RD Interest Subsidy Income | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Replacement Reserve Interest Income | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| SUBTOTAL TAXABLE INCOME | 862,757 | 2,538,901 | 2,579,226 | 2,626,149 | 2,661,571 | 2,701,402 | 3,745,261 | 1,780,881 | 2,832,244 | 2,876,164 | 2,920,535 | 1,965,491 | 3,010,906 | 3,056,770 | 3,103,148 | 3,150,011 | 3,197,354 | 3,245,176 | 3,293,469 | 3,342,231 |
| **INTEREST EXPENSE** | | | | | | | | | | | | | | | | | | | | |
| Seller Note | - | 667,218 | 627,050 | 624,050 | 623,050 | 623,050 | 623,050 | 623,050 | 623,050 | 823,050 | 823,050 | 623,050 | 623,050 | 599,858 | 559,842 | 512,672 | 443,264 | 334,459 | 181,521 | 138,750 |
| RV Contribution Note | - | 63,710 | 85,040 | 85,000 | 85,000 | 85,000 | 85,000 | 85,000 | 95,000 | 85,000 | 85,000 | 85,000 | 85,000 | 85,000 | 85,000 | 85,000 | 85,000 | 85,000 | 85,000 | 85,000 |
| Line of Credit | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| PMC + 1st SLR | - | 1,766,766 | 1,655,524 | 1,860,414 | 1,634,522 | 1,627,292 | 1,609,122 | 1,589,252 | 1,559,112 | 1,547,353 | 1,524,002 | 1,498,328 | 1,472,991 | 1,444,372 | 1,415,173 | 1,385,632 | 1,349,046 | 1,311,869 | 1,275,703 | 1,233,103 |
| Interest on Deferred Development Fee | 103,853 | 132,523 | 77,301 | 45,687 | 5,312 | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **DEPRECIATION EXPENSE** | | | | | | | | | | | | | | | | | | | | |
| Real Property | 638,752 | 1,780,513 | 1,629,536 | 1,551,516 | 1,426,271 | 1,643,326 | 1,592,340 | 1,592,340 | 1,592,340 | ,392,550 | 1,592,818 | 1,592,589 | 1,592,336 | 1,592,340 | 1,592,854 | 1,405,411 | 1,393,111 | 1,399,111 | 1,393,111 | 1,393,111 |
| Personal Property | 329,400 | 1,041,209 | 629,026 | 375,045 | 126,019 | 234,444 | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Repayment Reserves | - | - | - | 19,425 | 26,741 | 34,166 | 39,429 | 25,478 | 61,577 | 82,181 | 49,909 | 29,585 | 29,585 | 16,342 | 95,599 | 57,359 | 16,416 | 34,186 | 36,406 | 36,406 |
| AMORTIZATION EXPENSE | - | 33,164 | 17,548 | 17,548 | 17,548 | 17,548 | 17,548 | 13,548 | 13,548 | 13,548 | 13,548 | 13,548 | 17,548 | 13,548 | 13,548 | 17,548 | 10,609 | 8,405 | 8,405 | 8,405 |
| EXPENSED DEVELOPMENT COSTS | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| CONST. INTEREST EXPENSE | 373,447 | 355,930 | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **FEE EXPENSES** | | | | | | | | | | | | | | | | | | | | |
| Investor Services Fee | - | 8,550 | 8,960 | 9,323 | 9,452 | 9,796 | 10,028 | 10,325 | 10,634 | 10,954 | 11,283 | 13,625 | 11,974 | 12,333 | 12,703 | 13,084 | 13,477 | 13,881 | 14,297 | 14,726 |
| Partnership Management Fee | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Investor Management Fee | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| NET TAXABLE INCOME (LOSS) | 1 | (383,911) | (1,416,721) | (1,212,510) | (1,045,236) | (1,544,301) | (1,357,552) | (1,223,194) | (1,145,500) | (1,106,445) | (1,176,833) | (1,105,411) | (932,099) | (922,392) | (735,364) | (656,599) | (455,172) | (125,335) | (5,745) | 155,016 | 274,691 |
| Taxable Income (Loss) to LP (99.99%) | (383,973) | (1,418,600) | (1,212,390) | (1,043,192) | (1,566,600) | (1,355,900) | (1,225,727) | (1,149,311) | (1,090,374) | (1,061,727) | (1,164,821) | (932,793) | (922,303) | (924,865) | (932,993) | (650,97) | (455,127) | (125,733) | (5,745) | 155,000 | 274,600 |
| Taxable Income (Loss) to GP (0.01%) | 150 | (242) | (211) | (194) | (171) | (155) | (121) | (115) | (109) | (106) | (10.2) | (91) | (92) | (73) | (181,535) | (455,125) | (125,753) | (5,745) | 16 | 27 |

BENEFITS SCHEDULE

[illegible] Oak Creek, LP
Oak Creek Village

CAPITAL ACCOUNTS & MINIMUM GAIN CALCULATION

[illegible]
[illegible]

| BALANCE SHEET | Beginning | 1<br>2015 | 2<br>2016 | 3<br>2017 | 4<br>2018 | 5<br>2019 | 6<br>2020 | 7<br>2021 | 8<br>2022 | 9<br>2023 |
|---|---|---|---|---|---|---|---|---|---|---|
| ASSETS | | | | | | | | | | |
| Operating Reserve | $ 1,529,143 | $ 1,529,143 | $ 1,529,143 | $ 1,529,143 | $ 1,529,143 | $ 1,529,143 | $ 1,529,143 | $ 1,529,143 | $ 1,529,143 | $ 1,529,143 |
| Replacement Reserves | - | - | 41,251 | 87,799 | 133,684 | 145,437 | 137,417 | 151,505 | 184,720 | 217,484 |
| NBV Personal Property | 2,934,154 | 2,666,276 | 1,562,564 | 957,514 | 562,521 | 214,444 | (8) | (3) | (12) | (9) |
| NBV Buildings | 41,757,359 | 41,159,167 | 39,348,655 | 37,669,234 | 36,017,761 | 34,491,487 | 32,788,160 | 31,193,645 | 29,663,119 | 28,018,930 |
| Land | 7,330,000 | 7,330,000 | 7,140,084 | 7,330,000 | 7,330,000 | 7,330,000 | 7,330,000 | 7,330,000 | 7,330,000 | 7,330,000 |
| Amortized Assets | 431,130 | 431,130 | 415,169 | 400,620 | 386,072 | 363,524 | 347,476 | 330,427 | 312,879 | 293,331 |
| Expensed Costs (except interest) | - | - | - | - | - | - | - | - | - | - |
| Net Impound Expense | 251,188 | 251,431 | 23,937 | 23,992 | 23,992 | 23,992 | 23,992 | 23,992 | 23,992 | 23,992 |
| Development Costs Paid From LP | - | - | - | - | - | - | - | - | - | - |
| Other Assets | 5,541,051 | 5,541,051 | 5,541,051 | 5,541,455 | 5,541,051 | 5,541,855 | 5,541,051 | 5,541,251 | 5,541,855 | 5,541,051 |
| Housing Credits Received | - | - | - | - | - | - | - | - | - | - |
| TOTAL ASSETS | $ 60,114,807 | $ 58,772,988 | $ 53,758,833 | $ 53,315,4[illegible] | $ 51,521,236 | $ 49,[illegible] | $ 47,597,7[illegible] | $ 46,[illegible] | $ 44,524,926 | $ 43,[illegible] |
| LIABILITIES | | | | | | | | | | |
| Permanent Debt (1-3) | $ 32,118,400 | $ 32,330,900 | $ 31,190,300 | $ 10,555,[illegible] | $ 10,[illegible] | $ 10,730,082 | $ 10,[illegible] | $ 10,[illegible] | $ 10,[illegible] | $ 10,[illegible] |
| Permanent Debt (4-5) | 27,150,000 | 27,194,800 | 27,131,892 | 26,997,216 | 26,645,555 | 25,731,753 | 26,068,479 | 25,787,517 | 25,461,584 | 25,121,643 |
| Interest Payable (1-3) | - | - | 531,895 | 1,259,388 | 1,445,118 | 2,082,464 | 2,063,587 | 1,964,618 | 1,851,376 | 1,741,135 |
| Interest Payable (4-5) | - | - | - | - | - | - | - | - | - | - |
| Deferred Devel Fee Payable | 2,667,177 | 1,709,651 | 1,288,427 | 728,414 | 178,663 | - | - | - | - | - |
| Incentive Services Fee Payable | - | - | - | - | - | - | - | - | - | - |
| Partnership Mgmt Fee Payable | - | - | - | - | - | - | - | - | - | - |
| EQUITY | | | | | | | | | | |
| HLP Capital | - | 2,431,744 | 15,229,711 | 11,464,758 | 11,659,279 | 9,954,866 | 8,371,131 | 1,143,474 | 1,796,168 | 4,501,748 |
| General Partner | (30) | 42 | (546) | (421) | (265) | (772) | (913) | (1,855) | (1,178) | (1,374) |
| Unpaid HLP Capital | 10,648,739 | 15,875,411 | 657,451 | - | - | - | - | - | - | - |
| Grant Proceeds | - | - | - | - | - | - | - | - | - | - |
| Other Sources | 419,099 | 419,000 | 419,000 | 419,000 | 419,000 | 419,000 | 419,000 | 419,000 | 419,000 | 419,000 |
| Operating Deficit Guaranty Paid | - | - | - | - | - | - | - | - | - | - |
| Deferred Development Fee Payoff | - | - | - | - | - | - | - | - | - | - |
| Cumulative Surplus Retained | - | - | - | 23,992 | 23,912 | 23,992 | 23,992 | 23,992 | 23,992 | 23,992 |
| TOTAL LIABILITIES & EQUITY | $ 60,114,807 | $ 58,211,588 | $ 53,759,837 | $ 53,312,4[illegible] | $ 51,522,236 | $ 49,561,121 | $ 47,597,7[illegible] | $ 46,[illegible] | $ 44,524,926 | $ 43,[illegible] |
| Remaining Loss | - | - | - | - | - | - | - | - | - | - |

| BALANCE SHEET | 10<br>2024 | 11<br>2025 | 12<br>2026 | 13<br>2027 | 14<br>2028 | 15<br>2029 | 16<br>2030 | 17<br>2031 | 18<br>2032 | 19<br>2033 | 20<br>2034 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| ASSETS | | | | | | | | | | | |
| Operating Reserve | $ 1,529,143 | $ 1,529,143 | $ 1,529,143 | $ 1,529,143 | $ 1,529,143 | $ 1,529,143 | $ 1,529,143 | $ 1,529,143 | $ 1,529,143 | $ 1,529,143 | $ 1,529,143 |
| Replacement Reserves | 218,695 | 184,943 | 193,760 | 224,040 | 256,132 | 245,544 | 214,615 | 226,037 | 259,525 | 296,095 | 264,144 |
| NBV Personal Property | (8) | (8) | (8) | (8) | (8) | (8) | (8) | (8) | (8) | (8) | (8) |
| NBV Buildings | 26,817,796 | 24,824,952 | 23,312,441 | 21,629,601 | 20,087,064 | 18,454,255 | 16,938,448 | 15,559,555 | 14,040,221 | 12,741,118 | 11,561,966 |
| Land | 7,330,000 | 7,330,000 | 7,330,000 | 7,330,000 | 7,330,000 | 7,330,000 | 7,330,000 | 7,330,000 | 7,330,000 | 7,330,000 | 7,330,000 |
| Amortized Assets | 277,757 | 260,244 | 242,885 | 225,137 | 207,589 | 190,040 | 172,492 | 154,941 | 137,396 | 119,848 | 102,292 |
| Expensed Costs (except interest) | - | - | - | - | - | - | - | - | - | - | - |
| Net Impound Expense | 23,992 | 23,992 | 23,992 | 23,992 | 23,992 | 23,992 | 23,992 | 23,992 | 23,992 | 23,992 | 23,992 |
| Development Costs Paid From LP | - | - | - | - | - | - | - | - | - | - | - |
| Other Assets | 5,541,855 | 5,541,855 | 5,541,051 | 5,541,051 | 5,541,051 | 5,541,051 | 5,541,051 | 5,541,051 | 5,541,051 | 5,541,855 | 5,541,851 |
| Housing Credits Received | - | - | - | - | - | - | - | - | - | - | - |
| TOTAL ASSETS | $ 41,318,455 | $ 39,654,315 | $ 38,[illegible] | $ 36,512,[illegible] | $ 34,914,[illegible] | $ 33,313,377 | $ 31,[illegible] | $ 30,377,229 | $ 28,[illegible] | $ 27,627,385 | $ 26,[illegible] |
| LIABILITIES | | | | | | | | | | | |
| Permanent Debt (1-3) | $ 10,[illegible] | $ 10,[illegible] | $ 10,[illegible] | $ 10,[illegible] | $ 9,566,181 | $ 8,831,441 | $ 8,[illegible] | $ 7,[illegible] | $ 6,[illegible] | $ 5,[illegible] | $ 4,[illegible] |
| Permanent Debt (4-5) | 24,757,867 | 24,369,782 | 23,538,981 | 23,517,805 | 23,032,814 | 22,553,661 | 22,024,585 | 21,462,588 | 20,864,155 | 20,237,466 | 19,550,515 |
| Interest Payable (1-3) | 1,552,558 | 1,326,275 | 1,144,140 | 938,750 | 1,391,152 | 1,168,750 | 1,233,110 | 1,118,750 | 3,433,552 | 2,501,710 | 1,893,710 |
| Interest Payable (4-5) | - | - | - | - | - | - | - | - | - | - | - |
| Deferred Devel Fee Payable | - | - | - | - | - | - | - | - | - | - | - |
| Incentive Services Fee Payable | - | - | - | - | - | - | - | - | - | - | - |
| Partnership Mgmt Fee Payable | - | - | - | - | - | - | - | - | - | - | - |
| EQUITY | | | | | | | | | | | |
| HLP Capital | 1,548,143 | 2,432,237 | 1,519,966 | 1,097,036 | 332,461 | - | - | - | - | 151,060 | 435,830 |
| General Partner | (1,342) | (1,487) | (1,576) | (1,664) | (1,735) | (201,266) | (140,441) | (312,173) | (315,420) | (215,563) | (191,875) |
| Unpaid HLP Capital | - | - | - | - | - | - | - | - | - | - | - |
| Grant Proceeds | - | - | - | - | - | - | - | - | - | - | - |
| Other Sources | 419,000 | 419,000 | 419,000 | 419,000 | 419,000 | 419,000 | 419,000 | 419,000 | 419,000 | 419,000 | 419,000 |
| Operating Deficit Guaranty Paid | - | - | - | - | - | - | - | - | - | - | - |
| Deferred Development Fee Payoff | - | - | - | - | - | - | - | - | - | - | - |
| Cumulative Surplus Retained | 23,992 | 23,992 | 23,992 | 23,992 | 23,992 | 23,992 | 23,992 | 23,992 | 23,992 | 23,992 | 23,992 |
| TOTAL LIABILITIES & EQUITY | $ 41,318,455 | $ 39,654,315 | $ 38,[illegible] | $ 36,512,573 | $ 34,914,[illegible] | $ 33,313,377 | $ 31,[illegible] | $ 30,377,229 | $ 28,[illegible] | $ 27,627,385 | $ 26,[illegible] |
| Remaining Loss | - | - | - | - | - | - | - | - | - | - | - |

