

MULTIFAMILY

May 21, 2014

2013 Travis Oak Creek, LP
c/o Eureka Multifamily Group
3001 Knox Street, Suite 400
Dallas, TX 75205
Attention: Rene Campos

      Re:    Forward Commitment for Fixed Rate Mortgage Loan not to exceed
$27,300,000.00 under the Fannie Mae DUS Product Line relating to a 173
Unit multifamily housing project to be known as Oak Creek Village, and
located in Austin, Texas (the "**Project**")

Dear Mr. Campos:

PNC Bank, National Association, a national banking association ("**PNC**"), in its capacity as an
authorized Seller/Servicer under the Delegated Underwriting and Servicing Program
promulgated by Fannie Mae, hereby commits to make a mortgage loan with respect to the Project
(the "**Mortgage Loan**") to 2013 Travis Oak Creek, LP, a Texas limited partnership
("**Borrower**"), upon and subject to the terms, conditions and limitations set forth in this letter
(together with all exhibits hereto, the "**Commitment**"). Capitalized terms used and not defined
in the body of this Commitment shall have the respective meanings ascribed to them in Exhibit A
attached hereto.

A.    Satisfaction of Fannie Mae Requirements. This Commitment is issued subject to and in
accordance with a delegation of authority by Fannie Mae to PNC pursuant to the Fannie
Mae Delegated Underwriting and Servicing Product Line. Notwithstanding anything in
this Commitment to the contrary, the effectiveness of this Commitment shall at all times
be contingent upon Borrower's compliance with the DUS Product Line requirements
(including, without limitation, the Fannie Mae Multifamily Delegated Underwriting and
Servicing Guide) as in effect as of the date hereof, subject to procedural changes as may
hereafter become adopted by Fannie Mae (the "**Fannie Mae Guidelines**"), as modified
by the express provisions of this Commitment.

B.    Satisfaction of MBS Investor Trade Confirmation Requirements. This Commitment is
issued in coordination with the MBS Trade Confirmation among PNC Capital Markets
LLC ("**MBS Investor**"), and PNC dated as of May 23, 2014 (the "**MBS Trade
Confirmation**"), pursuant to which PNC will cause Fannie Mae to issue and deliver to
MBS Investor a Fannie Mae mortgage-backed security (the "**MBS**") secured by the
Mortgage Loan.



Oak Creek Village
May 21, 2014

C.     Conditions to Rate Lock. The availability of the Mortgage Loan and PNC's obligation to consent to the MBS Investor's setting of the interest rate for the Mortgage Loan (the "**Rate Lock**") shall be expressly conditioned upon the satisfaction of the following conditions precedent to the satisfaction of PNC:

    1.     PNC shall have received and approved a preliminary title report and survey with respect to the Project, and evidence satisfactory to it that fee title to the Project is vested in Borrower, and PNC shall be assured the a loan policy of title insurance meeting Fannie Mae Guidelines can be obtained upon the Mortgage Loan Closing (as defined in Section E below). The current Fannie Mae Guidelines with respect to title matters are attached as Exhibit F hereto.

    2.     PNC shall have received and approved all final plans and specifications with respect to the construction and/or rehabilitation of the Project (the "**Approved Plans**"), a budget for construction and/or rehabilitation of the Project, a copy of the executed fixed price contract for construction and/or rehabilitation of the Project with a general contractor acceptable to PNC, a timeline for completion of the construction and/or rehabilitation of the Project, and a projected absorption schedule for the lease-up of the units in the Project.

    3.     PNC shall have received and approved copies of the organizational documents of each of Borrower, each manager, managing member and/or general partner of Borrower, and each Key Principal and Guarantor which is not a natural person, all evidencing (i) the due organization, valid existence and good standing of each such entity, (ii) each such entity's power and authority to undertake the ownership and operation of the Project and otherwise undertaking its obligations with respect to the Project, and (iii) each such entity's power and authority to execute, deliver and perform its respective obligations under the Mortgage Loan Documents (as defined in Section E below), all of which shall be in compliance with applicable Fannie Mae Guidelines. Without in any way limiting the foregoing requirements, Borrower's organizational structure shall be identical to the organizational structure previously provided to and underwritten by Lender, which structure is shown in the organizational chart attached as Exhibit L hereto.

    4.     PNC and, to the extent required under the Fannie Mae Guidelines, Fannie Mae, shall have approved the terms and provisions of Borrower's construction financing loan from **JPMorgan Chase Bank, N.A.,** a national banking association ("**Construction Lender**"), with respect to construction financing in the amount of $26,000,000, with a loan term of at least twenty four (24) months (the "**Construction Loan**"), which Construction Loan shall be evidenced and secured by a promissory note, loan agreement, deed of trust and such other loan documents as may be required by Construction Lender in connection with the Construction Loan, including, without limitation, any tri-party agreement that may be required by the Construction Lender with respect to the Construction Loan, this Commitment, the Permanent Mortgage Loan, and/or such other matters

-2-

Forward Commitment/Unfunded MBS Rate Lock

CONFIDENTIAL                                  PLAINTIFFS_00020827

Oak Creek Village
May 21, 2014

as may be approved by PNC and Fannie Mae (collectively, the "**Construction Loan Documents**"). Prior to Rate Lock, all conditions to the closing the Construction Loan must be satisfied to PNC's reasonable satisfaction, and all Construction Loan Documents must be executed.

5. PNC shall have engaged or otherwise approved a construction consultant to monitor the progress of the construction and/or rehabilitation of the Project ("**Construction Consultant**"), and Borrower and the Construction Consultant shall have executed and delivered to PNC a consulting services agreement in form and substance acceptable to PNC, pursuant to which the Construction Consultant shall agree to monitor the progress of the construction and/or rehabilitation of the Project in the manner required under the Fannie Mae Guidelines and to provide the certifications required pursuant to this Commitment upon completion of the Project. Such activities shall be undertaken by the Construction Consultant for the sole benefit and reliance of PNC, but at the sole cost and expense of Borrower

6. PNC shall have received and approved the final architectural/cost review report from the Construction Consultant. THIS CONDITION HAS BEEN SATISFIED.

7. Borrower shall have provided PNC with a copy of its executed Amended and Restated Agreement of Limited Partnership reflecting the admission of PNC Bank, National Association, as Borrower's Investor Limited Partner, and confirming, to PNC's satisfaction, the low-income housing tax credit equity contributions underwritten by PNC in connection with the Mortgage Loan.

8. Borrower shall have provided PNC with copies of the final site, grading, foundation and building permits for the Project , and/or permit-ready letters, and a zoning letter from the City of Austin. THIS CONDITION HAS BEEN SATISFIED.

9. PNC shall have received evidence of policies of liability insurance coverage naming PNC and Fannie Mae as additional insureds under such policy(ies). Additionally, PNC shall have received evidence that Borrower has builder's-risk insurance in force. THIS CONDITION HAS BEEN SATISFIED.

10. PNC shall have approved the proposed property manager and received and approved a copy of the proposed management agreement. The management agreement must, under all circumstances, provide for management fees not to exceed the Underwritten Management Fee (as set forth in Exhibit A hereto), and both the property manager and management agreement shall comply with the Fannie Mae Guidelines. THIS CONDITION HAS BEEN SATISFIED.

11. PNC shall have received copies of all existing HAP contracts (including any and all extensions, amendments, riders and exhibits thereto), or drafts thereof along with a comfort letter evidencing that any pending HAP contracts will be issued

-3-

Forward Commitment/Unfunded MBS Rate Lock

 PLAINTIFFS_00020828

Oak Creek Village
May 21, 2014

prior to Mortgage Loan Closing, and PNC shall have also received satisfactory evidence of each HAP contract administrator's consent, or satisfactory evidence of its willingness to consent, to the collateral assignment of such HAP contract to PNC in connection with the Mortgage Loan Closing. Additionally, PNC shall have received evidence of HUD's post-construction rent approval.

12. Borrower shall have executed and delivered a forward loan commitment delivery assurance certificate (the "**Delivery Assurance Certificate**"), which shall be secured by a subordinate deed of trust encumbering the Project (the "**Delivery Assurance Security Instrument**"), both in the form attached as Exhibit D hereto, evidencing and securing the Borrower's obligations to close the Mortgage Loan pursuant to the terms and provisions of this Commitment, as further detailed in such Delivery Assurance Certificate.

13. PNC shall have received written confirmation from any subordinate lender confirming its willingness to subordinate its Approved Subordinate Financing (as described in Exhibit A hereto), including any loan documentation and regulatory agreements related thereto, to the Mortgage Loan pursuant to a subordination agreement conforming with Fannie Mae Guidelines. PNC shall have reviewed and approved the terms of any such Approved Subordinate Financing and any and all documents related thereto, and PNC shall have received evidence that all conditions precedent to the closing and funding of such Approved Subordinate Financing have been satisfied.

14. PNC shall have received and approved all existing and proposed Regulatory Agreements relating to the Project.

15 Borrower shall have furnished to PNC acceptable evidence of Borrower's qualification for federal low-income housing tax credits in the approximate amount set forth on the Sources and Uses of Funds Schedule attached as Exhibit B hereto (the "**Sources and Uses of Funds Schedule**"). THIS CONDITION HAS BEEN SATISFIED.

16. Receipt and approval by PNC of current UCC, judgment, tax lien, credit and Mornet searches performed at the appropriate state and local levels with respect to Borrower, each general partner or limited liability company manager of Borrower, and each Key Principal. THIS CONDITION HAS BEEN SATISFIED.

17. Fannie Mae shall have approved the Mortgage Loan and all waivers required in connection therewith.

18. PNC shall have received a copy of MBS Trade Confirmation.

19. Borrower shall have paid to PNC the Good Faith Deposit (as set forth in Section K below).

-4-

Forward Commitment/Unfunded MBS Rate Lock

CONFIDENTIAL

PLAINTIFFS_00020829

Oak Creek Village
May 21, 2014

> 20. Borrower and each Key Principal shall have executed and delivered this Commitment to PNC.

D. **Rate Lock.** Following satisfaction (as determined by PNC in its sole and absolute discretion) of all conditions precedent set forth in Sections A, B and C above, then, within five (5) days after the date on which Borrower and each Key Principal have delivered this Commitment, executed by each such party, to PNC (the **"Commitment Acceptance Date"**), Borrower and PNC, in consultation with MBS Investor, shall proceed with the Rate Lock pursuant to an Authorization to Rate Lock (the **"Authorization"**) to be executed by Borrower authorizing such Rate Lock pursuant to the terms and provisions of this Commitment at the interest rate specified in such Authorization. The date that the Rate Lock is completed shall thereafter be added to Exhibit A hereto and referred to herein as the "**Rate Lock Date**". Concurrently with the Rate Lock, PNC shall determine the maximum amount of the Mortgage Loan in accordance with the terms and provisions hereof, and such amount shall thereafter be added to Exhibit A hereto and referred to herein as the "**Maximum Mortgage Loan Amount.**" To the extent that the Maximum Mortgage Loan Amount, as so determined, is less than $27,300,000.00, then Borrower shall deliver to PNC for its review and approval an updated Sources and Uses of Funds Schedule for the Project.

E. **Conditions to Mortgage Loan Closing.** The closing of the Mortgage Loan (the **"Mortgage Loan Closing"**) shall be conditioned upon the satisfaction and completion of each and all of the following requirements, all to the satisfaction of PNC:

> 1. There shall have not occurred and be continuing any event of default, beyond any applicable notice and cure period, with respect to the Construction Loan and/or any Approved Subordinate Financing, nor shall there have occurred any payment defaults beyond any applicable grace or notice and cure period under the Construction Loan and/or any Approved Subordinate Financing during the twelve (12) month period immediately preceding the proposed date of the Mortgage Loan Closing.

> 2. Borrower and, as applicable, each Key Principal and Guarantor, shall have executed and delivered in favor of PNC, in recordable form if required, a permanent loan promissory note, loan agreement, security instrument and such other loan documents as required by PNC and/or Fannie Mae in connection with the Mortgage Loan Closing, all in form and content required by PNC and/or Fannie Mae to evidence and secure the Mortgage Loan in accordance with the Fannie Mae Guidelines, and otherwise to the satisfaction of PNC and Fannie Mae (collectively, the **"Mortgage Loan Documents"**). The Mortgage Loan Documents shall include, without limitation, each of the documents listed on Exhibit E attached hereto, as such documents (i) have been modified and approved by Borrower prior to the Commitment Acceptance Date (as indicated in

-5-

Forward Commitment/Unfunded MBS Rate Lock

CONFIDENTIAL

PLAINTIFFS_00020830

Oak Creek Village
May 21, 2014

Exhibit E), and (ii) may be further modified and/or supplemented following the Commitment Acceptance Date and prior to the Mortgage Loan Closing as required by the then-applicable Fannie Mae Guidelines.

3.      PNC shall have received and approved a loan policy of title insurance issued with respect to the Mortgage Loan, insuring, among other things, ownership of the Project by the Borrower, the first-priority lien of the security instrument securing the Mortgage Loan, and otherwise in compliance with the Fannie Mae Guidelines.

4.      PNC shall have received and approved an updated ALTA "as-built" survey with respect to the Project conforming to the Fannie Mae Guidelines. The current Fannie Mae Guidelines with respect to survey matters are attached as Exhibit G hereto.

5.      PNC shall have received and approved then-current UCC, judgment, tax lien, credit and Mornet searches performed at the appropriate state and local levels with respect to Borrower, each general partner or limited liability company manager of Borrower, and each Key Principal and Guarantor.

6.      PNC shall have received a final inspection report from the Construction Consultant (the **"Final Inspection Report"**), and such other certificates and reports of engineering and other consultants as required by PNC, to establish that Borrower has completed the Project (including all amenities, landscaping, signs, parking and the like, except for minor punch list and weather-sensitive items, and items for which sufficient funds have been reserved in a completion/repair reserve fund established with PNC), (a) in a good and workmanlike manner and substantially in accordance with the Approved Plans, (b) on a lien-free basis, (c) in compliance with all applicable requirements of all governmental authorities having jurisdiction over the Project, including, without limitation, all applicable laws, building codes, zoning requirements, subdivision requirements, fire and safety laws, ADA requirements and design and construction requirements established pursuant to the Fair Housing Act, as amended. Additionally, PNC shall have determined that (i) no portion of the Project shall have been damaged or destroyed by fire or other casualty (unless same has been repaired to the satisfaction of PNC), (ii) no portion of the Project shall be the subject of a condemnation or other similar proceeding, no material adverse change shall have occurred with respect to the physical condition of the Project, and (iii) no construction condition exists (whether deemed to be a "construction defect" or otherwise) which does or could threaten the life or safety of any tenants in occupancy on the Project or any other persons on or about the Project.

7.      Borrower shall have delivered to PNC for its review and approval (a) evidence of the availability of all public utilities necessary for the operation of the Project, (b) true and correct copies of each unconditional certificate of occupancy (or the local

-6-

Forward Commitment/Unfunded MBS Rate Lock

CONFIDENTIAL

Oak Creek Village
May 21, 2014

equivalent of a certificate of occupancy), issued by the governmental authority empowered to exercise jurisdiction over the Project and to properly issue such certificates, for all portions of the Project for which such a certificate is required or, if certificates of occupancy are not required by local law, evidence that the Project has passed all inspections and received all approvals which are conditions precedent to occupancy of all parts of the improvements thereon, and (c) true and correct copies of all operating permits and licenses for the Project.

8.      PNC shall have received evidence necessary to establish that the Project has achieved the Minimum Occupancy Requirement and Net Operating Income sufficient to support the Applicable Debt Service Coverage Factor  at the Maximum Mortgage Loan Amount (all as set forth in Exhibit A hereto).

9.      PNC shall have received satisfactory evidence that the Low-Income Units (as set forth in Exhibit A hereto) in the Project will be leased at rents affordable to persons whose incomes do not exceed the percentages of the area gross median income adjusted for family size, all as set forth in Exhibit A hereto.

10.     PNC shall have received and approved subordination agreements in conformity with the then-applicable Fannie Mae Guidelines with respect to (a) any cable television leases affecting the Project that are with affiliates of Borrower or any Key Principal, or (b) any laundry leases affecting the Project that (i) are with affiliates of Borrower or any Key Principal, (ii) provide for above-market rentals, as determined by PNC, or (iii) do not contain provisions allowing for termination for cause.

11.     PNC shall have received and approved insurance policies and paid receipts conforming with such requirements, and covering such risks, as PNC and Fannie Mae shall determine in accordance with the Fannie Mae Guidelines. The current Fannie Mae Guidelines with respect to insurance matters are attached as Exhibit H hereto.

12.     The proposed property manager and management agreement reviewed and approved by PNC under Section C.11 above shall not have been terminated, replaced or revised or, if any termination, replacement and/or revision or the like has occurred, PNC shall have approved such replacement property manager and received and approved a copy of the amended or replacement management agreement. The management agreement must, under all circumstances, provide for management fees not to exceed the Underwritten Management Fee, and both the property manager and the final management agreement shall comply with the Fannie Mae Guidelines. The management agreement shall be collaterally assigned to Fannie Mae pursuant to an Assignment of Management Agreement in form and content acceptable to PNC and otherwise in accordance with Fannie Mae Guidelines.

-7-

Forward Commitment/Unfunded MBS Rate Lock

CONFIDENTIAL                                        PLAINTIFFS_00020832

Oak Creek Village
May 21, 2014

13.  As of the Mortgage Loan Closing, (i) the identity and composition of the Borrower shall not have changed since the date of this Commitment, (ii) the Borrower shall be an eligible borrower under the Fannie Mae Guidelines, (iii) the Borrower shall own the Mortgaged Property, and (iv) there shall be no material adverse change in the condition, financial or otherwise, of the Borrower.

14.  As of the Mortgage Loan Closing, (i) the identity and composition of each Key Principal and Guarantor shall not have changed since the date of this Commitment, (ii) each Key Principal and Guarantor shall be an eligible key principal and guarantor, as applicable, under Fannie Mae Guidelines, (iii) there shall be no reduction in each such Key Principal's and/or Guarantor's direct or indirect ownership interest in or control over the Borrower, except to the extent permitted under the Loan Documents, and (iv) there shall be no material adverse change in the condition, financial or otherwise, of any Key Principal and/or Guarantor.

15.  PNC shall have received and approved complete copies of any changes or modifications to the organizational documents of Borrower, each general partner or limited liability company manager of Borrower, each Guarantor, and each Key Principal, since the date hereof, along with updated good standing certificates and, as applicable, certificates of authority to transact business in the jurisdiction in which the Project is located, all evidencing the due organization, valid existence and good standing of such entities, an organizational structure suitable to the tasks of owning and operating the Project, full power and authority to execute, deliver and perform under the Mortgage Loan Documents, and compliance with all applicable Fannie Mae Guidelines.

16.  PNC shall have received and approved an opinion of counsel to Borrower in the form attached as Exhibit I hereto. Borrower acknowledges that any deviations from the Fannie Mae promulgated opinion form will require PNC to seek the prior written approval of Fannie Mae and will delay the Mortgage Loan Closing.

17.  Intentionally Omitted.

18.  Pursuant to the terms and conditions of the Loan Agreement, Borrower shall have established an account with PNC for reserves for the completion of any immediate repairs and/or "punch-list" and weather-sensitive items identified in the Final Inspection Report and, if the individual or aggregate amount thereof exceeds $10,000, Borrower shall have funded such account to the extent required by PNC. The reserves for completion shall constitute additional security for the Mortgage Loan.

19.  Pursuant to the terms and conditions of the Loan Agreement, Borrower shall have established an account with PNC for reserves for ongoing replacements during the term of the Mortgage Loan. Borrower shall cause to be deposited into such

-8-

Forward Commitment/Unfunded MBS Rate Lock

CONFIDENTIAL

Oak Creek Village
May 21, 2014

account an initial deposit and subsequent monthly deposits in the amounts provided for in Exhibit A hereto. The monthly deposit requirements under the Replacement Reserve Agreement shall be subject to adjustment on the basis of physical needs assessments, which shall be conducted once every five (5) years during the term of the Mortgage Loan. The reserves for replacements shall constitute additional security for the Mortgage Loan.

20. Borrower shall have executed and delivered to PNC such documentation as shall be required by PNC to enroll Borrower in the PNC autodebit program for processing monthly payments due under the Mortgage Loan. An Autodebit Authorization form is attached as Exhibit K hereto.

21. Borrower shall have funded with PNC all impound accounts as shall be required by PNC under the Mortgage Loan Documents.

22. PNC shall have received satisfactory evidence that, other than the Mortgage Loan, all sources of funds reflected on the final Sources and Uses of Funds Schedule, including, without limitation, (a) all equity contributions to be made to the Borrower prior to the Mortgage Loan Closing in accordance with the terms and conditions of Borrower's partnership agreement, (b) all Approved Subordinate Financing, and (c) all other funds required to be contributed to Borrower and/or otherwise invested in the Project on or prior to the Mortgage Loan Closing, have been received by Borrower and all such funds have been properly invested in or otherwise applied to the Project.

