

ENGINEERS
ARCHITECTS
MATERIALS SCIENTISTS

**Wiss, Janney, Elstner Associates, Inc.**
9511 N. Lake Creek Parkway
Austin, Texas 78717
512.257.4800 tel | 512.219.9883 fax
Texas Registered Engineering Firm F-0093
www.wje.com

Via Email: *jtracy@cpmtx.com*

July 22, 2016

2013 Travis Oak Creek, LP
C/O Mr. Joe Tracy
3001 Knox Street, Suite 400
Dallas, Texas 72505

Re: Report for Limited Enclosure Assessment
    Oak Creek Village Apartments, Austin, Texas
    WJE No. 2016.3106

Dear Mr. Tracy:

At your request, Wiss, Janney, Elstner Associates, Inc. (WJE) has performed a limited visual survey of the stucco installation at the Oak Creek Village Apartments buildings, located at 2324 Wilson Street in Austin, Texas. This letter describes our findings and presents recommendations for the observed conditions.

## Background

Amy D Gelsone, AIA, and Erika Bonfanti, PE, of WJE visited the site the morning of June 20, 2016 to perform a limited visual survey of the exterior walls and identify apparent deficiencies in the installation of the stucco cladding system. No testing was conducted and no deconstructive openings were made during this visit. The purpose of our visit was to review the visible condition of the stucco installation and identify conditions that may affect short- and long-term performance of the enclosure system.

We understand from the drawings and submittals provided to us by you that the facades of the buildings consist of a Parex stucco cladding system, including 1/2-inch stucco over 1-inch expanded polystyrene (EPS) and MTI drain mat, with Tyvek Commercial Wrap over sheathing on wood stud backup with insulated cavities and interior gypsum board as well as flanged aluminum windows.

## Contract Document Review

WJE was provided with limited documents from Capital Project Management, including: the Construction Set architectural drawings by Craycroft McElroy Hendryx, dated May 23, 2014; the Construction Set specifications by Craycroft McElroy Hendryx, dated May 21, 2014; and Change Order Number 1, dated July 31, 2014. Change Order Number 1 indicates the substitution of a Parex stucco system for the EIFS system depicted in the Construction Documents. WJE performed a review of applicable portions of these documents.



EXHIBIT
35
Rogers 7-17-17
PENGAD 800-631-6989

**Headquarters & Laboratories–Northbrook, Illinois**
Atlanta | Austin | Boston | Chicago | Cleveland | Dallas | Denver | Detroit | Honolulu | Houston | Los Angeles
Minneapolis | New Haven | New York | Princeton | San Francisco | Seattle | South Florida | Washington, DC



**Locations of Control Joints**
The locations of vertical and horizontal control joints are indicated on the elevation drawings, Sheets A5.01 through A5.03. A note on Detail 6/A8.01 also calls for horizontal control joints to be aligned at each floor level with the breezeways and balconies.

**Locations of Weep Screeds**
In Specification Section 072418, Part 3.5.A.1, weep screeds are called for at base terminations and window and door heads.

**Window Sill**
Detail 1/A7.02 shows the flanged window sill terminating over the top of the EIFS. Presumably this detail would remain the same for the Parex stucco system substitution.

**Locations of Expansion Joints**
Despite several buildings being joined together by numerous breezeways, we could not identify indications for any expansion joints, either within the structure or cladding systems, between the buildings or breezeways on the drawings.

**Finish-coat Texture**
In the EIFS Specification Section, 072418, Part 3.8.A, the finish is indicated to match the Architect's samples and be free of texture variations.

## Visual Survey

WJE conducted a visual survey of the exterior walls, focusing on the installed stucco system (Figure 1). The stucco installation was generally in good condition; however, we noted a few systemic issues along with some isolated issues. We also noted some issues worth mentioning beyond the stucco installation.

WJE observed the following systemic issues with the stucco installation; these issues were characteristic of all observed buildings on the subject property:

- Control joints missing at floor lines, as compared with the locations noted on the Contract Documents, and associated cracks in these locations (Figure 2 and Figure 3).
- Weep screeds missing at base terminations of stucco at balconies and window and door heads (Figure 4 and Figure 5).
- Secondary trim installed at base terminations of stucco over foundation screeds (Figure 6).
- Sill flashing missing at windows and separation between stucco and window frame at sills (Figure 7 and Figure 8).
- Perceptible texture variations at apparent stucco repairs (Figure 9 through Figure 14).
- Deflection joints at tops of columns stopped shy of reglet termination accessory (Figure 15). Cracking of the stucco was noted along these columns.

WJE observed the following isolated issues related to the stucco installation. These issues were observed only in a limited number of locations:

- Separations between stucco and accessories at termination screeds, corner beads, foundation weep screeds, and balcony edges (Figure 16 through Figure 18).
- Uneven termination of stucco at edges and bases of walls (Figure 19 and Figure 20).

PLAINTIFFS_00004276



- Cracking in the field of stucco and along the wood column between Buildings C and D (Figure 21 through Figure 25).
- Lack of weather barrier tie-in above mailboxes at Building C and at multiple locations of low roof interfaces with stucco cladding (Figure 26 through Figure 28).
- Unsealed penetrations through face of stucco cladding (Figure 29 and Figure 30).
- Mechanical damage to stucco (Figure 31).
- Abandoned outlets (Figure 32).
- Railing corrosion and environmental staining at balcony and walkway edges (Figure 33 and Figure 34).
- Staining of stucco cladding below balconies (Figure 35).
- Stucco coating missing at relocated downspout at Building C and behind utility panels at Building A (Figure 36).

In addition to the stucco items noted above, WJE observed several issues unrelated to the stucco installation that may affect the long-term performance of the building systems. These include, but are not limited to, the following:

- Corrosion and limited spalling in concrete at embedded handrails (Figure 37 and Figure 38).
- Separation and moisture staining at soffit board joints (Figure 39 through Figure 41).
- Lack of building expansion joints (Figure 42).
- Efflorescence at edge of split slab at podium level (Figure 43).
- Damage to below-grade waterproofing (Figure 44).
- Spray foam sealing conduits at roof hood exposed to UV (Figure 45).
- Leaking downspout connections (Figure 46).
- Ponding water at roof section over Building C (Figure 47).
- Low roof access door threshold (Figure 48).

## Discussion

### *Stucco Installation, General*

In general, the stucco installation at the subject project appeared to be in line with typical stucco installations observed in this region. The surfaces were generally in good condition, with limited cracking and damage noted in the areas described above. However, the installation fell short of the design in a number of aspects. A discussion of these items is provided below.

### *Control Joints*

WJE observed that a number of control joints were not located as depicted on the drawings, with some added but several, primarily horizontal ones, eliminated, particularly at the balconies and floor lines. We also noted several cracks stemming from the bottom corners of balconies, which we see as correlating with a lack of control joints at these locations. Although these cracks are primarily cosmetic, they can allow a larger volume of water to enter through the cladding system, challenging weather barrier vulnerabilities.

### *Weep Screeds*

While we observed minimal cracks and separations at the heads of windows and doors, we would expect separations to appear over time, more so at the head conditions that are not protected under soffits. Foundation weep screeds were present at the bases of walls; however, a second piece of trim appears to provide the termination for the stucco, which may mitigate the drainage function of the weep screed. However, no distress associated with a lack of drainage at the base of the stucco was noted.

PLAINTIFFS_00004277



Mr. Joe Tracy
2013 Travis Oak Creek, LP
July 22, 2016
Page 4

### Window Sills

We observed the stucco system returning at an angle to meet the bottom of the windows, and there does not appear to be a path for incidental water to drain, other than through some of the cracking we observed along this joint between the stucco and window system. As no sealant joint exists to accommodate differential movement of the window frames and stucco system, we would expect additional separation along this joint to develop over time. Again, this separation is primarily a cosmetic issue but can allow a larger volume of water to enter behind the cladding system.

### Texture Variations

We were able to discern some resulting variation in texture of the stucco finish where repairs have apparently been made. On the east facade, we also noted a couple of panels that had a different pattern of texture relative to adjacent panels, perhaps due to repairs. We are currently unaware of the type of finish required by the Architect's samples; however, we observed a somewhat rough, textured finish on the installed stucco. The variations in texture are, in general, as expected for a textured stucco finish coat.

### Deflection Joints

At the columns supporting the breezeways, we observed that the reveal providing for deflection at the top of the column stopped shy of the reglet, making the stucco continuous across the joint at those locations. We also observed corresponding cracking in these locations. Typically, stucco accessories would be provided in these and similar joints to accommodate differential movement of substrates and inhibit cracking between stucco panels.

### Isolated Stucco Issues

In addition to the more systemic issues described above, we also observed a number of isolated issues. We noted some separation at stucco accessories as well as some uneven terminations at bases of stucco. We observed some isolated cracking in the field of the stucco as well, including cracking that extended almost the full height of a purportedly wood column between Buildings C and D. As described above, this cracking is primarily an aesthetic issue and is likely related to placement of control joints in locations inconsistent with those recommended in ASTM C1063, *Standard Specification for Installation of Lathing and Furring to Receive Interior and Exterior Portland Cement-Based Plaster*. This standard contains recommendations for locating control joints, including provision of horizontal and vertical joints at each window and door corner as well as limiting the length-to-width ratio of each stucco panel to 2:1. These standards generally appeared to be followed on the drawings and as constructed, with the exception of the isolated locations noted above. Exploratory openings could be made to confirm the installation methodology of the underlying system components; however, it does not appear that systemic installation issues exist due to the limited extent of distress at this time.

Some locations revealed a lack of weather barrier tie-in or edge termination between the stucco and interfacing system. These locations included the mailboxes at Building C, as well as two low roof-to-stucco interfaces at Building A. We also observed a number of penetrations through the stucco that did not appear to be sealed and one location where the sealant had separated. In locations of apparent lack of continuity between the weather barrier and adjacent opening or roof system, water can leak further into the building interior, leading to damage of wall components and finish materials. At locations of unsealed penetrations, it was unclear if the penetration was added subsequent to installation of the stucco. However, items added after stucco installation are likely not adequately integrated into the weather barrier system, which can also lead to water infiltration.

PLAINTIFFS_00004278

 ENGINEERS
ARCHITECTS
MATERIALS SCIENTISTS

Mr. Joe Tracy
2013 Travis Oak Creek, LP
July 22, 2016
Page 5

In a limited number of locations, we observed mechanical damage to the stucco. While not necessarily problematic, we did observe a few instances of what appeared to be abandoned outlets penetrating the stucco. A lack of continuous cladding material at damaged stucco and abandoned outlets can allow water to enter further into the wall system, potentially leading to leakage at the building interior.

WJE observed widespread staining of the breezeway and balcony fascia conditions as well as signs of corrosion at several instances of the railing where we presume some portions of the railing were not fully coated. Beyond the resulting staining, this also appears to be causing some spalling in the balcony concrete where the railing posts are encapsulated. Further corrosion of handrails will lead to additional spalling of the surrounding concrete, due to the expansive nature of the corrosion product. In at least two locations on Building A, we also observed staining below balconies at either end. The source of this staining was unknown but may be related to water infiltration through the balconies. Where one downspout was relocated at the base of Building A, the stucco surface was not coated, and abandoned fastener penetrations were present.

### Non-Stucco-Related Exterior Enclosure Issues

#### Soffit Panel Joints

While the perimeter gap we observed at the soffit panel of a ventilated balcony is likely not problematic, the separation at joints in the soffit panels we observed at both the ventilated balconies and unventilated plenums under the breezeways appear to be resulting in premature deterioration of the coating on the soffit and the soffit panels themselves. In at least two instances, we observed water damage at these joints. It does not appear that the panel joints were sufficiently prepared to allow the coating bridging them to remain intact. Although the soffit panel material is unknown, the damage at edges appears to be due to exposure to moisture within the air. Further exploration of this condition may be warranted to determine the cause of distress and evaluate the condition of the underlying soffit anchorage.

#### Lack of Building Expansion Joints

We did not observe any building expansion joints in the drawings or the as-constructed conditions between buildings or within cladding materials. We did observe an increase in separation at the soffit panel joints near breezeway connections between buildings. Beyond the insufficient preparation of these joints, the differential movement of separate buildings without any expansion joints appears to be putting increased strain on these soffit panels, promoting separation. Further examination of this condition is likely warranted to mitigate further cracking and separation of cladding and building materials over time.

#### Split-slab Efflorescence

We observed a significant amount of efflorescence stemming from the split-slab waterproofing system at the podium, along with some staining from the railing above. This efflorescence appears to be a result of water migrating through the finished surface over the podium, where it contacts the waterproofing surface and drains to the exterior, between the structural and topping slabs. Efflorescence can be cleaned from the surface of concrete with water and a brush and will likely lessen over time as the amount of water-soluble, uncontained salts within the concrete is reduced.

#### Below-grade Waterproofing

We also observed damage to the below-grade waterproofing termination in one location at the base of the podium. This damage appears to be related to settlement of the adjacent soil, which can apply pressure on the membrane and cause disengagement from the substrate.

PLAINTIFFS_00004279



### *Roof Level Conditions*

At the roof level, we observed several conduit hoods with spray polyurethane foam (SPF) used to provide an air seal around the conduit. Because SPF is not UV stable, it will deteriorate quickly, resulting in discontinuity in the air and moisture barrier. This could potentially lead to condensation or water infiltration to the building interior. In a couple of locations, leaking downspout connections resulted in staining of the stucco finish. One sizeable area of ponding water on the roof was noted on the east side of Building C. In addition, a roof access door threshold was observed to be less than the standard 8-inch minimum height above the finished roof surface. During heavy rain events, water could rise to this height, overtopping the door threshold and top edge of the roof membrane.

