# ANDREWS KURTH

1717 Main Street, Suite 3700
Dallas, Texas 75201
214.659.4400 Phone
214.659.4401 Fax
andrewskurth.com

Kathleen J. Wu
214.659.4448 Phone
kwu@akllp.com

June 7, 2017

**VIA FEDEX, CERTIFIED MAIL,**
**RETURN RECEIPT REQUESTED AND**
**U.S. MAIL**

**VIA FEDEX, CERTIFIED MAIL,**
**RETURN RECEIPT REQUESTED AND**
**U.S. MAIL**

2013 Travis Oak Creek GP, LLC
603 W 8th Street
Austin, Texas 78701
Attn: Rene Campos

2013 Travis Oak Creek GP, LLC
c/o Eureka Multifamily Group
3001 Knox Street, Suite 400
Dallas, Texas 75205
Attn: Rene Campos

Re:     Amended and Restated Agreement of Limited Partnership of 2013 Travis Oak Creek, LP,
a Texas limited partnership (the "*Partnership*"), dated as of May 23, 2014 (with any
amendments and modifications thereto specifically approved in writing by the limited
partners, the "*Partnership Agreement*"), among 2013 Travis Oak Creek GP, LLC, a
Texas limited liability company (the "*General Partner*"), PNC Bank, National
Association, a national banking association (the "*Investment Limited Partner*"), and
Columbia Housing SLP Corporation, an Oregon corporation (the "*Special Limited
Partner*", together with the Investment Limited Partner, the "*Limited Partners*")

**(i) DEMAND FOR REPURCHASE OF LIMITED PARTNER INTERESTS AND
(ii) NOTICE OF REMOVAL OF GENERAL PARTNER PURSUANT TO
SECTION 7.7(c) OF THE PARTNERSHIP AGREEMENT AND (iii) NOTICE OF
EVENT OF WITHDRAWAL OF GENERAL PARTNER PURSUANT TO
SECTION 9.1 OF THE PARTNERSHIP AGREEMENT**

Ladies and Gentlemen:

As you know, this firm represents and writes to you on behalf of the Limited Partners.
Capitalized terms not defined herein shall have the meaning ascribed to it in the Partnership
Agreement.

**(i)      DEMAND FOR REPURCHASE**

Pursuant to that certain Notice of Default under Forward Commitment by PNC Bank,
National Association delivered to the Partnership dated December 27, 2016, the Partnership is in

DAL:956266.1



CONFIDENTIAL

2013 Travis Oak Creek GP, LLC
June 7, 2017
Page 2

default under the terms of that certain $27,300,000 Fannie Mae Forward Commitment for Fixed Rate Mortgage Loan dated May 21, 2014 which has now been terminated. The General Partner has failed to timely cure those defaults under the Partnership Agreement that were outlined in that certain Notice of Default, Demand for Performance and Reservation of Right to Require Repurchase Pursuant to Partnership Agreement dated February 28, 2017 (the "*Notice of Default*"). Additionally, the General Partner has failed to cause the Partnership to cure the defaults set forth in that certain Notice of Reservation of Rights dated May 23, 2017 from JPMorgan Chase Bank, N.A., such that a Permitted Loan Event of Default has now been declared, among other repurchase triggers. Pursuant to <u>Section 5.1(c)(1)</u>, <u>Section 5.1(c)(3)</u> and <u>Section 5.1(f)</u> of the Partnership Agreement, this letter shall serve as written notice to General Partner demanding repurchase of the Limited Partners' respective interests in the Partnership at the purchase price outlined in <u>Section 5.2</u> of the Partnership Agreement. Pursuant to the terms of <u>Section 5.3</u> of the Partnership Agreement, **the full amount of the purchase price must be paid by General Partner to each Limited Partner within thirty (30) days from the date hereof, the same being July 7, 2017,** and any failure to so timely make such payment will result in interest accruing as set forth therein.

     (ii)     **NOTICE OF REMOVAL OF GENERAL PARTNER PURSUANT TO <u>SECTION 7.7(c)</u> OF THE PARTNERSHIP AGREEMENT AND NOTICE OF EVENT OF WITHDRAWAL OF GENERAL PARTNER PURSUANT TO <u>SECTION 9.1</u> OF THE PARTNERSHIP AGREEMENT**

The General Partner continues to be in breach of and in default under the Partnership Agreement as provided in the Notice of Default, among other defaults. These include, by way of example, but without limitation: (i) the failures referenced in the Notice of Default, and (ii) uncured defaults under Permitted Loans as set forth in <u>Section 7.7(a)(7)</u>. These failures constitute, both separately and in the aggregate, grounds for removal of General Partner as general partner pursuant to <u>Section 7.7(c)</u> of the Partnership Agreement. Pursuant to the terms of the Partnership Agreement, this letter shall serve as a notice from the Special Limited Partner of the removal of the General Partner as a general partner of the Partnership (the "*Removal*").

Please be advised that the Removal constitutes an Event of Withdrawal under the Partnership Agreement and such Event of Withdrawal is in violation of <u>Section 9.1</u> of the Partnership Agreement. As a result, the General Partner is no longer the general partner of the Partnership. In addition to all other legal remedies which may be pursued, the General Partner relinquishes to the Special Limited Partner (or its designee) the General Partner's entire Partnership interest and all unpaid fees from the Partnership to the General Partner and its Affiliates, including, without limitation, any unpaid fees, deferred development fees, reimbursements of amounts advanced or other amounts distributions, profits, deferred fees and other amounts, whether earned or not. In particular, payment of the Deferred Development Fee is deferred in accordance with the Partnership Agreement. Per <u>Section 9.1</u>, the General Partner shall remain liable for all of its obligations under the Partnership Agreement, including, without

DAL:956266.1

CONFIDENTIAL

2013 Travis Oak Creek GP, LLC
June 7, 2017
Page 3

limitation, Capital Contributions relating to the Deferred Development Fee, Adjustment Amounts relating to any recapture or reduction of Tax Credits, and every other obligation of the General Partner set forth in the Partnership Agreement. Demand is hereby made for the General Partner to deliver to the Special Limited Partner any and all documents and information relating to the Partnership currently in the General Partner's possession, including but not limited to all Partnership books, records, reports and accounts. Failure to do so will in no way impact or affect the fact that the General Partner is no longer a general partner of the Partnership. Furthermore, demand is made for the General Partner to transfer to the Special Limited Partner complete control of all funds currently held by or on behalf of the Partnership.

Alternatively, to the extent the General Partner's interests were not relinquished in accordance with the foregoing, Section 7.7(c) of the Partnership Agreement further provides that effective upon the removal of General Partner, the Special Limited Partner or its designee automatically shall become a general partner and acquire the interest of the removed or withdrawn general partner in consideration of the lesser of a cash payment of $100.00 or the amount of the removed General Partner's Capital Account, less any damages to the Partnership connected with removal. Accordingly, please be advised that the Special Limited Partner shall automatically become the successor general partner pursuant to Section 7.7(c)(1) of the Partnership Agreement, as applicable. Enclosed is this firm's check provided to you on behalf of the Special Limited Partner payable to the order of General Partner in the amount of $100.00.

This letter is not intended to recite each and every agreement, right or obligation of General Partner or agreement, right or obligation of the Partnership or any Limited Partner in connection with General Partner's removal as a general partner or otherwise, so General Partner should not infer from the absence of a reference herein to any such other right or obligation that either the Partnership or the Limited Partners intend not to honor such right or perform such obligation to the extent required under the Partnership Agreement.

We remind you that Section 7.7(d) of the Partnership Agreement provides that effective upon the removal of a general partner, such general partner continues to be liable for its obligations under the Partnership Agreement, except as specifically limited by the terms of Section 7.7(d). Moreover, Section 7.7 grants the Special Limited Partner an irrevocable power of attorney, coupled with an interest, to take all action and do all things necessary or appropriate to implement and carry out the provisions of Section 7.7 of the Partnership Agreement.

The Partnership and its Limited Partners have incurred or suffered significant costs, expenses, obligations, liabilities, losses and damages, and will continue to do so in the future as a result of General Partner's conduct, including without limitation its failure to perform its agreements and obligations under the Partnership Agreement. Please know that the Partnership and the Limited Partners intend to avail themselves of any offset rights which they may be directly or indirectly entitled to under the Partnership Agreement or otherwise.

DAL:956266.1

2013 Travis Oak Creek GP, LLC
June 7, 2017
Page 4

General Partner and its officers, directors, shareholders, members, employees, attorneys, accountants, agents and representatives are hereby expressly prohibited from (i) holding General Partner out as a general partner or other authorized agent or signatory of the Partnership to any third party (including, without limitation, any financial institution holding Partnership funds on deposit or in escrow and any property manager or leasing agent for the Project), (ii) expending Partnership funds or incurring costs or expenses on the Partnership's behalf, (iii) taking any action with the intent to bind, or that would bind, the Partnership to any monetary or non-monetary obligation of whatever kind or nature (including, without limitation, the ratification, modification, extension or enlargement of any existing obligation), or (iv) taking any other action with respect to the Partnership that is reserved to a general partner generally, or to General Partner specifically, under the Partnership Agreement or applicable law.  To the extent General Partner possessed any of the foregoing rights and powers in its former capacity as general partner under the Partnership Agreement, all such rights and powers are hereby revoked.

Furthermore, and in addition to all other demands, requests and notices set forth in this letter or in previous correspondence or communications, demand is hereby made that General Partner turn over any and all books and records, reports (including, without limitation, reports to be completed or distributed to any Partners pursuant to the terms of the Partnership Agreement) and other items in its possession relating, in whole or in part, directly or indirectly, to the Partnership or General Partner in its former capacity as a general partner.  Please further advise, in writing, as to the status of all reporting and other delivery obligations that are in progress.  Without limiting the generality of the foregoing, demand is hereby made that General Partner turn over any and all documents, agreements, contracts, records, reports, correspondence, communications, notices, surveys, plans, specifications and any and all other materials of whatever kind or nature (including, without limitation, electronic copies of the foregoing) in General Partner' possession or control relating to (i) any construction, improvements, additions, modifications, repairs, replacements or maintenance to the Project (including, without limitation, any work in progress and contemplated work not yet commenced), and (ii) any claim or threatened claim by any party against the Project or the Partnership.  All of the foregoing information and materials should be delivered to Kathleen J. Wu, as counsel for the Limited Partners, 1717 Main Street, Suite 3700, Dallas, TX 75201; Phone 214.659.4448, either by hand delivery or certified U.S. mail, return receipt requested, no later than ten (10) days following the date of this letter.

