IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| PNC BANK, N.A.; COLUMBIA HOUSING SLP CORPORATION; and 2013 TRAVIS OAK CREEK, LP; | § § § § | |
| Plaintiffs, | § § | |
| v. | § § | 1:17-cv-584-RP (consolidated with 1:17-cv-560-RP) |
| 2013 TRAVIS OAK CREEK GP, LLC; 2013 OAK CREEK DEVELOPER, INC.; CHULA INVESTMENTS, LTD; and RENE O. CAMPOS; | § § § § § | |
| Defendants. | § § | |

## ORDER

This litigation concerns a dispute as to what entity is the rightful general partner of 2013 Travis Oak Creek, LP ("the Partnership"), a limited partnership formed to develop an apartment complex in Austin, Texas. Plaintiffs PNC Bank, N.A. ("PNC") and Columbia Housing SLP Corporation ("Columbia Housing")—the Partnership's original limited partners—contend that 2013 Travis Oak Creek GP, LLC ("Oak Creek")—the Partnership's original general partner—has been removed and replaced by Columbia Housing. In an attempt to enforce the putative removal of Oak Creek as general partner, PNC and Columbia Housing filed this lawsuit against Oak Creek and its guarantors, 2013 Oak Creek Developer, Inc., Chula Investments, LTD, and Rene O. Campos ("Guarantor Defendants"). Both sides purport to represent and assert claims on behalf of the Partnership.

Pending before the Court are PNC and Columbia Housing's motion for a preliminary injunction, (Dkt. 9), and Oak Creek's motion to dismiss for lack of subject matter jurisdiction, (Dkt.

22).[1] The Court held evidentiary hearings on the preliminary injunction motion on July 22 and 25, 2017. For the following reasons, the Court concludes that: (1) subject matter jurisdiction exists and thus Defendants' motion to dismiss should be denied; and (2) Plaintiffs' motion for a preliminary injunction should be granted.

## I. Background

### A.  The Partnership Agreement

On May 23, 2014, 2013 Travis Oak Creek GP, LLC ("Oak Creek"); PNC Bank, N.A. ("PNC"); and Columbia Housing SLP Corporation ("Columbia Housing") entered into an amended partnership agreement ("the Partnership Agreement"), (Ex. P-3), forming 2013 Travis Oak Creek, LP ("the Partnership"), a Texas limited partnership. Oak Creek is the original general partner. PNC Bank and Columbia Housing are the original limited partners. The purpose of the Partnership is to develop, construct, operate, maintain, and manage an apartment complex in Austin, Texas, known as the Lucero Apartments ("the Property").

The Partnership financed the construction of the Property with a $26 million loan ("the Construction Loan") from J.P. Morgan Chase Bank, N.A. ("Chase" or "the Construction Lender"). The Construction Loan was secured with a mortgage on the Property and had an original maturity date of May 23, 2017. In order to secure permanent financing for the project, the Partnership entered into a forward commitment ("the Forward Commitment"), (Ex. P-30), with PNC and Fannie Mae. Under the Forward Commitment, PNC—acting as a creditor, not as a limited

---

[1] Defendants have also filed a motion for appointment of a receiver and for a preliminary injunction. (Case No. 1:17-cv-560, Dkt. 9). However, Defendants have represented to the Court that they seek only the limited injunctive relief necessary to effectuate the appointment of a receiver. In its order denying the parties' competing TRO applications, the Court took Defendants' motion for appointment of a receiver under advisement, pending resolution of Plaintiffs' motion for a preliminary injunction. (*See* Order, Dkt. 25). For the reasons outlined in this order, the Court grants Plaintiffs' motion for a preliminary injunction. For the same reasons, and because the injunctive relief granted herein obviates the need for a receiver, the Court denies Defendants' motion for a receiver and ancillary injunctive relief.

partner—agreed to underwrite and service a permanent loan ("the PNC Permanent Loan"), backed by Fannie Mae. The Partnership intended to use the PNC Permanent Loan to pay off the Construction Loan prior to its maturation.

## B.  Defects, Lien & Litigation

After construction of the Property was complete and the apartment complex occupied, Oak Creek discovered defects in the installation of the Property's exterior stucco. (*See* Exs. P-35, P-34 & P-36). Discovery of these defects led to a dispute between Oak Creek and Weis Builders, Inc. ("Weis"), the general contractor responsible for constructing the Property. This dispute ultimately resulted in Weis placing a multimillion dollar mechanic's lien on the Property, (Ex. P-4), and filing a lawsuit in state court against the Partnership to foreclose on the lien, (Ex. P-41). That litigation is ongoing. The character and severity of the stucco defect and costs necessary to remediate the defect are disputed.

## C.  Default on the Forward Commitment

The Forward Commitment was executed on May 23, 2014, and set the "Final Delivery Date" for twenty-four months following the date of execution, with an optional six month extension, which PNC granted. (Ex. P-30). Thus, the extended Final Delivery Date was November 23, 2016. (Ex. D-58). By that date, the Partnership was required to close the Permanent Loan, which in turn required satisfaction of a number of specified conditions. For example, in order to close the Permanent Loan, the Partnership was required to secure a certificate of substantial construction completion from Weis, the general contractor. If the Partnership failed to satisfy those conditions and was thus unable to close the Permanent Loan prior to the Final Completion Date, then the Forward Commitment expired and the Partnership was obligated to pay a substantial "Non-Delivery Fee."

The ongoing litigation between the Partnership and Weis prevented the Partnership from closing the Permanent Loan prior to the extended November 23, 2016, Final Delivery Date. Accordingly, the Partnership entered into negotiations with PNC to extend the Final Delivery Date. On November 14, 2016, PNC sent the Partnership an offer to extend the Final Delivery Date until May 23, 2017 (the maturation date for the Chase Construction Loan). (Ex. P-31). The offer required the Partnership to pay various fees, including: (1) a $34,125.00 Fannie Mae Standby Fee, (2) a $68,250 Fannie Mae Extension Fee, and (3) six escalating monthly MBS Investor Extension Fees, ranging from $204,750, for the first month, to $443,624.00, for the final month. The total cost to the Partnership for a six month extension of the Final Delivery Date was approximately $2 million.

On November 15, 2016, counsel for the Partnership sent PNC a letter objecting to the methodology used to calculate the extension fees and arguing that the fees were unreasonable and punitive. (Ex. D-51). Nonetheless, the Partnership agreed to pay the fees for the first month's extension, which were due on November 18, 2016, "under protest." (*Id.*). But, the Partnership failed to pay the second monthly extension fee, which was due on December 15, 2016. (Ex. P-8). On December 27, 2016, PNC—again, in its capacity as a creditor, not a limited partner—sent the Partnership notice that it was in default on the terms of the Forward Commitment. (*Id.*). On January 31, 2017, after the Partnership failed to pay the third monthly extension fee, which was due on January 13, 2017, PNC sent the Partnership a notice that the Forward Commitment had been terminated. (Ex. D-58). The notice demanded that the Partnership immediately remit a Non-Delivery Fee in the amount of $7,250,032.00 to PNC and Fannie Mae.