| MINIMUM GAIN CALCULATION | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 |
|---|---|---|---|---|---|---|---|---|---|---|
| MORTGAGE BALANCE AT 12/31 | $ 17,633,000 | $ 24,462,951 | $ 30,154,344 | $ 30,[illegible] | $ 30,[illegible] | $ 18,134,336 | $ [illegible] | $ 26,556,[illegible] | $ 25,[illegible] | $ 25,310,761 |
| LESS | | | | | | | | | | |
| Operating Reserve | 1,529,143 | 1,529,143 | 1,529,143 | 1,529,143 | 1,529,143 | 1,529,143 | 1,529,143 | 1,529,143 | 1,529,143 | 1,529,143 |
| Replacement Reserves | - | 41,250 | 87,799 | 133,681 | 145,437 | 137,432 | 151,505 | 184,720 | 217,484 | 218,695 |
| NBV Personal Property | 2,666,274 | 1,562,564 | 957,514 | 562,521 | 214,444 | (3) | (3) | (8) | (8) | (8) |
| NBV Building | 41,159,167 | 39,348,655 | 37,669,234 | 36,017,761 | 34,491,487 | 32,788,160 | 31,193,645 | 29,663,119 | 28,018,930 | 26,817,796 |
| Land | 7,330,000 | 7,330,000 | 7,330,000 | 7,330,000 | 7,330,000 | 7,330,000 | 7,330,000 | 7,330,000 | 7,330,000 | 7,330,000 |
| Other Assets/Cum Surplus Retained | 2,411,474 | 2,541,547 | 3,541,851 | 3,541,851 | 3,541,855 | 3,541,051 | 3,541,855 | 3,541,855 | 3,541,051 | 3,541,855 |
| MINIMUM GAIN | $ [illegible] | $ [illegible] | $ [illegible] | $ [illegible] | $ [illegible] | $ [illegible] | $ [illegible] | $ [illegible] | $ [illegible] | $ [illegible] |

| MINIMUM GAIN CALCULATION | 2025 | 2026 | 2027 | 2028 | 2029 | 2030 | 2031 | 2032 | 2033 | 2034 |
|---|---|---|---|---|---|---|---|---|---|---|
| MORTGAGE BALANCE AT 12/31 | $ 27,[illegible] | $ 27,[illegible] | $ 26,516,[illegible] | $ [illegible] | $ 21,722,411 | $ [illegible] | $ 25,401,[illegible] | $ [illegible] | $ 21,778,[illegible] | $ 23,144,[illegible] |
| LESS | | | | | | | | | | |
| Operating Reserve | 1,529,143 | 1,529,143 | 1,529,143 | 1,529,143 | 1,529,143 | 1,529,143 | 1,529,143 | 1,529,143 | 1,529,143 | 1,529,143 |
| Replacement Reserves | 184,943 | 193,760 | 224,040 | 256,132 | 245,544 | 214,615 | 226,037 | 259,525 | 296,095 | 264,144 |
| NBV Personal Property | (8) | (8) | (8) | (8) | (8) | (8) | (8) | (8) | (8) | (8) |
| NBV Building | 24,824,952 | 23,312,441 | 21,629,601 | 20,087,064 | 18,454,255 | 16,938,448 | 15,559,555 | 14,040,221 | 12,741,118 | 11,561,966 |
| Land | 7,330,000 | 7,330,000 | 7,330,000 | 7,330,000 | 7,330,000 | 7,330,000 | 7,330,000 | 7,330,000 | 7,330,000 | 7,330,000 |
| Other Assets/Cum Surplus Retained | 3,541,851 | 3,541,051 | 3,541,851 | 3,541,851 | 3,541,855 | 3,541,051 | 3,541,855 | 3,541,851 | 3,541,051 | 3,541,051 |
| MINIMUM GAIN | $ [illegible] | $ [illegible] | $ [illegible] | $ [illegible] | $ [illegible] | $ [illegible] | $ [illegible] | $ [illegible] | $ [illegible] | $ [illegible] |



| 2013 Travis Oak Creek, LP | | 5/21/2014 |
| --- | --- | --- |
| **DEBT ANALYSIS AT END OF YEAR 18 (2032)** | | |
| Oak Creek Village | | 2:59 PM |

**INCOME APPROACH**

| ESTIMATED INCOME AT END OF YEAR 18 (2032) | | |
| --- | --- | --- |
| Stabilized NOI (less Rep. Reserves) in Year 19 (2033) | $ | 3,221,984 |
| Capitalization Rate | | 9.50% |
| VALUE OF PROPERTY AT THE END OF YEAR 18 | $ | 33,915,617 |

| DEBT BALANCES AT THE END OF YEAR 18 (2032) | | |
| --- | --- | --- |
| Investor Services Fee Payable | $ | - |
| Partnership Management Fee Payable | | - |
| Seller Note | 3,782,604 | |
| GP Contribution Note | 2,423,750 | |
| City of Austin | 2,000,000 | |
| - | | - |
| - | | - |
| PNC - FNMA | 20,864,305 | |
| - | | - |
| - | | - |
| - | | - |
| - | | - |
| TOTAL DEBT BALANCE | $ | 29,070,659 |
| | | |
| INDICATED LOAN TO VALUE AT END OF YEAR 18 | | 85.71% |

**COST APPROACH**

| ESTIMATED REPLACEMENT COST AT END OF YEAR 18 (2032) | | |
| --- | --- | --- |
| Development Costs (Dep. Costs less Dev. Fee plus Land) | | 46,847,881 |
| Net Increase Rate (includes depreciation) | | 2.00% |
| VALUE OF PROPERTY AT THE END OF YEAR 18 | | $66,910,310.25 |
| | | |
| TOTAL DEBT BALANCE | $ | 29,070,659 |
| | | |
| INDICATED LOAN TO VALUE AT END OF YEAR 18 | | 43.45% |



2013 Travis Oak Creek, LP

Oak Creek Village

**PAYMENT SCHEDULE - DEFERRED FEES**

5/21/2014

3:59 PM

| Deferred Fees | $ 2,962,177 | Soft? | | YES | Balloon payment due in year |
| Total Acquisition Fee | $ - | Interest Only? | | NO | Balloon payment due month |
| Total Development Fee | $ 5,175,000 | Variable Interest | | NO | Balloon payment prorate |
| Interest Rate | 6.00% | First Year Change or Interest | | | |
| Amortization (Months) | - | Per Year Change (%) | | 0.00% | |
| Term (Months) | - | Rate Cap (%) | | 6.00% | |
| | | Month of Rate Change | | - | |

| Date of Rate Change | 01/00/00 | 01/00/00 | 01/00/00 | 01/00/00 | 01/00/01 | 01/00/00 | 01/00/02 | 01/01/00 | 01/00/04 | 01/00/00 | 01/00/00 | 01/00/00 | 01/00/00 | 01/00/00 | 01/00/00 | 01/00/00 | 01/00/00 | 01/00/00 | 01/00/00 | 01/00/00 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Interest Rate | 6.00% | 6.00% | 6.00% | 6.00% | 6.00% | 6.00% | 6.00% | 6.00% | 6.00% | 6.00% | 6.00% | 6.00% | 6.00% | 6.00% | 6.00% | 6.00% | 6.00% | 6.00% | 6.00% | 6.00% |
| Interest Rate Change | 6.00% | 6.00% | 6.00% | 6.00% | 6.00% | 6.00% | 6.00% | 6.00% | 6.00% | 6.00% | 6.00% | 6.00% | 6.00% | 6.00% | 6.00% | 6.00% | 6.00% | 6.00% | 6.00% | 6.00% |

| YEAR | 1 2015 | 2 2016 | 3 2017 | 4 2018 | 5 2019 | 6 2020 | 7 2021 | 8 2022 | 9 2023 | 10 2024 | 11 2025 | 12 2026 | 13 2027 | 14 2028 | 15 2029 | 16 2030 | 17 2031 | 18 2032 | 19 2033 | 20 2034 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| BEGINNING BALANCE | $ - | $ 2,208,691 | $ 1,388,423 | $ 728,114 | $ 118,860 | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| 1 INTEREST | | 13,043 | 8,442 | 3,641 | 594 | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| PRINCIPAL | | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| 1 BALANCE | | 2,208,691 | 1,288,423 | 728,114 | 118,860 | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| 2 INTEREST | | 11,043 | 8,442 | 3,641 | 594 | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| PRINCIPAL | | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| 2 BALANCE | | 2,208,691 | 1,288,423 | 728,114 | 118,860 | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| 3 INTEREST | | 11,043 | 8,442 | 3,641 | 594 | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| PRINCIPAL | | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| 3 BALANCE | | 2,208,691 | 1,288,423 | 728,114 | 118,860 | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| 4 INTEREST | | 13,043 | 8,442 | 3,641 | 594 | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| PRINCIPAL | | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| 4 BALANCE | | 2,208,691 | 1,288,423 | 728,114 | 118,860 | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| 5 INTEREST | 2,962,177 | 11,043 | 8,442 | 3,641 | 594 | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| PRINCIPAL | 34,836 | 11,043 | 6,442 | 3,641 | 594 | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| 5 BALANCE | 2,208,691 | 2,208,691 | 1,288,423 | 728,114 | 118,860 | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| 6 INTEREST | 14,836 | 11,043 | 8,442 | 3,641 | 594 | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| PRINCIPAL | | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| 6 BALANCE | 2,962,177 | 2,208,691 | 1,288,423 | 728,114 | 118,860 | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| 7 INTEREST | 14,836 | 11,043 | 8,442 | 3,641 | 594 | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| PRINCIPAL | | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| 7 BALANCE | 2,962,177 | 2,208,691 | 1,288,423 | 728,114 | 118,860 | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| 8 INTEREST | 14,836 | 11,043 | 8,442 | 3,641 | 594 | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| PRINCIPAL | | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| 8 BALANCE | 2,962,177 | 2,208,691 | 1,288,423 | 728,114 | 118,860 | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| 9 INTEREST | 14,836 | 11,043 | 8,442 | 3,641 | 594 | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| PRINCIPAL | | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| 9 BALANCE | 2,962,177 | 2,208,691 | 1,288,423 | 728,114 | 118,860 | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| 10 INTEREST | 14,836 | 11,043 | 8,442 | 3,641 | 594 | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| PRINCIPAL | | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| 10 BALANCE | 2,962,177 | 2,208,691 | 1,288,423 | 728,114 | 118,860 | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| 11 INTEREST | 14,836 | 11,043 | 8,442 | 3,641 | 594 | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| PRINCIPAL | | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| 11 BALANCE | 2,962,177 | 2,208,691 | 1,288,423 | 728,114 | 118,860 | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| 12 INTEREST | 14,836 | 11,043 | 8,442 | 3,641 | 594 | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| PRINCIPAL | 753,486 | 920,269 | 560,308 | 609,254 | 118,860 | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| 12 BALANCE | $ 2,208,691 | $ 1,388,423 | $ 728,114 | $ 118,860 | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |

| Cash Flow Available | $ 862,327 | $ 1,052,799 | $ 637,614 | $ 652,943 | $ 692,711 | $ 732,591 | $ 773,999 | $ 814,712 | $ 856,271 | $ 898,271 | $ 940,710 | $ 983,584 | $ 1,026,891 | $ 1,030,626 | $ 3,114,784 | $ 1,159,346 | $ 1,204,348 | $ 1,249,744 | $ 1,295,539 | $ 1,341,727 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Maximum Payment Amount (if Soft) | 862,327 | 1,052,799 | 637,614 | 652,943 | 692,711 | 732,591 | 773,999 | 814,712 | 856,271 | 898,271 | 940,710 | 983,584 | 1,026,891 | 1,030,626 | 3,114,784 | 1,159,346 | 1,204,348 | 1,249,744 | 1,295,539 | 1,341,727 |
| Annual Interest Due | 108,851 | 132,524 | 77,365 | 43,687 | 7,132 | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Ann Interest Due + Personal Unpaid Int | 108,851 | 132,524 | 77,365 | 43,687 | 7,132 | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Interest Paid | 108,851 | 132,524 | 77,365 | 43,687 | 3,132 | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Principal Paid from Cash Flow | 753,486 | 920,269 | 560,308 | 609,254 | 118,860 | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Total Annual Payments | $ 862,337 | $ 1,052,799 | $ 637,614 | $ 652,943 | $ 125,992 | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |

| Unpaid Interest | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Total Principal & Unpaid Interest | 2,208,691 | 1,288,423 | 728,114 | 118,860 | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| less: Deferred Development Fee Payoff | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Deferred Dev Fee Payable | $ 2,208,691 | $ 1,288,423 | $ 728,114 | $ 118,860 | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |

MORTGAGE AMORTIZATION SCHEDULE #1

Travis Oak Creek, LP

Oak Creek Village

| Lender: | Seller Note | Interest style | NA | Balloon Payment Due in Year | 2015.166442 |
| Mortgage Amount | $ 7,930,000 | Variable Interest | NO | Beginning of Month | 4 |
| Interest Rate (Annual) | 8.50% | Per Year Changed (%) | 0.00% | Balloon Payment Due | $ 1,758,990 |
| Amortization (Months) | 0 | Every (yr) (%) | 0.00% | | |
| Term (Months) | 240 | First Adj from Interest Rate Change | | | |
| Begin Month | 4 | | | | |
| Begin Year | 2016 | Balance | NO | | |

| Date of Rate Change | | | | | | | | | | | | | | | | | | |
| Interest Rate | 8.50% | 8.50% | 8.50% | 8.50% | 8.50% | 8.50% | 8.50% | 8.50% | 8.50% | 8.50% | 8.50% | 8.50% | 8.50% | 8.50% | 8.50% | 8.50% | 8.50% | 8.50% |
| Interest Rate Change | 8.50% | 8.50% | 8.50% | 8.50% | 8.50% | 8.50% | 8.50% | 8.50% | 8.50% | 8.50% | 8.50% | 8.50% | 8.50% | 8.50% | 8.50% | 8.50% | 8.50% | 8.50% |

*Dense amortization table data — illegible at available resolution.*

2013 Travis Oak Creek, LP

Oak Creek Village

MORTGAGE AMORTIZATION SCHEDULE #2

| | | | | |
|---|---|---|---|---|
| Lender | GP Contribution Note | Interest Rate | NG1 | Balloon Payment Due in Year |
| Mortgage Amount | $ 1,000,000 | Variable Interest | NG1 | Beginning of Month |
| Interest Rate (Annual) | 5.50% | Per Year Change (%) | 0.00% | No Scal Payment Due |
| Amortization (Months) | 0 | Base Cap (%) | 0.00% | |
| Term (Months) | 240 | Month of Interest Change | | |
| Begin Month | 4 | | | |
| Begin Year | 2018 | Errors | NO | |

2015 Travis Oak Creek, LP

Oak Creek Village

## MORTGAGE AMORTIZATION SCHEDULE #3

| Lender | City of Austin | Interest Only | NO | Balloon Payment Due in Year | 2054 (66667) |
| Mortgage Amount | $ 2,000,000 | Variable Interest | NO | Beginning of Month | 1 |
| Interest Rate (Annual) | 0.00% | Per Year Change (%) | 0.00% | Balloon Payment Due | $ 2,000,000 |
| Amortization (Months) | 0 | Rate Cap (%) | 0.00% | | |
| Term (Months) | 498 | Month of Interest Change | | | |
| Begin Month | 1 | | | | |
| Begin Year | 2014 | Recourse | NO | | |

2015 Travis Oak Creek, LP

Oak Creek Village

# MORTGAGE AMORTIZATION SCHEDULE #6

| | | | | | |
|---|---|---|---|---|---|
| Lender | PNC - FNMA | Interest Only | NO | Balloon Payment Due in Year | 2031 |
| Mortgage Amount | ######## | Variable Interest | NO | Beginning of Month | 4 |
| Interest Rate (Annual) | 6.20% | Per Year Change (%) | 0.00% | Balloon Payment Amt | ######## |
| Amortization (Months) | 420 | Rate Cap (%) | 0.00% | | |
| Term (Months) | 180 | Month of Interest Change | - | | |
| Begin Month | 4 | | | | |
| Begin Year | 2016 | Recourse | NO | | |

| | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 |
|---|---|---|---|---|---|---|---|---|---|---|
| Date of Rate Change | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |
| Interest Rate | 6.20% | 6.20% | 6.20% | 6.20% | 6.20% | 6.20% | 6.20% | 6.20% | 6.20% | 6.20% |
| Interest Rate Change | 6.20% | 6.20% | 6.20% | 6.20% | 6.20% | 6.20% | 6.20% | 6.20% | 6.20% | 6.20% |
| YEAR | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 |
| BEGINNING BALANCE | $ - | $ - | ######## | ######## | ######## | ######## | ######## | ######## | ######## | ######## |
| 1 INTEREST | - | - | 140,181 | 138,959 | 137,658 | 136,275 | 134,805 | 133,238 | 131,577 | 129,806 |
| PRINCIPAL | - | - | 19,164 | 20,387 | 21,687 | 23,071 | 24,542 | 26,108 | 27,774 | 29,545 |
| 1 BALANCE | - | - | 27,112,731 | 26,874,889 | 26,621,875 | 26,352,726 | 26,066,393 | 25,761,807 | 25,437,787 | 25,093,096 |
| 2 INTEREST | - | - | 140,082 | 138,854 | 137,546 | 136,156 | 134,676 | 133,103 | 131,429 | 129,648 |
| PRINCIPAL | - | - | 19,263 | 20,492 | 21,799 | 23,190 | 24,669 | 26,243 | 27,917 | 29,698 |
| 2 BALANCE | - | - | 27,093,468 | 26,854,397 | 26,600,076 | 26,329,536 | 26,041,727 | 25,735,564 | 25,409,870 | 25,063,398 |
| 3 INTEREST | - | - | 139,983 | 138,748 | 137,434 | 136,036 | 134,549 | 132,967 | 131,284 | 129,494 |
| PRINCIPAL | - | - | 19,363 | 20,598 | 21,912 | 23,310 | 24,797 | 26,379 | 28,061 | 29,852 |
| 3 BALANCE | - | 27,100,000 | 27,074,105 | 26,833,799 | 26,578,164 | 26,306,226 | 26,016,931 | 25,709,185 | 25,381,808 | 25,033,547 |
| 4 INTEREST | - | 141,250 | 139,883 | 138,641 | 137,321 | 135,915 | 134,421 | 132,831 | 131,139 | 129,340 |
| PRINCIPAL | - | 18,396 | 19,461 | 20,704 | 22,025 | 23,430 | 24,925 | 26,515 | 28,206 | 30,006 |
| 4 BALANCE | - | 27,281,104 | 27,054,642 | 26,813,005 | 26,556,139 | 26,282,794 | 25,992,006 | 25,682,671 | 25,353,602 | 25,003,541 |
| 5 INTEREST | - | 141,155 | 139,782 | 138,534 | 137,203 | 135,794 | 134,292 | 132,694 | 130,994 | 129,185 |
| PRINCIPAL | - | 18,491 | 19,563 | 20,811 | 22,139 | 23,551 | 25,054 | 26,652 | 28,352 | 30,161 |
| 5 BALANCE | - | 27,262,614 | 27,035,079 | 26,792,194 | 26,534,000 | 26,259,240 | 25,966,952 | 25,656,019 | 25,325,250 | 24,973,381 |
| 6 INTEREST | - | 140,860 | 139,681 | 138,427 | 137,092 | 135,673 | 134,165 | 132,556 | 130,847 | 129,029 |
| PRINCIPAL | - | 18,485 | 19,664 | 20,919 | 22,253 | 23,673 | 25,183 | 26,790 | 28,499 | 30,316 |
| 6 BALANCE | - | 27,244,829 | 27,015,414 | 26,771,365 | 26,511,747 | 26,235,567 | 25,941,769 | 25,629,229 | 25,296,751 | 24,943,064 |
| 7 INTEREST | - | 140,765 | 139,580 | 138,319 | 136,977 | 135,550 | 134,032 | 132,418 | 130,700 | 128,872 |
| PRINCIPAL | - | 18,581 | 19,766 | 21,027 | 22,368 | 23,795 | 25,313 | 26,928 | 28,646 | 30,473 |
| 7 BALANCE | - | 27,226,248 | 26,995,648 | 26,750,338 | 26,489,379 | 26,211,772 | 25,916,456 | 25,602,301 | 25,268,106 | 24,912,591 |
| 8 INTEREST | - | 140,669 | 139,478 | 138,210 | 136,862 | 135,427 | 133,902 | 132,279 | 130,552 | 128,715 |
| PRINCIPAL | - | 18,677 | 19,868 | 21,136 | 22,484 | 23,918 | 25,444 | 27,067 | 28,794 | 30,631 |
| 8 BALANCE | - | 27,207,572 | 26,975,780 | 26,729,203 | 26,466,895 | 26,187,854 | 25,891,012 | 25,575,234 | 25,239,312 | 24,881,960 |
| 9 INTEREST | - | 140,572 | 139,375 | 138,101 | 136,746 | 135,304 | 133,770 | 132,139 | 130,403 | 128,557 |
| PRINCIPAL | - | 18,773 | 19,971 | 21,245 | 22,600 | 24,042 | 25,575 | 27,207 | 28,943 | 30,789 |
| 9 BALANCE | - | 27,188,799 | 26,955,810 | 26,707,958 | 26,444,295 | 26,163,812 | 25,865,437 | 25,548,027 | 25,210,369 | 24,851,172 |
| 10 INTEREST | - | 140,475 | 139,273 | 137,991 | 136,629 | 135,180 | 133,638 | 131,998 | 130,254 | 128,398 |
| PRINCIPAL | - | 18,870 | 20,074 | 21,355 | 22,717 | 24,166 | 25,706 | 27,347 | 29,092 | 30,948 |
| 10 BALANCE | - | 27,169,928 | 26,935,736 | 26,686,603 | 26,421,578 | 26,139,646 | 25,839,729 | 25,520,680 | 25,181,277 | 24,820,224 |
| 11 INTEREST | - | 140,378 | 139,168 | 137,881 | 136,511 | 135,055 | 133,505 | 131,857 | 130,103 | 128,238 |
| PRINCIPAL | - | 18,968 | 20,178 | 21,465 | 22,834 | 24,291 | 25,840 | 27,489 | 29,242 | 31,108 |
| 11 BALANCE | - | 27,150,961 | 26,915,558 | 26,665,138 | 26,398,744 | 26,115,355 | 25,813,889 | 25,493,191 | 25,152,035 | 24,789,116 |
| 12 INTEREST | - | 140,280 | 139,064 | 137,770 | 136,394 | 134,929 | 133,372 | 131,715 | 129,952 | 128,077 |
| PRINCIPAL | - | 19,066 | 20,282 | 21,576 | 22,952 | 24,416 | 25,974 | 27,631 | 29,393 | 31,269 |
| 12 BALANCE | - | 27,131,895 | 26,895,276 | 26,643,563 | 26,375,792 | 26,090,939 | 25,787,915 | 25,465,560 | 25,122,642 | 24,757,847 |
| Cash Flow Available | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| Maximum Payment Amount (if Set) | - | - | - | - | - | - | - | - | - | - |
| Annual Interest Due | - | 1,266,006 | 1,675,529 | 1,660,414 | 1,644,377 | 1,627,395 | 1,609,121 | 1,589,791 | 1,569,229 | 1,547,353 |
| Ann. Interest Due + Previous Unpaid Int | - | 1,266,006 | 1,675,529 | 1,660,414 | 1,644,377 | 1,627,395 | 1,609,121 | 1,589,793 | 1,569,229 | 1,547,353 |
| Interest Paid | - | 1,266,006 | 1,675,529 | 1,660,414 | 1,644,377 | 1,627,395 | 1,609,121 | 1,589,793 | 1,569,229 | 1,547,353 |
| Principal Paid | - | 168,105 | 236,619 | 251,713 | 267,771 | 284,853 | 303,024 | 322,355 | 342,919 | 364,794 |
| Total Annual Payments | $ - | $ 1,434,111 | $ 1,912,148 | $ 1,912,148 | $ 1,912,148 | $ 1,912,148 | $ 1,912,148 | $ 1,912,148 | $ 1,912,148 | $ 1,912,148 |
| | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| Unpaid Interest | - | - | - | - | - | - | - | - | - | - |
| Total Principal & Unpaid Interest | - | 27,131,895 | 26,895,236 | 26,643,564 | 26,375,792 | 26,090,939 | 25,787,915 | 25,465,560 | 25,122,642 | 24,757,847 |