23. PNC shall have received such additional certifications as may be reasonably required by Fannie Mae and PNC consistent with this Commitment and the applicable Fannie Mae Guidelines.

24. No law or regulation shall have been adopted, and no order, judgment or decree of any governmental authority having jurisdiction over Borrower, any Key Principal, any Guarantor and/or the Project shall have been issued, and no litigation shall be pending with respect to Borrower, any Key Principal, any Guarantor and/or the Project, which, in the good faith judgment of PNC, would enjoin, prohibit, restrain or otherwise impose or cause to be imposed any condition which materially and adversely affects, or which may, directly or indirectly, materially and adversely affect, (a) the transactions to be effected pursuant to this Commitment, or (b) the ability of PNC to deliver the Mortgage Loan to Fannie Mae in accordance with and in the time and manner required under the Fannie Mae Guidelines.

25. Borrower shall have delivered to PNC (i) a complete copy of each HAP contract affecting the Project, including all exhibits, amendments and renewals thereto, and any assignments thereof; and (ii) an executed consent by the administrator of each such HAP contract to the collateral assignment thereof in favor of PNC and/or Fannie Mae in connection with the Mortgage Loan.

-9-

Forward Commitment/Unfunded MBS Rate Lock

CONFIDENTIAL                                        PLAINTIFFS_00020834

Oak Creek Village
May 21, 2014

26.    PNC shall have received evidence of compliance with all then-current zoning laws.

27.    PNC shall have received evidence necessary to establish that the Project is eligible for low-income housing tax credits, and that such low-income housing tax credits have been reserved for or allocated to the Project in the required amount, all to be evidenced by PNC's receipt of an IRS Form 8609 with respect to the Project.

28.    PNC shall have received a copy of the certification of substantial completion (AIA Document G704, or its then-current equivalent) executed by the appropriate parties including the architect, the general contractor and the owner representative for the Project.

29.    PNC shall have received final executed copies of the loan documents and regulatory agreements relating to any Approved Subordinate Financing, evidencing that such financing constitutes "soft debt" as defined under Fannie Mae Guidelines, and each such financing shall be subordinated to the Mortgage Loan pursuant to a subordination agreement conforming with applicable Fannie Mae Guidelines.

30.    No more than sixty (60) days prior to the Mortgage Loan Closing, Borrower shall, at its sole cost and expense, obtain an update to the Environmental Assessment (as defined in Section I below) by consultants acceptable to PNC to confirm that no adverse changes have occurred with respect to the environmental condition of the Project from that reflected in such Environmental Assessment[s].

31.    No later than ninety (90) days prior to the Mortgage Loan Closing, Borrower shall have furnished to PNC such information as may be required by PNC in accordance with then-applicable Fannie Mae Guidelines to review the final underwriting for the Project, including, without limitation, a final Sources and Uses of Funds Schedule for the Project.

32.    Borrower shall not have obtained another permanent mortgage loan with respect to the Project, other than as expressly permitted under this Commitment.

33.    Borrower shall have otherwise complied with all delivery and timing requirements imposed herein.

F.    Calculation of Mortgage Loan Amount. The Maximum Mortgage Loan Amount is the amount set forth in Exhibit A hereto; provided, however, that prior to Mortgage Loan Closing the Maximum Mortgage Loan Amount shall be recomputed by PNC in accordance with the provisions of this Section F, and such recomputed amount shall be deemed to be the

-10-

Forward Commitment/Unfunded MBS Rate Lock

CONFIDENTIAL

PLAINTIFFS_00020835

Oak Creek Village
May 21, 2014

Maximum Mortgage Loan Amount for purposes of this Commitment. The Maximum Mortgage Loan Amount determined as of the Mortgage Loan Closing (the "**Mortgage Loan Amount**") will be determined by application of the mortgage loan formula set forth below.

1.     Mortgage Loan Amount.  The Mortgage Loan Amount will be determined by dividing (x) by (y), where (x) is the quotient obtained by dividing the Net Operating Income of the Project by the applicable Debt Service Coverage Factor (as set forth in Exhibit A hereto), and (y) is the Annual Debt Service Constant or, expressed as a formula:

$$x = \text{(Net Operating Income} \div \text{Debt Service Coverage Factor)}$$

Mortgage Loan Amount =

$$y = \text{Annual Debt Service Constant}$$

"**Net Operating Income**" means the difference between: (a) the annualized effective gross income of the Project determined on the basis of the actual effective gross income produced by the Project during the three (3) consecutive full calendar months immediately preceding the month in which the Borrower requests that PNC determine the Mortgage Loan Amount under this Commitment (the "**Three-Month Period**"), as established in accordance with this Commitment; and (b) the annualized expenses for the Project determined in accordance with the Fannie Mae Guidelines and on the basis of the higher of the: (1) annualized expenses of the Project from the date the Project achieves ninety percent (90%) occupancy, plus such other expenses as PNC, in its discretion, may require, or (2) the Underwritten Expenses assumed by PNC in its underwriting of the Mortgage Loan and set forth in Exhibit A hereto; provided, however, that such expense calculations shall exclude taxes, insurance and management fees, each of which must be determined separately and then added to the expense calculation to determine the total Underwritten Expenses.

"**Annual Debt Service Constant**" means the constant annual percentage necessary to fully amortize the Mortgage Loan in level monthly annuity payments over the Amortization Period set forth in Exhibit A hereto (when expressed as a percentage, the Annual Debt Service Constant must be carried out to at least six decimal places).

The Mortgage Loan Amount, as determined in accordance with this Section F shall be rounded to the nearest hundred dollars.

2.     Establishment of Effective Gross Income.  The Mortgage Loan Amount shall be calculated based on the actual effective gross income produced by the Project in the Three-Month Period, including only: (a) rental income from the Units as certified on the Fannie Mae prescribed underwriting certificate (currently known as "**Fannie Mae Form 6460**"), less any concessions as provided or calculated in accordance

-11-

Forward Commitment/Unfunded MBS Rate Lock

CONFIDENTIAL

PLAINTIFFS_00020836

Oak Creek Village
May 21, 2014

with the Fannie Mae Guidelines and any vacancies and thirty (30) day or more delinquencies and (b) any other income permitted by or calculated in accordance with the Fannie Mae Guidelines and used by PNC in underwriting the Mortgage Loan. Notwithstanding the foregoing, in computing the Mortgage Loan Amount, the actual rental income from the Project shall be reduced as necessary to reflect an assumed vacancy equal to the higher of: (a) five percent (5%); or (b) the actual vacancy rate at the time of establishment of the actual effective gross income under this Section F. No other income may be included for purposes of establishing the actual effective gross income produced by the Project in the Three-Month Period. Borrower shall deliver to PNC such information and documentation as shall be required to establish: (a) the percentage of the Units in the Project that have achieved occupancy (in accordance with paragraph 3 below), categorized by bedroom configuration (e.g., one-bedroom, two-bedroom, etc.), size (i.e., square footage) and Unit type (i.e., low-income or market rate); (b) the actual effective gross income and net rental income produced by the Project in the Three-Month Period, and (c) the rental income by Unit type.

3.     Minimum Occupancy Requirement. Borrower shall deliver to PNC, as of the Mortgage Loan Closing Date, a fully executed Certification to Project Rent Roll, on Fannie Mae Form 6460, for each of the three (3) months comprising the Three-Month Period, each certified as true and correct and which is otherwise complete by the Borrower and, with respect to the most recent rent roll, demonstrating that, in each of the three (3) months comprising the Three-Month Period, not less than ninety percent (90%) of the Units were physically occupied under Acceptable Leases (the "**Minimum Occupancy Requirement**"). The rent rolls for the second and third months of the Three-Month Period shall be dated thirty (30) days and sixty (60) days, respectively, from the date of the rent roll for the first month of the Three-Month Period. The Borrower must certify, as of the date of the Mortgage Loan Closing, that there has been no material adverse change in the information contained in the Fannie Mae Form 6460 previously certified to PNC. For purposes of this Commitment, "**Acceptable Leases**" means legally valid, binding and enforceable written lease agreements with bona fide tenants (excluding employees of the Borrower or any Affiliate of the Borrower) providing for initial lease terms of not less than six (6) months and complying with all applicable laws and with the Fannie Mae Guidelines.

4.     Financing of Shortfall. In the event that the Mortgage Loan Amount determined in accordance with this Section F is less than the Maximum Mortgage Loan Amount set forth in Exhibit A hereto, the Borrower shall be required to secure, to the satisfaction of PNC, a source of funds, whether debt or equity, acceptable to PNC, including, without limitation, any cost savings, to cover the difference between the Maximum Mortgage Loan Amount and the Mortgage Loan Amount. If the Borrower has incurred or will incur additional debt to cover such difference, the additional debt must be subordinated to the Mortgage Loan, and the terms,

-12-

Forward Commitment/Unfunded MBS Rate Lock

CONFIDENTIAL                    PLAINTIFFS_00020837

Oak Creek Village
May 21, 2014

conditions and documentation of the additional debt must meet the requirements for subordinate financing as set forth in the Fannie Mae Guidelines.

G.   Commencement and Completion of Improvements.   Borrower shall commence construction and/or rehabilitation of the Improvements, as applicable, within one hundred eighty (180) days from the Commitment Acceptance Date, and shall undertake and complete the same in a good and workmanlike manner, substantially in accordance with the Approved Plans, on a lien-free basis, in compliance with all applicable requirements of governmental authorities having jurisdiction over the Project and in accordance with the applicable Fannie Mae Guidelines. Any modification or deviation from the Approved Plans that (i) decreases the size of the Project or materially reduces the size of any unit or of any material structures comprising the Project in any material respect, (ii) changes the number of residential units, (iii) diminishes the quality of materials or finishes in any material respect, (iv) decreases or modifies any of the material amenities, the main design (such as a reconfiguration of the floor plans) or the asset quality features comprising the Project in any material respect, or (v) result in a change order of $100,000 or more, shall be subject to the prior written approval of PNC.

H.   Single Purpose Entity.   Borrower shall all times be a single asset, single-purpose entity, organized and operated in a manner that renders it unlikely to become insolvent as a result of its own activities and which is adequately insulated from the consequences of any related party's insolvency, as determined by PNC in its discretion.

I.   Environmental Assessment.   PNC confirms that it has received an acceptable Phase I Environmental Assessment with respect to the Project, (the "**Environmental Assessment**"). To the extent disclosed in the Environmental Assessment, Borrower shall undertake such remedial actions and shall enter into such operations and maintenance agreements as PNC shall require in order to address any conditions indicated in the Environmental Assessment and to conform with the Fannie Mae Guidelines. Prior and as a condition to the Mortgage Loan Closing, Borrower shall, at its sole cost and expense, obtain an update to the Environmental Assessment to confirm that it has completed the remediation required under the Environmental Assessment and confirming that no adverse change to the environmental condition of the Project has occurred since the date of the original Environmental Assessment.

-13-

Forward Commitment/Unfunded MBS Rate Lock

   PLAINTIFFS_00020838

Oak Creek Village
May 21, 2014

J.    Subordinate Financing.

1.    Upon the Mortgage Loan Closing, neither the Project, nor any direct or indirect interest of Borrower in the Project, nor any direct or indirect interest in any Key Principal or Guarantor in the Project, may be encumbered by, benefit from, or be otherwise affected, directly or indirectly, by junior or subordinate financing (without regard to whether such junior or subordinate financing will be secured by a lien on the Project or any such direct or indirect interest), or any form of public, quasi-public, public/private or private debt or equity infusion, grant, subsidy, tax relief or abatement, plan, program or other form of assistance (without regard to whether such assistance is or will be secured by a lien on the Project or any such direct or indirect interest), except for the Approved Subordinate Financing.

2.    With respect to any Approved Subordinate Financing, Borrower shall be permitted to record a mortgage or deed of trust securing the same against the Project provided that the following conditions shall have been satisfied: (a) the loan documents evidencing and securing the Approved Subordinate Financing shall be in form and substance reasonably acceptable to PNC and Fannie Mae, and shall conform to the Fannie Mae Guidelines, (b) Borrower and the subordinate lender shall have entered into a Fannie Mae form subordination agreement, substantially in the form attached as Exhibit J hereto, which shall be recorded against the Project, and (c) Fannie Mae's loan policy of title insurance shall reflect (by endorsement or otherwise) that the lien(s) securing such Approved Subordinate Financing is subordinate in all respects to the lien(s) securing the Mortgage Loan.

K.    Fees and Costs to be Paid by Borrower. The following fees and costs shall be due and payable by Borrower:

1.    A loan origination fee equal to one percent (1%) of the Maximum Mortgage Loan Amount (the "**Origination Fee**") shall be due and payable to PNC upon the acceptance of this Commitment by Borrower and shall be paid by certified check or wire transfer. The Origination Fee shall be non-refundable and shall be deemed fully earned upon the acceptance of this Commitment by Borrower.

2.    A Standby Forward Commitment Deposit Fee equal to 25 basis points (0.25%) of the Maximum Mortgage Loan Amount per annum for two year period commencing as of the Rate Lock Date, shall be due and payable to PNC upon the acceptance of this Commitment and shall be paid by certified check or wire transfer. If the Final Delivery Date is extended pursuant to Section L below, an additional Standby Forward Commitment Deposit Fee will be due.

-14-

Forward Commitment/Unfunded MBS Rate Lock

CONFIDENTIAL                    PLAINTIFFS_00020839

Oak Creek Village
May 21, 2014

3.    A "Good Faith Deposit" (as defined in the Delivery Assurance Certificate) in an amount equal to three percent (3%) the Maximum Mortgage Loan Amount (the "**Good Faith Deposit**") shall be deposited, held and, as applicable, applied and/or refunded in accordance with the terms and provisions of the Delivery Assurance Certificate.

4.    A "Non-Delivery Fee" (as defined in the Delivery Assurance Certificate) shall be due and payable in accordance with the terms and provisions of the Delivery Assurance Certificate.

5.    A "Shortfall Fee" (as defined in the Delivery Assurance Certificate) shall be due and payable in accordance with the terms and provisions of the Delivery Assurance Certificate.

6.    A Construction Loan Administration Fee equal to $300.00 per month shall be due and payable on or before the Rate Lock Date for the twenty four (24) month period commencing as of the Rate Lock Date. An additional Construction Loan Administration Fee shall be due and payable to PNC upon each extension of the Final Delivery Date (as set forth in Exhibit A hereto) in an amount equal to the monthly fee set forth above multiplied by the number of months of the extension. All such fees shall be paid by certified check or wire transfer.

7.    Borrower shall pay all reasonable closing fees, costs and expenses incurred by PNC in connection with the Mortgage Loan including, without limitation, legal fees and costs incurred by PNC, engineering, seismic, appraisal, market study and environmental assessment fees, survey fees, title insurance fees and premiums, recording fees, Construction Consultant fees, and any fees and expenses of Fannie Mae, including, without limitation, the fees and expenses of its outside counsel, if any, which are chargeable to PNC pursuant to the Fannie Mae Guidelines, and any fees and expenses associated with the Rate Lock. Borrower further agrees to pay all fees of brokers arising in connection with the execution of this Commitment by PNC or the consummation of transactions contemplated hereby, all whether or not the transactions close. Borrower hereby agrees to indemnify PNC against any and all claims for payment of the forgoing fees, costs and expenses.

8.    Upon the Mortgage Loan Closing, Borrower shall pay to or reimburse PNC for all reasonable out of pocket costs and expenses incurred or anticipated to be incurred by PNC in connection with the re-underwriting of the Mortgage Loan and the satisfaction of the Fannie Mae requirements in connection therewith, including, but not limited to, a $20,000 Mortgage Loan Closing Fee. The payment of such $20,000 Mortgage Loan Closing Fee shall be due and payable upon demand by PNC prior to the commencement of its re-underwriting of the Mortgage Loan.

-15-

Forward Commitment/Unfunded MBS Rate Lock

CONFIDENTIAL

Oak Creek Village
May 21, 2014

9. The obligations of Borrower to pay the fees, costs and expenses set forth in this Commitment shall survive the Mortgage Loan Closing or the termination of this Commitment.

L. Expiration; Termination.

1. This Commitment shall expire if (a) it is not executed by Borrower and each Key Principal and returned to PNC by May 23, 2014 or, (b) Rate Lock has not occurred by the date that is five (5) days after the Commitment Acceptance Date, or (c) if the Mortgage Loan Closing does not occur at least thirty (30) days prior to the Final Delivery Date, which date is subject to extension of up to six (6) months by PNC in its sole and absolute discretion. If any such date is not a business day, then such date shall be extended to the next succeeding business day thereafter. Time is of the essence with respect to any and all deadlines set forth in this Commitment.

2. In connection with any request for an extension of the Final Delivery Date, Borrower shall deliver to PNC, at least ninety (90) days prior to the original Final Delivery Date, (a) a summary report of the status of the Project, including the reasons for any delays, (b) such reports from the Borrower's construction, engineering, architectural or other consultants, and any other persons as required by PNC, to establish that the Project can reasonably be completed in the manner and to the extent required under this Commitment by the Final Delivery Date, as extended, and (c) such information and documentation as shall be reasonably required by PNC to confirm that there have been no material and adverse changes to the status of the Project, Borrower, any Key Principal and/or any Guarantor. In addition, if the Good Faith Deposit is held by Fannie Mae, PNC and/or MBS Investor in the form of a letter of credit, the extension of the Final Delivery Date shall be conditioned upon receipt by Fannie Mae, PNC and/or MBS Investor, as applicable, at least thirty (30) days prior to the original Final Delivery Date, of an amendment to the letter of credit or a replacement letter of credit, accompanied by an appropriate opinion conforming with the Fannie Mae Guidelines, extending the expiration date of such letter of credit to the date which is fifteen (15) days following the Final Delivery Date, as extended. The current Fannie Mae Guidelines with respect to letter of credit matters are attached as Exhibit C hereto.

3. As noted above in Section K 2, and additional Standby Forward Commitment Fee of twenty-five (25) basis points (.25%) of the Maximum Mortgage Loan Amount (per annum – i.e. 12.5 basis points for 6-months) shall be due and payable upon the approval of the 6-month extension described in the Section L. Borrower shall also pay an extension fee of fifty (50) basis points (.50%) of the Maximum Mortgage Loan Amount for a six-month extension which PNC shall collect on behalf of MBS Investor.

-16-

Forward Commitment/Unfunded MBS Rate Lock

CONFIDENTIAL

PLAINTIFFS_00020841

Oak Creek Village
May 21, 2014

M.    Additional Conditions and Provisions.    The following additional conditions and
provisions shall apply to this Commitment:

1.    This Commitment may be terminated by PNC at its option upon (a) the failure by
the Borrower to comply with any of the terms and conditions of this Commitment
and the Fannie Mae Guidelines to the extent any such failure is not cured within
thirty (30) days after notice thereof from PNC, or (b) the filing by or against
Borrower or any Key Principal and/or Guarantor of a petition in bankruptcy or
insolvency, the appointment of a receiver or trustee, the making by Borrower or
any Key Principal and/or Guarantor of an assignment for benefit of creditors, or
the filing by Borrower or any Key Principal and/or Guarantor of a petition or an
arrangement with creditors.

2.    This Commitment is not assignable or transferable by Borrower, by operation of
law or otherwise, except that Borrower may collaterally assign this Commitment
to the Construction Lender.

3.    Counsel for PNC shall review all organizational documentation, title and survey
work, prepare loan documentation and oversee the Mortgage Loan Closing. The
form and substance of each and every document evidencing the Mortgage Loan
and security thereof, or incident thereto, and the title and evidence thereof, shall
be satisfactory to and approved by counsel for PNC.

4.    Borrower hereby gives permission to PNC to issue press releases, subject to
Borrower's prior written consent not to be unreasonably withheld or delayed, and
advertising with respect to the general terms of the Mortgage Loan and the
Project and PNC's participation in connection therewith.    Such media and
marketing materials may include, among other things, information about the
location of the Property, the number of units in the Project, the amenities
associated with the Project, and the Mortgage Loan terms (including economic
terms such as the interest rate and amortization terms).

5.    Borrower hereby represents and warrants that, as of the Commitment Acceptance
Date, (a) all information and materials submitted by or on behalf of Borrower to
PNC in connection with the Project and this Commitment are true, complete and
accurate in all material respects and are not misleading in any material respect;
(b) there has been no material adverse change to the financial condition of
Borrower or the physical condition of the Project from that previously represented
by Borrower to PNC; (c) there has been no material change to either the income
and expenses of the Project or the sources and uses of the funding of the costs of
the Project from that set forth in the Sources and Uses of Funds Schedule; and (d)
(i) there are no actions, suits, proceedings, arbitrations, tenant disputes, labor
disputes or governmental investigations pending or, to the best of Borrower's
knowledge, threatened against or otherwise affecting Borrower, any Key Principal
and/or Guarantor, and/or the Project, which, if successful, could have a material

-17-

Forward Commitment/Unfunded MBS Rate Lock

Oak Creek Village
May 21, 2014

adverse effect on any such party and/or the Project, (ii) none of Borrower or any Key Principal and/or Guarantor are operating under, or is subject to, any order, writ, injunction, decree or demand of any court or any governmental authority which could have a material adverse effect on any such party and/or the Project, and (iii) no actions, suits, proceedings or arbitrations are pending or, to the best knowledge of each of Borrower and each Key Principal and/or Guarantor, threatened against any of them and which, if successful, could have a material adverse effect on any such party and/or the Project.   In the event that, at any time between the Commitment Acceptance Date and Rate Lock, any of the foregoing representations and warranties become untrue in any material respect, Borrower shall immediately notify PNC of the same and provide PNC with any and all additional or updated information required by PNC with respect to the same.