## Conclusions and Recommendations

Without conducting exploratory openings, we are unable to speak to the installation of the lath and control joint fastening, but the majority of the stucco installation appeared to be performing adequately. Even so, several deficiencies in the stucco cladding system were observed. WJE's recommendations for addressing these items are organized by condition, below. We acknowledge that the repairs to construction deficiencies described below all represent compromises to the design intent. Indeed, even repairs to the design deficiencies will likely result in perceptible patching. In our opinion, removing the stucco in its entirety, making the needed corrections, and reinstalling the stucco would be the course of action recommended to restore the buildings to the original expectations. That being said, there could be reasons why the owner may choose to accept a compromised solution or solutions. In a number of our conclusions below, we have offered such a solution as well as a less comprehensive solution for consideration by the owner as alternates to a full stucco reclad.

### *Stucco Conditions*

#### *Control Joints*

Cracking was primarily present in locations where control joints are recommended per ASTM C1063 but were not installed; however, some locations at which joints were not installed are consistent with a lack of jointing noted on the drawings. This is presumably due to the aesthetic impact of additional control joint locations. Even so, horizontal control joints were specifically called for in the drawings to align with the balconies and breezeways at each floor level but were not installed; some cracking has occurred in these locations. To mitigate future cracking of this type, stucco could be removed to the nearest adjacent panels in these locations to allow for installation of control joints. Repairs in these locations, if implemented, would likely result in noticeable patched areas; damage to the underlying weather barrier and substrate could also occur during removal and reinstallation. Alternatively, the cracks themselves could be repaired with sealant.

#### *Weep Screeds*

While the lack of weep screeds at the heads of the windows and doors and the possibly non-functioning weep screeds at the bases of walls may contribute to future separation of the stucco from the trim accessory, repairing those conditions will likely result in noticeable patching of the stucco. We did not note evidence of a lack of adequate drainage of the stucco; however, corrosion of the lath and accessories near these horizontal terminations may occur over time due to trapped moisture. To provide drainage, stucco cladding can be removed to allow for installation of weep screeds in locations indicated. However, as noted above, this would likely result in noticeable patched areas. Alternatively, these conditions can continue to be monitored for evidence of distress.

PLAINTIFFS_00004280



**Window Sills**

As constructed, without sill flashing that extends over the top of the stucco per the Contract Documents or a sealant joint to provide separation and allow for differential movement between the stucco and window frames, we anticipate additional separations to develop. As previously discussed, this is primarily an aesthetic issue, unless discontinuities in the underlying weather barrier exist through which water could penetrate to the interior. At this time, removing the windows to install sill flashing would introduce more risk of water intrusion and would be fairly invasive. It is unclear whether the sill flashing was eliminated from the Contract Documents during the construction process. However, we understand that no water infiltration has been reported at this time as a result of a lack of this flashing. As such, WJE recommends discrete removal of stucco at the base of the window frames and installation of sealant within these joints. Further monitoring of the interior conditions can also be performed for evidence of water penetration.

**Texture Variations**

Given the nature of the rough, textured stucco finish, we would expect some difficulty in matching any patching to the existing stucco completely. Also, it does not appear that any tolerance beyond matching the Architect's samples was specified in the Contract Documents. In our opinion, some slight disparity is to be expected with this type of stucco finish and the performance will not be affected by these discrepancies in texture.

**Deflection Joints**

Continued cracking can be expected at the interface of columns with the breezeways where the stucco is continuous, without a corner bead or other means of separation between stucco panels. To provide separation and accommodate movement, stucco can be cut out to allow for installation of corner casing beads separated by sealant and backer rod. Alternatively, stucco can be routed out along these vertical joints and sealant and backer rod.

**Isolated Stucco Issues**

The separation occurring at the accessories as well as the isolated cracks observed can be repaired with sealant and sanded and painted to match the existing stucco. At the wood column at Building C that shows considerable cracking, WJE recommends complete removal of the stucco, installation of membrane flashing over the extents of the wood, and covering the column with formed sheet metal panels or similar to match the surrounding stair. We do not recommend reinstalling stucco in this location, given the geometry of the column and limited area for installing control joints at corners.

Where the stucco at the bases of walls is uneven, facing Wilson Street and the interior courtyard, the stucco panel at the base of wall can be removed and replaced. At the mailboxes, both the stucco and mailboxes should be removed to allow for installation of membrane flashing into the perimeter of the rough opening to ensure continuity of the air and moisture barrier system.

We recommend adding sealant to the untreated penetrations and repairing any separated sealant. The mechanically-damaged stucco should also be repaired and recoated. It is unclear whether the abandoned outlets are contributing to any water intrusion behind the stucco; however, we recommend considering installing permanent exterior covers that can then be sealed to the stucco. In addition, we recommend continued monitoring of the area interior of unsealed penetrations to determine whether water infiltration is occurring as a result of these installations.

PLAINTIFFS_00004281



Staining on the surface of stucco below balconies and walkways can be removed with water and a brush; a mild cleaner may also be used to remove environmental stains. However, cleaners with strong acids, such as muriatic/hydrochloric acid, should be avoided to prevent damage to the stucco. Regular cleaning of the balcony surfaces may limit the recurrence of this staining; however, stucco surfaces will likely require continued cleaning. For the staining observed below the balconies facing the courtyard, we recommend further investigation to determine the source of the staining and extents of underlying distress.

Areas of stucco with relocated downspouts and utilities should be painted to match adjacent panel colors.

### *Railing Corrosion and Spalling*
We recommend cleaning the railings where corrosion is already occurring and applying a protective coating to mitigate any further corrosion. Depending on the extents of corrosion, the railing may need to be removed to allow for continuous application of the coating over embedded rail post surfaces. Subsequent to these repairs, corrosion staining can be removed from the faces of the stucco.

### **Non-Stucco-Related Enclosure Conditions**

### *Soffit Panel Joints*
As the observed distress is already occurring at many of the joints, it will likely spread to most, if not all, of the panel joints and to greater areas of the panels themselves. The soffit panel material is unknown; however, treating the joints with an exterior-grade filler or sealant and recoating may mitigate this distress. Where water damage has occurred, we recommend removing and replacing the affected panels. To develop an appropriate, long-term repair strategy, we recommend further exploration of this condition.

### *Lack of Building Expansion Joints*
We recommend further evaluation of the lack of expansion joints between buildings by a structural engineer to determine the long-term impact of this condition. Currently, evidence of differential movement between buildings was observed at the podium concrete, in cracks at the stucco, and at separations of soffit panel joints near the adjoining breezeways; however, continued damage may occur over time if this condition is not addressed.

### *Split-slab Efflorescence*
The efflorescence is primarily an aesthetic issue and can be maintained with regular cleaning. However, the corrosion from the railing above can lead to premature failure of the systems, and, indeed, a spall appears to have formed at one corner of the concrete supporting the railing. Refer to the recommendation above regarding the railing. Concrete spalls can be removed and patched.

### *Below-grade Waterproofing*
WJE recommends excavation of a small area of soil adjacent to the damaged below-grade waterproofing to allow for repair of the existing membrane. A new termination bar should be installed at the top edge of the membrane to protect against further movement of the membrane due to soil settlement.

### *Roof Level Conditions*
We recommend considering replacing the exposed SPF with a panel notched around the conduit and then sealed at the perimeter and conduit interfaces. Leaking downspout connections can be corrected with sealant between sheet metal sections, and discolored stucco can be cleaned as noted above.

 ENGINEERS
ARCHITECTS
MATERIALS SCIENTISTS

Mr. Joe Tracy
2013 Travis Oak Creek, LP
July 22, 2016
Page 9

Where water has ponded on the roof surface, the roof manufacturer should visit the site to evaluate this condition and provide recommendations for repair, if needed, in order to maintain the roof warranty. Repairs may consist of the addition of insulation and/or cover board layers and removal and replacement of the roof membrane at ponded areas. At the low access door threshold, WJE recommends monitoring for water infiltration during heavy rain events and evaluation by the roof manufacturer for potential repair strategies to divert water away from the door.

## Closing

This assessment was based on limited visual observations of readily-accessible portions of the building exterior. Our findings and recommendations are based on observations of these representative conditions at the referenced facility at the time of our assessment. Other conditions may exist, or develop over time, which were not found during our investigation. WJE reserves the right to modify our findings should additional information become available. Our recommendations and/or opinions are presented for consideration by 2013 Travis Oak Creek, LP and do not represent a design or specification for repairs.

Sincerely,

**WISS, JANNEY, ELSTNER ASSOCIATES, INC.**

Amy D Gelsone

Amy D Gelsone, AIA, CIT, LEED AP
Senior Associate

PLAINTIFFS_00004283



ENGINEERS
ARCHITECTS
MATERIALS SCIENTISTS

Mr. Joe Tracy
2013 Travis Oak Creek, LP
July 22, 2016
Page 10

## Figures



*Figure 1. Courtyard overview.*



*Figure 2. Cracking at balcony on Building D with no horizontal control joint.*

CONFIDENTIAL



Mr. Joe Tracy
2013 Travis Oak Creek, LP
July 22, 2016
Page 11



*Figure 3. Cracking at balcony on Building A with no horizontal control joint.*



*Figure 4. Lack of weep screed at window head.*

PLAINTIFFS_00004285



ENGINEERS
ARCHITECTS
MATERIALS SCIENTISTS

Mr. Joe Tracy
2013 Travis Oak Creek, LP
July 22, 2016
Page 12



*Figure 5. Lack of weep screed at balcony door head, as well as apparent damage to flashing.*



*Figure 6. Weep screed at base of wall. Note additional termination accessory above weep screed.*

CONFIDENTIAL

PLAINTIFFS_00004286





*Figure 7. Lack of sill flashing at base of window.*



*Figure 8. Separation between stucco and window frame; note lack of stucco termination accessory.*

PLAINTIFFS_00004287





*Figure 9. Texture variation apparent at stucco repair on Building B.*



*Figure 10. Apparent repairs at beam penetrations on Building C.*

PLAINTIFFS_00004288





*Figure 11. Visible sealant repair at crack on Building C.*



*Figure 12. Visible difference in finish texture at this panel on Building D.*

CONFIDENTIAL



*Figure 13. Slight overall texture variation on Building B.*



*Figure 14. Slight overall texture variation on Building A.*





*Figure 15. Crack visible at column adjacent to breezeway where deflection control joint has been filled with stucco.*



*Figure 16. Separation in base trim above weep screed at south end of Building A.*

PLAINTIFFS_00004291





*Figure 17. Slight separation in base trim at Building A.*



*Figure 18. Separation of stucco at jamb trim.*

CONFIDENTIAL





*Figure 19. Uneven termination of stucco at wall base above garage vent on east side of Building C.*



*Figure 20. Uneven termination of stucco at wall base above garage vent on east side of Building A.*

PLAINTIFFS_00004293





*Figure 21. One uncontrolled crack and staining visible at breezeway on Building C.*



*Figure 22. Crack above splice in stucco accessory.*

CONFIDENTIAL





*Figure 23. Hairline crack near Mail Center signage.*



*Figure 24. Cracking on all sides for much of height of column at Building C.*

CONFIDENTIAL

PLAINTIFFS_00004295





*Figure 25. Small crack at base of window near breezeway; note lack of vertical control joint.*



*Figure 26. Lack of sealing of weather barrier at wall base on roof of Building A.*

PLAINTIFFS_00004296





*Figure 27. Exposed Tyvek tape unsealed at exposed concrete on Building C.*



*Figure 28. Lack of weather barrier tie-in at sheathing above mailboxes at Building C.*

PLAINTIFFS_00004297



ENGINEERS
ARCHITECTS
MATERIALS SCIENTISTS

Mr. Joe Tracy
2013 Travis Oak Creek, LP
July 22, 2016
Page 24



*Figure 29. Damage visible at security camera on Building A.*



*Figure 30. Fire hose spigot penetration not sealed at face of stucco on Building A.*

CONFIDENTIAL





*Figure 31. Mechanical damage to stucco on Building A.*



*Figure 32. Abandoned outlet on Building A.*

PLAINTIFFS_00004299





*Figure 33. Typical staining at breezeway fascia due to moisture runoff.*



*Figure 34. Corrosion of railing behind stucco resulting in staining at balcony on Building D.*

PLAINTIFFS_00004300



ENGINEERS
ARCHITECTS
MATERIALS SCIENTISTS

Mr. Joe Tracy
2013 Travis Oak Creek, LP
July 22, 2016
Page 27



*Figure 35. Abandoned outlet (blue) and undiagnosed staining (red) below balcony on Building A.*



*Figure 36. Relocated downspout reveals lack of coating and abandoned fastener penetrations in stucco.*

CONFIDENTIAL

PLAINTIFFS_00004301





*Figure 37. Corrosion of presumably uncoated portions of railing mesh noted in several locations.*



*Figure 38. Spalling of concrete at balcony where railing does not appear to be fully coated.*

PLAINTIFFS_00004302





*Figure 39. Separation at soffit board joint on Building 4.*



*Figure 40. Separation at soffit board joint.*





*Figure 41. Soffit board joint showing apparent water damage.*



*Figure 42. Crack between Buildings A and B at west elevation; note lack of building expansion joint in this location.*

CONFIDENTIAL





*Figure 43. Efflorescence visible with active wetting at split-slab condition of podium.*



*Figure 44. Damage to below-grade waterproofing termination visible at base of podium.*

PLAINTIFFS_00004305





*Figure 45. Spray foam used to seal conduit hoods on roof.*



*Figure 46. Staining resulting from leak in downspout connection.*





*Figure 47. Large area of apparent ponding water on eastern portion of roof over Building C.*



*Figure 48. Roof access door threshold lower than industry standard 8-inch minimum.*

PLAINTIFFS_00004307

**From:**       Stephen Gibson
**To:**         "Kenneth Chaiken"; Kirk Standly; Rene Campos; David Campos; Mark Rogers (mrogers972@gmail.com) (mrogers972@gmail.com)
**Subject:**    FW: Lucero Apartments Arbor Loan
**Date:**       Monday, June 12, 2017 4:19:00 PM
**Attachments:** Term Sheet - Lucero Apts. 9369.pdf

**From:** William Connolly
**Sent:** Monday, June 12, 2017 3:13 PM
**To:** Gianni Ottaviano <GOttaviano@arbor.com>; Alan Steinmetz <ASteinmetz@arbor.com>
**Subject:** Lucero Apartments

Arbor Realty Trust is prepared to continue underwriting a potential mortgage loan in the amount of approximately $30,500,000, to be secured by the above referenced property, so long as the following are received in short order:

**- confirmation that PNC as limited partner and as second mortgage lender will sign a notarized consent approving of Arbor's loan documents, and that PNC as second mortgage lender will waive their right to provide the mortgage loan which Arbor would instead provide**

**- written consent by PNC as limited partner to the current litigation with the contractors, and confirmation from PNC that they have waived any right they have to remove Campos as general partner in the borrower.**

**- explanation of in what manner and when PNC as limited partner will fund their final capital contribution of ~$3,200,000.**

**- confirmation that borrower will fund the amount of the Weis claim in escrow with Arbor pending Borrower bonding over the Weis lien.**

If Arbor receives each of the above referenced items, then Arbor will continue underwriting the loan referenced in the attached term sheet dated March 7, 2017 between Arbor, Borrower and Rene Campos.  As stated in the term sheet the loan, among other things, remains subject to Arbor credit committee review and approval.