Neither this letter nor any previous or contemporaneous correspondence or other communications (including all communications directly from or on behalf of the Limited Partners) is intended to be, nor should it be construed as, an election of remedies by either of the Limited Partners or a waiver of any rights, benefits, agreements, remedies or recourses to which either of them may be entitled.  Each of the Limited Partners hereby reserves any and all rights, remedies, agreements, benefits and recourses available to it under the Partnership Agreement or any other agreement, document or instrument to which either of the Limited Partners is a party or possesses rights as a direct or third party beneficiary, or otherwise at law or in equity, together

DAL:956266.1

CONFIDENTIAL

PLAINTIFFS_00008033

2013 Travis Oak Creek GP, LLC
June 7, 2017
Page 5

with any and all claims, counterclaims or defenses the Limited Partners may have under the Partnership Agreement or otherwise at law or in equity in connection with any negligence, misconduct, or otherwise on the part of General Partner. The Limited Partners continue to reserve the right to seek recovery of any and all costs, expenses, damages and other recoverable amounts, whether or not demanded hereunder, including, without limitation, any actual, punitive or other damages. The recital herein of any default under the Partnership Agreement shall not be deemed a waiver of any other events of default, conditions or circumstances that exist but not specified or which may occur at a later date regardless of whether the same are known to the Limited Partners.

If any party who receives this letter is a debtor in a bankruptcy subject to the provisions of the United States Bankruptcy Code (Title 11 of the United States Code) (the "*Code*"), this letter is merely intended to be written notice that formal demand has been made in compliance with the Partnership Agreement and applicable law. This letter is not an act to collect, assess or recover a claim against you, nor is this letter intended to violate any provisions of the Code. Any and all claims that the Limited Partners assert against General Partner will be properly asserted in compliance with the Code in its respective bankruptcy proceedings.

Thank you for your immediate attention to this important matter.

Very truly yours,

Kathleen J. Wu

cc:     Chaiken & Chaiken, P.C.              **VIA FEDEX, CERTIFIED MAIL,**
        5801 Tennyson Parkway, Suite 440    **RETURN RECEIPT REQUESTED,**
        Plano, Texas 75024                  **U.S. MAIL AND EMAIL**
        Attn: Kenneth B. Chaiken, Esq.      (*kchaiken@chaikenlaw.com*)

        Rene O. Campos                      **VIA FEDEX, CERTIFIED MAIL,**
        603 W 8th Street                    **RETURN RECEIPT REQUESTED,**
        Austin, Texas 78701                 **AND U.S. MAIL**

        2013 Travis Oak Creek Developer, Inc.   **VIA FEDEX, CERTIFIED MAIL,**
        603 W 8th Street                        **RETURN RECEIPT REQUESTED,**
        Austin, Texas 78701                     **AND U.S. MAIL**
        Attn: Rene O. Campos

DAL:956266.1

CONFIDENTIAL                                    PLAINTIFFS_00008034

2013 Travis Oak Creek GP, LLC
June 7, 2017
Page 6

Chula Investments, Ltd.                 **VIA FEDEX, CERTIFIED MAIL,**
603 W 8th Street                        **RETURN RECEIPT REQUESTED,**
Austin, Texas 78701                     **AND U.S. MAIL**
Attn:  Rene O. Campos

Mr. J. Kirk Standly                     **VIA EMAIL**

Joy O'Brien, Esq.                       **VIA EMAIL**
Mr. David Hasselwander                  **VIA EMAIL**
Ms. Lisa Williams                       **VIA EMAIL**

DAL:956266.1

CONFIDENTIAL

PLAINTIFFS_00008035

ANDREWS KURTH LLP
OPERATING ACCOUNT
1717 MAIN ST., SUITE 3700
DALLAS, TEXAS 75201

22158

32-61-1110

PAY
TO THE
ORDER OF _2013 Marin Oak Creek bl, llc_

_One Hundred + w/100_

DATE _6-7-07_

$ _100.00_

DOLLARS

J.P.Morgan
JPMorgan Chase Bank, N.A.
Dallas, Texas

Nohie of _removal + Note of withdrawal_
FOR _____

_Noreg RS_

⑈"022158⑈ ⑈111000614⑈ 8805000 201⑈



CONFIDENTIAL

PLAINTIFFS_00008036

?Subject: Oak Creek Village -- Settlement Extension
From: "Douglass, Michael" <"/o=pnc/ou=exchange administrative group
(fydibohf23spdit)/cn=recipients/cn=f9dded5bcdb14eb393083d763b8f0237-pt00404">
Date: Tue, 31 May 2016 19:20:56 +0000
To: "Faught, Kyle" <kyle.faught@pnc.com>
Cc: "Tobun, Abi" <abi.tobun@pnc.com>

PNC Capital Markets acknowledges that the borrower of Oak Creek Village, a 15/14.5/35 TBA security
initially scheduled to settle on 5/23/16, has opted to extend the settlement of the security under the terms of
the Confirmation Letter.  The borrower may settle the security at any time on or before 11/30/16, and in
exchange, we agree to purchase the security at a 0.5% reduction in original purchase price, so at 99.50%
instead of 100.00%.  If delivery of the security does not occur on or before 11/30/16, PNC Capital Markets
shall have no obligation to purchase the security and shall be entitled to the Non-Delivery Amount as
detailed in the attached.


Michael Douglass
Vice President
Structured Products Group

PNC Capital Markets
340 Madison Avenue, 11th Floor
New York, NY 10173

212.210.9945 (office)
Michael.Douglass@pnc.com

********************************IMPORTANT NOTICE*****************

This message is intended for the use of the individual or entity to which it is addressed and may contain
confidential information that is privileged, confidential and exempt from disclosure under applicable law.  If
the reader of this message is not the intended recipient, you are hereby notified that any dissemination,
distribution or copying of this communication is strictly prohibited.  If you have received this communication
in error, please notify me immediately by reply or by telephone at 212-210-9945 and immediately delete this
message and all of its attachments.



**EXHIBIT**

18

7/14/17 Bn

?Subject: Re: DUS msr valuations
From: "Tobun, Abi" <"/o=pnc/ou=exchange administrative group
(fydibohf23spdlt)/cn=recipients/cn=2bac6c6342c3465cacc5b75381ccc303-pt46266">
Date: Thu, 08 Sep 2016 20:01:07 +0000
To: "Isaacs, Robert J" <robert.isaacs@pnc.com>
Cc: "Wilson, Andrew" <andrew.wilson@pnc.com>,
    "Jacobsen, Jordan" <jordan.jacobsen@midlandls.com>,
    "Bowes, Scott" <scott.bowes@pnc.com>,
    "McCarthy, Peter J" <peter.mccarthy@pnc.com>,
    "Douglass, Michael" <michael.douglass@pnc.com>

See attached Delivery Assurance Cert. Section 4 talks about the consequences of non delivery, Exhibits B,
C & D show how the penalties are calculated. Section D on page 1 puts a lien on the property for non
payment of any penalties or fees.


From:    Robert Isaacs/FinAdmin/PGH/PNC
To:      Abi Tobun/CorpBank/CLE/PNC,
Cc:      Andrew Wilson/FinAdmin/NYC/PNC@PNC, jordan.jacobsen@exchange.pnc.com,
scott.bowes@exchange.pnc.com, Peter J Mccarthy/CorpBank/CLE/PNC@PNC
Date:    09/08/2016 03:49 PM
Subject:    Re: DUS msr valuations


Abi,
Can you send us the language you crafted regarding yield maintenance, prepay penalties, fail fees, or
whatever other economic disincentive the borrower has to prepaying this loan, which obviously has a well
above market rate.

Thanks,
Rob


From:    Abi Tobun/CorpBank/CLE/PNC
To:      Andrew Wilson/FinAdmin/NYC/PNC@PNC, Robert Isaacs/FinAdmin/PGH/PNC@PNC,
Cc:      jordan.jacobsen@exchange.pnc.com, scott.bowes@exchange.pnc.com, Peter J
Mccarthy/CorpBank/CLE/PNC@PNC
Date:    09/08/2016 03:40 PM
Subject:    Re: DUS msr valuations


Thanks Andrew. Peter, Rob and I just discussed the reason for the question. See attached the transaction
details we discussed. I was hoping to get what the model pricing would be for the 7bps servicing strip.

This is an affordable housing deal with LIHTC tax credits.

Deal Name: Oak Creek Apartments
Address: 2324 Wilson St, Austin, TX 78704
Loan Amount: $27,300,000


EXHIBIT
21
7/14/17 BN
PENGAD 800-631-6989

Loan Term: 15 Years Fixed
Amortization: 35 Years Amortization
Prepay Term: 14.5 Years - Yield Maintenance
Interest Accrual: Act/360
G.Fee: 128bps
Svc. Fee: 7bps
Note Rate: 6.150%
MBS Coupon Rate: 4.800%
MBS Issue Date: 5/1/2016
MBS Delivery Date: 11/23/2016
Loss Share: 0%

Reserves and Guarantees:
   Operating Reserve: Required by the Tax Credit Equity Limited Partner, a reserve in the approximate
amount of $1,500,000 (approximately 6 months of operating expense, reserves and mandatory debt service)
funded via the fourth
installment of equity (at stabilization) and held through the compliance period (15 years); if drawn down must
be replenished through available cash flow.

   Retenanting Reserve: Required by the Tax Credit Equity Limited Partner, a reserve in the amount of
$3,000,000 will be funded from the fourth installment of equity (at stabilization). Reserve mitigates risk of
loss of Section 8 appropriations
and equates to the forecasted deficits below a 1.00 DCR for a period of 10 years due to loss of the HAP
subsidy. If HAP contract remains in effect, the reserve will be released in 20% increments, beginning in year
11 of the compliance
period. If HAP subsidy is lost and property restabilized, upon reaching a 1.20 DCR over two consecutive
quarters, the remainder of the balance of the reserve (if any) will be released to the General Partner as a
distribution. The GP will be
required to first restore any shortfalls to the Operating Deficit Reserve and Replacement Reserves, and the
rest will be distributed to the waterfall specified in the Limited Partnership Agreement.

   Operating Deficit Guaranty: Operating Deficit Guaranty amount of $3,000,000 equates to 12 months of
operating expenses, reserves and mandatory debt service. The ODG term is 60 months following
achievement of stabilized
occupancy (90% physical occupancy/80% economic occupancy for 90 days, 1.20 DCR projected through
compliance period). The ODG can be released after the term as long as the operating reserve and
retenanting reserve are fully
funded.