## D.  Default on the Construction Loan

After the Forward Commitment was terminated, the Partnership attempted to secure alternative permanent financing from Arbor Realty Trust. (*See* Ex. P-37). The limited partners initially consented to the alternative financing, but the Partnership was never able to close the loan.

The parties dispute the reasons why the loan fell through. Oak Creek contends that PNC and Columbia Housing needlessly interfered and prevented the loan from closing. (Ex. P-61).

Ultimately, the Partnership was unable to secure any alternative permanent financing prior to the Chase Construction Loan's May 23rd maturation date and consequently defaulted on the Construction Loan. On June 2, 2017, Chase sent the Partnership a notice of default declaring its right to exercise any available remedies against the Partnership, including its right to foreclose on the Property. (Ex. P-45). On June 28, 2017, Chase exercised its right to claim a setoff on a cash account held by the Partnership and designated as collateral against the Construction Loan. (Ex. P-7). To date, Chase has not initiated foreclosure proceedings.

**E.  Putative Removal of the General Partner**

On February 28, 2017, counsel for PNC and Columbia Housing sent Oak Creek a "Notice of Default," stating that they believed Oak Creek was in default under the terms of the Partnership Agreement. (Ex. P-10). The noticed alleged two defaults under the agreement: first, that Oak Creek allowed the Partnership to default on the Forward Commitment, and, second, that Oak Creek had failed to cure any liens affecting the Property. It further demanded that Oak Creek cure these defaults on or before March 21, 2017, and warned that if the defaults were not cured, that the limited partners would exercise their right to remove the general partner.

On June 7, 2017, counsel for PNC and Columbia Housing sent Oak Creek a "Notice of Removal" stating that it had been removed as the Partnership's general partner pursuant to Section 7.7(c) of the Partnership Agreement. (Ex. P-11). The notice further stated that Oak Creek's removal as general partner constituted an "Event of Withdrawal" under Section 9.1 of the Partnership Agreement and, accordingly, that Oak Creek was required to relinquish the entirety of its interest in the Partnership to Columbia Housing. On June 16, 2017, sent Oak Creek a "Supplemental Notice of Removal," which included an expanded list of Oak Creek's alleged defaults under the Partnership

Agreement. (Ex. P-12). In addition to defaults referenced in the February 28th Notice of Default, the Supplemental Notice of Removal alleged that Oak Creek had defaulted on the Partnership Agreement by (1) failing to achieve "Final Construction Completion" by March 1, 2016; (2) voluntarily commencing receivership proceedings (a reference to a motion filed in this litigation); and (3) allowing a lawsuit to be filed that could materially and adversely affect the Partnership (a reference to the litigation with Weis).

PNC and Columbia Housing contend that, in the event the general partner defaults on its obligations under the Partnership Agreement, the agreement allows Columbia Housing to remove and replace the general partner. PNC and Columbia Housing also contend that the relevant removal provisions of the Partnership Agreement are automatic and self-executing. Thus, it is the position of PNC and Columbia Housing that on June 7, 2017, the date Oak Creek was served with the original Notice of Removal, it immediately ceased to be the Partnership's general partner. In accord with that belief, on the morning of June 8, 2017, Columbia Housing sent a new management company to the premises to take control of the Property. The new management company was turned away by Oak Creek's management company, at the direction of Oak Creek's counsel.

Oak Creek disputes that it has been rightfully removed from the Partnership and continues to (1) represent to third-parties that it is the Partnership's general partner, (2) manage and operate the Property, and (3) exercise dominion and control over the Partnership's assets, including the Property.

**F.  Procedural History**

On June 8, 2017, PNC Bank and Columbia Housing filed this lawsuit in the United States District Court for the Northern District of Texas against Oak Creek and its guarantors. (Compl., Dkt. 1). The lawsuit asserts a cause of action for breach of contract and seeks injunctive and declaratory relief preventing Oak Creek, the Guarantor Defendants, or anyone acting in active

concert with them from interfering with Columbia Housing's exercise of its purported rights as general partner of the Partnership. On the morning of June 10, PNC Bank and Columbia Housing amended their complaint to add the Partnership itself as a plaintiff. (Am. Compl., Dkt. 9). Also on the morning of June 10, Oak Creek filed a mirror-image lawsuit in state court in Travis County, Texas. (Orig. Pet., Dkt. 2, Case No. 1:17-cv-560). Later that day, PNC Bank and Columbia Housing removed the mirror-image case to this Court, asserting federal diversity jurisdiction. (Notice of Removal, Dkt. 1, Case No. 1:17-cv-560).

On June 12, 2017, PNC Bank and Columbia Housing filed an emergency motion in the Northern District requesting entry of a temporary restraining order and a preliminary injunction. (Dkt. 10). On the same day, Oak Creek filed its own emergency motion in this Court, requesting the appointment of a temporary receiver to manage the Partnership and the Property as well as entry of a temporary restraining order and a preliminary injunction. (Dkt. 9, Case No. 1:17-cv-560). The next day, this Court held a hearing on Oak Creek's motion and subsequently stayed the action pending a resolution of the proper venue for this litigation by the district court in the Northern District, where the first-filed action was pending. (Order, Dkt. 14, Case No. 1:17-cv-560). On June 15, the Northern District, acting on its own motion, determined that venue was proper in the Western District and transferred the first-filed action here. (Order, Dkt. 16).

On June 16, 2017, this Court heard the emergency motions in the two related actions. Following the hearing, the Court issued a written order denying both motions for temporary restraining orders, taking Oak Creek's motion for appointment of a receiver under advisement, and setting the preliminary injunction motions for a hearing. (Order, Dkt. 25). Since the TRO hearing, the parties have engaged in expedited discovery on issues related to the pending preliminary injunction motions. (Order, Dkt. 37). Each side has also filed a motion to dismiss. (Dkts. 22 & 39).

On July 22 and 25, 2017, the Court held an evidentiary hearing on the competing preliminary injunction motions. At the hearing, the Court heard testimony from four witnesses: Abi Tobun, David Hasselwander, Mark Rogers, and Kirk Standly.  Having reviewed the evidence presented at the hearing, the Court issues the following order.