| | 11 | 12 | 13 | 14 | 15 | 16 | 17 | 18 | 19 | 20 |
|---|---|---|---|---|---|---|---|---|---|---|
| Date of Rate Change | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |
| Interest Rate | 6.20% | 6.20% | 6.20% | 6.20% | 6.20% | 6.20% | 6.20% | 6.20% | 6.20% | 6.20% |
| Interest Rate Change | 6.20% | 6.20% | 6.20% | 6.20% | 6.20% | 6.20% | 6.20% | 6.20% | 6.20% | 6.20% |
| YEAR | 2025 | 2026 | 2027 | 2028 | 2029 | 2030 | 2031 | 2032 | 2033 | 2034 |
| BEGINNING BALANCE | ######## | ######## | ######## | ######## | ######## | ######## | ######## | ######## | ######## | ######## |
| 1 INTEREST | 127,916 | 125,961 | 123,778 | 121,509 | 119,095 | 116,527 | 113,796 | 110,890 | 107,799 | 104,511 |
| PRINCIPAL | 31,430 | 33,435 | 35,566 | 37,837 | 40,251 | 42,818 | 45,550 | 48,456 | 51,547 | 54,835 |
| 1 BALANCE | 24,726,411 | 24,336,347 | 23,921,391 | 23,479,968 | 23,010,383 | 22,510,841 | 21,979,435 | 21,414,128 | 20,812,758 | 20,172,035 |
| 2 INTEREST | 127,753 | 125,718 | 123,594 | 121,311 | 118,887 | 116,306 | 113,562 | 110,644 | 107,553 | 104,213 |
| PRINCIPAL | 31,592 | 33,608 | 35,752 | 38,032 | 40,459 | 43,040 | 45,785 | 48,706 | 51,813 | 55,118 |
| 2 BALANCE | 24,694,825 | 24,302,739 | 23,885,641 | 23,441,935 | 22,969,925 | 22,467,803 | 21,933,650 | 21,365,422 | 20,760,945 | 20,117,907 |
| 3 INTEREST | 127,590 | 125,564 | 123,409 | 121,117 | 118,678 | 116,084 | 113,324 | 110,388 | 107,265 | 103,943 |
| PRINCIPAL | 31,756 | 33,781 | 35,936 | 38,229 | 40,668 | 43,262 | 46,022 | 48,958 | 52,081 | 55,403 |
| 3 BALANCE | 24,663,069 | 24,268,957 | 23,849,705 | 23,403,706 | 22,929,257 | 22,424,541 | 21,887,628 | 21,316,464 | 20,708,864 | 20,062,504 |
| 4 INTEREST | 127,426 | 125,390 | 123,223 | 120,919 | 118,468 | 115,860 | 113,086 | 110,135 | 106,996 | 103,656 |
| PRINCIPAL | 31,920 | 33,956 | 36,122 | 38,426 | 40,878 | 43,486 | 46,260 | 49,211 | 52,350 | 55,690 |
| 4 BALANCE | 24,631,149 | 24,235,001 | 23,813,582 | 23,365,280 | 22,888,379 | 22,381,056 | 21,841,369 | 21,267,254 | 20,656,514 | 20,006,814 |
| 5 INTEREST | 127,261 | 125,214 | 123,037 | 120,731 | 118,257 | 115,635 | 112,847 | 109,881 | 106,725 | 103,369 |
| PRINCIPAL | 32,085 | 34,132 | 36,309 | 38,625 | 41,089 | 43,710 | 46,499 | 49,465 | 52,620 | 55,977 |
| 5 BALANCE | 24,599,065 | 24,200,870 | 23,777,274 | 23,326,655 | 22,847,290 | 22,337,345 | 21,794,870 | 21,217,789 | 20,603,894 | 19,950,833 |
| 6 INTEREST | 127,095 | 125,038 | 122,849 | 120,523 | 118,044 | 115,410 | 112,607 | 109,625 | 106,453 | 103,079 |
| PRINCIPAL | 32,250 | 34,308 | 36,496 | 38,825 | 41,301 | 43,936 | 46,739 | 49,720 | 52,892 | 56,266 |
| 6 BALANCE | 24,566,814 | 24,166,562 | 23,740,777 | 23,287,830 | 22,805,989 | 22,293,409 | 21,748,131 | 21,168,069 | 20,551,002 | 19,894,571 |
| 7 INTEREST | 126,929 | 124,861 | 122,661 | 120,320 | 117,831 | 115,183 | 112,365 | 109,368 | 106,180 | 102,789 |
| PRINCIPAL | 32,417 | 34,485 | 36,685 | 39,025 | 41,515 | 44,161 | 46,980 | 49,977 | 53,165 | 56,557 |
| 7 BALANCE | 24,534,397 | 24,132,077 | 23,704,092 | 23,248,805 | 22,764,474 | 22,249,248 | 21,701,151 | 21,118,091 | 20,497,836 | 19,838,014 |
| 8 INTEREST | 126,761 | 124,682 | 122,471 | 120,119 | 117,616 | 114,954 | 112,123 | 109,110 | 105,905 | 102,496 |
| PRINCIPAL | 32,585 | 34,663 | 36,874 | 39,227 | 41,729 | 44,391 | 47,223 | 50,235 | 53,440 | 56,849 |
| 8 BALANCE | 24,501,812 | 24,097,414 | 23,667,218 | 23,209,578 | 22,722,745 | 22,204,857 | 21,653,928 | 21,067,856 | 20,444,396 | 19,781,165 |
| 9 INTEREST | 126,593 | 124,503 | 122,281 | 119,916 | 117,401 | 114,725 | 111,879 | 108,851 | 105,629 | 102,203 |
| PRINCIPAL | 32,753 | 34,842 | 37,065 | 39,429 | 41,945 | 44,621 | 47,467 | 50,495 | 53,716 | 57,143 |
| 9 BALANCE | 24,469,060 | 24,062,572 | 23,630,153 | 23,170,149 | 22,680,800 | 22,160,235 | 21,606,461 | 21,017,361 | 20,390,680 | 19,724,022 |
| 10 INTEREST | 126,423 | 124,321 | 122,089 | 119,717 | 117,184 | 114,495 | 111,633 | 108,590 | 105,352 | 101,907 |
| PRINCIPAL | 32,922 | 35,022 | 37,257 | 39,633 | 42,161 | 44,851 | 47,712 | 50,756 | 53,994 | 57,438 |
| 10 BALANCE | 24,436,137 | 24,027,549 | 23,592,896 | 23,130,516 | 22,638,639 | 22,115,383 | 21,558,749 | 20,966,605 | 20,336,686 | 19,666,584 |
| 11 INTEREST | 126,253 | 124,142 | 121,897 | 119,508 | 116,966 | 114,265 | 111,387 | 108,327 | 105,073 | 101,611 |
| PRINCIPAL | 33,092 | 35,203 | 37,449 | 39,838 | 42,379 | 45,083 | 47,959 | 51,018 | 54,273 | 57,735 |
| 11 BALANCE | 24,403,045 | 23,992,345 | 23,555,447 | 23,090,678 | 22,596,259 | 22,070,301 | 21,510,790 | 20,915,586 | 20,282,411 | 19,608,849 |
| 12 INTEREST | 126,082 | 123,960 | 121,703 | 119,302 | 116,747 | 114,030 | 111,139 | 108,064 | 104,792 | 101,312 |
| PRINCIPAL | 33,263 | 35,385 | 37,642 | 40,044 | 42,598 | 45,316 | 48,207 | 51,282 | 54,555 | 58,011 |
| 12 BALANCE | 24,369,782 | 23,956,961 | 23,517,805 | 23,050,634 | 22,553,661 | 22,024,985 | 21,462,583 | 20,864,305 | 20,227,856 | 19,550,815 |
| Cash Flow Available | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| Maximum Payment Amount (if Set) | - | - | - | - | - | - | - | - | - | - |
| Annual Interest Due | 1,524,083 | 1,499,326 | 1,472,992 | 1,444,977 | 1,415,175 | 1,383,472 | 1,349,746 | 1,313,869 | 1,275,703 | 1,235,103 |
| Ann. Interest Due + Previous Unpaid Int | 1,524,083 | 1,499,326 | 1,472,992 | 1,444,977 | 1,415,175 | 1,383,472 | 1,349,746 | 1,313,869 | 1,275,703 | 1,235,103 |
| Interest Paid | 1,524,083 | 1,499,326 | 1,472,992 | 1,444,977 | 1,415,175 | 1,383,472 | 1,349,746 | 1,313,869 | 1,275,703 | 1,235,103 |
| Principal Paid | 388,065 | 412,821 | 439,156 | 467,171 | 496,973 | 528,676 | 562,402 | 598,279 | 636,444 | 677,045 |
| Total Annual Payments | $ 1,912,148 | $ 1,912,148 | $ 1,912,148 | $ 1,912,148 | $ 1,912,148 | $ 1,912,148 | $ 1,912,148 | $ 1,912,148 | $ 1,912,148 | $ 1,912,148 |
| | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| Unpaid Interest | - | - | - | - | - | - | - | - | - | - |
| Total Principal & Unpaid Interest | 24,369,782 | 23,956,961 | 23,517,805 | 23,056,634 | 22,551,661 | 22,024,985 | 21,462,583 | 20,864,305 | 20,227,856 | 19,550,815 |

| 2013 Travis Oak Creek, LP | | 5/21/2014 |
|---|---|---|
| **PERSONAL PROPERTY DEPRECIATION SCHEDULES** | | |
| Oak Creek Village | | 2:59 PM |

**5 year (150% DB to SL)**   **12 year (150% DB to SL)**

Amount: $ 2,934,154    Amount: $ -

| Year | Amount | Year | Amount | YEAR | TOTAL | BALANCE |
|---|---|---|---|---|---|---|
| | | | | Beg. | | $ 2,934,154 |
| 2014 | $ - | 2014 | $ - | 2014 | $ - | 2,934,154 |
| 2015 | 329,880 | 2015 | - | 2015 | 329,880 | 2,604,274 |
| 2016 | 1,041,709 | 2016 | - | 2016 | 1,041,709 | 1,562,564 |
| 2017 | 625,026 | 2017 | - | 2017 | 625,026 | 937,539 |
| 2018 | 375,015 | 2018 | - | 2018 | 375,015 | 562,523 |
| 2019 | 328,079 | 2019 | - | 2019 | 328,079 | 234,444 |
| 2020 | 234,444 | 2020 | - | 2020 | 234,444 | (0) |
| 2021 | - | 2021 | - | 2021 | - | (0) |
| 2022 | - | 2022 | - | 2022 | - | (0) |
| 2023 | - | 2023 | - | 2023 | - | (0) |
| 2024 | - | 2024 | - | 2024 | - | (0) |
| 2025 | - | 2025 | - | 2025 | - | (0) |
| 2026 | - | 2026 | - | 2026 | - | (0) |
| | | 2027 | - | 2027 | - | (0) |
| | | 2028 | - | 2028 | - | (0) |
| | | 2029 | - | 2029 | - | (0) |
| | | 2030 | - | 2030 | - | (0) |
| | | 2031 | - | 2031 | - | (0) |
| TOTAL | $ 2,934,154 OK | TOTAL | $ - OK | | $ 2,934,154 OK | |

Travis Oak Creek Forecast 05-20-14

2015 Travis Oak Creek, LP

Oak Creek Village

**REAL PROPERTY DEPRECIATION SCHEDULES**

| | |
|---|---|
| Total Capitalized Costs | $ 44,692,841 |
| less: Personal Property | (2,934,154) |
| less: Historic Credits | - |
| less: Eligible for Variance | (2,368) |
| Depreciable Real Property | $ 41,757,959 |

| | |
|---|---|
| Acquired Real Property | $ - |
| less: Acq. Personal Prop | (2,934,154) |
| Depreciable Acq. Property | $ - |
| Acquired Site Work | $ - |
| Other Acquired Real Prop. | $ - |

| | |
|---|---|
| New Real Property | $ 44,691,515 |
| less: New Personal Property | (2,934,154) |
| Depreciable new Property | $ 41,757,959 |
| New Site Work | $ 3,227,953 |
| Other New Real Property | $ 18,429,406 |

| 15 year (150% DB to SL) | | |
|---|---|---|
| Amount | $ 3,227,953 | |
| | Year | Amount |
| 1 | 2014 | $ - |
| 2 | 2015 | 161,896 |
| 3 | 2016 | 311,406 |
| 4 | 2017 | 280,265 |
| 5 | 2018 | 252,402 |
| 6 | 2019 | 227,162 |
| 7 | 2020 | 204,216 |
| 8 | 2021 | 203,599 |
| 9 | 2022 | 193,399 |
| 10 | 2023 | 193,727 |
| 11 | 2024 | 193,399 |
| 12 | 2025 | 193,727 |
| 13 | 2026 | 193,399 |
| 14 | 2027 | 193,727 |
| 15 | 2028 | 193,399 |
| 16 | 2029 | 193,727 |
| 17 | 2030 | 96,700 |
| 18 | 2031 | - |
| 19 | 2032 | - |
| 20 | 2033 | - |
| 21 | 2034 | - |