6.     Borrower shall indemnify and hold harmless PNC and each of its officers, directors, employees and agents from and against any and all out-of-pocket losses, damages, liabilities, costs, expenses and legal counsel fees incurred by PNC as a result of (a) the assertion of any claim made in connection with the issuance by PNC of this Commitment, the Mortgage Loan and/or Fannie Mae's involvement in connection with the Mortgage Loan (except to the extent that any such damages are finally proven to have been caused by the gross negligence or willful misconduct of PNC, Fannie Mae and/or any of their respective officers, directors, employees or agents), provided that such claim is based upon or arises from, out of or as a consequence of any act, event, circumstance or omission of, or is otherwise caused by or is within the control or direction of, Borrower or any Key Principal and/or Guarantor, and/or or their respective directors, officers or employees, and (b) any fraud or material misrepresentation by Borrower or any Key Principal and/or Guarantor in connection with the Mortgage Loan.

7.     This Commitment, and the Exhibits attached hereto, contain the complete and entire understanding of the parties hereto of the agreement by PNC with respect to the subject matter hereof, and supersedes all prior agreements, discussions and any previously issued letters of intent or commitments with respect thereto.   No changes or amendments to this Commitment shall be valid unless made in writing and executed by the parties hereto.

8.     This Commitment may be executed in any number of counterparts, each of which when so executed and delivered shall be an original, but all of which shall together constitute one and the same instrument.

9.     The terms and conditions of this Commitment shall survive the Mortgage Loan Closing.

**[Signatures begin on next page]**

-18-

Forward Commitment/Unfunded MBS Rate Lock

CONFIDENTIAL

Oak Creek Village
May 21, 2014

To accept this Commitment, Borrower must execute and return to PNC, by 5:00 p.m. Pacific Time on May 23, 2014, a "pdf" copy of this Commitment, with the original to be delivered by the following business day via overnight delivery. This Commitment shall automatically expire if not accepted as and when set forth above.

**PNC:**

PNC BANK, NATIONAL ASSOCIATION,
a national banking association

By: Kelli A. Tyler,
Vice President

**[Signatures continue on next page]**

S-1

Forward Commitment/Unfunded MBS Rate Lock

CONFIDENTIAL

PLAINTIFFS_00020844

By signing below, Borrower acknowledges its acceptance of this Commitment and agrees to close the Mortgage Loan in accordance with the terms and conditions of this Commitment.

**BORROWER:**

2013 TRAVIS OAK CREEK, LP,
a Texas limited partnership

By:     2013 TRAVIS OAK CREEK GP, LLC,
        a Texas limited liability company,
        its general partner

        By:     _____
                Rene O. Campos,
                Manager

Date: _May 23_____, 2014


By signing below, the Guarantor/Key Principal agrees to be liable to PNC for the obligations of Borrower to pay the fees and expenses set out in Section K of this Commitment and for the indemnification obligations of Borrower set out in Section M(5) of this Commitment.

**KEY PRINCIPAL / GUARANTOR:**

_____
RENE O. CAMPOS

Date: _May 23_____, 2014


Forward Commitment/Unfunded MBS Rate Lock

CONFIDENTIAL

PLAINTIFFS_00020845

## SCHEDULE OF EXHIBITS

Exhibit A:   Commitment Terms and Conditions

Exhibit B:   Sources and Uses of Funds

Exhibit C:   Letter of Credit Requirements – Intentionally Omitted

Exhibit D:   Forms of Delivery Assurance Certificate and Delivery Assurance Security
             Instrument

Exhibit E:   List of Anticipated Mortgage Loan Documents and Approved Modifications

Exhibit F:   Title Insurance Requirements

Exhibit G:   Survey Requirements

Exhibit H:   Insurance Requirements

Exhibit I:   Form of Borrower's Counsel Opinion Letter

Exhibit J:   Form of Subordination Agreement

Exhibit K:   Form of Autodebit Authorization

Exhibit L:   Borrower Organizational Structure

Schedule of Exhibits

Forward Commitment/Unfunded MBS Rate Lock

CONFIDENTIAL                           PLAINTIFFS_00020846

## EXHIBIT A

### COMMITMENT TERMS AND CONDITIONS

This Exhibit A is an integral part of, and establishes additional terms, conditions and requirements of, the PNC Commitment.

## A.   SUMMARY OF MORTGAGE LOAN TERMS

**Project:**              Oak Creek Village, Austin, Texas

**Improvements:**   The Project includes (or will include) the following Units:

| # of Units | # of Bedrooms | Approx. Sq. Footage |
|---|---|---|
| 51 | 1 | 719 |
| 58 | 2 | 1,037 |
| 48 | 3 | 1,382 |
| 16 | 4 | 1,503 |

**Maximum Mortgage Loan Amount:**              $27,300,000.00

**Rate Lock Date:**              May 23, 2014

**PNC and Fannie Mae Fees to be included in Gross Note Rate on Mortgage Loan:**

Fannie Mae Guaranty Fee:      One-hundred twenty-eight (128) basis points per annum applied to the outstanding unpaid principal balance of the Mortgage Loan at the time of calculation.

A-1

Forward Commitment/Unfunded MBS Rate Lock

CONFIDENTIAL                                        PLAINTIFFS_00020847

| | |
|---|---|
| PNC Servicing Fee: | Seven (7) basis points per annum applied to the outstanding unpaid principal balance of the Mortgage Loan at the time of calculation. |
| Pass-Through Rate: | 4.80% per annum |
| Gross Note Rate: | 6.15% per annum |
| **Mortgage Loan Term:** | Fifteen (15) years from the Mortgage Loan Closing Date. |
| **Day-Year Interest Accrual Method:** | Actual/360 Method |
| **Amortization Commencement Date:** | The Amortization Period shall: (i) if the Mortgage Loan Closing Date is the first day of a month, begin on the Mortgage Loan Closing Date; or (ii) if the Mortgage Loan Closing Date is other than the first day of the month, begin on the first day of the calendar month following the month in which the Mortgage Loan Closing Date falls. |
| **Amortization Period:** | 35 years |
| **Yield Maintenance Period:** | 14.5 years |
| **Final Delivery Date:** | Twenty-four (24) months following the date of the acceptance of this Commitment, subject to an extension of up to six (6) months pursuant to <u>Section L</u> of the Commitment. |
| **Low-Income Units:** | 10.4% @ 30% AMI<br>40.5% @ 50% AMI<br>49.1% @ 60% AMI |

**The Mortgage Loan Amount shall be determined based on the formula set forth in <u>Section F</u> of the Commitment and applying the following values:**

| | |
|---|---|
| Applicable Debt Service Coverage Factor: | 1.20 to 1.00 |
| Underwritten Expenses: | The greater of actual expenses or $ 7,064/unit/year (including $250/unit/year for Replacement Reserves) |

A-2

Forward Commitment/Unfunded MBS Rate Lock

CONFIDENTIAL

PLAINTIFFS_00020848

| | |
|---|---|
| Underwritten Net Operating Income: | $2,379,919 |
| Underwritten Interest Rate | 6.23% |
| Maximum Underwritten Loan to Value Ratio: | 90.0% |
| Actual Loan to Value | 68.1% |
| Pricing Tier: | Tier 2 |
| Underwritten Management Fee | 4.0% of effective gross income, per year |

**B.   REQUIRED RESERVES**

Replacement Reserve:      $250.00/Unit/Year minimum in years 1-5 and thereafter, based upon a physical needs assessment.   Replacement Reserve collections will escalate 3% per year.

**C.   BORROWER, KEY PRINCIPAL, AND GUARANTOR**

Borrower:       2013 Travis Oak Creek, LP
3001 Knox St., Suite 400, Dallas, TX 75205
EIN#: 46-1682109

Key Principal:   Rene O. Campos
3001 Knox St., Suite 400, Dallas, TX 75205
EIN#: 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

Guarantor:      Rene O. Campos
3001 Knox St., Suite 400, Dallas, TX 75205
EIN#: 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

**D.   CONSTRUCTION LENDER**

JPMorgan Chase Bank, N.A.
Community Development Group
221 West 6th St., 2nd Floor
Austin, TX 78701

A-3

Forward Commitment/Unfunded MBS Rate Lock

CONFIDENTIAL

PLAINTIFFS_00020849

**E.   APPROVED SUBORDINATE FINANCING**

- Seller Note: The seller of the property (an entity owned by the Guarantor) will provide a seller note representing the value of the property conveyed and carrying an interest rate of 8.5% and a loan term of 20 years. Repayment of principal and interest is soft and payments are subordinated to senior debt and made from available cash flow after other obligations are satisfied. The Seller Note will be secured by a lien on the subject property, subordinate to the Fannie Mae loan.

- General Partner Note: The GP will loan the funds needed for the 3% Good Faith Deposit (1% to Fannie Mae, 2% to MBS Investor) to the project. The note has a maturity date of 2035 and is unsecured.

- Subordinate Financing: Loan of $2,000,000 is funded at closing from the HUD Community Development Block Grant (CDBG) program, and will have a loan term of 40 years, 0% interest rate, and payments deferred to maturity. There will be a restrictive covenant associated with the financing which will require a 40-year affordability period, affordability set asides will not contradict or supersede the LIHTC set asides. Upon foreclosure or deed in lieu, the restrictive covenants have no further force or effect.

**F.   SPECIAL CONDITIONS**

**Underwriting waivers approved by Fannie Mae:**

1. Amortization – utilize 35-year amortization in underwriting with minimum DSCR of 1.20; alternate test utilizing 30-year amortization with minimum DSCR of 1.15

2. Construction Loan Administration Fee – request reduction in fee from $2,500 per month to $300 per month

3. Modified Loss Sharing – due to PNC providing tax credit equity, Fannie Mae requires Lender to take no loss sharing risk in transaction

4. Section 8 Overhang – Lender requests approval to underwrite < 5% Section 8 HAP rent overhang on two out of four unit types

A-4

Forward Commitment/Unfunded MBS Rate Lock

CONFIDENTIAL

## EXHIBIT B

### SOURCES AND USES OF FUNDS

B-1

Forward Commitment/ Unfunded MBS Rate Lock

CONFIDENTIAL

PLAINTIFFS_00020851

**Permanent Sources and Uses**

Oak Creek Village

| Sources | | | Uses | | |
|---|---|---|---|---|---|
| Loan Amount | $ | 27,300,000 | Land Acquisition (appraised value) | $ | 7,330,000 |
| LIHTC Equity | | 18,698,130 | | | |
| City of Austin Loan | | 2,000,000 | Origination Fee | 1.00% | 273,000 |
| Seller Note | | 7,330,000 | Construction Hard Costs | | 35,687,488 |
| Deferred Developer Fee | | 2,967,177 | Owner Carried Items | | – |
| General Partner Equity | | 100 | Soft Costs | | 5,561,272 |
| General Partner Note | | 1,000,000 | Financial Costs | | 739,504 |
| | | | Debt Service Reserve | | 1,529,143 |
| | | | Retenanting Reserve | | 3,000,000 |
| | | | Developer Fee | | 5,175,000 |
| Cash from Borrower | | – | Cash to Borrower | | – |
| **Total Sources** | **$** | **59,295,407** | **Total Uses** | **$** | **59,295,407** |

CONFIDENTIAL

PLAINTIFFS_00020852

## EXHIBIT C

## LETTER OF CREDIT REQUIREMENTS

Intentionally Omitted

C-1

Forward Commitment/ Unfunded MBS Rate Lock

CONFIDENTIAL

PLAINTIFFS_00020853

## EXHIBIT D

### FORMS OF DELIVERY ASSURANCE CERTIFICATE AND DELIVERY ASSURANCE SECURITY INSTRUMENT

D-1

Forward Commitment/ Unfunded MBS Rate Lock

CONFIDENTIAL

PLAINTIFFS_00020854

## DELIVERY ASSURANCE CERTIFICATE

### (MBS Financing Method
### Multifamily Affordable Housing Product Line)

**THIS DELIVERY ASSURANCE CERTIFICATE** (the "**Certificate**") dated as of May 23, 2014 (the "**Effective Date**") is made by 2013 TRAVIS OAK CREEK, LP, a Texas limited partnership, together with its permitted successors and assigns ("**Borrower**"), and delivered to PNC BANK, NATIONAL ASSOCIATION, a national banking association, approved by Fannie Mae as a DUS Multifamily Affordable Housing Lender of conventional mortgage loans (together with its successors and assigns, "**DUS Lender**").

### RECITALS

A.    DUS Lender has issued a commitment dated May 21, 2014 (the "**Permanent Mortgage Loan Commitment**") to make a permanent mortgage loan (the "**Permanent Mortgage Loan**") to Borrower in an original principal amount not to exceed Twenty-Seven Million Three Hundred Thousand Dollars ($27,300,000) (the "**Maximum Mortgage Loan Amount**") to provide permanent mortgage financing for a multifamily housing project known as Oak Creek Village, located in Austin, Texas (the "**Project**").

B.    Pursuant to an MBS Trade Confirmation dated as of May [___], 2014 (the "**MBS Trade Confirmation**"), DUS Lender has agreed to sell, and PNC Capital Markets LLC ("**MBS Purchaser**") has agreed to purchase, on the terms and conditions set forth in the MBS Trade Confirmation, one or more Fannie Mae Mortgage-Backed Securities (the "**Security**") backed by the Permanent Mortgage Loan.

C.    As more particularly described in the Permanent Mortgage Loan Commitment, Borrower's obligations under the Permanent Mortgage Loan Commitment are subject to various conditions including (1) completion of construction (or rehabilitation) of the Project in accordance with the Approved Plans, and (2) lease-up and stabilization of the Project at not less than ninety percent (90%) occupancy for three consecutive calendar months as adjusted for economic vacancy in accordance with the DUS Guide (the "**Minimum Occupancy Requirement**") unless waived by Fannie Mae, both conditions to be satisfied on or before May 23, 2016, or a later date as extended by DUS Lender and by Fannie Mae (the "**Final Delivery Date**").

D.    In consideration of DUS Lender's agreement to lock the interest rate on the Permanent Mortgage Loan upon Borrower's acceptance of the Permanent Mortgage Loan Commitment (the "**Rate Lock**"), DUS Lender requires that Borrower execute and deliver this Certificate, together with a deed of trust securing Borrower's obligations under this Certificate (the "**Security Instrument**").

E.    All terms used in this Certificate and defined in this Certificate or in any of the attached Exhibits shall have the meanings so given.

In consideration of the above recitals and the promises contained in this Certificate, the receipt and sufficiency of which are acknowledged, Borrower agrees as follows:

CONFIDENTIAL

PLAINTIFFS_00020855

**SECTION 1.** **Borrower's Agreement to Close Permanent Mortgage Loan.** In consideration of DUS Lender's Permanent Mortgage Loan Commitment and Rate Lock, Borrower agrees to close the Permanent Mortgage Loan with DUS Lender (the "**Permanent Mortgage Loan Closing**") not less than 30 days prior to the Final Delivery Date on the terms set forth in the Permanent Mortgage Loan Commitment, as such terms may be changed in accordance with Section 2(d) below, and for the amount at which the Permanent Mortgage Loan underwrites at the time of the Permanent Mortgage Loan Closing as determined by DUS Lender.

**SECTION 2.** **Borrower Acknowledgements.** Borrower acknowledges and agrees that:

(a) Fannie Mae has agreed to confirm its commitment to purchase the Permanent Mortgage Loan from DUS Lender, and to issue the Security to MBS Purchaser under Forward Commitment Confirmation number 874426 (the "**Forward Commitment**").

(b) MBS Purchaser has agreed to purchase the Security as evidenced by the MBS Trade Confirmation.

(c) [Intentionally Omitted]

(d) Fannie Mae shall have the right, from time to time to do any or all of the following, in which event Borrower shall remain obligated to close the Permanent Mortgage Loan as set out in Section 1 above:

(1) extend the Final Delivery Date;

(2) lessen the Minimum Occupancy Requirement by the percentage of occupancy, the type of occupancy or the time period over which the occupancy requirement must be met; and

(3) waive any condition to the closing or delivery of the Permanent Mortgage Loan or any term or condition of the Permanent Mortgage Loan Commitment or the Forward Commitment or to otherwise lessen any standard of performance or achievement required of the Property or Borrower or any Key Principal of Borrower as a condition to the closing or delivery of the Permanent Mortgage Loan under the Permanent Mortgage Loan Commitment or the Forward Commitment as it may deem appropriate in its sole discretion.

**SECTION 3.** **Payment, Allocation and Use of Good Faith Deposit.**

(a) Pursuant to the Forward Commitment and this Certificate, Fannie Mae and DUS Lender require Borrower to provide a good faith deposit in an amount equal to three percent (3%) of the Maximum Mortgage Loan Amount (the "**Good Faith Deposit**"). Borrower has paid the Good Faith Deposit in an amount equal to $819,000, one-third of which (i.e., $273,000) shall be held by Fannie Mae in a non-interest bearing account (the "**Fannie Mae GFD Allocation**"), and two-thirds of which (i.e., $546,000) shall be held by DUS Lender for the account of MBS Purchaser in and interest-bearing account selected by DUS Lender in its commercially reasonable discretion (the "**MBS Purchaser GFD Allocation**").

(b) Should a Non-Delivery Fee become due to Fannie Mae and MBS Purchaser pursuant to Section 4 below, then (i) Fannie Mae shall apply the Fannie Mae GFD Allocation toward the applicable portion of the Non-Delivery Fee that is due to Fannie Mae, and (ii) DUS Lender shall apply the

**Delivery Assurance Certificate - MBS Financing Method**
**Multifamily Affordable Housing Product Line**

Page 2

CONFIDENTIAL

PLAINTIFFS_00020856

MBS Purchaser GFD Allocation toward the applicable portion of the Non-Delivery Fee that is due to MBS Purchaser. If the amount of any such fees due to Fannie Mae and/or MBS Purchaser exceeds, respectively, the amount of the Fannie Mae GFD Allocation and/or the MBS Purchaser GFD Allocation, then Borrower shall be responsible to pay the excess amount(s) due to Fannie Mae and/or to DUS Lender for the account of MBS Purchaser, as applicable.

(c)   Should a Shortfall Fee become due to MBS Purchaser pursuant to Section 5 below (it being understood that no Shortfall Fee shall be due to Fannie Mae under any circumstances), then DUS Lender shall apply the MBS Purchaser GFD Allocation toward the Shortfall Fee that is due to MBS Purchaser. If the amount of the Shortfall Fee due to MBS Purchaser exceeds the amount of the MBS Purchaser GFD Allocation, then Borrower shall be responsible to pay the excess amount due to DUS Lender for the account of MBS Purchaser.

(d)   If (i) no Non-Delivery Fee or Shortfall Fee becomes due, or (ii) the amount of any Shortfall Fee paid to DUS Lender for the account of MBS Purchaser pursuant to Section 5 below is less than the amount of the MBS Purchaser GFD Allocation, then Fannie Mae and DUS Lender shall refund, respectively, the Fannie Mae GFD Allocation and the MBS Purchaser GFD Allocation, or any unapplied portion(s) thereof, with such refund(s) to be paid to Borrower promptly following DUS Lender's delivery of the Permanent Mortgage Loan to Fannie Mae and Fannie Mae's delivery of the Security to MBS Purchaser.

**SECTION 4.   Non-Delivery Fee.   If** (i) Fannie Mae terminates the Forward Commitment in accordance with its terms before the Final Delivery Date, or (ii) by no later than the Final Delivery Date, the Permanent Mortgage Loan has not been made by DUS Lender to Borrower, or DUS Lender has not delivered the Permanent Mortgage Loan for purchase to Fannie Mae, or Fannie Mae determines that the Mortgage Loan Delivery Package for the Permanent Mortgage Loan is not acceptable (each, a "**Delivery Failure**"), then Borrower shall pay a non-delivery fee (the "**Non-Delivery Fee**") to (a) Fannie Mae, and (b) DUS Lender for account of MBS Purchaser, in accordance with the provisions of this Section 4. The Non-Delivery Fee shall be due and payable on the first to occur of (1) the date Fannie Mae terminates the Forward Commitment in accordance with its terms, or (2) if there is a Delivery Failure, the Final Delivery Date. If the Permanent Mortgage Loan closes, but the amount of the Permanent Mortgage Loan is less than ninety percent (90%) of the Maximum Mortgage Loan Amount (as further addressed in Section 5 below), then a Non-Delivery Fee shall not be due under this Section 4, but a Shortfall Fee may be due pursuant to the terms and provisions of Section 5 below.