EXHIBIT KK
37
PENGAD 800-631-6989
Rogers 7-12-17

This email contains privileged and/or confidential information and is for the sole use of the intended recipient(s). If you are not the intended recipient, a disclosure copy and distribution or use of the contents of this information is prohibited and may be unlawful. If you have received this electronic transmission in error, please reply immediately to the sender that you have received this message in

error and delete it.

 **ARBOR**

### FINANCING TERM SHEET
### BRIDGE LOAN

### LUCERO APARTMENTS
### 2301 DURWOOD STREET
### AUSTIN, TEXAS 78704
### (THE "PROPERTY")

**March 7, 2017**

Arbor will consider a request from Borrower (as such term is defined below) that Arbor provide financing (the "Loan") on the Property, to be secured by a first mortgage lien and the other security all as more particularly described below, provided that the Loan is structured on the terms and conditions outlined below.

**Borrower:** A to-be-formed, special purpose, single asset, bankruptcy remote entity satisfactory to Arbor formed exclusively to own and develop the Property. Borrower shall be prohibited from engaging in any other business activities and shall otherwise meet applicable Rating Agency criteria with respect to qualifying as a bankruptcy remote entity, including, but not limited to, the existence of one (1) independent director.

**Key Principal(s):** Rene Campos (the "Key Principal"). The Key Principal(s) shall execute one or more guaranty and indemnity agreements evidencing their liability as set forth herein.

**Lender:** Arbor Realty SR, Inc. ("Arbor") or an affiliate or nominee designated by Arbor.

**Servicer:** Arbor or an affiliate or nominee designated by Arbor.

**Loan Amount:** Up to $30,500,000; provided however, that (i) the debt service coverage ratio for the asset, as determined by Arbor in its sole discretion, is no less than 1.40x, based on the in place cash flow and actual Interest Rate, and 1.25x based on the stabilized underwritten cash flow using the estimated then prevailing market constant for Fannie Mae, (ii) the loan to value ratio for the asset on an as-stabilized basis, as determined by Arbor in its sole discretion, is no greater than 75%, and (iii) the loan to cost ratio for the asset inclusive of the purchase price and reserve amounts as set forth herein, as determined by Arbor in its sole discretion, is no greater than 62%; provided, further, that the Loan may be structured with one or more notes and mortgages and some component of the Loan may be structured as a mezzanine loan on the same terms as set forth below, secured by all of the direct or indirect ownership interests in Borrower, as determined by Arbor.

**Loan Term:** The Loan Term shall be for twelve (12) months (the "Initial Term"), unless extended.

I

The Initial Term may be extended for an additional twelve (12) months (the "Extended Term"), provided that: (i) Arbor receives written notice of Borrower's election to extend the Initial Term at least 30 days prior to the expiration of the Initial Term (the "Notice of Extension"); (ii) along with the Notice of Extension, Borrower delivers to Arbor an extension fee in an amount equal to one half of one percent (0.5%) of the maximum Loan Amount; (iii) no event of default shall have occurred and no event shall have occurred that with notice, passage of time or both would constitute an event of default; (iv) Borrower shall purchase a new Rate Cap in form and substance acceptable to Arbor; and (v) the Property shall achieve an in-place debt service coverage of no less than 1.25x, using the then prevailing market constant for Fannie Mae (the "DSCR Extension Test"), provided that if the Property fails to meet the DSCR Extension Test, then, in order to qualify for the Extended Term, Borrower shall rebalance the Loan by making a payment in an amount necessary to cause the debt service coverage, as determined by Arbor in its sole discretion, to satisfy the DSCR Extension Test.

**Interest Rate:** Commencing on the closing date and continuing until maturity (whether at the expiration of the term, prepayment, acceleration or otherwise), interest on the Loan shall be paid and accrue monthly on the full Loan Amount at a rate equal to 475 basis points in excess of the one (1) month LIBOR Rate, provided that at no time during the Loan Term shall the one (1) month LIBOR Rate be less than the greater of (i) 80 basis points and (ii) the LIBOR Rate on the business day immediately prior to the closing date.

**Rate Cap Agreement:** At Closing, Borrower may be required to obtain a Rate Cap Agreement in form and substance acceptable to Arbor, and such agreement must have provisions for extensions so that the Rate Cap Agreement matures concurrent with the Loan Term.

**Amortization:** The Loan shall be interest only.

**Initial Closing Fees and Costs and On-going Expenses:** Upon execution hereof, Borrower shall deliver to Lender (or shall have already delivered to Lender), a $50,000 non-refundable deposit (the "Good Faith Deposit") pursuant to the wire instructions set forth on Exhibit A attached hereto. Whether or not the transaction contemplated herein closes, Borrower shall be liable for all Lender, Servicer and third-party provider fees, costs and expenses related to this transaction, including, without limitation, the reasonable fees and expenses of Lender's outside counsel, fees and expenses associated with loan document preparation and review, title insurance fees and premiums, fees and expenses associated with the preparation and review of appraisal, engineering, environmental and other internal and third-party reports, underwriting fees, recording fees, costs incurred in reviewing due diligence materials, on-going inspection and construction related expenses, rating agency review fees, securitization loan summary fees and costs and fees associated with funding, and establishing, maintaining and terminating interest rate caps or hedges (collectively, "Lender Expenses"). Lender shall pay all or any portion of the Lender Expenses directly from the Good Faith Deposit. If Lender determines not to make the Loan on substantially the terms and conditions set forth herein, or on other terms acceptable to Borrower, the Good Faith Deposit (to the extent that any funds remain in the Good Faith Deposit), less any Lender Expenses, shall be returned to Borrower. In the event that the Closing occurs, the Good Faith Deposit (to the extent that any funds remain in the Good Faith Deposit),

2

less any amounts expended by Lender in payment of the foregoing fees, costs and expenses, shall, at Lender's sole option, either be refunded by Lender to Borrower or applied to satisfy any amounts due Lender in connection with the Closing of the Loan. If Lender Expenses exceed the Good Faith Deposit, Borrower and Key Principals, each jointly and severally, promise to promptly pay such difference to Arbor on demand as well as indemnify Arbor for any costs, expenses, and attorney's fees incurred seeking collection of any unreimbursed Lender Expense and pursuing the recovery of any unreimbursed Lender Expense in litigation by Lender against Borrower and/or Key Principal(s).

**Loan Origination Fee:** Borrower shall pay a loan fee to Arbor equal to one percent (1.0%) of the maximum Loan Amount (the "Loan Fee"). The entire Loan Fee shall be paid at Closing.

**Exit Fee:** Upon the maturity of the Loan (whether at the expiration of the term, prepayment, acceleration or otherwise), Borrower shall pay an exit fee in an amount equal to one percent (1.0%) of the maximum Loan Amount (the "Exit Fee") and, to the extent that a partial prepayment is made, the amount of the Exit Fee corresponding to such prepayment amount, as calculated by Arbor, shall be due and payable in connection with such prepayment. Arbor shall waive its right to receive the Exit Fee if Arbor provides any permanent financing on the Property.

**Tax and Insurance Escrow:** Borrower is required to make monthly escrow payments to the Servicer equal to $1/12^{th}$ of the annual insurance premiums and real estate taxes, plus a one time charge, payable at Closing, for a real estate tax service fee. The initial escrow will be determined by Arbor based upon the number of months remaining until the next payment is due. All tax and insurance payments due and not paid must be satisfied prior to Closing. Proof of payment shall be submitted prior to Closing.

**Repair Reserve:** At Closing, Borrower shall establish a repair reserve for stucco repair in an amount to be determined by Arbor in its sole discretion during underwriting of the Loan, currently estimated to be $5,500,000 (the "Repair Reserve"), and such funds shall be deposited in an account controlled by Arbor. Funds may be withdrawn from the Repair Reserve at Arbor's discretion pursuant to plans and specifications and a budget approved by Arbor in its sole discretion.

**Loan Out of Balance:** The Loan shall be deemed to be "Out of Balance" if at any time during the Loan Term, Arbor determines, in its sole discretion, that the remaining amount available under the Loan is not or will not be sufficient to complete the repairs, to pay interest on the Loan through completion of the project, and to pay all costs and expenses set forth in the approved repair budget, plus such additional amounts as Arbor, in its sole discretion, deems necessary to complete the repairs, pay all liabilities and perform all obligations of Borrower under the loan documents. In determining whether the Loan is Out of Balance, only funds being held in the Repair Reserve will be considered. In the event that Arbor determines that the Loan is Out of Balance, within 10 days of being notified thereof, Borrower shall be required to deposit with Arbor funds equal to the amount that Arbor estimates that the Loan will be Out of Balance (the "Out of Balance Payment"). Any Out of Balance Payment deposited with Arbor shall be added to and made a part of the Repair Reserve. Failure to pay the Out of Balance Payment and deposit

3

such payment with Arbor shall constitute an event of default. In addition, the Out of Balance Payment shall become recourse to the Key Principals.

**Replacement Reserve:** At Closing, Borrower shall establish a replacement reserve in an initial amount to be determined by Arbor in its sole discretion during underwriting of the Loan (the "Replacement Reserve"), and such funds shall be deposited in an account controlled by Arbor. In addition to the initial deposit, Borrower shall be required to make monthly escrow payments to the Replacement Reserve in an amount to be determined by Arbor in its sole discretion during underwriting of the Loan. Funds may be withdrawn from the Replacement Reserve pursuant to Arbor's standard disbursement guidelines.

**Deferred Maintenance Reserve:** At Closing, Borrower shall establish a deferred maintenance reserve in an amount equal to 125% of estimated repair costs (as detailed in the engineering report obtained by Arbor during the underwriting process) (the "Deferred Maintenance Reserve"), and such funds shall be deposited in an account controlled by Arbor. Funds may be withdrawn from the Deferred Maintenance Reserve pursuant to Arbor's standard disbursement guidelines.

**Security:** The Loan shall be evidenced by a promissory note of Borrower which shall be secured by: (i) a first mortgage lien on the Property; (ii) the non-recourse carve-out guaranty; (iii) the completion guaranty; (iv) the environmental indemnity; (v) the Out of Balance Payment guaranty; and (vi) such other security as may be required by Arbor and consistent with this Term Sheet including, without limitation, UCC financing statements, an assignment of all books and records and plans relating to the Property or construction of the project, and an assignment of all contracts entered into or to be hereafter entered into by Borrower.

**Guarantors:** The Key Principals will be required to execute guaranties in favor of Arbor guaranteeing, on a joint and several basis: (i) the payment and performance of recourse carve-out obligations under the Loan as set forth herein; (ii) completion of repairs; (iii) any obligations and liabilities of Borrower under the environmental indemnity agreement; (iv) the Out of Balance Payment; and (v) all costs of enforcement of any such guaranties. At all times during the term of the Loan, the Key Principal shall maintain a Net Worth in an amount to be determined by Arbor in its sole discretion during underwriting of the Loan. As used herein, the term "Net Worth" shall mean tangible net worth, calculated and determined by Lender in accordance with generally acceptable accounting practices, consistently applied. Failure to maintain such a Net Worth shall constitute an Event of Default under the Loan Documents. At all times during the term of the Loan, the Key Principal shall maintain a Liquidity in an amount to be determined by Arbor in its sole discretion during underwriting of the Loan. As used herein, the term "Liquidity" shall mean the amount of liquid assets held by the Key Principal, calculated and determined by Lender in accordance with generally acceptable accounting practices, consistently applied. Failure to maintain such Liquidity shall constitute an Event of Default under the Loan Documents.

**Recourse:** The Key Principal shall have no personal liability for the repayment of the Loan or performance under the loan documents, except as otherwise provided herein and except with respect to Lender's standard carveouts as to Lender's losses and as to full recourse.

4

**Completion Guaranty:** The Key Principals and the Borrower shall, jointly and severally, provide a standard industry guaranty of any and all stucco repairs to be performed at the Property based upon the Arbor approved repair budget and plans and specifications.

**Loan Out of Balance Guaranty:** The Key Principal and the Borrower shall, jointly and severally, provide a standard industry guaranty of the obligation to rebalance the Loan and make the Out of Balance Payment as set forth in the Loan Out Of Balance section of this Term Sheet.

**Environmental Indemnity:** The Key Principals and the Borrower shall, jointly and severally, provide an environmental indemnity agreement in form and substance acceptable to Arbor, which is not subject to limitations on recourse.

**Cash Management:** Borrower shall establish at Closing a Soft Lockbox Account at BankUnited, N.A. for the deposit of all revenues generated by the Property's operations, which account shall be pledged to Lender as additional security. The Borrower's property manager shall be required to collect rents, credit card receipts, and all other sources of income generated from the operation of the Property and deposit such income collected on a daily basis into the Lockbox Account, and until (i) an event of default occurs, (ii) ninety (90) days prior to the maturity date of the Loan, or (iii) the failure of certain property and operations performance tests as determined by Lender in its sole and absolute discretion during underwriting of the Loan, such funds may be utilized by the Borrower to pay operating expenses of the Property.