Abi Tobun
Managing Director
PNC Capital Markets - Structured Products Group
340 Madison (11th Floor)
New York, NY  10173
Phone: 212-210-9979
email: abi.tobun@pnc.com


From:    Andrew Wilson/FinAdmin/NYC/PNC
To:      Abi Tobun/CorpBank/CLE/PNC@PNC,
Cc:      jordan.jacobsen@exchange.pnc.com, scott.bowes@exchange.pnc.com
Date:    09/09/2016 02:45 PM
Subject:       Re: DUS msr valuations

Abi - below are some ranges on the multiples. The range reflects the servicing valued by itself (entirely model-based) as well as the indicative pricing from 3rd party brokers. The model-based pricing will tighter relative to the 3rd party brokers because the brokers reflect levels which are not detachable from the origination platforms. Our experience is that the servicing doesn't trade separately because FNMA discourages originators from selling their servicing into a secondary market. Therefore the circumstances for which you are pricing the structures below will be relevant for which end of the range you fall on.

Please let us know what the client ends up deciding with respect to the pricing. There are very few transactions in DUS, so we will be very interested.

| | | |
|---|---|---|
| 10yr term, 9.5yr Yield Maintenance, 30yr Amortization | 4.5-5.6 mult | |
| 15yr term, 14.5yr Yield Maintenance, 30yr Amortization | 5.8-7.6 mult | |
| 15yr term, 14.5yr Yield Maintenance, 35yr Amortization | 6.0-7.9 mult | |
| 30yr term, 15yr Yield Maintenance, 30yr Amortization | 6.4-8.8 mult | |

Thank you

Andrew Wilson
PNC Financial
Portfolio Manager
Managing Director
212-527-3009
andrew.wilson@pnc.com

From:    Abi Tobun/CorpBank/CLE/PNC
To:      Andrew Wilson/FinAdmin/NYC/PNC@PNC, jordan.jacobsen@exchange.pnc.com,
scott.bowes@exchange.pnc.com,
Date:    09/07/2016 10:46 AM
Subject:      Re: DUS msr valuations

I forgot to mention, 0% Loss share scenario for all these options.

From:    Abi Tobun/CorpBank/CLE/PNC
To:      Andrew Wilson/FinAdmin/NYC/PNC@PNC,
Cc:      jordan.jacobsen@exchange.pnc.com, scott.bowes@exchange.pnc.com
Date:    09/07/2016 09:24 AM
Subject:      Re: DUS msr valuations

Thanks Andrew, I was looking for some generic valuation levels on MSRs on the following structures assuming 1.25 Min DSCR and 75 Max LTV.

10yr term, 9.5yr Yield Maintenance, 30yr Amortization
15yr term, 14.5yr Yield Maintenance, 30yr Amortization

15yr term, 14.5yr Yield Maintenance, 35yr Amortization
30yr term, 15yr Yield Maintenance, 30yr Amortization

Abi Tobun
Managing Director
PNC Capital Markets - Structured Products Group
340 Madison (11th Floor)
New York, NY 10173
Phone: 212-210-9979
email: abi.tobun@pnc.com


From:    Andrew Wilson/FinAdmin/NYC/PNC
To:      Abi Tobun/CorpBank/CLE/PNC@PNC,
Cc:      jordan.jacobsen@exchange.pnc.com, scott.bowes@exchange.pnc.com
Date:    09/07/2016 09:21 AM
Subject:        Re: DUS msr valuations

Hi Abi,

Jordan and I are happy to help. What is the general thread of information that you're look for? Please
provide a couple bullet points.

We will try to answer them here with some data to support. We can also set up a quick call if there needs
to be a little more back and forth.

Regards,

Andrew Wilson
PNC Financial
Portfolio Manager
Managing Director
212-527-3009
andrew.wilson@pnc.com



From:    Robert Isaacs/FinAdmin/PGH/PNC
To:      Andrew Wilson/FinAdmin/NYC/PNC@PNC, jordan.jacobsen@exchange.pnc.com@PNC,
Cc:      scott.bowes@exchange.pnc.com@PNC, Abi Tobun/CorpBank/CLE/PNC@PNC
Date:    09/07/2016 09:12 AM
Subject:        DUS msr valuations


Good morning,

Abi, from Peter's team, reached out looking to have a chat about DUS msr multiples. I thought Jordan and
Andrew could help.

Would one of you guys be able to reach out?

Thanks much,

Rob

 STANDLY | HAMILTON, LLP

November 15, 2016

*Via Email*

**PNC REAL ESTATE**
Attention: Kelli A. Tyler
10731 Treena Street, Suite 201
San Diego, CA 92131

      Re:    Extension of Final Delivery Date
             Lucero Apartments (f/k/a Oak Creek Village) Austin, Texas
             Fannie Mae Forward Commitment No.: 874426
             PNC Loan No: 310401235

Ladies and Gentlemen:

This firm represents 2013 Travis Oak Creek, LP, a Texas limited partnership ("***Borrower***"), in connection with the above-referenced matter and we are writing to you on their behalf. Borrower is in receipt of your letter of November 14, 2016, emailed to Borrower's representative at 5:50 pm Central Time on November 14, 2016 ("***PNC's Letter***"). Initially capitalized terms not otherwise defined herein shall have the respective meanings given in PNC's Letter or the Commitment (as defined in PNC's Letter).

PNC's Letter sets forth the terms on which PNC would extend the Final Delivery Date. As you know, Borrower has questioned on several occasions, including on a conference call today among PNC and Borrower representatives, the methodology and calculations that MBS Investor, which is also PNC, used to calculate a six (6) month "Extension Fee" that totals $2,013,375.00 - 7.375% of the loan amount. Borrower believes the fee to be unreasonable and to be nothing more than punitive. Per the terms of PNC's Letter, Borrower has wired today the one month MBS Investor Extension Fee of $204,750.00. Such payment by Borrower is made under protest and Borrower reserves all rights at law and in equity with respect to such "Fee."

Further, Borrower has questioned on several occasions, including last week, earlier today and on a conference call today among PNC and Borrower representatives, why the MBS Investor Extension Fee is due today and on the 15th day of the following months when the Final Delivery Date is on the 23rd of the month (specifically on November 23, 2016 with respect to the Final Delivery Date). The only response that was given is that the MBS Investor says that is when the MBS Investor requires that it be paid. Borrower believes the timing of the payment of the "Fee" to be unreasonable and to be nothing more than punitive.

**EXHIBIT NO. 5**

CONFIDENTIAL                        PLAINTIFFS_00017000

PLAINTIFFS_0001/000

**PNC REAL ESTATE**
November 15, 2016
Page 2

Borrower's payment of the "Fee" as described herein is specifically under protest and is not a waiver of any of Borrower's rights or remedies, at law or in equity, all of which are hereby expressly reserved.

Very truly yours,

J. Kirk Standly
*Direct Phone: 214.234.7951*
*Direct Fax: 214.234.7351*
*kstandly@standlyhamilton.com*

CONFIDENTIAL

 **PNC**

May 23, 2014

PNC Bank, National Association
26901 Agoura Road, Suite 200
Calabasas Hills, CA 91301
Attention:  Mr. Joe G. Basurto, Senior Vice President

Re:     Oak Creek Village
        FNMA Pool # TBA
        CUSIP # TBA

Ladies and Gentlemen:

This confirms the trade, made as of the above date, in which PNC Bank, National Association ("**Seller**"), has agreed to sell, and PNC Capital Markets LLC ("**Purchaser**") has agreed to purchase, on the terms and conditions set forth herein, mortgage-backed securities (such security or securities are hereinafter referred to as the "**Security**").

The terms and conditions of this trade are as follows:

1.     Security; Mortgage Loan.

      a.     The Security shall be backed by a mortgage loan secured by a first-priority lien on the above-identified real property (the "**Mortgage Loan**") and shall have the features described below.

      b.     The Security shall be fully guaranteed as to the timely payment of principal and interest by the Federal National Mortgage Association ("**Fannie Mae**").

      c.     The Mortgage Loan shall be underwritten and closed pursuant to the standard Fannie Mae Multifamily MBS/Delegated Underwriting and Servicing ("**MBS/DUS**") Product Line, with Fannie Mae approved waiver requests, and shall be originated and serviced by the Seller.

      d.     The per annum pass-through rate under the Security (the "**Security Rate**") shall be 4.800 percent (4.800 %) and the per annum interest rate under the Mortgage Loan shall be 6.150 percent (6.150 %).

      e.     The Mortgage Loan shall have a term of fifteen (15) years and amortization under the Mortgage Loan shall be on a thirty-five (35) year term.

      f.     Partial Prepayments are prohibited.

Defendant's
Exhibits

56

PNC Bank, National Association
May 23, 2014
Page 2

g.    Prepayment in whole shall be subject to yield maintenance for the first 14.5 years under the Fannie Mae MBS/DUS Yield Maintenance Prepayment Premium Option as specified in Section 505.02-1, Part XI of the Fannie Mae DUS Guide.

h.    The Mortgage Loan shall have the characteristics set forth in <u>Annex A</u> attached hereto and made a part hereof. Attached hereto as <u>Annex B</u> is a copy of the Delivery Assurance Certificate (the "**Certificate**") dated as of May 23, 2014, delivered by 2013 Travis Oak Creek, LP (the "**Borrower**") to Seller with respect to the Mortgage Loan.