## II. Jurisdiction

"Before ruling on the merits of the case, it is imperative that the court first determine whether it has jurisdiction to hear the suit." *Cook v. Reno*, 74 F.3d 97, 99 (5th Cir. 1996). PNC and Columbia Housing assert federal diversity jurisdiction under 28 U.S.C. § 1332, which gives federal district courts original jurisdiction over civil actions "between . . . citizens of different States." To satisfy this requirement, there must be "complete diversity between all plaintiffs and all defendants." *Lincoln Prop. Co. v. Roche*, 546 U.S. 81, 90 (2005).

In its pending motion to dismiss for lack of subject matter jurisdiction, Oak Creek argues that it is the general partner of the Partnership, and, therefore, the Partnership, which is named a plaintiff, is a citizen of Texas. *See Harvey v. Grey Wolf Drilling Co.,* 542 F.3d 1077, 1079 (5th Cir. 2008) ("The citizenship of a limited partnership is based upon the citizenship of each of its partners."). Because the defendants, Oak Creek and its guarantors, are also citizens of Texas, it follows that there is a lack of complete diversity that deprives this Court of jurisdiction. Plaintiffs, on the other hand, argue that Columbia Housing, a citizen of Oregon, has rightfully removed and replaced Oak Creek as the Partnership's general partner. If so, the Partnership is no longer a citizen of Texas and complete diversity exists. Thus, the issue of jurisdiction turns on the central issue underlying the merits of this litigation: was Oak Creek rightfully and automatically removed as general partner of the Partnership?

A court may assess its subject matter jurisdiction by looking to: "(1) the complaint alone; (2) the complaint supplemented by undisputed facts evidenced in the record; or (3) the complaint

supplemented by undisputed facts plus the court's resolution of disputed facts." *Ramming v. United States*, 281 F.3d 158, 161 (5th Cir. 2001) (citing *Barrera–Montenegro v. United States,* 74 F.3d 657, 659 (5th Cir.1996)). In examining its jurisdiction, "the district court is empowered to consider matters of fact which may be in dispute," but a case should be dismissed for lack of subject matter jurisdiction "only if it appears certain that the plaintiff cannot prove any set of facts in support of his claim that would entitle plaintiff to relief." *Id.* (citing *Home Builders Ass'n of Miss., Inc. v. City of Madison, Miss.,* 143 F.3d 1006, 1010 (5th Cir.1998)). Here, the Court is satisfied that subject matter jurisdiction exists for two reasons.

First, PNC and Columbia Housing's amended complaint alleges complete diversity. The amended complaint asserts that Plaintiff PNC is a citizen of Pennsylvania, (Am. Compl., Dkt. 9, ¶ 1), and that Plaintiff Columbia Housing is a citizen of Oregon, (*id.* ¶ 2). The amended complaint further asserts that Defendant Oak Creek and the Guarantor Defendants are all citizens of Texas. (*Id.* ¶¶ 4–7). Plaintiffs allege that Oak Creek committed numerous defaults on the Partnership Agreement, (*id.* ¶¶ 20–28); that in the event of default, the Partnership Agreement affords Columbia housing the right to remove and replace Oak Creek as general partner, (*id.* ¶¶ 31–32); and that Columbia Housing has properly exercised that right, (*id.*). Consequently, the amended complaint asserts that the Partnership is presently a citizen of the states of citizenship of its two remaining partners—Pennsylvania and Oregon. (*Id.* ¶¶ 3–8). Assuming the truth of these allegations, all plaintiffs are citizens of either Pennsylvania, Oregon, or both, whereas all defendants are citizens of Texas. Thus, Plaintiffs' amended complaint survives a facial inquiry on subject matter jurisdiction. *E.g. Campbell v. United States*, 172 F.3d 869 (5th Cir. 1999) (per curiam); *Lewis v. Knutson*, 699 F.2d 230, 237 (5th Cir. 1983).

Second, "where issues of fact are central both to subject matter jurisdiction and the claim on the merits," the Fifth Circuit has held that "the trial court must assume jurisdiction and proceed to

the merits." *Montez v. Dep't of Navy*, 392 F.3d 147, 150 (5th Cir. 2004); *see also Williamson v. Tucker*, 645 F.2d 404, 415 (5th Cir. 1981) ("[N]o purpose is served by indirectly arguing the merits in the context of federal jurisdiction."). Here, the jurisdictional issue raised by Oak Creek turns on the same question as the merits of the claims asserted by PNC and Columbia Housing. Thus, the Court may properly assume jurisdiction, deny Oak Creek's motion to dismiss, and proceed to the merits.

### III. Discussion

"A preliminary injunction is an extraordinary equitable remedy that may be granted only if the plaintiff establishes four elements: (1) a substantial likelihood of success on the merits; (2) a substantial threat that the movant will suffer irreparable injury if the injunction is denied; (3) that the threatened injury outweighs any damage that the injunction might cause the defendant; and (4) that the injunction will not disserve the public interest. These four elements are mixed questions of law and fact." *Hoover v. Morales*, 164 F.3d 221, 224 (5th Cir. 1998) (quoting *Sunbeam Prods. Inc. v. W. Bend Co.*, 123 F.3d 246, 250 (5th Cir. 1997)).

### A.  Likelihood of Success on the Merits

The Court begins by asking whether Plaintiffs are likely to succeed on the merits. PNC and Columbia Housing argue that Oak Creek committed numerous defaults under the Partnership Agreement and that, following those defaults and in accordance with the terms of the Partnership Agreement, Columbia Housing properly removed and replaced Oak Creek as the Partnership's general partner. PNC and Columbia Housing ask the Court to enforce their bargained-for right to remove Oak Creek as the general partner in the event of default and to enjoin Oak Creek from interfering with Columbia Housing's exercise of its rights as the new general partner. Having held an evidentiary hearing, heard testimony, and reviewed the available record, the Court concludes that PNC and Columbia Housing have demonstrated a substantial likelihood that they will ultimately

succeed on the merits of their breach of contract claim and be able to prove their right to the requested equitable relief.

1. **Oak Creek Committed Multiple Defaults Under the Partnership Agreement**.