| | TOTAL | $ 3,227,953 OK |

| 20 year (150% DB to SL) | | |
|---|---|---|
| Amount | $ | |
| | Year | Amount |
| 1 | 2014 | $ - |
| 2 | 2015 | - |
| 3 | 2016 | - |
| 4 | 2017 | - |
| 5 | 2018 | - |
| 6 | 2019 | - |
| 7 | 2020 | - |
| 8 | 2021 | - |
| 9 | 2022 | - |
| 10 | 2023 | - |
| 11 | 2024 | - |
| 12 | 2025 | - |
| 13 | 2026 | - |
| 14 | 2027 | - |
| 15 | 2028 | - |
| 16 | 2029 | - |
| 17 | 2030 | - |
| 18 | 2031 | - |
| 19 | 2032 | - |
| 20 | 2033 | - |
| 21 | 2034 | - |
| 22 | 2035 | - |
| 23 | 2036 | - |
| 24 | 2037 | - |
| 25 | 2038 | - |

| | TOTAL | $ - OK |

| 27.5 years (Straight Line) | | |
|---|---|---|
| Amount | $ 18,429,406 | |
| | Year | Amount |
| 1 | 2014 | $ - |
| 2 | 2015 | 334,294 |
| 3 | 2016 | 1,399,111 |
| 4 | 2017 | 1,399,111 |
| 5 | 2018 | 1,399,111 |
| 6 | 2019 | 1,399,111 |
| 7 | 2020 | 1,399,111 |
| 8 | 2021 | 1,399,111 |
| 9 | 2022 | 1,399,111 |
| 10 | 2023 | 1,399,111 |
| 11 | 2024 | 1,399,111 |
| 12 | 2025 | 1,399,111 |
| 13 | 2026 | 1,399,111 |
| 14 | 2027 | 1,399,111 |
| 15 | 2028 | 1,399,111 |
| 16 | 2029 | 1,399,111 |
| 17 | 2030 | 1,399,111 |
| 18 | 2031 | 1,399,111 |
| 19 | 2032 | 1,399,111 |
| 20 | 2033 | 1,399,111 |
| 21 | 2034 | 1,399,111 |
| 22 | 2035 | 1,399,111 |
| 23 | 2036 | 1,399,111 |
| 24 | 2037 | 1,399,111 |
| 25 | 2038 | 1,399,111 |
| 26 | 2039 | 1,399,111 |
| 27 | 2040 | 1,399,111 |
| 28 | 2041 | 1,399,111 |
| 29 | 2042 | 1,227,846 |
| 30 | 2043 | 243,374 |
| 31 | 2044 | - |
| 32 | 2045 | - |
| 33 | 2046 | - |

| | TOTAL | $ 18,429,406 OK |

| 40 year (Straight Line) | | |
|---|---|---|
| Amount | $ - | |
| | Year | Amount |
| 1 | 2014 | $ - |
| 2 | 2015 | - |
| 3 | 2016 | - |
| 4 | 2017 | - |
| 5 | 2018 | - |
| 6 | 2019 | - |
| 7 | 2020 | - |
| 8 | 2021 | - |
| 9 | 2022 | - |
| 10 | 2023 | - |
| 11 | 2024 | - |
| 12 | 2025 | - |
| 13 | 2026 | - |
| 14 | 2027 | - |
| 15 | 2028 | - |
| 16 | 2029 | - |
| 17 | 2030 | - |
| 18 | 2031 | - |
| 19 | 2032 | - |
| 20 | 2033 | - |
| 21 | 2034 | - |
| 22 | 2035 | - |
| 23 | 2036 | - |
| 24 | 2037 | - |
| 25 | 2038 | - |
| 26 | 2039 | - |
| 27 | 2040 | - |
| 28 | 2041 | - |
| 29 | 2042 | - |
| 30 | 2043 | - |
| 31 | 2044 | - |
| 32 | 2045 | - |
| 33 | 2046 | - |
| 34 | 2047 | - |
| 35 | 2048 | - |
| 36 | 2049 | - |
| 37 | 2050 | - |
| 38 | 2051 | - |
| 39 | 2052 | - |
| 40 | 2053 | - |
| 41 | 2054 | - |
| 42 | 2055 | - |
| 43 | 2056 | - |
| 44 | 2057 | - |
| 45 | 2058 | - |

| | TOTAL | $ - OK |

| 39.5 year (Straight Line) | | |
|---|---|---|
| Amount | $ | |
| | Year | Amount |
| 1 | 2014 | $ - |
| 2 | 2015 | - |
| 3 | 2016 | - |
| 4 | 2017 | - |
| 5 | 2018 | - |
| 6 | 2019 | - |
| 7 | 2020 | - |
| 8 | 2021 | - |
| 9 | 2022 | - |
| 10 | 2023 | - |
| 11 | 2024 | - |
| 12 | 2025 | - |
| 13 | 2026 | - |
| 14 | 2027 | - |
| 15 | 2028 | - |
| 16 | 2029 | - |
| 17 | 2030 | - |
| 18 | 2031 | - |
| 19 | 2032 | - |
| 20 | 2033 | - |

| | TOTAL | $ - OK |

| YEAR | TOTAL | BALANCE |
|---|---|---|
| | Beginning | $41,757,959 |
| 2014 | $ - | 41,757,959 |
| 2015 | 498,192 | 41,659,167 |
| 2016 | 1,710,517 | 39,948,650 |
| 2017 | 1,679,376 | 37,669,274 |
| 2018 | 1,653,514 | 36,015,761 |
| 2019 | 1,626,273 | 34,391,487 |
| 2020 | 1,603,328 | 32,788,160 |
| 2021 | 1,592,510 | 31,195,649 |
| 2022 | 1,592,510 | 29,603,139 |
| 2023 | 1,592,831 | 28,010,308 |
| 2024 | 1,592,510 | 26,417,798 |
| 2025 | 1,592,831 | 24,824,967 |
| 2026 | 1,592,510 | 23,232,441 |
| 2027 | 1,592,831 | 21,639,603 |
| 2028 | 1,592,510 | 20,047,093 |
| 2029 | 1,592,834 | 18,454,255 |
| 2030 | 1,495,811 | 16,958,444 |
| 2031 | 1,399,111 | 15,559,333 |
| 2032 | 1,399,111 | 14,160,221 |
| 2033 | 1,399,111 | 12,761,110 |
| 2034 | 1,399,111 | 11,361,999 |
| 2035 | 1,399,111 | 9,962,888 |
| 2036 | 1,399,111 | 8,563,776 |
| 2037 | 1,399,111 | 7,164,665 |
| 2038 | 1,399,111 | 5,765,554 |
| 2039 | 1,399,111 | 4,366,443 |
| 2040 | 1,399,111 | 2,967,332 |
| 2041 | 1,399,111 | 1,568,220 |
| 2042 | 1,327,846 | 240,374 |
| 2043 | 240,374 | (0) |
| 2044 | - | (0) |
| 2045 | - | (0) |
| 2046 | - | (0) |
| 2047 | - | (0) |
| 2048 | - | (0) |
| 2049 | - | (0) |
| 2050 | - | (0) |
| 2051 | - | (0) |
| 2052 | - | (0) |
| 2053 | - | (0) |
| 2054 | - | (0) |
| 2055 | - | (0) |
| 2056 | - | (0) |
| 2057 | - | (0) |
| 2058 | - $ | (0) |

| | | $43,624,826 OK |

2013 Travis Oak Creek, LP                                                                                    5/21/2014

Oak Creek Village                          AMORTIZATION SCHEDULES                                            2:59 PM

**AMORTIZATION**

| | 35 YEARS | | | | 15 YEARS | | | | 1 YEARS | | | | Amortized Expenses | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| % Amortized | 3.14% | | | % Amortized | | | | % Amortized | | | | | YEAR | TOTAL | BALANCE |
| Amount | | $ 294,183 | | Amount | | $ 137,147 | | Amount | | $ - | | | Beg. | | $ 411,330 |
| PIS Month | | 4 | | PIS Month | | 4 | | PIS Month | | 4 | | | | | |

| | Year | % | Amount | | Year | % | Amount | | Year | % | Amount | | YEAR | TOTAL | BALANCE |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 2016 | 3.14% | 6,304 | 1 | 2016 | 5.00% | 6,857 | 1 | 2016 | 75.00% | - | 2016 | $ 13,161 | 418,169 |
| 2 | 2017 | 2.86% | 8,405 | 2 | 2017 | 6.67% | 9,143 | 2 | 2017 | 25.00% | - | 2017 | 17,548 | 400,620 |
| 3 | 2018 | 2.86% | 8,405 | 3 | 2018 | 6.67% | 9,143 | 3 | 2018 | 0.00% | - | 2018 | 17,548 | 383,072 |
| 4 | 2019 | 2.86% | 8,405 | 4 | 2019 | 6.67% | 9,143 | 4 | 2019 | 0.00% | - | 2019 | 17,548 | 365,524 |
| 5 | 2020 | 2.86% | 8,405 | 5 | 2020 | 6.67% | 9,143 | 5 | 2020 | 0.00% | - | 2020 | 17,548 | 347,975 |
| 6 | 2021 | 2.86% | 8,405 | 6 | 2021 | 6.67% | 9,143 | 6 | 2021 | 0.00% | - | 2021 | 17,548 | 330,427 |
| 7 | 2022 | 2.86% | 8,405 | 7 | 2022 | 6.67% | 9,143 | 7 | 2022 | 0.00% | - | 2022 | 17,548 | 312,879 |
| 8 | 2023 | 2.86% | 8,405 | 8 | 2023 | 6.67% | 9,143 | 8 | 2023 | 0.00% | - | 2023 | 17,548 | 295,330 |
| 9 | 2024 | 2.86% | 8,405 | 9 | 2024 | 6.67% | 9,143 | 9 | 2024 | 0.00% | - | 2024 | 17,548 | 277,782 |
| 10 | 2025 | 2.86% | 8,405 | 10 | 2025 | 6.67% | 9,143 | 10 | 2025 | 0.00% | - | 2025 | 17,548 | 260,234 |
| 11 | 2026 | 2.86% | 8,405 | 11 | 2026 | 6.67% | 9,143 | 11 | 2026 | 0.00% | - | 2026 | 17,548 | 242,685 |
| 12 | 2027 | 2.86% | 8,405 | 12 | 2027 | 6.67% | 9,143 | 12 | 2027 | 0.00% | - | 2027 | 17,548 | 225,137 |
| 13 | 2028 | 2.86% | 8,405 | 13 | 2028 | 6.67% | 9,143 | 13 | 2028 | 0.00% | - | 2028 | 17,548 | 207,589 |
| 14 | 2029 | 2.86% | 8,405 | 14 | 2029 | 6.67% | 9,143 | 14 | 2029 | 0.00% | - | 2029 | 17,548 | 190,040 |
| 15 | 2030 | 2.86% | 8,405 | 15 | 2030 | 6.67% | 9,143 | 15 | 2030 | 0.00% | - | 2030 | 17,548 | 172,492 |
| 16 | 2031 | 2.86% | 8,405 | 16 | 2031 | 1.67% | 2,286 | 16 | 2031 | 0.00% | - | 2031 | 10,691 | 161,801 |
| 17 | 2032 | 2.86% | 8,405 | 17 | 2032 | 0.00% | - | 17 | 2032 | 0.00% | - | 2032 | 8,405 | 153,396 |
| 18 | 2033 | 2.86% | 8,405 | 18 | 2033 | 0.00% | - | 18 | 2033 | 0.00% | - | 2033 | 8,405 | 144,990 |
| 19 | 2034 | 2.86% | 8,405 | 19 | 2034 | 0.00% | - | 19 | 2034 | 0.00% | - | 2034 | 8,405 | 136,585 |
| 20 | 2035 | 2.86% | 8,405 | 20 | 2035 | 0.00% | - | 20 | 2035 | 0.00% | - | 2035 | 8,405 | 128,180 |
| 21 | 2036 | 2.86% | 8,405 | 21 | 2036 | 0.00% | - | 21 | 2036 | 0.00% | - | 2036 | 8,405 | 119,775 |
| 22 | 2037 | 2.86% | 8,405 | 22 | 2037 | 0.00% | - | 22 | 2037 | 0.00% | - | 2037 | 8,405 | 111,369 |
| 23 | 2038 | 2.86% | 8,405 | 23 | 2038 | 0.00% | - | 23 | 2038 | 0.00% | - | 2038 | 8,405 | 102,964 |
| 24 | 2039 | 2.86% | 8,405 | 24 | 2039 | 0.00% | - | 24 | 2039 | 0.00% | - | 2039 | 8,405 | 94,559 |
| 25 | 2040 | 2.86% | 8,405 | 25 | 2040 | 0.00% | - | 25 | 2040 | 0.00% | - | 2040 | 8,405 | 86,154 |
| 26 | 2041 | 2.86% | 8,405 | 26 | 2041 | 0.00% | - | 26 | 2041 | 0.00% | - | 2041 | 8,405 | 77,748 |
| 27 | 2042 | 2.86% | 8,405 | 27 | 2042 | 0.00% | - | 27 | 2042 | 0.00% | - | 2042 | 8,405 | 69,343 |
| 28 | 2043 | 2.86% | 8,405 | 28 | 2043 | 0.00% | - | 28 | 2043 | 0.00% | - | 2043 | 8,405 | 60,938 |
| 29 | 2044 | 2.86% | 8,405 | 29 | 2044 | 0.00% | - | 29 | 2044 | 0.00% | - | 2044 | 8,405 | 52,533 |
| 30 | 2045 | 2.86% | 8,405 | 30 | 2045 | 0.00% | - | 30 | 2045 | 0.00% | - | 2045 | 8,405 | 44,128 |
| 31 | 2046 | 2.86% | 8,405 | 31 | 2046 | 0.00% | - | 31 | 2046 | 0.00% | - | 2046 | 8,405 | 35,722 |
| 32 | 2047 | 2.86% | 8,405 | 32 | 2047 | 0.00% | - | 32 | 2047 | 0.00% | - | 2047 | 8,405 | 27,317 |
| 33 | 2048 | 2.86% | 8,405 | 33 | 2048 | 0.00% | - | 33 | 2048 | 0.00% | - | 2048 | 8,405 | 18,912 |
| 34 | 2049 | 2.86% | 8,405 | 34 | 2049 | 0.00% | - | 34 | 2049 | 0.00% | - | 2049 | 8,405 | 10,507 |
| 35 | 2050 | 2.89% | 8,405 | 35 | 2050 | 0.00% | - | 35 | 2050 | 0.00% | - | 2050 | 8,405 | 2,101 |
| 36 | 2051 | 0.71% | 2,101 | 36 | 2051 | 0.00% | - | 36 | 2051 | 0.00% | - | 2051 | 2,101 | - |
| 37 | 2052 | 0.00% | - | 37 | 2052 | 0.00% | - | 37 | 2052 | 0.00% | - | 2052 | - | - |
| 38 | 2053 | 0.00% | - | 38 | 2053 | 0.00% | - | 38 | 2053 | 0.00% | - | 2053 | - | - |
| 39 | 2054 | 0.00% | - | 39 | 2054 | 0.00% | - | 39 | 2054 | 0.00% | - | 2054 | - | - |
| 40 | 2055 | 0.00% | - | 40 | 2055 | 0.00% | - | 40 | 2055 | 0.00% | - | 2055 | - | - |
| 41 | 2056 | 0.00% | - | 41 | 2056 | 0.00% | - | 41 | 2056 | 0.00% | - | 2056 | - | - |
| 42 | 2057 | 0.00% | - | 42 | 2057 | 0.00% | - | 42 | 2057 | 0.00% | - | 2057 | - | - |
| 43 | 2058 | 0.00% | - | 43 | 2058 | 0.00% | - | 43 | 2058 | 0.00% | - | 2058 | - | - |
| 44 | 2059 | 0.00% | - | 44 | 2059 | 0.00% | - | 44 | 2059 | 0.00% | - | 2059 | - | - |
| 45 | 2060 | 0.00% | - | 45 | 2060 | 0.00% | - | 45 | 2060 | 0.00% | - | 2060 | - | - |
| 46 | 2061 | 0.00% | - | 46 | 2061 | 0.00% | - | 46 | 2061 | 0.00% | - | 2061 | - | - |
| 47 | 2062 | 0.00% | - | 47 | 2062 | 0.00% | - | 47 | 2062 | 0.00% | - | 2062 | - | - |
| 48 | 2063 | 0.00% | - | 48 | 2063 | 0.00% | - | 48 | 2063 | 0.00% | - | 2063 | - | - |
| 49 | 2064 | 0.00% | - | 49 | 2064 | 0.00% | - | 49 | 2064 | 0.00% | - | 2064 | - | - |
| 50 | 2065 | 0.00% | - | 50 | 2065 | 0.00% | - | 50 | 2065 | 0.00% | - | 2065 | - | - |
| 51 | 2066 | 0.00% | - | 51 | 2066 | 0.00% | - | 51 | 2066 | 0.00% | - | 2066 | - $ | - |
| TOTAL | | 100% | $ 294,183 OK | TOTAL | | 100% | $ 137,147 OK | TOTAL | | 100% | $ - OK | | $ 411,330 OK | |