(a)   **Stabilization Failure**.   If the Permanent Mortgage Loan fails to close on or before the Final Delivery Date because, in spite of the best efforts of Borrower, the Project fails to satisfy the Minimum Occupancy Requirement on or before the Final Delivery Date (a "**Stabilization Failure**"), then the Non-Delivery Fee shall be calculated and paid as set forth in Exhibit B to this Certificate.

(b)   **Any Other Reason**.   If the Permanent Mortgage Loan fails to close on or before the Final Delivery Date for any reason other than a Stabilization Failure, or if Fannie Mae terminates the Forward Commitment in accordance with its terms before the Final Delivery Date, then the Non-Delivery Fee shall be calculated and paid as set forth in Exhibit C to this Certificate.

(c)   **Application of Good Faith Deposit Toward Non-Delivery Fee**.   Fannie Mae shall apply the Fannie Mae GFD Allocation toward the portion of the Non-Delivery Fee due to Fannie Mae, and DUS Lender shall apply the MBS Purchaser GFD Allocation toward the portion of the Non-Delivery Fee due to DUS Lender for the account of MBS Purchaser. If the amount of the Non-Delivery

Delivery Assurance Certificate - MBS Financing Method
Multifamily Affordable Housing Product Line

Page 3

CONFIDENTIAL

Fee exceeds the Good Faith Deposit, Borrower shall be responsible to pay the excess amount due to Fannie Mae and/or to DUS Lender for the account of MBS Purchaser, as applicable.

(d)  **Savings Provision**.  Nothing in this <u>Section 4</u> shall be interpreted to allow Borrower to avoid its obligation to close the Permanent Mortgage Loan as required by <u>Section 1</u> above.

**SECTION 5.  Shortfall Fee**.  If the Permanent Mortgage Loan closes, but the principal amount of the Permanent Mortgage Loan (the "**Actual Loan Amount**") is less than ninety percent (90%) of the Maximum Mortgage Loan Amount because the principal amount of the Permanent Mortgage Loan was reduced as a condition to delivery of the Permanent Mortgage Loan as determined by DUS Lender, then Borrower agrees to pay a shortfall fee in an amount which shall be calculated and paid as set forth in <u>Exhibit D</u> (the "**Shortfall Fee**").  The Shortfall Fee shall be due and payable on the closing date of the Permanent Mortgage Loan and payment of the Shortfall Fee shall be a condition precedent to the closing of the Permanent Mortgage Loan.  DUS Lender shall apply the MBS Purchaser GFD Allocation toward any such Shortfall Fee.  If the amount of such Shortfall Fee exceeds the MBS Purchaser GFD Allocation, Borrower shall be responsible to pay the excess amount due to DUS Lender for the account of MBS Purchaser.

**SECTION 6.  Reasonable Estimates**.  Borrower recognizes that the occurrence of any event which gives rise to the payment of a fee under <u>Sections 4</u> or <u>5</u> above will result in DUS Lender and/or MBS Purchaser incurring additional expenses, loss to DUS Lender in not being able to originate the Permanent Mortgage Loan and to MBS Purchaser in not being able to purchase and own the Security and the interest to accrue thereon and frustration or impairment of DUS Lender's ability and/or MBS Purchaser's ability to meet its respective commitments to third parties.  Borrower agrees that, upon the occurrence of any such event, each of DUS Lender and MBS Purchaser shall be entitled to damages for the detriment caused thereby, but that it is extremely difficult and impractical to ascertain the extent of such damages.  Borrower therefore acknowledges and agrees that the compensatory fees referred to in <u>Sections 4</u> and <u>5</u> above represent reasonable estimates of such damages to DUS Lender and to MBS Purchaser.  Borrower further acknowledges that this provision is a material part of the consideration for the Permanent Mortgage Loan Commitment, Rate Lock and the Forward Commitment.

**SECTION 7.  Interest**.  Borrower agrees to pay interest on the unpaid balance of any fee which becomes due under this Certificate from the date upon which such fee first becomes due to the date upon which such fee is paid in full at a per annum interest rate equal to the sum of the Prime Rate plus four percent (4%), or, if less, the highest maximum rate permitted to be charged by applicable law.  The term "**Prime Rate**" means an annual rate of interest equal to the prime rate of interest as reported from day to day in <u>The Wall Street Journal</u> (notwithstanding that such publication shows the prime rate of interest for the preceding Business Day) as the base rate on corporate loans posted by at least seventy-five percent (75%) of the nation's 30 largest banks, or, if such rate is no longer available, then the base rate or prime rate of interest of any "Money Center" bank designated from time to time by DUS Lender, in its discretion.  Any change in the interest rate under this Certificate due to a change in the prime rate of interest as reported in <u>The Wall Street Journal</u> shall take effect on the date of publication.  Interest shall be computed on the basis of a 360-day year and twelve 30-day months.

**SECTION 8.  Additional Security**.  As security for the performance of Borrower's obligations under this Certificate, Borrower has delivered to DUS Lender the Security Instrument to be filed of record against the Project.

**SECTION 9.  Remedies**.  Should any fee become payable under <u>Sections 4</u> or <u>5</u> above and not be paid when due, DUS Lender shall have the right to take such action at law or in equity, without notice

**Delivery Assurance Certificate  - MBS Financing Method**
**Multifamily Affordable Housing Product Line**

Page 4

CONFIDENTIAL

or demand, as it deems advisable to protect and enforce the rights of DUS Lender against Borrower and/or in and to the Project, and to exercise any and all rights and remedies available to it under this Certificate and the Security Instrument.

SECTION 10. **No Remedy Exclusive**. Each right, power and remedy of DUS Lender under this Certificate or under applicable laws shall be cumulative and concurrent, and the exercise of any one or more of them shall not preclude the simultaneous or later exercise by DUS Lender of any or all such other rights, powers or remedies. No failure or delay by DUS Lender to insist upon the strict performance of any one or more provisions of this Certificate or to exercise any right, power or remedy under this Certificate shall constitute a waiver thereof or preclude DUS Lender from exercising any such right, power or remedy. In order to entitle DUS Lender to exercise any remedy reserved to DUS Lender, it shall not be necessary for DUS Lender to give any notice thereof.

SECTION 11. **Limits on Personal Liability.** DUS Lender's only recourse for the satisfaction of the indebtedness evidenced by this Certificate and the performance of any other obligations of Borrower under this Certificate or the Security Instrument shall be DUS Lender's exercise of its rights and remedies with respect to that certain real property and the other property described as security in the Security Instrument.

SECTION 12. **Successors and Assigns Bound.** This Certificate shall be binding upon Borrower and its successors and assigns, and shall inure to the benefit of and may be enforced by DUS Lender and its successors, transferees and assigns. Borrower shall not assign any of its rights and obligations under this Certificate without the prior written consent of DUS Lender.

SECTION 13. **Entire Agreement; Amendment and Waiver.** This Certificate, together with the attached Exhibits, contains the complete and entire understanding of Borrower with respect to the matters covered and no change or amendment shall be valid unless it is made in writing and executed by Borrower with the written consent of DUS Lender. No specific waiver of any of the terms of this Certificate by DUS Lender shall be considered as a general waiver.

SECTION 14. **Notices**. All notices given under this Certificate shall be in writing to the other party, at the address and in the manner set forth in the Security Instrument.

SECTION 15. **Severability**. The invalidity, illegality or unenforceability of any provision of this Certificate pursuant to judicial decree shall not affect the validity or enforceability of any other provision of this Certificate, all of which shall remain in full force and effect.

SECTION 16. **Applicable Law**. This Certificate shall be governed by and construed in accordance with the laws of the jurisdiction in which the Project is located.

[Continued on next page]

CONFIDENTIAL

PLAINTIFFS_00020859

SECTION 17. **Acceptance.** Borrower waives any requirement that DUS Lender accepts or give notice of acceptance of this Certificate.

**BORROWER:**

2013 TRAVIS OAK CREEK, LP.,
a Texas limited partnership

By:     2013 Travis Oak Creek GP, LLC,
        a Texas limited liability company,
        its general partner

        By:     _____
                Rene O. Campos,
                Manager

CONFIDENTIAL

PLAINTIFFS_00020860

## Exhibit A

## DEFINITIONS

The following defined terms shall have the meanings set forth in this Exhibit A and shall be applicable to the Certificate to which this Exhibit A is attached:

**Approved Plans**:  Plans, drawings, sketches, specifications, reports, modifications and change orders prepared by the Project Consultants and approved by the Architectural Consultant.

**Architectural Consultant**:  The architect engaged to provide services on behalf of DUS Lender and Fannie Mae with respect to the Project.

**Conditions to Delivery**: Fannie Mae's obligation to purchase the Permanent Mortgage Loan and deliver the Security is subject to Fannie Mae's determination, in its sole and absolute discretion, that the conditions to delivery set forth below, and each special condition set forth in the Permanent Mortgage Loan Commitment (each, a "**Condition to Delivery**") have been satisfied:

(i)  Completion of the Project.  As evidenced by the satisfaction of the requirements set forth in subparagraph (ii) below, Borrower has completed the Project (including all amenities, landscaping, signs, parking and the like, except for minor punch list and weather-sensitive items for which sufficient funds have been reserved in a completion/repair reserve fund) as of the Final Delivery Date (a) in a good and workmanlike manner and substantially in accordance with the Approved Plans; (b) on a lien-free basis; (c) in compliance with all applicable requirements of all governmental authorities having jurisdiction over the Project, including, without limitation, all applicable laws, building codes, zoning requirements, subdivision requirements, fire and safety laws, the requirements of the Americans with Disabilities Act and, if applicable, the design and construction requirements established pursuant to the Fair Housing Act, as amended; and (d) in compliance with the environmental requirements of the DUS Guide.

(ii)  Evidence of Completion.  All certificates and reports of the Project Architect, the Architectural Consultant and other Project Consultants as required by the DUS Guide to establish completion of the Improvements in accordance with the requirements of the DUS Guide have been provided to or obtained by DUS Lender, including (a) evidence of the availability of all public utilities necessary to the operation of the Project; (b) true and correct copies of each unconditional certificate of occupancy (or the local equivalent of a certificate of occupancy), issued by the governmental authority empowered to exercise jurisdiction over the Project and to properly issue such certificates, for all portions of the Project for which such a certificate is required or, if certificates of occupancy are not required by local law, evidence that the Project has passed all inspections and received all approvals which are conditions precedent to occupancy of all parts of the Improvements; (c) true and correct copies of all operating permits and licenses for the Project; and (d) certificates from the Architectural Consultant and the Project Consultants, including the Project Architect, in form and substance acceptable to DUS Lender and Fannie Mae, in its discretion, stating that the Improvements have been completed substantially in accordance with the Approved Plans.

CONFIDENTIAL                                                    PLAINTIFFS_00020861

(iii)   <u>Timely Delivery of Mortgage Loan Delivery Package</u>.  DUS Lender has timely delivered the Mortgage Loan Delivery Package to Fannie Mae, including, where appropriate, executed assignments or endorsements of the Permanent Mortgage Loan Documents.

(iv)    <u>Payment of Fees</u>.  All required fees under the Forward Commitment have been paid.

(v)     <u>Equity Contributions</u>.  Borrower has provided to DUS Lender a certificate, or other evidence satisfactory to Fannie Mae, confirming that all funds reflected on Borrower's sources and uses of funds statement, including but not limited to all equity contributions to Borrower required to be paid in as of the time of Mortgage Loan Delivery, have been received by Borrower and have been properly invested in the Project as of the time of Mortgage Loan Delivery.

(vi)    <u>Evidence of Low-Income Housing Credit Reservation or Allocation</u>.  The Project (if it is a Multifamily Affordable Housing Property as specified in the DUS Guide) is eligible for Low-Income Housing Tax Credits, and Low-Income Housing Tax Credits have been reserved for, or allocated to, the Project in the required amount.

(vii)   <u>Continued Compliance with Fannie Mae Eligibility and Underwriting Standards</u>.  Borrower under the Permanent Mortgage Loan must remain unchanged, subject to the right of Borrower's construction lender for the Project to provide a Substitute Borrower; Borrower must continue to be an eligible borrower under the DUS Guide; Borrower must continue to own the Project; there must be no change in the Key Principals and no reduction in the Key Principals' direct or indirect ownership interest in and control over Borrower; and there must be no material adverse change in the condition, financial or otherwise, of Borrower or any Key Principal.

(viii)  <u>Minimum Occupancy Requirement</u>. The Minimum Occupancy Requirement is achieved.

In spite of anything to the contrary contained in this definition, the term "Conditions to Delivery" shall be automatically and correspondingly adjusted if and to the extent Fannie Mae waives any of the conditions set out above or otherwise lessens any standard of performance or achievement required of the Property, Borrower or any Key Principal, all as set out in <u>Section 2(d)</u> of the Certificate.

**DUS Guide**:  Fannie Mae's Delegated Underwriting and Servicing Guide in its present form and as amended, modified, supplemented or reissued from time to time by Fannie Mae, including any DUS Lender Memos, announcements or guide updates (all references to Parts, Chapters, Sections and other subdivisions of the DUS Guide shall be deemed references to (a) the Parts; Chapters, Sections and other subdivisions in effect on the Effective Date; and (b) any successor provisions to such Parts, Chapters, Sections and other subdivisions.

**Improvements**:  For the Project, all improvements on the land described in the Permanent Mortgage Loan Commitment, whether existing or to be reconstructed and, if existing, without regard to whether being rehabilitated.

**Mortgage Loan Delivery**:  DUS Lender's assignment and delivery of the Permanent Mortgage Loan (including all Permanent Mortgage Loan Documents) to Fannie Mae.

Delivery Assurance Certificate - MBS Financing Method                              Page A-2
Multifamily Affordable Housing Product Line

CONFIDENTIAL

**Mortgage Loan Delivery Package**: The loan and loan-related documents required to be delivered to Fannie Mae in connection with Fannie Mae's purchase of a mortgage loan as specified in the Fannie Mae DUS Guide.

**Permanent Mortgage Loan Documents**: All documents to be executed and delivered by Borrower in connection with the Permanent Mortgage Loan, which must, in form and substance, satisfy the requirements of the DUS Guide.

**Project Architect**: For the Project, the Architect employed or engaged by Borrower to prepare the plans and specifications for the Project.

**Project Consultants**: All architects (except the Architectural Consultant), landscape architects, structural engineers, civil engineers, environmental engineers, mechanical engineers, electrical engineers and other architects, designers, engineers, consultants and professionals engaged to provide services with respect to the Project.

**Substitute Borrower**: One who is approved by DUS Lender and meets the requirements of the DUS Guide. Fannie Mae must be reimbursed in full for all costs, expenses and fees owing to Fannie Mae in connection with substitution of the Substitute Borrower. The Substitute Borrower must be substituted in a timely manner in order to effect the Mortgage Loan Delivery on or before the Final Delivery Date.

CONFIDENTIAL

PLAINTIFFS_00020863

## Exhibit B

### Non-Delivery Fee
### (Stabilization Failure)

The Non-Delivery Fee under this Exhibit B shall be the greater of:

(1)    three percent (3%) of the Maximum Mortgage Loan Amount; or

(2)    an amount calculated by multiplying:

- the difference between (i) the Note Rate for the Permanent Mortgage Loan in the Forward Commitment less the Servicing Fee (the "**Required Net Coupon Rate**") and (ii) the Required Net Coupon Rate offered for purchase by Fannie Mae for an immediate funding loan with the same terms as the Permanent Mortgage Loan in the Forward Commitment on the Final Delivery Date or, if terminated prior to the Final Delivery Date, the last day of the calendar month in which the Forward Commitment is terminated; TIMES

- the Maximum Mortgage Loan Amount; TIMES

- a present value factor, calculated using the following formula:

$$\frac{1 - (1+r)^{-n/12}}{r}$$

- where:

    $r$    =    the Required Net Coupon Rate used in (ii) above; and

    $n$    =    the number of months in the Yield Maintenance Period of the Permanent Mortgage Loan in the Forward Commitment.

One-third (1/3rd) of the Non-Delivery Fee as calculated under just line (1) above (i.e., one percent (1%) of the Maximum Mortgage Loan Amount) shall be due and payable to Fannie Mae per the terms of the Forward Commitment, and the remainder of the Non-Delivery Fee as calculated under lines (1) and (2) above, as applicable, shall be due and payable to DUS Lender for the account of MBS Purchaser per the terms of the MBS Trade Confirmation.

CONFIDENTIAL    PLAINTIFFS_00020864

**Exhibit C**

**Non-Delivery Fee
(Any Other Reason)**

The Non-Delivery Fee under this Exhibit C shall be the greater of:

(1)     three percent (3%) of the Maximum Mortgage Loan Amount; or

(2)     an amount calculated by multiplying:

- the difference between (i) the Note Rate for the Permanent Mortgage Loan in the Forward Commitment and (ii) the yield rate (the "**Yield Rate**") of the U.S. Treasury security selected by Fannie Mae whose maturity is closest to the end of the Yield Maintenance Period of the Permanent Mortgage Loan in the Forward Commitment on the Final Delivery Date, or if terminated prior to the Final Delivery Date, the last day of the calendar month in which the Forward Commitment is terminated, as the Yield Rate is reported in *The Wall Street Journal*; TIMES

- the Maximum Mortgage Loan Amount; TIMES

- a present value factor, calculated using the following formula:

$$\frac{1 - (1+r)^{-n/12}}{r}$$

- where:

    r   =    the Yield Rate; and

    n   =    the number of months in the Yield Maintenance Period of the Permanent Mortgage Loan in the Forward Commitment.

One-third (1/3rd) of the Non-Delivery Fee as calculated under just line (1) above (i.e., one percent (1%) of the Maximum Mortgage Loan Amount) shall be due and payable to Fannie Mae per the terms of the Forward Commitment, and the remainder of the Non-Delivery Fee as calculated under lines (1) and (2) above, as applicable, shall be due and payable to DUS Lender for the account of MBS Purchaser per the terms of the MBS Trade Confirmation.

CONFIDENTIAL

PLAINTIFFS_00020865

## Exhibit D

### Shortfall Fee

As used in this Exhibit D, the term **"Shortfall Amount"** shall mean the difference between (i) the amount which is ninety percent (90%) of the Maximum Mortgage Loan Amount, and (ii) the Actual Loan Amount.

The Shortfall Fee under this Exhibit D shall be the greater of:

(1)     two percent (2%) of the Shortfall Amount; or

(2)     an amount calculated by multiplying:

- the difference between (i) the Note Rate for the Permanent Mortgage Loan in the Forward Commitment less the Servicing Fee (the **"Required Net Coupon Rate"**) and (ii) the Required Net Coupon Rate offered for purchase by Fannie Mae for an immediate funding loan with the same terms as the Permanent Mortgage Loan in the Forward Commitment on the date the Lender delivers the Permanent Mortgage Loan to Fannie Mae; TIMES

- the Shortfall Amount; TIMES

- a present value factor, calculated using the following formula:

$$\frac{1 - (1+r)^{-n/12}}{r}$$

- where:

    $r$ = the Required Net Coupon Rate used in (ii) above; and

    $n$ = the number of months in the Yield Maintenance Period of the Permanent Mortgage Loan in the Forward Commitment.

The Shortfall Fee calculated under lines (1) and (2) above, as applicable, shall be due and payable to DUS Lender for the account of MBS Purchaser per the terms of the MBS Trade Confirmation.

CONFIDENTIAL

Prepared by, and after recording
return to:

PNC Bank, National Association
26901 Agoura Rd., Suite 200
Calabasas Hills, California 91301
PNC Loan No. 310401235
Fannie Mae No. 874426

**PERMANENT MORTGAGE LOAN COMMITMENT**
**MULTIFAMILY DEED OF TRUST,**
**ASSIGNMENT OF LEASES AND RENTS,**
**SECURITY AGREEMENT**
**AND FIXTURE FILING**

**(TEXAS)**

**Fannie Mae Multifamily Security Instrument**          **Form 6025.TX**
**Modified – Permanent Mortgage Loan Commitment**
**Texas**                                    **06-12**          **© 2012 Fannie Mae**

CONFIDENTIAL                                    PLAINTIFFS_00020867

# PERMANENT MORTGAGE LOAN COMMITMENT
## MULTIFAMILY DEED OF TRUST,
## ASSIGNMENT OF LEASES AND RENTS,
## SECURITY AGREEMENT
## AND FIXTURE FILING

This PERMANENT MORTGAGE LOAN COMMITMENT MULTIFAMILY DEED OF TRUST, ASSIGNMENT OF LEASES AND RENTS, SECURITY AGREEMENT AND FIXTURE FILING (as amended, restated, replaced, supplemented, or otherwise modified from time to time, the "**Security Instrument**") dated as of May 23, 2014, is executed by  2013 TRAVIS OAK CREEK, LP, a limited partnership organized and existing under the laws of Texas, as grantor ("**Borrower**"), to JAMES CLUTTS, JR., as trustee ("**Trustee**"), for the benefit of PNC BANK, NATIONAL ASSOCIATION, a national banking association, as beneficiary ("**Lender**").