**Property Management:** Property management agreement and all service contracts and operating licenses shall be in a form and substance satisfactory to Arbor, require Arbor's approval over fees, and be subordinate to Loan payments.

**Prepayment:** The Loan may be prepaid in whole or in part on any payment date (provided, however, partial prepayments may not be in principal amounts less than $100,000) upon not less than 30 days advance written notice. Any such prepayment shall include full repayment of all principal being prepaid, interest, the Prepayment Fee, Exit Fee (or portion thereof), and all other charges including, without limitation, legal expenses, prepayment fees, property inspection fees, and other loan processing and servicing fees, if any. The "Prepayment Fee" is defined as an amount equal to the debt service (including debt service at a default interest rate, if a default shall have occurred), fees and expenses (including late fees and legal fees, if any) which would have otherwise been payable on such prepaid amount from the date of such prepayment until the date which is six (6) months after the commencement of the Loan Term.

**Transferability:** No transfer of any direct or indirect legal or beneficial interest in Borrower will be permitted except with respect to approved estate planning transfers.

**Other Financing:** Except as approved by Arbor, no subordinate financing will be allowed during the term of the Loan, either on a secured or unsecured basis.

**Borrower's Counsel Opinion Letter:** On or before the Closing, Borrower's counsel shall provide Arbor an opinion letter acceptable to Arbor covering the following: (i) proper formation of the borrowing entity and any other entity which is pledging an interest or in which an interest

5

is being pledged, (ii) proper authority to borrow funds, (iii) opinion as to usury, (iv) enforceability, (v) due execution and delivery, and (vi) such other matters as Arbor shall request.

**Borrower's Counsel Non-Consolidation Opinion Letter:** On or before the Closing, Borrower's counsel shall provide Arbor an opinion letter acceptable to Arbor covering non-consolidation.

**Other Conditions:** The making of the Loan shall be subject to satisfactory completion of real estate, underwriting and legal due diligence, including, but not limited to: (i) review and approval of all third party reports, including an Appraisal, Phase I Environmental Site Assessment Report, a Plan and Cost review and an engineer's report; (ii) review and approval of Borrower's organizational documents; (iii) review of sources and uses; (iv) verification of Borrower's cost basis in the Property; (v) review and approval of all subsidy programs applicable to the tenants and/or Property, including but not limited to low income tax credit programs, (vi) confirmation that the underwritten real estate taxes at stabilization are not greater than $310,000, and (vii) confirmation that no proceeds from the Loan shall be disbursed to Borrower at closing.

**Other Approvals:** Arbor shall have approval rights over various actions of Borrower, including, without limitation: (a) approval over Borrower's operating budgets, (b) approval over all brokerage and management agreements relating to the Property, (c) approval over monthly, quarterly and annual reporting requirements, (d) approval of all equipment leases, (e) approval of all Property transactions with entities affiliated with Borrower or its Key Principals, and (f) approval of all commercial leases.

**Title Insurance:** Borrower shall obtain, at Borrower's expense, fee and loan title insurance policies and endorsements, issued by a title insurance company selected by Arbor, in amounts and in form and substance reasonably acceptable to Arbor and subject only to such exceptions as are reasonably acceptable to Arbor.

**ALTA/NSPS Survey:** Borrower shall furnish Arbor with a current ALTA/NSPS survey in respect of the Property prepared by a licensed surveyor satisfactory to Arbor and certified to Arbor, the title insurer and Borrower, and otherwise satisfactory to Arbor in all respects.

**Right of First Refusal:** Borrower and Key Principals hereby grant an irrevocable right of first refusal to Lender, its affiliates and any third party sourced by Lender, for any refinancing of the Loan.

**Broker Fees:** The Borrower and the Key Principals shall indemnify and hold harmless Arbor and its affiliates from any liability whatsoever relating to any brokerage commissions relating to this transaction and any broker fees that may have been incurred, and at Closing, the Borrower agrees to pay the agreed upon brokerage commission.

**Arbor's Right to Securitize or Sell Loan:** Arbor may, without consent of Borrower, sell all or a portion of the Loan by certificates, participations, securities or notes evidencing whole or component interests therein, through one or more public or private offerings (each, a "Securitization") or for such other purpose (a "Sale"). Borrower and Key Principals agree to

6

cooperate in such Securitization or Sale provided such cooperation does not alter the economics of the transaction. Borrower acknowledges that Arbor may disclose the Property's, the Borrower's, the Key Principal's and the property manager's financial information in connection with such Securitization or Sale.

**Confidentiality:** Borrower and Key Principals will keep, and will instruct and cause their respective agents, advisors and legal counsel to keep this term sheet strictly confidential. Borrower will disclose to Arbor the names of any advisors and legal counsel to whom this term sheet is provided, if any. The foregoing confidentiality provisions shall be inapplicable in the event and to the extent any court or regulatory authority having jurisdiction over the matter shall require disclosure of any such information. Borrower hereby gives Arbor permission to release publicity articles and other information concerning the closing of the Loan.

Borrower shall not publicize or advertise any information regarding the Loan or Lender's financing of the Property without first submitting any proposed publication or advertisement to Lender, and then receiving the written approval of Lender (such approval to be granted or not granted in Lender's sole discretion), and shall instruct Guarantor and any Affiliate of Borrower of the restriction against publicizing or advertising any information regarding the Loan or Lender's financing of the Property without such review and approval by Lender.

**Exclusivity:** Neither Borrower, Key Principal(s) nor any affiliate of any of the same shall make, accept, negotiate, entertain or otherwise pursue or deal with any offers to engage in any debt financing regarding the Property other than the financing contemplated under this Term Sheet unless Arbor elects in writing not to provide the proposed financing set forth in this Term Sheet. Notwithstanding anything to the contrary set forth herein, should Borrower, Key Principal(s) or any affiliate of either obtain financing for the Property from another lender or sells the Property, unless Arbor has elected in writing not to provide the proposed financing set forth in this Term Sheet, then Arbor will be entitled to retain the unapplied balance of the Good Faith Deposit and Borrower, Key Principal or any affiliate thereof shall pay immediately, upon demand, to Arbor a break-up fee equal to 2.0% of the maximum principal balance of the proposed Loan Amount, which break-up fee shall constitute liquidated damages for the time and effort expended by Arbor in connection with this Term Sheet, it being expressly acknowledged and agreed that Arbor's actual damages in such instance will be impossible to calculate.

**Governing Law and Jurisdiction:** This Term Sheet shall be governed and construed in accordance with the laws of the State of New York and the applicable laws of the United States of America. In any action brought under or arising out of this Term Sheet, Borrower and Key Principals hereby consent to the jurisdiction of any competent state or federal court within the State of New York.

**Term Sheet Not a Commitment:** Borrower and Key Principals understand and agree that this Term Sheet is provided by Arbor solely for discussion purposes only and is not a commitment to lend or an agreement to issue a commitment of any kind. As such the terms set forth herein are not binding upon Arbor. Arbor may withdraw from such discussions and/or this Term Sheet at any time and for any reason, or change any of the terms contained herein, in Arbor's sole and absolute discretion, including without limitation: (i) prior to the Return Date set forth below; (ii)

7

if there is a material adverse change in or regarding, inter alia, the Borrower, the Property, any Key Principal, any investments of the Borrower or the Key Principals other than the Property, Arbor and/or the real estate or financial markets (including, but not limited to, the secondary mortgage market); or (iii) if Arbor, during underwriting of the Loan, decides to change any of the terms contained herein as it may require, or modify or add to the performance tests, guarantees and other security instruments described herein or add any other reserves or escrows. *Borrower further understands and agrees that Arbor is not obligated to enter into the transaction contemplated by this Term Sheet, on the terms set forth herein or on any other terms, unless and until (1) Arbor obtains internal committee approval, which committee approval shall be predicated on multiple factors, including but not limited to underwriting to a viable exit strategy at the Loan Amount; and (2) Arbor executes and delivers to Borrower a separate written commitment letter or executes final documentation, the terms of which shall supersede in their entirety the terms set forth herein.* Borrower and Key Principals, for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, agree to be bound by the terms hereof, including, without limitation, those contained in the paragraphs entitled Exclusivity, Confidentiality, Term Sheet Not a Commitment and Broker Fees.

## REMAINDER OF PAGE INTENTIONALLY BLANK

8

CONFIDENTIAL          2013TOGP 000445

Notwithstanding anything to the contrary contained herein, this Term Sheet shall automatically terminate if an executed copy of the Term Sheet, along with the required Good Faith Deposit specified herein, is not delivered to Arbor prior to March 14, 2017 at 5:00 pm NY time (the "Return Date"). The undersigned represents and warrants that neither it nor any proposed Key Principal has, within the past seven years of the date hereof: (i) personally filed for bankruptcy or a similar proceeding, or caused another entity or person which her or she controlled the operations or affairs of, to file for bankruptcy or a similar proceeding; (ii) had an involuntary bankruptcy or similar proceeding filed against himself or herself, or filed against another entity or person which her or she controlled the operations or affairs of; (iii) had real property which he or she owned foreclosed on, or had real property owned by another entity or person which he or she controlled the operations or affairs of foreclosed on; or (iv) delivered a deed in lieu of foreclosure or similar surrender agreement for real property owned by him or her, or directed another entity or person which he or she controlled the operations or affairs of to sign a deed in lieu of foreclosure or similar surrender agreement for real property owned by such person or entity.

ARBOR REALTY SR, INC.

By:
Name:
Title:


ACCEPTED AND AGREED:

BORROWER

By:
Name: Rene O. Campos
Title: Manager.
2013 Travis Oak Creek LLC.

KEY PRINCIPAL

By:
Name: Rene O Campos
Title:


KEY PRINCIPAL

By:
Name:
Title:

9

<u>Exhibit A</u>
(wire instructions)

| | |
|---|---|
| Bank: | Capital One<br>Elmont, NY 11003 |
| ABA: | 021 407 912 |
| Account: | 7424024003 |
| Acct Name: | Arbor Realty SR Inc.<br>Corporate Account |

10

CONFIDENTIAL              2013TOGP 000447

2/24/2017 4:39:36 PM
Velva L. Price
District Clerk
Travis County
D-1-GN-16-006178
Nancy Rodriguez

CAUSE NO. D-1-GN-16-006178

| | | |
|---|---|---|
| **JOHN R. KELLER MASONRY, INC.** | § | **IN THE DISTRICT COURT** |
| | § | |
| **V.** | § | **250th JUDICIAL DISTRICT** |
| | § | |
| **WEIS BUILDERS, INC. and FEDERAL** | § | |
| **INSURANCE COMPANY, Jointly and** | § | |
| **Severally** | § | **TRAVIS COUNTY, TEXAS** |

### DEFENDANT WEIS BUILDERS, INC.'S FIRST AMENDED THIRD-PARTY PETITION AGAINST 2013 TRAVIS OAK CREEK, LP, 2013 TRAVIS OAK CREEK GP, LLC, 2007 TRAVIS HEIGHTS GP, LLC, AND 2007 TRAVIS HEIGHTS, LP.

To The Honorable Judge of Said Court:

Comes now WEIS BUILDERS, INC. (hereinafter referred to as "Weis"), Defendant/Third-Party Plaintiff in the above-entitled and numbered cause, and files this its First Amended Third-Party Petition, and would respectfully show unto the Court as follows:

### I.  DISCOVERY LEVEL

Pursuant to Rule 190.4 of the Texas Rules of Civil Procedure, Weis intends to conduct Discovery under Level 3 Discovery Control Plan.

### II.  PARTIES

Plaintiff John R. Keller Masonry, Inc. ("Keller") is a corporation with its principal place of business at 10920 Switzer Avenue, Suite 104, Dallas, Texas 75238, and may be served through its counsel of record.

Defendant Federal Insurance Company ("Federal Insurance") is an insurance company authorized to do business in the State of Texas. Federal Insurance has made an appearance in this suit and may be served through its counsel of record.

Defendant/Third-Party Plaintiff Weis Builders, Inc. ("Weis") is a Minnesota corporation conducting business in Texas and has made an appearance through its attorney of record.



EXHIBIT NO. 4

CONFIDENTIAL

Third-Party Defendant 2013 Travis Oak Creek, LP ("2013 Oak Creek") is a limited partnership doing business in Texas and may be served through its registered agent: 2001 Agency Corporation, 14160 Dallas Parkway, Suite 800, Dallas, Texas 75254.

Third-Party Defendant 2013 Travis Oak Creek GP, LLC ("2013 Oak Creek GP") is a limited liability company and general partner of Oak Creek, doing business in Texas and may be served through its registered agent: 2001 Agency Corporation, 14160 Dallas Parkway, Suite 800, Dallas, Texas 75254.

Third-Party Defendant 2007 Travis Heights, LP ("2007 Travis Heights") is a limited partnership doing business in Texas and may be served through its registered agent: 2001 Agency Corporation, 14160 Dallas Parkway, Suite 800, Dallas, Texas 75254.

Third-Party Defendant 2007 Travis Heights GP, LLC ("2007 Travis Heights GP") is a limited liability company and general partner of Travis Heights, doing business in Texas and may be served through its registered agent: 2001 Agency Corporation, 14160 Dallas Parkway, Suite 800, Dallas, Texas 75254.

### III.   VENUE & JURISDICTION

This Court has proper jurisdiction over the parties and the subject matter of this action. The amount in controversy is within the jurisdictional limits of this Court.

Venue is proper in Travis County, Texas, pursuant to Texas Civil Practice and Remedies Code Section 15.002(a) because Travis County, Texas is the county in which all or a substantial part of the events or omissions giving rise to this action occurred and the real property, which is the subject of this suit, is located in Travis County, Texas.