2.    <u>Terms of Trade.</u>

a.    The principal amount of the Security to be sold to Purchaser by Seller is currently projected to be $27,300,000 (the "**Projected Delivery Amount**"). Notwithstanding the foregoing, the principal amount of the Security may be less than the Projected Delivery Amount so long as any such variance does not exceed $2,730,000 (i.e., ten percent (10%) of the Projected Delivery Amount); provided, however, that, if the principal amount of the Security is less than $24,570,000 and Seller delivers to Buyer the Shortfall Fee (as defined in, and calculated in accordance with, <u>Exhibit D</u> of the Certificate) in immediately available funds on the date of the purchase and sale of the Security, then Buyer will accept and pay for the Security with such reduced principal amount and such payment of the Shortfall Fee shall constitute the total liquidated damages sustained by Purchaser resulting from such reduction in the principal amount of the Security below $24,570,000.

b.    Seller represents to Purchaser that Seller has collected from the Borrower an amount equal to two percent (2%) of the Projected Delivery Amount (the "**Good Faith Deposit**") and that the Good Faith Deposit is being held by Seller, in trust, to satisfy its obligations to Purchaser under this confirmation. In the event Seller fails to deliver the Security in accordance with all of the terms and conditions of this confirmation (a "**Delivery Failure**"), Seller shall pay to Purchaser in immediately available funds an amount (the "**Non-Delivery Amount**") that is the applicable proportion of the Non-Delivery Fee (as defined in, and calculated in accordance with, either <u>Exhibit B</u> or <u>Exhibit C</u> of the Certificate, as applicable). Seller's obligation to deliver any amount in excess of the Good Faith Deposit is subject to compliance by the Borrower with its obligation, if any, to pay any additional amounts to Seller pursuant to <u>Section 4</u> of the Certificate. In the event Seller pays to Buyer the amount determined in accordance with the second sentence of this <u>Section 2(b)</u>, such amount shall constitute the total liquidated damages sustained by Purchaser resulting from the Delivery Failure.

c.    In consideration of the delivery to Purchaser of the Security, Purchaser shall pay Seller an amount equal to one hundred percent (100%) of the principal amount of the Security (the "**Purchase Price Percentage**"), plus accrued interest at the Security Rate from the date of issue of the Security through the date prior to the

PLAINTIFFS_00011427

PNC Bank, National Association
May 23, 2014
Page 3

        date of delivery of the Security (such amount, as subject to modification in accordance with Section 2(d) below, is hereinafter referred to as the "**Purchase Price**").

d.      The Security shall bear a Fannie Mae issue date of May 1, 2016, and shall be delivered to Purchaser no later than the last business day of May 2016; provided, however, that an extension of the dates for issuance and delivery of the Security is permitted to November 1, 2016, and the last business day of November, 2016, respectively, subject to a fifty basis point (0.50 %) reduction in the Purchase Price Percentage (i.e., a reduction from 100 percent (100 %) to 99.50 percent (99.5 %)). If delivery of the Security does not occur on or before November 30, 2016, then Purchaser shall have no obligation to purchase the Security and shall be entitled to the Non-Delivery Amount.

3.      <u>Settlement.</u>   Seller will deliver the Security to Purchaser pursuant to the following procedure:

a.      Seller will give Purchaser at least two (2) business days' prior written notice of the proposed date of delivery of the Security and the principal amount of the Security to be delivered if not the Projected Delivery Amount, and will furnish Purchaser with such other information as may be reasonably requested by Purchaser to provide for settlement of the Security, including, without limitation, Seller's written wire instructions.

b.      Prior to the funding of the Security, Purchaser may review the Fannie Mae Prospectus with respect to the Security at http://sls.fanniemae.com/slsSearch/Home.do. Such Prospectus shall be true and correct in all respects and consistent with <u>Section 1</u> above and <u>Annex A</u> attached hereto.

c.      Seller shall effect delivery of the Security through the Federal Reserve Book-Entry System to the Federal Reserve member depository account specified by Purchaser in writing. Delivery shall take place versus payment. Immediately upon delivery of the Security to such account, Purchaser shall pay Seller the Purchase Price by wire transfer of immediately available Federal funds for the account of Seller.

4.      <u>Conditions to Purchase of the Security.</u>  The obligation of Purchaser to purchase the Security is expressly conditioned upon (i) delivery of a Fannie Mae security that satisfies the description contained in Section 1 above and Annex A attached hereto; and (ii) satisfaction of all the other obligations of Seller set forth herein. If Seller fails to deliver a Security that satisfies such description, Purchaser shall have no obligation to purchase such Security and shall be entitled to the Non-Delivery Amount.

5.      <u>Brokerage Commissions, etc.</u>  Each party hereto shall indemnify the other party hereto from and against any and all losses, claims, expenses and liabilities (including attorney's fees) suffered by the latter party in connection with any of the indemnifying party's obligations to pay brokerage commissions, finder's fees or similar payments in connection with the Security.

CONFIDENTIAL          PLAINTIFFS_00011428

PNC Bank, National Association
May 23, 2014
Page 4

6.   Miscellaneous.  If any one or more of the terms or conditions of this confirmation shall be
     determined by a court of competent jurisdiction to be invalid, such invalidity shall in no way
     affect the validity or effectiveness of the remaining terms and conditions hereof.  The trade
     evidenced by this confirmation may not be assigned by Seller, other than to Fannie Mae,
     without the prior written consent of Purchaser, which consent shall not be unreasonably
     withheld.  This confirmation shall be construed in accordance with the laws of the State of New
     York without reference to the choice of law provisions of such state.  Any suit, action or
     proceeding arising out of or relating to this confirmation shall be instituted in a court of
     competent jurisdiction in the State of New York.  This confirmation contains the entire
     agreement between Purchaser and Seller relating to the purchase and sale of the Security
     and the other transactions that are the subject of this confirmation, and supersedes all
     previous and contemporaneous understandings and agreements relating to such
     transactions.  This confirmation cannot be modified or amended, except by an instrument
     in writing signed by the parties hereto, nor may any of the terms or provisions of this
     confirmation be waived except by an instrument in writing signed by the party waiving its
     rights hereunder.

[Continued on next page]

CONFIDENTIAL

PLAINTIFFS_00011429

PNC Bank, National Association
May 23, 2014
Page 5

Please acknowledge receipt of this confirmation by countersigning at the place provided below and
promptly returning a fully completed original to Carla Wissner, INV OPS, PNC Capital Markets
LLC, 116 Allegheny Center, Pittsburgh, PA 15212

Sincerely,

By: _____

Name: Michael Douglass

Title: Director

AGREED AND ACCEPTED:

PNC Bank, National Association,
a national banking association

By: _____
Name: _____Joe G. Basurto_____
Title: _____SVP_____

CONFIDENTIAL

PLAINTIFFS_00011430

**Annex A**

Mortgage Loan Characteristics

PLAINTIFFS_00011431

MULTIFAMILY



**Fixed Loan Details**

| | |
|---|---|
| Deal Name | Oak Creek Village |
| Address | 2324 Wilson St Austin, TX 78704 |
| Total Loan Amount | $27,300,000 |
| Loan Term | 15 Years Fixed |
| Amortization | 35 Years Amortization |
| Prepay Term | 14.5 Years - Yield Maintenance |
| Interest Accrual | Act/360 |
| Gfee & Srv Combined | 135bps |
| Note Rate | 6.150% |
| MBS Coupon Rate | 4.800% |
| MBS Issue Date | 5/1/2016 |
| MBS Delivery Date | 5/23/2016 |
| If ARM, Cap Rate | N/A |

**Additional Deal Details**

| | | | | |
|---|---|---|---|---|
| Building Type | Garden | Tier (Deal Drop?) | 2 - No | |
| | | Min DSC | 1.20x | |
| Total Units | 173 | Max LTV | 90.0% | |
| Year Built | 2016 | Actual DSC | 1.25x | |
| Occupancy | 95.0% | Actual LTV | 68.1% | |
| Close Rate | | | | |

**Special Disclosures - See next page**

24 month forward commitment with 6 month extension option. This is a complete tear down of public housing. It will be replaced by this affordable property.

*100% Hap Contract covering 170 of the 173 units
*9% LIHTC 100% of the units 100% below 60%

Loan is Senior to Soft Subordinate Debt.

Operating Deficit Reserves and Operating Deficit Guaraaty – The equity investor-required ODR and ODG may present a special disclosure requirement. The ODR is equal to 6 months of operating expenses, escrows and debt service (about $1.5MM); and the ODG is equal to 12 months of the same (about $3MM).

Restrictive Covenants and Regulatory Agreements – there are several agreements, in addition to the Low Income Housing Tax Credit Regulatory Agreement, that will encumber the property. These agreements have been issued by HUD, the City of Austin, and the Bouldin Creek Neighborhood Association.

CONFIDENTIAL

PLAINTIFFS_00011432

## Comments:

24 month forward commitment.
This is a complete tear down of public housing. It will be replaced by this affordable property.
PNC will provide the equity and will be a limited partner in the transaction

NOI: $2,379,919
Value: $40,100,000

Special Conditions/Regulatory Agreements

- As described earlier, the subject property currently has a project-based HAP contract covering 170 of the 173 units. HUD will approve a 20-year renewal contract and approve post-construction contract rents before closing of the forward. There is also a HUD Special Warranty Deed in place (pre- existing) that has 10 years remaining in the restriction period. This use agreement requires the property to offer units to tenants with moderate income not exceeding 80% of AMI as long as there is a HAP contract in place. There are other conditions noted and the subject is currently in compliance with the terms of the agreement.

- Due to the allocation of LIHTC, there will be a TDHCA regulatory agreement in effect when the property is placed in service at construction completion. The set aside requirements were described earlier in this narrative (30%, 50% and 60% AMI).

- The subordinate financing from the Austin Housing Finance Corporation will also have a Restrictive Covenant Running with the Land. The terms of the agreement include maintaining affordability restrictions for tenants up to the 60% AMI level, which will not contradict the LIHTC requirements. The term of the agreement is 40 years. If the property is foreclosed or deeded, the agreement will have no further force or effect.

- A Declaration of Covenants, Conditions and Restrictions (CC&Rs) dated June 2013 was entered into by the current owner of the property (the Seller) for the benefit of the Oak Creek Village Tenants Association. The CC&Rs govern aspects of the redevelopment of the property and include a requirement to provide social services in line with TDHCA guidelines (which are being adhered to), a requirement to maintain the same number of units, unit mix and affordability set asides that currently exist at the property, a requirement to pay the Tenants Association a stipend of $1 for each unit each month, as well as some conditions pertaining to the relocation and security of the tenants during construction. The CC&Rs also require a guaranty to provide affordable housing for a minimum of 35 years, and the use of commercially reasonable efforts to keep the HAP contract subsidy in place for the same period. The CC&Rs are considered satisfied and terminated upon the issuance by the City of Austin of certificates of occupancy, as well as the execution of a "binding legal instrument" guaranteeing the affordable housing will remain in place for 35 years.

- A Special Warranty Deed (HUD Deed) issued by HUD in April 1995 encumbers the property and runs with the land. The HUD Deed requires non-discrimination against Section 8 voucher holders and is in effect for 20 years from the date of the Deed (or April 2015), Section 8 Unit Maintenance for a period of 15 years (or April 2010), Equity Participation by HUD upon sale or transfer of the property, conveyance to another non-profit owner, disclosure of other governmental assistance received, maintenance of the property as rental housing for 30 years from the date of the Deed (or April 2025), and maintain affordability for low- and moderate-income tenants up to 80% AMI for 30 years. An amendment to the HUD Deed has been drafted that removes the Equity Participation and Conveyance requirements going forward. This amendment will be executed by HUD before closing.