PNC and Columbia Housing allege that Oak Creek has committed numerous defaults under the Partnership Agreement. Specifically, they argue that Oak Creek has: (1) failed to achieve "Final Construction Completion," as defined by the Partnership Agreement; (2) allowed Weis, the general contractor, to file a mechanic's lien against the Property; (3) allowed Weis to seek a judicial foreclosure on that mechanic's lien; (4) defaulted on the Forward Commitment; (5) defaulted on the Construction Loan; and (6) sought (in this litigation) the appointment of a receiver. The Court agrees that the evidence suggests Oak Creek has defaulted by failing to achieve Final Construction Completion, allowing a mechanic's lien to be placed on the Property, and allowing a lawsuit to be filed to foreclose on that lien. Having concluded that PNC and Columbia Housing have demonstrated the occurrence of these first three default events, the Court does not reach the remaining alleged defaults.

i. **Final Construction Completion**

First, Oak Creek has defaulted on the Partnership Agreement by failing to timely achieve Final Construction Completion. Section 7.7(a)(2) of the Partnership Agreement states that an "Event of Default" occurs if "[t]he Partnership fails to achieve Final Construction Completion by the Completion Date," which is defined as March 1, 2016. (Ex. P-3, at 52, § 7.7(a)(2)). Final Construction Completion requires that "construction and/or rehabilitation of the Project . . . has been completed . . . without lien (unless such liens have been bonded over to the satisfaction of [Columbia Housing]) . . . or defect in accordance with the Plans and Specifications." (*Id.* at 7). Moreover, for Final Construction Completion to be achieved, Columbia Housing must receive and

accept both an "AIA Form G704 Certificate of Substantial Completion" issued by the architect and final lien waivers issued by the general contractor and some subcontractors. (*Id.*)

Final Construction Completion has not been achieved. At this point, more than a year has passed since the required completion date, and it is beyond dispute that the Property has a serious construction defect involving the installation of the buildings' exterior stucco that may cost millions of dollars to remediate. While the parties characterize the defect somewhat differently, there is no evidence in the record disputing that the defect exists, nor is there any evidence suggesting that the defect is in actuality minor or immaterial. Moreover, a certificate of substantial completion has not been issued by the project's architect. Oak Creek offered into evidence an unsigned, draft version of the form required by the Partnership Agreement, (Ex. D-62), and argues that the circulation of this incomplete draft somehow constitutes issuance of a certificate of substantial completion. It does not. The form's signature block indicates that it is considered "issued" on the date it is signed by the architect and there is no version of the document bearing the architect's signature in evidence.

Oak Creek stresses that certificates of occupancy for the Property have been issued and that most of the units at the Property are leased and occupied, and, accordingly, Oak Creek urges the Court to deem Final Construction Completion achieved. To do so would be to rewrite the Partnership Agreement and to excise from it specific language defining the conditions that the general partner must meet in order to achieve timely Final Construction Completion and avoid default. Oak Creek was of course free to negotiate an alternative agreement with a more flexible definition of Final Construction Completion, and doing so may have provided the general partner a helpful hedge against contingencies outside its control. But the Court must enforce the Partnership Agreement as written. Oak Creek's failure to ensure the Project was completed without lien or defect prior to March 1, 2016, and its failure to achieve issuance of a Form G704 Certificate of

Substantial Completion prior to March 1, 2016, constitute an Event of Default under the clear language of the agreement.

### ii.   Mechanic's Lien & General Contractor Litigation

Second, Oak Creek has defaulted on the Partnership Agreement by allowing a mechanic's lien to be filed against the Property and by allowing a judicial proceeding to be instituted to foreclose on that lien. Section 7.7(a)(6) states that an "Event of Default" occurs in the event of "[a]ny default or breach by a General Partner . . . of any covenant, representation, warranty, duty or obligation under [the Partnership Agreement] . . . which is not cured within any applicable notice or cure period." (Ex. P-3, at 53, § 7.7(a)(6)). Under Section 6.5 of the Partnership Agreement, the general partner agrees to be bound by certain "Duties, Covenants, Obligations, Representations, and Warranties." (*Id.* at 33, § 6.5). Specifically, the general partner represents and warrants that "[n]o . . . liens . . . exist against the Project other than those which are created or permitted by the Project Documents," (*id.* at 38, § 6.5(w)), and that "[n]o . . . suit . . . or claim, including, but not limited to, judicial, municipal, or administrative proceedings . . . is pending, has occurred, or, to the best of the General Partner's knowledge after due inquiry, is threatened, the continuing effect of which could materially or adversely affect the operation of the Partnership," (*id.* at 38, § 6.5(x)).

On January 10, 2017, Derek Armstrong, Vice President of Weis Builders, filed a mechanic's lien against the Property for $3,285,305.94 in unpaid work and materials. (Ex. P-4). Subsequently, Weis has filed a lawsuit to foreclose on the lien. (Ex. P-41). The litigation between Weis and the Partnership is ongoing. By allowing a lien and resultant litigation to be filed against the Partnership, Oak Creek has breached the duties, covenants, obligations, representations, and warranties outlined in Section 6.5 of the Partnership Agreement and thereby allowed an Event of Default to occur under Section 7.7

Oak Creek argues that the Weis mechanic's lien was "created or permitted" by the Construction Contract and is therefore exempt from the language of Section 6.5(w), which excludes liens "created or permitted by the Project Documents." Oak Creek reasons that because a mechanic's lien may only be filed by a party under contract with the owner of the property against which the lien is filed, the mechanic's lien must have arisen out of the Construction Contract and therefore should be considered to have been "created or permitted" by the Construction Contract, which is one of the "Project Documents."

The Court disagrees. The Construction Contract neither creates nor permits any mechanic's lien. Rather, the Weiss mechanic's lien is created by and was filed pursuant to the relevant provisions of the Texas Constitution and the Texas Property Code. *See* Tex. Const., Art. XVI, § 37; Tex. Prop. Code § 53.021. Moreover, the language of the Construction Contract does not authorize Weis to file a mechanic's lien; it merely provides that a party pursuing a claim related to a mechanic's lien should adhere to the filing deadlines set forth under relevant law, (Construction Contract, Pls.' Reply Ex. C, Dkt. 69-3, at 92, § 15.2.8), and that lien waivers must be issued prior to the project achieving final completion, (*id.* at 77, § 9.10.2.3(v)). Additionally, under Oak Creek's interpretation of Section 6.5(w), any lien filed by the general contractor or a subcontractor would be considered permitted by the Project Documents and thereby exempt from the covenant of no liens. The Court agrees with Plaintiffs that such a reading would render the covenant contained in Section 6.5(w) effectively meaningless and gut an important protection afforded to the limited partners by the Partnership Agreement.

Oak Creek also suggests that the Court should disregard the Weis mechanic's lien and resultant litigation because the Partnership, including the limited partners, dispute the validity of the lien, and because the Partnership's limited partners have consented to answering and opposing the litigation. However, the relevant covenants in the Partnership Agreement do not recognize these

14

distinctions. Section 6.5(w) makes no reference to whether a lien placed on the Property is valid. Similarly, Section 6.5(x) makes no reference to whether a lawsuit brought against the Partnership is meritorious. The fact that the limited partners dispute the validity of the lien and related lawsuit and have agreed to challenge both does not alter the fact that the Partnership Agreement requires the general partner to avoid these encumbrances.