2013 Travis Oak Creek, LP                                                                                              5/21/2014
Oak Creek Village

## REPLACEMENT RESERVE DEPRECIATION SCHEDULES

**CASH RESERVES**

| | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 17 | 18 | 19 | 20 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Year | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 | 2025 | 2026 | 2027 | 2028 | 2029 | 2030 | 2031 | 2032 | 2033 | 2034 |
| Beginning Cash Balance | - | - | - | 43,250 | 87,298 | 131,681 | 3,619 | 52,297 | 102,436 | 154,078 | 207,271 | 5,241 | 61,673 | 119,792 | 179,665 | 241,329 | 6,097 | 71,516 | 138,898 | 208,302 | 270,788 |
| Deposits | | | 43,250 | 44,048 | 45,004 | 42,200 | 48,678 | 50,139 | 51,641 | 53,197 | 54,790 | 56,431 | 58,124 | 59,868 | 61,664 | 63,514 | 63,420 | 67,262 | 69,409 | 71,486 | 22,630 |
| Interest Income (0.00%) | | | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| APPLICATIONS | | | | | (177,533) | | | | | | (256,823) | | | | | (298,746) | | | | | (346,350) |
| ENDING CASH BALANCE | - | - | 43,250 | 87,298 | 131,681 | 3,619 | 52,297 | 102,436 | 154,078 | 207,271 | 5,241 | 61,673 | 119,792 | 179,665 | 241,329 | 6,097 | 71,516 | 138,898 | 208,302 | 270,788 | 7,068 |

**DEPRECIATION**

| | | | | Year | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 5 Year Property | 100.00% | of Total Applications | | Dep. Rates | 20.00% | 32.00% | 19.20% | 11.52% | 11.52% | 5.76% | 0.00% | 0.00% | | | | | |
| 12 Year Property | 0.00% | of Total Applications | | Dep. Rates | 6.25% | 11.72% | 10.25% | 8.97% | 7.85% | 7.10% | 7.13% | 7.13% | 7.14% | 7.14% | 7.14% | 5.36% | |

| | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 17 | 18 | 19 | 20 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Year | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 | 2025 | 2026 | 2027 | 2028 | 2029 | 2030 | 2031 | 2032 | 2033 | 2034 |
| First Application | | | | | | | | | | | | | | | | | | | | |
| 5 Year | | | | | 35,465 | 56,743 | 34,046 | 20,428 | 20,428 | 10,214 | - | - | | | | | | | | |
| 12 Year | | | | | | | | | | | | | | | | | | | | |
| Second Application | | | | | | | | | | | | | | | | | | | | |
| 5 Year | | | | | | | | | | 51,363 | 82,181 | 49,309 | 29,585 | 29,585 | 14,793 | - | | | | |
| 12 Year | | | | | | | | | | | | | | | | | | | | |
| Third Application | | | | | | | | | | | | | | | | | | | | |
| 5 Year | | | | | | | | | | | | | | | 59,749 | 95,599 | 57,559 | 34,416 | 34,416 | 12,208 |
| 12 Year | | | | | | | | | | | | | | | | | | | | |
| Fourth Application | | | | | | | | | | | | | | | | | | | | |
| 5 Year | | | | | | | | | | | | | | | | | | | | 69,270 |
| 12 Year | | | | | | | | | | | | | | | | | | | | |
| Fifth Application | | | | | | | | | | | | | | | | | | | | |
| 5 Year | | | | | | | | | | | | | | | | | | | | |
| 12 Year | | | | | | | | | | | | | | | | | | | | |
| Sixth Application | | | | | | | | | | | | | | | | | | | | |
| 5 Year | | | | | | | | | | | | | | | | | | | | |
| 12 Year | | | | | | | | | | | | | | | | | | | | |
| Seventh Application | | | | | | | | | | | | | | | | | | | | |
| 5 Year | | | | | | | | | | | | | | | | | | | | |
| 12 Year | | | | | | | | | | | | | | | | | | | | |
| Eighth Application | | | | | | | | | | | | | | | | | | | | |
| 5 Year | | | | | | | | | | | | | | | | | | | | |
| 12 Year | | | | | | | | | | | | | | | | | | | | |
| Ninth Application | | | | | | | | | | | | | | | | | | | | |
| 5 Year | | | | | | | | | | | | | | | | | | | | |
| 12 Year | | | | | | | | | | | | | | | | | | | | |
| Tenth Application | | | | | | | | | | | | | | | | | | | | |
| 5 Year | | | | | | | | | | | | | | | | | | | | |
| 12 Year | | | | | | | | | | | | | | | | | | | | |
| TOTAL DEPRECIATION | - | - | - | - | 35,465 | 56,743 | 34,046 | 20,428 | 20,428 | 51,577 | 82,181 | 49,309 | 29,585 | 29,585 | 74,542 | 95,599 | 57,559 | 34,416 | 34,416 | 81,478 |

**BOOK VALUE**

| | | | | | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Ending Cash Balance | | 43,250 | 87,298 | 131,681 | 3,619 | 52,297 | 102,436 | 154,078 | 207,271 | 5,241 | 61,673 | 119,792 | 179,665 | 241,329 | 6,097 | 71,516 | 138,898 | 208,302 | 270,788 | 7,068 |
| Net Applications less Depreciation | | - | - | - | 141,838 | 85,115 | 51,069 | 30,641 | 10,214 | 205,456 | 123,292 | 73,963 | 44,378 | 14,793 | 238,967 | 143,308 | 86,014 | 51,623 | 17,208 | 277,010 |
| Book Value | - | 43,250 | 87,298 | 131,681 | 145,472 | 137,412 | 153,505 | 184,720 | 217,486 | 210,697 | 184,965 | 193,760 | 224,043 | 256,332 | 245,064 | 214,913 | 224,937 | 259,925 | 296,995 | 284,148 |

| 2013 Travis Oak Creek, LP | | | | | | | | | | | | 1/21/2014 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | RETENANTING RESERVE CALCULATION | | | | | | | | | | |
| Oak Creek Village | 10 | Number of years to display | | | | | | | | | | 2:59 PM |

NPV of Yr 6-t Reserve @ 0.0%: (13,870,332)

| 2020 | | January | February | March | April | May | June | July | August | September | October | November | December |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Total Units | | 172 | 172 | 172 | 172 | 172 | 172 | 172 | 173 | 173 | 173 | 173 | 173 |
| Section 8 % of Units | | 98% | 98% | 98% | 98% | 98% | 98% | 98% | 98% | 98% | 98% | 98% | 98% |
| Section 8 Units | | 170 | 170 | 170 | 170 | 170 | 170 | 172 | 172 | 172 | 170 | 170 | 170 |
| | | | | | | | | | | | | | |
| Initial Turnover @ 95.00% | | 153 | | | | | | | | | | | |
| Retenant Rate | | 18 | 18 | 18 | 18 | 14 | 18 | 18 | 14 | 9 | 0 | 0 | 0 |
| Vacant Units | | 175 | 112 | 95 | 81 | 60 | 45 | 27 | 9 | 0 | 0 | 0 | 0 |
| | | | | | | | | | | | | | |
| Turnover Vacancy | | 78% | 64% | 57% | 47% | 34% | 26% | 16% | 5% | 0% | 0% | 0% | 0% |
| Normal Vacancy @ 7.00% | | 1.9% | 5.9% | 3.4% | 2.7% | 4.7% | 5.2% | 5.9% | 6.6% | 7.0% | 7.0% | 7.0% | 7.0% |
| Monthly Vacancy | | 79.6% | 69.9% | 60.2% | 50.5% | 40.9% | 31.3% | 21.5% | 11.8% | 7.0% | 7.0% | 7.0% | 7.0% | 32.10% |
| | | | | | | | | | | | | | |
| Rental Income (PGI) | 1,657,149 | 138,095 | 138,095 | 138,095 | 138,095 | 138,095 | 138,095 | 138,095 | 138,095 | 138,095 | 138,095 | 138,095 | 138,095 |
| Other Income | 10,883 | 907 | 907 | 907 | 907 | 907 | 907 | 907 | 907 | 907 | 907 | 907 | 907 |
| Monthly Vacancy | (547,187) | (110,610) | (97,160) | (83,709) | (70,258) | (56,808) | (43,357) | (29,906) | (16,456) | (9,730) | (9,730) | (9,730) | (9,730) |
| Effective Gross Income (EGI) | 1,120,845 | 28,394 | 41,842 | 55,293 | 68,744 | 82,199 | 95,649 | 109,100 | 122,551 | 129,276 | 129,276 | 129,276 | 129,276 |
| Operating Expenses (less Mgmt Fee) | 898,232 | 74,851 | 74,851 | 74,851 | 74,851 | 74,851 | 74,851 | 74,851 | 74,851 | 74,851 | 74,851 | 74,851 | 74,851 |
| Management Fee | 33,488 | 772 | 1,138 | 1,504 | 1,870 | 2,236 | 2,602 | 2,968 | 3,333 | 3,516 | 3,516 | 3,516 | 3,516 |
| Replacement Reserves | 48,678 | 4,057 | 4,057 | 4,057 | 4,057 | 4,057 | 4,057 | 4,057 | 4,057 | 4,057 | 4,057 | 4,057 | 4,057 |
| Hard Debt service | 1,912,146 | 159,346 | 159,346 | 159,346 | 159,346 | 159,346 | 159,346 | 159,346 | 159,346 | 159,346 | 159,346 | 159,346 | 159,346 |
| Cash (Deficits) at 1.00 DSC | (1,768,637) | (210,625) | (197,750) | (184,400) | (171,270) | (158,290) | (145,350) | (131,380) | (119,036) | (112,840) | (112,840) | (112,840) | (112,840) |
| DSCR | | -0.321842 | -0.359226 | -0.157641 | 0.075494 | 0.046621 | 0.048634 | 0.708534 | 0.25296699 | 0.2945278 | 0.2945278 | 0.2945278 | 0.2945278 |