Borrower, in consideration of Lender's issuance of a commitment to make a permanent mortgage loan to Borrower in the original principal amount of $27,300,000, subject to the satisfaction of all conditions precedent set forth in that certain Forward Commitment for Fixed Rate Mortgage Loan dated May 21, 2014, executed by Lender and Borrower (the "**Commitment**"), and that certain Delivery Assurance Certificate dated as of the date hereof, executed by Borrower in favor of Lender (the "**Delivery Assurance Certificate**"), irrevocably and unconditionally mortgages, grants, warrants, conveys, bargains, sells, and assigns to Trustee, in trust, for benefit of Lender, with power of sale and right of entry and possession, the Mortgaged Property (as defined in this Security Instrument), including the real property located in Travis County, State of Texas, and described in Exhibit A attached to this Security Instrument and incorporated by reference (the "**Land**"), to have and to hold such Mortgaged Property unto Trustee and Trustee's successors and assigns, forever; Borrower hereby releasing, relinquishing and waiving, to the fullest extent allowed by law, all rights and benefits, if any, under and by virtue of the homestead exemption laws of the Property Jurisdiction (as defined in this Security Instrument), if applicable.

Borrower represents and warrants that Borrower is lawfully seized of the Mortgaged Property and has the right, power and authority to mortgage, grant, warrant, convey, bargain, sell, and assign the Mortgaged Property, and that the Mortgaged Property is not encumbered by any Lien (as defined in this Security Instrument) other than Permitted Encumbrances (as defined in this Security Instrument). Borrower covenants that Borrower will warrant and defend the title to the Mortgaged Property against all claims and demands other than Permitted Encumbrances.

Borrower, and by their acceptance hereof, each of Trustee and Lender covenants and agrees as follows:

| | | |
|---|---|---|
| Fannie Mae Multifamily Security Instrument | Form 6025.TX | Page 1 |
| Modified – Permanent Mortgage Loan Commitment | | |
| Texas | 06-12 | © 2012 Fannie Mae |

CONFIDENTIAL

1.    **Defined Terms.**

Capitalized terms used and not specifically defined herein have the meanings given to such terms in the Commitment and/or the Delivery Assurance Certificate, as applicable. All terms used and not specifically defined herein, but which are otherwise defined by the UCC, shall have the meanings assigned to them by the UCC. The following terms, when used in this Security Instrument, shall have the following meanings:

"**Condemnation Action**" means any action or proceeding, however characterized or named, relating to any condemnation or other taking, or conveyance in lieu thereof, of all or any part of the Mortgaged Property, whether direct or indirect.

"**Enforcement Costs**" means all expenses and costs, including reasonable attorneys' fees and expenses, fees and out-of-pocket expenses of expert witnesses and costs of investigation, incurred by Lender as a result of any Event of Default under the Delivery Assurance Certificate or in connection with efforts to collect any amount due under the Loan Commitment Documents, or to enforce the provisions of the Delivery Assurance Certificate or any of the other Loan Commitment Documents, including those incurred in post-judgment collection efforts and in any bankruptcy or insolvency proceeding (including any action for relief from the automatic stay of any bankruptcy proceeding or Foreclosure Event) or judicial or non-judicial foreclosure proceeding, to the extent permitted by law.

"**Environmental Laws**" means (a) all present and future federal, state, and local laws, ordinances, regulations, standards, rules, policies, and other governmental requirements, administrative rulings, court judgments, and decrees, and all amendments thereto, relating to pollution or protection of human health, wildlife, wetlands, natural resources or the environment (including ambient air, surface water, ground water, land surface, or subsurface strata) including such laws governing or regulating the use, generation, storage, removal, remediation, recovery, treatment, handling, transport, disposal, control, release, discharge of, or exposure to, Hazardous Materials. Environmental Laws include the Comprehensive Environmental Response, Compensation, and Liability Act, 42 U.S.C. Section 9601, et seq., the Resource Conservation and Recovery Act, 42 U.S.C. Section 6901, et seq., the Toxic Substances Control Act, 15 U.S.C. Section 2601, et seq., the Federal Water Pollution Control Act, 33 U.S.C. Section 1251, et seq., the Hazardous Materials Transportation Act, 49 U.S.C. Section 5101, et seq., the Clean Air Act, 42 U.S.C. Section 7401, et seq., the Safe Drinking Water Act, 42 U.S.C. Section 300f, et seq., the Occupational Safety and Health Act, 29 U.S.C. Chapter 15, et seq., the Oil Pollution Act of 1990, 33 U.S.C. Section 2701, et seq., the Federal Insecticide, Fungicide, and Rodenticide Act, 7 U.S.C. Section 136, et seq., and the River and Harbors Appropriation Act, 33 U.S.C. Section 403, et seq., and their state and local analogs, as any such statutes may be amended, restated, modified, or supplemented from time to time, and (b) all voluntary cleanup programs and/or brownfields programs under federal, state or local law, as may be amended, restated, modified, or supplemented from time to time.

CONFIDENTIAL

PLAINTIFFS_00020869

"**Event of Default**" means (i) any failure by Borrower to pay when due any amount required by the Commitment, the Delivery Assurance Certificate, this Security Instrument and/or any other Loan Commitment Document, (ii) any failure by Borrower to comply with any and all terms, provisions and covenants as set forth in the Commitment, the Delivery Assurance Certificate, this Security Instrument and/or any other Loan Commitment Document, which failure continues beyond any applicable notice and cure period, and (iii) any failure of any warranty, representation, certification, or statement of Borrower in the Commitment, the Delivery Assurance Certificate, this Security Instrument or any other Loan Commitment Document to be true, accurate and not misleading in any material respect when made.

"**Fixtures**" means all Goods that are so attached or affixed to the Land or the Improvements as to constitute a fixture under the laws of the Property Jurisdiction.

"**Goods**" means all of Borrower's present and hereafter acquired right, title and interest in all goods which are used now or in the future in connection with the ownership, management, or operation of the Land or the Improvements or are located on the Land or in the Improvements, including inventory; furniture; furnishings; machinery, equipment, engines, boilers, incinerators, and installed building materials; systems and equipment for the purpose of supplying or distributing heating, cooling, electricity, gas, water, air, or light; antennas, cable, wiring, and conduits used in connection with radio, television, security, fire prevention, or fire detection, or otherwise used to carry electronic signals; telephone systems and equipment; elevators and related machinery and equipment; fire detection, prevention and extinguishing systems and apparatus; security and access control systems and apparatus; plumbing systems; water heaters, ranges, stoves, microwave ovens, refrigerators, dishwashers, garbage disposers, washers, dryers, and other appliances; light fixtures, awnings, storm windows, and storm doors; pictures, screens, blinds, shades, curtains, and curtain rods; mirrors, cabinets, paneling, rugs, and floor and wall coverings; fences, trees, and plants; swimming pools; exercise equipment; supplies; tools; books and records (whether in written or electronic form); websites, URLs, blogs, and social network pages; computer equipment (hardware and software); and other tangible personal property which is used now or in the future in connection with the ownership, management, or operation of the Land or the Improvements or are located on the Land or in the Improvements.

"**Governmental Authority**" means any court, board, commission, department or body of any municipal, county, state or federal governmental unit, or any subdivision of any of them, that has or acquires jurisdiction over Borrower or the Mortgaged Property or the use, operation or improvement of the Mortgaged Property.

"**Hazardous Materials**" means any substance, chemical, material or waste now or in the future defined as a "hazardous substance," "hazardous material," "hazardous waste," "toxic substance," "toxic pollutant," "contaminant," or "pollutant" within the meaning of or regulated or addressed under any Environmental Law. Without limiting the generality of the foregoing, Hazardous Materials includes: Significant Mold; petroleum and petroleum products and compounds containing them or derived from them, including natural gas, gasoline, diesel fuel, oil and other fuels and

| Fannie Mae Multifamily Security Instrument | Form 6025.TX | Page 3 |
| Modified – Permanent Mortgage Loan Commitment | | |
| Texas | 06-12 | © 2012 Fannie Mae |

CONFIDENTIAL

petroleum products or fractions thereof; radon; carcinogenic materials; explosives; flammable materials; infectious materials; corrosive materials; mutagenic materials; radioactive materials; polychlorinated biphenyls (PCBs) and compounds containing them; lead and lead-based paint; asbestos or asbestos-containing materials in any form that is or could become friable; underground or above-ground storage tanks, whether empty or containing any substance; pipelines constructed for the purpose of transporting Hazardous Materials, whether empty or containing any substance; any substance the presence of which on, under or about the Mortgaged Property is regulated or prohibited by any Governmental Authority; any substance that is designated, classified or regulated pursuant to any Environmental Law; and any medical products or devices, including those materials defined as "medical waste" or "biological waste" under relevant statutes or regulations pertaining to any Environmental Law.

"**Impositions**" means

     (a)     any water and sewer charges which, if not paid, may result in a lien on all or any part of the Mortgaged Property;

     (b)     any premiums for fire and other casualty insurance, liability insurance, rent loss insurance and such other insurance as Lender may require under any of the Loan Commitment Documents;

     (c)     Taxes; and

     (d)     amounts for other charges and expenses assessed against the Mortgaged Property which Lender at any time reasonably deems necessary to protect the Mortgaged Property, to prevent the imposition of liens on the Mortgaged Property, or otherwise to protect Lender's interests, all as reasonably determined from time to time by Lender.

"**Improvements**" means the buildings, structures, improvements, and alterations now constructed or at any time in the future constructed or placed upon the Land, including any future replacements, facilities, and additions and other construction on the Land.

"**Indebtedness**" means any and all amounts due from Borrower to Lender at any time under the Commitment, the Delivery Assurance Certificate, this Security Instrument or any other Loan Commitment Document, including, without limitation, Enforcement Costs.

"**Land**" means the real property described in Exhibit A.

"**Leases**" means all present and future leases, subleases, licenses, concessions or grants or other possessory interests now or hereafter in force, whether oral or written, covering or affecting the Mortgaged Property, or any portion of the Mortgaged Property (including proprietary leases or occupancy agreements if Borrower is a cooperative housing corporation), and all modifications, extensions or renewals thereof.

CONFIDENTIAL

"**Lien**" means any claim or charge against property for payment of a debt or an amount owed for services rendered, including any mortgage, deed of trust, deed to secure debt, security interest, tax lien, any materialman's or mechanic's lien, or any lien of a Governmental Authority, including any lien in connection with the payment of utilities, or any other encumbrance.

"**Loan Commitment Documents**" means the Commitment, the Delivery Assurance Certificate, this Security Instrument and any and all other documents executed by Borrower and/or Lender in connection with Lender's issuance of the Commitment.

"**Mortgaged Property**" means all of Borrower's present and hereafter acquired right, title and interest, if any, in and to all of the following:

      (a)     the Land;

      (b)     the Improvements;

      (c)     the Personalty;

      (d)     current and future rights, including air rights, development rights, zoning rights and other similar rights or interests, easements, tenements, rights-of-way, strips and gores of land, streets, alleys, roads, sewer rights, waters, watercourses, and appurtenances related to or benefitting the Land or the Improvements, or both, and all rights-of-way, streets, alleys and roads which may have been or may in the future be vacated;

      (e)     insurance policies relating to the Mortgaged Property (and any unearned premiums) and all proceeds paid or to be paid by any insurer of the Land, the Improvements, the Personalty, or any other part of the Mortgaged Property, whether or not Borrower obtained the insurance pursuant to Lender's requirements;

      (f)     awards, payments and other compensation made or to be made by any municipal, state or federal authority with respect to the Land, the Improvements, the Personalty, or any other part of the Mortgaged Property, including any awards or settlements resulting from (1) Condemnation Actions, (2) any damage to the Mortgaged Property caused by governmental action that does not result in a Condemnation Action, or (3) the total or partial taking of the Land, the Improvements, the Personalty, or any other part of the Mortgaged Property under the power of eminent domain or otherwise and including any conveyance in lieu thereof;

      (g)     contracts, options and other agreements for the sale of the Land, the Improvements, the Personalty, or any other part of the Mortgaged Property entered into by Borrower now or in the future, including cash or securities deposited to secure performance by parties of their obligations;

      (h)     Leases and Lease guaranties, letters of credit and any other supporting obligation for any of the Leases given in connection with any of the Leases, and all Rents;

| Fannie Mae Multifamily Security Instrument | Form 6025.TX | Page 5 |
| Modified – Permanent Mortgage Loan Commitment | | |
| Texas | 06-12 | © 2012 Fannie Mae |

CONFIDENTIAL

PLAINTIFFS_00020872

(i)      earnings, royalties, accounts receivable, issues and profits from the Land, the Improvements or any other part of the Mortgaged Property and, if Borrower is a cooperative housing corporation, maintenance charges or assessments payable by sharcholders or residents;

(j)      [Intentionally Omitted];

(k)      refunds or rebates of Impositions by any municipal, state or federal authority or insurance company (other than refunds applicable to periods before the real property tax year in which this Security Instrument is dated);

(l)      tenant security deposits;

(m)      names under or by which any of the above Mortgaged Property may be operated or known, and all trademarks, trade names, and goodwill relating to any of the Mortgaged Property;

(n)      [Intentionally Omitted];

(o)      products, and all cash and non-cash proceeds from the conversion, voluntary or involuntary, of any of the above into cash or liquidated claims, and the right to collect such proceeds; and

(p)      all of Borrower's right, title and interest in the oil, gas, minerals, mineral interests, royalties, overriding royalties, production payments, net profit interests and other interests and estates in, under and on the Mortgaged Property and other oil, gas and mineral interests with which any of the foregoing interests or estates are pooled or unitized.

**"Permitted Encumbrance"** means only the easements, restrictions and other matters listed in a schedule of exceptions to coverage in the Title Policy and Taxes for the current tax year that are not yet due and payable.

**"Personalty"** means all of Borrower's present and hereafter acquired right, title and interest in all Goods, accounts, choses of action, chattel paper, documents, general intangibles (including Software), payment intangibles, instruments, investment property, letter of credit rights, supporting obligations, computer information, source codes, object codes, records and data, all telephone numbers or listings, claims (including claims for indemnity or breach of warranty), deposit accounts and other property or assets of any kind or nature related to the Land or the Improvements now or in the future, including operating agreements, surveys, plans and specifications and contracts for architectural, engineering and construction services relating to the Land or the Improvements, and all other intangible property and rights relating to the operation of, or used in connection with, the Land or the Improvements, including all governmental permits relating to any activities on the Land.

**"Property Jurisdiction"** means the jurisdiction in which the Land is located.

| | | |
|---|---|---|
| **Fannie Mae Multifamily Security Instrument** | **Form 6025.TX** | **Page 6** |
| **Modified – Permanent Mortgage Loan Commitment** | | |
| **Texas** | **06-12** | **© 2012 Fannie Mae** |

CONFIDENTIAL

"**Remedial Work**" means any investigation, site monitoring, containment, abatement, clean-up, removal, restoration or other remedial work in connection with any Significant Mold, Environmental Laws, or order of or agreement with any Governmental Authority that has or acquires jurisdiction over the Mortgaged Property, or the use, operation or improvement of the Mortgaged Property under any Environmental Law or as recommended in writing by an environmental professional, certified industrial hygienist or person with similar qualifications with respect to Significant Mold.

"**Rents**" means all rents (whether from residential or non-residential space), revenues and other income from the Land or the Improvements, including subsidy payments received from any sources, including payments under any "Housing Assistance Payments Contract" or other rental subsidy agreement (if any), parking fees, laundry and vending machine income and fees and charges for food, health care and other services provided at the Mortgaged Property, whether now due, past due, or to become due, and tenant security deposits.

"**Significant Mold**" means any mold, fungus, bacterial, viral, or microbial matter or pathogenic organisms at, in or about the Mortgaged Property of a type or quantity that:

     (a)    results in, or should reasonably result in, Remedial Work or a significant risk to human health or the environment as determined by a written analysis prepared by an environmental professional, certified industrial hygienist or person with similar qualifications reasonably acceptable to Lender;

     (b)    is required or recommended to be addressed pursuant to Environmental Law, or written recommendation of an environmental professional, certified industrial hygienist or person with similar qualifications; or

     (c)    would materially and negatively impact the value of the Mortgaged Property.

"**Software**" means a computer program and any supporting information provided in connection with a transaction relating to the program. The term does not include any computer program that is included in the definition of Goods.

"**Taxes**" means all taxes, assessments, vault rentals and other charges, if any, general, special or otherwise, including assessments for schools, public betterments and general or local improvements, which are levied, assessed or imposed by any public authority or quasi-public authority, and which, if not paid, may become a lien, on the Land or the Improvements or any taxes upon any Loan Commitment Document.

"**Title Policy**" means the mortgagee's loan policy of title insurance issued in connection with the Commitment and insuring the lien of this Security Instrument, as approved by Lender.

"**UCC**" means the Uniform Commercial Code in effect in the Property Jurisdiction, as amended from time to time.

CONFIDENTIAL

PLAINTIFFS_00020874

"**UCC Collateral**" means any or all of that portion of the Mortgaged Property in which a security interest may be granted under the UCC and in which Borrower has any present or hereafter acquired right, title or interest.

2.      **Security Agreement; Fixture Filing.**

(a)      To secure to Lender, the repayment of the Indebtedness, and all renewals, extensions and modifications thereof, and the performance of the covenants and agreements of Borrower contained in the Loan Commitment Documents, Borrower hereby pledges, assigns, and grants to Lender a continuing security interest in the UCC Collateral. This Security Instrument constitutes a security agreement and a financing statement under the UCC. This Security Instrument also constitutes a financing statement pursuant to the terms of the UCC with respect to any part of the Mortgaged Property that is or may become a Fixture under applicable law, and will be recorded as a "fixture filing" in accordance with the UCC. Borrower hereby authorizes Lender to file financing statements, continuation statements and financing statement amendments in such form as Lender may require to perfect or continue the perfection of this security interest without the signature of Borrower. If an Event of Default has occurred and is continuing, Lender shall have the remedies of a secured party under the UCC or otherwise provided at law or in equity, in addition to all remedies provided by this Security Instrument and in any Loan Commitment Document. Lender may exercise any or all of its remedies against the UCC Collateral separately or together, and in any order, without in any way affecting the availability or validity of Lender's other remedies. For purposes of the UCC, the debtor is Borrower and the secured party is Lender. The name and address of the debtor and secured party are set forth after Borrower's signature below which are the addresses from which information on the security interest may be obtained.

(b)      Borrower represents and warrants that: (1) Borrower maintains its chief executive office at the location set forth after Borrower's signature below, and Borrower will notify Lender in writing of any change in its chief executive office within five (5) days of such change; (2) Borrower is the record owner of the Mortgaged Property; (3) Borrower's state of incorporation, organization, or formation, if applicable, is as set forth on Page 1 of this Security Instrument; (4) Borrower's exact legal name is as set forth on Page 1 of this Security Instrument; (5) Borrower's organizational identification number, if applicable, is as set forth after Borrower's signature below; (6) Borrower is the owner of the UCC Collateral subject to no liens, charges or encumbrances other than the lien hereof; (7) the UCC Collateral will not be removed from the Mortgaged Property without the consent of Lender; and (8) no financing statement covering any of the UCC Collateral or any proceeds thereof is on file in any public office except pursuant hereto.

(c)      All property of every kind acquired by Borrower after the date of this Security Instrument which by the terms of this Security Instrument shall be subject to the lien and the security interest created hereby, shall immediately upon the acquisition thereof by Borrower and without further conveyance or assignment become subject to the lien and security interest created

CONFIDENTIAL                                                          PLAINTIFFS_00020875

by this Security Instrument. Nevertheless, Borrower shall execute, acknowledge, deliver and record or file, as appropriate, all and every such further deeds of trust, mortgages, deeds to secure debt, security agreements, financing statements, assignments and assurances as Lender shall require for accomplishing the purposes of this Security Instrument and to comply with the rerecording requirements of the UCC.

3. **Assignment of Leases and Rents; Appointment of Receiver; Lender in Possession.**

(a)     As part of the consideration for the Indebtedness, Borrower absolutely and unconditionally assigns and transfers to Lender all Leases and Rents. It is the intention of Borrower to establish present, absolute and irrevocable transfers and assignments to Lender of all Leases and Rents and to authorize and empower Lender to collect and receive all Rents without the necessity of further action on the part of Borrower. Borrower and Lender intend the assignments of Leases and Rents to be effective immediately and to constitute absolute present assignments, and not assignments for additional security only. Only for purposes of giving effect to these absolute assignments of Leases and Rents, and for no other purpose, the Leases and Rents shall not be deemed to be a part of the Mortgaged Property. However, if these present, absolute and unconditional assignments of Leases and Rents are not enforceable by their terms under the laws of the Property Jurisdiction, then each of the Leases and Rents shall be included as part of the Mortgaged Property, and it is the intention of Borrower, in such circumstance, that this Security Instrument create and perfect a lien on each of the Leases and Rents in favor of Lender, which liens shall be effective as of the date of this Security Instrument.