Damages sought are within the jurisdictional limits of the Court. Those damages exceed $1,000,000 and Weis asks for monetary relief of over $1,000,000.

CONFIDENTIAL                                    PLAINTIFFS_00008102

## IV.   FACTS

Third-Party Defendant 2013 Oak Creek is the Owner of a construction project located at 2324 Wilson Street, Austin, Texas 78704. (herein "Project").

Third-Party Defendant Oak Creek GP is the general partner of Oak Creek, and, therefore, is liable for all claims against 2013 Oak Creek. All allegations against 2013 Oak Creek are hereby incorporated as to 2013 Oak Creek GP.

Third-Party Plaintiff Weis was a general contractor on the Project.

Plaintiff Keller was a subcontractor on the Project and filed suit seeking payment for work performed on the Project.

Defendant Federal Insurance provided a payment bond for the Project.

On May 21, 2014, Weis and 2013 Oak Creek entered into a General Contract. **(Exhibit A).**

On May 22, 2014, Weis, as principal, and Federal Insurance, as surety, executed and delivered a payment bond to 2013 Oak Creek.

On or about August 12, 2014, Plaintiff Keller, a stucco subcontractor, entered into a subcontract with Weis to provide stucco and CMU systems labor on the Project.

2013 Oak Creek failed to make payment to Weis pursuant to the General Contract for construction performed by Weis. The outstanding amount owed by 2013 Oak Creek to Weis is $3,285,305.94, exclusive of any delay damages, attorney's fees, and court costs. In addition to failing to pay Weis for its work, 2013 Oak Creek provided deficient plans and specifications to Weis, which caused numerous complications and delays throughout the Project. As a result of 2013 Oak Creek's failures, Weis had to expand significant additional resources and time in an attempt to accelerate the Project. 2013 Oak Creek also refused to allow Weis to perform punch list and warranty items.

Weis made numerous demands to 2013 Oak Creek to remit payment for the work it had

3

CONFIDENTIAL

performed. However, 2013 Oak Creek failed to remit payment.

On January 10, 2017, Weis filed lien No. 2017004689 in the amount of $3,285,305.94 in Travis County for the actual amount owed to Weis by 2013 Oak Creek. In addition to this amount, Weis seeks delay damages, attorney's fees, court costs, and any other damages to which Weis may be entitled.

In the alternative, and upon information and belief, 2007 Travis Heights is also the property owner of the real property on which the Project is located, 2324 Wilson Street, Austin, Texas 78704. 2007 Travis Heights GP is the general partner of 2007 Travis Heights, and, therefore, is liable for the claims against 2007 Travis Heights. All allegations against 2007 Travis Heights are hereby incorporated as to 2007 Travis Heights GP.

In the alternative, and upon information and belief, although Weis did not have a written contract signed by 2007 Travis Heights, 2007 Travis Heights is the owner of the Project and received the benefits of construction services performed by Weis on the Project. 2013 Oak Creek and 2007 Travis Heights appear to be owned and/or controlled by each through interlocking directorship and/or ownership of voting stock, and/or otherwise. Specifically, Rene Campos is the manager of all four entities: 2013 Oak Creek, 2013 Oak Creek GP, 2007 Travis Heights, 2007 Travis Heights GP.

## V. CLAIMS AGAINST 2013 TRAVIS OAK CREEK, LP AND 2013 TRAVIS OAK CREEK GP, LLC

### Count 1: Breach of Contract

Weis fully performed its contractual obligations and furnished all labor, materials, and/or equipment to complete the Project.

2013 Oak Creek and 2013 Oak Creek GP breached the contract by failing to pay Weis for the labor, materials, and/or equipment furnished on the Project. Specifically, but not by way of limitation, 2013 Oak Creek and 2013 Oak Creek GP failed and refused, and continue to refuse, to

4

PLAINTIFFS_00008104

issue payment to Weis for $3,285,305.94, which is currently due and owing. Weis is also entitled to damages due to delays caused by 2013 Oak Creek and 2013 Oak Creek GP, acceleration expenses, and any other consequential damages as a result of 2013 Oak Creek and 2013 Oak Creek GP's breach.

As a result of 2013 Oak Creek and 2013 Oak Creek GP's breach, Weis sustained actual and consequential damages.

### Count 2: Foreclosure of Liens

On January 10, 2017, Weis filed lien No. 2017004689 in the amount of $3,285,305.94 in Travis County for the amount owed to Weis by 2013 Oak Creek and 2013 Oak Creek GP, pursuant to Chapter 53 of the Texas Property Code, and Article 16, Section 37 of the Texas Constitution in regards to property generally described as Oak Creek Village Apartments, and more particularly described on the attached lien. **(Exhibit B).** Weis seeks foreclosure of the liens against the defendants' property described in Exhibit B.

All conditions precedent to Weis's right to foreclose the mechanic's lien against 2013 Oak Creek and 2013 Oak Creek GP's property have either occurred, been performed or have been waived.

### Count 3: Texas Prompt Pay Act

2013 Oak Creek and 2013 Oak Creek GP violated the Texas Prompt Pay Act by failing and/or refusing to pay Weis by the 35th day after Weis's final invoices were submitted to and received by 2013 Oak Creek and 2013 Oak Creek GP. TEX. PROP. CODE § 28.002. Weis brings this action, in part, to enforce its rights to payment from 2013 Oak Creek and 2013 Oak Creek GP, pursuant to Section 28.005 of the Texas Property Code, and seeks, in addition to the principal sums due, interest on the overdue payments, costs, and attorney's fees, as allowed by Texas Property Code §§ 28.004-05.

CONFIDENTIAL

PLAINTIFFS_00008105

**Count 4: Violation of Texas Construction Trust Fund Act**

Additionally, 2013 Oak Creek and 2013 Oak Creek GP violated the Texas Construction Trust Fund Act, pursuant to Chapter 162 of the Texas Property Code. Weis supplied labor and materials at the request of 2013 Oak Creek and 2013 Oak Creek GP for the Project. 2013 Oak Creek and 2013 Oak Creek GP was and/or are trustees of the loan proceeds for the Project, pursuant to Section 162.002 of the Texas Property Code. Weis is a beneficiary of the trust funds pursuant to Section 162.003 of the Texas Property Code. To the extent 2013 Oak Creek and 2013 Oak Creek GP received loan funds for the materials or services by Weis, such payments are trust funds held by 2013 Oak Creek and 2013 Oak Creek GP for the benefit of Weis. 2013 Oak Creek and 2013 Oak Creek GP violated the Texas Trust Fund Act by intentionally and/or knowingly, directly and/or indirectly retaining, using, disbursing or otherwise diverting trust funds without first fully paying all current or past due obligations incurred by trustees 2013 Oak Creek and 2013 Oak Creek GP to Weis.

## VI.   CLAIMS AGAINST 2007 TRAVIS HEIGHTS, LP AND 2007 TRAVIS HEIGHTS GP, LLC

**Count 1: Unjust Enrichment/Quantum Meruit**

In the alternative, and upon information and belief, Weis pleads quantum meruit claim against 2007 Travis Heights and 2007 Travis Heights GP. Weis provided valuable construction services and materials to 2007 Travis Heights and 2007 Travis Heights GP. 2007 Travis Heights and 2007 Travis Heights GP accepted these services and materials. 2007 Travis Heights and 2007 Travis Heights GP had reasonable notice that Weis expected compensation for these services and materials.

**Count 2: Foreclosure of Liens**

In the alternative, and upon information and belief, 2007 Travis Heights and/or 2007 Travis Heights GP, are also owners of real property on which the project is located, 2324 Wilson Street,

6

PLAINTIFFS_00008106

Austin, Texas, 78704.

On January 10, 2017, Weis filed lien No. 2017004689 in the amount of $3,285,305.94 in Travis County for the amount owed to Weis by 2013 Oak Creek and 2013 Oak Creek GP, pursuant to Chapter 53 of the Texas Property Code, and Article 16, Section 37 of the Texas Constitution in regards to property generally described as Oak Creek Village Apartments, and more particularly described on the attached lien. **(Exhibit B).** Weis seeks foreclosure of the liens against the defendants' property described in Exhibit B.

All conditions precedent to Weis's right to foreclose the mechanic's lien against 2007 Travis Heights and/or 2007 Travis Heights GP's property have either occurred, been performed or have been waived.

## VII.   CONDITIONS PRECEDENT

All conditions precedent to Weis's right to recover against 2013 Oak Creek,  2013 Oak Creek GP, 2007 Travis Heights and 2007 Travis Heights GP have either occurred, been performed or have been waived.

## VIII.   ATTORNEY'S FEES

Weis has presented its claim to 2013 Oak Creek,  2013 Oak Creek GP, 2007 Travis Heights and 2007 Travis Heights GP more than 30 days prior to the filing of this suit. As a result of 2013 Oak Creek,  2013 Oak Creek GP, 2007 Travis Heights and 2007 Travis Heights GP's failure to pay the amounts owed, Weis employed the undersigned law firm to prepare and prosecute this case; therefore, Weis is entitled to recover reasonable and necessary attorney's fees from and against 2013 Oak Creek,  2013 Oak Creek GP, 2007 Travis Heights and 2007 Travis Heights GP, plus additional reasonable and necessary attorney's fees in the event of an appeal and application for writ of error to the Texas Supreme Court, all for which Weis sues herein.

7

Attorney's fees are recoverable pursuant to, but not by way of limitation, Texas Property Code § 53.156, Texas Civil Practice and Remedies Code § 38.001 and Texas Property Code § 28.005.

## IX.   REQUESTS FOR DISCLOSURE

Pursuant to Texas Rule of Civil Procedure 194, 2013 Oak Creek, 2013 Oak Creek GP, 2007 Travis Heights and 2007 Travis Heights GP are hereby requested to disclose, within 50 days of service of this request, the information or material described in Rule 194.2(a)-(l). Please produce responsive documents and information to the offices of Cokinos, Bosien & Young, 1210 Nueces Street, Austin, Texas 78701.

## X.   REQUESTS FOR ADMISSIONS AND PRODUCTION

Pursuant to Texas Rules of Civil Procedure 196 and 198, Weis serves upon 2013 Oak Creek the requests for admissions and requests for production, attached hereto as **Exhibit C** and **D**, respectively. 2013 Oak Creek must produce all requested documents, as they are kept in the ordinary course of business or segregated according to each request, for inspection and copying, not more than 50 days after service, at the law firm of Cokinos, Bosien & Young, 1210 Nueces Street, Austin, Texas 78701.

## XI.   JURY DEMAND

Weis demands a trial by jury and tenders the appropriate fee herewith.

## XII.   PRAYER

WHEREFORE, PREMISES CONSIDERED, Defendant/Third-Party Plaintiff, WEIS BUILDERS, INC., respectfully asks that the Court issue citations for 2013 TRAVIS OAK CREEK, LP, 2013 TRAVIS OAK CREEK GP, LLC, 2007 TRAVIS HEIGHTS GP, LLC and 2007 TRAVIS HEIGHTS, LP, to appear and answer, and that WEIS BUILDERS, INC. be awarded a judgment against 2013 TRAVIS OAK CREEK, LP, 2013 TRAVIS OAK CREEK GP, LLC,

8

PLAINTIFFS_00008108

2007 TRAVIS HEIGHTS GP, LLC, and 2007 TRAVIS HEIGHTS, LP for the following:

    a.  Actual damages.

    b.  Prejudgment and post-judgment interest.

    c.  Court costs.

    d.  Reasonable and necessary attorney fees.

    e.  All other relief to which WEIS BUILDERS, INC. is entitled.

Respectfully submitted,

COKINOS, BOSIEN & YOUNG
1210 Nueces Street
Austin, Texas 78701
(512) 476-1080
By:  /s/ Shelly D. Masters
    Shelly D. Masters
    State Bar No. 24008934
    smasters@cbylaw.com
    Natalya S. Sheddan
    State Bar No. 24088398
    nsheddan@cbylaw.com

ATTORNEYS FOR DEFENDANT/THIRD
PARTY PLAINTIFF, WEIS BUILDERS, INC. and
DEFENDANT FEDERAL INSURANCE
COMPANY

9

Unofficial copy Travis Co. District Clerk Amalia L. Price

PLAINTIFFS_00008109



Dianne M. Stark          Commercial Banking – Special Credits Group
Authorized Officer        tel: (312) 732-6945  fax: (312) 336-3541
                          10 S. Dearborn, Floor 36
                          Chicago, IL 60603
                          diane.m.stark@chase.com

June 2, 2017

**VIA COURIER AND EMAIL SCAN**
2013 Travis Oak Creek, LP
3001 Knox Street, Suite 400
Dallas Texas 75205

PNC Bank, National Association
c/o PNC Real Estate
121 S. W. Morrison Street, Suite 1300
Portland, OR  97201
Attention: Fund Manager

## NOTICE OF DEFAULT

Re:   2013 Travis Oak Creek, LP (the "**Borrower**") indebtedness to JPMorgan Chase Bank,
N.A. (the "**Bank**") evidenced by that certain Advance Promissory Note Dated as of May 23, 2014
(the "Construction Note") in the Principal Amount of $26,000,000.00 (the "**Loan**")

Ladies and Gentlemen:

Reference is made to that certain indebtedness evidenced by the Construction Note and advanced
pursuant to that certain Credit Support and Funding Agreement between the Borrower and  the Bank
dated May 23, 2014 (as amended from time to time, the "**Loan Agreement**").  The Loan is secured by
that certain:  (i) Construction Deed of Trust, Absolute Assignment of Rents, Security Agreement and
Financing Statement effective as of May 23, 2014 (as amended from time to time, the "**Deed of Trust**"),
(ii) guaranty of payment and completion made by Eureka Multi-Family Group, LP, Chula Investments,
Ltd., 2013 Travis Oak Creek Developer, Inc. and Rene O. Campos, jointly and severally, each  May 23,
2014 ("**Guarantees**"), and all other documents evidencing and/or securing the Loan (as amended from
time to time, collectively, the "**Loan Documents**").  Capitalized terms used but not defined herein shall
have the respective meaning ascribed to them in the Loan Agreement and the Loan Documents.