PLAINTIFFS_00011433

- A Declaration of Easements and Restrictive Covenant Regarding Unified Development and Maintenance of Drainage Facilities Agreement (UDA) dated May 2014 and required by the City of Austin has been entered into by the current owner of the subject property and encumbers all current and future owners (Owners) of Lot 1A (subject) and Lot 1B (held for future development). The UDA calls for joint responsibility of the Owners to construct and maintain a critical water quality zone adjacent to Bouldin Creek (Retention Pond), which lies on the western edge of Lot 1B, as well as establishing joint access between the Lots. The Owners share joint and several liability under the agreement. A separate Common Facilities Maintenance Agreement will be entered into between the Owners that further specifies each party's share of the costs to construct and maintain the Retention Pond and joint access road and provides for maintenance responsibility and payment of costs mechanisms. The UDA is a recorded document and PNC is requesting that the Common Facilities Maintenance Agreement also be recorded.

CONFIDENTIAL

 PNC

## Standard Disclosure

- PNC, PINACLE, Working Cash, ActivePay, Global Trade Excellence, XPACK and Vested Interest are registered marks of The PNC Financial Services Group, Inc.("PNC")

- Midland Loan Services, Enterprise!, CMBS Investor Insight, Portfolio Investor Insight, Borrower Insight, Deal Flow and Shared Servicing are registered marks of PNC Bank, National Association.

- Banking and lending products and services and bank deposit products and investment and wealth management and fiduciary services are provided by PNC Bank, National Association, a wholly-owned subsidiary of PNC and **Member FDIC.** Certain fiduciary and agency services are provided by PNC Delaware Trust Company. Equipment financing and leasing products are provided by PNC Equipment Finance, LLC, a wholly-owned subsidiary of PNC Bank, National Association. Aircraft financing is provided by PNC Aviation Finance, a division of PNC Equipment Finance, LLC. Merchant services are provided by PNC Merchant Services Company. Private equity financing is provided by affiliates of PNC Equity Management Corp. Mezzanine financing is provided by PNC Mezzanine Capital Corp. Investment banking and capital markets activities are conducted by PNC through its subsidiaries PNC Bank, National Association, PNC Capital Markets LLC, and Harris Williams LLC. Services such as public finance advisory services, securities underwriting, and securities sales and trading are provided by PNC Capital Markets LLC. Merger and acquisition advisory and related services are provided by Harris Williams LLC. PNC Capital Markets LLC and Harris Williams LLC are registered broker-dealers and members of FINRA and SIPC. Harris Williams & Co. is the trade name under which Harris Williams LLC conducts its business. Foreign exchange and derivative products are obligations of PNC Bank, National Association. Securities products and brokerage services are offered through PNC Investments LLC, a registered broker-dealer and member of FINRA and SIPC. Insurance products and advice may be provided by PNC Insurance Services, LLC.

- **Important Investor Information: Brokerage and insurance products are  Not FDIC Insured. Not Bank Guaranteed. May Lose Value.**

- PNC does not provide legal, tax or accounting advice. PNC does not provide investment advice to Vested Interest plan sponsors or participants.

- Lending and leasing products and services, including card services, trade finance and merchant services, as well as certain other banking products and services, require credit approval.

©2011 The PNC Financial Services Group, Inc. All rights reserved.

3-23-2011

PLAINTIFFS_00011435

## Annex B

Delivery Assurance Certificate

(See attached)

CONFIDENTIAL

## DELIVERY ASSURANCE CERTIFICATE

### (MBS Financing Method
### Multifamily Affordable Housing Product Line)

THIS DELIVERY ASSURANCE CERTIFICATE (the "Certificate") dated as of May 23, 2014 (the "Effective Date") is made by 2013 TRAVIS OAK CREEK, LP, a Texas limited partnership, together with its permitted successors and assigns ("Borrower"), and delivered to PNC BANK, NATIONAL ASSOCIATION, a national banking association, approved by Fannie Mae as a DUS Multifamily Affordable Housing Lender of conventional mortgage loans (together with its successors and assigns, "DUS Lender").

### RECITALS

A.    DUS Lender has issued a commitment dated May 21, 2014 (the "Permanent Mortgage Loan Commitment") to make a permanent mortgage loan (the "Permanent Mortgage Loan") to Borrower in an original principal amount not to exceed Twenty-Seven Million Three Hundred Thousand Dollars ($27,300,000) (the "Maximum Mortgage Loan Amount") to provide permanent mortgage financing for a multifamily housing project known as Oak Creek Village, located in Austin, Texas (the "Project").

B.    Pursuant to an MBS Trade Confirmation dated as of May 23, 2014 (the "MBS Trade Confirmation"), DUS Lender has agreed to sell, and PNC Capital Markets LLC ("MBS Purchaser") has agreed to purchase, on the terms and conditions set forth in the MBS Trade Confirmation, one or more Fannie Mae Mortgage-Backed Securities (the "Security") backed by the Permanent Mortgage Loan.

C.    As more particularly described in the Permanent Mortgage Loan Commitment, Borrower's obligations under the Permanent Mortgage Loan Commitment are subject to various conditions including (1) completion of construction (or rehabilitation) of the Project in accordance with the Approved Plans, and (2) lease-up and stabilization of the Project at not less than ninety percent (90%) occupancy for three consecutive calendar months as adjusted for economic vacancy in accordance with the DUS Guide (the "Minimum Occupancy Requirement") unless waived by Fannie Mae, both conditions to be satisfied on or before May 23, 2016, or a later date as extended by DUS Lender and by Fannie Mae (the "Final Delivery Date").

D.    In consideration of DUS Lender's agreement to lock the interest rate on the Permanent Mortgage Loan upon Borrower's acceptance of the Permanent Mortgage Loan Commitment (the "Rate Lock"), DUS Lender requires that Borrower execute and deliver this Certificate, together with a deed of trust securing Borrower's obligations under this Certificate (the "Security Instrument").

E.    All terms used in this Certificate and defined in this Certificate or in any of the attached Exhibits shall have the meanings so given.

In consideration of the above recitals and the promises contained in this Certificate, the receipt and sufficiency of which are acknowledged, Borrower agrees as follows:

Delivery Assurance Certificate – MBS Financing Method
Multifamily Affordable Housing Product Line

Page 1

CONFIDENTIAL

PLAINTIFFS_00011437

**SECTION 1.**   **Borrower's Agreement to Close Permanent Mortgage Loan.**  In consideration of DUS Lender's Permanent Mortgage Loan Commitment and Rate Lock, Borrower agrees to close the Permanent Mortgage Loan with DUS Lender (the **"Permanent Mortgage Loan Closing"**) not less than 30 days prior to the Final Delivery Date on the terms set forth in the Permanent Mortgage Loan Commitment, as such terms may be changed in accordance with Section 2(d) below, and for the amount at which the Permanent Mortgage Loan underwrites at the time of the Permanent Mortgage Loan Closing as determined by DUS Lender.

**SECTION 2.**   **Borrower Acknowledgements.**  Borrower acknowledges and agrees that:

(a)      Fannie Mae has agreed to confirm its commitment to purchase the Permanent Mortgage Loan from DUS Lender, and to issue the Security to MBS Purchaser under Forward Commitment Confirmation number 874426 (the **"Forward Commitment"**).

(b)      MBS Purchaser has agreed to purchase the Security as evidenced by the MBS Trade Confirmation.

(c)      [Intentionally Omitted]

(d)      Fannie Mae shall have the right, from time to time to do any or all of the following, in which event Borrower shall remain obligated to close the Permanent Mortgage Loan as set out in Section 1 above:

(1)      extend the Final Delivery Date;

(2)      lessen the Minimum Occupancy Requirement by the percentage of occupancy, the type of occupancy or the time period over which the occupancy requirement must be met; and

(3)      waive any condition to the closing or delivery of the Permanent Mortgage Loan or any term or condition of the Permanent Mortgage Loan Commitment or the Forward Commitment or to otherwise lessen any standard of performance or achievement required of the Property or Borrower or any Key Principal of Borrower as a condition to the closing or delivery of the Permanent Mortgage Loan under the Permanent Mortgage Loan Commitment or the Forward Commitment as it may deem appropriate in its sole discretion.

**SECTION 3.**   **Payment, Allocation and Use of Good Faith Deposit.**

(a)      Pursuant to the Forward Commitment and this Certificate, Fannie Mae and DUS Lender require Borrower to provide a good faith deposit in an amount equal to three percent (3%) of the Maximum Mortgage Loan Amount (the "Good Faith Deposit"). Borrower has paid the Good Faith Deposit in an amount equal to $819,000, one-third of which (i.e., $273,000) shall be held by Fannie Mae in a non-interest bearing account (the **"Fannie Mae GFD Allocation"**), and two-thirds of which (i.e., $546,000) shall be held by DUS Lender for the account of MBS Purchaser in and interest-bearing account selected by DUS Lender in its commercially reasonable discretion (the **"MBS Purchaser GFD Allocation"**).

(b)      Should a Non-Delivery Fee become due to Fannie Mae and MBS Purchaser pursuant to Section 4 below, then (i) Fannie Mae shall apply the Fannie Mae GFD Allocation toward the applicable portion of the Non-Delivery Fee that is due to Fannie Mae, and (ii) DUS Lender shall apply the

CONFIDENTIAL                                                  PLAINTIFFS_00011438

MBS Purchaser GFD Allocation toward the applicable portion of the Non-Delivery Fee that is due to MBS Purchaser. If the amount of any such fees due to Fannie Mae and/or MBS Purchaser exceeds, respectively, the amount of the Fannie Mae GFD Allocation and/or the MBS Purchaser GFD Allocation, then Borrower shall be responsible to pay the excess amount(s) due to Fannie Mae and/or to DUS Lender for the account of MBS Purchaser, as applicable.

(c)     Should a Shortfall Fee become due to MBS Purchaser pursuant to Section 5 below (it being understood that no Shortfall Fee shall be due to Fannie Mae under any circumstances), then DUS Lender shall apply the MBS Purchaser GFD Allocation toward the Shortfall Fee that is due to MBS Purchaser. If the amount of the Shortfall Fee due to MBS Purchaser exceeds the amount of the MBS Purchaser GFD Allocation, then Borrower shall be responsible to pay the excess amount due to DUS Lender for the account of MBS Purchaser.

(d)     If (i) no Non-Delivery Fee or Shortfall Fee becomes due, or (ii) the amount of any Shortfall Fee paid to DUS Lender for the account of MBS Purchaser pursuant to Section 5 below is less than the amount of the MBS Purchaser GFD Allocation, then Fannie Mae and DUS Lender shall refund, respectively, the Fannie Mae GFD Allocation and the MBS Purchaser GFD Allocation, or any unapplied portion(s) thereof, with such refund(s) to be paid to Borrower promptly following DUS Lender's delivery of the Permanent Mortgage Loan to Fannie Mae and Fannie Mae's delivery of the Security to MBS Purchaser.