Finally, Oak Creek argues that the litigation against Weis is immaterial and thus not a breach of Section 6.5(x), which only bars claims that "could materially or adversely affect the operation of the Partnership." Yet, the litigation seeks a judgment in excess of $3 million and foreclosure on the Property, the development and maintenance of which is the Partnership's sole reason for existence. Thus, the Court has no trouble finding that the litigation could materially or adversely affect the Partnership.

In sum, the evidence suggests that Oak Creek has breached multiple covenants set forth in Section 6.5 of the Partnership Agreement, and, therefore, an Event of Default has occurred under Section 7.7(a)(6).

2. **Columbia Housing Properly Exercised Its Contractual Right to Remove and Replace Oak Creek as the Partnership's General Partner.**

Having concluded that Oak Creek defaulted under the Partnership Agreement, the remaining question is whether Oak Creek's default allows Columbia Housing to remove and replace it as general partner. Section 7.7 of the Partnership Agreement states that "upon the occurrence of an Event of Default . . . [Columbia Housing] shall have the right . . . to . . . remove each General Partner as provided in Section 7.7(c)." (Ex. P-3, at 52, § 7.7). Section 7.7(c) reads in part, "If, after an Event of Default that is not timely cured as set forth herein, [Columbia Housing] elects to remove a General Partner, then such a removal shall occur automatically and without further action by any Partner upon the giving of notice thereof by [Columbia Housing] to the Partners." (*Id.* at 54, § 7.7(c)). Moreover, Section 9.1 provides that "[Columbia Housing]'s removal of the General

15

Partner" constitutes an "Event of Withdrawal,"(*id.* at 60, § 9.1(a)(5)), and that "[u]pon the

occurrence of an Event of Withdrawal, such General Partner shall automatically cease to be Partner

of the Partnership and . . . shall automatically and without notice or action of the Partners, relinquish

to [Columbia Housing] . . . such General Partner's entire economic interest in the Partnership," (*id.*

at 60, § 9.1(b)(1)).

On June 7, 2017, Columbia Housing sent Oak Creek a "Notice of Removal." (Ex. P-11). In

light of the clear language of Sections 7.7 and 9.1 of the Partnership Agreement, service of the

Notice of Removal automatically removed Oak Creek as the general partner and effectuated a

transfer of Oak Creek's interest in the Partnership to Columbia Housing.

Oak Creek contends that the above provisions of the Partnership Agreement are

unenforceable. Specifically, Oak Creek argues: (1) Sections 7.7 and 9.1 provide the limited partners a

right to rescind the contract unilaterally and that under Texas law rescission is a remedy that may

only be enforced in limited circumstances; and (2) that Sections 7.7 and 9.1 render all of the

promises offered by limited partners under the partnership agreement illusory, and that, under Texas

law, a contract is unenforceable if the promise of performance is illusory.

Rescission of a contract is an equitable remedy that may be granted under a number of

circumstances, such as when a contract was obtained through fraudulent inducement. *E.g.*, *Boyter v.

MCR Construction Co.*, 673 S.W.2d 938, 941 (Tex. App.–Dallas 1984, writ ref'd n.r.e). The cases cited

by Oak Creek spell out the conditions under which a court may rescind a contract. *Ferguson v.

DRG/Colony North, Ltd.*, 764 S.W.2d 874, 886 (Tex. App.–Austin 1989, writ denied) (holding that to

be entitled to rescission a party must demonstrate the absence of an adequate remedy at law);

*Williams v. Davey*, 114 S.W. 195 (Tex. App.–Galveston 1908, writ ref'd) (affirming judgment for

defendant where plaintiff seeking rescission was the first to breach); *Boyter*, 673 S.W.2d at 941

(holding that to be entitled to rescission a party generally must show that it will not retain benefits

received under the contract). Oak Creeks intimates that because Sections 7.7 and 9.1 provide PNC and Columbia a remedy (removal of the general partner) that voids other portions of the contract, that enforcement of these sections should be subject to the same conditions as judicial rescission.

However, PNC and Columbia Housing do not seek to rescind the Partnership Agreement— they seek to enforce it. Here, the relief provided in Sections 7.7 and 9.1 was agreed to by the parties and is expressly and unambiguously allowed by the contract. None of the cases cited by Oak Creek support the proposition that a bargained-for contractual provision is invalidated because it provides a party a remedy akin to rescission. And even if that were the law, the remedy provided by Sections 7.7 and 9.1 is not akin to rescission, because it neither voids the contract nor returns the parties to their pre-contract status, as rescission necessarily implies: after Oak Creek's removal as general partner, the Partnership Agreement remains intact and the Partnership lives on.

Moreover, the Partnership Agreement is not illusory. A contract is unenforceable if one party to the contract has tendered no more than an "illusory promise," or "a promise that fails to bind the promisor, who retains the option of discontinuing performance." *O'Farrill Avila v. Gonzalez*, 974 S.W.2d 237, 244 (Tex. App.– San Antonio 1998, pet. denied). Yet, because "an individual paragraph is merely a part of an entire, integrated contract," Texas law does not probe the enforceability of individual contractual provisions. *Howell v. Murray Mortg. Co.*, 890 S.W.2d 78, 86 (Tex. App.–Amarillo 1994, writ denied). Rather, "[m]utuality of obligation in each individual clause of a contract is unnecessary where there is consideration given for the contract as a whole." *Id.*

Oak Creek argues that the promises of performance offered by PNC and Columbia Housing throughout the Partnership Agreement are illusory, because at any time they can invoke Section 7.7 and 9.1 to remove Oak Creek and evade their contractual obligations. The Court disagrees because, first, under the Partnership Agreement as a whole, PNC and Columbia Housing have tendered adequate consideration. Most concretely, they are obligated to make substantial capital contributions

17

to the Partnership. (Ex. P-3, at 15, ¶ 3.1). Second, Sections 7.7 and 9.1 do not afford PNC and Columbia Housing an unconditional right to remove and replace Oak Creek as general partner. Rather, their right to removal vests only upon the occurrence of an Event of Default. Under the agreement, the limited partners promise to allow Oak Creek to serve as general partner and to receive all of the rights associated with that role *as long as* Oak Creek avoids an Event of Default. That promise is conditional, but not illusory.