| 2021 | | January | February | March | April | May | June | July | August | September | October | November | December |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Total Units | | 173 | 173 | 173 | 173 | 173 | 173 | 173 | 173 | 173 | 173 | 173 | 173 |
| Section 8 % | | 98% | 98% | 98% | 98% | 98% | 98% | 98% | 98% | 98% | 98% | 98% | 98% |
| Section 8 Units | | 170 | 170 | 170 | 170 | 170 | 170 | 170 | 170 | 170 | 170 | 170 | 170 |
| | | | | | | | | | | | | | |
| Retenant Rate | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Vacant Units | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | | | | | | | | | | | | |
| Turnover Vacancy | | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% |
| Normal Vacancy @ 7.00% | | 7.0% | 7.0% | 7.0% | 7.0% | 7.0% | 7.0% | 7.0% | 7.0% | 7.0% | 7.0% | 7.0% | 7.0% |
| Monthly Vacancy | | 7.0% | 7.0% | 7.0% | 7.0% | 7.0% | 7.0% | 7.0% | 7.0% | 7.0% | 7.0% | 7.0% | 7.0% | 7.00% |
| | | | | | | | | | | | | | |
| Rental Income (PGI) | 1,690,512 | 140,861 | 140,861 | 140,861 | 140,861 | 140,861 | 140,861 | 140,861 | 140,861 | 140,861 | 140,861 | 140,855 | 140,851 |
| Other Income | 11,110 | 925 | 925 | 925 | 925 | 925 | 925 | 925 | 925 | 925 | 925 | 925 | 925 |
| Monthly Vacancy | (119,151) | (9,925) | (9,925) | (9,925) | (9,925) | (9,925) | (9,925) | (9,925) | (9,925) | (9,925) | (9,925) | (9,925) | (9,925) |
| Effective Gross Income (EGI) | 1,282,537 | 131,861 | 131,861 | 131,861 | 131,861 | 131,861 | 131,861 | 131,861 | 131,861 | 131,861 | 131,861 | 131,862 | 131,861 |
| Operating Expenses (less Mgmt Fee) | 925,154 | 77,097 | 77,097 | 77,097 | 77,097 | 77,097 | 77,097 | 77,097 | 77,097 | 77,097 | 77,097 | 77,097 | 77,097 |
| Management Fee | 43,940 | 3,547 | 3,547 | 3,547 | 3,547 | 3,547 | 3,547 | 3,547 | 3,547 | 3,547 | 3,547 | 3,547 | 3,547 |
| Replacement Reserves | 50,129 | 4,178 | 4,178 | 4,178 | 4,178 | 4,178 | 4,178 | 4,178 | 4,178 | 4,178 | 4,178 | 4,178 | 4,178 |
| Hard Debt service | 1,912,146 | 159,346 | 159,346 | 159,346 | 159,346 | 159,346 | 159,346 | 159,346 | 159,346 | 159,346 | 159,346 | 159,346 | 159,346 |
| Cash (Deficits) at 1.00 DSC | (1,348,147) | (112,349) | (112,349) | (112,349) | (112,349) | (112,349) | (112,349) | (112,349) | (112,349) | (112,349) | (112,349) | (112,336) | (112,346) |
| DSCR | | 0.2949564 | 0.2949564 | 0.2949564 | 0.2949564 | 0.2949564 | 0.2949564 | 0.2949564 | 0.2949564 | 0.2949564 | 0.2949564 | 0.2949564 | 0.2949564 |

| 2022 | | January | February | March | April | May | June | July | August | September | October | November | December |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Total Units | | 173 | 173 | 173 | 173 | 173 | 173 | 173 | 173 | 173 | 173 | 173 | 173 |
| Section 8 % | | 98% | 98% | 98% | 98% | 98% | 98% | 98% | 98% | 98% | 98% | 98% | 98% |
| Section 8 Units | | 170 | 170 | 170 | 170 | 170 | 170 | 170 | 170 | 170 | 170 | 170 | 170 |
| | | | | | | | | | | | | | |
| Retenant Rate | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Vacant Units | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | | | | | | | | | | | | |
| Turnover Vacancy | | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% |
| Normal Vacancy @ 7.00% | | 7.0% | 7.0% | 7.0% | 7.0% | 7.0% | 7.0% | 7.0% | 7.0% | 7.0% | 7.0% | 7.0% | 7.0% |
| Monthly Vacancy | | 7.0% | 7.0% | 7.0% | 7.0% | 7.0% | 7.0% | 7.0% | 7.0% | 7.0% | 7.0% | 7.0% | 7.0% | 7.00% |
| | | | | | | | | | | | | | |
| Rental Income | 1,724,179 | 143,678 | 143,678 | 143,678 | 143,678 | 143,678 | 143,678 | 143,678 | 143,678 | 143,678 | 143,678 | 143,678 | 143,678 |
| Other Income | 11,327 | 944 | 944 | 944 | 944 | 944 | 944 | 944 | 944 | 944 | 944 | 944 | 944 |
| Monthly Vacancy | (121,413) | (10,124) | (10,124) | (10,124) | (10,124) | (10,124) | (10,124) | (10,124) | (10,124) | (10,124) | (10,124) | (10,124) | (10,124) |
| Effective Gross Income (EGI) | 1,611,914 | 134,499 | 134,499 | 134,499 | 134,499 | 134,499 | 134,499 | 134,499 | 134,499 | 134,499 | 134,499 | 134,499 | 134,499 |
| Operating Expenses (less Mgmt Fee) | 952,913 | 79,409.435 | 79,409.435 | 79,409.423 | 79,409.423 | 79,409.435 | 79,409.435 | 79,409.435 | 79,409.435 | 79,409.435 | 79,409.435 | 79,409.435 | 79,409.435 |
| Management Fee | 44,906 | 3,658 | 3,658 | 3,658 | 3,658 | 3,658 | 3,658 | 3,658 | 3,658 | 3,658 | 3,658 | 3,658 | 3,658 |
| Replacement Reserve | 51,643 | 4,304 | 4,304 | 4,304 | 4,304 | 4,304 | 4,304 | 4,304 | 4,304 | 4,304 | 4,304 | 4,304 | 4,304 |
| Hard Debt service | 1,912,146 | 159,346 | 159,346 | 159,346 | 159,346 | 159,346 | 159,346 | 159,346 | 159,346 | 159,346 | 159,346 | 159,346 | 159,346 |
| Cash (Deficits) at 1.00 DSC | (1,346,820) | (112,218) | (112,218) | (112,218) | (112,218) | (112,218) | (112,218) | (112,218) | (112,218) | (112,218) | (112,218) | (112,218) | (112,218) |
| DSCR | | 0.295755 | 0.295755 | 0.295755 | 0.295755 | 0.295755 | 0.295755 | 0.295755 | 0.295755 | 0.295755 | 0.295755 | 0.295755 | 0.295755 |

**EXHIBIT 9**

**FORM OF ACCOUNTANT'S ADDENDUM**

Note: in this addendum, "company" shall mean 2013 Travis Oak Creek, LP and "partner" shall mean any member or partner of the company. "Limited Partners" shall mean, collectively, any partner or member of the company related to PNC Bank, National Association.

In addition to preparing each of the following items in full compliance with Generally Accepted Accounting Principles ("GAAP"), requirements of the Internal Revenue Service ("IRS"), as applicable, the accountant's work shall include the following minimum requirements.

**Cost Certification**

The Cost Certification sent to the Limited Partners shall be accompanied by the accountant's work papers, with sufficient detail provided for any "lumped" categories presented on the cost certification. Additionally, the accountants shall prepare a comparison of the actual certified costs and computation of eligible basis juxtaposed to the corresponding computation in the Financial Forecast that is attached to the company's operating agreement, as amended and restated from time to time. The Cost Certification shall capitalize and expense interest costs of the company in a manner consistent with the Financial Forecast and in accordance with the requirements under the Code, and shall not capitalize any operating expenses unless corresponding allocations were assumed in the Financial Forecast.

**Tax Returns**

The annual tax returns (federal and state) sent to the Limited Partners shall include, or be accompanied by, depreciation schedules for each depreciable asset class, and by a capital account analysis for each partner. The schedules shall show the annual activity in the account, beginning with the company's first tax year, and including the beginning and ending balances. K-1s and applicable state information reporting forms shall be on a tax-basis.

**Annual Audit**

The annual audit sent to the Limited Partners shall be accompanied by the adjusting and reclassifying journal entries and an audit trial balance reflecting the financial statement groupings. The annual audit sent to the Limited Partners shall include in the footnotes, or be accompanied by, book-basis depreciation schedules for each asset class and a capital account analysis for each partner. Each of these schedules shall show the annual activity in the account, beginning with the year in which the company was formed, and including the beginning and ending balances for each year. The depreciation schedules shall include adequate detail, for each asset class, to determine the beginning and ending acquisition cost, disposals, depreciation expense and accumulated depreciation. The capital account schedules shall separately show the total capital commitment of each partner, any adjustments thereto that have occurred, the amount actually contributed to-date, the annual net income or loss, and any syndication costs, cash distributions, etc. affecting each partner's account.

In the presentation of the balance sheet (or in the footnotes), the audit shall include details on accrued interest and interest expense for each liability of the company.

In the computation of net operating income, the income statement shall report operating revenues and expenses in form no less granular than the following categories (each as applicable).

EXHIBIT 9 – Page 1

# EXHIBIT 9

## FORM OF ACCOUNTANT'S ADDENDUM

Note: in this addendum, "company" shall mean 2013 Travis Oak Creek, LP and "partner" shall mean any member or partner of the company. "Limited Partners" shall mean, collectively, any partner or member of the company related to PNC Bank, National Association.

In addition to preparing each of the following items in full compliance with Generally Accepted Accounting Principles ("GAAP"), requirements of the Internal Revenue Service ("IRS"), as applicable, the accountant's work shall include the following minimum requirements.

### Cost Certification

The Cost Certification sent to the Limited Partners shall be accompanied by the accountant's work papers, with sufficient detail provided for any "lumped" categories presented on the cost certification. Additionally, the accountants shall prepare a comparison of the actual certified costs and computation of eligible basis juxtaposed to the corresponding computation in the Financial Forecast that is attached to the company's operating agreement, as amended and restated from time to time. The Cost Certification shall capitalize and expense interest costs of the company in a manner consistent with the Financial Forecast and in accordance with the requirements under the Code, and shall not capitalize any operating expenses unless corresponding allocations were assumed in the Financial Forecast.

### Tax Returns

The annual tax returns (federal and state) sent to the Limited Partners shall include, or be accompanied by, depreciation schedules for each depreciable asset class, and by a capital account analysis for each partner. The schedules shall show the annual activity in the account, beginning with the company's first tax year, and including the beginning and ending balances. K-1s and applicable state information reporting forms shall be on a tax-basis.

### Annual Audit

The annual audit sent to the Limited Partners shall be accompanied by the adjusting and reclassifying journal entries and an audit trial balance reflecting the financial statement groupings. The annual audit sent to the Limited Partners shall include in the footnotes, or be accompanied by, book-basis depreciation schedules for each asset class and a capital account analysis for each partner. Each of these schedules shall show the annual activity in the account, beginning with the year in which the company was formed, and including the beginning and ending balances for each year. The depreciation schedules shall include adequate detail, for each asset class, to determine the beginning and ending acquisition cost, disposals, depreciation expense and accumulated depreciation. The capital account schedules shall separately show the total capital commitment of each partner, any adjustments thereto that have occurred, the amount actually contributed to-date, the annual net income or loss, and any syndication costs, cash distributions, etc. affecting each partner's account.

In the presentation of the balance sheet (or in the footnotes), the audit shall include details on accrued interest and interest expense for each liability of the company.

In the computation of net operating income, the income statement shall report operating revenues and expenses in form no less granular than the following categories (each as applicable).

EXHIBIT 9 – Page 1

4837-4545-8969.4

| |
|---|
| Rental Revenue |
| Gross Potential Rental Income paid by Tenants |
| Gross Potential Rental Income paid by Subsidy |
| Rental Vacancy (contra-revenue account) |
| Other Revenue |
| Amenity Income (garages, carports, storage lockers, cable television, etc.) |
| Other Operating Income (laundry, vending, etc.) |
| Tenant Charges (late fees, key replacement fees, pet fees, application fees, etc.) |
| Collection Loss and Bad Debts (contra-revenue account) |
| Rental Concessions and Specials (contra-revenue account) |
| Commercial Lease Income |
| Miscellaneous Operating Income (please provide detail unless amount is nominal) |
| Administrative Expenses |
| Advertising and Marketing |
| Annual Audit |
| Compliance Consulting |
| Other Professional Services (bookkeeping, accounting and legal) |
| Tenant Supportive Services (job training, financial counseling, fitness training, etc.) |
| Annual Fees owed to the State Tax Credit Allocating Agency (excluding amortizing fees that were paid up-front) |
| Payroll Taxes |
| Workers Compensation Insurance |
| Payroll Benefits (retirement, health insurance, etc.) |
| Other Administrative Expenses |
| Property Management Fees (non-payroll) |
| Repairs & Maintenance (excluding Capital Expenditures) |
| Snow Removal |
| Pool Maintenance or other significant amenity maintenance |
| Maintenance and Janitorial Payroll |
| Security (contracts, equipment, etc.) |
| Security Payroll |
| Turn-over Costs |
| Other Contract Labor and Services (grounds keeping, janitorial, painting, etc.) |
| Other Repairs & Maintenance (please separately identify any significant line-item costs) |
| Utilities (if the property is sub-metered or there is some other reliable means of categorizing the various utilities, then distinguish between common area costs and costs for apartment units) |
| Electricity |
| Gas |
| Fuel Oil |
| Water |
| Sewer |
| Trash Removal |
| Payroll |
| Administrative and Leasing Payroll |
| Social or Supportive Services Payroll |
| Employee Apartment |
| Other Payroll  (please provide detail unless amount is nominal) |
| Property Taxes |
| Casualty and Liability Insurance |

EXHIBIT 9 – Page 2

**EXHIBIT 10**

**FORM OF QUARTERLY STATUS REPORT**

(See attached.)