(b)     Until an Event of Default has occurred and is continuing, but subject to the limitations set forth in the Loan Commitment Documents, Borrower shall have a revocable license to exercise all rights, power and authority granted to Borrower under the Leases (including the right, power and authority to modify the terms of any Lease, extend or terminate any Lease, or enter into new Leases, subject to the limitations set forth in the Loan Commitment Documents), and to collect and receive all Rents, to hold all Rents in trust for the benefit of Lender, and to apply all Rents to pay the Monthly Debt Service Payments and the other amounts then due and payable under the other Loan Commitment Documents and to pay the current costs and expenses of managing, operating and maintaining the Mortgaged Property, including utilities and Impositions, tenant improvements and other capital expenditures. So long as no Event of Default has occurred and is continuing (and no event which, with the giving of notice or the passage of time, or both, would constitute an Event of Default has occurred and is continuing), the Rents remaining after application pursuant to the preceding sentence may be retained and distributed by Borrower free and clear of, and released from, Lender's rights with respect to Rents under this Security Instrument.

(c)     If an Event of Default has occurred and is continuing, without the necessity of Lender entering upon and taking and maintaining control of the Mortgaged Property directly, by a receiver, or by any other manner or proceeding permitted by the laws of the Property Jurisdiction, the revocable license granted to Borrower pursuant to Section 3(b) shall

| | | |
|---|---|---|
| **Fannie Mae Multifamily Security Instrument** | **Form 6025.TX** | **Page 9** |
| **Modified – Permanent Mortgage Loan Commitment** | | |
| **Texas** | **06-12** | **© 2012 Fannie Mae** |

CONFIDENTIAL

automatically terminate, and Lender shall immediately have all rights, powers and authority granted to Borrower under any Lease (including the right, power and authority to modify the terms of any such Lease, or extend or terminate any such Lease) and, without notice, Lender shall be entitled to all Rents as they become due and payable, including Rents then due and unpaid. During the continuance of an Event of Default, Borrower authorizes Lender to collect, sue for and compromise Rents and directs each tenant of the Mortgaged Property to pay all Rents to, or as directed by, Lender, and Borrower shall, upon Borrower's receipt of any Rents from any sources, pay the total amount of such receipts to Lender. Although the foregoing rights of Lender are self-effecting, at any time during the continuance of an Event of Default, Lender may make demand for all Rents, and Lender may give, and Borrower hereby irrevocably authorizes Lender to give, notice to all tenants of the Mortgaged Property instructing them to pay all Rents to Lender. No tenant shall be obligated to inquire further as to the occurrence or continuance of an Event of Default, and no tenant shall be obligated to pay to Borrower any amounts that are actually paid to Lender in response to such a notice. Any such notice by Lender shall be delivered to each tenant personally, by mail or by delivering such demand to each rental unit.

(d)     If an Event of Default has occurred and is continuing, Lender may, regardless of the adequacy of Lender's security or the solvency of Borrower, and even in the absence of waste, enter upon, take and maintain full control of the Mortgaged Property, and may exclude Borrower and its agents and employees therefrom, in order to perform all acts that Lender, in its discretion, determines to be necessary or desirable for the operation and maintenance of the Mortgaged Property, including the execution, cancellation or modification of Leases, the collection of all Rents (including through use of a lockbox, at Lender's election), the making of repairs to the Mortgaged Property and the execution or termination of contracts providing for the management, operation or maintenance of the Mortgaged Property, for the purposes of enforcing this assignment of Rents, protecting the Mortgaged Property or the security of this Security Instrument, or for such other purposes as Lender in its discretion may deem necessary or desirable.

(e)     Notwithstanding any other right provided Lender under this Security Instrument or any other Loan Commitment Document, if an Event of Default has occurred and is continuing, and regardless of the adequacy of Lender's security or Borrower's solvency, and without the necessity of giving prior notice (oral or written) to Borrower, Lender may apply to any court having jurisdiction for the appointment of a receiver for the Mortgaged Property to take any or all of the actions set forth in Section 3. If Lender elects to seek the appointment of a receiver for the Mortgaged Property at any time after an Event of Default has occurred and is continuing, Borrower, by its execution of this Security Instrument, expressly consents to the appointment of such receiver, including the appointment of a receiver *ex parte*, if permitted by applicable law. Borrower consents to shortened time consideration of a motion to appoint a receiver. Lender or the receiver, as applicable, shall be entitled to receive a reasonable fee for managing the Mortgaged Property and such fee shall become an additional part of the Indebtedness. Immediately upon appointment of a receiver or Lender's entry upon and taking possession and control of the Mortgaged Property, possession of the Mortgaged Property and all documents,

| Fannie Mae Multifamily Security Instrument | Form 6025.TX | Page 10 |
|---|---|---|
| Modified – Permanent Mortgage Loan Commitment | | |
| Texas | 06-12 | © 2012 Fannie Mae |

PLAINTIFFS_00020877

records (including records on electronic or magnetic media), accounts, surveys, plans, and specifications relating to the Mortgaged Property, and all security deposits and prepaid Rents, shall be surrendered to Lender or the receiver, as applicable. If Lender or receiver takes possession and control of the Mortgaged Property, Lender or receiver may exclude Borrower and its representatives from the Mortgaged Property.

(f)     The acceptance by Lender of the assignments of the Leases and Rents pursuant to this Section 3 shall not at any time or in any event obligate Lender to take any action under any Loan Commitment Document or to expend any money or to incur any expense. Lender shall not be liable in any way for any injury or damage to person or property sustained by any Person in, on or about the Mortgaged Property. Prior to Lender's actual entry upon and taking possession and control of the Land and Improvements, Lender shall not be:

(1)     obligated to perform any of the terms, covenants and conditions contained in any Lease (or otherwise have any obligation with respect to any Lease);

(2)     obligated to appear in or defend any action or proceeding relating to any Lease or the Mortgaged Property; or

(3)     responsible for the operation, control, care, management or repair of the Mortgaged Property or any portion of the Mortgaged Property.

The execution of this Security Instrument shall constitute conclusive evidence that all responsibility for the operation, control, care, management and repair of the Mortgaged Property is and shall be that of Borrower, prior to such actual entry and taking possession and control by Lender of the Land and Improvements.

(g)     Lender shall be liable to account only to Borrower and only for Rents actually received by Lender. Lender shall not be liable to Borrower, anyone claiming under or through Borrower or anyone having an interest in the Mortgaged Property by reason of any act or omission of Lender under this Section 3, and Borrower hereby releases and discharges Lender from any such liability to the fullest extent permitted by law, provided that Lender shall not be released from liability that occurs as a result of Lender's gross negligence or willful misconduct as determined by a court of competent jurisdiction pursuant to a final, non-appealable court order. If the Rents are not sufficient to meet the costs of taking control of and managing the Mortgaged Property and collecting the Rents, any funds expended by Lender for such purposes shall be added to, and become a part of, the principal balance of the Indebtedness, be immediately due and payable, and bear interest from the date of disbursement until fully paid at an interest rate equal to the lesser of (i) ten percent (10%) per annum, or (ii) the maximum interest rate which may be collected from Borrower under applicable law.. Any entering upon and taking control of the Mortgaged Property by Lender or the receiver, and any application of Rents as provided in this Security Instrument, shall not cure or waive any Event of Default or invalidate any other right or

CONFIDENTIAL

remedy of Lender under applicable law or provided for in this Security Instrument or any Loan Commitment Document.

## 4.    Protection of Lender's Security.

If Borrower fails to perform any of its obligations under this Security Instrument or any other Loan Commitment Document, or any action or proceeding is commenced that purports to affect the Mortgaged Property, Lender's security, rights or interests under this Security Instrument or any Loan Commitment Document (including eminent domain, insolvency, code enforcement, civil or criminal forfeiture, enforcement of Environmental Laws, fraudulent conveyance or reorganizations or proceedings involving a debtor or decedent), Lender may, at its option, make such appearances, disburse or pay such sums and take such actions, whether before or after an Event of Default or whether directly or to any receiver for the Mortgaged Property, as Lender reasonably deems necessary to perform such obligations of Borrower and to protect the Mortgaged Property or Lender's security, rights or interests in the Mortgaged Property, including:

(a)    paying fees and out-of-pocket expenses of attorneys, accountants, inspectors and consultants;

(b)    entering upon the Mortgaged Property to make repairs or secure the Mortgaged Property;

(c)    obtaining (or force-placing) the insurance required by the Loan Commitment Documents; and

(d)    paying any amounts required under any of the Loan Commitment Documents that Borrower has failed to pay.

Any amounts so disbursed or paid by Lender shall be added to, and become part of, the principal balance of the Indebtedness, be immediately due and payable and bear interest at the Default Rate from the date of disbursement until fully paid. The provisions of this Section 4 shall not be deemed to obligate or require Lender to incur any expense or take any action.

## 5.    Default; Acceleration; Remedies.

(a)    If an Event of Default has occurred and is continuing, Lender, at its option, may declare the Indebtedness to be immediately due and payable without further demand, and may either with or without entry or taking possession as herein provided or otherwise, proceed by suit or suits at law or in equity or any other appropriate proceeding or remedy (1) to enforce the terms and provisions of the Commitment and the Delivery Assurance Certificate; (2) to foreclose this Security Instrument judicially or non-judicially by the power of sale granted herein; (3) to enforce or exercise any right under any Loan Commitment Document; and (4) to pursue any one (1) or more other remedies provided in this Security Instrument or in any other Loan Commitment Document or otherwise afforded by applicable law. Each right and remedy provided in this

| Fannie Mae Multifamily Security Instrument | Form 6025.TX | Page 12 |
| Modified – Permanent Mortgage Loan Commitment | | |
| Texas | 06-12 | © 2012 Fannie Mae |

CONFIDENTIAL

Security Instrument or any other Loan Commitment Document is distinct from all other rights or remedies under this Security Instrument or any other Loan Commitment Document or otherwise afforded by applicable law, and each shall be cumulative and may be exercised concurrently, independently, or successively, in any order. Borrower has the right to bring an action to assert the nonexistence of an Event of Default or any other defense of Borrower to acceleration and sale.

(b)    Borrower acknowledges that the power of sale granted in this Security Instrument may be exercised or directed by Lender without prior judicial hearing. In the event Lender invokes the power of sale:

(1)    Lender may, by and through the Trustee, or otherwise, sell or offer for sale the Mortgaged Property in such portions, order and parcels as Lender may determine, with or without having first taken possession of the Mortgaged Property, to the highest bidder for cash at public auction. Such sale shall be made at the courthouse door of the county in which all or any part of the Mortgaged Property to be sold is situated (whether the parts or parcel, if any, situated in different counties are contiguous or not, and without the necessity of having any Personalty present at such sale) on the first Tuesday of any month between the hours of 10:00 a.m. and 4:00 p.m., after advertising the time, place and terms of sale and that portion of the Mortgaged Property to be sold by posting or causing to be posted written or printed notice of sale at least twenty-one (21) days before the date of the sale at the courthouse door of the county in which the sale is to be made and at the courthouse door of any other county in which a portion of the Mortgaged Property may be situated, and by filing such notice with the County Clerk(s) of the county(s) in which all or a portion of the Mortgaged Property may be situated, which notice may be posted and filed by the Trustee acting, or by any person acting for the Trustee, and Lender has, at least twenty-one (21) days before the date of the sale, served written or printed notice of the proposed sale by certified mail on each debtor obligated to pay the Indebtedness according to Lender's records by the deposit of such notice, enclosed in a postpaid wrapper, properly addressed to such debtor at debtor's most recent address as shown by Lender's records, in a post office or official depository under the care and custody of the United States Postal Service. The affidavit of any person having knowledge of the facts to the effect that such service was completed shall be prima facie evidence of the fact of service;

(2)    Trustee shall deliver to the purchaser at the sale, within a reasonable time after the sale, a deed conveying the Mortgaged Property so sold in fee simple with covenants of general warranty. Borrower covenants and agrees to defend generally the purchaser's title to the Mortgaged Property against all claims and demands. The recitals in Trustee's deed shall be prima facie evidence of the truth of the statements contained in those recitals;

CONFIDENTIAL                                                   PLAINTIFFS_00020880

(3)     Trustee shall be entitled to receive fees and expenses from such sale not to exceed the amount permitted by applicable law; and

(4)     Lender shall have the right to become the purchaser at any sale made under or by virtue of this Security Instrument and Lender so purchasing at any such sale shall have the right to be credited upon the amount of the bid made therefor by Lender with the amount payable to Lender out of the net proceeds of such sale. In the event of any such sale, the outstanding principal amount of the Indebtedness, if not previously due, shall be and become immediately due and payable without demand or notice of any kind. If the Mortgaged Property is sold for an amount less than the amount outstanding under the Indebtedness, the deficiency shall be determined by the purchase price at the sale or sales. Borrower waives all rights, claims, and defenses with respect to Lender's ability to obtain a deficiency judgment.

(c)     Borrower acknowledges and agrees that the proceeds of any sale shall be applied as determined by Lender unless otherwise required by applicable law.

(d)     In connection with the exercise of Lender's rights and remedies under this Security Instrument and any other Loan Commitment Document, there shall be allowed and included as Indebtedness: (1) all expenditures and expenses authorized by applicable law and all other expenditures and expenses which may be paid or incurred by or on behalf of Lender for reasonable legal fees, appraisal fees, outlays for documentary and expert evidence, stenographic charges and publication costs; (2) all expenses of any environmental site assessments, environmental audits, environmental remediation costs, appraisals, surveys, engineering studies, wetlands delineations, flood plain studies, and any other similar testing or investigation deemed necessary or advisable by Lender incurred in preparation for, contemplation of or in connection with the exercise of Lender's rights and remedies under the Loan Commitment Documents; and (3) costs (which may be reasonably estimated as to items to be expended in connection with the exercise of Lender's rights and remedies under the Loan Commitment Documents) of procuring all abstracts of title, title searches and examinations, title insurance policies, and similar data and assurance with respect to title as Lender may deem reasonably necessary either to prosecute any suit or to evidence the true conditions of the title to or the value of the Mortgaged Property to bidders at any sale which may be held in connection with the exercise of Lender's rights and remedies under the Loan Commitment Documents. All expenditures and expenses of the nature mentioned in this Section 5, and such other expenses and fees as may be incurred in the protection of the Mortgaged Property and rents and income therefrom and the maintenance of the lien of this Security Instrument, including the fees of any attorney employed by Lender in any litigation or proceedings affecting this Security Instrument, the Delivery Assurance Certificate, the other Loan Commitment Documents, or the Mortgaged Property, including bankruptcy proceedings, any Foreclosure Event, or in preparation of the commencement or defense of any proceedings or threatened suit or proceeding, or otherwise in dealing specifically therewith, shall be so much additional Indebtedness and shall be immediately due and payable by Borrower, with interest thereon at the Default Rate until paid.

| Fannie Mae Multifamily Security Instrument | Form 6025.TX | Page 14 |
| Modified – Permanent Mortgage Loan Commitment | | |
| Texas | 06-12 | © 2012 Fannie Mae |

CONFIDENTIAL

(e)     If all or any part of the Mortgaged Property is sold pursuant to this Section 5, Borrower will be divested of any and all interest and claim to the Mortgaged Property, including any interest or claim to all insurance policies, utility deposits, bonds, loan commitments and other intangible property included as a part of the Mortgaged Property. Additionally, after a sale of all or any part of the Land, Improvements, Fixtures and Personalty, Borrower will be considered a tenant at sufferance of the purchaser of the same, and the purchaser shall be entitled to immediate possession of such property. If Borrower shall fail to vacate the Mortgaged Property immediately, the purchaser may and shall have the right, without further notice to Borrower, to go into any justice court in any precinct or county in which the Mortgaged Property is located and file an action in forcible entry and detainer, which action shall lie against Borrower or its assigns or legal representatives, as a tenant at sufferance. This remedy is cumulative of any and all remedies the purchaser may have under this Security Instrument or otherwise.

(f)     In any action for a deficiency after a foreclosure under this Security Instrument, if any person against whom recovery is sought requests the court in which the action is pending to determine the fair market value of the Mortgaged Property, as of the date of the foreclosure sale, the following shall be the basis of the court's determination of fair market value; provided that Borrower and any guarantor hereby waive any rights to contest the amount of the deficiency claim afforded to Borrower and such guarantor under Tex. Prop. Code Sections 51.003; 51.004 and 51.005; in the event the waiver of such provision is held invalid, that the valuation method as currently set forth below shall be used;

(1)     the Mortgaged Property shall be valued "as is" and in its condition as of the date of foreclosure, and no assumption of increased value because of post-foreclosure repairs, refurbishment, restorations or improvements shall be made;

(2)     any adverse effect on the marketability of title because of the foreclosure or because of any other title condition not existing as of the date of this Security Instrument shall be considered;

(3)     the valuation of the Mortgaged Property shall be based upon an assumption that the foreclosure purchaser desires a prompt resale of the Mortgaged Property for cash within a six (6) month period after foreclosure;

(4)     although the Mortgaged Property may be disposed of more quickly by the foreclosure purchaser, the gross valuation of the Mortgaged Property as of the date of foreclosure shall be discounted for a hypothetical reasonable holding period (not to exceed six (6) months) at a monthly rate equal to five percent (5%) per annum;

(5)     the gross valuation of the Mortgaged Property as of the date of foreclosure shall be further discounted and reduced by reasonable estimated costs of disposition, including brokerage commissions, title policy premiums, environmental assessment and

| Fannie Mae Multifamily Security Instrument | Form 6025.TX | Page 15 |
| Modified – Permanent Mortgage Loan Commitment | | |
| Texas | 06-12 | © 2012 Fannie Mae |

CONFIDENTIAL

clean-up costs, tax and assessment, prorations, costs to comply with legal requirements, and attorneys' fees;

(6)    expert opinion testimony shall be considered only from a licensed appraiser certified by the State of Texas and, to the extent permitted under Texas law, a member of the Appraisal Institute, having at least five (5) years' experience in appraising property similar to the Mortgaged Property in the county where the Mortgaged Property is located, and who has conducted and prepared a complete written appraisal of the Mortgaged Property taking into considerations the factors set forth in this Security Instrument; no expert opinion testimony shall be considered without such written appraisal;

(7)    evidence of comparable sales shall be considered only if also included in the expert opinion testimony and written appraisal referred to in the preceding paragraph; and

(8)    an affidavit executed by Lender to the effect that the foreclosure bid accepted by Trustee was equal to or greater than the value of the Mortgaged Property determined by Lender based upon the factors and methods set forth in subparagraphs (1) through (7) above before the foreclosure shall constitute prima facie evidence that the foreclosure bid was equal to or greater than the fair market value of the Mortgaged Property on the foreclosure date.

(g)    Lender may, at Lender's option, comply with these provisions in the manner permitted or required by Title 5, Section 51.002 of the Texas Property Code (relating to the sale of real estate) or by Chapter 9 of the Texas Business and Commerce Code (relating to the sale of collateral after default by a debtor), as those titles and chapters now exist or may be amended or succeeded in the future, or by any other present or future articles or enactments relating to same subject. Unless expressly excluded, the Mortgaged Property shall include Rents collected before a foreclosure sale, but attributable to the period following the foreclosure sale, and Borrower shall pay such Rents to the purchaser at such sale. At any such sale:

(1)    whether made under the power contained in this Security Instrument, Section 51.002, the Texas Business and Commerce Code, any other legal requirement or by virtue of any judicial proceedings or any other legal right, remedy or recourse, it shall not be necessary for Trustee to have physically present, or to have constructive possession of, the Mortgaged Property (Borrower shall deliver to Trustee any portion of the Mortgaged Property not actually or constructively possessed by Trustee immediately upon demand by Trustee) and the title to and right of possession of any such Mortgaged Property shall pass to the purchaser as completely as if the Mortgaged Property had been actually present and delivered to the purchaser at the sale;

| Fannie Mae Multifamily Security Instrument | Form 6025.TX | Page 16 |
|---|---|---|
| Modified – Permanent Mortgage Loan Commitment | | |
| Texas | 06-12 | © 2012 Fannie Mae |

CONFIDENTIAL

(2)     each instrument of conveyance executed by Trustee shall contain a general warranty of title, binding upon Borrower;

(3)     the recitals contained in any instrument of conveyance made by Trustee shall conclusively establish the truth and accuracy of the matters recited in the Instrument, including nonpayment of the Indebtedness and the advertisement and conduct of the sale in the manner provided in this Security Instrument and otherwise by law and the appointment of any successor Trustee;

(4)     all prerequisites to the validity of the sale shall be conclusively presumed to have been satisfied;

(5)     the receipt of Trustee or of such other party or officer making the sale shall be sufficient to discharge to the purchaser or purchasers for such purchaser(s)' purchase money, and no such purchaser or purchasers, or such purchaser(s)' assigns or personal representatives, shall thereafter be obligated to see to the application of such purchase money or be in any way answerable for any loss, misapplication or nonapplication of such purchase money; and

(6)     to the fullest extent permitted by law, Borrower shall be completely and irrevocably divested of all of Borrower's right, title, interest, claim and demand whatsoever, either at law or in equity, in and to the Mortgaged Property sold, and such sale shall be a perpetual bar to any claim to all or any part of the Mortgaged Property sold, both at law and in equity, against Borrower and against any person claiming by, through or under Borrower.