By letter dated May 23, 2017, the Bank advised you that the Loan matured and that if the
Borrower failed to pay all Obligations due under the Loan Documents by June 1, 2017, an Event of
Default shall be declared ("**Event of Default**").  As of June 2, 2017, the Obligations remain unpaid, and
as a result, the Bank is hereby declaring an Event of Default as set forth in the Loan Agreement, Section
7.1.  Effective the date of this letter and as set forth in Section 4 of the Construction Note, the interest rate
shall increase by 3%.

The Bank reserves the right to exercise any and all remedies allowed under the Loan Documents
or at law or in equity due to the Event of Default.  Any and all costs pursuant to Bank's rights and
remedies under the Loan Documents, including but not limited to, attorneys' fees, shall be due and
payable by Borrower pursuant to Section 4.1(w) of the Loan Agreement.

This notice does not (1) operate as a waiver or forbearance of any right, remedy, power or
privilege of the Bank under any of the Loan Documents or applicable law, (2) prejudice or preclude any
other or further exercise of any respective rights, remedies, powers of privileges of the Bank under any of
the Loan Documents or at law or in equity, (3) entitle you to any other notice or demand whatsoever, or



EXHIBIT NO. 45

# CHASE ○

(4) in any way modify, impair or release any of your liabilities under or pursuant to any of the Loan Documents or any other liability that you have to the Bank.  This notice does not purport to contain a complete or exclusive list of defaults.

Furthermore, no delay by the Bank in enforcing its rights and remedies under the Loan Documents or applicable law and/or the acceptance from time to time by the Bank of any payments on account of the Loan shall, in any way, constitute or act as (a) a rescission or waiver of the default described in this notice, (b) a modification of any of the Loan Documents or (c) an accord or satisfaction with respect to the entire amount of the obligations due under the Construction Note and the other Loan Documents.  No oral communication from or on behalf of the Bank by any party shall constitute any agreement, commitment or evidence of any assurance or intention with respect to any aspect of the subject Loan.

Effective today, all communications to the Bank concerning the Loan should be directed to me. Please give this matter your immediate attention.  Contact me at your earliest convenience at (312) 732-6945.

Very truly yours,

JPMORGAN CHASE BANK, N.A.

By: _____

Name: Dianne M. Stark
Title:  Authorized Officer

cc:     Austin Housing Finance Corporation, Subordinated Lender
        2007 Travis Heights, LP, Subordinated Lender
        Rene Campos, Guarantor
        Eureka Multi-Family Group, LP, Guarantor
        Chula Investments, Ltd., Guarantor
        2013 Travis Oak Creek Developer, Inc., Guarantor
        Texas Dept. of Housing & Community Affairs, Executive Director
        PNC Bank, National Association, Additional Addressee
        Gardere Wynne Sewell LLP, Lender's Attorney
        PNC Bank, National Association, Loan Administration Manager
        Jackson DeMarco Tidus Peckenpaugh, Permanent Lender's Attorney

## NOTICE TO SERVICEMEMBERS

If the borrower, guarantor, collateral pledgor, property owner, any individual who is personally liable for the obligations of a business entity that is a borrower, or any individual who owns, directly or indirectly, 50% or more of the equity or similar interests in a business entity that constitutes a borrower, guarantor, property owner, or collateral pledgor, is a Servicemember and is, or recently was, on Active Duty or active service, that person may be entitled to certain legal rights and protections, including protection from foreclosure, pursuant to the Servicemembers Civil Relief Act (50 USC App. §§ 501-596), as amended and, possibly, certain similar state statutes.

Eligible service may include the following: Active Duty with the Army, Navy, Air Force, Marine Corps, or Coast Guard; Active service with the National Guard; Active service as a commissioned officer of the National Oceanic and Atmospheric Administration; Active service as a commissioned officer of the Public Health Service; Service with the forces of a nation with which the United States is allied in the prosecution of a war or military action; or Service with the National Guard or a state militia under a state call to duty. Eligible service also includes any period during which a Servicemember is absent from duty on account of sickness, wounds, leave, or other lawful cause.

If you or any of the persons described above is such a Servicemember, you should contact Chase at 1-877-344-3080, Monday through Friday, 8:00am-7:00pm Central Time to discuss the status of this loan.



ANDREWS
   KURTH

1717 Main Street, Suite 3700
Dallas, Texas 75201
214.659.4400 Phone
214.659.4401 Fax
andrewskurth.com

Kathleen J. Wu
214.659.4448 Phone
kwu@akllp.com

April 24, 2017

**VIA FEDEX, CERTIFIED MAIL,**
**RETURN RECEIPT REQUESTED AND**
**U.S. MAIL**

2013 Travis Oak Creek GP, LLC
603 W 8th Street
Austin, Texas 78701
Attn: Rene Campos

**VIA FEDEX, CERTIFIED MAIL,**
**RETURN RECEIPT REQUESTED AND**
**U.S. MAIL**

2013 Travis Oak Creek GP, LLC
c/o Eureka Multifamily Group
3001 Knox Street, Suite 400
Dallas, Texas 75205
Attn: Rene Campos

Re:     Amended and Restated Agreement of Limited Partnership of 2013 Travis Oak Creek, LP,
        a Texas limited partnership (the "*Partnership*"), dated as of May 23, 2014 (with any
        amendments and modifications thereto specifically approved in writing by the limited
        partners, the "*Partnership Agreement*"), among 2013 Travis Oak Creek GP, LLC, a
        Texas limited liability company (the "*General Partner*"), PNC Bank, National
        Association, a national banking association (the "*Investment Limited Partner*"), and
        Columbia Housing SLP Corporation, an Oregon corporation (the "*Special Limited
        Partner*", together with the Investment Limited Partner, the "*Limited Partners*")

Dear Mr. Campos:

        As you know, this firm represents and writes to you on behalf of the Limited Partners.
We have received notice of General Partner's request for the Limited Partners' consent to the
Partnership obtaining new bridge financing for the Project[1] (the "*Proposed Financing*"). By this
correspondence the Limited Partners hereby grant their consent to the Proposed Financing,
subject to General Partner fulfilling one condition set forth below to the satisfaction of the
Limited Partners.

        The Limited Partners' consent to the Proposed Financing is expressly conditioned on
receipt by the Limited Partners of the final documents evidencing the Proposed Financing,
including but not limited to the settlement statement, and approval of the same.

---

[1] Capitalized terms not otherwise defined herein shall take the meanings assigned to them in the Partnership
Agreement.

DAL:956671.1



EXHIBIT NO. 54

Travis Oak
April 24, 2017
Page 2

At this time, all rights of the Limited Partners to exercise any rights or remedies under the Partnership Agreement for any existing or future defaults on the part of General Partner, including the right to require repurchase of their interests, are hereby specifically reserved.

Neither the conditional consent provided herein nor any previous or contemporaneous correspondence or other communications (including all communications directly from or on behalf of the Limited Partners) is intended to be, nor should it be construed as, a waiver of any rights, benefits, agreements, remedies or recourses to which any of the Limited Partners may be entitled with respect to any failures, breaches or defaults that have occurred or may occur under the Partnership Agreement, or otherwise, including the Partnership Default or as consent or acquiescence to any acts or omissions. Each of the Limited Partners further continues to reserve any and all rights, remedies, agreements, benefits and recourses available to it under the Partnership Agreement or any other agreement, document or instrument (including, without limitation, the Guaranty and any Project Document) to which any of the Limited Partners is a party or possesses rights as a direct or third party beneficiary, or otherwise at law or in equity, together with any and all claims, counterclaims or defenses the Limited Partners may have under the Partnership Agreement or otherwise at law or in equity in connection with any negligence, misconduct, or otherwise on the part of General Partner. The Limited Partners further continue to reserve the right to seek recovery of any and all costs, expenses, obligations, liabilities, losses, damages and other recoverable amounts, whether or not demanded hereunder, including, without limitation, any actual, punitive or other damages against General Partner, the Guarantors and/or any other responsible party.

Thank you for your urgent attention to this important matter.

Very truly yours,

Kathleen J. Wu

cc:    Joy O'Brien, Esq.                    **VIA EMAIL**
       Mr. David Hasselwander               **VIA EMAIL**

       Kenneth B. Chaiken, Esq.             **VIA EMAIL**
       (*kchaiken@chaikenlaw.com*)

DAL:956671.1

CONFIDENTIAL

PLAINTIFFS_00008629

Plaintiff's
Exhibits

55

## DELIVERY ASSURANCE CERTIFICATE

### (MBS Financing Method
### Multifamily Affordable Housing Product Line)

THIS DELIVERY ASSURANCE CERTIFICATE (the "Certificate") dated as of May 23, 2014 (the "Effective Date") is made by 2013 TRAVIS OAK CREEK, LP, a Texas limited partnership, together with its permitted successors and assigns ("Borrower"), and delivered to PNC BANK, NATIONAL ASSOCIATION, a national banking association, approved by Fannie Mae as a DUS Multifamily Affordable Housing Lender of conventional mortgage loans (together with its successors and assigns, "DUS Lender").

## RECITALS

A.    DUS Lender has issued a commitment dated May 21, 2014 (the "Permanent Mortgage Loan Commitment") to make a permanent mortgage loan (the "Permanent Mortgage Loan") to Borrower in an original principal amount not to exceed Twenty-Seven Million Three Hundred Thousand Dollars ($27,300,000) (the "Maximum Mortgage Loan Amount") to provide permanent mortgage financing for a multifamily housing project known as Oak Creek Village, located in Austin, Texas (the "Project").

B.    Pursuant to an MBS Trade Confirmation dated as of May 23, 2014 (the "MBS Trade Confirmation"), DUS Lender has agreed to sell, and PNC Capital Markets LLC ("MBS Purchaser") has agreed to purchase, on the terms and conditions set forth in the MBS Trade Confirmation, one or more Fannie Mae Mortgage-Backed Securities (the "Security") backed by the Permanent Mortgage Loan.

C.    As more particularly described in the Permanent Mortgage Loan Commitment, Borrower's obligations under the Permanent Mortgage Loan Commitment are subject to various conditions including (1) completion of construction (or rehabilitation) of the Project in accordance with the Approved Plans, and (2) lease-up and stabilization of the Project at not less than ninety percent (90%) occupancy for three consecutive calendar months as adjusted for economic vacancy in accordance with the DUS Guide (the "Minimum Occupancy Requirement") unless waived by Fannie Mae, both conditions to be satisfied on or before May 23, 2016, or a later date as extended by DUS Lender and by Fannie Mae (the "Final Delivery Date").

D.    In consideration of DUS Lender's agreement to lock the interest rate on the Permanent Mortgage Loan upon Borrower's acceptance of the Permanent Mortgage Loan Commitment (the "Rate Lock"), DUS Lender requires that Borrower execute and deliver this Certificate, together with a deed of trust securing Borrower's obligations under this Certificate (the "Security Instrument").

E.    All terms used in this Certificate and defined in this Certificate or in any of the attached Exhibits shall have the meanings so given.

In consideration of the above recitals and the promises contained in this Certificate, the receipt and sufficiency of which are acknowledged, Borrower agrees as follows:

Delivery Assurance Certificate - MBS Financing Method                                        Page 1
Multifamily Affordable Housing Product Line

CONFIDENTIAL                                        PLAINTIFFS_00011437

SECTION 1. **Borrower's Agreement to Close Permanent Mortgage Loan.** In consideration of DUS Lender's Permanent Mortgage Loan Commitment and Rate Lock, Borrower agrees to close the Permanent Mortgage Loan with DUS Lender (the **"Permanent Mortgage Loan Closing"**) not less than 30 days prior to the Final Delivery Date on the terms set forth in the Permanent Mortgage Loan Commitment, as such terms may be changed in accordance with Section 2(d) below, and for the amount at which the Permanent Mortgage Loan underwrites at the time of the Permanent Mortgage Loan Closing as determined by DUS Lender.

SECTION 2. **Borrower Acknowledgements.** Borrower acknowledges and agrees that:

(a) Fannie Mae has agreed to confirm its commitment to purchase the Permanent Mortgage Loan from DUS Lender, and to issue the Security to MBS Purchaser under Forward Commitment Confirmation number 874426 (the **"Forward Commitment"**).

(b) MBS Purchaser has agreed to purchase the Security as evidenced by the MBS Trade Confirmation.

(c) [Intentionally Omitted]

(d) Fannie Mae shall have the right, from time to time to do any or all of the following, in which event Borrower shall remain obligated to close the Permanent Mortgage Loan as set out in Section 1 above:

(1) extend the Final Delivery Date;

(2) lessen the Minimum Occupancy Requirement by the percentage of occupancy, the type of occupancy or the time period over which the occupancy requirement must be met; and

(3) waive any condition to the closing or delivery of the Permanent Mortgage Loan or any term or condition of the Permanent Mortgage Loan Commitment or the Forward Commitment or to otherwise lessen any standard of performance or achievement required of the Property or Borrower or any Key Principal of Borrower as a condition to the closing or delivery of the Permanent Mortgage Loan under the Permanent Mortgage Loan Commitment or the Forward Commitment as it may deem appropriate in its sole discretion.

SECTION 3. **Payment, Allocation and Use of Good Faith Deposit.**

(a) Pursuant to the Forward Commitment and this Certificate, Fannie Mae and DUS Lender require Borrower to provide a good faith deposit in an amount equal to three percent (3%) of the Maximum Mortgage Loan Amount (the **"Good Faith Deposit"**). Borrower has paid the Good Faith Deposit in an amount equal to $819,000, one-third of which (i.e., $273,000) shall be held by Fannie Mae in a non-interest bearing account (the **"Fannie Mae GFD Allocation"**), and two-thirds of which (i.e., $546,000) shall be held by DUS Lender for the account of MBS Purchaser in and interest-bearing account selected by DUS Lender in its commercially reasonable discretion (the **"MBS Purchaser GFD Allocation"**).