SECTION 4.    Non-Delivery Fee.   If (i) Fannie Mae terminates the Forward Commitment in accordance with its terms before the Final Delivery Date, or (ii) by no later than the Final Delivery Date, the Permanent Mortgage Loan has not been made by DUS Lender to Borrower, or DUS Lender has not delivered the Permanent Mortgage Loan for purchase to Fannie Mae, or Fannie Mae determines that the Mortgage Loan Delivery Package for the Permanent Mortgage Loan is not acceptable (each, a "**Delivery Failure**"), then Borrower shall pay a non-delivery fee (the "**Non-Delivery Fee**") to (a) Fannie Mae, and (b) DUS Lender for the account of MBS Purchaser, in accordance with the provisions of this Section 4. The Non-Delivery Fee shall be due and payable on the first to occur of (1) the date Fannie Mae terminates the Forward Commitment in accordance with its terms, or (2) if there is a Delivery Failure, the Final Delivery Date. If the Permanent Mortgage Loan closes, but the amount of the Permanent Mortgage Loan is less than ninety percent (90%) of the Maximum Mortgage Loan Amount (as further addressed in Section 5 below), then a Non-Delivery Fee shall not be due under this Section 4, but a Shortfall Fee may be due pursuant to the terms and provisions of Section 5 below.

(a)     Stabilization Failure   If the Permanent Mortgage Loan fails to close on or before the Final Delivery Date because, in spite of the best efforts of Borrower, the Project fails to satisfy the Minimum Occupancy Requirement on or before the Final Delivery Date (a "**Stabilization Failure**"), then the Non-Delivery Fee shall be calculated and paid as set forth in Exhibit B to this Certificate.

(b)     Any Other Reason.   If the Permanent Mortgage Loan fails to close on or before the Final Delivery Date for any reason other than a Stabilization Failure, or if Fannie Mae terminates the Forward Commitment in accordance with its terms before the Final Delivery Date, then the Non-Delivery Fee shall be calculated and paid as set forth in Exhibit C to this Certificate.

(c)     Application of Good Faith Deposit Toward Non-Delivery Fee.   Fannie Mae shall apply the Fannie Mae GFD Allocation toward the portion of the Non-Delivery Fee due to Fannie Mae, and DUS Lender shall apply the MBS Purchaser GFD Allocation toward the portion of the Non-Delivery Fee due to DUS Lender for the account of MBS Purchaser. If the amount of the Non-Delivery

CONFIDENTIAL                                                                    PLAINTIFFS_00011439

Fee exceeds the Good Faith Deposit, Borrower shall be responsible to pay the excess amount due to Fannie Mae and/or to DUS Lender for the account of MBS Purchaser, as applicable.

(d)     **Savings Provision.**  Nothing in this Section 4 shall be interpreted to allow Borrower to avoid its obligation to close the Permanent Mortgage Loan as required by Section 1 above.

**SECTION 5.   Shortfall Fee.**  If the Permanent Mortgage Loan closes, but the principal amount of the Permanent Mortgage Loan (the "**Actual Loan Amount**") is less than ninety percent (90%) of the Maximum Mortgage Loan Amount because the principal amount of the Permanent Mortgage Loan was reduced as a condition to delivery of the Permanent Mortgage Loan as determined by DUS Lender, then Borrower agrees to pay a shortfall fee in an amount which shall be calculated and paid as set forth in Exhibit D (the "**Shortfall Fee**").  The Shortfall Fee shall be due and payable on the closing date of the Permanent Mortgage Loan and payment of the Shortfall Fee shall be a condition precedent to the closing of the Permanent Mortgage Loan.  DUS Lender shall apply the MBS Purchaser GFD Allocation toward any such Shortfall Fee.  If the amount of such Shortfall Fee exceeds the MBS Purchaser GFD Allocation, Borrower shall be responsible to pay the excess amount due to DUS Lender for the account of MBS Purchaser.

**SECTION 6.   Reasonable Estimates.**  Borrower recognizes that the occurrence of any event which gives rise to the payment of a fee under Sections 4 or 5 above will result in DUS Lender and/or MBS Purchaser incurring additional expenses, loss to DUS Lender in not being able to originate the Permanent Mortgage Loan and to MBS Purchaser in not being able to purchase and own the Security and the interest to accrue thereon and frustration or impairment of DUS Lender's ability and/or MBS Purchaser's ability to meet its respective commitments to third parties.  Borrower agrees that, upon the occurrence of any such event, each of DUS Lender and MBS Purchaser shall be entitled to damages for the detriment caused thereby, but that it is extremely difficult and impractical to ascertain the extent of such damages.  Borrower therefore acknowledges and agrees that the compensatory fees referred to in Sections 4 and 5 above represent reasonable estimates of such damages to DUS Lender and to MBS Purchaser.  Borrower further acknowledges that this provision is a material part of the consideration for the Permanent Mortgage Loan Commitment, Rate Lock and the Forward Commitment.

**SECTION 7.   Interest.**  Borrower agrees to pay interest on the unpaid balance of any fee which becomes due under this Certificate from the date upon which such fee first becomes due to the date upon which such fee is paid in full at a per annum interest rate equal to the sum of the Prime Rate plus four percent (4%), or, if less, the highest maximum rate permitted to be charged by applicable law.  The term "**Prime Rate**" means an annual rate of interest equal to the prime rate of interest as reported from day to day in The Wall Street Journal (notwithstanding that such publication shows the prime rate of interest for the preceding Business Day) as the base rate on corporate loans posted by at least seventy-five percent (75%) of the nation's 30 largest banks, or, if such rate is no longer available, then the base rate or prime rate of interest of any "Money Center" bank designated from time to time by DUS Lender, in its discretion.  Any change in the interest rate under this Certificate due to a change in the prime rate of interest as reported in The Wall Street Journal shall take effect on the date of publication.  Interest shall be computed on the basis of a 360-day year and twelve 30-day months.

**SECTION 8.   Additional Security.**  As security for the performance of Borrower's obligations under this Certificate, Borrower has delivered to DUS Lender the Security Instrument to be filed of record against the Project.

**SECTION 9.   Remedies.**  Should any fee become payable under Sections 4 or 5 above and not be paid when due, DUS Lender shall have the right to take such action at law or in equity, without notice

**Delivery Assurance Certificate – MBS Financing Method**                                                          Page 4
**Multifamily Affordable Housing Product Line**

or demand, as it deems advisable to protect and enforce the rights of DUS Lender against Borrower and/or in and to the Project, and to exercise any and all rights and remedies available to it under this Certificate and the Security Instrument.

SECTION 10. No Remedy Exclusive. Each right, power and remedy of DUS Lender under this Certificate or under applicable laws shall be cumulative and concurrent, and the exercise of any one or more of them shall not preclude the simultaneous or later exercise by DUS Lender of any or all such other rights, powers or remedies. No failure or delay by DUS Lender to insist upon the strict performance of any one or more provisions of this Certificate or to exercise any right, power or remedy under this Certificate shall constitute a waiver thereof or preclude DUS Lender from exercising any such right, power or remedy. In order to entitle DUS Lender to exercise any remedy reserved to DUS Lender, it shall not be necessary for DUS Lender to give any notice thereof.

SECTION 11. Limits on Personal Liability. DUS Lender's only recourse for the satisfaction of the indebtedness evidenced by this Certificate and the performance of any other obligations of Borrower under this Certificate or the Security Instrument shall be DUS Lender's exercise of its rights and remedies with respect to that certain real property and the other property described as security in the Security Instrument.

SECTION 12. Successors and Assigns Bound. This Certificate shall be binding upon Borrower and its successors and assigns, and shall inure to the benefit of and may be enforced by DUS Lender and its successors, transferees and assigns. Borrower shall not assign any of its rights and obligations under this Certificate without the prior written consent of DUS Lender.

SECTION 13. Entire Agreement; Amendment and Waiver. This Certificate, together with the attached Exhibits, contains the complete and entire understanding of Borrower with respect to the matters covered and no change or amendment shall be valid unless it is made in writing and executed by Borrower with the written consent of DUS Lender. No specific waiver of any of the terms of this Certificate by DUS Lender shall be considered as a general waiver.

SECTION 14. Notices. All notices given under this Certificate shall be in writing to the other party, at the address and in the manner set forth in the Security Instrument.

SECTION 15. Severability. The invalidity, illegality or unenforceability of any provision of this Certificate pursuant to judicial decree shall not affect the validity or enforceability of any other provision of this Certificate, all of which shall remain in full force and effect.

SECTION 16. Applicable Law. This Certificate shall be governed by and construed in accordance with the laws of the jurisdiction in which the Project is located.

[Continued on next page]

CONFIDENTIAL

PLAINTIFFS_00011441

SECTION 17. Acceptance. Borrower waives any requirement that DUS Lender accepts or give notice of acceptance of this Certificate.

BORROWER:

2013 TRAVIS OAK CREEK, LP,
a Texas limited partnership

By:  2013 Travis Oak Creek GP, LLC,
     a Texas limited liability company,
     its general partner

By:  _____
     Rene O. Campos,
     Manager

Delivery Assurance Certificate – MBS Financing Method                    Page S-1
Multifamily Affordable Housing Product Line

CONFIDENTIAL                                                    PLAINTIFFS_00011442

## Exhibit A

## DEFINITIONS

The following defined terms shall have the meanings set forth in this Exhibit A and shall be applicable to the Certificate to which this Exhibit A is attached:

**Approved Plans**: Plans, drawings, sketches, specifications, reports, modifications and change orders prepared by the Project Consultants and approved by the Architectural Consultant.

**Architectural Consultant**: The architect engaged to provide services on behalf of DUS Lender and Fannie Mae with respect to the Project.

**Conditions to Delivery**: Fannie Mae's obligation to purchase the Permanent Mortgage Loan and deliver the Security is subject to Fannie Mae's determination, in its sole and absolute discretion, that the conditions to delivery set forth below, and each special condition set forth in the Permanent Mortgage Loan Commitment (each, a "**Condition to Delivery**") have been satisfied:

    (i)        <u>Completion of the Project</u>. As evidenced by the satisfaction of the requirements set forth in subparagraph (ii) below, Borrower has completed the Project (including all amenities, landscaping, signs, parking and the like, except for minor punch list and weather-sensitive items for which sufficient funds have been reserved in a completion/repair reserve fund) as of the Final Delivery Date (a) in a good and workmanlike manner and substantially in accordance with the Approved Plans; (b) on a lien-free basis; (c) in compliance with all applicable requirements of all governmental authorities having jurisdiction over the Project, including, without limitation, all applicable laws, building codes, zoning requirements, subdivision requirements, fire and safety laws, the requirements of the Americans with Disabilities Act and, if applicable, the design and construction requirements established pursuant to the Fair Housing Act, as amended; and (d) in compliance with the environmental requirements of the DUS Guide.