Finally, the Court notes that Oak Creek's various arguments that the removal provisions found in Sections 7.7 and 9.1 are unenforceable are inconsistent with Texas statutory law which expressly allows for the removal of a limited partnership's general partner in accordance with the terms of the partnership agreement. Chapter 153 of the Texas Business Organizations Code provides that "[a] person ceases to be a general partner of a limited partnership on the occurrence of one or more . . . events of withdrawal" including when "the general partner is removed as general partner in accordance with the partnership agreement." Tex. Bus. Org. Code § 153.155(a)(3). It therefore must be the case that a partnership agreement may provide the limited partners a right to remove the general partner under specified circumstances and that such removal provisions are, as a general rule, enforceable. Absent some compelling argument as to why the removal provisions in the Partnership Agreement are unique and not of the sort contemplated by Chapter 153, the Court is unpersuaded that those provisions are unenforceable under Texas law.

Thus, the Court concludes that PNC and Columbia Housing have demonstrated a substantial likelihood that they will ultimately be able to prove that the Oak Creek was properly removed and replaced as the Partnership's general partner pursuant to legally enforceable provisions of the Partnership Agreement.

3.  __Oak Creek's Affirmative & Equitable Defenses Are Unavailing__.

The Court now turns to the litany of affirmative and other equitable defenses asserted by Oak Creek, including: (1) laches, (2) estoppel and quasi-estoppel, (3) consent, (4) waiver, (5) induced breach, (6) first material breach, and (7) unclean hands. Oak Creek is entitled to an opportunity to fully develop and substantiate these theories, most of which have not yet been fully briefed, explained or argued in any detail. Yet, in light of the record developed as of yet, the Court is not persuaded that any of these defenses will prevail.

While Oak Creek asserts a variety of defenses, undergirding those defenses are two general arguments. The first is that PNC and Columbia Housing have waived, consented to, or are otherwise estopped from asserting any of Oak Creek's defaults under the Partnership Agreement. The second is that PNC and Columbia Housing have acted inequitably and against the interests of the Partnership and, in light of their unclean hands, should be refused the injunctive relief they seek.

As to the first argument, there is no reason to believe that PNC and Columbia Housing ever consented to allowing any Event of Default to occur or agreed to waive their rights that are triggered under the Partnership Agreement upon the occurrence of an Event of Default. As discussed above, the record indicates PNC and Columbia Housing have consented to the Partnership taking certain steps to defend its interests. Specifically, they have consented to allowing the Partnership to make efforts to remediate construction defects and they have consented to allowing the Partnership to challenge the Weis mechanic's lien and to answer and fight Weis' lawsuit to foreclose on the lien. Yet, there is a distinction between allowing the Partnership to take certain remedial steps to mitigate the consequence of a default and consenting to the default in the first instance. Thus, the Court concludes that the limited partners have not intentionally relinquished any of their rights under the Partnership Agreement and that the cooperative undertakings cited by Oak Creek are in fact fully consistent with the limited partners' claiming and preserving their right to

remove the general partner after an uncured default. *E.g.*, *Sun Expl. & Prod. Co. v. Benton*, 728 S.W.2d 35, 37 (Tex. 1987) (citing *Massachusetts Bond & Ins. Co. v. Orkin Exterm. Co.*, 416 S.W.2d 396, 401 (Tex. 1967)) (holding that waiver requires a showing of either "an intentional relinquishment of a known right" or "intentional conduct inconsistent with claiming that right"); *Lopez v. Munoz, Hockema & Reed, L.L.P.*, 22 S.W.3d 857, 864 (Tex. 2000) (holding that the doctrine of quasi-estoppel only applies "when it would be unconscionable to allow a person to maintain a position inconsistent with one to which he acquiesced").

As to the second argument, there is some evidence in the record suggesting that PNC and Columbia Housing may not have always had the Partnership's best interests at heart. Oak Creek argues that PNC engaged in troublesome self-dealing and used the construction defects and consequent obstacles to the Partnership's ability to secure permanent financing as an opportunity to extract substantial fees from the Partnership. Some of this alleged conduct may give rise to viable claims against PNC. It is difficult for the Court to say as Oak Creek has not yet asserted any claims against PNC, though it has represented its intention to do so. But, the Court does not believe that any of PNC's conduct warrants denying PNC and Columbia Housing the injunctive relief they presently seek. To begin with, the bulk if not all of PNC and Columbia Housing's allegedly inequitable conduct occurred well after Oak Creek's failure to achieve timely Final Construction Completion and its allowing a lien to be filed against the Property and litigation initiated against the Partnership. Because Oak Creek's first defaults pre-date and are not directly related to PNC and Columbia Housing's later alleged inequitable conduct, it is difficult to conceive how that conduct could vitiate the contractual consequences of those defaults. *See Park v. Escalera Ranch Owners' Ass'n, Inc.*, 457 S.W.3d 571, 597 (Tex. App.–Austin 2015, no pet.) (affirming the grant of an injunction when defendant asserted an unclean hands defense based on an alleged breach of a restrictive covenant related to but distinct from the earlier breach that gave rise to the injunction); *see also In re*

*Jim Walter Homes, Inc.*, 207 S.W.3d 888, 899 (Tex. App.—Houston [14th Dist.] 2006, no pet.) (stating that conduct giving rise to an unclean hands defense must arise from "the same matter or transaction"). More to the point, an unclean hands defense requires a showing that the wrong complained of cannot be remedied without denying the requested equitable relief. *Park*, 457 S.W.3d at 597. Here, Oak Creek has not made any showing that refusing PNC and Columbia Housing the requested injunction is the only way to right PNC's alleged misconduct. To the contrary, the Court is satisfied that any misconduct on the part of PNC involving the parties dispute over fees related to the Forward Commitment can likely be fully remedied with damages and denying the injunction risks exacerbating the situation by jeopardizing the Partnership's solvency and title to the Property.

And finally, the Court notes that Oak Creek's two arguments appear to be in tension. On one hand, any step which PNC and Columbia Housing take to help Oak Creek remediate a default and defend the interests of the Partnership, Oak Creek construes as consent to the default and waiver of any rights thereby triggered. On the other hand, in those instances where PNC and Columbia Housing have declined to help clean up the mess, Oak Creek argues their conduct suggests unclean hands. The limited partners are thus struck in a double bind where it is impossible for them to both offer the cooperation necessary to defend the Partnership while at the same time preserving for future exercise their bargained-for right to remove the general partner.

To be sure, it is possible that Oak Creek's various defenses will eventually prove viable. But for now, the Court is satisfied that none of these defenses has been sufficiently proven as to unsettle its conclusion that PNC and Columbia Housing have demonstrated a substantial likelihood of success on the merits.