EXHIBIT 10 – Page 1

**Period:** _____ **Quarter 20___**
**Due:** _____, 20___

**◉ PNC**
REAL ESTATE

QUARTERLY STATUS REPORT

<<PRIMARYCONTACT>>

<<Alternate>>

**Partnership** <<ltname>>

**PROPERTY:** <<PROPERTYNAME>>

*This form is designed to be completed by hand.  Required fields are in **bold**, but also note conditionally required information.*
*If you prefer to use an electronic form, please contact us and we will send you the appropriate version.*
**ALL REQUIRED ITEMS ON THE FORM MUST BE COMPLETED.**

---

**1. Management**

**Management Company**: <<mgmtCompany>>

**a. Are there any plans to change management?**   Yes   No      If Yes, provide details:_____

**b. Have contacts changed since _____?** Yes   No   **(If Yes, complete section below.  If No, skip to 2.)**

Site Manager:
_____

Regional/Property Manager:
_____

Site Phone:
_____

Regional/Property Manager Email: _____.

Phone: _____

---

**2. Occupancy**

**Occupied Units on _____: #___ /___%  _____: # ___ /___%  _____: #___ /___%** (Include manager's unit in total.)  Please note, we are asking for both a percentage and an actual count of the occupied units.

**(If 92% or less at quarter-end, complete section below.  If 93% or above at quarter-end, skip to 3.)**

- Specify reason(s) for occupancy below 92% (check all that apply):

Evictions          New Housing in Area
Declining Economy      Other: _____

- Indicate efforts being made to increase occupancy (check all that apply):

Increased Advertising       Agency Outreach
Rent Incentives  (Provide details: _____.)
Other: _____

---

**3. Regional**

**Provide the following information about the regional economy:**

a. Average occupancy % of other rent-restricted properties—non-RHS—in the area as of _____: _____ %
b. The overall regional economic condition is:  Improving  Stable  Declining  Other:_____
c. Is there any planned construction of affordable housing in the area?  Yes   No(If Yes, provide details: _____.)
d. Have any local businesses closed recently?  Yes   No   (If Yes, provide details: _____.)

---

**4. Events**

**a.  Has the property experienced any of the following since _____?**(check all that apply)

Flood   Fire   Mold   Excessive Wind   Hail   Drug Trafficking/Crime/Gang Activity   Other: _____

If any of the boxes above are checked, describe plan to correct/repair damages:
_____
Property has not experienced any events impacting operations.

**b.  Has any qualified unit been out of compliance for more than 60 days?** Yes   No
(If Yes, provide details: _____.)

---

**5. Rental Rates**

**a.  Does the property receive project-based rental assistance?** Yes   No**(If Yes, complete section below.  If No, skip to (b).)**

| Source of contract: | | Amount of contract:  $_____ |
| HUD Housing Assistance Payments (HAP) | Project-based Section 8 | Contract Expiration Date: _____ |
| Rural Development Rental Assistance | Other: _____ | # Units Subsidized: _____ |

EXHIBIT 10 – Page 2

b. **Have rental rates changed since** _____ ? _Yes_ _No_____    **(If Yes, complete section below.  If No, skip to 6.)**
Attach additional pages if necessary.

| Unit Type | Size | % AMI | # Units at Rate | Current Rental Rate | Previous Rental Rate | Date of Rate Change | Conventional Market Rate |
|---|---|---|---|---|---|---|---|
| ___ bed, ___ bath | _____ sq ft | _____ % | _____ | $_____ | $_____ | _____ | $_____ |
| ___ bed, ___ bath | _____ sq ft | _____ % | _____ | $_____ | $_____ | _____ | $_____ |
| ___ bed, ___ bath | _____ sq ft | _____ % | _____ | $_____ | $_____ | _____ | $_____ |
| ___ bed, ___ bath | _____ sq ft | _____ % | _____ | $_____ | $_____ | _____ | $_____ |

EXHIBIT 10 – Page 3

4837-4545-8969.4

<<*ltname*>>

_____ *Quarter 20___*

<table>
<tr><td rowspan="2">6. Finances</td><td colspan="2">

**Provide the following information YEAR-TO-DATE as of _____:**
a. Is YTD income under budget?   Yes   No   (If Yes, provide details: _____.)
b. Are YTD expenses over budget?   Yes   No   (If Yes, provide details: _____.)
c. Is there a YTD operating deficit?   Yes   No   **(If Yes, complete section below. If No, skip to 7.)**
</td></tr>
<tr><td colspan="2">

How is the deficit being funded?   Operating cash   Accrual of expenses   (If accrual, explain: _____.)
                                   GP advances   Other: _____
</td></tr>
</table>

<table>
<tr><td rowspan="6">7. Debt</td><td colspan="2">

**a. YTD Mortgage Payments:**   Principal:  $_____        Interest:  $_____
</td></tr>
<tr><td colspan="2">

**b. Is the mortgage delinquent?** Yes   No   **(If Yes, complete questions below. If No, skip to (c).)**
</td></tr>
<tr><td colspan="2">

Delinquent Amount: $_____        Is property under a workout plan with the lender?   Yes   No
                                     (If Yes, attach copy of plan.)

Reason:                                        Plan to correct:
_____              _____
</td></tr>
<tr><td colspan="2">

**c. Does the property receive financing from a HUD program?**   Yes   No
**(If Yes, complete all questions below. If No, skip to 8.)**
</td></tr>
<tr><td colspan="2">

1.   FHA/HUD   2.   Date of most recent   3.   Most recent   4.   Most recent REAC   5. Date of most recent REAC
Project ID       #   REAC   inspection:      REAC   score:   Mgmt   Co.   Rating:   Mgmt Co. Rating: _____
_____
</td></tr>
<tr><td>

6.   Has the property received any notices from HUD regarding adverse findings on the following?
</td><td>

- HUD Regulatory Agreement
  violations:                     Yes  No
- Management review:              Yes  No
- Section 8 HAP contract violations:  Yes  No
</td><td>

If Yes to any, provide copies of all notices received from HUD.
</td></tr>
</table>

<table>
<tr><td rowspan="3">8. Past Due</td><td>

**a. Are property taxes delinquent?** Yes   No
</td><td>

**b. Are any insurance payments delinquent?** Yes   No
</td></tr>
<tr><td colspan="2">

**(If Yes to either, complete appropriate section below. If No to both, skip to 9.)**
</td></tr>
<tr><td>

Amount Taxes Delinquent:
$_____
Reason: _____
Plan to correct: _____
</td><td>

Amount Insurance Delinquent:
$_____
Reason: _____
Plan to correct: _____
</td></tr>
</table>

<table>
<tr><td rowspan="4">9. Major Expenditures</td><td>

**a. Provide the following information regarding the project's reserve accounts:**
</td></tr>
<tr><td>

|              | **YTD Deposits** | **YTD Withdrawals** | **Actual Balance at** | **Required Balance at** | **Is account underfunded?** | **Reason for underfunding:** (Also indicate if project is under a workout plan with lender.) |
|--------------|------------------|---------------------|-----------------------|-------------------------|-----------------------------|---------------------------|
| Replacement  | $_____         | $_____            | $_____              | $_____                | Yes  No                     | _____ |
| Tax/Insurance| $_____         | $_____            | $_____              | $_____                | Yes  No                     | _____ |
| Operating    | $_____         | $_____            | $_____              | $_____                | Yes  No                     | _____ |
| Other        | $_____         | $_____            | $_____              | $_____                | Yes  No                     | _____ |
</td></tr>
<tr><td>

**FOR <u>ALL</u> RESERVE WITHDRAWALS, COMPLETE PAGE 3 OR PROVIDE EQUIVALENT REPORT.**
Equivalent report must show amount, date and reason for withdrawals, source of funds, and status of lender approval.
</td></tr>
<tr><td>

**b. Any repairs/improvements planned for _____ quarter?** Yes   No   **(If Yes, complete section below. If No, skip to 10.)**

Estimated Cost: _____   Source:   Replacement reserve   Operating cash   Operating reserve       New financing
Details: _____
</td></tr>
</table>

EXHIBIT 10 – Page 4

4837-4545-8969.4

**10. Attachments:**

If not previously submitted, attach the following:

| | | |
|---|---|---|
| Balance Sheet | Reserve withdrawal detail | Inspection reports from state/federal agencies |
| YTD Income Statement (must be YTD) | Annual budget | Notices of adverse findings from state/federal agencies |
| Tax Credit Compliance/Occupancy Reports | Most recent marketing survey | Details of workout plans with lender |

**11. Completed by:**

| | | |
|---|---|---|
| Your Name | Company | Phone Number | Date |

<div align="center">

**Please return this form and attachments by _____, 20__:**

**PNC Real Estate, Asset Management Department, 121 SW Morrison, Suite 1300, Portland, OR 97204**
**Phone: (503) 808-1392   Fax: (503) 808-1301   Alt Fax: (503) 808-1400   Email: pncmfcassetmgmt@pnc.com**

</div>

EXHIBIT 10 – Page 5

4837-4545-8969.4

<<ltname>>                      **Quarterly Reserve Withdrawal Detail**                      _____ *Quarter 20*___

**Instructions:** For <u>all</u> withdrawals from reserve accounts during this quarter,
please complete the following or attach an equivalent report.

<u>Source of Funds:</u>

(e.g., replacement reserve, operating cash, operating reserve, tax/insurance reserve, etc.)

| <u>Type of Expense:</u> | <u>Total Cost:</u> | <u>Date Funds Transferred to Operating:</u> | | <u>Approved by Lender?</u> |
|---|---|---|---|---|

**Unit Turnover**

| Type of Expense | Total Cost | Date Funds Transferred | Source of Funds | Approved by Lender? |
|---|---|---|---|---|
| Air conditioners | $ _____ | _____ | _____ | Yes  No  Pending  N/A |
| Appliances | $ _____ | _____ | _____ | Yes  No  Pending  N/A |
| Blinds | $ _____ | _____ | _____ | Yes  No  Pending  N/A |
| Cabinets | $ _____ | _____ | _____ | Yes  No  Pending  N/A |
| Doors | $ _____ | _____ | _____ | Yes  No  Pending  N/A |
| Drywall | $ _____ | _____ | _____ | Yes  No  Pending  N/A |
| Flooring | $ _____ | _____ | _____ | Yes  No  Pending  N/A |
| Heating units | $ _____ | _____ | _____ | Yes  No  Pending  N/A |
| Painting | $ _____ | _____ | _____ | Yes  No  Pending  N/A |
| Plumbing | $ _____ | _____ | _____ | Yes  No  Pending  N/A |

**Major Repairs/Improvements**

| Type of Expense | Total Cost | Date Funds Transferred | Source of Funds | Approved by Lender? |
|---|---|---|---|---|
| Accessibility (ADA) | $ _____ | _____ | _____ | Yes  No  Pending  N/A |
| Alarm system | $ _____ | _____ | _____ | Yes  No  Pending  N/A |
| Common area | $ _____ | _____ | _____ | Yes  No  Pending  N/A |
| Exterior painting | $ _____ | _____ | _____ | Yes  No  Pending  N/A |
| Exterior windows | $ _____ | _____ | _____ | Yes  No  Pending  N/A |
| Fire safety system | $ _____ | _____ | _____ | Yes  No  Pending  N/A |
| Landscaping | $ _____ | _____ | _____ | Yes  No  Pending  N/A |
| Laundry facilities | $ _____ | _____ | _____ | Yes  No  Pending  N/A |
| Office equipment | $ _____ | _____ | _____ | Yes  No  Pending  N/A |
| Parking lot | $ _____ | _____ | _____ | Yes  No  Pending  N/A |
| Roof | $ _____ | _____ | _____ | Yes  No  Pending  N/A |
| Sidewalks | $ _____ | _____ | _____ | Yes  No  Pending  N/A |
| Siding | $ _____ | _____ | _____ | Yes  No  Pending  N/A |
| Signage | $ _____ | _____ | _____ | Yes  No  Pending  N/A |

**Annual**

| Type of Expense | Total Cost | Date Funds Transferred | Source of Funds | Approved by Lender? |
|---|---|---|---|---|
| Audit | $ _____ | _____ | _____ | Yes  No  Pending  N/A |
| Compliance fees | $ _____ | _____ | _____ | Yes  No  Pending  N/A |
| Deficit funding | $ _____ | _____ | _____ | Yes  No  Pending  N/A |
| Insurance payment | $ _____ | _____ | _____ | Yes  No  Pending  N/A |
| Property taxes | $ _____ | _____ | _____ | Yes  No  Pending  N/A |

EXHIBIT 10 – Page 6

4837-4545-8969.4

| Other | | $ _____ | _____ | _____ | Yes No Pending N/A |
|---|---|---|---|---|---|
| | | $ _____ | _____ | _____ | Yes No Pending N/A |
| | | $ _____ | _____ | _____ | Yes No Pending N/A |

EXHIBIT 10 – Page 7

4837-45-45-8969.4