(h)     Any action taken by Trustee or Lender pursuant to the provisions of this Section 5 shall comply with the laws of the Property Jurisdiction. Such applicable laws shall take precedence over the provisions of this Section 5, but shall not invalidate or render unenforceable any other provision of any Loan Commitment Document that can be construed in a manner consistent with any applicable law. If any provision of this Security Instrument shall grant to Lender (including Lender acting as a mortgagee-in-possession), Trustee or a receiver appointed pursuant to the provisions of this Security Instrument any powers, rights or remedies prior to, upon, during the continuance of or following an Event of Default that are more limited than the powers, rights, or remedies that would otherwise be vested in such party under any applicable law in the absence of said provision, such party shall be vested with the powers, rights, and remedies granted in such applicable law to the full extent permitted by law.

6.      **Waiver of Statute of Limitations and Marshaling.**

Borrower hereby waives the right to assert any statute of limitations as a bar to the enforcement of the lien of this Security Instrument or to any action brought to enforce any Loan Commitment Document. Notwithstanding the existence of any other security interests in the Mortgaged Property held by Lender or by any other party, Lender shall have the right to

Fannie Mae Multifamily Security Instrument          Form 6025.TX                    Page 17
Modified – Permanent Mortgage Loan Commitment
Texas                                               06-12                © 2012 Fannie Mae

determine the order in which any or all of the Mortgaged Property shall be subjected to the remedies provided in this Security Instrument and/or any other Loan Commitment Document or by applicable law. Lender shall have the right to determine the order in which any or all portions of the Indebtedness are satisfied from the proceeds realized upon the exercise of such remedies. Borrower, for itself and all who may claim by, through, or under it, and any party who now or in the future acquires a security interest in the Mortgaged Property and who has actual or constructive notice of this Security Instrument waives any and all right to require the marshaling of assets or to require that any of the Mortgaged Property be sold in the inverse order of alienation or that any of the Mortgaged Property be sold in parcels (at the same time or different times) in connection with the exercise of any of the remedies provided in this Security Instrument or any other Loan Commitment Document, or afforded by applicable law.

## 7.    Waiver of Redemption; Rights of Tenants.

(a)    Borrower hereby covenants and agrees that it will not at any time apply for, insist upon, plead, avail itself, or in any manner claim or take any advantage of, any appraisement, stay, exemption or extension law or any so-called "Moratorium Law" now or at any time hereafter enacted or in force in order to prevent or hinder the enforcement or foreclosure of this Security Instrument. Without limiting the foregoing:

(1)    Borrower for itself and all Persons who may claim by, through, or under Borrower, hereby expressly waives any so-called "Moratorium Law" and any and all rights of reinstatement and redemption, if any, under any order or decree of foreclosure of this Security Instrument, it being the intent hereof that any and all such "Moratorium Laws," and all rights of reinstatement and redemption of Borrower and of all other Persons claiming by, through, or under Borrower are and shall be deemed to be hereby waived to the fullest extent permitted by applicable law;

(2)    Borrower shall not invoke or utilize any such law or laws or otherwise hinder, delay or impede the execution of any right, power remedy herein or otherwise granted or delegated to Lender but will suffer and permit the execution of every such right, power and remedy as though no such law or laws had been made or enacted; and

(3)    if Borrower is a trust, Borrower represents that the provisions of this Section 7 (including the waiver of reinstatement and redemption rights) were made at the express direction of Borrower's beneficiaries and the persons having the power of direction over Borrower, and are made on behalf of the trust estate of Borrower and all beneficiaries of Borrower, as well as all other persons mentioned above.

(b)    Lender shall have the right to foreclose subject to the rights of any tenant or tenants of the Mortgaged Property having an interest in the Mortgaged Property prior to that of Lender. The failure to join any such tenant or tenants of the Mortgaged Property as party defendant or defendants in any such civil action or the failure of any decree of foreclosure and

| Fannie Mae Multifamily Security Instrument | Form 6025.TX | Page 18 |
|---|---|---|
| Modified – Permanent Mortgage Loan Commitment | | |
| Texas | 06-12 | © 2012 Fannie Mae |

sale to foreclose their rights shall not be asserted by Borrower as a defense in any civil action instituted to collect the Indebtedness, or any part thereof or any deficiency remaining unpaid after foreclosure and sale of the Mortgaged Property, any statute or rule of law at any time existing to the contrary notwithstanding.

**8.     Notice.**

(a)     All notices under this Security Instrument shall be:

(1)     in writing, and shall be (A) delivered, in person, (B) mailed, postage prepaid, either by registered or certified delivery, return receipt requested, or (C) sent by overnight express courier;

(2)     addressed to the intended recipient at its respective address set forth at the end of this Security Instrument; and

(3)     deemed given on the earlier to occur of:

(A)     the date when the notice is received by the addressee; or

(B)     if the recipient refuses or rejects delivery, the date on which the notice is so refused or rejected, as conclusively established by the records of the United States Postal Service or such express courier service.

(b)     Any party to this Security Instrument may change the address to which notices intended for it are to be directed by means of notice given to the other party in accordance with this Section 8.

(c)     Any required notice under this Security Instrument which does not specify how notices are to be given shall be given in accordance with this Section 8.

**9.     Mortgagee-in-Possession.**

Borrower acknowledges and agrees that the exercise by Lender of any of the rights conferred in this Security Instrument shall not be construed to make Lender a mortgagee-in-possession of the Mortgaged Property so long as Lender has not itself entered into actual possession of the Land and Improvements.

**10.     Release.**

Upon payment in full of the Indebtedness, Lender shall cause the release of this Security Instrument and Borrower shall pay Lender's costs incurred in connection with such release.

| | | |
|---|---|---|
| **Fannie Mae Multifamily Security Instrument** | **Form 6025.TX** | **Page 19** |
| **Modified – Permanent Mortgage Loan Commitment** | | |
| **Texas** | **06-12** | **© 2012 Fannie Mae** |

CONFIDENTIAL

11.    **Trustee.**

(a)    Trustee may resign by giving of notice of such resignation in writing to Lender. If Trustee shall die, resign or become disqualified from acting under this Security Instrument or shall fail or refuse to act in accordance with this Security Instrument when requested by Lender or if for any reason and without cause Lender shall prefer to appoint a substitute trustee to act instead of the original Trustee named in this Security Instrument or any prior successor or substitute trustee, Lender shall have full power to appoint a substitute trustee and, if preferred, several substitute trustees in succession who shall succeed to all the estate, rights, powers and duties of the original Trustee named in this Security Instrument.  Such appointment may be executed by an authorized officer, agent or attorney-in-fact of Lender (whether acting pursuant to a power of attorney or otherwise), and such appointment shall be conclusively presumed to be executed with authority and shall be valid and sufficient without proof of any action by Lender.

(b)    Any successor Trustee appointed pursuant to this Section 11 shall, without any further act, deed or conveyance, become vested with all the estates, properties, rights, powers and trusts of the predecessor Trustee with like effect as if originally named as Trustee in this Security Instrument; but, nevertheless, upon the written request of Lender or such successor Trustee, the Trustee ceasing to act shall execute and deliver an instrument transferring to such successor Trustee, all the estates, properties, rights, powers and trusts of the Trustee so ceasing to act, and shall duly assign, transfer and deliver any of the Mortgaged Property and monies held by the Trustee ceasing to act to the successor Trustee.

(c)    Trustee may authorize one (1) or more parties to act on Trustee's behalf to perform the ministerial functions required of Trustee under this Security Instrument, including the transmittal and posting of any notices.

12.    **No Fiduciary Duty.**

Lender owes no fiduciary or other special duty to Borrower.

13.    **Additional Provisions Regarding Assignment of Leases and Rents.**

In no event shall the assignment of Rents or Leases in Section 3 cause the Indebtedness to be reduced by an amount greater than the Rents actually received by Lender and applied by Lender to the Indebtedness, whether before, during or after (a) an Event of Default, or (b) a suspension or revocation of the license granted to Borrower in Section 3 with regard to the Rents. Borrower and Lender specifically intend that the assignment of Rents and Leases in Section 3 is not intended to result in a pro tanto reduction of the Indebtedness. The assignment of Rents and Leases in Section 3 is not intended to constitute a payment of, or with respect to, the Indebtedness and, therefore, Borrower and Lender specifically intend that the Indebtedness shall not be reduced by the value of the Rents and Leases assigned. Such reduction shall occur only if, and to the extent that, Lender actually receives Rents pursuant to Section 3 and applies such Rents to the Indebtedness. Borrower agrees that the value of the license granted with regard to

CONFIDENTIAL                                          PLAINTIFFS_00020887

the Rents equals the value of the absolute assignment of Rents to Lender. The assignment of Rents contained in Section 3 shall terminate upon the release of this Security Instrument.

## 14.    Loan Commitment Charges.

Borrower agrees to pay any charges to be paid in connection with the Commitment and any other fees or amounts to be paid by Borrower pursuant to any of the other Loan Commitment Documents. Neither this Security Instrument, the Commitment, the Delivery Assurance Certificate nor any of the other Loan Commitment Documents shall be construed to create a contract for the use, forbearance or detention of money requiring payment of interest at a rate greater than the maximum interest rate permitted to be charged under applicable law. It is expressly stipulated and agreed to be the intent of Borrower and Lender at all times to comply with all applicable laws governing the maximum rate or amount of interest payable on the indebtedness evidenced by this Security Instrument, the Delivery Assurance Certificate and the other Loan Commitment Documents. If any applicable law limiting the amount of interest or other charges permitted to be collected from Borrower is interpreted so that any interest or other charge or amount provided for in any Loan Commitment Document, whether considered separately or together with other charges or amounts provided for in any other Loan Commitment Document, or otherwise charged, taken, reserved or received in connection with the Commitment, violates that law, and Borrower is entitled to the benefit of that law, that interest or charge is hereby reduced to the extent necessary to eliminate any such violation. Amounts, if any, previously paid to Lender in excess of the permitted amounts shall be shall be refunded to Borrower, and the provisions of the Loan Commitment Documents immediately shall be deemed reformed and the amounts thereafter collectible under the Loan Commitment Documents reduced, without the necessity of the execution of any new documents, so as to comply with any applicable law, but so as to permit the recovery of the fullest amount otherwise payable under the Loan Commitment Documents.

## 15.    ENTIRE AGREEMENT.

**THIS SECURITY INSTRUMENT, THE COMMITMENT, THE DELIVERY ASSURANCE CERTIFICATE AND ANY OTHER LOAN COMMITMENT DOCUMENTS REPRESENT THE FINAL AGREEMENT BETWEEN THE PARTIES AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS OR SUBSEQUENT ORAL AGREEMENTS. THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES.**

## 16.    Governing Law; Consent to Jurisdiction and Venue.

This Security Instrument shall be governed by the laws of the Property Jurisdiction without giving effect to any choice of law provisions thereof that would result in the application of the laws of another jurisdiction. Borrower agrees that any controversy arising under or in relation to this Security Instrument shall be litigated exclusively in the Property Jurisdiction. The

| Fannie Mae Multifamily Security Instrument | Form 6025.TX | Page 21 |
| Modified – Permanent Mortgage Loan Commitment | | |
| Texas | 06-12 | © 2012 Fannie Mae |

CONFIDENTIAL

state and federal courts and authorities with jurisdiction in the Property Jurisdiction shall have exclusive jurisdiction over all controversies that arise under or in relation to any security for the Indebtedness. Borrower irrevocably consents to service, jurisdiction, and venue of such courts for any such litigation and waives any other venue to which it might be entitled by virtue of domicile, habitual residence or otherwise.

17. **Miscellaneous Provisions.**

(a)    This Security Instrument shall bind, and the rights granted by this Security Instrument shall benefit, the successors and assigns of Lender. This Security Instrument shall bind, and the obligations granted by this Security Instrument shall inure to, any permitted successors and assigns of Borrower under the Loan Commitment Documents. If more than one (1) person or entity signs this Security Instrument as Borrower, the obligations of such persons and entities shall be joint and several. The relationship between Lender and Borrower shall be solely that of creditor and debtor, respectively, and nothing contained in this Security Instrument shall create any other relationship between Lender and Borrower. No creditor of any party to this Security Instrument and no other person shall be a third party beneficiary of this Security Instrument or any other Loan Commitment Document.

(b)    The invalidity or unenforceability of any provision of this Security Instrument or any other Loan Commitment Document shall not affect the validity or enforceability of any other provision of this Security Instrument or of any other Loan Commitment Document, all of which shall remain in full force and effect. This Security Instrument contains the complete and entire agreement among the parties as to the matters covered, rights granted and the obligations assumed in this Security Instrument. This Security Instrument may not be amended or modified except by written agreement signed by the parties hereto.

(c)    The following rules of construction shall apply to this Security Instrument:

(1)    The captions and headings of the sections of this Security Instrument are for convenience only and shall be disregarded in construing this Security Instrument.

(2)    Any reference in this Security Instrument to an "Exhibit" or "Schedule" or a "Section" or an "Article" shall, unless otherwise explicitly provided, be construed as referring, respectively, to an exhibit or schedule attached to this Security Instrument or to a Section or Article of this Security Instrument.

(3)    Any reference in this Security Instrument to a statute or regulation shall be construed as referring to that statute or regulation as amended from time to time.

(4)    Use of the singular in this Security Instrument includes the plural and use of the plural includes the singular.

| Fannie Mae Multifamily Security Instrument | Form 6025.TX | Page 22 |
| Modified – Permanent Mortgage Loan Commitment | | |
| Texas | 06-12 | © 2012 Fannie Mae |

PLAINTIFFS_00020889

(5)    As used in this Security Instrument, the term "including" means "including, but not limited to" or "including, without limitation," and is for example only, and not a limitation.

(6)    Whenever Borrower's knowledge is implicated in this Security Instrument or the phrase "to Borrower's knowledge" or a similar phrase is used in this Security Instrument, Borrower's knowledge or such phrase(s) shall be interpreted to mean to the best of Borrower's knowledge after reasonable and diligent inquiry and investigation.

(7)    Unless otherwise provided in this Security Instrument, if Lender's approval, designation, determination, selection, estimate, action or decision is required, permitted or contemplated hereunder, such approval, designation, determination, selection, estimate, action or decision shall be made in Lender's sole and absolute discretion.

(8)    All references in this Security Instrument to a separate instrument or agreement shall include such instrument or agreement as the same may be amended or supplemented from time to time pursuant to the applicable provisions thereof.

(9)    "Lender may" shall mean at Lender's discretion, but shall not be an obligation.

## 18.    Time is of the Essence.

Borrower agrees that, with respect to each and every obligation and covenant contained in this Security Instrument and the other Loan Commitment Documents, time is of the essence.

## 19.    WAIVER OF TRIAL BY JURY.

**TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, EACH OF BORROWER AND LENDER (BY ITS ACCEPTANCE HEREOF) (A) COVENANTS AND AGREES NOT TO ELECT A TRIAL BY JURY WITH RESPECT TO ANY ISSUE ARISING OUT OF THIS SECURITY INSTRUMENT OR THE RELATIONSHIP BETWEEN THE PARTIES AS BORROWER AND LENDER THAT IS TRIABLE OF RIGHT BY A JURY AND (B) WAIVES ANY RIGHT TO TRIAL BY JURY WITH RESPECT TO SUCH ISSUE TO THE EXTENT THAT ANY SUCH RIGHT EXISTS NOW OR IN THE FUTURE.  THIS WAIVER OF RIGHT TO TRIAL BY JURY IS SEPARATELY GIVEN BY EACH OF BORROWER AND LENDER, KNOWINGLY AND VOLUNTARILY WITH THE BENEFIT OF COMPETENT LEGAL COUNSEL.**

## 20.    Lien Priority.

This lien of this Security Instrument is and shall remain subject and subordinate to the lien of each of (a) that certain Construction Deed of Trust, Absolute Assignment of Rents,

| Fannie Mae Multifamily Security Instrument | Form 6025.TX | Page 23 |
|---|---|---|
| Modified – Permanent Mortgage Loan Commitment | | |
| Texas | 06-12 | © 2012 Fannie Mae |

CONFIDENTIAL

Security Agreement and Financing Statement of even date herewith, executed by Borrower for the benefit of JPMorgan Chase Bank, N.A., a national banking association (the "**First Deed of Trust**"), (b) that certain Deed of Trust and Security Agreement and Financing Statement of even date herewith, executed by Borrower for the benefit of Austin Housing Finance Corporation, a Texas public non-profit corporation (the "**Second Deed of Trust**"), and (c) that certain Third Lien Deed of Trust, Mortgage and Security Agreement of even date herewith, executed by Borrower for the benefit of 2007 Travis Heights, LP, a Texas limited partnership (the "**Third Deed of Trust**" and, collectively with the First Deed of Trust and the Second Deed of Trust, the "**Deeds of Trust**"), which Deeds of Trust are being recorded concurrently herewith.

**ATTACHED EXHIBITS.**  The following Exhibits are attached to this Security Instrument and incorporated fully herein by reference:

|  |  |  |
|---|---|---|
| [X] | Exhibit A | Description of the Land (required) |
| [ ] | Exhibit B | Modifications to Security Instrument |

**[Remainder of Page Intentionally Blank]**

| | | |
|---|---|---|
| **Fannie Mae Multifamily Security Instrument** | **Form 6025.TX** | **Page 24** |
| **Modified – Permanent Mortgage Loan Commitment** | | |
| **Texas** | **06-12** | **© 2012 Fannie Mae** |

CONFIDENTIAL

**IN WITNESS WHEREOF**, Borrower has signed and delivered this Security Instrument under seal (where applicable) or has caused this Security Instrument to be signed and delivered by its duly authorized representative under seal (where applicable). Where applicable law so provides, Borrower intends that this Security Instrument shall be deemed to be signed and delivered as a sealed instrument.

**BORROWER**:

2013 TRAVIS OAK CREEK, LP,
a Texas limited partnership

By:     2013 Travis Oak Creek GP, LLC,
        a Texas limited liability company,
        its general partner

        By:     _____

                Rene O. Campos,
                Manager

The name, chief executive office and organizational identification number of Borrower (as Debtor under any applicable Uniform Commercial Code) are:

Debtor Name/Record Owner: 2013 TRAVIS OAK CREEK, LP

Debtor Chief Executive Office Address:
3001 Knox Street, Suite 400
Dallas, Texas 75205

Debtor Organizational ID Number: 801710934

The name and chief executive office of Lender (as Secured Party) are:

Secured Party Name: PNC BANK, NATIONAL ASSOCIATION

Secured Party Chief Executive Office Address:
26901 Agoura Road, Suite 200
Calabasas Hills, California 91301

CONFIDENTIAL

PLAINTIFFS_00020892

Trustee Notice Address:
JAMES CLUTTS, JR.
c/o Chicago Title
14160 N. Dallas Parkway, Suite 810
Dallas, Texas 75254

CONFIDENTIAL

PLAINTIFFS_00020893

## ACKNOWLEDGEMENT

THE STATE OF TEXAS       )
                                ) SS

COUNTY OF _____ )

     This instrument was acknowledged before me on _____, 2014, by Rene O. Campos, Manager of 2013 TRAVIS OAK CREEK GP, LLC, a Texas limited liability company, on behalf of said limited liability company, as general partner of 2013 TRAVIS OAK CREEK, LP, a Texas limited partnership.