(b) Should a Non-Delivery Fee become due to Fannie Mae and MBS Purchaser pursuant to Section 4 below, then (i) Fannie Mae shall apply the Fannie Mae GFD Allocation toward the applicable portion of the Non-Delivery Fee that is due to Fannie Mae, and (ii) DUS Lender shall apply the

**Delivery Assurance Certificate - MBS Financing Method** Page 2
**Multifamily Affordable Housing Product Line**

CONFIDENTIAL PLAINTIFFS_00011438

MBS Purchaser GFD Allocation toward the applicable portion of the Non-Delivery Fee that is due to MBS Purchaser. If the amount of any such fees due to Fannie Mae and/or MBS Purchaser exceeds, respectively, the amount of the Fannie Mae GFD Allocation and/or the MBS Purchaser GFD Allocation, then Borrower shall be responsible to pay the excess amount(s) due to Fannie Mae and/or to DUS Lender for the account of MBS Purchaser, as applicable.

(c)     Should a Shortfall Fee become due to MBS Purchaser pursuant to Section 5 below (it being understood that no Shortfall Fee shall be due to Fannie Mae under any circumstances), then DUS Lender shall apply the MBS Purchaser GFD Allocation toward the Shortfall Fee that is due to MBS Purchaser. If the amount of the Shortfall Fee due to MBS Purchaser exceeds the amount of the MBS Purchaser GFD Allocation, then Borrower shall be responsible to pay the excess amount due to DUS Lender for the account of MBS Purchaser.

(d)     If (i) no Non-Delivery Fee or Shortfall Fee becomes due, or (ii) the amount of any Shortfall Fee paid to DUS Lender for the account of MBS Purchaser pursuant to Section 5 below is less than the amount of the MBS Purchaser GFD Allocation, then Fannie Mae and DUS Lender shall refund, respectively, the Fannie Mae GFD Allocation and the MBS Purchaser GFD Allocation, or any unapplied portion(s) thereof, with such refund(s) to be paid to Borrower promptly following DUS Lender's delivery of the Permanent Mortgage Loan to Fannie Mae and Fannie Mae's delivery of the Security to MBS Purchaser.

SECTION 4.   **Non-Delivery Fee.**   If (i) Fannie Mae terminates the Forward Commitment in accordance with its terms before the Final Delivery Date, or (ii) by no later than the Final Delivery Date, the Permanent Mortgage Loan has not been made by DUS Lender to Borrower, or DUS Lender has not delivered the Permanent Mortgage Loan for purchase to Fannie Mae, or Fannie Mae determines that the Mortgage Loan Delivery Package for the Permanent Mortgage Loan is not acceptable (each, a "**Delivery Failure**"), then Borrower shall pay a non-delivery fee (the "**Non-Delivery Fee**") to (a) Fannie Mae, and (b) DUS Lender for account of MBS Purchaser, in accordance with the provisions of this Section 4. The Non-Delivery Fee shall be due and payable on the first to occur of (1) the date Fannie Mae terminates the Forward Commitment in accordance with its terms, or (2) if there is a Delivery Failure, the Final Delivery Date. If the Permanent Mortgage Loan closes, but the amount of the Permanent Mortgage Loan is less than ninety percent (90%) of the Maximum Mortgage Loan Amount (as further addressed in Section 5 below), then a Non-Delivery Fee shall not be due under this Section 4, but a Shortfall Fee may be due pursuant to the terms and provisions of Section 5 below.

(a)     **Stabilization Failure.**   If the Permanent Mortgage Loan fails to close on or before the Final Delivery Date because, in spite of the best efforts of Borrower, the Project fails to satisfy the Minimum Occupancy Requirement on or before the Final Delivery Date (a "**Stabilization Failure**"), then the Non-Delivery Fee shall be calculated and paid as set forth in Exhibit B to this Certificate.

(b)     **Any Other Reason.**   If the Permanent Mortgage Loan fails to close on or before the Final Delivery Date for any reason other than a Stabilization Failure, or if Fannie Mae terminates the Forward Commitment in accordance with its terms before the Final Delivery Date, then the Non-Delivery Fee shall be calculated and paid as set forth in Exhibit C to this Certificate.

(c)     **Application of Good Faith Deposit Toward Non-Delivery Fee.**   Fannie Mae shall apply the Fannie Mae GFD Allocation toward the portion of the Non-Delivery Fee due to Fannie Mae, and DUS Lender shall apply the MBS Purchaser GFD Allocation toward the portion of the Non-Delivery Fee due to DUS Lender for the account of MBS Purchaser. If the amount of the Non-Delivery

CONFIDENTIAL                                                                                PLAINTIFFS_00011439

Fee exceeds the Good Faith Deposit, Borrower shall be responsible to pay the excess amount due to Fannie Mae and/or to DUS Lender for the account of MBS Purchaser, as applicable.

(d)     **Savings Provision.** Nothing in this Section 4 shall be interpreted to allow Borrower to avoid its obligation to close the Permanent Mortgage Loan as required by Section 1 above.

**SECTION 5.   Shortfall Fee.** If the Permanent Mortgage Loan closes, but the principal amount of the Permanent Mortgage Loan (the "**Actual Loan Amount**") is less than ninety percent (90%) of the Maximum Mortgage Loan Amount because the principal amount of the Permanent Mortgage Loan was reduced as a condition to delivery of the Permanent Mortgage Loan as determined by DUS Lender, then Borrower agrees to pay a shortfall fee in an amount which shall be calculated and paid as set forth in Exhibit D (the "**Shortfall Fee**"). The Shortfall Fee shall be due and payable on the closing date of the Permanent Mortgage Loan and payment of the Shortfall Fee shall be a condition precedent to the closing of the Permanent Mortgage Loan. DUS Lender shall apply the MBS Purchaser GFD Allocation toward any such Shortfall Fee. If the amount of such Shortfall Fee exceeds the MBS Purchaser GFD Allocation, Borrower shall be responsible to pay the excess amount due to DUS Lender for the account of MBS Purchaser.

**SECTION 6.   Reasonable Estimates.** Borrower recognizes that the occurrence of any event which gives rise to the payment of a fee under Sections 4 or 5 above will result in DUS Lender and/or MBS Purchaser incurring additional expenses, loss to DUS Lender in not being able to originate the Permanent Mortgage Loan and MBS Purchaser in not being able to purchase and own the Security and the interest to accrue thereon and frustration or impairment of DUS Lender's ability and/or MBS Purchaser's ability to meet its respective commitments to third parties. Borrower agrees that, upon the occurrence of any such event, each of DUS Lender and MBS Purchaser shall be entitled to damages for the detriment caused thereby, but that it is extremely difficult and impractical to ascertain the extent of such damages. Borrower therefore acknowledges and agrees that the compensatory fees referred to in Sections 4 and 5 above represent reasonable estimates of such damages to DUS Lender and to MBS Purchaser.   Borrower further acknowledges that this provision is a material part of the consideration for the Permanent Mortgage Loan Commitment, Rate Lock and the Forward Commitment.

**SECTION 7.   Interest.** Borrower agrees to pay interest on the unpaid balance of any fee which becomes due under this Certificate from the date upon which such fee first becomes due to the date upon which such fee is paid in full at a per annum interest rate equal to the sum of the Prime Rate plus four percent (4%), or, if less, the highest maximum rate permitted to be charged by applicable law. The term "**Prime Rate**" means an annual rate of interest equal to the prime rate of interest as reported from day to day in The Wall Street Journal (notwithstanding that such publication shows the prime rate of interest for the preceding Business Day) as the base rate on corporate loans posted by at least seventy-five percent (75%) of the nation's 30 largest banks, or, if such rate is no longer available, then the base rate or prime rate of interest of any "Money Center" bank designated from time to time by DUS Lender, in its discretion. Any change in the interest rate under this Certificate due to a change in the prime rate of interest as reported in The Wall Street Journal shall take effect on the date of publication. Interest shall be computed on the basis of a 360-day year and twelve 30-day months.

**SECTION 8.   Additional Security.** As security for the performance of Borrower's obligations under this Certificate, Borrower has delivered to DUS Lender the Security Instrument to be filed of record against the Project.

**SECTION 9.   Remedies.** Should any fee become payable under Sections 4 or 5 above and not be paid when due, DUS Lender shall have the right to take such action at law or in equity, without notice

Delivery Assurance Certificate - MBS Financing Method                                        Page 4
Multifamily Affordable Housing Product Line

or demand, as it deems advisable to protect and enforce the rights of DUS Lender against Borrower and/or in and to the Project, and to exercise any and all rights and remedies available to it under this Certificate and the Security Instrument.

SECTION 10. **No Remedy Exclusive**. Each right, power and remedy of DUS Lender under this Certificate or under applicable laws shall be cumulative and concurrent, and the exercise of any one or more of them shall not preclude the simultaneous or later exercise by DUS Lender of any or all such other rights, powers or remedies. No failure or delay by DUS Lender to insist upon the strict performance of any one or more provisions of this Certificate or to exercise any right, power or remedy under this Certificate shall constitute a waiver thereof or preclude DUS Lender from exercising any such right, power or remedy. In order to entitle DUS Lender to exercise any remedy reserved to DUS Lender, it shall not be necessary for DUS Lender to give any notice thereof.

SECTION 11. **Limits on Personal Liability**. DUS Lender's only recourse for the satisfaction of the indebtedness evidenced by this Certificate and the performance of any other obligations of Borrower under this Certificate or the Security Instrument shall be DUS Lender's exercise of its rights and remedies with respect to that certain real property and the other property described as security in the Security Instrument.

SECTION 12. **Successors and Assigns Bound**. This Certificate shall be binding upon Borrower and its successors and assigns, and shall inure to the benefit of and may be enforced by DUS Lender and its successors, transferees and assigns. Borrower shall not assign any of its rights and obligations under this Certificate without the prior written consent of DUS Lender.

SECTION 13. **Entire Agreement; Amendment and Waiver**. This Certificate, together with the attached Exhibits, contains the complete and entire understanding of Borrower with respect to the matters covered and no change or amendment shall be valid unless it is made in writing and executed by Borrower with the written consent of DUS Lender. No specific waiver of any of the terms of this Certificate by DUS Lender shall be considered as a general waiver.

SECTION 14. **Notices**. All notices given under this Certificate shall be in writing to the other party, at the address and in the manner set forth in the Security Instrument.

SECTION 15. **Severability**. The invalidity, illegality or unenforceability of any provision of this Certificate pursuant to judicial decree shall not affect the validity or enforceability of any other provision of this Certificate, all of which shall remain in full force and effect.

SECTION 16. **Applicable Law**. This Certificate shall be governed by and construed in accordance with the laws of the jurisdiction in which the Project is located.

[Continued on next page]

CONFIDENTIAL

PLAINTIFFS_00011441

SECTION 17.  Acceptance.  Borrower waives any requirement that DUS Lender accepts or give notice of acceptance of this Certificate.

BORROWER:

2013 TRAVIS OAK CREEK, LP,
a Texas limited partnership

By:    2013 Travis Oak Creek GP, LLC,
      a Texas limited liability company,
      its general partner

By:    _____
      Rene O. Campos
      Manager

Delivery Assurance Certificate – MBS Financing Method        Page S-1
Multifamily Affordable Housing Product Line

CONFIDENTIAL

PLAINTIFFS_00011442

## Exhibit A

### DEFINITIONS

The following defined terms shall have the meanings set forth in this Exhibit A and shall be applicable to the Certificate to which this Exhibit A is attached:

**Approved Plans**: Plans, drawings, sketches, specifications, reports, modifications and change orders prepared by the Project Consultants and approved by the Architectural Consultant.

**Architectural Consultant**: The architect engaged to provide services on behalf of DUS Lender and Fannie Mae with respect to the Project.

**Conditions to Delivery**: Fannie Mae's obligation to purchase the Permanent Mortgage Loan and deliver the Security is subject to Fannie Mae's determination, in its sole and absolute discretion, that the conditions to delivery set forth below, and each special condition set forth in the Permanent Mortgage Loan Commitment (each, a **"Condition to Delivery"**) have been satisfied:

(i)     Completion of the Project. As evidenced by the satisfaction of the requirements set forth in subparagraph (ii) below, Borrower has completed the Project (including all amenities, landscaping, signs, parking and the like, except for minor punch list and weather-sensitive items for which sufficient funds have been reserved in a completion/repair reserve fund) as of the Final Delivery Date (a) in a good and workmanlike manner and substantially in accordance with the Approved Plans; (b) on a lien-free basis; (c) in compliance with all applicable requirements of all governmental authorities having jurisdiction over the Project, including, without limitation, all applicable laws, building codes, zoning requirements, subdivision requirements, fire and safety laws, the requirements of the Americans with Disabilities Act and, if applicable, the design and construction requirements established pursuant to the Fair Housing Act, as amended; and (d) in compliance with the environmental requirements of the DUS Guide.

(ii)    Evidence of Completion. All certificates and reports of the Project Architect, the Architectural Consultant and other Project Consultants as required by the DUS Guide to establish completion of the Improvements in accordance with the requirements of the DUS Guide have been provided to or obtained by DUS Lender, including (a) evidence of the availability of all public utilities necessary to the operation of the Project; (b) true and correct copies of each unconditional certificate of occupancy (or the local equivalent of a certificate of occupancy), issued by the governmental authority empowered to exercise jurisdiction over the Project and to properly issue such certificates, for all portions of the Project for which such a certificate is required or, if certificates of occupancy are not required by local law, evidence that the Project has passed all inspections and received all approvals which are conditions precedent to occupancy of all parts of the Improvements; (c) true and correct copies of all operating permits and licenses for the Project; and (d) certificates from the Architectural Consultant and the Project Consultants, including the Project Architect, in form and substance acceptable to DUS Lender and Fannie Mae, in its discretion, stating that the Improvements have been completed substantially in accordance with the Approved Plans.