    (ii)      <u>Evidence of Completion</u>. All certificates and reports of the Project Architect, the Architectural Consultant and other Project Consultants as required by the DUS Guide to establish completion of the Improvements in accordance with the requirements of the DUS Guide have been provided to or obtained by DUS Lender, including (a) evidence of the availability of all public utilities necessary to the operation of the Project; (b) true and correct copies of each unconditional certificate of occupancy (or the local equivalent of a certificate of occupancy), issued by the governmental authority empowered to exercise jurisdiction over the Project and to properly issue such certificates, for all portions of the Project for which such a certificate is required or, if certificates of occupancy are not required by local law, evidence that the Project has passed all inspections and received all approvals which are conditions precedent to occupancy of all parts of the Improvements; (c) true and correct copies of all operating permits and licenses for the Project; and (d) certificates from the Architectural Consultant and the Project Consultants, including the Project Architect, in form and substance acceptable to DUS Lender and Fannie Mae, in its discretion, stating that the Improvements have been completed substantially in accordance with the Approved Plans.

CONFIDENTIAL                                                PLAINTIFFS_00011443

(iii)    Timely Delivery of Mortgage Loan Delivery Package. DUS Lender has timely delivered the Mortgage Loan Delivery Package to Fannie Mae, including, where appropriate, executed assignments or endorsements of the Permanent Mortgage Loan Documents.

(iv)    Payment of Fees. All required fees under the Forward Commitment have been paid.

(v)    Equity Contributions. Borrower has provided to DUS Lender a certificate, or other evidence satisfactory to Fannie Mae, confirming that all funds reflected on Borrower's sources and uses of funds statement, including but not limited to all equity contributions to Borrower required to be paid in as of the time of Mortgage Loan Delivery, have been received by Borrower and have been properly invested in the Project as of the time of Mortgage Loan Delivery.

(vi)    Evidence of Low-Income Housing Credit Reservation or Allocation. The Project (if it is a Multifamily Affordable Housing Property as specified in the DUS Guide) is eligible for Low-Income Housing Tax Credits, and Low Income Housing Tax Credits have been reserved for, or allocated to, the Project in the required amount.

(vii)    Continued Compliance with Fannie Mae Eligibility and Underwriting Standards. Borrower under the Permanent Mortgage Loan must remain unchanged, subject to the right of Borrower's construction lender for the Project to provide a Substitute Borrower; Borrower must continue to be an eligible borrower under the DUS Guide; Borrower must continue to own the Project; there must be no change in the Key Principals and no reduction in the Key Principals' direct or indirect ownership interest in and control over Borrower; and there must be no material adverse change in the condition, financial or otherwise, of Borrower or any Key Principal.

(viii)    Minimum Occupancy Requirement. The Minimum Occupancy Requirement is achieved.

In spite of anything to the contrary contained in this definition, the term "Conditions to Delivery" shall be automatically and correspondingly adjusted if and to the extent Fannie Mae waives any of the conditions set out above or otherwise lessens any standard of performance or achievement required of the Property, Borrower or any Key Principal, all as set out in Section 2(d) of the Certificate.

**DUS Guide**: Fannie Mae's Delegated Underwriting and Servicing Guide in its present form and as amended, modified, supplemented or reissued from time to time by Fannie Mae, including any DUS Lender Memos, announcements or guide updates (all references to Parts, Chapters, Sections and other subdivisions of the DUS Guide shall be deemed references to (a) the Parts, Chapters, Sections and other subdivisions in effect on the Effective Date; and (b) any successor provisions to such Parts, Chapters, Sections and other subdivisions.

**Improvements**: For the Project, all improvements on the land described in the Permanent Mortgage Loan Commitment, whether existing or to be reconstructed and, if existing, without regard to whether being rehabilitated.

**Mortgage Loan Delivery**: DUS Lender's assignment and delivery of the Permanent Mortgage Loan (including all Permanent Mortgage Loan Documents) to Fannie Mae.

CONFIDENTIAL                                        PLAINTIFFS_00011444

**Mortgage Loan Delivery Package**:  The loan and loan-related documents required to be delivered to Fannie Mae in connection with Fannie Mae's purchase of a mortgage loan as specified in the Fannie Mae DUS Guide.

**Permanent Mortgage Loan Documents**:  All documents to be executed and delivered by Borrower in connection with the Permanent Mortgage Loan, which must, in form and substance, satisfy the requirements of the DUS Guide.

**Project Architect**:  For the Project, the Architect employed or engaged by Borrower to prepare the plans and specifications for the Project.

**Project Consultants**:  All architects (except the Architectural Consultant), landscape architects, structural engineers, civil engineers, environmental engineers, mechanical engineers, electrical engineers and other architects, designers, engineers, consultants and professionals engaged to provide services with respect to the Project.

**Substitute Borrower**:  One who is approved by DUS Lender and meets the requirements of the DUS Guide. Fannie Mae must be reimbursed in full for all costs, expenses and fees owing to Fannie Mae in connection with substitution of the Substitute Borrower.  The Substitute Borrower must be substituted in a timely manner in order to effect the Mortgage Loan Delivery on or before the Final Delivery Date.

CONFIDENTIAL

PLAINTIFFS_00011445

### Exhibit B

### Non-Delivery Fee
### (Stabilization Failure)

The Non-Delivery Fee under this Exhibit B shall be the greater of:

(1)    three percent (3%) of the Maximum Mortgage Loan Amount; or

(2)    an amount calculated by multiplying:

- the difference between (i) the Note Rate for the Permanent Mortgage Loan in the Forward Commitment less the Servicing Fee (the "**Required Net Coupon Rate**") and (ii) the Required Net Coupon Rate offered for purchase by Fannie Mae for an immediate funding loan with the same terms as the Permanent Mortgage Loan in the Forward Commitment on the Final Delivery Date or, if terminated prior to the Final Delivery Date, the last day of the calendar month in which the Forward Commitment is terminated; TIMES

- the Maximum Mortgage Loan Amount; TIMES

- a present value factor, calculated using the following formula:

$$\frac{1 - (1+r)^{-n/12}}{r}$$

- where:

  $r$    =    the Required Net Coupon Rate used in (ii) above; and

  $n$    =    the number of months in the Yield Maintenance Period of the Permanent Mortgage Loan in the Forward Commitment.

One-third ($1/3^{rd}$) of the Non-Delivery Fee as calculated under just line (1) above (i.e., one percent (1%) of the Maximum Mortgage Loan Amount) shall be due and payable to Fannie Mae per the terms of the Forward Commitment, and the remainder of the Non-Delivery Fee as calculated under lines (1) and (2) above, as applicable, shall be due and payable to DUS Lender for the account of MBS Purchaser per the terms of the MBS Trade Confirmation.

CONFIDENTIAL                                                          PLAINTIFFS_00011446

## Exhibit C

### Non–Delivery Fee
### (Any Other Reason)

The Non-Delivery Fee under this Exhibit C shall be the greater of:

(1)     three percent (3%) of the Maximum Mortgage Loan Amount; or

(2)     an amount calculated by multiplying:

- the difference between (i) the Note Rate for the Permanent Mortgage Loan in the Forward Commitment and (ii) the yield rate (the "**Yield Rate**") of the U.S. Treasury security selected by Fannie Mae whose maturity is closest to the end of the Yield Maintenance Period of the Permanent Mortgage Loan in the Forward Commitment on the Final Delivery Date, or if terminated prior to the Final Delivery Date, the last day of the calendar month in which the Forward Commitment is terminated, as the Yield Rate is reported in *The Wall Street Journal*; TIMES

- the Maximum Mortgage Loan Amount; TIMES

- a present value factor, calculated using the following formula:

$$\frac{1 - (1+r)^{-n/12}}{r}$$

- where:

    $r \ = \quad$ the Yield Rate; and

    $n \ =$    the number of months in the Yield Maintenance Period of the Permanent Mortgage Loan in the Forward Commitment.

One-third ($1/3^{rd}$) of the Non-Delivery Fee as calculated under just line (1) above (i.e., one percent (1%) of the Maximum Mortgage Loan Amount) shall be due and payable to Fannie Mae per the terms of the Forward Commitment, and the remainder of the Non-Delivery Fee as calculated under lines (1) and (2) above, as applicable, shall be due and payable to DUS Lender for the account of MBS Purchaser per the terms of the MBS Trade Confirmation.

CONFIDENTIAL                                                    PLAINTIFFS_00011447

## Exhibit D

### Shortfall Fee

As used in this Exhibit D, the term "**Shortfall Amount**" shall mean the difference between (i) the amount which is ninety percent (90%) of the Maximum Mortgage Loan Amount, and (ii) the Actual Loan Amount.

The Shortfall Fee under this Exhibit D shall be the greater of:

(1) two percent (2%) of the Shortfall Amount; or

(2) an amount calculated by multiplying:

- the difference between (i) the Note Rate for the Permanent Mortgage Loan in the Forward Commitment less the Servicing Fee (the "**Required Net Coupon Rate**") and (ii) the Required Net Coupon Rate offered for purchase by Fannie Mae for an immediate funding loan with the same terms as the Permanent Mortgage Loan in the Forward Commitment on the date the Lender delivers the Permanent Mortgage Loan to Fannie Mae; TIMES

- the Shortfall Amount; TIMES

- a present value factor, calculated using the following formula:

$$\frac{1 - (1+r)^{-n/12}}{r}$$

- where:

  $r$ = the Required Net Coupon Rate used in (ii) above; and

  $n$ = the number of months in the Yield Maintenance Period of the Permanent Mortgage Loan in the Forward Commitment.

The Shortfall Fee calculated under lines (1) and (2) above, as applicable, shall be due and payable to DUS Lender for the account of MBS Purchaser per the terms of the MBS Trade Confirmation.

Delivery Assurance Certificate - MBS Financing Method
Multifamily Affordable Housing Product Line

Page D-1

CONFIDENTIAL

PLAINTIFFS_00011448

| | |
|---|---|
| **From:** | Tobun, Abi <abi.tobun@pnc.com> |
| **Sent:** | Thursday, February 02, 2017 2:00 PM |
| **To:** | Grote, Eric |
| **Cc:** | Murgenovich, Brian R |
| **Subject:** | RE: Oak Creek claim. |

There was a change in plan, Peter ended discussing the details with Bill P, so the memo was no longer needed from me. However, Brian was able to document the resolution in his memo (see attachment).