## B.  Irreparable Injury

To be entitled to a preliminary injunction, PNC and Columbia Housing must also demonstrate that absent relief they face a substantial threat of irreparable harm. *Opulent Life Church v.*

*City of Holly Springs*, 697 F.3d 279, 297 (5th Cir. 2012); *Hoover,* 164 F.3d at 224. PNC and Columbia Housing have articulated two potential harms they claim constitute irreparable injury: first, the loss of a bargained-for, contractual right to control the Partnership, and, second, foreclosure on the Property by the Construction Lender. The Court concludes that the threat of foreclosure is both substantial and irreparable, and thus does not reach the issue of whether loss of control of the Partnership is an irreparable injury.

The Fifth Circuit has held that the loss of an interest in real property due to foreclosure is an irreparable harm. *See Bean v. Indep. Am. Sav. Ass'n*, 838 F.2d 739, 743 (5th Cir. 1988) ("Because [plaintiff] stands to lose interests in real property, which we presume are unique, there is no adequate post-foreclosure remedy that could substitute for injunctive relief."); *see also Opulent Life Church*, 697 F.3d at 297 (quoting *Third Church of Christ, Scientist, of N.Y.C. v. City of New York*, 617 F.Supp.2d 201, 215 (S.D.N.Y. 2008), *aff'd*, 626 F.3d 667 (2d. Cir. 2010)) ("The deprivation of an interest in real property constitutes irreparable harm."). This rule extends not only to residential but also to commercial property and applies even when the party seeking an injunction is an investor. *Bean*, 838 F.2d at 743.

The only remaining question is whether the threat of foreclosure is substantial. To show a substantial threat, the party seeking an injunction must demonstrate "that the threatened harm is more than mere speculation." *Janvey v. Alguire*, 647 F.3d 585, 601 (5th Cir. 2011). "[I]t is not necessary to demonstrate that harm is inevitable. . . . The plaintiff need show only . . . that the injury is imminent." *Humana, Inc. v. Avram A. Jacobson, M.D., P.A.*, 804 F.2d 1390, 1394 (5th Cir. 1986). "[I]n most situations the mere threat of foreclosure, without the actual institution of proceedings, does not constitute imminent harm sufficient to justify an injunction." *Bean*, 838 F.2d at 743. But ultimately the inquiry is case-specific and turns on whether the facts of the case suggest "the threat of foreclosure is sufficiently real to support equitable relief." *Id.*

Here, the threat of foreclosure is quite real. The Construction Lender—Chase Bank—has sent the Partnership a notice of default and declared its rights to enforce all available remedies against the Partnership, including foreclosure. (Ex. P-45). On June 28, 2017, the Construction Lender began exercising its available remedies by claiming a setoff on a cash account held by the Partnership and designated as collateral against the Construction Loan. (Ex. P-7). Moreover, the Construction Lender has requested the opportunity to appraise the Property, which under federal law is one of the last steps necessary prior to foreclosure. (*See* Reply Exs. A & B, Dkts 69-1 & 69-2). Oak Creek nonetheless argues that absent the Construction Lender's decision to post notice of foreclosure there is no proof that any harm is imminent. However, in light of the concrete steps the Construction Lender has taken to exercise its available remedies and to prepare for foreclosure, PNC and Columbia Housing's concern is clearly much more than mere speculation.

Moreover, unlike in the standard case where the mortgagor moves to directly enjoin the bank from foreclosing, here injunctive relief alone will not immediately prevent foreclosure. Rather, PNC and Columbia Housing contend that the requested injunction will clarify what entity controls the Partnership and thereby allow the Partnership to secure permanent financing and pay off the Construction Lender. Thus, if the Court were to wait until the Construction Lender posts notice of foreclosure prior to granting preliminary relief, there simply may not be enough time for the Partnership to take the necessary steps to secure financing and cure its default. *See* Tex. Prop. Code § 51.002(b) (allowing foreclosure to commence 21 days after notice is posted). The Court is thus persuaded that threat of foreclosure faced by the Partnership is sufficiently real to justify equitable relief and therefore concludes that PNC and Columbia Housing have satisfied the irreparable injury prong of the preliminary injunction standard.

## C.  Balance of the Equities

Next, PNC and Columbia must demonstrate that the threatened injury outweighs any damage that the injunction might cause the Defendants. In weighing these equities, the Court first notes that the risk of foreclosure on the Property seriously threatens the interests of all the parties to this litigation. And all parties are in agreement that some form of equitable relief is necessary to provide clarity as to what entity is the Partnership's general partner and allow the Partnership to secure permanent financing out from under the cloud of this litigation. The parties simply disagree as to what relief is appropriate, with PNC and Columbia Housing arguing for an injunction to enforce the removal of Oak Creek, and with Oak Creek arguing for the appointment of a receiver to manage the Partnership in the interim. The Court must do something, the question is simply what.

Ultimately, the damage an injunction may inflict on Oak Creek is minimal. Oak Creek has adamantly argued that granting the requested injunction would cause it to forfeit the entirety of its interests in the Partnership. Those interests include: (1) a $7.3 million "Seller Loan,"[2] (Ex. P-3, at Schedule), and (2) an approximately $5.2 million "Development Fee," (Ex. P-3, at 43, ¶ 6.8). However, Oak Creek's interest in both the Seller Loan and the Development Fee are purely monetary. If, at the conclusion of this litigation, the Court finds that an injunction was improvidently granted and that Oak Creek was improperly removed as general partner, then Oak

---

[2] At the hearing, there was some disagreement as to whether Oak Creek's removal as general partner would cause it to forfeit its right to be repaid the Seller Loan. PNC and Columbia Housing argued that it would not. Oak Creek found itself in the difficult situation of wanting to emphasize the magnitude of the damage an injunction might cause while obviously not wanting to concede that its removal as general partner causes it to forfeit a $7.3 million note. The confusion appears to arise from tension between Section 7.7(c)(4), which states that upon removal the general partner forfeits the right to be repaid any loan from the Partnership, but expressly exempts the Seller Loan, and Section 9.3(b)(2), which states that upon an Event of Withdrawal the general partner relinquishes all unpaid fees, distributions, and loans, and does not expressly exempt the Seller Loan. The Court does not need to resolve this ambiguity now. Even assuming Oak Creek's right to be repaid the Seller Loan is forfeited upon removal, this, like the forfeited Development Fee, is a monetary loss that can be fully remedied if it is later found that Oak Creek was not properly removed as general partner and the injunction was thus improvidently granted.

Creek's forfeited financial interests can be reinstated and Oak Creek's injury can be fully remediated with damages. In other words, Oak Creek is right to worry that a possible consequence of this lawsuit is forfeiture of its interests in the Partnership, but it will not forfeit those interests simply as a consequence of the Court issuing a preliminary injunction.