                                                _____

                                            Notary Public for the State of Texas

CONFIDENTIAL

## EXHIBIT A

## LEGAL DESCRIPTION OF THE MORTGAGED PROPERTY(LOT 1A)

LEGAL DESCRIPTION OF A 3.879 ACRE (168,990 SQUARE FEET) TRACT OR PARCEL OF LAND OUT OF THE ISSAC DECKER SURVEY, LOCATED IN THE CITY OF AUSTIN, AND BEING ALL OF LOT 1A, RESUBDIVISION OF LOT 1 OAK CREEK VILLAGE, AS RECORDED IN DOC. 201400101 OF THE OFFICIAL PUBLIC RECORDS, TRAVIS COUNTY, TEXAS, SAID OAK CREEK VILLAGE BEING A SUBDVISION RECORDED IN BOOK 50, PAGE 11, PLAT RECORDS, TRAVIS COUNTY, TEXAS, AND CONVEYED TO OAK CREEK AUSTIN HOUSING, INC. BY SPECIAL WARRANTY DEED IN DOC. 2007116822 OF THE OFFICIAL PUBLIC RECORDS OF TRAVIS COUNTY, SAID 3.879 ACRE TRACT BEING MORE PARTICULARLY DESCRIBED BY METES AND BOUNDS AND THE ACCOMPANYING SKETCH AS FOLLOWS:

**BEGINNING** at a ½-inch iron rod found with cap on the northwest right-of-way (R.O.W. ) line of Wilson Street (60-foot R.O.W.) at the east corner of Lot C, of the "Resubdivision of a Portion of Lot 16, Live Oak Grove", as recorded in Doc. 199900381, Official Public Records, Travis County, Texas (O.P.R.T.C.T), same being the south corner of said Lot 1A, and said Lot 1, Oak Creek Village, for the south corner and **POINT OF BEGINNING** of the herein described tract, from which a ½" iron rod with cap found at the south corner of Lot "B" of said Live Oak Grove Resubdivision bears S26°39'56"W a distance of 100.17 feet;

**THENCE, N62°40'33"W,** with the southwest line of said Lot 1A, same being the southwest line of said Lot 1, Oak Creek Village, passing a ½" iron rod found at a distance of 158.19', offset 0.40 feet left (south) at the north corner of said Lot C, same being a point in the most northerly line of a 2-foot strip of land conveyed to the C.O.A. in Volume 3834, Page 1414, Deed Records, Travis County, Texas, (D.R.T.C.T.), said strip lying adjacent to a 18-foot City of Austin alley conveyed in Volume 3451, Page 2224, D.R.T.C.T., and continuing with the north line of said 2-foot strip for **a total distance of 354.58 feet** to a ½" iron rod set with cap labeled "P Flugel 5096" for a west corner of this tract;

**THENCE,** with the common lot line between said Lot 1A, and Lot 1B, of said Resubdivision of Lot 1, Oak Creek Village, for the following eleven (11) courses:

**1) N26°39'57"E a distance of 26.40 feet** to a ½" iron rod set with cap labeled "P Flugel 5096" for an ell corner of this tract;

**2) S63°20'03"E a distance of 92.90 feet** to a ½" iron rod set with cap labeled "P Flugel 5096" for an ell corner of this tract;

Fannie Mae Multifamily Security Instrument          Form 6025.TX                    Page A-1
Modified – Permanent Mortgage Loan Commitment
Texas                                               06-12                     © 2012 Fannie Mae

CONFIDENTIAL

**3) N26°39'57"E a distance of 47.50 feet** to a ½" iron rod set with cap labeled "P Flugel 5096" for an ell corner of this tract;

**4) N63°20'03"W a distance of 10.50 feet to** a ½" iron rod set cap labeled "P Flugel 5096" for an ell corner of this tract;

**5) N26°39'57"E a distance of 5.00 feet** to calculated point for an ell corner of this tract;

**6) S63°20'03"E a distance of 10.50 feet** to calculated point for an ell corner of this tract;

**7) N26°39'57"E a distance of 288.09 feet** to a MAG NAIL set for an ell corner of this tract;

**8) N63°20'03"W a distance of 10.50 feet** to a MAG NAIL set for an ell corner of this tract;

**9) N26°39'57"E a distance of 5.00 feet** to a MAG NAIL set for an ell corner of this tract;

**10) S63°20'03"E a distance of 10.50 feet** to a MAG NAIL set for an ell corner of this tract;

**11) N26°39'57"E a distance of 263.10 feet** to a ½" iron rod set with cap labeled "P Flugel 5096" in the north line of said Lot 1, Oak Creek Village, same being the north corner of this tract and the east corner of said Lot 1B; same also being a point in the south line of Lot 5A, Amended Plat of Lots 5, 6, and 7, Shelton's Subdivision, as recorded in Volume 87, Page 12D, Plat Records, Travis County, Texas,

**THENCE**, with the southerly line of said Lot 5A, and the southerly line of Shelton's Subdivision, as recorded in Book 4, Page 163, P.R.T.C.T, same being the northerly line of said Oak Creek Village Lot 1 and this tract, **S62°38'45"E a distance of 261.49 feet** to a ½" iron rod found in the northwest R.O.W. line of said Wilson Street, at the south corner of Lot 1, of said Shelton's Subdivision for the east corner of this tract;

**THENCE**, with said northwest line of said Wilson Street, **S26°38'55"W a distance of 636.02 feet** to the **POINT OF BEGINNING** and containing **3.879 acres** (or 168,990 square feet) of land, more or less.

The bearings described herein are based on NAD'83 state plane coordinates, Texas Central (4203) zone.

**As Prepared by**
**Flugel Land Surveying**
Firm Registration No. 10193837

Fannie Mae Multifamily Security Instrument          Form 6025.TX              Page A-2
Modified – Permanent Mortgage Loan Commitment
Texas                                               06-12                     © 2012 Fannie Mae

CONFIDENTIAL

## EXHIBIT E

### LIST OF ANTICIPATED MORTGAGE LOAN DOCUMENTS
### AND APPROVED MODIFICATIONS

#### I. List of Anticipated Mortgage Loan Documents:

- Multifamily Loan and Security Agreement (Non-Recourse)
  - *Schedule 1 – Definitions Schedule*
  - *Schedule 2 – Summary of Loan Terms*
    - *Schedule 2 Addenda – Tax Credit Properties*
    - *Schedule 2 Addenda – Section 8 HAP Contract*
  - *Schedule 3 – Schedule of Interest Rate Type Provisions*
  - *Schedule 4 – Prepayment Premium Schedule*
  - *Schedule 5 – Required Replacement Schedule*
  - *Schedule 6 – Required Repair Schedule*
  - *Schedule 7 – Exceptions to Representations and Warranties Schedule*
  - *Modifications to Multifamily Loan and Security Agreement (Tax Credit Properties)*
  - *Modifications to Multifamily Loan and Security Agreement (Section 8 HAP Contract)*

- Multifamily Note

- Multifamily Deed of Trust, Assignment of Leases and Rents, Security Agreement and Fixture Filing (Texas)
  - *Modifications to Security Instrument (Tax Credit Properties)*

- UCC-1 Financing Statements (State and County)

- Subordination Agreement (Affordable) – 2nd Priority AHFC Loan

- Subordination Agreement (Affordable) – 3rd Priority Seller Loan

- Environmental Indemnity Agreement

- Guaranty of Non-Recourse Obligations

- Assignment of Management Agreement

- Assignment of Housing Assistance Payments Contract

- Consent to Assignment of Housing Assistance Payments Contract as Security for FNMA Financing

E-1

Forward Commitment/ Unfunded MBS Rate Lock

CONFIDENTIAL

PLAINTIFFS_00020897

## II. Approved Modifications to Anticipated Loan Documents:

**Multifamily Loan and Security Agreement (Non-Recourse):**

**Section 13.02    Mortgage Loan Administration Matters Regarding Reserves.**

      (1)    **Adjustment to Deposits.**

           (A)    **Mortgage Loan Terms Exceeding Ten (10) Years.**

If the Loan Term exceeds ten (10) years (or five (5) years in the case of any Mortgaged Property that is an "affordable housing property" as indicated on the Summary of Loan Terms), a physical needs assessment shall be ordered by Lender for the Mortgaged Property at the expense of Borrower (which expense may be paid out of the Replacement Reserve Account if excess funds are available). The physical needs assessment shall be performed no earlier than the sixth (6th) month and no later than the ninth (9th) month of (i) the tenth (10th) Loan Year-(, and of the twentieth (20th) Loan Year if the Loan Term exceeds twenty (20) years, or (ii) in the case of an affordable housing property, the fifth (5th) Loan Year, and every fifth (5th) Loan Year thereafter. After review of the physical needs assessment, the amount of the Monthly Replacement Reserve Deposit may be adjusted by Lender for the remaining Loan Term by written notice to Borrower so that the Monthly Replacement Reserve Deposits are sufficient to fund the Replacements as and when required and/or the amount to be held in the Repairs Escrow Account may be adjusted by Lender so that the Repairs Escrow Deposit is sufficient to fund the Repairs as and when required.

### SCHEDULE 7 TO
### MULTIFAMILY LOAN AND SECURITY AGREEMENT

**Exceptions to Representations and Warranties Schedule**

**[IF NONE, SO STATE]**

    1.    With respect to Sections 4.01(h)(3), 4.02(d)(5), 11.02(a) and 11.02(c) of the Loan Agreement, Borrower is indebted to Austin Housing Finance Corporation, a Texas non-profit corporation organized and operated under the Texas Non-Profit Corporation Act ("**AHFC**"), in the amount of $2,000,000 as evidenced by that Promissory Note dated May _____, 2014 (the "**AHFC Note**"), and the other documents governing and/or securing the loan evidenced by the AHFC Note (collectively, the "**AHFC Loan Documents**"). The AHFC Loan Documents are

E-2

Forward Commitment/ Unfunded MBS Rate Lock

PLAINTIFFS_00020898

subject to the terms and provisions of that Subordination Agreement dated of even date with the AHFC Note, executed by Borrower, Lender and AHFC.

2.      With respect to Section 11.01(b)(2) of the Loan Agreement, pursuant to and as more particularly described by the terms of the Extended Use Agreement, Section 42 of the Internal Revenue Code, and the rules and procedures of the Texas Department of Housing and Community Affairs ("**TDHCA**"), a right of first refusal has been granted to tenant and qualified nonprofit organizations identified by TDHCA.

3.      With respect to Section 16.04(d) of the Modifications to Multifamily Loan and Security Agreement attached to the Loan Agreement, the AHFC Loan Documents contain tenant eligibility requirements and rent restrictions that are applicable to the Mortgaged Property.

4.      With respect to Section 16.05(c) of the Modifications to Multifamily Loan and Security Agreement attached to the Loan Agreement, the AHFC Loan Documents contain tenant eligibility requirements and rent restrictions that are applicable to the Mortgaged Property.

E-3

Forward Commitment/ Unfunded MBS Rate Lock

CONFIDENTIAL

PLAINTIFFS_00020899

## EXHIBIT F

### TITLE INSURANCE REQUIREMENTS

F-1

Forward Commitment/ Unfunded MBS Rate Lock

CONFIDENTIAL

PLAINTIFFS_00020900

# Fannie Mae
# Title Insurance Requirements

### Section 323: Title Insurance (04/29/11)

Each Mortgage Loan must be covered by an acceptable title insurance policy meeting the following requirements:

### Section 323.01: Title Insurance Company (04/29/11)

The title policy must be issued by a title insurance company that:
- is duly authorized to issue title policies in the jurisdiction where the Property is located; and
- has an acceptable rating with adequate reserves

### Section 323.02: Policy Form (04/29/11)

Subject to satisfaction of other requirements set forth in this Section, Fannie Mae will accept the standard 2006 or the 1992 ALTA forms of loan title insurance policies. In those states in which ALTA forms of coverage are not approved for use by the applicable state insurance board or commission, the Lender must obtain the closest equivalent alternative coverage.

### Section 323.03: Electronic Policies (04/29/11)

Electronically issued title insurance policies are acceptable provided that the title insurance coverage is enforceable against the insurer notwithstanding electronic issuance and/or electronic signatures.

### Section 323.04: Insured (04/29/11)

The title policy must name the Lender as the insured and, upon assignment of the Mortgage Loan to Fannie Mae, must insure Fannie Mae (either by reference to the Lender's "successors and assigns, as their interests may appear" or by direct reference to Fannie Mae).

### Section 323.05: Effective Date (04/29/11)

If a 1992 ALTA title insurance policy form is issued, the effective date of the title insurance policy must be no earlier than the date (and time, if the effective date includes time) of recording of the Security Instrument. If a 2006 ALTA title insurance policy form is issued, the effective date of the title insurance policy must be no earlier than the date of the funding of the Mortgage Loan.

### Section 323.06: Amount of Title Insurance Policy (04/29/11)

The amount of the title insurance policy must be not less than the original principal amount of the Mortgage Loan

### Section 323.07: Mortgage Loan Description (04/29/11)

The title insurance policy must insure the same property description as is contained in the Security Instrument.

### Section 323.08: Standard Exceptions (04/29/11)

Standard exceptions (such as for matters not shown on public records) must be deleted. The title insurance policy may contain an exception for tenants in possession under residential leases.

### Section 323.09: Survey Exception (04/29/11)

PLAINTIFFS_00020901

The standard survey exception, if any, to the title insurance policy must be deleted. Exceptions to matters shown on a recorded map or plat must be specifically described and are subject to the other requirements of this Section.

## Section 323.10: Exception for Taxes, Assessments, or Other Lienable Items (04/29/11)

If the title insurance policy includes any exception for taxes, assessments, or other Lienable items, the title insurance policy must expressly insure that such taxes, assessments, or other Lienable items are not yet due and payable or not yet delinquent. In the event that taxes will become delinquent within 60 days after closing of the Mortgage Loan, then the Lender must require payment of taxes at closing.

## Section 323.11: Financing Statements (04/29/11)

Any financing statements filed or recorded in the office in which the Security Instrument must be recorded and showing the Lender as the secured party and related assignments thereof to Fannie Mae must be shown as an informational note on Schedule B, Part II, and must not be listed as exceptions on Schedule B, Part I. Other financing statements (such as those filed or recorded with the state or local office(s) for UCC filings) may be shown as an informational note on Schedule B, Part II, but must not be listed as exceptions on Schedule B, Part I.

### Section 323.12: Endorsements (04/29/11)

#### A.   Generally (04/29/11)

Lender must obtain appropriate ALTA, CLTA or equivalent endorsements, including, but not limited to, the endorsement discussed herein. For each endorsement, the Lender must assure that the endorsement is adequately incorporated into or cross referenced by the related "base" policy.

#### B.   Required Endorsements (04/29/11)

In jurisdictions where a required ALTA form of endorsement is not available, a substantially equivalent form of endorsement or affirmative coverage included in Schedule B of the title policy is acceptable. The following endorsements are required:

##### 1.   Environmental Protection Lien Endorsement (04/29/11)

Each title insurance policy must include an acceptable Environmental Protection Lien Endorsement. ALTA Form 8.1 (or the previously issued ALTA Form 8 or equivalent endorsement. Part (b) of ALTA Form 8.1 (or the previously issued ALTA Form 8 or equivalent endorsement) may only take exception for a statute under which environmental protection Liens could take priority over the Mortgage Loan. The Lender is liable to Fannie Mae for any loss sustained by the inclusion of a statute that is not a "super lien" or does not take priority over the Mortgage Loan. Super lien statutes acceptable as exceptions for inclusion in the ALTA Form 8.1 endorsement are listed in Acceptable Super Lien Statutes (Form 4666).

##### 2.   Comprehensive Endorsement (04/29/11)

A Restrictions, Encroachments, Minerals Endorsement (ALTA Form 9.3-06, Form 9.3 or Form 9) or an equivalent comprehensive endorsement must be included in the title insurance policy if any Lien, encumbrance, condition, restriction, or easement is listed in the title insurance policy. If an ALTA Form 9 endorsement (or an equivalent comprehensive endorsement) has been issued, but any Schedule B, Part I exception(s) continue to be excluded from the coverage provided through that endorsement for (i) encroachments onto the Property or onto easements or rights of way excepted in Schedule B of the title insurance policy, (ii) encroachments by the Improvements on the Property onto adjoining land, (iii) violations of existing covenants, conditions or restrictions, or (iv) other adverse circumstances, the Lender must determine whether the exception(s) would be acceptable to a reasonable, prudent Lender and to Fannie Mae.

##### 3.   Creditor's Rights (04/29/11)

A Creditor's Rights (ALTA Form 21-06) or the equivalent affirmative coverage must be included in all title insurance policies.

##### 4.   Other Endorsements (04/29/11)

PLAINTIFFS_00020902

Where appropriate because of the type of Property, Lender must assure that the title insurance policy includes: Condominium Endorsement; PUD Endorsement; Variable Rate Endorsement; Leasehold Mortgage Endorsement (or Leasehold Mortgagee Policy is also acceptable); Location Endorsement; Unlocated Easements; Contiguity-Multiple Parcel.

### Section 323.13: Document Retention (04/29/11)

The Lender must examine and keep in its Servicing File copies of all easements, encumbrances, or other restrictions shown as exceptions in the title insurance policy. Upon request, legible copies must be delivered to Fannie Mae.

CONFIDENTIAL

# EXHIBIT G

## SURVEY REQUIREMENTS

G-1

Forward Commitment/ Unfunded MBS Rate Lock

CONFIDENTIAL

PLAINTIFFS_00020904

# Fannie Mae Survey Requirements

An acceptable as-built survey prepared in connection with the origination of the Mortgage Loan must:

☐ meet the requirements of an ALTA/ACSM Land Title Survey, made in accordance with the 2011 Minimum Standard Detail Requirements for ALTA/ACSM Land Title Surveys as adopted by American Land Title Association and National Society of Professional Surveyors, including, at a minimum, the following Table A items: 1, 2, 3, 4, 6(a) and (b), 7(a), 8, 9, 10, 11(a) and (b), 13, 16 and 20;

☐ include the certification required in the 2011 Minimum Standard Detail Requirements for ALTA/ACSM Land Title Surveys as adopted by American Land Title Association and Society of Professional Surveyors; and

☐ be dated no more than 360 days prior to the date of the Security Instrument is recorded.

**Certification**: The survey needs to be certified to: ☐ PNC Bank, National Association ☐ Fannie Mae, it successors and/or assigns ☐ Title Insurer ☐ Owner / Borrower

**Draft Survey**:  When available send one copy to Lender and one copy to the Title Insurer for review. Please send one hard copy and If possible, please email a pdf version.

**Final Survey**:  Four (4) original signed surveys to Lender; Two (2) original signed surveys to Title Insurer.

**Lender Contact:** Ms. Lee Peterson Sr. Title Coordinator PNC Bank 11800 338ᵗʰ Ave NE Carnation, WA 98014
(p) 425-788-4124
(f) 425-788-3126 lee.peterson@pnc.com

CONFIDENTIAL

## EXHIBIT H

### INSURANCE REQUIREMENTS

H-1

Forward Commitment/ Unfunded MBS Rate Lock

CONFIDENTIAL

PLAINTIFFS_00020906

## Fannie Mae Insurance Requirements Guide
## for PNC Bank, National Association

## GENERAL REQUIREMENTS SECTION

### 1. General Insurance Requirements

Fannie Mae requires each Property to be covered by Property and Liability Insurance for the life of the Mortgage Loan. The Borrower must be listed as a named insured on the policy. Policies must comply with all of the following provisions.

- Policies must be written on a per occurrence basis except for Earthquake and Professional Liability coverage, which may be written on a "claims made" basis.

- Policies must have a cancellation provision requiring the carrier to notify the Lender at least 30 days in advance of policy cancellation for any reason other than non-payment of premium.

- Policies must include a cancellation provision that provides for at least a 10 day written notification for non-payment of premium.

- Policies must name Fannie Mae as "additional insured" on General Liability and Excess/Umbrella policies.

- Property policies must contain a mortgagee clause and loss payable clause acceptable to Fannie Mae. An acceptable mortgagee clause would be:

**Fannie Mae, its successors and/or assigns,**
**as their interest may appear**
**C/O PNC Bank, National Association**
**26901 Agoura Road, Suite 200**
**Calabasas Hills, CA 91301**

### 2. Blanket and Other Policies Covering More Than One Property

Use of a Blanket Policy (or policies) or multiple property policy (or policies) covering the Property and General/Excess/Umbrella/Professional Liability is acceptable, provided: the policy provides the same or better insurance coverage as a single property insurance policy;

- the Property is listed and identified in the policy or associated schedules;

- the policy complies with all other applicable requirements contained in this Guide; and

- all insured properties covered by the policy either:

  ❖ have common ownership with the Borrower, or with a Key Principal, Principal or Affiliate of the Borrower; or

  ❖ are managed by the same property management company.
  ❖ A Statement of Values and, if requested, a Probable Maximum Loss Report or other verification that the limits being provided are adequate.

FNMA Guide                                                                 1/2014

CONFIDENTIAL                                           PLAINTIFFS_00020907

### 3.  Blanket Policies for Properties Not Having Common Ownership

Use of Blanket Polices insuring non-related entities is subject to review and approval by Fannie Mae.

### 4.  Insurance Carrier Rating

All property and casualty insurance carriers must meet one of the following rating requirements even if it is rated by one or more rating agencies or conditions:

- A.M. Best Company general policyholder's rating of "A-" or better, and a financial performance index rating of "VI" or better;

- state wind pools or state funds, if they are the only coverages that can be obtained; or

- flood coverages issued by the National Flood Insurance Program ("NFIP") or written by companies approved under the NFIP's "Write Your Own" program.

### 5.  Term

Polices must have a minimum 12-month policy term.  For new Mortgage Loans, a Property may be added mid-term to an existing 12-month policy.

### 6.  Payment of Premium

Premiums for all required policies must be paid in full with no premium financing.  For Mortgage Loans where no insurance impounds are being collected, the Borrower must provide evidence that all policies are paid in full annually.

### 7.  Evidence of Insurance

The Borrower must provide evidence of insurance for the Property on or before the closing or the policy's renewal date.  Evidence of insurance coverages for the Property must be provided as follows.

- Temporary Evidence – Any of the following are acceptable forms of temporary evidence of insurance:

  - ACORD 28 – "Evidence of Commercial Property Insurance" (most recent version or per state requirements if applicable), combined with ACORD 25 – "Certificate of Liability Insurance";

  - ACORD 75 – "Insurance Binder"; or

  - Mortgage Bankers Association (MBA) Evidence of Insurance – Commercial Property Form.  In states where the MBA form is filed and approved, the appropriate state form must be used otherwise the most recently revised MBA form should be used, which can be found at:

FNMA Guide

1/2014

CONFIDENTIAL

PLAINTIFFS_00020908