CONFIDENTIAL                                                      PLAINTIFFS_00011443

(iii)    Timely Delivery of Mortgage Loan Delivery Package.  DUS Lender has timely delivered the Mortgage Loan Delivery Package to Fannie Mae, including, where appropriate, executed assignments or endorsements of the Permanent Mortgage Loan Documents.

(iv)    Payment of Fees.  All required fees under the Forward Commitment have been paid.

(v)    Equity Contributions.  Borrower has provided to DUS Lender a certificate, or other evidence satisfactory to Fannie Mae, confirming that all funds reflected on Borrower's sources and uses of funds statement, including but not limited to all equity contributions to Borrower required to be paid in as of the time of Mortgage Loan Delivery, have been received by Borrower and have been properly invested in the Project as of the time of Mortgage Loan Delivery.

(vi)    Evidence of Low-Income Housing Credit Reservation or Allocation.  The Project (if it is a Multifamily Affordable Housing Property as specified in the DUS Guide) is eligible for Low-Income Housing Tax Credits, and Low-Income Housing Tax Credits have been reserved for, or allocated to, the Project in the required amount.

(vii)    Continued Compliance with Fannie Mae Eligibility and Underwriting Standards.  Borrower under the Permanent Mortgage Loan must remain unchanged, subject to the right of Borrower's construction lender for the Project to provide a Substitute Borrower; Borrower must continue to be an eligible borrower under the DUS Guide; Borrower must continue to own the Project; there must be no change in the Key Principals and no reduction in the Key Principals' direct or indirect ownership interest in and control over Borrower; and there must be no material adverse change in the condition, financial or otherwise, of Borrower or any Key Principal.

(viii)    Minimum Occupancy Requirement.  The Minimum Occupancy Requirement is achieved.

In spite of anything to the contrary contained in this definition, the term "Conditions to Delivery" shall be automatically and correspondingly adjusted if and to the extent Fannie Mae waives any of the conditions set out above or otherwise lessens any standard of performance or achievement required of the Property, Borrower or any Key Principal, all as set out in Section 2(d) of the Certificate.

**DUS Guide**:  Fannie Mae's Delegated Underwriting and Servicing Guide in its present form and as amended, modified, supplemented or reissued from time to time by Fannie Mae, including any DUS Lender Memos, announcements or guide updates (all references to Parts, Chapters, Sections and other subdivisions of the DUS Guide shall be deemed references to (a) the Parts, Chapters, Sections and other subdivisions in effect on the Effective Date; and (b) any successor provisions to such Parts, Chapters, Sections and other subdivisions.

**Improvements**:  For the Project, all improvements on the land described in the Permanent Mortgage Loan Commitment, whether existing or to be reconstructed and, if existing, without regard to whether being rehabilitated.

**Mortgage Loan Delivery**:  DUS Lender's assignment and delivery of the Permanent Mortgage Loan (including all Permanent Mortgage Loan Documents) to Fannie Mae.

CONFIDENTIAL                                                                 PLAINTIFFS_00011444

**Mortgage Loan Delivery Package**: The loan and loan-related documents required to be delivered to Fannie Mae in connection with Fannie Mae's purchase of a mortgage loan as specified in the Fannie Mae DUS Guide.

**Permanent Mortgage Loan Documents**: All documents to be executed and delivered by Borrower in connection with the Permanent Mortgage Loan, which must, in form and substance, satisfy the requirements of the DUS Guide.

**Project Architect**: For the Project, the Architect employed or engaged by Borrower to prepare the plans and specifications for the Project.

**Project Consultants**: All architects (except the Architectural Consultant), landscape architects, structural engineers, civil engineers, environmental engineers, mechanical engineers, electrical engineers and other architects, designers, engineers, consultants and professionals engaged to provide services with respect to the Project.

**Substitute Borrower**: One who is approved by DUS Lender and meets the requirements of the DUS Guide. Fannie Mae must be reimbursed in full for all costs, expenses and fees owing to Fannie Mae in connection with substitution of the Substitute Borrower. The Substitute Borrower must be substituted in a timely manner in order to effect the Mortgage Loan Delivery on or before the Final Delivery Date.

Delivery Assurance Certificate - MBS Financing Method
Multifamily Affordable Housing Product Line

Page A-3

CONFIDENTIAL

PLAINTIFFS_00011445

## Exhibit B

### Non-Delivery Fee
### (Stabilization Failure)

The Non-Delivery Fee under this Exhibit B shall be the greater of:

(1)     three percent (3%) of the Maximum Mortgage Loan Amount; or

(2)     an amount calculated by multiplying:

- the difference between (i) the Note Rate for the Permanent Mortgage Loan in the Forward Commitment less the Servicing Fee (the "**Required Net Coupon Rate**") and (ii) the Required Net Coupon Rate offered for purchase by Fannie Mae for an immediate funding loan with the same terms as the Permanent Mortgage Loan in the Forward Commitment on the Final Delivery Date or, if terminated prior to the Final Delivery Date, the last day of the calendar month in which the Forward Commitment is terminated; TIMES

- the Maximum Mortgage Loan Amount; TIMES

- a present value factor, calculated using the following formula:

$$\frac{1 - (1+r)^{-n/12}}{r}$$

- where:

  r     =     the Required Net Coupon Rate used in (ii) above; and

  n     =     the number of months in the Yield Maintenance Period of the Permanent Mortgage Loan in the Forward Commitment.

One-third ($1/3^{rd}$) of the Non-Delivery Fee as calculated under just line (1) above (i.e., one percent (1%) of the Maximum Mortgage Loan Amount) shall be due and payable to Fannie Mae per the terms of the Forward Commitment, and the remainder of the Non-Delivery Fee as calculated under lines (1) and (2) above, as applicable, shall be due and payable to DUS Lender for the account of MBS Purchaser per the terms of the MBS Trade Confirmation.

CONFIDENTIAL                                                                PLAINTIFFS_00011446

## Exhibit C

### Non-Delivery Fee
### (Any Other Reason)

The Non-Delivery Fee under this Exhibit C shall be the greater of:

(1)      three percent (3%) of the Maximum Mortgage Loan Amount; or

(2)      an amount calculated by multiplying:

- the difference between (i) the Note Rate for the Permanent Mortgage Loan in the Forward Commitment and (ii) the yield rate (the "**Yield Rate**") of the U.S. Treasury security selected by Fannie Mae whose maturity is closest to the end of the Yield Maintenance Period of the Permanent Mortgage Loan in the Forward Commitment on the Final Delivery Date, or if terminated prior to the Final Delivery Date, the last day of the calendar month in which the Forward Commitment is terminated, as the Yield Rate is reported in *The Wall Street Journal*; TIMES

- the Maximum Mortgage Loan Amount; TIMES

- a present value factor, calculated using the following formula:

$$\frac{1 - (1+r)^{-n/12}}{r}$$

- where:

     $r \ = \ $      the Yield Rate; and

     $n \ = \ $      the number of months in the Yield Maintenance Period of the Permanent Mortgage Loan in the Forward Commitment.

One-third ($1/3^{rd}$) of the Non-Delivery Fee as calculated under just line (1) above (i.e., one percent (1%) of the Maximum Mortgage Loan Amount) shall be due and payable to Fannie Mae per the terms of the Forward Commitment, and the remainder of the Non-Delivery Fee as calculated under lines (1) and (2) above, as applicable, shall be due and payable to DUS Lender for the account of MBS Purchaser per the terms of the MBS Trade Confirmation.

**Delivery Assurance Certificate - MBS Financing Method**
**Multifamily Affordable Housing Product Line**
           Page C-1

CONFIDENTIAL            PLAINTIFFS_00011447

## Exhibit D

### Shortfall Fee

As used in this Exhibit D, the term "**Shortfall Amount**" shall mean the difference between (i) the amount which is ninety percent (90%) of the Maximum Mortgage Loan Amount, and (ii) the Actual Loan Amount.

The Shortfall Fee under this Exhibit D shall be the greater of:

(1)    two percent (2%) of the Shortfall Amount; or

(2)    an amount calculated by multiplying:

- the difference between (i) the Note Rate for the Permanent Mortgage Loan in the Forward Commitment less the Servicing Fee (the "**Required Net Coupon Rate**") and (ii) the Required Net Coupon Rate offered for purchase by Fannie Mae for an immediate funding loan with the same terms as the Permanent Mortgage Loan in the Forward Commitment on the date the Lender delivers the Permanent Mortgage Loan to Fannie Mae; TIMES

- the Shortfall Amount; TIMES

- a present value factor, calculated using the following formula:

$$\frac{1 - (1+r)^{-n/12}}{r}$$

- where:

   r    =    the Required Net Coupon Rate used in (ii) above; and

   n    =    the number of months in the Yield Maintenance Period of the Permanent Mortgage Loan in the Forward Commitment.

The Shortfall Fee calculated under lines (1) and (2) above, as applicable, shall be due and payable to DUS Lender for the account of MBS Purchaser per the terms of the MBS Trade Confirmation.

**Delivery Assurance Certificate - MBS Financing Method**                                    Page D-1
**Multifamily Affordable Housing Product Line**

CONFIDENTIAL                                    PLAINTIFFS_00011448



&CHAIKEN
CHAIKEN

ATTORNEYS

CHAIKEN & CHAIKEN, P.C.
LEGACY TOWN CENTER III
5801 TENNYSON PKWY., SUITE 440
PLANO, TEXAS 75024
P 214-265-0250
F 214-265-1537
WWW.CHAIKENLAW.COM

June 28, 2017

Plaintiff's
Exhibits

61

**VIA EMAIL AND**
**CM-RRR NO. 7016 0600 0000 3333 1847**

Dianne M. Stark
JPMorgan Chase Bank, NA
10 South Dearborn, Suite ILI-1415
36th Floor
Chicago, Illinois 60603
diane.m.stark@chase.com

Re:    Advance Promissory Note (as modified, renewed, and extended (the "Note") dated May
       23, 2014, in the face amount of $26,000,000.00, executed by 2013 Travis Oak Creek,
       LP ("Borrower") to the order of JPMorgan Chase Bank, N.A. ("Bank") which was
       issued pursuant to the terms of the Credit Support and Funding Agreement dated on or
       about May 23, 2014 (the "Loan Agreement"), and which is secured by, among other
       things, a Construction Deed of Trust, Absolute Assignment of Rents, Security
       Agreement and Financing Statement ("Deed of Trust") dated on or about May 23, 2014,
       from Borrower for the benefit of the Bank, and all other loan documents which
       collectively constitute the Loan (the "Loan Documents"), covering the real property
       described therein (referred to herein as the "Premises")

Dear Ms. Stark:

        We represent 2013 Travis Oak Creek GP, LLC ("TOCGP") and on its behalf, write in
response to your letter to Borrower dated June 22, 2017, inviting Borrower and its partners to
respond.

        Bank recently was informed of pending litigation between TOCGP, PNC Bank, National
Association ("PNC") and Columbia Housing SLP Corporation ("Columbia"), including disputes
between these parties concerning who currently is Borrower's general partner, and who is
authorized to represent it, or act on its behalf. Before PNC and Columbia commenced that
litigation, and before they claimed to have putatively removed TOCGP as general partner, these
three partners had agreed to pursue closing of loan with Arbor Realty SR, Inc. or its affiliates,
which (as Bank knows) would have paid Bank's loan in full by May 23, 2017 or shortly

Dianne M. Stark
JPMorgan Chase Bank, NA
June 28, 2017
Page 2

thereafter.  That loan could have closed, but for various actions by PNC and Columbia that interfered with the occurrence of a closing, including the aforementioned actions.

When PNC and Columbia commenced litigation and notified third parties, including Bank, that TOCGP was no longer Borrower's general partner and Arbor became aware that these topics were the subject of contested litigation, Arbor hesitated to continue processing and underwriting its potential loan because of the litigation, and outstanding questions concerning who is a partner in the Borrower, who is not, and who its general partner or authorized representative(s) are.  Arbor formally confirmed to TOCGP today that it has in fact  discontinued the processing and underwriting, and passed on the opportunity to make a loan to Borrower.

In your letter to Borrower, Bank requested that "Borrower (or its partners) provide a proposal outlining a viable and imminent source of repayment of all obligations under the Loan Documents, by July 10, 2017."  Please be advised of the following:

1.  There is a July 21st hearing scheduled in the litigation that may result in a preliminary decision by the Court to authorize one of the partners or possibly a receiver, to act for the Borrower until the litigation is finally decided;

2.  Counsel for PNC and Columbia  represented to the Court that its clients do not intend to attempt to assume control of the Partnership pending resolution of the motions set to be heard on July 21, 2017 and TOCGP disputes that it has any right to control or act for the Partnership;

3.  PNC's and Columbia's putative actions to remove TOCGP as general partner, and TOCGP's dispute that any such removal  has occurred, remain open, contested issues requiring final adjudication in the litigation;

4.  Borrower has no current source of repayment of Bank's obligations that is known to TOCGP;

5.  A mediation has been ordered to occur in the litigation by not later than July 11, 2017, but one won't be scheduled until July 10th, at the earliest;

6.  TOCGP believes it would be in a position to revive and promptly close the Arbor potential loan (or a similar alternative) if it can reach certain agreements with PNC and Columbia to resolve the issues that caused Arbor to terminate its loan processing and underwriting activity; and,

7.  TOCGP hopes that the July 10 or 11 mediation otherwise yields agreements that will authorize and enable TOCGP to present a proposal

Dianne M. Stark
JPMorgan Chase Bank, NA
June 28, 2017
Page 3

outlining a viable and imminent plan to repay Bank, with a viable and imminent payment source.

Please do not hesitate to contact me if you have any questions concerning the foregoing.

Very truly yours,

Kenneth B. Chaiken

cc:     Wayne Yaffee, Esq. *(via email)*
        Kathleen J. Wu, Esq. *(via email)*
        Rob Hoffman, Esq. *(via email)*