Abi Tobun
PNC Capital Markets - Structured Products Group
340 Madison (11th Floor)
New York, NY  10173
Phone: 212-210-9979
email: abi.tobun@pnc.com

---

**From:** Grote, Eric
**Sent:** Wednesday, February 01, 2017 5:56 PM
**To:** Tobun, Abi <abi.tobun@pnc.com>
**Subject:** Oak Creek claim.

Hi Abi,

The last time we spoke (with Brian) you were talking about writing up a document to explain the value of the claim from Oak Creek.  I was just wondering if you finished that.  Looks like the gain came through yesterday.  Are you able to provide me with a copy.

Thanks

Eric

Defendant's
Exhibits

57

1

PLAINTIFFS_00016581



January 31, 2017

**VIA OVERNIGHT MAIL**
2013 Travis Oak Creek, LP
c/o Eureka Multifamily Group
3001 Knox Street, Suite 400
Dallas, TX 75205
Attention: Rene Campos

**VIA OVERNIGHT MAIL**
PNC Bank, National Association
121 S.W. Morrison Street, Suite 1300
Portland, OR 97201
Attention: Fund Manager

**VIA OVERNIGHT MAIL**
JPMorgan Chase Bank, N.A.
Community Development Group
221 W. 6th Street, 2nd Floor
Mail Code TX3-8207
Austin, TX 78701

Re:     **Notice of Termination of Forward Commitment**

Ladies and Gentlemen:

Reference is hereby made to the $27,300,000 Fannie Mae Forward Commitment for Fixed Rate Mortgage Loan dated May 21, 2014 (the "**Original Forward Commitment**"), as amended by each of (i) the letter agreement initially dated March 28, 2016, and subsequently revised on April 6, 2016 (the "**Commitment Extension**"), and (ii) the letter agreement dated November 14, 2016 (the "**Second Commitment Extension**" and, collectively with the Original Forward Commitment and the Commitment Extension, the "**Forward Commitment**"), from PNC Bank, National Association, a national banking association, in its capacity as delegated underwriting and servicing lender for Fannie Mae (in such capacity, "**PNC**"), to 2013 Travis Oak Creek, LP, a Texas limited partnership ("**Borrower**"). Initially capitalized terms not otherwise defined herein shall have the respective meanings given in the Forward Commitment.

Reference is also made to the Tri-Party Agreement dated as of May 23, 2014, executed by and among Borrower, JPMorgan Chase Bank, N.A., a national banking association ("**Construction Lender**"), and PNC (the "**Tri-Party Agreement**").

Pursuant to Section L.1.(c) of the Forward Commitment, the Forward Commitment shall expire if the Mortgage Loan Closing does not occur at least thirty (30) days prior to the Final Delivery Date. Per the First Commitment Extension (which extension was contemplated by the Original Forward Commitment), the Final Delivery Date was extended from May 23, 2016, to November 23, 2016 (the "**First Extension**"), subject to the satisfaction of the terms and conditions set forth therein. Such terms and conditions of the First Extension were satisfied and the Final Delivery Date was extended to November 23, 2016.

Defendant's
Exhibits

58

CONFIDENTIAL

2013 Travis Oak Creek, LP, et al.
January 31, 2017
Page 2

In late 2016, as the Borrower was unable to meet the extended contractual Final Delivery Date, PNC agreed, as an accommodation to another extension request by the Borrower, to further extend the Final Delivery Date. Per the Second Commitment Extension, the Final Delivery Date was further extended from November 23, 2016 to May 23, 2017 (the "**Second Extension**"), subject to the satisfaction of the terms and conditions set forth therein, including, without limitation, Borrower's payment of all extension fees as and when due under condition (b) of the Second Commitment Extension.

As you know from prior letters to you dated December 27, 2016 and January 23, 2017, respectively, the Borrower failed to pay two different extension fee installments as and when due pursuant to condition (b) of the Second Commitment Extension; namely, the following MBS Investor Extension Fees: (i) in the amount of $238,875.00 due by January 13, 2017, and (ii) in the amount of $307,125.00 due by January 13, 2017 (collectively, the "**Forward Commitment Defaults**"). The thirty (30) day grace period to cure the first such Forward Commitment Default, as set forth in Section M.1. of the Original Forward Commitment, expired upon the close of business on January 27, 2017.

**Accordingly, this letter gives notice to each of you that the Forward Commitment is hereby terminated, as the Borrower has failed to comply with the terms of the Forward Commitment. Pursuant to the Second Extension, the Final Delivery Date was December 23, 2016, on the date of termination. Such termination also constitutes a Delivery Failure, as defined in the Delivery Assurance Certificate referenced below.**

As a result of such termination and the failure of the Borrower to close the Construction Loan not later than the Final Delivery Date of December 23, 2016 and pursuant to Section 4 of that certain Delivery Assurance Certificate (the "**Delivery Assurance Certificate**") dated as of May 23, 2013 between the Borrower and PNC, Borrower is obligated to pay the Non-Delivery Fee (as referenced in Section K.4. of the Original Forward Commitment) immediately, in such amount as is calculated and set forth in the Delivery Assurance Certificate. Per the formula in the Delivery Assurance Certificate, the Non-Delivery Fee is calculated (based on a Final Delivery Date of December 23, 2016) to be $7,250,032.00.

**Demand is hereby made upon the Borrower to remit the Non-Delivery Fee to PNC and to Fannie Mae immediately.** PNC also intends to use the MBS Purchaser GFD Allocation (as defined in the Delivery Assurance Certificate) to offset any amounts owing from Borrower under the Forward Commitment.

No forbearance, delay or inaction by PNC in the exercise of its rights and remedies, and no continuing performance by PNC under the Forward Commitment: (a) shall constitute: (i) a modification or an alteration of the terms, conditions or covenants of the Forward Commitment or (ii) a waiver, release or limitation upon PNC's exercise of any of its rights and remedies

CONFIDENTIAL

PLAINTIFFS_00011022

2013 Travis Oak Creek, LP, et al.
January 31, 2017
Page 3

thereunder, all of which are hereby expressly reserved.   PNC is also retaining external counsel to protect its rights and to collect amounts owing.

In a separate discussions, Mark Gittelman and Kirk Standly had mentioned the possibility of a forbearance agreement to delay actions by PNC to collect the Non-Delivery Fee.  If the Borrower remains interested in discussing such an arrangement, please have your counsel reach out to Mr. Gittelman promptly.

Very truly yours,

MARK RAGSDALE
Senior Vice President

SG/mag

cc:   Wayne A. Yaffee, Esquire of Greenberg Traurig, Counsel to Construction Lender
      Mark A. Gittelman, Esquire
      Jeffrey Christopher, Esquire
      Kirk Standly, Esquire
      Kenneth Chaiken, Esquire

CONFIDENTIAL

PLAINTIFFS_00011023

**From:** Hasselwander, David A [mailto:david.hasselwander@pnc.com]
**Sent:** Tuesday, May 9, 2017 8:05 AM
**To:** Mark Rogers <mrogers972@gmail.com>
**Subject:** RE: EXTERNAL: RE: 2016 Audited Financial Reports

Mark,

I would agree with you that some of these events effecting the partnership occurred after year end (2016). The Subsequent Events section of the audit (Note 11) indicates that there are no material events since April 10, 2017. There are items that should be mentioned in the report that are not included. I have provided suggested language for your review regarding the forward commitment and the other material events. Please let me know if these are acceptable to the you as I tried to state them as fact without denying or accepting liability on any party to the transaction. Thanks!

Change last paragraph of Note 10:

Finally, the Partnership may be at risk for the filing of a suit against it by a lender that previously sent notice that it had terminated a loan commitment, although this is disputed by the Partnership. The facts are in contention, however the Partnership views any potential claim to be fully defensible, with exposure not to exceed $1 million.

Add the following language to Subsequent Events (Note 11):

On February 28, 2017, the limited partners issued a default letter to the partnership claiming violations under the partnership agreement. The general partner of the partnership has denied the claim. As of April 10, 2017, the matter remains unresolved.

On February 28, 2017, the bridge lender issued a default and demand letter to the partnership. The partnership has denied the claim. As of April 10, 2017, the matter remains unresolved.

David Hasselwander
Vice President
PNC Real Estate
101 South Fifth Street
7th Floor
Louisville, KY 40202
(Office) 502-581-3044
(Mobile) 502-741-4468
david.hasselwander@pnc.com



1

**From:** Mark Rogers [mailto:mrogers972@gmail.com]
**Sent:** Friday, May 05, 2017 4:57 PM
**To:** Hasselwander, David A <david.hasselwander@pnc.com>
**Subject:** EXTERNAL: RE: 2016 Audited Financial Reports

David, the language regarding the general contractor lawsuit was added to the final report (attached; page 20 of the report, 21 of the pdf). The forward commitment issue didn't occur into 2017.

Let me know if you have any questions.

Mark

**From:** Hasselwander, David A [mailto:david.hasselwander@pnc.com]
**Sent:** Tuesday, May 2, 2017 2:22 PM
**To:** Mark Rogers <mrogers972@gmail.com>
**Subject:** 2016 Audited Financial Reports

Mark,

I reviewed a copy of the draft audit for 2013 Travis Oak. The accountants did not include anything about the partnership's forward loan commitment or the lawsuit with the general contractor. Please have the accountants add these items with the appropriate language to the draft audit. Please let me know if you would like to discuss.

Thanks!

David Hasselwander
Vice President
PNC Real Estate
101 South Fifth Street
7th Floor
Louisville, KY 40202
(Office) 502-581-3044
(Mobile) 502-741-4468
david.hasselwander@pnc.com

The contents of this email are the property of PNC. If it was not addressed to you, you have no legal right to read it. If you think you received it in error, please notify the sender. Do not forward or copy without permission of the sender. This message may be considered a commercial electronic message under Canadian law or this message may contain an advertisement of a product or service and thus may constitute a commercial electronic mail message under US law. You may unsubscribe at any time from receiving commercial electronic messages from PNC at http://pages.e.pnc.com/globalunsub/
PNC, 249 Fifth Avenue, Pittsburgh, PA 15222; pnc.com


The contents of this email are the property of PNC. If it was not addressed to you, you have no legal right to read it. If you think you received it in error, please notify the sender. Do not

forward or copy without permission of the sender. This message may be considered a commercial electronic message under Canadian law or this message may contain an advertisement of a product or service and thus may constitute a commercial electronic mail message under US law. You may unsubscribe at any time from receiving commercial electronic messages from PNC at http://pages.e.pnc.com/globalunsub/
PNC, 249 Fifth Avenue, Pittsburgh, PA 15222; pnc.com