The only damage that a preliminary injunction would directly inflict on Oak Creek is a loss of its purported right to control the Partnership for the pendency of this litigation. But, given that both sides assert a present and ongoing right to control the Partnership, however the Court rules at this stage, there is some risk that one side will be unduly (albeit temporarily) denied its right to corporate control. Such harm is unavoidable.

So, balancing the equities requires the Court to weigh, on one hand, the substantial and irreparable damage that foreclosure would do not only to the Partnership and to the financial interests of all the parties to this litigation, and, on the other hand, the damage that would be inflicted on Oak Creek by removing it as general partner while this litigation runs its course. Weighing these competing interests, the Court comfortably concludes that the third prong of the preliminary injunction standard counsels toward issuing an injunction.

**D.  The Public Interest**

Finally, the Court concludes that granting an injunction will not disserve the public interest, as "it is in the public interest to uphold contracts and to enforce a remedy to which the parties have expressly agreed." *Mach 1 Air Servs., Inc. v. Bustillos*, No. EP-13-CV-00088-DCG, 2013 WL 12108595, at *11 (W.D. Tex. May 10, 2013) (quoting *AmeriSpec, Inc. v. Metro Inspection Servs., Inc.*, 2001 WL 770999, at *6 (N.D. Tex. July 3, 2001)); *Interox Am. v. PPG Indus., Inc.*, 736 F.2d 194, 203 (5th Cir. 1984) (acknowledging a strong public interest in enforcing contracts).

**IV. Bond**

"The court may issue an injunction . . . only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c). The bond requirement (1) "assures the enjoined party that it may readily collect damages from the funds posted . . . in the event that it was wrongfully enjoined, without further litigation and without regard to the possible insolvency of the assured" and (2) "provides the plaintiff with notice of the maximum extent of its potential liability, since the amount of the bond 'is the limit of the damages the defendant can obtain for a wrongful injunction'" provided the plaintiff was acting in good faith. *Continuum Co. v. Incepts, Inc.*, 873 F.2d 801, 803 (5th Cir. 1989) (quoting *Coyne-Delany v. Capital Development Bd.*, 717 F.2d 385, 391 (7th Cir. 1983)); *but see Jonibach Mgmt. Tr. v. Wartburg Enterprises, Inc.*, 136 F. Supp. 3d 792, 799–806 (S.D. Tex. 2015) (citing *Contiuum*, 873 F.2d 803–804) (recognizing that there is authority allowing a wrongfully enjoined party to seek recovery outside the posted bond amount). The amount of security required pursuant to Rule 65(c) is "a matter of discretion for a trial court," which "may elect to require no security at all." *Kaepa, Inc. v. Achilles Corp.*, 76 F.3d 624, 628 (5th Cir. 1996).

Here, PNC and Columbia Housing request a bond of $1,000. Oak Creek counters that, if an injunction issues, bond should be set as high as $20 million. In support of its request, Oak Creek argues that a large bond is necessary to secure its interests related to the Seller Loan and the Development Fee. But, if Oak Creek has a right to be repaid the Seller Loan or to be paid the Development Fee, those rights arise out of the underlying contracts at issue in this litigation. The only damages that Oak Creek might incur as a direct result of wrongful injunction relate to the temporary loss of its right to control the Partnership. Any attempt to quantify the harm that might be incurred by Oak Creek as a consequence of temporarily losing its right to corporate control is necessarily conjectural and imprecise. But, the Court acknowledges that the temporary loss of corporate control could be extremely consequential. In particular, the mismanagement of the

Partnership during the pendency of this litigation could jeopardize Oak Creek's ability to collect on

in its asserted interests pursuant to the Seller Loan and the Development Fee.

The Court concludes that a $1 million bond is ample to provide Oak Creek and the

Guarantor Defendants security that they will be able to recover any damages incurred as

consequence of a wrongfully issued injunction. This bond determination is made without prejudice

to any party requesting a modification in the event that circumstances change.

### V. Conclusion

**IT IS HEREBY ORDERED** that Defendants 2013 Travis Oak Creek GP, LLC, 2013

Oak Creek Developer, Inc., Chula Investments, Ltd., and Rene O. Campos's Motion to Dismiss for

Lack of Subject Matter Jurisdiction, (Dkt. 22), is **DENIED.**

**IT IS FURTHER ORDERED** that Plaintiffs PNC Bank, N.A., Columbia Housing SLP

Corporation, and 2013 Travis Oak Creek, LP's Motion for a Preliminary Injunction is **GRANTED.**

**IT IS FURTHER ORDERED** that the Court finds 2013 Travis Oak Creek, GP, LLC was

removed as the general partner of 2013 Travis Oak Creek, LP.

**IT IS FURTHER ORDERED** that the Defendants 2013 Travis Oak Creek GP, LLC,

2013 Oak Creek Developer, Inc., Chula Investments, Ltd., and Rene O. Campos and all persons

acting in active concert with them are hereby **ENJOINED** from taking any action that interferes

with Columbia Housing SLP Corporation's singular exercise of its role, authority, powers, control,

rights, duties, obligations, or privileges as general partner of 2013 Travis Oak Creek, LP.

**IT IS FURTHER ORDERED** that bond is set in the amount of $1,000,000. This

Preliminary Injunction shall not take effect unless and until Plaintiffs tender to the Clerk of the

Court $1,000,000 cash or a bond in the amount of $1,000,000 in a form approved by the Clerk of

the Court and in compliance with Rule 65(c) of the Federal Rules of Civil Procedure.

**IT IS FURTHER ORDERED** that if Plaintiffs elect to satisfy the bond by tendering cash, then Clerk of the United States District Court shall receive and deposit into the Court's registry a check in the amount of $1,000,000. The Clerk of the United States District Court shall, as soon as the business of the office allows, deposit these monies into the Court Registry Investment System (CRIS) where they shall remain until further order of the Court.

**IT IS FURTHER ORDERD** that Defendants 2013 Travis Oak Creek GP, LLC, 2013 Oak Creek Developer, Inc., Chula Investments, Ltd., and Rene O. Campos respond to Plaintiffs PNC Bank, N.A and Columbia Housing SLP Corporation's Motion to Dismiss, (Dkt. 39), **within thirty days of the date of this order.**

**IT IS FINALLY ORDERED** that the parties confer and submit a joint proposed scheduling order **within thirty days of the date of this order.**[3]

**SIGNED** on August 2, 2017.

ROBERT PITMAN
UNITED STATES DISTRICT JUDGE

---

[3] The parties are requested to use District Judge Robert Pitman's form available on the "Judges' Policies and Procedures" page, under the "Judges' Info" tab, on the website for the United States District Court for the Western District of Texas (www.txwd.uscourts.gov).