UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION


PNC BANK N.A.,                        )
COLUMBIA HOUSING SLP CORPORATION      )
                                      )
            Plaintiffs,               )
                                      )
      vs.                             )Case No. 17-CV-584-RP
                                      )
2013 TRAVIS OAK CREEK GP, LLC,        )
2013 TRAVIS OAK CREEK DEVELOPER INC,  )
CHULA INVESTMENTS LTD.,               )
RENE O. CAMPOS,                       )
                                      )
            Defendants.               )
_____)



TRANSCRIPT OF PRELIMINARY INJUNCTION HEARING
BEFORE THE HONORABLE ROBERT PITMAN,
TUESDAY JULY 25, 2017, 1:00 P.M.




FOR THE PLAINTIFF:  ROBERT M. HOFFMAN, ESQ.
                    JAMES C. BOOKHOUT, ESQ.


FOR THE DEFENDANT:  KENNETH B. CHAIKEN, ESQ.
                    WILLIAM S. RHEA, ESQ.
                    MILLICENT M. LUNDBURG, ESQ.




Proceedings recorded by mechanical stenography, transcript
produced using computer aided transcription.


Pamela J. Andasola, CSR/RMR/FCRR
FEDERAL OFFICIAL COURT REPORTER
355 EAST CESAR E. CHAVEZ BLVD.
SAN ANTONIO, TEXAS 78210

1          **AFTERNOON SESSION, JULY 25, 2017**

2                              *****

3          (The following proceedings were had in

4          open court with all parties present at

5          the hour of 1:00 p.m.)

6                              *****

7          THE CLERK:  Court calls 17-CV-584, PNC Bank, N.A.,

8    Columbia Housing SLP Corporation versus 2013 Travis Oak

9    Creek GP, LLC, and others, for continuation of preliminary

10   injunction hearing.

11         THE COURT:  If I can get announcements for the

12   record, please.

13         MR. HOFFMAN:  Rob Hoffman and James Bookhout for

14   the plaintiffs, Your Honor.

15         MR. CHAIKEN:  Good afternoon, Judge.

16         Kenneth Chaiken, Bill Rhea and Millicent Lundburg

17   for the other parties, whatever we're calling them.  And

18   Rene Campos is here with us again.

19         THE COURT:  Good afternoon.  Thank you.

20         So, before you make whatever sort of summary

21   argument you would like to make following our hearing last

22   week, let me just reiterate what I have expressed in the

23   past to no avail but it doesn't hurt to mention it again,

24   and that is what occurred to me before the hearing, but

25   especially after the hearing, is the extent of which -- I'm

1   a bit frustrated that I'm being put in a position to make so

2   many difficult decisions that so obviously could be made by

3   people in this room and their clients.

4           You are highly incentivized to do this, you seem

5   to have the will and the means and the resources to do it.

6   You have a prior relationship that at least at some point

7   was contemplated that you could do it together and I'm not

8   complaining that -- I'm happy to do this.  It's what I get

9   paid for, but it's frustrating in the sense that I don't

10  want to do something that is what neither of you want.

11          Because you're in the best position to know from

12  your respective sort of interests what would work for you

13  and what you could come to the table with and leave the

14  table with that would be to your joint advantage.

15          And I live in fear in all my cases, but especially

16  this one right now, that I will do something that is not the

17  right thing for either of your interests because I, you

18  know, this is a -- there are a lot of moving parts to this.

19  But I just -- probably to no avail -- but I just wanted to

20  let you know my continuing sort of feeling about this.  At

21  the end of the day, I'll rule on these things.

22          I will tell you that one of the things I'm

23  thinking about doing, for what it's worth and related to

24  that, is there have been times during the hearing and since

25  the hearing that I have thought, you know, there's a

1   distinct possibility that neither of you will be able to

2   meet your burden for injunctive relief in which case, you

3   know, I'll just say, you know, go with God or pox on both of

4   your houses, one of those two.

5          If you are not -- if you haven't met your burden,

6   then if it's self-executing, then let's see if it is and let

7   a jury ultimately determine that and unravel it.  If -- you

8   know, if it all can be resolved with monetary damages, then

9   let's let it run its course and see if that's what happens.

10         Now, I don't think either of you want that.  I

11  don't think it's probably good for either of your interests

12  to do that but that's a distinct possibility here.  So as

13  you have sort of addressed this, sort of let me know your

14  perspective on that.

15         So, with that, Mr. Hoffman, if you would like --

16  or, Mr. Bookhout -- if you would like to.

17         MR. HOFFMAN:  Thank you, Your Honor.

18         And may it please the Court.  To the point you

19  raised a second ago, I will address them in my closing, not

20  at the front end but they will be addressed.

21         THE COURT:  Thank you.

22         MR. HOFFMAN:  And of course we understand your

23  questions, your -- what you just raised is a very serious

24  issue for the Court.  We think we can explain it to the

25  Court's satisfaction so that it won't be after this.

5

1          Your Honor, of course these are cross motions

2     for -- I'll start with an introduction, if it please the

3     Court.  These are cross motions for an injunction and we

4     feel that one party has to be right, one party has to be

5     wrong.  We seek to enforce the succession language in the

6     Partnership Agreement which has already occurred.  The

7     removal has already occurred.

8          The original general partner, however, seeks to

9     enjoin the peaceful operation of the Partnership Agreement

10    that it had already agreed to.  Under Texas law -- and I

11    want to quote from a Texas Supreme Court case called BMG

12    Direct Marketing.  It's in our briefing.  It's 178 Southwest

13    3rd 763.  It's a 2005 Texas Supreme Court case.

14         But it says something very important about the

15    public policy, paramount public policy under Texas law.  And

16    it says, quote, "If there is one thing which more than

17    another public policy requires, it is that men of full age

18    and competent understanding shall have the utmost liberty of

19    contracting and that their contracts, when entered into

20    freely and voluntarily, shall be held sacred and shall be

21    enforced, therefore, you have this paramount public policy

22    to consider that you are not lightly to interfere with this

23    freedom of contract."

24         Your Honor, we think everything that we put before

25    this Court is consistent with the partnership agreement, and

1 we think the other side, to get anywhere to avoid this

2 injunction, is asking you to rewrite the contract by

3 ignoring important contract terms and ignoring the way this

4 contract was hung together, which was, we invest $11-million

5 but we do it with certain protections, we do it with certain

6 conditions, and including if there are events of default,

7 this is what will happen.  The events -- we point to

8 numerous events of default here, any one of which would have

9 satisfied the removal of the original GP.  And they -- they

10 really are undisputed.

11          The construction loan is in default.  No one says

12 it isn't.  It's a $26-million default.  There is no signed

13 binding Certificate of Substantial Completion.  There is a

14 mechanic's lien clouding timing.  There is a request for a

15 receiver.  And I'll get to it in a moment, to why that isn't

16 an insolvency receiver, and then also a lawsuit for judicial

17 foreclosure ongoing right now.

18          Now, after everything, all the dust has settled,

19 it seems to us the original general partner is putting its

20 head in the sand.  It has no plan in place, preferring in

21 order to hopefully cling to its $4-million developer fee,

22 preferring to destroy the partnership rather than give up

23 the control they already agreed to give up when it agreed to

24 the succession plan that has already been effectuated.

25          Based upon the evidence at the preliminary

1    injunction hearing, the partnership agreement only permits

2    one outcome.  Columbia Housing has succeeded as general

3    partner and the original GP needs to stop interfering with

4    Columbia Housing's role as the new GP.  That's the only

5    way -- not only is that what the parties agreed to, but

6    that's the only course that will save this partnership and

7    save this affordable-housing property for Travis County.

8         Moving on from the introduction, I would like to

9    go to the substantial likelihood of success on the merits,

10   which are substantial default.  That there is no Certificate

11   of Substantial Completion is undisputed, and why, because

12   there's at least $5-million -- $5-million of construction to

13   fix, including having to take the stucco all the way down as

14   their experts conclude.

15        THE COURT:  That's just a punch list thing, right?

16        MR. HOFFMAN:  That's rhetorical, right?

17        THE COURT:  Yes.  Thank you.

18        MR. HOFFMAN:  Okay.  I'll go on.

19        And the stuc -- these stucco defects, they were

20   born at the beginning, at the embryo of construction.  And

21   their expert reports are over a year old and they still sit

22   there today and, unlike wine, cracking and facade and water

23   penetration defects, they don't get better with age, they

24   get worse.  They create an unsafe environment for the

25   tenants.

1          As a result of these defects, there's never been a

2   binding, signed, certificate of completion under the AIA

3   form as any permanent lender would require.

4          Now, you saw the original general partner try to

5   pull a fast one putting a draft in front of the Court that

6   was not signed.  In fact, on the top left-hand corner it

7   says the word "draft" very clearly.  It says on one of the

8   blanks "to be determined."  It's not signed.  It's not

9   authenticated.  It's not binding on an architect or builder

10  or anybody else.

11          THE COURT:  What about the idea that you didn't

12  raise that until after the lawsuit was filed?

13          MR. HOFFMAN:  The substantial --

14          THE COURT:  Yes.  Isn't that my understanding or

15  at least -- is that right?

16          MR. HOFFMAN:  I know we raised three defaults in

17  May -- I'm sorry -- on February 28th.  Then we raised

18  additional defaults on June 7th, then we raised the

19  remainder by the June 17th supplement.

20          THE COURT:  Then I guess my question would be --

21  because I honestly don't know whether or not it matters,

22  that some -- that you raised some of those alleged breaches

23  after you filed a lawsuit.  I don't know that it matters.  I

24  think it's their contention that it does matter.

25          MR. HOFFMAN:  I don't know why they say it

1  matters.  Even if you wanted to look at it in their

2  best-case scenario that the last of those defaults mentioned

3  on June 17th, which gave further support to the Notice of

4  Removal, at worse it makes the Notice of Removal effective

5  on June 17th if not before.  Since we're here a month later

6  seeking injunctive relief, I don't see how it matters.

7          And here's a key point.  You've heard a lot of

8  complaining about the second extension which is not called

9  for by the -- they requested a second extension.  And you

10  heard that the pricing, they signed it, it was exorbitant

11  and they say that's unclean hands.

12          The second extension turned out to be a red

13  herring in this case because without the Certificate of

14  Substantial Completion, they could never close on a forward

15  commitment anyway.

16          You can have a second, third, to a thousand

17  extensions.  They have to end by the maturity date of the

18  construction loan, which was May 23, 2017.  But that default

19  day, if they don't have a Certificate of Substantial

20  Completion, which they don't.  It doesn't matter what

21  happened to the extension.  They are not -- they are not

22  important to this anymore.  What is important is there could

23  never have been a closing of forward commitment ever because

24  of the lack of commitment of substantial completion.

25          So I never thought that was proof of unclean hands

1  anyway.  They asked us for a second extension, we told them
2  what the pricing would be, but even if it were under their
3  best argument, it's not important.  It's a moot point.
4          So, number one, Certificate of Substantial
5  Completion, there's no dispute.  We have no signed, binding
6  one.  Number two, the Chase construction loan is obviously
7  in default.  That's also undisputed.  May be the biggest
8  event of default of all time.  It matured on May 23, 2017.
9  The notice of -- the default was sent out by Chase on
10  June 2nd.  Chase set off $834,000 of partnership funds on
11  June 28th, and then -- this is in our reply brief to their
12  response -- something very interesting happened.
13          On July 18, 2017, Chase told the partnership we
14  want to do an appraisal, we want to do an environmental
15  assessment, we want to look at your books and records which
16  Mr. Chaiken advised us about, and that letter is in -- or
17  that email correspondence is attached to the reply.  Under
18  12CFR34.85, that's the last step before posting a
19  foreclosure.  They have to do that appraisal, they have to
20  get this information, but once they do -- so you see this
21  trajectory of default, notice of default, took partnership
22  funds, now they're doing the due diligence that's required
23  by law and this trajectory of pursuing their remedies
24  towards foreclosure is in place.
25          I do want to make one more point before I leave

1   the construction loan default.  There is no reserve set

2   forth -- set up by the partnership or the original GP to

3   handle that construction loan default.  Then the third

4   undisputed default is the mechanic's lien, the

5   $3.285-million mechanic's lien against the project.

6           A current loan is impossible to obtain with a

7   cloud on the title, and that mechanic's lien remained

8   despite all their protests about we would have done this, we

9   might have done this.  Six months later, it remains

10  unbonded.  It's a continuous cloud on title.

11          Rather than say we'll fix the mechanic's lien,

12  which means they would have to put up $3.825 million of

13  their own money to bond around it, the original GP says --

14  they argue that a lien has to be valid and enforceable to be

15  a lien under the partnership agreement, even though the

16  partnership agreement doesn't have that language, it just

17  says lien.  So they say even though it's a cloud on the

18  title it would have to sit there for several years before

19  they got a final judgment and went up on appeal and so forth

20  before it could be considered a lien under the partnership

21  agreement.  Well, A, that doesn't make logical sense.  B,

22  nowhere does the partnership agreement say that.

23          Then they say well, okay, that does not -- that

24  argument doesn't work so how about this one, the lien would

25  have to be -- the lien is created -- or permitted by the

1  construction documents.  But that's not what the

2  construction documents say.

3       The -- a lien is created by statutory law,

4  mechanic's lien law.  The construction-law documents merely

5  say that if a lien is filed, here's how you have to deal

6  with it.  It doesn't say go out and create a lien

7  contractor.  It just gives you a condition for -- or gives

8  you circumstances in which to -- if there isn't a lien

9  against the property, here's how you handle it.

10       In fact, the construction documents say the

11  opposite.  They say you have to produce a lien waiver,

12  completely inconsistent to their argument.

13       Fourth, is the contractor lawsuit, another event

14  of default.  Weis Builders is using this lawsuit to

15  foreclose on it's mechanic's lien.  They are seeking

16  $3.285-million in those damages, also delayed damages of an

17  unknown quantity plus 18 percent interest annually under the

18  Prompt Payment Act.  That's an estimated exposure of the

19  partnership of between 5- and $10-million.

20       That lawsuit remains unbonded and again no reserve

21  has -- no contingency reserve has been created by that

22  partnership or by the original GP.

23       Fifth -- and I'll move away from the events of

24  default -- is receivership.  They clearly promise not to

25  pursue a case for receiver.  They say, well it's not an

1  insolvency receiver, but that doesn't make sense either.

2  The partnership is insolvent.  They have a duty to pay its

3  debts when they become due.  They haven't done that.  The

4  $26 million, the 5- to $10-million for Weis, the mechanics

5  lien, et cetera.

6          The partnership is not able to pay its debts when

7  they become due, there are no reserves set up for these

8  contingencies.

9          THE COURT:  Slow down a little bit.

10         MR. HOFFMAN:  Oh, I'm sorry.  I get so excited.

11         THE COURT:  Yeah.

12         MR. HOFFMAN:  That is the definition of

13  insolvency.

14         All right.  So here what -- getting to the Court's

15  question, PNC could not -- could not hold out any longer.

16  On February 28th, 2017, PNC sent a notice to the original GP

17  to clean up its defaults or risk removal as the GP.

18         As the partnership agreement requires, PNC gave 15

19  business days for this cure to take place.  But PNC didn't

20  rush after 15 business days and rush with a Notice of

21  Removal.

22         But things continued to get worse.  The defaults

23  continued to pile up.  To your point about why only three

24  defaults are mentioned on February 28th; more and more

25  defaults piled up.

14

1          And then, finally, the Chase construction loan

2     default was the straw that broke the camel's back.  A

3     default on a first mortgage loan of $26-million would be a

4     final straw for any prudent investor because it threatens to

5     lose the very reason for this single purpose entity.  So on

6     June 7th, a Notice of Removal was sent, ninety days after

7     the February 28th email -- I'm sorry, February 28th letter,

8     not fifteen business days, ninety days.  And as you used the

9     words, it was self-effectuating.  The Columbia Housing

10    immediately became the GP and now they're trying to stop

11    that.

12          So, the original GP has placed this partnership in

13    a perilous situation.  This, as admitted, was the original

14    general partners' first new construction project.  It was

15    its first low-income housing project.  Under the partnership

16    agreement, the original GP took on the responsibility to

17    avoid and clean up all of these defaults and it failed in

18    its general-partner obligations.  There was no options for

19    PNC, other than to try and save the partnership, which is

20    the effect of the June 7th notice of removal of the failing

21    original GP.

22          Now, Your Honor, moving on to substantial threat

23    of irreparable harm, there are three plaintiffs.  Let's talk

24    about the partnership first and the irreparable harm to the

25    partnership.  The partnership is facing an imminent

15

1   foreclosure from Chase.  The loss of the Lucero Apartments

2   complex will be the end of this partnership.  It will end

3   its existence.  Chase is exercising its remedies.  It's

4   doing everything it can to move toward foreclosure,

5   including taking partnership cash and moving toward the --

6   satisfying the OCC guidelines.

7            Chase cannot keep a $26 million postmaturity

8   default on its books when there's collateral that's more

9   than sufficient to cover it.  Now, as the Court is aware,

10  Texas law only requires 21 days' notice between posting the

11  foreclosure and selling the property at auction.  If it

12  sells at auction, the next owner is not required to des --

13  keep the designation of affordability, low-income housing.

14  So that's --

15           THE COURT:  That would be a more convincing

16  argument if this was a low-income-housing corporation which

17  was the general partner and that's what their reason for

18  being was and that's why they did this.  You're a bank.  You

19  invested in this, presumably to make money.  So it's about

20  the money and that's why you've made this investment, that's

21  what you were expecting from it.  So doesn't that sort of

22  give strength to their argument that at the end of the day

23  it's just money so you can come after them for money if they

24  owe you money at the end of the day?

25           MR. HOFFMAN:  Your Honor, that's only partially

1   true.  We did invest to make money but we also invested

2   because this was low-income housing and it's important to

3   PNC to promote low-income housing.

4         PNC invests in thousands of low income housing, as

5   it is to any bank, frankly.  It's required by law to invest

6   in low-income housing.

7         PNC does it because it's a good thing.  Don't get

8   me wrong, I don't want to overstate that.  Making money is

9   clearly important, it's important to everybody in this room,

10   but I don't want to diminish the importance of this

11   remaining low-income housing and affordable housing.  My

12   point is only this, the citizens of Travis County have this

13   low-income-housing opportunity that is in danger of being

14   lost if there is a foreclosure by Chase.

15         And here's the other problem.  PNC cannot easily

16   come back to court after receiving the foreclosure notice

17   from Chase and as a practical matter, and here's why:  PNC

18   is subject to the same OCC regulations that Chase is subject

19   to.  PNC has to get an appraisal, PNC has to do that same

20   due diligence before it can by -- it can take care of the

21   Chase foreclosure.  It could -- it may be that it might not

22   be able to do that within 21 days' notice, I'm told it takes

23   normally 30 to 40 days to perform all those things, so if --

24   if we're really at the last second, the last moment before

25   these dominoes go into effect and the partnership loses the

1   property; in other words, if the Court waits until a

2   foreclosure notice is given, it will likely be too late.  I

3   qualify it on purpose, I said likely, but I'm -- that's a

4   real concern of ours.

5          So that was -- losing the partnership, losing the

6   very asset was the subject or the reason for this, that's

7   the irreparable harm to the partnership.  Now let's talk

8   about the irreparable harm to Columbia Housing and PNC.

9   This is -- when you talked about the money you didn't

10  mention this but it's critically important.  Columbia

11  Housing and PNC are being denied a bargained-for right and

12  remedy, and that is to control the GP under these -- after

13  events of default.

14         I cannot use money to value the right to remove

15  the original general partner and step in to control the

16  partnership's affairs and fix all these problems.

17         And, Your Honor, we've cited to the case called

18  *Oracle Real Estate Holding* which dealt with the same issue,

19  and I would like to just read a small segment of the Oracle

20  because it -- Oracle had to face the same question:  Can

21  control the right to operate and manage and control this

22  partnership as the partnership agreement allows Columbia

23  Housing under these circumstances, is that a right that even

24  if they had money they could solve with money damages three,

25  five years from now?

1        And Oracle says, first, the -- the agreement

2   reflects a clear understanding that Oracle is entitled to

3   take control of Adrian Two if an event of default occurs, so

4   same situation that we have, just like our partnership

5   agreement.

6        Second, the value of control over Adrian Two is

7   almost entirely a function of the skill and resources of the

8   party who exercises control.  And then, third, time is of

9   the essence.

10       For those three reasons that court entered the

11   injunctive relief.  And I want to stress that the control is

12   entirely a function of the skill and resources of the party

13   who exercises control.

14       The original GP has failed, has failed its GP

15   under any standard.  I've listed the five events of default,

16   you've heard them all, I'm not going to repeat them.

17       We have the right under this partnership agreement

18   to do just what we've done, to become the GP as we have, and

19   to control it and to solve all these problems.  And they're

20   not letting us control and solve these problems.

21       THE COURT:  Let me ask you, I mean, isn't there a

22   corresponding -- isn't the flip side true as well and that

23   is that they're contesting whether or not there were these

24   breaches.  They have done their best to articulate fact

25   issues around each one of the those allegations.  And as a

1   matter of injunctive relief, if I jump the gun before

2   there's a full record in this case and say there's a

3   substantial likelihood of success on the merits for you, and

4   then somewhere down the line at summary judgment phase where

5   a jury ends up finding that there were no breaches, then, I

6   mean, as it stands now, they could make the same argument

7   you're making and that is that you are going to be depriving

8   them of the rights they had as the original partner, general

9   partner.

10          Do you see what I'm saying?  It begs the question

11   of whether -- and this is the central question for you, and

12   that is, at this point -- and I get your argument that there

13   is no dispute as to operative facts and that I can find with

14   regard to some or all of these alleged breaches that they

15   did occur and that there is no fact issue but they have at

16   least done their best to articulate the fact issue and say

17   that that's in controversy.

18          What do we do if I improvidently give you the

19   relief you are seeking and later we find out that I

20   shouldn't have done that and that there were no breaches?

21   And he used -- I believe Mr. Chaiken used sort of a -- you

22   can't unring that bell.  How do you go back and see what

23   would have happened if I hadn't taken away their rights and

24   duties as the general partner?  Then I've created a big

25   mess, right?

20

1          MR. HOFFMAN:  Well, I don't think so but I'll back

2     up one second.  Obviously, this is the case in every

3     preliminary injunction hearing, right, and that's why the

4     right doesn't require you to be perfect.

5          THE COURT:  That's why they're discouraged.

6          MR. HOFFMAN:  Right.  Right.  But we're pretty --

7     I mean, just like the -- in this case, the *Oracle* case,

8     that's why they were able to grant an injunction on these

9     very same facts.

10          You know, the standard is not that you have to

11     guarantee what a jury will do down the road.  The situation

12     is:  Given these five events of default, including but not

13     limited to the construction loan in and of itself being in

14     default, have we met the standard of showing a substantial

15     likelihood on the merits?

16          Personally, I don't think there can be any dispute

17     about whether there's a substantial likelihood.  Again, we

18     know there is no Certificate of Substantial Completion.  We

19     know the construction loan is in default.  We know there's a

20     mechanic's lien.

21          So now, given -- I understand -- I understand the

22     issue you're grappling with, but in terms of what the legal

23     standard is, I believe we've met it, but let's talk

24     practicality.  Let's talk practicality.  They said their

25     investment in this partnership so far is they've got a

1   $7 million loan, seller's note, which we don't think they

2   lose anyway with the injunctive relief, and they've got a

3   $4 million developer fee.  And they would lose that at trial

4   though, if we're right they lose it at trial.  They don't

5   lose that as part of the injunctive relief, that would be

6   tried on the merits.  The difference between us and them is

7   we have the financial wherewithal, if they're right, they

8   get their $4 million fee.  If something happens to the

9   seller note and we're -- and we're found liable by a jury,

10  they get their $7 million seller note.

11           THE COURT:  Presumably to sort of make your point

12  for you as well, I don't know the full scope of the relief

13  they will ultimately seek, but even if there are issues with

14  regard to fees and things, that sort of alleged self-dealing

15  and if there are those sorts of allegations later, that will

16  be able to be sorted out later, right?

17           MR. HOFFMAN:  Right.

18           THE COURT:  And you'll be able to have to either

19  just gorge or they will be made whole if you have been

20  determined to have misused your position as a limited

21  partner, general partner, creditor, all of that.

22           MR. HOFFMAN:  Yes.

23           When we became the general partner, assume they

24  stop interfering, we have fiduciary duties now to that

25  partnership.  And if we breach those fiduciary duties, you

22

1   know, that will be sorted out at trial.  The fact is, I

2   wanted to get to the practical matter, and this is kind of

3   putting the law aside for a second which I don't like to do,

4   but the fact is, we've pledged and sworn under oath we're

5   going to solve every one of these problems, so if at trial

6   something -- the jury goes against what you believe was a

7   substantial likelihood of success on the merits, they get a

8   partnership back that's in much better shape than it is

9   today.  Today it's about to be lost.

10          I mean, I know you started off saying well, gosh

11  pox on both your houses.  I think I'll just let this thing

12  go.  Let Chase -- what you didn't say, but what is the next

13  segment of that -- let Chase foreclose.  Let this

14  partnership lose its property.  Let go of affordable

15  housing, and I pray that's not the Court's decision.

16          A, it would be contrary to the written word that

17  Texas public policy says we must enforce; and, B, it would

18  be horrendous.  And I know you're going to get all right,

19  Rob, if you think it's so horrendous, why don't you work

20  with these guys?  That's what we are getting to.

21          We invested $11-million.  We've given this

22  original GP $11-million.  It's gone.  It's squandered.

23  Instead, we have $3-million in defects -- not we, because

24  we're the limited partner.  The partnership has $5-million

25  in defects, it's got a cloud on the title, it's got a

1  defaulted construction loan at $26-million, it's got a

2  lawsuit.  It's got no plan in effect.

3          We're -- we're already at $11 million, there's the

4  sense of -- we're not going to put more money in with

5  these -- with this original GP.  They have proven that they

6  cannot do the job, they don't have a plan in place to take

7  care of any of those defaults except to just blame us which

8  does nothing.  We have experience under these conditions.

9  We have experience taking over and running partnerships when

10  it's absolutely necessary and here we are at the

11  eleventh hour.  It's absolutely necessary.

12          We're not going to keep putting good money after

13  bad, you know, once bitten, twice shy.  If -- if the Court

14  lets them keep running this into the ground, we can't do

15  anything about it, we're -- we're a limited partner, we do

16  not have -- under the way this agreement is hung together.

17  There is no such thing as co-GP's.  There is no such thing

18  as the limited partner taking on fiduciary responsibilities

19  and borrowing money and taking and doing those things.

20          If we have to stay -- if it's the Court's ruling

21  that we stay as the limited partner, we're going to stay as

22  the limited partner.  If the Court's ruling is they have to

23  stop interfering with our role as general partner, we take

24  on those fiduciary duties and we are going to do the job we

25  pledge to you.  We've sworn to you in every way possible.

1   We're going to do the job and get it done.  We have that
2   financial wherewithal.  We have the possibility.

3        Back to your question about:  Can't they solve
4   things in money damages?  First, they can never give us back
5   that control.  The control that *Oracle* says that we
6   bargained for and is irreparable harm in and of itself.

7        I love that when *Oracle* says the function of skill
8   and resources of the party who exercises that control.  We
9   have the skill, we have the resources.  Every time there's a
10  mention of they can solve all these problems with money
11  damages five years down the road, how can they solve the
12  money damages?  They haven't put up $3 million against the
13  mechanic's lien, they haven't put up one reserve.  They've
14  shown no evidence that they have any financial wherewithal
15  to take care of any of these problems.

16       Defendant's argument, Your Honor, is that PNC
17  should ignore its role as limited partner and instead hand
18  them tens of millions of dollars to fix these problems,
19  which is not how the partnership reads -- partnership
20  agreement reads.

21       And this concept that anybody, whether it's the
22  original GP or even the Court can start -- can start
23  rewriting this agreement to put us into a position where we
24  have to give money or we have to act as the GP -- or co-GP
25  with them is just not -- none of us are able or capable or

1   empowered to operate outside this partnership agreement.

2        Your Honor, I would like to address status quo for

3   a moment.

4        The part -- the parties' relationship is, as you

5   know, is governed by the partnership agreement, that

6   partnership agreement defines status quo when it defines the

7   parties' duties to each other.

8        Upon numerous events of default Columbia Housing

9   exercised its contractual remedy removing a general partner.

10       Sorry.

11       THE COURT:  Sorry, go ahead.

12       MR. HOFFMAN:  No, sure.

13       Upon numerous events of default the Columbia

14  Housing exercised its contractual remedy under the

15  partnership agreement to remove the original general

16  partner.  That removal was automatic, it's already happened,

17  that's past tense, that is status quo, that's become the

18  status quo under the parties' agreement that they agreed to.

19  The original general partner has upset the partnership

20  agreement status quo by interfering with the role of the

21  successor general partner.  In fact, they threw Columbia

22  Housing's management out of the property and won't let them

23  operate the property.

24       PNC needs and asks for the Court's help to restore

25  the partnership agreement status quo.  The last peaceable

1   act was notice of automatic removal under the partnership

2   agreement and our people coming to the property to run its

3   affairs, when we were thrown out.  That's the last -- that's

4   when it stopped being peaceable.

5           It is not a mandatory injunction to request that

6   the original GP stop interfering with Columbia Housing's

7   right as general partner, having already succeeded to that

8   role under the partnership agreement.

9           The original GP is not asked to do anything other

10  than stop interfering.

11          But, Your Honor, another interesting point about

12  *Oracle*, that court basically said, look, even if it's a

13  mandatory injunction, it wouldn't matter because a mandatory

14  injunction, the federal court system, the standard is clear

15  or substantial showing of likelihood of success on the

16  merits.  Just like when they prove the events of default in

17  that case, same thing is true in this case, PNC has done

18  that, the events of default are straightforward and material

19  and remember, Your Honor, only one event of default is

20  needed.  You don't need five, you don't need four.  One

21  would suffice.

22          Your Honor, in -- one more thing, there's -- as

23  you know, there's two more elements to injunctive relief:

24  Balancing of the harms and serving the public interest.

25          The harm that will result if the partnership

1   agreement is not enforced is that the partnership will fail.

2   It was -- it was designed and hung together for what we're

3   asking the Court to do, that's how it's hung together,

4   that's how it was designed.  They had four law firms, great

5   law firms, it was all designed by the parties that if they

6   defaulted we come in -- we step in and we become the general

7   partner.  And we fix things.

8          If the partnership isn't enforced nothing happens

9   to the original GP other than it is required to stop

10  inferring with Columbia Housing.  It can sue for anything it

11  wants at trial, this is not a final determination, no one is

12  pretending that it is, the original GP would still have its

13  rights, whatever rights it has to sue for its developer fee

14  at trial.  And unlike defendants, PNC is good for the money.

15  The public interest is served by letting Columbia Housing

16  exercise its rights and solve the crisis facing this

17  partnership -- and I'm serious when I use the word

18  "crisis" -- by enforcing a contract between two

19  sophisticated parties as written.

20         In contrast, the original general partner

21  essentially seeks to have this Court rewrite the partnership

22  by ignoring the number of terms; by putting the word "valid"

23  before lean; by misreading the construction documents to

24  think that they permit or create a lien as opposed to

25  require the waiver of liens.

1          To think that a draft Certificate of Substantial

2     Completion that's unsigned and not binding on anybody is

3     what the partnership agreement intended when it used

4     Certificate of Substantial Completion.

5          In conclusion, Your Honor, these are sophisticated

6     parties and they were represented by counsel in a

7     substantial business transaction.

8          The parties agreed -- they agreed -- that Columbia

9     Housing would succeed as the general partner upon occurrence

10    of one or more Notice of Default and Removal, which has

11    occurred.  There's nothing unfair about this.  The original

12    general partner has been given ample opportunities to

13    correct the downward trajectory of this partnership and it

14    has failed to do so.  The succession plan in the partnership

15    agreement is what the parties agree to but the original GP

16    is interfering with its own agreement.  The original GP,

17    Your Honor, should be enjoined from interfering with

18    Columbia Housing's role as the GP which occurred -- which

19    started on June 7th, 2017.

20          Thank you, Your Honor.

21          THE COURT:  Thank you.

22          MR. HOFFMAN:  Once, after Mr. Chaiken, we await

23    any questions that you may have.

24          THE COURT:  Thank you.

25          Mr. Chaiken or Mr.

29

1        MR. RHEA:  May I proceed, Your Honor?

2        THE COURT:  Yes.

3        MR. RHEA:  I think counsel inadvertently answered

4   your question which is whether or not this Court can say

5   nobody has met the burden with regard to injunctive relief.

6   The intellectually honest answer is yes.

7        Counsel started this discussion about the entire

8   matter by quoting something about the freedom of contract.

9        Now bear in mind the concept of the freedom to

10  contract is not an issue in this case, everybody agrees that

11  the parties are free to enter into the contract of their

12  choosing.  After they do so, it is incumbent upon a court or

13  a judge or a jury to then decide whether or not a breach

14  occurred and that's where we are today, which circles back

15  and begs the question that the Court raised early on, which

16  is has either party met their burden with regard to a

17  substantial likelihood of success or proof of irreparable

18  harm.

19        In order to be fully candid with the Court we

20  would have to represent to the Court that absolutely this

21  Court could find that neither party has met its burden and

22  certainly that would be an appropriate finding, and whether

23  it's a good, bad, or indifferent outcome for the parties of

24  this case is quite likely and it may very well be the

25  appropriate legal outcome given the burdens that are imposed

1    upon this Court.

2         So now we circle back to really what this case is

3    about, because oddly enough, the plaintiff never wants to

4    talk about what the legal burdens are.  They never want to

5    talk about what the potential outcome is, and that's because

6    this never has been a case about irreparable harm.  This has

7    always -- and always will be -- a case about wresting

8    control and ownership from another party when you're not

9    entitled to do so.

10        What is interestingly enough, is that the entire

11   premise of the plaintiff's claim is that foreclosure is

12   imminent.  Then I'll notice something conspicuously absent

13   from last Friday.  Nobody, nobody from Chase Bank was

14   brought down here by the plaintiff who had plenty of

15   opportunity to either secure that testimony by deposition or

16   by way of subpoena or simply bring them down here to say,

17   oh, yes, we're going to foreclose.

18        And this Court can conclude like any fact finder

19   can that there is a reason for that, and the reason is

20   that's not Chase Bank's intent, it's obvious it's not

21   because if it were their intent we would have heard from

22   Chase Bank and we all in this courtroom understand that full

23   well.

24        What we have is a situation where the plaintiffs

25   sought to sabotage this partnership all along and then rely

1  upon the sabotage that created the very defaults that they

2  now complain of to then claim that they have become the GP,

3  which is an utterly absurd result that simply can't be

4  countenanced by this Court or by the 5th Circuit when

5  interpreting contracts, yet that's the result they want.

6        The comment just made to you actually exemplifies

7  that.  The comment to you, which is to me rather -- it's

8  just mind boggling.  We can have a forfeiture of all this

9  money, of all this property.  We can create a default.  We

10 can take control away from you, regardless of whether or not

11 a lien valid.

12       What the plaintiff is proposing to this Court is

13 that you interpret these contracts in such a way that the

14 most absurd of results would be appropriate, and that simply

15 can't be the way the contract can be interpreted.

16       THE COURT:  Well, perhaps in that instance but

17 let's pick another one, let's pick the completion.  What --

18 tell me -- give me your best shot other than, you know, you

19 got a $4 million punch-list item, what did they do to

20 sabotage the completion and the successful completion of the

21 project which was a very clear and unambiguous term of the

22 contract.

23       MR. RHEA:  You've got a dispute as to what

24 substantial completion means and whether or not there was

25 compliance with that provision.  Whether or not the

1   substantial completion drafted was actually compliant with

2   the contract position.

3            THE COURT:  Assume with me that it's not.

4            MR. RHEA:  Assuming that it's not, then we have a

5   question of whether or not, in fact, the plaintiff

6   contributed to the very situation that has prevented us from

7   getting a substantial completion document.

8            THE COURT:  And that's what I'm asking.

9            MR. RHEA:  What they did was when we notified and

10  of course the plaintiff acknowledged through

11  Mr. Hasselwander that they were fully apprized of the

12  construction defecting issue.  They were given the

13  opportunity through the consent to the Arbor loan to have

14  the construction dispute bonded around because that's what

15  would have occurred in the event they would have agreed to

16  that, and they chose not to.

17            Secondly, they waive it, they sat from that time

18  period until as this Court correctly pointed out, and which

19  they refused to acknowledge until after they filed the

20  lawsuit, to bootstrap that claim in.

21            THE COURT:  What does that matter at this point?

22  You're either in breach or not, and even if you found out

23  yesterday that you were in breach we're here today.  In

24  this -- this may go back to whether or not this was, you

25  know, they should have signed the contract, because the

1   contract is pretty clear, pretty ambiguous on that point at

2   least, what if I were to tell you it's pretty easy for me,

3   with the information that I have, to say that that's a

4   breach and there's no issue of fact regarding that breach.

5   What if that's where I was?

6           MR. RHEA:  Well, then you would have to go back

7   and determine whether or not there was a waiver by the

8   plaintiff, whether or not they waived that contractual

9   provision, whether or not there's the issue of latches

10  applies in this instance, we would suggest it does whether

11  or not there was estoppel because reliance upon their

12  decision not to rely upon that provision, we proceeded, we

13  continued to invest money in this program.  We continue to

14  work on the project.

15          There are all sorts of fact issues to demonstrate

16  they have not proven a substantial likelihood of success.

17  They've done one thing and one thing only, they have simply

18  said to the Court we don't have a signed Certificate of

19  Substantial Completion, that's it.  That doesn't resolve all

20  of the outstanding issues relevant to that particular

21  contract matter, nor does it demonstrate to the Court that

22  there's a substantial likelihood of success on that

23  particular claim.

24          Finally, the Court's going to have to interpret

25  those contract provisions and to determine whether or not

34

1   the contract provision was designed to create an

2   impossibility or whether we call it a warranty claim or we

3   call it -- there's a clear distinction in all of these

4   construction contracts between the actual completion of

5   construction and then a later finding that there is a defect

6   in the construction that was complete.  And that's the

7   fundamental hurdle they've never gotten over.

8           In fact, construction was complete and then a

9   defect was found and a warranty claim was submitted.  And

10  then we get into the middle of a dispute between the builder

11  and the partnership over whether or not it is a defect,

12  whether or not money is owed.  And then you run into the

13  situation where the plaintiff is attempting to speak out of

14  both sides of their mouth.  When that issue comes up, rather

15  than take the position that there is no substantial

16  completion they said you bet, go defend the lawsuit and

17  assert counter claims against the builder, we want to

18  recover that money.  Have at it.  In fact, as

19  Mr. Hasselwander said, we told them we defer to you on the

20  handling of those claims.

21          THE COURT:  They're in a little catch-22 there,

22  would you expect them to say no?

23          MR. HOFFMAN:  We would expect them to notify us if

24  they were going to rely upon the substantial completion

25  issue, at that point in time to notify us then, because at

1    that point everyone would have decisions to make about how

2    we handle this claim, whether we do so as we chose to do as

3    a partnership or whether we take advantage of an unfortunate

4    situation to try and arrest control and steal a partnership

5    interest away.

6            At that point in time it was incumbent upon them

7    to put us on notice of what, if anything, they consider to

8    be a breach by way of substantial completion issue and they

9    chose not to.

10           You, in essence, at this point in time -- what the

11   Court is being asked to do is say, Well, we're going to

12   indulge all of their efforts to cause us to forfeit.  They

13   have consented to the litigation.  We had financing

14   available to the Arbor loan, as Mr. Hasselwander

15   acknowledged.  We had that financing available.  It resolved

16   the Chase loan.  There is no dispute.  But then after

17   agreeing to consent they say:  Never mind, we're not going

18   to resolve after all.

19           THE COURT:  You hadn't resolved the Arbor loan.

20   They were still asking for things, right?

21           MR. RHEA:  They were asking for things, but the

22   letter Mr. Bookhout got offered into evidence is a letter

23   from Chaiken that confirms that Arbor was prepared to close

24   on the loan, in fact, that's the testimony until -- until

25   the plaintiff raised these issues.

1          So what transpired, Your Honor, is simply this,

2    you had a breakage fee they were trying to assert, an absurd

3    breakage fee of over $7 million, and rather than deal with

4    their partner they attempted to self-deal with PNC Bank and

5    said:  We're not going consent to pay the Arbor loan unless

6    you agree to pay $7 million out of that loan, which is

7    clearly unclean hands, because rather than look out for the

8    best interest of the partnership as a whole, they chose to

9    look out for the best interest of the bank in particular.

10          It's interesting because in the discussion with

11   Mr. Hasselwander it was very clear that if they were able to

12   steal control away from the original GP, they wouldn't pay

13   that.  Now, that's fascinating that under some circumstances

14   they somehow would not be required to pay that $7 million

15   fee, yet they're dealing with their own partner and they

16   have the opportunity to resolve the Chase loan, they say oh,

17   no, we're not going to agree to it, we're not going to

18   consent unless you take care of this breakage fee which is

19   our other department which is in essence what

20   Mr. Hasselwander said.

21          We've got a situation where not only with regard

22   to the breakage fee but at some point in time we have this

23   extension quote, and it's a quote where the Court will

24   recall the testimony, initially the six-months' extension

25   was valued at $110,000.  Suddenly when this other loan

1  becomes available, this bridge loan through the Arbor Loan

2  and suddenly when there's an attempt to extort more money,

3  not for the partnership but PNC Bank, they say, we're not

4  going to consent unless you pay the $2-million extension

5  fee.

6          What I've got is the limited partner not looking

7  out for the best interest of the partnership as a whole but

8  simply looking out for the best interest of PNC Bank

9  throughout this process.  That's the poster child for

10 unclean hands.  When you have a situation where you're

11 attempting to leverage your own partners, when you're

12 attempting to extort 9 million in fees from your own

13 partner, not to benefit the partnership but to benefit PNC

14 Bank, those are unclean hands.

15         THE COURT:  Let me ask you this, wouldn't all

16 those claims survive an injunction on their behalf?  In

17 other words, if they get their injunction, they right the

18 ship, they maintain the asset, all of your causes of action

19 live to see another day and you will -- you have a solvent

20 party on the other side to make you whole in the event that

21 you are right about everything you just said.

22         MR. RHEA:  In all candor, Your Honor, every cause

23 of action asserted by either party is going to survive an

24 injunction, that's the fundamental reality.  And the reality

25 is also this, Your Honor, contrary to what was suggested to

38

1    you by counsel, it's money damages, it's the value of their

2    partnership as a whole when it's an affordable-housing

3    project.

4            THE COURT:  That's what I'm saying to you, it's

5    money damages and you're articulating all of the horrible

6    things they have done, they will answer for those, if you

7    are right, somewhere down the line a jury will agree with

8    you or not, and if they agree with you you'll be made whole

9    with everything you're complaining about right now.

10           MR. RHEA:  Absolutely, and we relish the

11   opportunity to take those before the jury, but the problem

12   at the moment is the burden to prove a substantial

13   likelihood of success, and that's why we discussed the

14   issues and we discussed what the likelihood of the Court is

15   to discuss those issues, because they chose not to prove a

16   substantial likelihood of success, what occurred instead was

17   simply a recitation by Mr. Hasselwander of what their

18   position is on these claims.  And as the Court will recall

19   under cross-examination, he couldn't stand up to cross.  In

20   fact, on many occasions he backed up on what those claims

21   were, he agreed, in fact, that he consented -- or, excuse

22   me, that the partner consented to the Arbor loan to the

23   defense of litigation.

24           But here's the problem with Mr. Hasselwander, he

25   also presented initially to this Court that as a limited

1  partner, his hands were tied, he couldn't do anything to

2  help this partnership out, we were just a limited partner,

3  we would never discuss loans to cure all these issues and

4  ways to assist the partnership.

5          Then he was presented with an email that reflected

6  that PNC, the limited partner, did just that, they had

7  numerous internal discussions.  They had been asked by the

8  general partner to become involved.  Why do we even raise

9  this issue?  Because it goes back to the substantial

10  likelihood of success issue.  The plaintiff can't simply get

11  there, they can't even get close.  Mr. Hasselwander finally

12  admitted he wasn't sure whether or not there was certainly a

13  cause of action for repurchase of their interest, he wasn't

14  even certain whether they wanted repurchase of their

15  interest.

16          And here's why they refused, Your Honor.  What

17  they really want is to require a forfeiture of the interest

18  of the original GP and to benefit to the tune of millions of

19  dollars from that forfeiture and then they gain control.  We

20  have the same arguments they do, well, do we have to sit

21  back and have -- and watch as they destroy this partnership?

22  Who knows if they're going to be successful.  You heard from

23  counsel, we're the Bexar County big PNC Bank, but the

24  reality is we heard no testimony about their ability to

25  manage a project like this, not one word about how in the

1   past they've managed affordable-housing projects, how

2   they've developed affordable-housing projects.

3          In fact, under the watch of the current GP, the

4   appropriate GP, that is an award-winning project.  It's a

5   project that, quite frankly, but for -- but for a

6   construction defect -- we're not here today.

7          But, unfortunately what has occurred is that in

8   light of that construction defect, rather than assist the

9   partnership in resolving that dispute and moving forward,

10  the limited partners are simply attempting to take advantage

11  of a construction defect and wrestle control away.

12         When we talk about the contract and we talk about

13  who has breached and who has done what, the 5th Circuit has

14  made it very clear that every party to a contract has a duty

15  to cooperate.  There's no doubt about it.  In this

16  particular agreement, contrary to what Mr. Hasselwander

17  represented to the Court, the partnership agreement requires

18  that we get their consent on various matters, their

19  cooperation, including matters of financing.  That's where

20  the problem arose, they had a duty to cooperate with us in

21  that instance.

22         THE COURT:  When they cooperate then you use it

23  against them by saying they've waived their rights.

24         MR. RHEA:  Actually, they didn't cooperate.

25         THE COURT:  But on other occasions they did, when

1    they -- you can't have it both ways.  When they cooperate
2    you use it against them by saying they waive something and
3    they shouldn't in other instances.

4         MR. RHEA:  I hear you, but actually, I would
5    submit to the Court that you can have it both ways in this
6    instance because a grain of consent and pulling of that
7    consent is not cooperation, it simply is not.  In fact, if
8    anything is interference in the Dallas Court of Appeals
9    under Texas law has said, cooperation -- the lack of
10   cooperation in interference are functionally equivalent --

11        And that's what we have in this instance.  What
12   they have done throughout this process is set the original
13   general partner up to fail by design in order to arrest
14   control of the partnership and arrest control of the
15   interest of the general partnership, and that's what's going
16   on in this situation.

17        In terms of having it both ways -- and I do agree
18   with the Court's comment because you can't have the
19   plaintiff say on one hand well, we don't have to do
20   anything, we don't have any control of this limited partner
21   but then on the other hand interfere in the manner in which
22   they have interfered.

23        We talk about substantial completion and the Court
24   has to understand that there was a knowing waiver of that
25   substantial completion requirement.  It wasn't as if they

42

1   weren't aware what was going on with the defect in

2   construction and they chose to knowingly to waive that

3   provision.

4            As far as construction financing, what the

5   evidence confirmed is that the GP had arranged for the

6   financing through the Arbor loan that had originally been

7   consented to.

8            Here is where, Your Honor, the interference came

9   in and here's where we're not asking to have it both ways.

10  At this point in time they immediately ask that we also

11  account for the $9 million and other fees that they wish to

12  charge us, to the detriment of the very partnership that

13  would be paying for those.  So you have a situation where

14  it's clearly their interference that caused default because

15  we have the financing in place.

16           We also have -- you know, we've got not only the

17  problem with the breakage fee, we have the problem with this

18  absurd $2 million fee to extend the loan.  And, in fact, the

19  reality is, it should have been extended.  But here's where

20  the sinister nature of their conduct becomes obvious, what

21  you heard counsel tell this Court is about this horrible

22  $7-million fee that we owed, and, in fact, what you heard

23  about that through the testimony is that it's clearly

24  something that was an obligation that should have been paid,

25  and yet you have Mr. Hasselwander tell you in an email, it's

43

 1  fully defensible.

 2          So you got -- you talk about someone trying to

 3  have it both ways, you've got Mr. Hasselwander trying to

 4  rely upon that as a breach but then you've got him saying

 5  months ago that those claims are fully -- or weeks ago that

 6  those claims are fully defensible.

 7          You've got a project, Your Honor, that is

 8  occupied.  You've got a project that is complete.  You've

 9  got a project that has a defect.

10          THE COURT:  Let me stop you right there, because

11  the contract said, "Final construction completion means

12  construction and/or rehabilitation of the project as

13  applicable has been completed without a lien" -- and then in

14  parentheses -- "or defect."

15          So it says, "without defect," and you've just said

16  there is a defect.

17          MR. RHEA:  And in that we would say, Your Honor,

18  and submit to the Court that there is a construction defect.

19  There is no dispute.  There is a construction defect that we

20  are curing.  And we certainly have the opportunity to cure

21  it under that contract.  It's not a permanent defect.  It's

22  a warranty issue.

23          THE COURT:  But the date by which you were

24  supposed to have completed the project has passed so isn't

25  it -- then you're in breach by the term of that provision at

44

1   least?

2              MR. RHEA:  There's no doubt that there is a defect

3   that exists at the present time that we need to have to

4   fixed through a warranty.

5              THE COURT:  He's dying over here.

6              MR. CHAIKEN:  I'm not dying but I have some more

7   elucidation on some of these issues, if I may.

8              THE COURT:  Sure.  Sure.  If he doesn't mind, I

9   don't.

10             MR. CHAIKEN:  No, he doesn't mind because I just

11  told him he doesn't mind.

12             But a couple of things on this --

13             THE COURT:  You need to get near a microphone, if

14  you don't mind.

15             MR. CHAIKEN:  I apologize for interfering.

16             I want to focus on this final construction

17  completion issue for a second.  I don't know if the Court

18  will recall, but during the testimony of Mr. Stanley we

19  talked about a provision in the contract which I think is 6

20  point -- Page 42.  It was a little "i" and it said that one

21  of the obligations -- a development obligation -- on the

22  part of the GP, our client, was to promptly seek remediation

23  of any construction issues.  It was an obligation under the

24  contract to do just that.

25             And so when you look at the definition of final

1   construction completion -- and I can refer you to the

2   specific provision in a moment, Judge, if you want -- but if

3   you look at the definition of final construction completion

4   and you look at what they're alleging is a default, what

5   they're really saying is there was absence of a document,

6   okay, a document that said that it was substantially

7   complete.

8          Now, is the absence of a document -- first I ask

9   this question -- the same thing as the project not being

10  substantially complete?  I mean, we've got to look at what

11  the purpose of the definition is.  It was to determine when

12  was there substantial completion.

13         There was issuance of that document incidentally.

14  They don't like the fact that it was in draft form.  The

15  condition doesn't say that it has to be signed or signed by

16  anybody.

17         THE COURT:  What does this mean, issued by the

18  project architect?  Are you suggesting a draft was --

19  unsigned draft is to be considered by me to be issued?

20         MR. CHAIKEN:  Yes, and I'll explain why.  Okay.

21         The way this works -- and we didn't have enough

22  time at the end of the day to get into the explanation due

23  to the time constraints that we had, but what happens with

24  these things is you get to the point of substantial

25  completion, which is not final completion by the way, it's

1  substantial completion which really means that the project

2  can be used for its intended purposes.  What happens is the

3  architect put out a proposal, they issue a form, a GS,

4  whatever form it is.  They ask the parties and the

5  contractor and the owner to comment to determine whether or

6  not they agree upon the dates proposed for substantial

7  completion.

8          And if you look at the document that was

9  introduced and was admitted into evidence, it identifies a

10 date of substantial completion as March 30 -- as March 1st,

11 excuse me, the date that they said it had to be done by.

12 And what the Court would have heard is that factually there

13 was a disagreement between the general contractor and the

14 owner, but -- as represented by the original partner -- with

15 regard to what that date was.

16         Again, it was all before that March 2016 date but

17 there was a disagreement and that's why it didn't get signed

18 by anybody.  But the usual and customary practice is for the

19 architect to say this is what we're proposing as substantial

20 completion.  Here's the attached punch list.  All that's

21 there.  This is what remains to be done on the project.  And

22 that was issued by the deadline that they are claiming it

23 should be issued for.

24         THE COURT:  Why wasn't it signed?

25         MR. CHAIKEN:  Because they don't sign it until

1   after everybody agrees on what the substantial complete date

2   is.  It's a tri-party agreement.  But that condition doesn't

3   say it has to be signed by everybody in order to meet the

4   definition of final construction completion.  It says it has

5   to be issued by the architect.

6           THE COURT:  Then why didn't -- the architect is

7   the one who signs it.

8           MR. CHAIKEN:  No, the architect prepares it, sends

9   it out, and says this is what we're proposing is the

10  substantial completion date, does everybody agree.  There

11  was no agreement so therefore it didn't get signed by

12  everybody.  That's the way they do it.

13          And if I brought in an architect I could establish

14  for you that that's precisely how that situation works.

15          Moreover -- and this is also very important -- the

16  fact is that the issuance of that document that's designed

17  to decide what's left over to be done on a punch list but,

18  first of all, these stucco issues that we've been talking

19  about as a defect -- by the way, it is a defect that is in

20  deviation from the plans and specifications of the project,

21  number one, it may just be a defect in workmanship,

22  workmanship that was done in accordance with the plans and

23  specifications.  And if you follow my logic on this, what

24  I'm saying, Judge, is this:  Okay, the mere fact that it's a

25  defect isn't enough.  It's got to be a defect, which is a

48

1    deviation from the plans and specs.  Number one, there's

2    been no proof of that.  Number two is the fact that the

3    problem didn't even exist, okay, it didn't exist as of

4    March 1st of 2016.  It wasn't discovered until long after

5    that.

6            So, there was no defect, certainly no proven

7    defect in deviation from the plans and specifications but

8    there was issuance by the architect of a Certificate of

9    Substantial Completion.  And as a matter of materiality and

10   substance the project was substantially complete and there's

11   an obligation under the very same partnership agreement,

12   under precisely the circumstances that existed for the

13   original general partner to go ahead and remediate within

14   the warranty, and that was done.  And you know how it was

15   done?  It was done by going back to Weis, the contractor,

16   saying fix it.  And when they refused, with the consent of

17   all parties, the decision was made to enforce the warranty

18   in the litigation which is now also the subject of whether

19   or not there has been an event of default.

20           THE COURT:  So let me just cover another part of

21   that with you and get your response.

22           MR. CHAIKEN:  I'm going to grab my copy of the

23   Partnership Agreement.

24           THE COURT:  All right.

25           MR. CHAIKEN:  And I'm listening while --

49

1          THE COURT:  It's not just the -- so, in the

2    definition of final construction completion, it lists a

3    number of things that based on the receipt and acceptance of

4    which do we lack acceptance, then, if it was never signed

5    by -- it says by receipt and acceptance of the Certificate

6    of Substantial Completion.

7          MR. CHAIKEN:  There's been no proof regarding

8    acceptance one way or the other.

9          THE COURT:  Well, I have an unsigned draft, that's

10   my only evidence.

11         MR. CHAIKEN:  No, but what I'm saying is whether

12   they accepted that or not, okay, it hasn't been proven.  And

13   here's what's important.

14         THE COURT:  But you're looking at it backwards.  I

15   have to look to see whether there was final construction

16   completion and in the absence of that evidence, then I have

17   no evidence that there was.  It --

18         MR. CHAIKEN:  I think to be clear, you have no

19   evidence either way whether there was or there wasn't, you

20   know, under the -- under the multiple prongs of that test.

21   In other words, if they didn't prove -- and they didn't --

22   okay, that they didn't accept that, then we don't have proof

23   one way or the other on that issue.

24         And I can tell you this --

25         THE COURT:  You don't think I can -- I mean, I

50

1  would have to think about which part of the evidence I

2  would -- certainly there's the strong presumption and all of

3  the evidence in this case is that their whole position is

4  that they never accepted the final construction completion

5  documents.  I mean, that's why we're here.

6        MR. CHAIKEN:  But if you recall, Mr. Stanley

7  testified that when he was attempting, after they charged

8  that exorbitant MBS investor extension fee, to try to close

9  the loan, one of the things they were discussing was

10  actually waiving the condition altogether.  They were

11  willing to waive it.  Okay?  So they had accepted the status

12  of construction and substantial completion.  They had

13  accepted it in the form of agreeing that rather than go

14  ahead and pay the contractor for deficient work, they would

15  go ahead and litigate to enforce the warranty, which is in

16  accordance with the obligations of the original general

17  partner under the same Partnership Agreement.

18        And if you look at Page 42, I think is the page

19  where that obligation is -- if you start on paragraph 6.7 on

20  Page 41, it says, "The general partner shall promptly take

21  all action as may be necessary or appropriate including the

22  following."  And if you turn to the next page at the very

23  bottom it says, "The general partner agrees to diligently

24  pursue remediation of any construction-related issues prior

25  to the expiration of the warranty period under the

1  construction contract."

2          And what that provision contemplates is that after

3  the date of the substantial completion, there may still be

4  some construction issues out there that need to be remedied.

5  It doesn't impact whether or not there was substantial

6  completion, because if the issue that remains for

7  remediation is a warranty item, it's something that can be

8  dealt with after the fact of completion.  And that's

9  precisely the situation we're in here because --

10          THE COURT:  They've clearly said that there was no

11  final construction completion.  Then I look at the contract

12  and say how would I know that.  Well, it's based on the

13  receipt and acceptance of this form and I have no evidence

14  of that.

15          MR. CHAIKEN:  There's no evidence as to whether

16  they received it or not, nobody addressed the question as to

17  whether they received that document, nobody presented

18  evidence either way on that issue.  They didn't say they

19  didn't get it.  They didn't prove that they didn't get it,

20  and, in fact, I can prove that they did when it was issued.

21  But, that issue was never proven by either party either way.

22          But in the end it really doesn't matter because

23  the real crux of this particular issue, construction

24  completion, is, number one, they agreed that we were doing

25  what we were supposed to do with regard to the issue, which

1   was the stucco issue which was enforcing the warranty, and

2   they agreed one step further which was go ahead and enforce

3   it in court if need be against the contractor.  And when you

4   look at the issue, when you look at the issue of the

5   definition of final construction, the issue is to establish

6   when was the project substantially complete so that it can

7   be used for its intended purpose.  And nowhere has there

8   been any proof, suggestion or even hint that it wasn't in

9   that position.  It was occupied.  It had certificates of

10  occupancy.  The Court heard about all of that, all before

11  that deadline.

12          The only issue is what were we going to do with a

13  warranty item and what we agreed to do under the contract

14  with a warranty item was precisely what we did with their

15  consent, so the failure to have acceptance of these

16  documents by a particular date, it's a pretty technical

17  argument in terms of a definition, but in terms of

18  materiality, how was it material.  The project was

19  substantially complete, nobody argues that it wasn't

20  substantially complete, and if we lose on this issue because

21  a document was unsigned that was issued that substantiated

22  everything it was required to substantiate and it's because

23  they didn't accept it, well, I guess --

24          THE COURT:  Well, that's what contracts are for.

25  That's why you have these 45-page contracts that set out

53

1   very specifically what that means so you don't have somebody

2   come in and say, Oh, it was already done and people were

3   living there.  It doesn't matter.  What matters is what the

4   contract called for, both parties negotiated, presumably,

5   and agreed to.  The contract could have said what you're

6   saying.  It could have said we all know what it means to be

7   substantially complete and it was.  That's not much of a

8   contract.

9           The contract says and by this you will know it and

10  that's what I've got to go by.

11          MR. CHAIKEN:  Except what you have to go by is the

12  whole contract, okay.  Your obligation as a judge is to

13  harmonize all of the provisions of the contract.

14          THE COURT:  Sure.

15          MR. CHAIKEN:  And in doing that, when you do that

16  and you go to Page 42 and the provision I just cited you to,

17  I would respectfully suggest that the only construction you

18  can give to that provision is that, hey, after the date of

19  the substantial completion, whatever that is, okay, this

20  contract more specifically deals with what happens if there

21  is an open warranty item.  That's where the obligation is,

22  and the obligation to fix a warranty problem isn't delivery

23  of a certificate, the obligation is it's probably

24  remediated, and the way the parties agreed that that would

25  be remediated in this particular instance was to enforce the

54

1    warranty against the builder after the fact.

2         THE COURT:  But --

3         MR. CHAIKEN:  After the fact of substantial

4    completion it contemplated the exact scenario where the

5    definition of final construction completion doesn't

6    contemplate it at all.  So the more specific provision of

7    the agreement, the one the Court is required to construe,

8    actually contemplates doing exactly what happened.

9         THE COURT:  Then why put in the sentence "final

10   construction completion shall occur by the completion date."

11   What does -- what does that even mean then?

12        MS. LUNDBURG:  It means final construction

13   completion as defined shall occur by that date.

14        THE COURT:  And it didn't, by that definition.

15        MR. CHAIKEN:  We submit that it did.  We submit

16   that we've shown you a document.  There's an argument over

17   what that document is and whether that constitutes issuance

18   by the architect or not.  And in the end, it was a default

19   that they waived in any event if it was in fact a default

20   and I think you have to look at the totality of the facts

21   and circumstances on that issue.

22        I think I understand the Court's question.  I

23   think I've answered them.  I hope I have.

24        The other aspect of this that I wanted to talk

25   about was this Arbor loan.  And the Court said, well, didn't

1   Arbor issue conditions that couldn't be satisfied?  And I

2   think the Court was referring to the email.  I think it was

3   June 14th email from Mr. Connolly at Arbor.

4           And I hope the Court will recall that Mr. Stanley

5   testified about this issue, and Mr. Stanley testified look,

6   that condition, those particular conditions to moving

7   forward with the completion of the Arbor loan, those weren't

8   imposed until after, after, PNC and Columbia punitively

9   removed the original general partner, punitively caused a

10  forfeiture of their interest.  And there seems to be a lot

11  of ambiguity about what that forfeiture looks like, a point

12  I raised in my very opening comments to you, my very opening

13  comments when we first met, the very first time I appeared

14  before you.  We talked about how equity abhors a forfeiture.

15          And there seems to be a great ambiguity about what

16  they're saying is a forfeiture.  And I raise that for this

17  reason, because number one, the party clamming a forfeiture

18  may now be claiming it's only a partial forfeiture.

19          Let's be clear about what they are asking the

20  Court to find if it looks as their injunction papers.  The

21  Court is being asked to find in this injunction proceeding,

22  that not only did they have the right and did they

23  effectuate a proper removal of the original general partner,

24  but that that removal constitutes an event of withdrawal

25  from the partnership with the relinquishment of rights and a

1  relinquishment of interest as defined by Section 9.1 of the

2  partnership agreement.  And that's a complete forfeiture.

3           THE COURT:  And do you think that that extends to

4  the rights they have as a creditor?

5           MR. CHAIKEN:  To the rights as a creditor?

6           THE COURT:  Because that what Mr. Stanley was

7  suggesting.  Because they are a creditor.  Your client is a

8  creditor to the partnership, right?

9           MR. CHAIKEN:  My client is a partner in the

10 partnership that has certain notes that are payable back to

11 it.

12          THE COURT:  And you had suggested somewhere along

13 the way that they would lose all those rights, including

14 whatever they had, those rights.

15          MR. CHAIKEN:  That's what they have said and

16 that's what they allege.

17          THE COURT:  They said the opposite, to my hearing,

18 twice.  They said that that don't believe that would affect.

19 What's the basis of your belief that that's true?  That's

20 what I'm getting at.

21          MR. CHAIKEN:  Well, in their removal notice and in

22 their request for repurchase they said so.

23          THE COURT:  Oh, so you accept that.

24          MR. CHAIKEN:  Well, I don't know, that's what

25 they're saying.  They're asking the Court to find that

1   that's what occurred.

2           THE COURT:  You're not asking me -- if that's what

3   they have said.

4           You said it, that you believe -- my impression was

5   that you believe that that was to be the case, that they

6   would lose their rights to be a creditor to the partnership.

7   I'm asking you whether you believe that's true?

8           MR. CHAIKEN:  Whether they can effectuate and

9   remove -- a forfeiture of all of our rights, including the

10  right to pay the notes --

11          THE COURT:  Yes.

12          MR. CHAIKEN:  They've already said some of those

13  things--

14          THE COURT:  This is the third time you've told me

15  they've said that.  I'm asking you, you've said that.

16          Other than them saying that, do you believe -- in

17  other words, do you agree with their analysis that under the

18  contract they would loose those rights?

19          MR. CHAIKEN:  If their removal constitutes an

20  event of withdrawal under the partnership as it's written

21  and there's a relinquishment of rights, then we relinquish

22  the rights that Section 9.1 says that we relinquish.

23          THE COURT:  Except when Mr. Stanley was directed

24  to that position, he specifically accepted that kind of

25  right, and then there was going to be another one that I

58

1   never heard about.

2          Am I running this wrong?

3          MR. HOFFMAN:  Yes, Your Honor.  It's on Page 54,

4   the seller notes excluded.

5          THE COURT:  You directed -- who had him?  I don't

6   remember who was questioning him.

7          MR. HOFFMAN:  I did, sir.

8          THE COURT:  And he said it was in the contract and

9   that's what he believed and then once he looked at the

10  contract he had to admit that there was a specific

11  exception, but it was somewhere else that we never got to

12  the somewhere else.

13         MR. HOFFMAN:  Page 54 at the bottom of the page on

14  Subsection 4 you'll see seller note is specifically

15  excluded.

16         THE COURT:  Excluding the seller loan and GP

17  predevelopment loan.

18         So then he had to admit that that was not the

19  provision that he was making that claim under, but there was

20  another one.  But nobody ever -- and I just -- you have said

21  it, and other than that's what they're claiming, it's

22  important to me to know whether or not they are going to be

23  forfeiting their rights pursuant to the outstanding loans,

24  and if you think they are, then I need you to tell me where

25  that comes from.

59

1          MR. CHAIKEN:  I don't know the answer.  I just

2   know what they're alleging and what they're asking the Court

3   to find.  And that's what they're seeking to effectuate

4   through the request for injunctive relief.

5          And the reason I go back to that is this, I heard

6   Mr. Hoffman in his opening remarks the other day state the

7   following, which was, you know, what we're really concerned

8   about -- what we're really concerned about here overall,

9   biggest concern, is this Chase situation.  Okay?  And

10  Mr. Rhea pointed out, you know, we didn't hear from Chase.

11  There is a lot of speculation about what Chase might do and

12  when Chase might do it and speculation is not enough under

13  the law to meet an injunctive burden.

14         And, you know, I can sit here and tell the Court:

15  I've been talking do Chase.  I've been trying to appease

16  Chase so that Chase will work with the parties, Chase has

17  expressed an interest in working with the parties.  The

18  letter in evidence that I wrote talks about that, talks

19  about, you know, we appreciate you've asked for a plan, we

20  are working on trying to get you a plan.  All those kind of

21  things.

22         THE COURT:  If your house was subject to

23  foreclosure and they asked to come and do an inspection,

24  would you be a little nervous?

25         MR. CHAIKEN:  Would I be nervous about it?  It

60

1    depends.  If they told me they were trying to work out

2    something to resolve the situation, I might not be so

3    nervous.  And that's what they said in this particular

4    instance.  But it's important that we look at the totality

5    of the circumstances about how we got here.  Okay.

6            So if the Court accepts for purposes of this

7    discussion that the forward commitment, which was intended

8    to take out Chase, and that was a document that was

9    terminated by PNC, and let's just assume it was wrongfully

10   terminated as we've alleged.  And the reason it was

11   terminated, according to the termination document, was for

12   nonpayment of the MBS investor fees, fees which we, I think,

13   proved were not due and owing under the forward commitment

14   therefore it was not a failure under the forward commitment

15   to perform.

16           So on the one hand right then and there PNC has

17   breached an obligation, an obligation that was intended to

18   resolve the Chase situation, and then they said, well, it's

19   your obligation as the original general partner to make sure

20   that the partnership has whatever financing it needs in

21   order to operate in contemplation of what the Partnership

22   Agreement is.  You say okay.

23           We go out, we identify the Arbor loan.  The Arbor

24   loan is something that we cannot pursue without their

25   consent.  We have to have their consent.  We go out, we get

1   their consent.  They actually testified and they have

2   acknowledged that they fully underwrote the Arbor loan and

3   the only thing they wanted to reserve was the right to

4   approve the final document.  That's what they did.

5           In trying to get to the final documentation what

6   did the evidence show, us?  Mr. Stanley, the only person who

7   knew anything about the Arbor loan in the courtroom, the

8   only person, the only witness with any knowledge of what

9   happened with regard to the Arbor loan told the Court the

10  following:  We were in a position to close it.  One of the

11  conditions that Arbor had required was a bond around the

12  lien.

13          We had the bond arranged at the risk of the

14  original general partner and its related entities because

15  PNC wouldn't put at risk any of its assets or credit to

16  secure a bond.  And that was done and that was teed up and

17  ready to go and that bond would have closed and would have

18  been perfected if the loan closed, but the interfering acts

19  of the limited partners at that point is what caused the

20  loan not to close then.  And then we see the issuance of

21  additional conditions.

22          What's important about that is they're complaining

23  about the Chase loan being in default.  They're trying to

24  take advantage of the existence of that Chase default which

25  they, in part, created by virtue of wrongfully terminating

1    the forward commitment in the first place.

2            Then after they consent to going forward and

3    getting the Arbor loan, they actually fail to cooperate

4    which is in violation of their legal obligation once that

5    consent is given, and then they turn around and they say

6    well, guess what, you know what, we have the wherewithal to

7    fix it if you grant us an injunction and oust these guys and

8    effectuate the event of withdraw that we're contending

9    amounts to a forfeiture of something, okay, for purposes of

10   this discussion, of something.

11           And what they're saying is:  We don't want to be a

12   partner, so we could cooperate.  And if we had a duty to

13   cooperate -- as we argue that they do and I can cite you a

14   bunch of cases that say so -- we chose not to cooperate, so

15   that we can protect the partnership only if they are no

16   longer our partners.

17           THE COURT:  I presume what they would say and what

18   they've effectively said is because of the mismanagement by

19   the original general partner, we certainly are not going to

20   put good money after bad, especially when we believe that

21   we're the existing general partner now.  So what -- why

22   would we have faith to put more money in -- into a

23   partnership we have no control over, we're still limited

24   partners, when we think that it's been mismanaged to this

25   extent up to this point?

63

1          MR. CHAIKEN:  Well, first of all, I heard no proof

2     of mismanagement.  I heard complaints about the existence of

3     a lien, okay, a lien that they chose to fight and consented

4     to fighting; the existence of a lawsuit that they consented

5     to fighting.

6          THE COURT:  But at the time their complaint was

7     the lawsuit and lien were filed.  So the damage is done by

8     then.  Of course they're going to say, yeah, we're limited,

9     do what you need to do.

10          MR. CHAIKEN:  No, no, no.  They didn't say just a

11     fad, they said go ahead and sue back.  At the end of the

12     day -- can I just make one final point?

13          Okay, the final point is that against all of that

14     and all the fact issues surrounding whether these issues

15     were events of default, whether or not they can be the basis

16     of seeking remedial action as a matter of law, estoppel,

17     waiver, consent issues, all of which is -- there are a lot

18     of fact issues surrounding all of that as the Court

19     acknowledged.

20          Here's, at the end of the day, perhaps the most

21     disturbing and distressing thing.  What they are really

22     doing with this lawsuit, they are suing for money damages

23     only.  The harm that they claim is irreparable doesn't flow

24     from any of their causes of action, but what they're really

25     saying to you is let us take control, let us do whatever we

1   want to do to burden the partnership now, subject to our

2   fiduciary duties, sure, well let us do it but make these

3   guys repurchase our interests and make them take it back

4   subject to whatever burden that we've created in the

5   interim.

6           So you've got a party that wants out of the

7   partnership -- out of the partnership -- that was unwilling

8   to cooperate as a partner under circumstances where they had

9   a duty to cooperate saying we're going to come in and we're

10  going to protect the asset now, but only if you are gone and

11  only if we can force you to repurchase our interest subject

12  to the asset being in whatever condition we put it in after

13  the fact.  There's such an inconsistency there I don't even

14  know how to describe it.

15          THE COURT:  Well, let me ask you this, in the

16  event that they do any of that improperly in hindsight, if

17  that's what the jury said, you have -- your client has the

18  ability to make -- to be made completely whole at that

19  point.  If you -- and there is a way to unwind this and to

20  say what did they do wrong, what apportionment of blame is

21  there, what violation of fiduciary duties, and what's the

22  loss to your client of all that at the end of the day?

23          MR. CHAIKEN:  Not completely whole, Judge.  And

24  the reason, as you've heard, this is a very important

25  project to these folks.  These are the creators of the

1  project.  These are the people who designed it, developed

2  it.  They're the people who run it every day.  They're the

3  people that have relationship HUD, they're the people who

4  have the relationship with the city departments that are

5  involved in all of this.  They've got a reputation to

6  maintain here.  They've got a reputation to maintain.

7           And, notwithstanding everything else, everything

8  else that occurred, they can never regain the reputation if

9  they have been wrongfully displaced.  Money damages will not

10 deal with that.

11          So the Court asked a question earlier which is,

12 you know, what do we do about that?  What if I'm wrong?

13 What if it turns out that I say that there is a substantial

14 likelihood of success and it turns out that I'm wrong, what

15 do I do?  Well, one thing the Court can do is take into

16 consideration the severity of the harm that the injunction

17 will have, okay, on my client.

18          And if the Court is inclined to grant it, okay,

19 the Court should, at a minimal, require the posting of a

20 substantial bond.  And I would submit to Your Honor, given

21 the numbers that we're talking about, the kind of interest

22 that we have, if you take into consideration what

23 Mr. Stanley said, Mr. Stanley said there's a $7.2 million

24 note, there's another note for developer fees for about

25 $4 million.  There is another contribution of a million

1   dollars in expenses put in that haven't been repaid out,

2   there's a management fee of $800,000 a year.  Okay.  You get

3   into all of these numbers.

4         If you're going to grant them injunctive relief

5   and it's going to have this forfeiture effect at whatever

6   level, I will submit to the Court that a $20-million bond

7   would be the only reasonable thing to do.  And they're

8   talking about how they've got the wherewithal they've got

9   the wherewithal.  They've got the financial ability.

10         THE COURT:  I appreciate you bringing it up.  I

11   know you're not conceding anything by bringing it up, but I

12   made a note, in any event, whatever I do, I have questions I

13   wanted answered and that was one of them.  So I would ask

14   you to, in your remarks, respond to that as well.  That

15   would be great.

16         MR. CHAIKEN:  So, Your Honor, at this point I

17   think I addressed the issues that were pending.  I don't

18   think that Mr. Rhea was quite done.

19         MR. RHEA:  We're done.

20         MR. CHAIKEN:  But in closing then I will say, you

21   asked whether -- whether the Court could find that neither

22   party has met their burden for injunctive relief.  The Court

23   can find that.  The Court probably should find that,

24   candidly, given the availability of monetary relief going

25   both ways, although we haven't asserted any claims for

1    monetary relief yet.

2              And I'll only leave the Court with one other

3    thing, which is when I heard Mr. Hoffman stand before you

4    early Friday and say by 5 p.m. where we're going to be is in

5    a position to solve the problems for the partnership, I

6    thought about that.  I thought about it all day on Friday.

7    I thought about it about 5:30 on Friday.  I thought about it

8    all weekend.  I thought about it all day on Monday.  I

9    thought about it before we arrived here today; and what I

10   thought about was this:  Mr. Hoffman is saying his client is

11   already the GP, already the GP, and they -- they are going

12   to fix everything.  Okay?  In fact, he said they have a

13   fiduciary obligation to do just that.

14             The one thing I haven't seen is them fix anything.

15   And I hear them say well, we're preventing them from doing

16   that.  How so?  How have we prevented them with anything?

17             THE COURT:  Didn't they show up with somebody to

18   manage the complex?

19             MR. CHAIKEN:  What did that have to do with

20   solving the Chase default?

21             THE COURT:  That was their first attempt to

22   express their belief that they were now the general partner,

23   and if the first thing they did was to be kicked off the

24   property, you can't blame them for not doing all the other

25   things that they said they were going to do.  If it ends up

1    being that that was -- that they're right and that they are

2    the general partner, then you can't blame them for being --

3    being a lot more cautious after they were kicked off the

4    property.

5         MR. CHAIKEN:  They can be as cautious as they

6    want.  What I'm saying is, what have they introduced in the

7    way of evidence that suggests that anybody connected with

8    the original general partner has stopped them from fixing a

9    Chase default, writing a check?  One they say that they have

10   the wherewithal to do, that they pledge they're going to do,

11   that they told this Court by five o'clock p.m. on Friday

12   they were going to do.

13        THE COURT:  I would guess they would say they need

14   a little more certainty, given your position.  They need me

15   to stand behind them when they do all those things, or they

16   will be doing it, because of the position of your client, in

17   a world of great uncertainty, and I wouldn't blame them for

18   not doing any of that.

19        MR. CHAIKEN:  Well, then you bring me to my final

20   point.

21        THE COURT:  That worked.

22        MR. CHAIKEN:  It did.

23        What was the first thing I asked from Your Honor

24   the very first time I walked in here?

25        THE COURT:  Receiver.

69

1          MR. CHAIKEN:  Yup.  Okay.

2          You got a party coming in testifying on the stand,

3   counsel arguing, we're past the point of being cooperative.

4   Your Honor asked the question earlier today, okay, it seems

5   to me that nobody is going to like what I might do.  Okay.

6   Maybe I can't do anything.  Maybe I just leave things as

7   they are.  Maybe I just say, you know what, you people are

8   big boys, you got yourself in this situation, get yourselves

9   out.  Go sue each other, monetary damages, let it all sort

10  itself out later.  Totally reasonable.  Totally within the

11  Court's discretion.  Totally possible.

12         But here's the thing, when you're looking at the

13  issue of the last peaceable status quo and the parties can't

14  even agree on what that was, okay, they said well the last

15  peaceable status quo was when we came in, we ousted you,

16  claimed an event of withdrawal and forfeiture at whatever

17  level there is a forfeiture.  I think the law says the last

18  peaceable status quo is the last actual true peaceable

19  status quo prior to the controversy.

20         And when I hear a party come in and say we're

21  beyond the point of cooperation, no, we will not cooperate,

22  we don't want to cooperate, we're past cooperation, I start

23  thinking receivership because it's the only way that the law

24  contemplates in a situation where partners are fighting over

25  who is in control, who has the right of control, okay, and

1   the effect of absence of resolution of that decisions to

2   resolve it.

3            So while the Court said it's not real keen on the

4   idea of a receivership, I would submit to the Court that a

5   receivership exists for precisely the circumstances that

6   exist here today, and I would ask the Court to consider that

7   as an alternative to doing nothing, which the Court has a

8   prerogative to do either way, and that's all I'll say.

9            THE COURT:  Thank you very much.

10           Please.

11           MR. HOFFMAN:  Thank you, Your Honor.

12           Your Honor, I'll be brief and I'll go backwards.

13           Receiver, this hearing was not a receivership

14   hearing.  That was the Court's order to defer that down the

15   road.  This was an injunction hearing.

16           If it had been a receivership hearing, we would

17   have had Mr. Stanley say on the witness stand what he said

18   under oath in his deposition, which is they don't -- there's

19   nothing a receiver can do that the original GP didn't do,

20   can't do.

21           The receivership has no money, it doesn't have

22   $26 million, the receivership can't go get a permanent loan

23   as long as there's no Certificate of Substantial Completion,

24   the receiver doesn't have $3.285-million to bond around a

25   mechanic's lien.  In terms of legal basis for a receiver,

1   there is none here.  What they're really saying --

2           THE COURT:  Wouldn't you be more likely to

3   cooperate with a mutual receiver in accomplishing some of

4   the things that need to be done here than you are the

5   original general partner?

6           MR. HOFFMAN:  Let's talk about cooperation.  We

7   have a Partnership Agreement.  The receiver would be bound

8   by a Partnership Agreement.  We're a limited partner.

9   Limited partner is an investor.  Limited partner has no

10  fiduciary responsibility.  Its job as limited partner is to

11  watch over its investment.  They say -- they act like that's

12  some breach.  That's how this Partnership Agreement is hung

13  together.

14          We are an investor.  We invested $11-million with

15  certain conditions and protections, as a limited partner.

16  We're not supposed to go borrow money for this partnership.

17          You heard Mr. Stanley list all of things that a

18  limited partner does, is not obligated to do.  That doesn't

19  change if a receiver comes in.

20          What they're -- what Mr. Stanley testified in his

21  deposition -- and I would, if I had known it was going to be

22  a receivership hearing or if I had known it was going to

23  turn into one, what I would have adduced from him, what he's

24  really talking about is a mediator.  He's talking about

25  someone to bring these parties together.

1    We went to mediation.  We went to mediation for, I
2    don't know, eleven hours.  We tried every which way.  There
3    was no way to mediate this dispute.

4    The time -- this concept -- this fantasy that some
5    adult in the room will -- well, enough on that.

6    Mr. -- Mr. Chaiken kicks us out and then says we
7    should suffer because we haven't acted as the general
8    partner.  Right.  And of course you caught onto that very
9    quickly.  Not only did they kick us out, they sent --
10   Mr. Chaiken sent a cease and desist letter to us saying you
11   are not permitted -- you are not allowed to perform your
12   function as the general partner.

13   He sent a letter to third parties, HUD and
14   everybody else involved said you are not allowed to deal
15   with Columbia Housing as the general partner.  And then he
16   comes in here and says, Judge, they haven't done anything as
17   the general partner because we've been interfered with.

18   Regarding a bond, the typical bond -- remember,
19   the function of a bond in this context is for wrongful
20   injunction.  Mr. Chaiken's acting like it's a supersedeas
21   bond.  It is not a supersedeas bond, it is not a bond to
22   cover any potential damages they could recover at trial.

23   It is purely a matter of was -- is the injunction
24   wrongful.  Typically it would be a thousand dollars, that's
25   what we put in our draft order to the Court.

73

At the bottom Mr. Chaiken says well, look, this
Certificate of Substantial Completion, it's not material
anyway, it's a technical thing.  But that's not what the
witness has testified, first Mr. Hasselwander and then
Mr. Rogers.  First, Mr. Hasselwander says you cannot get a
permanent loan without a Certificate of Substantial
Completion, and that it's in breach of the forward
commitment and then Mr.-- did not have one, and then
Mr. Rogers said the exact same thing, they could not have a
Certificate of Substantial Completion.  He was very clear on
that, he didn't go into all this draft stuff, he said we
don't have one, here we are in July, the project has existed
for all this year and we don't have a Certificate of
Substantial Completion, and he also admitted that it's a
breach of the forward commitment.

I asked who this big -- this so-called consent to
the defect and the mechanic's lien and everything, you're
exactly right.  All we did is say, yes, we don't want a --
it's bad -- it would be bad for the partnership if there
were default judgments attained by Weis Builders.  So file
an answer.  Fine.  Do what you want.  That's your job.
You're the GP.  They asked us for our consent if we can file
an answer.  The answer is, yes, don't let a default go.
Suddenly that turns into we waived every right we had under
the partnership agreement.  That's their argument.

1            Stanley did not testify that we waived the need

2    for a Certificate of Substantial Completion.  It's very

3    clear, several places in the partnership agreement that

4    that's required.

5            In fact, if you go to the definition of final

6    construction completion, Page 7 of the Partnership

7    Agreement, not only can there not be a defect in accordance

8    with the plans and specs but when you look at the WJE

9    reports, these defects, these liens are completely contrary

10   to the plans and specs.

11           It's very specific in that report.  He says both

12   things.  He says the plans and specs don't call for these

13   defects and the design was wrong at the same time.  He had

14   it in both directions.  But more to the point, more to

15   saying the design was wrong, he said they didn't comply --

16   they being Weis -- didn't comply with the plans and specs.

17           And then, Your Honor, the way to evidence final

18   construction completion under Page 7 of the partnership

19   agreement is, A, the thing we don't have here, the

20   Certificate of Substantial Completion issued by the project

21   architect, which I will get back to in one second; and D,

22   don't forget D, final lien waivers from the builder.

23           Now, Your Honor, if you would look at Tab -- I

24   don't know if you have the exhibits in front of you.

25           THE COURT:  I don't.

1          MR. HOFFMAN:  May I approach the Court with Tab B?

2          THE COURT:  Tab D?

3          MR. HOFFMAN:  B, as in boy.

4          THE COURT:  I'll just take that.

5          MR. HOFFMAN:  This is merely a form of the AIA

6    form G704 Certificate of Substantial Completion which you

7    can pull off the Internet, which is I think is where we got

8    it.  We did get it from the Internet.

9          So you can see how it would have to be completed.

10   It's a tri-party agreement, it would need three signatures.

11   The one that they are using has zero signatures, they're O

12   for 3.

13         The defects that -- the defects, since they are

14   original to the construction, they've been -- they've played

15   this project since day one.  Mr. Chaiken has some argument

16   that they didn't occur until after the completion date.

17   That's crazy.  They had to, by definition, be there from day

18   one.

19         I'm getting close to finishing here.

20         The Arbor loan, okay, the Arbor loan, if you will

21   remember -- it's Exhibit 37, isn't it, the Arbor loan?  I'm

22   pretty sure it is.

23         MR. BOOKHOUT:  It's 37.

24         MR. HOFFMAN:  Thank you.

25         Was in underwriting, wasn't at committee.  They

1  say at the bottom what it would have to do to keep going, it

2  would have to get to underwriting, get to commit, be

3  reviewed and then be approved, they would have to go through

4  all those things and it wasn't even through underwriting.

5         One of the underwriting requirements was that we,

6  PNC, waive its right to remove the GP, the original GP,

7  under the agreement, just waive that right for all time.  We

8  were unwilling to do that.  That's their example of how we

9  don't cooperate.  We don't waive rights under the

10  partnership agreement.  That's their example.  That means we

11  don't cooperate.

12         Every time when they say we don't cooperate, look

13  and see if we've breached that Partnership Agreement.  Never

14  once do we do that.

15         Their statement that we fail to cooperate is that

16  we don't act outside the partnership agreement, that we

17  don't give them money that's not called for under the

18  partnership agreement.  That we don't take out a loan that's

19  not called for by us under the Partnership Agreement.

20  That's the fallacy of this cooperation claim -- this lack of

21  cooperation claim.

22         Mr. Chaiken says PNC, all it wants to do is gain

23  by millions of dollars, that was his statement.  Let's see,

24  we're going to have to pay Chase 26 million, we're going to

25  have to put up 3-, 4-, $5-million to deal with Weis.  If

1  this injunction is granted, as we pray, we're going to put

2  up $30 million like that.  That's the big gain that

3  Mr. Chaiken is accusing us of.

4       He's -- he was critical that there were internal

5  communications between entities at PNC but I read -- or

6  excuse me -- Mr. Stanley read in the agreement that that

7  specifically allowed and it was specifically stated that is

8  not a breach of the Partnership Agreement nor any kind of

9  other duty.

10      I think, Your Honor, everything -- other question

11 I heard you give the answer to so I won't go further.

12      Thank you.

13      THE COURT:  Good.  Thank you very much.

14      Let me say this case, up to this point, has been

15 very well briefed, very well argued.  There's nothing more

16 enjoyable in this job than to preside over proceedings where

17 people are as well prepared and as skilled in doing what

18 they do.  I wish I wasn't in the position to be Solomon in

19 this case, but that's what they pay me for and that's what

20 I'll do.

21      To the extent that I've said anything during this

22 hearing that would prompt you to continue to seek a

23 resolution among yourselves, feel free to do that and until

24 I issue my order in this case, just give us a call and until

25 it's signed, we won't be mad at you even if we've been

1   working all week on it if you tell us that you don't need us

2   anymore.  He may be mad but I won't.

3          So, with that, again, thank you very much, we will

4   get to work on this and we'll get back -- we'll get a ruling

5   on this just as soon as we can.

6          Thank you very much.

7          (Whereupon, the hearing concluded at the

8          hour of 2:46 p.m.)

9                    *      *      *      *      *

1                    **C E R T I F I C A T E**

2

3              I, Pamela J. Andasola, Certified Shorthand

4    Reporter, Registered Merit Reporter, Federal Certified

5    Realtime Reporter, in my capacity as Official Reporter do

6    hereby certify that I was present and recorded the above

7    proceedings in stenotype and reduced the same to typewritten

8    form, that the foregoing 78 pages constitute a true and

9    complete record of the proceedings, to the best of my

10   ability, had and done on July 25, 2017, before the Honorable

11   ROBERT PITMAN, Courtroom 4 of the United States District

12   Court, Western District of Texas, Austin Division.

13

14

15                         Dated this 31st day of August, 2017.

16

17

18                    s/Pamela J. Andasola
                      PAMELA J. ANDASOLA, CSR/RMR/FCRR
19

20

21

22

23

24

25

MR. BOOKHOUT: [1] 75/22
MR. CHAIKEN: [38] 2/14 44/5 44/9
44/14 45/19 46/24 47/7 48/21 48/24
49/6 49/10 49/17 50/5 51/14 53/10
53/14 54/2 54/14 56/4 56/8 56/14 56/20
56/23 57/7 57/11 57/18 58/25 59/24
62/25 63/9 64/22 66/15 66/19 67/18
68/4 68/18 68/21 68/25
MR. HOFFMAN: [27] 2/12 4/16 4/21
7/15 7/17 8/12 8/15 8/24 13/9 13/11
15/24 19/25 20/5 21/16 21/21 25/11
28/21 34/22 58/2 58/6 58/12 70/10 71/5
74/25 75/2 75/4 75/23
MR. RHEA: [14] 28/25 29/2 31/22 32/3
32/8 33/5 35/20 37/1 38/9 40/23 41/3
43/16 44/1 66/18
MS. LUNDBURG: [1] 54/11
THE CLERK: [1] 2/5
THE COURT: [77] 2/10 2/18 4/20 7/14
7/16 8/10 8/13 8/19 13/8 13/10 15/14
18/20 20/4 21/10 21/17 25/10 28/20
28/23 29/1 31/15 32/2 32/7 32/20 34/20
35/18 37/14 38/3 40/21 40/24 43/9
43/22 44/4 44/7 44/12 45/16 46/23 47/5
48/19 48/23 48/25 49/8 49/13 49/24
51/9 52/23 53/13 54/1 54/8 54/13 56/2
56/5 56/11 56/16 56/22 57/1 57/10
57/13 57/22 58/4 58/7 58/15 59/21
62/16 63/5 64/14 66/9 67/16 67/20
68/12 68/20 68/24 70/8 71/1 74/24 75/1
75/3 77/12

## $

$10 [2] 12/19 13/4
$10-million [2] 12/19 13/4
$11 [5] 6/4 22/21 22/22 23/3 71/14
$11 million [1] 23/3
$11-million [4] 6/4 22/21 22/22 71/14
$110,000 [1] 36/25
$2 [2] 37/4 42/18
$2 million [1] 42/18
$2-million [1] 37/4
$20 [1] 66/6
$20-million [1] 66/6
$26 [6] 6/12 13/4 14/3 15/7 23/1 70/22
$26 million [3] 13/4 15/7 70/22
$26-million [3] 6/12 14/3 23/1
$3 [2] 22/23 24/12
$3 million [1] 24/12
$3-million [1] 22/23
$3.285 [3] 11/5 12/16 70/24
$3.285-million [3] 11/5 12/16 70/24
$3.825 [1] 11/12
$3.825 million [1] 11/12
$30 [1] 77/2
$30 million [1] 77/2
$4 [5] 6/21 21/3 21/8 31/19 65/25
$4 million [4] 21/3 21/8 31/19 65/25
$4-million [1] 6/21
$5 [4] 7/12 7/12 22/24 76/25
$5-million [4] 7/12 7/12 22/24 76/25
$7 [6] 21/1 21/10 36/3 36/6 36/14 42/22
$7 million [5] 21/1 21/10 36/3 36/6 36/14
$7-million [1] 42/22
$7.2 [1] 65/23
$7.2 million [1] 65/23
$800,000 [1] 66/2
$834,000 [1] 10/10
$9 [1] 42/11

$9 million [1] 42/11

## 1

12CFR34.85 [1] 10/18
14th [1] 55/3
15 [2] 13/18 13/20
17-CV-584 [1] 2/7
17-CV-584-RP [1] 1/6
178 [1] 5/12
17th [1] 9/3
18 [1] 10/13
18 percent [1] 12/17
1:00 [2] 1/13 2/5
1st [1] 46/10

## 2

2005 [1] 5/13
2013 [3] 1/7 1/7 2/8
2016 [2] 46/16 48/4
2017 [9] 1/13 2/1 9/18 10/8 10/13 13/16
28/19 79/10 79/15
21 [2] 15/10 16/22
22 [1] 34/21
23 [2] 9/18 10/8
25 [3] 1/13 2/1 79/10
26 million [1] 76/24
28th [4] 8/17 10/11 13/16 13/24
2:46 [1] 78/8
2nd [1] 10/10

## 3

30 [2] 16/23 46/10
31st [1] 79/15
355 [1] 1/25
37 [2] 75/21 75/23
3rd [1] 5/13

## 4

40 [1] 16/23
41 [1] 50/20
42 [3] 44/20 50/18 53/16
45-page [1] 52/25

## 5

5 p.m [1] 67/4
54 [2] 58/3 58/13
584 [1] 2/7
5:30 [1] 67/7
5th Circuit [2] 31/4 40/13

## 6

6.7 [1] 50/19

## 7

763 [1] 5/13
78 [1] 79/8
78210 [1] 1/25
7th [3] 8/18 14/6 28/19

## 9

9 million [1] 37/12
9.1 [2] 56/1 57/22

## A

abhors [1] 55/14
ability [4] 39/24 64/18 66/9 79/10
able [8] 4/1 13/6 16/22 20/8 21/16 21/18
24/25 36/11
about [75] 3/20 3/23 5/14 8/11 9/8 10/16
11/8 11/24 13/23 14/24 15/19 17/8 17/9
20/17 22/9 23/15 24/3 26/11 28/11 29/7

29/8 30/3 30/4 30/5 30/6 30/7 35/1
37/17 38/24 39/24 39/25 40/12 40/12
40/15 41/23 42/21 42/23 43/2 44/19
47/19 50/1 52/10 54/25 55/5 55/11
55/14 55/15 55/19 58/1 59/8 59/8 59/11
59/18 59/19 59/25 60/5 61/7 61/22
61/23 63/2 65/12 65/21 65/24 66/6 67/6
67/6 67/7 67/7 67/7 67/8 67/9 67/10
71/6 71/24 71/24
above [1] 79/6
absence [4] 45/5 45/8 49/16 70/1
absent [1] 30/12
absolutely [4] 23/10 23/11 29/20 38/10
absurd [4] 31/3 31/14 36/2 42/18
accept [3] 49/22 52/23 56/23
acceptance [6] 49/3 49/4 49/5 49/8
51/13 52/15
accepted [5] 49/12 50/4 50/11 50/13
57/24
accepts [1] 60/6
accomplishing [1] 71/3
accordance [3] 47/22 50/16 74/7
according [1] 60/11
account [1] 42/11
accusing [1] 77/3
acknowledge [1] 32/19
acknowledged [4] 32/10 35/15 61/2
63/19
act [5] 12/18 24/24 26/1 71/11 76/16
acted [1] 72/7
acting [1] 72/20
action [6] 37/18 37/23 39/13 50/21 63/16
63/24
acts [1] 61/18
actual [2] 34/4 69/18
actually [8] 31/6 32/1 40/24 41/4 50/10
54/8 61/1 62/3
additional [2] 8/18 61/21
address [2] 4/19 25/2
addressed [4] 4/13 4/20 51/16 66/17
adduced [1] 71/23
admit [1] 58/10 58/18
admitted [4] 14/13 39/12 46/9 73/14
Adrian [2] 18/3 18/6
adult [1] 72/5
advantage [4] 3/14 35/3 40/10 61/24
advised [1] 10/16
affairs [2] 17/16 26/3
affect [1] 56/18
affordability [1] 15/13
affordable [6] 7/7 16/11 22/14 38/2 40/1
40/2
affordable-housing [4] 7/7 38/2 40/1
40/2
after [31] 2/25 4/25 6/18 8/12 8/23 13/20
14/6 15/23 16/16 17/12 23/12 28/22
29/12 32/19 35/16 35/18 47/1 48/4 50/7
51/2 51/8 53/18 54/1 54/3 55/8 55/8
62/2 62/20 64/12 68/3 75/16
afternoon [3] 2/1 2/15 2/19
again [6] 2/18 2/23 12/20 20/17 46/16
78/3
against [10] 11/5 12/9 22/6 24/12 34/17
40/23 41/2 52/3 54/1 63/13
age [2] 5/17 7/23
ago [3] 4/19 43/5 43/5
agree [10] 28/15 36/6 36/17 38/7 38/8
41/17 46/6 47/10 57/17 69/14
agreed [14] 5/10 6/23 6/23 7/5 25/18
28/8 32/8 32/15 38/21 51/24 52/2 52/13

**A**

agreed... [2]  53/5 53/24
agreeing [2]  35/17 50/13
agreement [56]  5/6 5/9 5/25 7/1 11/15
11/16 11/21 11/23 12/18 14/16 17/22
18/1 18/5 18/17 23/16 24/20 24/23 25/1
25/5 25/6 25/15 25/18 25/20 25/25 26/2
26/8 27/1 28/3 28/15 28/16 40/16 40/17
47/2 47/11 48/11 48/23 50/17 54/7 56/2
60/22 71/7 71/8 71/12 73/25 74/3 74/7
74/19 75/10 76/7 76/10 76/13 76/16
76/18 76/19 77/6 77/8
agrees [3]  29/10 47/1 50/23
ahead [6]  25/11 48/13 50/14 50/15 52/2
63/11
AIA [2]  8/2 75/5
aided [1]  1/22
all [70]  2/4 3/15 4/8 6/18 7/13 10/8 11/8
13/14 14/17 16/23 17/16 18/16 18/19
19/14 21/21 22/18 24/10 27/5 30/22
30/25 31/8 31/9 33/15 33/19 34/3 35/12
35/18 37/15 37/18 37/22 38/5 39/3
46/16 46/20 47/18 48/17 48/24 50/2
50/21 52/10 52/10 53/6 53/13 54/6
56/13 57/9 59/20 63/1 63/13 63/14
63/17 63/18 64/22 65/5 66/3 67/6 67/8
67/8 67/24 68/15 69/9 70/7 71/17 73/11
73/13 73/18 76/4 76/7 76/22 78/1
allegations [2]  18/25 21/15
allege [1]  56/16
alleged [4]  8/22 19/14 21/14 60/10
alleging [2]  45/4 59/2
allowed [3]  72/11 72/14 77/7
allows [1]  17/22
almost [1]  18/7
along [2]  30/25 56/12
already [12]  5/6 5/7 5/10 6/23 6/24 23/3
25/16 26/7 53/2 57/12 67/11 67/11
also [11]  6/16 10/7 12/16 16/1 37/25
38/25 42/10 42/16 47/15 48/18 73/14
alternative [1]  70/7
although [1]  66/25
altogether [1]  50/10
always [2]  30/7 30/7
Am [1]  58/2
ambiguity [2]  55/11 55/15
ambiguous [1]  33/1
among [1]  77/23
amounts [1]  62/9
ample [1]  28/12
analysis [1]  57/17
and/or [1]  43/12
Andasola [4]  1/24 79/3 79/18 79/18
announcements [1]  2/11
annually [1]  12/17
another [11]  5/17 12/13 26/11 30/8
31/17 37/19 48/20 57/25 58/20 65/24
65/25
answer [7]  29/6 38/6 59/1 73/21 73/23
73/23 77/11
answered [3]  29/3 54/23 66/13
ANTONIO [1]  1/25
any [26]  6/8 8/3 13/15 14/4 16/5 18/15
20/16 23/7 24/14 24/15 28/23 30/18
41/20 44/23 50/23 52/8 54/19 61/8
61/15 63/24 64/16 66/12 66/25 68/18
72/22 77/8
anybody [6]  8/10 24/21 28/2 45/16 46/18
68/7
anymore [2]  9/22 78/2

anything [14]  23/15 26/9 27/10 35/7 39/1
41/8 42/6 51/8 54/1 67/10 69/13 69/24
72/16 77/21
anyway [4]  9/15 10/1 21/2 73/3
anywhere [1]  6/1
Apartments [1]  15/1
apologize [1]  44/15
appeal [1]  11/19
Appeals [1]  41/8
appeared [1]  55/13
appease [1]  59/15
applicable [1]  43/13
applies [1]  33/10
apportionment [1]  64/20
appraisal [3]  10/14 10/19 16/19
appreciate [2]  59/19 66/10
apprized [1]  32/11
approach [1]  75/1
appropriate [5]  29/22 29/25 31/14 40/4
50/21
approve [1]  61/4
approved [1]  76/3
Arbor [22]  32/13 35/14 35/19 35/23 36/5
37/1 38/22 42/6 54/25 55/1 55/3 55/7
60/23 60/23 61/2 61/7 61/9 61/11 62/3
75/20 75/20 75/21
architect [11]  8/9 45/18 46/3 46/19 47/5
47/6 47/8 47/13 48/8 54/18 74/21
are [73]  3/4 3/18 4/5 5/1 5/3 5/22 6/6
6/10 7/10 7/21 9/21 9/21 12/15 13/7
13/24 14/23 17/11 19/7 19/19 21/13
21/15 22/20 23/10 23/24 24/25 26/18
28/5 29/11 29/14 29/25 30/4 33/15
37/14 37/21 38/7 40/10 41/10 43/5 43/6
43/20 45/18 46/22 52/24 55/19 56/7
56/10 58/22 58/24 59/20 62/15 62/19
63/17 63/21 63/22 64/10 64/25 65/1
65/4 67/11 68/1 69/7 69/7 69/24 71/4
71/14 72/11 72/11 72/14 73/12 74/9
75/11 75/13 77/17
argue [2]  11/14 62/13
argued [1]  77/15
argues [1]  52/19
arguing [1]  69/3
argument [13]  2/21 10/3 11/24 12/12
15/16 15/22 19/6 19/12 24/16 52/17
54/16 73/25 75/15
arguments [1]  39/20
arose [1]  40/20
around [6]  11/13 18/25 32/14 61/11 62/5
70/24
arranged [2]  42/5 61/13
arrest [3]  35/4 41/13 41/14
arrived [1]  67/9
articulate [2]  18/24 19/16
articulating [1]  38/5
as [100]
aside [1]  22/3
ask [8]  18/21 37/15 42/10 45/8 46/4
64/15 66/13 70/6
asked [13]  10/1 26/9 35/11 39/7 55/21
59/19 59/23 65/11 66/21 68/23 69/4
73/16 73/22
asking [12]  6/2 27/3 32/8 35/20 35/21
42/9 55/19 56/25 57/2 57/7 57/15 59/2
asks [1]  25/24
aspect [1]  54/24
assert [2]  34/17 36/2
asserted [2]  37/23 66/25
assessment [1]  10/15

asset [4]  17/6 37/18 64/10 64/12
assets [1]  64/12
assist [2]  39/4 40/8
assume [3]  21/23 32/3 60/9
Assuming [1]  32/4
attached [2]  10/17 46/20
attained [1]  73/20
attempt [2]  37/2 67/21
attempted [1]  36/4
attempting [5]  34/13 37/11 37/12 40/10
50/7
auction [2]  15/11 15/12
August [1]  79/15
AUSTIN [2]  1/2 79/12
authenticated [1]  8/9
automatic [2]  25/16 26/1
avail [2]  2/23 3/19
availability [1]  66/24
available [3]  35/14 35/15 37/1
avoid [2]  6/1 14/17
await [1]  28/22
award [1]  40/4
award-winning [1]  40/4
aware [2]  15/9 42/1
away [6]  12/23 19/23 31/10 35/5 36/12
40/11

**B**

back [20]  14/2 16/16 19/22 20/1 22/8
24/3 24/4 29/14 30/2 32/24 33/6 39/9
39/21 48/15 56/10 59/5 63/11 64/3
74/21 78/4
backed [1]  38/20
backwards [2]  49/14 70/12
bad [5]  23/13 29/23 62/20 73/19 73/19
Balancing [1]  26/24
bank [12]  1/3 2/7 15/18 16/5 30/13
30/22 36/4 36/9 37/3 37/8 37/14 39/23
Bank's [1]  30/20
bargained [2]  17/11 24/6
bargained-for [1]  17/11
based [3]  6/25 49/3 51/12
basically [1]  26/12
basis [3]  56/19 63/15 70/25
be [108]
bear [1]  29/9
became [2]  14/10 21/23
because [43]  3/11 3/17 7/11 8/21 9/13
9/23 14/4 16/2 16/7 17/20 22/23 26/13
30/3 30/5 30/21 32/14 32/25 33/11
34/25 36/7 36/10 38/15 39/9 41/6 41/18
42/14 43/10 44/10 46/25 51/6 51/9
51/22 52/20 52/22 55/17 56/6 56/7
61/14 62/18 68/16 69/23 72/7 72/17
become [7]  13/3 13/17 18/18 25/17 27/6
31/2 39/8
becomes [2]  37/1 42/20
been [30]  3/24 6/24 8/1 9/23 12/21
21/19 28/12 30/6 39/7 42/6 42/19 42/24
43/13 47/18 48/2 48/19 49/7 49/12 52/8
59/15 59/15 61/18 62/24 65/9 66/1
72/12 72/17 75/14 77/14 77/25
before [20]  1/12 2/20 2/24 5/24 9/5
10/18 10/25 11/18 11/20 16/20 16/24
19/1 27/23 38/11 46/16 52/10 55/14
67/3 67/9 79/10
beginning [1]  7/20
begs [2]  19/10 29/15
behalf [1]  37/16
behind [1]  68/15

**B**

being [16]   3/1 15/18 16/13 17/11 20/13
  26/4 35/11 45/9 55/21 61/23 64/12 68/1
  68/2 68/3 69/3 74/16
belief [2]   56/19 67/22
believe [9]   19/21 20/23 22/6 56/18 57/4
  57/5 57/7 57/16 62/20
believed [1]   58/9
bell [1]   19/22
benefit [3]   37/13 37/13 39/18
best [11]   3/11 9/2 10/3 18/24 19/16
  31/18 36/8 36/9 37/7 37/8 79/9
best-case [1]   9/2
bet [1]   34/16
better [2]   7/23 22/8
between [8]   12/19 15/10 21/6 27/18 34/4
  34/10 46/13 77/5
Bexar [1]   39/23
beyond [1]   69/21
big [5]   19/24 39/23 69/8 73/16 77/2
biggest [2]   10/7 59/9
Bill [1]   2/16
binding [5]   6/13 8/2 8/9 10/5 28/2
bit [2]   3/1 13/9
bitten [1]   23/13
blame [5]   23/7 64/20 67/24 68/2 68/17
blanks [1]   8/8
BLVD [1]   1/25
BMG [1]   5/11
boggling [1]   31/8
bond [11]   1/13 61/11 61/13 61/16
  61/17 65/20 66/6 70/24 72/18 72/18
  72/19 72/21 72/21 72/21
bonded [1]   32/14
BOOKHOUT [4]   1/16 2/13 4/16 35/22
books [2]   10/15 15/8
bootstrap [1]   32/20
born [1]   7/20
borrow [1]   71/16
borrowing [1]   23/19
both [12]   4/3 22/11 34/14 41/1 41/5
  41/17 42/9 43/3 53/4 66/25 74/11 74/14
bottom [4]   50/23 58/13 73/1 76/1
bound [1]   71/7
boy [1]   75/3
boys [1]   69/8
breach [13]   21/25 29/13 32/22 32/23
  33/4 33/4 35/8 43/4 43/25 71/12 73/7
  73/15 77/8
breached [3]   40/13 60/17 76/13
breaches [5]   8/22 18/24 19/5 19/14
  19/20
breakage [5]   36/2 36/3 36/18 36/22
  42/17
bridge [1]   37/1
brief [2]   10/11 70/12
briefed [1]   77/15
briefing [1]   5/12
bring [3]   30/16 68/19 71/25
bringing [2]   66/10 66/11
broke [1]   14/2
brought [2]   30/14 47/13
builder [5]   8/9 34/10 34/17 54/1 74/22
Builders [2]   12/14 73/20
bunch [1]   62/14
burden [10]   4/2 4/5 29/5 29/16 29/21
  38/12 59/13 64/1 64/4 66/22
burdens [2]   29/25 30/4
business [4]   13/19 13/20 14/8 28/7

**C**

call [4]   34/2 34/3 74/12 77/24
called [7]   5/11 9/8 17/17 53/4 73/16
  76/17 76/19
calling [1]   2/17
calls [1]   2/7
came [2]   42/8 69/15
camel's [1]   14/2
CAMPOS [2]   1/8 2/18
can [50]   2/11 4/8 4/24 9/16 15/4 15/23
  16/20 16/20 17/20 19/13 20/16 24/4
  24/10 24/11 24/22 24/22 27/10 29/4
  30/18 30/19 31/8 31/9 31/10 31/15 41/5
  45/1 46/2 49/24 49/25 51/7 51/20 52/6
  53/18 57/8 59/14 62/13 62/15 63/12
  63/15 64/11 65/8 65/15 66/23 68/5
  70/19 73/22 74/7 75/9 75/9 78/5
can't [15]   19/22 23/14 24/3 31/3 31/15
  39/10 39/11 41/1 41/18 67/24 68/2 69/6
  69/13 70/20 70/22
candid [1]   29/19
candidly [1]   66/24
candor [1]   37/22
cannot [6]   15/7 16/15 17/14 23/6 60/24
  73/5
capable [1]   24/25
capacity [1]   79/5
care [4]   16/20 23/7 24/15 36/18
case [24]   1/6 4/2 5/13 9/2 9/13
  12/25 17/17 19/2 20/2 20/7 20/7 26/17
  26/17 29/10 29/24 30/2 30/6 30/7 50/3
  57/5 77/14 77/19 77/24
cases [2]   3/15 62/14
cash [1]   15/5
catch [1]   34/21
catch-22 [1]   34/21
caught [1]   72/8
cause [3]   35/12 37/22 39/13
caused [3]   42/14 55/9 61/19
causes [2]   37/18 63/24
cautious [3]   68/3 68/5
cease [1]   72/10
central [1]   19/11
certain [5]   6/5 6/5 39/14 56/10 71/15
certainly [6]   29/22 39/12 43/20 48/6 50/2
  62/19
certainty [1]   68/14
certificate [21]   6/13 7/10 8/2 9/13 9/19
  10/4 20/18 28/1 28/4 33/18 48/8 49/5
  53/23 70/23 73/2 73/6 73/10 73/13 74/2
  74/20 75/6
certificates [1]   52/9
Certified [2]   79/3 79/4
certify [1]   79/6
CESAR [1]   1/25
cetera [1]   13/5
CHAIKEN [13]   1/18 2/16 10/16 19/21
  28/22 28/25 35/23 72/6 72/10 73/1
  75/15 76/22 77/3
Chaiken's [1]   72/20
change [1]   71/19
charge [1]   42/12
charged [1]   50/7
Chase [34]   10/6 10/9 10/10 10/13 14/1
  15/1 15/3 15/7 16/14 16/17 16/18 16/21
  22/12 22/13 30/13 30/20 30/22 35/16
  36/16 59/9 59/10 59/11 59/12 59/15
  59/16 59/16 59/16 60/8 60/18 61/23
  61/24 67/20 68/9 76/24
CHAVEZ [1]   1/25

check [1]   68/9
child [1]   69/7
choosing [1]   29/12
chose [8]   32/16 35/2 35/9 36/8 38/15
  42/2 62/14 63/3
CHULA [1]   1/8
circle [1]   30/2
circles [1]   29/14
Circuit [2]   31/4 40/13
circumstances [8]   12/8 17/23 36/13
  48/12 54/21 60/5 64/8 70/5
cite [1]   62/13
cited [2]   17/17 53/16
citizens [1]   16/12
city [1]   65/4
claim [30]   30/11 31/2 32/20 33/23 34/2
  34/9 35/2 58/19 63/23 76/20 76/21
claimed [1]   69/16
claiming [3]   46/22 55/18 58/21
claims [8]   34/17 34/20 37/16 38/18
  38/20 43/5 43/6 66/25
clamming [1]   55/17
clean [2]   13/17 14/17
clear [11]   18/2 26/14 31/21 33/1 34/3
  36/11 40/14 49/18 55/19 73/10 74/3
clearly [7]   8/7 12/24 16/9 36/7 42/14
  42/23 51/10
client [8]   44/22 56/7 56/9 64/17 64/22
  65/17 67/10 68/16
clients [1]   3/3
cling [1]   6/21
close [7]   9/14 35/23 39/11 50/8 61/10
  61/20 75/19
closed [1]   61/17 61/18
closing [3]   4/19 9/23 66/20
cloud [1]   11/7 11/10 11/17 22/25
clouding [1]   6/14
co [2]   23/17 24/24
co-GP [1]   24/24
co-GP's [1]   23/17
collateral [1]   15/8
COLUMBIA [18]   1/4 2/8 7/2 7/4 14/9
  17/8 17/10 17/22 25/8 25/13 25/21 26/6
  27/10 27/15 28/8 28/18 55/8 72/15
come [8]   3/13 15/23 16/16 27/6 53/2
  59/23 64/9 69/20
comes [4]   34/14 58/25 71/19 72/16
coming [2]   26/2 69/2
comment [4]   31/6 31/7 41/18 46/5
comments [2]   55/12 55/13
commit [1]   76/2
commitment [9]   9/15 9/23 9/24 60/7
  60/13 60/14 62/1 73/8 73/15
committee [1]   75/25
communications [1]   77/5
competent [1]   5/18
complain [1]   31/2
complaining [4]   3/8 9/8 38/9 61/22
complaint [1]   63/6
complaints [1]   63/2
complete [13]   34/6 34/8 43/8 45/7 45/10
  47/1 48/10 52/6 52/19 52/20 53/7 56/2
  79/9
completed [3]   43/13 43/24 75/9
completely [4]   12/12 64/18 64/23 74/9
completion [65]   6/13 7/11 8/2 9/14 9/20
  9/24 10/5 20/18 28/22 28/4 31/17 31/20
  31/20 31/24 32/1 32/7 33/19 34/4 34/16
  34/24 35/8 41/23 41/25 43/11 44/17
  45/1 45/3 45/12 45/25 45/25 46/1 46/7

## C

completion... [33]  46/10 46/20 47/4
47/10 48/9 49/2 49/6 49/16 50/4 50/12
51/3 51/6 51/8 51/11 51/24 53/19 54/4
54/5 54/10 54/10 54/13 54/23 55/7 70/23 73/2
73/7 73/10 73/14 74/2 74/6 74/18 74/20
75/6 75/16
complex [2]  15/2 67/18
compliance [1]  31/25
compliant [1]  32/1
comply [2]  74/15 74/16
computer [1]  1/22
conceding [1]  66/11
concept [3]  24/21 29/9 72/4
concern [2]  17/4 59/9
concerned [2]  59/7 59/8
conclude [2]  7/14 30/18
concluded [1]  78/7
conclusion [1]  28/5
condition [6]  12/7 45/15 47/2 50/10 55/6
64/12
conditions [7]  6/6 23/8 55/1 55/6 61/11
61/21 71/15
conduct [1]  42/20
confirmed [1]  42/5
confirms [1]  35/23
connected [1]  68/7
Connolly [1]  55/3
consent [18]  32/13 35/17 36/5 36/18
37/4 40/18 41/6 41/7 48/16 52/15 60/25
60/25 61/1 62/2 62/5 63/17 73/16 73/22
consented [6]  35/13 38/21 38/22 42/7
63/3 63/4
consider [3]  5/22 35/7 70/6
consideration [2]  65/16 65/22
considered [2]  11/20 45/19
consistent [1]  5/25
conspicuously [1]  30/12
constitute [1]  79/8
constitutes [3]  54/17 55/24 57/19
constraints [1]  45/23
construction [54]  6/11 7/12 7/20 9/18
10/6 11/1 11/3 12/1 12/2 12/4 12/10
14/1 14/14 20/13 20/19 23/1 27/23
32/12 32/14 34/4 34/5 34/6 34/8 40/6
40/8 40/11 42/2 42/4 43/11 43/12 43/18
43/19 44/16 44/23 45/1 45/3 47/4 49/2
49/15 50/4 50/12 50/24 51/1 51/4 51/11
51/23 52/5 53/17 54/5 54/10 54/12 74/6
74/18 75/14
construction-law [1]  12/4
construction-related [1]  50/24
construe [1]  54/7
contemplate [1]  54/6
contemplated [2]  3/7 54/4
contemplates [3]  51/2 54/8 69/24
contemplation [1]  60/21
contending [1]  62/8
contention [1]  8/24
contesting [1]  18/23
context [1]  72/19
contingencies [1]  13/8
contingency [1]  12/21
continuation [1]  2/9
continue [2]  33/13 77/22
continued [3]  13/22 13/23 33/13
continuing [1]  3/20
continuous [1]  11/10
contract [35]  5/23 6/2 6/3 6/4 27/18 29/8
29/10 29/11 31/15 31/22 32/2 32/25

33/1 33/21 33/25 34/1 40/12 40/14
40/17 42/9 42/12 42/24 51/6 51/20
52/13 53/4 53/5 53/8 53/9 53/12 53/13
53/20 57/18 58/8 58/10
contracting [1]  5/19
contractor [7]  12/7 12/13 46/5 46/13
48/15 50/14 52/3
contracts [6]  5/19 31/5 31/13 34/4 52/24
52/25
contractual [3]  25/9 25/14 33/8
contrary [4]  22/16 37/25 40/16 74/9
contrast [1]  27/20
contributed [1]  32/6
contribution [1]  65/25
control [28]  6/23 17/12 17/15 17/21
17/21 18/3 18/6 18/8 18/11 18/13 18/19
18/20 24/5 24/5 24/8 30/8 31/10 35/4
36/12 39/19 40/11 41/14 41/14 41/20
42/23 63/25 69/25 69/25
controversy [2]  19/17 69/19
convincing [1]  15/15
cooperate [18]  40/15 40/20 40/22 40/24
41/1 62/3 62/12 62/13 62/14 64/8 64/9
69/21 69/22 71/3 76/9 76/11 76/12
76/15
cooperation [9]  40/19 41/7 41/9 41/10
69/21 69/22 71/6 76/20 76/21
cooperative [1]  69/3
copy [1]  48/22
corner [1]  8/6
corporation [3]  1/4 2/8 15/16
correct [1]  28/13
correctly [1]  32/18
correspondence [1]  10/17
corresponding [1]  18/22
could [19]  3/2 3/7 3/13 9/14 9/22 11/20
13/15 13/15 16/21 17/24 19/6 29/21
47/13 53/5 53/6 62/12 66/21 72/22 73/9
couldn't [3]  38/19 39/1 55/1
counsel [7]  28/6 29/3 29/7 38/1 39/23
42/21 69/3
countenanced [1]  31/4
counter [1]  34/17
County [3]  7/7 16/12 39/23
couple [1]  44/12
course [7]  4/9 4/22 5/1 7/6 32/10 63/8
72/8
court [78]  1/1 1/24 2/4 2/7 4/18 4/24 5/3
5/11 5/13 5/25 8/5 15/9 16/16 17/1
18/10 23/13 24/22 26/12 26/14 27/3
27/21 29/4 29/12 29/15 29/19 29/20
29/21 30/1 30/18 31/4 31/12 32/18
33/18 33/21 35/11 36/23 38/14 38/18
38/25 40/17 41/5 41/8 41/23 42/21
43/18 44/17 46/12 52/3 52/10 54/7
54/25 55/2 55/4 55/20 55/21 56/25 59/2
59/14 60/6 61/9 63/18 65/11 65/15
65/18 65/19 66/6 66/21 66/22 66/23
67/2 68/11 70/3 70/4 70/6 70/7 72/25
75/1 79/12
Court's [11]  4/25 13/14 22/15 23/20
23/22 25/24 33/24 41/18 54/22 69/11
70/14
courtroom [3]  30/22 61/7 79/11
cover [3]  15/9 48/20 72/22
cracking [1]  7/22
crazy [1]  75/17
create [5]  7/24 12/6 27/24 31/9 34/1
created [7]  11/25 12/3 12/21 19/24 31/1
62/5 64/4

creators [1]  64/25
credit [2]  56/16 73/18
creditor [6]  21/21 56/4 56/5 56/7 56/8
57/6
CREEK [3]  1/7 1/7 2/9
crisis [2]  27/16 27/18
critical [1]  77/4
critically [1]  17/10
cross [4]  5/1 5/3 38/19 38/19
cross-examination [1]  38/19
crux [1]  51/23
CSR [2]  1/24 79/18
CSR/RMR/FCRR [2]  1/24 79/18
cure [3]  13/19 39/3 43/20
curing [1]  43/20
current [2]  11/6 40/3
customary [1]  46/18
CV [2]  1/6 2/7

## D

Dallas [1]  41/8
damage [1]  63/7
damages [13]  4/8 12/16 12/16 17/24
24/4 24/11 24/12 38/1 38/5 63/22 65/9
69/9 72/22
danger [1]  16/13
date [14]  9/17 43/23 46/10 46/11 46/15
46/16 47/1 47/10 51/3 52/16 53/18
54/10 54/13 75/16
Dated [1]  79/15
dates [1]  46/6
day [16]  3/21 9/19 15/22 15/24 37/19
45/22 59/6 63/12 63/20 64/22 65/2 67/6
67/8 75/15 75/17 79/15
days [6]  13/19 13/20 14/6 14/8 14/8
16/23
days' [2]  15/10 16/22
deadline [2]  46/22 52/11
deal [6]  12/5 36/3 36/4 65/10 72/14
76/25
dealing [2]  21/14 36/15
deals [1]  53/20
dealt [2]  17/18 51/8
debts [2]  13/3 13/6
decide [2]  29/13 47/17
decision [3]  22/15 33/12 48/17
decisions [3]  3/2 35/1 70/1
default [44]  6/6 6/8 6/11 6/12 7/10 9/18
10/7 10/8 10/9 10/21 10/21 11/1 11/3
11/4 12/14 12/24 14/2 14/3 15/8 17/13
18/3 18/15 20/12 20/14 20/19 25/8
25/13 26/16 26/18 26/19 28/10 31/9
42/14 45/4 48/19 54/18 54/19 61/23
61/24 63/15 67/20 68/9 73/20 73/23
defaulted [2]  23/1 27/6
defaults [10]  8/16 8/19 9/2 13/17 13/22
13/24 13/25 14/17 23/7 31/1
defect [24]  34/5 34/9 34/11 40/6 40/8
40/11 42/1 43/9 43/14 43/15 43/16
43/18 43/19 43/21 44/2 47/19 47/19
47/21 47/25 47/25 48/6 48/7 73/17 74/7
defecting [1]  32/12
defects [9]  7/19 7/23 8/1 22/23 22/25
74/9 74/13 75/13 75/13
defend [1]  34/16
DEFENDANT [1]  1/18
Defendant's [1]  24/16
defendants [2]  1/9 27/14
defense [1]  38/23
defensible [2]  43/1 43/6

**D**

defer [2] 34/19 70/14
deficient [1] 50/14
defined [2] 54/13 56/1
defines [2] 25/6 25/6
definition [12] 13/12 44/25 45/3 45/11 47/4 49/2 52/5 52/17 54/5 54/14 74/5 75/17
delayed [1] 12/16
delivery [1] 53/22
demonstrate [2] 33/15 33/21
denied [1] 17/11
department [1] 36/19
departments [1] 65/4
depends [1] 60/1
deposition [3] 30/15 70/18 71/21
depriving [1] 19/7
des [1] 15/12
describe [1] 14/6
design [3] 41/13 74/13 74/15
designation [1] 15/13
designed [6] 27/2 27/4 27/5 34/1 47/16 65/1
desist [1] 72/10
despite [1] 11/8
destroy [2] 6/22 39/21
determination [1] 27/11
determine [5] 4/7 33/7 33/25 45/11 46/5
determined [2] 8/8 21/20
detriment [1] 42/12
developed [2] 40/2 65/1
developer [5] 1/7 6/21 21/3 27/13 65/24
development [1] 44/21
deviation [3] 47/20 48/1 48/7
did [24] 15/18 16/1 19/15 31/9 32/9 39/6 40/25 51/20 52/14 54/15 55/22 55/22 58/7 61/4 61/6 64/20 67/19 67/23 68/22 72/9 73/8 73/18 74/1 75/8
didn't [29] 8/11 13/19 17/9 22/12 40/24 45/21 46/17 47/6 47/11 48/3 48/3 49/21 49/21 49/22 51/18 51/19 51/19 51/19 52/23 54/14 54/25 59/10 63/10 67/17 70/19 73/11 74/15 74/16 75/16
difference [1] 21/6
difficult [1] 3/2
diligence [2] 10/22 16/20
diligently [1] 50/23
diminish [1] 16/10
Direct [1] 5/12
directed [2] 57/23 58/5
directions [1] 74/14
disagreement [2] 46/13 46/17
discouraged [1] 20/5
discovered [1] 48/4
discretion [1] 69/11
discuss [2] 38/15 39/3
discussed [2] 38/13 38/14
discussing [1] 50/9
discussion [4] 29/7 36/10 60/7 62/10
discussions [1] 39/7
displaced [1] 65/9
dispute [10] 10/5 19/13 20/16 31/23 32/14 34/10 35/16 40/9 43/19 72/3
distinct [2] 4/1 4/12
distinction [1] 34/3
distressing [1] 63/21
DISTRICT [4] 1/1 1/1 79/11 79/12
disturbing [1] 63/21
DIVISION [2] 1/2 79/12
do [96]

document [14] 32/7 45/5 45/6 45/8 45/10 54/16 54/17 54/20 54/23 54/17 60/8 60/11 61/4
documentation [1] 61/5
documents [7] 12/1 12/2 12/4 12/10 27/23 50/5 52/16
does [13] 8/24 11/22 11/23 16/7 23/8 32/21 33/10 33/21 45/17 47/10 54/11 54/11 71/18
doesn't [23] 2/23 9/20 11/16 11/21 11/24 12/6 13/1 15/21 20/4 33/19 44/8 44/10 44/11 45/15 47/2 51/5 51/22 53/3 54/5 63/23 70/21 70/24 71/18
doing [14] 3/23 10/22 15/4 23/19 51/24 53/15 54/8 63/22 67/15 67/24 68/16 68/18 70/7 77/17
dollars [5] 24/18 39/19 66/1 72/24 76/23
dominoes [1] 16/25
don't [61] 3/9 4/10 4/11 7/23 8/21 8/23 8/25 9/6 9/19 9/20 16/7 16/8 16/10 20/1 20/16 21/1 21/4 21/12 22/3 22/19 23/6 26/20 26/20 33/18 41/19 41/20 44/9 44/14 44/17 45/14 46/25 49/22 49/25 53/1 56/18 56/24 58/5 59/1 62/11 64/13 66/17 69/22 70/18 72/2 73/12 73/13 73/18 73/23 74/12 74/19 74/22 74/24 74/25 76/9 76/9 76/11 76/12 76/16 76/17 76/18 78/1
doubt [2] 40/15 44/2
down [9] 7/13 13/9 19/4 20/11 24/11 30/14 30/16 38/7 70/14
downward [1] 28/13
draft [9] 8/5 8/7 28/1 45/14 45/18 45/19 49/9 72/25 73/11
drafted [1] 32/1
due [6] 10/22 13/3 13/7 16/20 45/22 60/13
during [3] 3/24 44/18 77/21
dust [1] 6/18
duties [7] 19/24 21/24 21/25 23/24 25/7 64/2 64/21
duty [6] 13/2 40/14 40/20 62/12 64/9 77/9
dying [2] 44/5 44/6

**E**

each [3] 18/25 25/7 69/9
earlier [2] 65/11 69/4
early [2] 29/15 67/4
easily [1] 16/15
EAST [1] 1/25
easy [1] 33/2
effect [5] 14/20 16/25 23/2 66/5 70/1
effective [1] 9/4
effectively [1] 62/18
effectuate [4] 55/23 57/8 59/3 62/8
effectuated [1] 6/24
effectuating [1] 14/9
efforts [1] 35/12
either [14] 3/17 4/10 4/11 13/1 21/18 29/16 30/15 32/22 37/23 49/19 51/18 51/21 51/21 70/8
elements [1] 26/23
eleven [1] 72/2
eleventh [1] 23/11

eleventh hour [1] 23/11
else [10] 3/10 18/12 65/7 65/8 72/14
elucidation [1] 44/7
email [6] 10/17 14/7 39/5 42/25 55/2 55/3
embryo [1] 7/20
empowered [1] 25/1
end [13] 3/21 4/20 9/17 15/2 15/2 15/22 15/24 45/22 51/22 54/18 63/11 63/20 64/22
ends [2] 19/5 67/25
enforce [6] 5/5 22/17 48/17 50/15 50/2 53/25
enforceable [1] 11/14
enforced [3] 5/21 27/1 27/8
enforcing [2] 27/18 52/1
enjoin [1] 5/9
enjoined [1] 28/17
enjoyable [1] 77/16
enough [6] 30/3 30/10 45/21 47/25 59/12 72/5
enter [1] 29/11
entered [2] 5/19 18/10
entire [2] 29/7 30/10
entirely [2] 18/7 18/12
entities [2] 61/14 77/5
entitled [2] 18/2 30/9
entity [1] 14/5
environment [1] 7/24
environmental [1] 10/14
equity [1] 55/14
equivalent [1] 41/10
especially [3] 2/25 3/15 62/20
ESQ [5] 1/16 1/16 1/18 1/18 1/19
essence [3] 18/9 35/10 36/19
essentially [1] 27/21
establish [2] 47/13 52/5
Estate [1] 17/18
estimated [1] 12/18
estoppel [2] 33/11 63/16
et [1] 13/5
even [19] 9/1 10/2 11/15 11/17 17/23 21/13 24/22 26/12 32/22 39/8 39/11 39/14 48/3 52/8 54/11 64/13 69/14 76/4 77/25
event [14] 10/8 12/13 18/3 26/19 32/15 37/20 48/19 54/19 55/24 57/20 62/8 64/16 66/12 69/16
events [12] 6/6 6/7 6/8 12/23 17/13 18/15 20/12 25/8 25/13 26/16 26/18 63/15
ever [2] 9/23 58/20
every [10] 20/2 22/5 23/25 24/9 37/22 40/14 65/2 72/2 73/24 76/12
everybody [7] 16/9 29/10 47/1 47/3 47/10 47/12 72/14
everyone [1] 35/1
everything [11] 5/24 6/18 15/4 37/21 38/9 52/22 65/7 65/7 67/12 73/17 77/10
evidence [18] 6/25 24/14 35/22 42/5 46/9 49/10 49/16 49/17 49/19 50/1 50/3 51/13 51/15 51/18 59/18 61/6 68/7 74/17
exact [2] 54/4 73/9
exactly [2] 54/8 73/18
examination [1] 38/19
example [2] 76/8 76/10
except [3] 23/7 53/11 57/23
exception [1] 58/11

## E

excited [1]  13/10
excluded [2]  58/4 58/15
Excluding [1]  58/16
excuse [3]  38/21 46/11 77/6
executing [1]  4/6
exemplifies [1]  31/6
exercise [1]  27/16
exercised [2]  25/9 25/14
exercises [3]  18/8 18/13 24/8
exercising [1]  15/3
Exhibit [1]  75/21
Exhibit 37 [1]  75/21
exhibits [1]  74/24
exist [3]  48/3 48/3 70/6
existed [1]  48/12 73/12
existence [4]  15/3 61/24 63/2 63/4
existing [1]  62/21
exists [2]  44/3 70/5
exorbitant [2]  9/10 50/8
expect [2]  34/22 34/23
expecting [1]  15/21
expenses [1]  66/1
experience [2]  23/8 23/9
expert [1]  7/21
experts [1]  7/14
expiration [1]  50/25
explain [2]  4/24 45/20
explanation [1]  45/22
exposure [1]  12/18
express [1]  67/22
expressed [2]  2/22 59/17
extend [1]  42/18
extended [1]  42/19
extends [1]  56/3
extension [9]  9/8 9/9 9/12 9/21 10/1
  36/23 36/24 37/4 50/8
extensions [1]  9/17
extent [3]  2/25 62/25 77/21
extort [2]  37/2 37/12

## F

facade [1]  7/22
face [1]  17/20
facing [2]  14/25 27/16
fact [35]  8/6 12/10 18/24 19/15 19/16
  22/1 22/4 25/21 30/18 32/5 33/4 33/15
  34/8 34/18 35/24 38/20 38/21 40/3 41/7
  42/18 42/22 45/14 47/16 47/24 48/2
  51/8 51/20 54/1 54/3 54/19 63/14 63/18
  64/13 67/12 74/5
facts [3]  19/13 20/9 54/20
factually [1]  46/12
fad [1]  63/11
fail [4]  27/1 41/13 62/3 76/15
failing [1]  14/20
failure [2]  52/15 60/14
faith [1]  62/22
fallacy [1]  76/20
fantasy [1]  72/4
far [2]  20/25 42/4
fascinating [1]  36/13
fast [1]  8/5
FCRR [1]  1/24 79/18
fear [1]  3/15
February [5]  8/17 13/16 13/24 14/7 14/7
February 28th [2]  8/17 13/24
February 28th email [1]  14/7
February 28th letter [1]  14/7

federal [3]  1/24 26/14 79/4
fee [15]  9/13 9/25 24/8 27/16 32/13
  36/15 36/18 36/22 37/5 42/17 42/18
  42/22 50/8 66/2
feel [2]  5/4 77/23
feeling [1]  3/20
fees [6]  21/14 37/12 42/11 60/12 60/12
  65/24
fiduciary [8]  21/24 21/25 23/18 23/24
  64/2 64/21 67/13 71/10
fifteen [1]  14/8
Fifth [1]  12/23
fight [1]  63/3
fighting [1]  63/4 63/5 69/24
file [2]  73/20 73/22
filed [5]  8/12 8/23 12/5 32/19 63/7
final [25]  11/19 14/4 27/11 43/11 44/16
  44/25 45/3 45/25 47/4 49/2 49/15 50/4
  51/11 52/5 54/5 54/9 54/12 61/4 61/5
  63/12 63/13 68/19 74/5 74/17 74/22
finally [3]  14/1 33/24 39/11
financial [4]  21/7 24/2 24/14 66/9
financing [7]  35/13 35/15 40/19 42/4
  42/6 42/15 60/20
find [10]  19/13 19/19 29/21 55/20 55/21
  56/25 59/3 66/21 66/23 66/23
finder [1]  30/18
finding [3]  19/5 29/22 34/5
Fine [1]  73/21
finishing [1]  75/19
firms [2]  27/4 27/5
first [18]  14/3 14/14 14/15 14/24 18/1
  24/4 45/8 47/18 55/13 55/13 62/1 63/1
  67/21 67/23 68/23 68/24 73/4 73/5
five [6]  17/25 18/15 20/12 24/11 26/20
  68/11
fix [10]  7/13 11/11 17/16 24/18 27/7
  48/16 53/22 62/7 67/12 67/14
fixed [1]  44/4
fixing [1]  68/8
flip [1]  18/22
flow [1]  63/23
focus [1]  44/16
folks [1]  64/25
follow [1]  47/23
following [5]  2/3 2/21 50/22 59/7 61/10
force [1]  64/11
foreclose [3]  12/15 22/13 30/17
foreclosure [12]  6/17 10/19 10/24 15/1
  15/4 15/11 16/14 16/16 16/21 17/2
  30/11 59/23
foregoing [1]  79/8
forfeit [1]  35/12
forfeiting [1]  58/23
forfeiture [15]  31/8 39/17 39/19 55/10
  55/11 55/14 55/16 55/17 55/18 56/2
  57/9 62/9 66/5 69/16 69/17
forget [1]  74/22
form [9]  8/3 45/14 46/3 46/4 50/13 51/13
  75/5 75/6 79/8
forth [2]  11/2 11/19
forward [11]  9/4 9/23 40/9 55/7 60/7
  60/13 60/14 62/1 62/2 73/7 73/15
found [3]  21/9 32/22 34/9
four [2]  26/20 27/4
Fourth [1]  12/13
frankly [2]  16/5 40/5
free [2]  29/11 77/23
freedom [3]  5/23 29/8 29/9
freely [1]  5/20

Friday [5]  30/13 67/4 67/6 67/7 68/11
  68/13 69/22
frustrated [1]  3/1
frustrating [1]  3/9
full [4]  5/17 19/2 21/12 30/22
fully [6]  29/19 32/11 43/1 43/5 43/6 61/2
function [5]  18/7 18/12 24/7 72/12 72/19
functionally [1]  41/10
fundamental [2]  34/7 37/24
funds [2]  10/10 10/22
further [3]  9/3 52/2 77/11

## G

G704 [1]  75/6
gain [3]  39/19 76/22 77/2
gave [2]  9/3 13/18
general [44]  5/8 6/19 7/2 8/4 14/14
  14/18 15/17 17/15 19/8 19/24 21/21
  21/23 23/23 25/9 25/15 25/19 25/21
  26/7 27/6 27/20 28/9 28/12 39/8 41/13
  41/15 46/13 48/13 50/16 50/20 50/23
  55/9 55/23 60/19 61/14 62/19 62/21
  67/22 68/2 68/8 71/5 72/7 72/12 72/15
  72/17
general-partner [1]  14/18
get [45]  2/11 3/8 6/1 6/15 7/23 7/24
  10/20 13/10 13/22 16/7 16/19 19/12
  21/8 21/10 22/2 22/7 22/18 24/1 34/10
  37/17 39/10 39/11 40/18 44/13 45/22
  45/24 46/17 47/11 48/21 51/19 51/19
  59/20 60/25 61/5 66/2 69/8 70/22 73/5
  74/21 75/8 76/2 76/2 78/4 78/4 78/4
  getting [6]  13/14 22/20 32/7 56/20 62/3
  75/19
give [11]  6/22 6/23 15/22 19/18 24/4
  24/24 31/18 53/18 76/17 77/11 77/24
given [11]  17/2 20/12 20/21 22/21 28/12
  29/25 32/12 62/5 65/20 66/24 68/14
gives [2]  12/7 12/7
go [33]  4/3 7/9 7/18 12/6 16/25 19/22
  22/12 22/14 25/11 32/24 33/6 34/16
  48/13 50/13 50/15 52/2 53/10 53/11
  53/16 59/5 60/23 60/25 61/17 63/11
  69/9 70/12 70/22 71/16 71/17 73/23
  74/5 76/3 77/11
God [1]  4/3
goes [2]  22/6 39/9
going [47]  18/16 19/7 22/5 22/18 23/4
  23/12 23/21 23/24 24/1 30/17 33/24
  34/24 35/11 35/17 36/5 36/17 36/17
  37/4 37/23 39/22 41/15 42/1 48/15
  48/22 52/12 57/25 58/22 62/2 62/19
  63/8 64/9 64/10 66/4 66/5 66/24 67/4
  67/11 67/25 68/10 68/12 69/5 71/21
  71/22 76/1 76/24 76/24 77/1
gone [2]  22/22 64/10
good [9]  2/15 2/19 4/11 16/7 23/12
  27/14 29/23 62/20 77/13
gorge [1]  21/19
gosh [1]  22/10
got [33]  11/19 20/25 21/2 22/25 22/25
  23/1 23/2 31/19 31/23 35/22 36/21 37/6
  42/16 43/2 43/3 43/4 43/7 43/8 43/9
  45/10 47/25 53/10 58/11 60/5 64/6 65/5
  65/6 66/8 66/8 66/9 69/2 69/8 75/7
gotten [1]  34/7
governed [1]  25/5
GP [44]  1/7 2/9 6/9 7/3 7/4 11/2 11/13
  12/22 13/16 13/17 14/10 14/12 14/16
  14/21 17/12 18/14 18/14 18/18 22/22

G

GP... [25]  23/5 24/22 24/24 24/24 26/6
26/9 27/9 27/12 28/15 28/16 28/18 31/2
36/12 39/18 40/3 40/4 42/5 44/22 58/16
67/11 67/11 70/19 73/22 76/6 76/6
GP's [1]  23/17
grab [1]  48/22
grain [1]  41/6
grant [4]  20/8 62/7 65/18 66/4
granted [1]  77/1
grappling [1]  20/22
great [4]  27/4 55/15 66/15 68/17
ground [1]  23/14
GS [1]  46/3
guarantee [1]  20/11
guess [4]  8/20 52/23 62/6 68/13
guidelines [1]  15/6
gun [1]  19/1
guys [3]  22/20 62/7 64/3

H

had [37]  2/3 5/10 17/20 17/24 19/8 27/4
30/14 35/13 35/15 36/2 39/6 39/7 40/20
42/5 42/6 45/23 46/11 50/11 50/12 52/9
56/12 56/14 58/5 58/10 58/18 61/11
61/13 62/12 64/8 70/16 70/17 71/21
71/22 73/24 74/13 75/17 79/10
hadn't [2]  19/23 35/19
hand [5]  8/6 24/17 41/19 41/21 60/16
handle [3]  11/3 12/9 35/2
handling [1]  51/6
hands [6]  9/11 9/25 36/7 37/10 37/14
39/1
happen [1]  6/7
happened [6]  9/21 10/12 19/23 25/16
54/8 61/9
happens [6]  4/9 21/8 27/8 45/23 46/2
53/20
happy [1]  3/8
harm [10]  14/23 14/24 17/7 17/8 24/6
26/25 29/18 30/6 63/23 65/16
harmonize [1]  53/13
harms [1]  26/24
has [60]  5/4 5/4 5/6 5/7 6/18 6/20 6/24
7/2 11/14 12/21 12/21 14/12 16/19
16/19 18/14 18/14 22/24 25/19 26/17
27/13 28/10 28/12 28/14 29/5 29/16
29/21 30/6 30/6 32/6 40/7 40/13 40/13
40/13 40/14 41/9 41/24 43/9 43/13
43/24 45/15 47/3 47/4 48/19 52/7 56/10
59/16 60/16 60/20 64/17 66/22 68/8
69/25 70/7 70/21 71/9 73/4 73/12 75/11
75/15 77/14
hasn't [1]  49/12
Hasselwander [11]  32/11 34/19 35/14
36/11 36/20 38/17 38/24 39/11 40/14
42/25 43/3 73/4 73/5
have [166]
haven't [9]  4/5 13/3 24/12 24/13 66/1
66/25 67/14 72/7 72/16
having [3]  7/13 26/7 41/17
he [35]  19/21 38/19 38/20 38/21 38/21
38/24 39/1 39/5 39/12 39/13 44/8 44/10
44/11 50/7 57/24 58/8 58/9 58/9 58/10
58/18 58/19 67/12 70/17 72/13 72/15
73/10 73/11 73/11 73/14 74/11 74/12
74/13 74/15 77/4 79/6
he's [4]  44/5 71/23 71/24 77/4
head [1]  6/20
hear [4]  41/4 59/10 67/15 69/20
heard [18]  9/7 9/10 18/16 30/21 39/22
39/24 40/12 42/12 52/10 59/5
59/5 63/1 63/2 64/24 67/3 71/17 77/11
hearing [17]  1/12 2/10 2/21 2/24 2/25
3/24 3/25 7/1 20/3 56/17 70/13 70/14
70/15 70/16 71/22 77/22 78/7
held [1]  5/20
help [2]  25/24 39/2
here [27]  2/18 4/12 6/8 9/5 13/14 23/10
30/14 30/16 32/23 40/6 42/8 44/5 50/5
51/9 59/8 59/14 60/5 65/6 65/9 67/9 68/24
70/6 71/1 71/4 72/16 73/12 74/19 75/19
here's [13]  9/7 12/5 12/9 16/15 16/17
38/24 39/16 42/9 42/19 46/20 49/13
63/20 69/12
hereby [1]  79/6
herring [1]  9/13
hey [1]  53/18
highly [1]  3/4
him [5]  43/4 44/11 58/5 58/6 71/23
hindsight [1]  64/16
hint [1]  52/8
his [6]  39/1 59/6 67/10 70/18 71/20
76/23
HOFFMAN [6]  1/16 2/13 4/15 59/6 67/3
67/10
hold [1]  13/15
Holding [1]  17/18
honest [1]  29/6
honestly [1]  8/21
Honor [33]  2/14 4/17 5/1 5/24 14/22
15/25 17/17 24/16 25/2 26/11 26/19
26/22 28/5 28/17 28/20 29/1 36/1 37/22
37/25 39/16 42/8 43/7 43/17 58/3 65/20
66/16 68/23 69/4 70/11 70/12 74/17
74/23 77/10
HONORABLE [2]  1/12 79/10
hope [2]  54/23 55/4
hopefully [1]  6/21
horrendous [2]  22/18 22/19
horrible [2]  38/5 42/21
hour [3]  2/5 23/11 78/8
hours [1]  72/2
house [1]  59/22
houses [2]  4/4 22/11
housing [28]  1/4 2/8 7/2 7/7 14/9 14/15
15/13 15/16 16/2 16/3 16/4 16/6 16/11
16/11 16/13 17/8 17/11 17/23 22/15
25/8 25/14 27/10 27/15 28/9 38/2 40/1
40/2 72/15
Housing's [4]  7/4 25/22 26/6 28/18
how [25]  9/6 11/24 12/5 12/9 19/22
24/11 24/19 27/3 27/4 35/1 39/25 40/1
47/14 48/14 51/12 52/18 55/14 60/5
64/14 66/8 67/16 67/16 71/12 75/9 76/8
however [1]  5/8
HUD [2]  65/3 72/13
hung [5]  6/4 23/16 27/2 27/3 71/12
hurdle [1]  34/7
hurt [1]  2/23

I

I'll [16]  3/21 4/3 5/2 6/15 7/18 12/23 20/1
22/11 30/12 45/20 67/2 70/8 70/12
70/12 75/4 77/20
I'm [28]  2/25 3/1 3/7 3/8 3/22 8/17 13/10
14/7 16/22 17/3 18/16 19/10 27/17 32/8
38/4 44/6 47/24 48/22 48/25 49/11
56/20 57/7 57/15 65/12 65/14 68/6
75/19 75/21
I've [8]  18/15 19/24 37/6 53/10 54/23
59/7 66/8 67/21
idea [2]  8/11 70/4
identifies [1]  46/9
identify [1]  60/23
ignore [1]  24/17
ignoring [3]  6/3 6/3 27/22
immediately [2]  14/10 42/10
imminent [2]  14/25 30/12
impact [1]  51/5
importance [1]  16/10
important [15]  5/14 6/3 9/22 9/22 10/3
16/2 16/9 16/9 17/10 47/15 49/13 58/22
60/4 61/22 64/24
imposed [2]  29/25 55/8
impossibility [1]  34/2
impossible [1]  11/6
impression [1]  57/4
improperly [1]  64/16
improvidently [1]  19/18
inadvertently [1]  29/3
INC [1]  1/7
incentivized [1]  3/4
incidentally [1]  45/13
inclined [1]  65/18
income [8]  6/6 7/13 15/5 20/12 40/19
50/21 56/13 57/9
inconsistency [1]  64/13
inconsistent [1]  12/12
incumbent [2]  29/12 35/6
indifferent [1]  29/23
indulge [1]  35/12
inferring [1]  27/10
information [1]  10/20 33/3
initially [2]  36/24 38/25
injunction [21]  1/12 2/10 5/3 6/2 7/1 20/3
20/8 26/5 26/13 26/14 37/16 37/17
37/24 55/20 55/21 62/7 65/16 70/15
72/20 72/23 77/1
injunctive [12]  4/2 9/6 18/11 19/1 21/2
21/5 26/23 29/5 59/4 59/13 66/4 66/22
insolvency [3]  6/16 13/1 13/13
insolvent [1]  13/2
inspection [1]  59/23
instance [7]  31/16 33/10 40/21 41/6
41/11 53/25 60/4
instances [1]  41/3
instead [3]  22/23 24/17 38/16
intellectually [1]  29/6
intended [5]  28/3 46/2 52/7 60/7 60/17
intent [2]  30/20 30/21
interest [17]  12/17 26/24 27/15 35/5
36/8 36/9 37/7 37/8 39/13 39/15 39/17
41/15 55/10 56/1 59/17 64/11 65/21
interesting [3]  10/12 26/11 36/10
interestingly [1]  30/10
interests [4]  3/12 3/17 4/11 64/3
interfere [5]  5/22 41/21
interfered [2]  41/22 72/17
interference [4]  41/8 41/10 42/8 42/14
interfering [10]  7/3 21/24 22/23 25/20
26/6 26/10 28/16 28/17 44/15 61/18
interim [1]  64/5
internal [2]  39/7 77/4
Internet [2]  75/7 75/8
interpret [2]  31/13 33/24
interpreted [1]  31/15
interpreting [1]  31/5

**I**

introduced [2]  46/9 68/6
introduction [2]  5/2 7/8
invest [4]  6/4 16/1 16/5 33/13
invested [4]  15/19 16/1 22/21 71/14
investment [3]  15/20 20/25 71/11
INVESTMENTS [1]  1/8
investor [5]  14/4 50/8 60/12 71/9 71/14
invests [1]  16/4
involved [1]  39/8 65/5 72/14
irreparable [8]  14/23 14/24 17/7 17/8
 24/6 29/17 30/6 63/23
is [280]
isn't [11]  6/12 6/15 8/14 12/8 18/21
 18/22 27/8 43/24 47/25 53/22 75/21
issuance [5]  45/13 47/16 48/8 54/17
 61/20
issue [34]  4/24 17/18 19/15 19/16 20/22
 29/10 32/12 33/4 33/9 34/14 34/25 35/8
 39/9 39/10 43/22 44/17 46/3 49/23 51/6
 51/18 51/21 51/23 51/25 52/1 52/4 52/4
 52/5 52/12 52/20 54/21 55/1 55/5 69/13
 77/24
issued [8]  45/17 45/19 46/22 46/23 47/5
 51/20 52/21 74/20
issues [18]  18/25 21/13 33/15 33/20
 35/25 38/14 38/15 39/3 44/7 44/23
 47/18 50/24 51/4 63/14 63/14 63/17
 63/18 66/17
it [251]
it's [93]
item [5]  31/19 51/7 52/13 52/14 53/21
its [29]  4/9 6/19 6/21 13/2 13/6 13/17
 14/15 14/18 15/3 15/3 15/8 18/14 22/14
 24/17 25/9 25/14 26/2 27/12 27/13
 27/16 28/16 29/21 46/2 52/7 61/14
 61/15 71/10 71/11 76/6
itself [3]  20/13 24/6 69/10

**J**

JAMES [2]  1/16 2/13
job [6]  23/6 23/24 24/1 71/10 73/21
 77/16
joint [1]  3/14
judge [7]  2/15 29/13 45/2 47/24 53/12
 64/23 72/16
judgment [2]  11/19 19/4
judgments [1]  73/20
judicial [1]  6/16
JULY [5]  1/13 2/1 10/13 73/12 79/10
July 18 [1]  10/13
jump [1]  19/1
June [10]  8/18 8/19 9/3 9/5 10/10 10/11
 14/6 14/20 28/19 55/3
June 14th [1]  55/3
June 17th [1]  9/3
June 17th if [1]  9/5
June 17th supplement [1]  8/19
June 28th [1]  10/11
June 2nd [1]  10/10
June 7th [3]  8/18 14/6 28/19
June 7th notice [1]  14/20
jury [9]  4/7 19/5 20/11 21/9 22/6 29/13
 38/7 38/11 64/17
just [42]  2/22 3/19 3/19 4/3 4/23 7/15
 11/16 12/7 15/23 17/19 18/4 18/18 20/7
 21/19 22/11 23/24 26/16 31/6 31/8
 37/21 39/2 39/6 43/15 44/10 44/24
 47/21 48/20 49/1 53/16 58/20 59/1 60/9
 63/10 63/12 67/13 69/6 69/7 75/4 76/7

**K**

keen [1]  70/3
keep [5]  15/7 15/13 23/12 23/14 76/1
KENNETH [2]  1/18 2/16
key [1]  9/7
kick [1]  72/9
kicked [2]  67/23 68/3
kicks [1]  72/6
kind [5]  22/2 57/24 59/20 65/21 77/8
knew [1]  61/7
know [47]  3/11 3/18 3/20 3/25 4/3 4/3
 4/8 4/13 8/16 8/21 8/23 8/25 20/10
 20/18 20/19 20/19 21/12 22/1 22/10
 22/18 23/13 25/5 26/23 31/18 32/25
 42/16 44/17 48/14 49/20 51/12 53/6
 53/9 56/24 58/22 59/1 59/2 59/7 59/10
 59/14 59/19 62/6 64/14 65/12 66/11
 69/7 72/2 74/24
knowing [1]  41/24
knowingly [1]  42/2
knowledge [1]  61/8
known [2]  71/21 71/22
knows [1]  39/22

**L**

lack [4]  9/24 41/9 49/4 76/20
language [2]  5/5 11/16
last [12]  2/21 9/2 10/18 16/24 16/24
 25/25 26/3 30/13 69/13 69/14 69/17
 69/18
latches [1]  33/9
late [1]  17/2
later [7]  9/5 11/9 19/19 21/15 21/16 34/5
 69/18
law [16]  5/10 5/15 10/23 12/3 12/4 12/4
 15/10 16/5 22/3 27/4 27/5 41/9 59/13
 63/16 69/17 69/23
lawsuit [12]  6/16 8/12 8/23 12/13 12/14
 12/20 23/2 32/20 34/16 63/4 63/7 63/22
lean [1]  27/23
least [6]  3/6 7/12 8/15 19/16 33/2 44/1
leave [4]  3/13 10/25 67/2 69/6
left [2]  8/6 47/17
left-hand [1]  8/6
legal [5]  20/22 29/25 30/4 62/4 70/25
lender [1]  8/3
let [22]  2/22 3/20 4/6 4/9 4/13 18/21
 22/11 22/12 22/13 22/13 22/14 25/22
 37/15 43/10 48/20 63/25 63/25 64/2
 64/15 69/9 73/23 77/14
let's [12]  4/6 4/9 14/23 17/7 20/23 20/24
 31/17 31/17 55/19 60/9 71/6 76/23
lets [1]  23/14
letter [7]  10/16 14/7 35/22 35/22 59/18
 72/10 72/13
letting [2]  18/20 27/15
level [2]  66/6 69/17
leverage [1]  37/11
liable [1]  21/9
liberty [1]  5/18
lien [31]  6/14 11/4 11/5 11/7 11/11 11/14
 11/15 11/17 11/20 11/24 12/5 12/3
 12/4 12/5 12/6 12/8 12/11 12/15 13/5
 20/20 24/13 27/24 31/11 43/13 61/12
 63/3 63/3 63/7 70/25 73/17 74/22
liens [2]  27/25 74/9
light [1]  40/8
lightly [1]  5/22

**77/24 78/5**

like [18]  2/21 4/15 4/16 7/8 17/19 18/4
 20/7 21/2 25/2 26/9 30/18 39/25 45/14
 55/11 69/5 71/11 72/20 77/2
likelihood [14]  7/9 19/3 20/15 20/17 22/7
 26/15 29/17 33/16 33/22 38/13 38/14
 38/16 39/10 65/14
likely [4]  17/2 17/3 29/24 71/2
limited [23]  20/13 21/20 22/24 23/15
 23/18 23/21 23/22 24/17 37/6 38/25
 39/2 39/6 40/10 41/20 61/19 62/23 63/8
 71/8 71/9 71/9 71/10 71/15 71/18
line [2]  19/4 38/7
list [5]  7/15 31/19 46/20 47/17 71/17
listed [1]  18/15
listening [1]  48/25
lists [1]  49/2
litigate [1]  50/15
litigation [3]  35/13 38/23 48/18
little [5]  13/9 34/21 44/20 59/24 68/14
live [2]  3/15 37/19
living [1]  53/3
LLC [2]  1/7 2/9
loan [46]  6/11 9/18 10/6 11/1 11/3 11/6
 14/1 14/3 20/13 20/19 21/1 23/1 32/13
 35/14 35/16 35/19 35/24 36/5 36/6
 36/16 36/25 37/1 37/1 38/22 42/6 42/18
 50/9 54/25 55/7 58/16 58/17 60/23
 60/24 61/2 61/7 61/9 61/18 61/20 61/23
 62/3 70/22 73/6 75/20 75/20 75/21
 76/18
loans [2]  39/3 58/23
logic [1]  47/23
logical [1]  11/21
long [2]  48/4 70/23
longer [2]  13/15 62/16
look [22]  9/1 10/15 26/12 36/7 36/9
 44/25 45/3 45/4 45/10 46/8 49/15 50/18
 51/11 52/4 52/4 54/20 55/5 60/4 73/1
 74/8 74/23 76/12
looked [1]  58/9
looking [4]  37/6 37/8 49/14 69/12
looks [2]  55/11 55/20
loose [1]  57/18
lose [9]  14/5 21/2 21/3 21/4 21/5 22/14
 52/20 56/13 57/6
loses [1]  16/25
losing [2]  17/5 17/5
loss [2]  15/1 64/22
lost [2]  16/14 22/9
lot [6]  3/18 9/7 55/10 59/11 63/17 68/3
love [1]  24/7
low [9]  14/15 15/13 15/16 16/2 16/3 16/4
 16/6 16/11 16/13
low-income [6]  14/15 15/13 16/2 16/3
 16/6 16/11
low-income-housing [2]  15/16 16/13
LTD [1]  1/8
Lucero [1]  15/1
LUNDBURG [2]  1/19 2/16

**M**

mad [2]  77/25 78/2
made [9]  3/2 15/20 21/19 31/6 38/8
 40/14 48/17 64/18 66/12
maintain [3]  37/18 65/6 65/6
make [17]  2/20 2/21 3/1 10/25 11/21
 13/1 15/19 16/21 17/21 21/1 35/1 37/20
 60/19 63/12 64/2 64/3 64/18
makes [1]  9/4
making [2]  16/8 19/7 58/19

## M

manage [3]  17/21 39/25 67/18
managed [1]  40/1
management [2]  25/22 66/2
mandatory [3]  26/5 26/13 26/13
manner [1]  41/21
many [2]  3/2 38/20
March [4]  46/10 46/10 46/16 48/4
March 1st [1]  46/10
March 1st of [1]  48/4
March 2016 [1]  46/16
March 30 [1]  46/10
Marketing [1]  5/12
material [3]  26/18 52/18 73/2
materiality [2]  48/9 52/18
matter [14]  8/24 9/20 16/17 19/1 22/2
 26/13 29/8 32/21 33/21 48/9 51/22 53/3
 63/16 72/23
matters [7]  8/21 8/23 9/1 9/6 40/18
 40/19 53/3
matured [1]  10/8
maturity [1]  9/17
may [17]  4/18 8/17 9/18 10/7 10/8 16/21
 28/23 29/1 29/24 32/24 44/7 47/21
 50/21 51/3 55/18 75/1 78/2
May 23 [2]  9/18 10/8
Maybe [3]  69/6 69/6 69/7
MBS [2]  50/8 60/12
me [28]  2/22 2/24 4/13 16/8 18/21 31/7
 31/18 31/18 32/3 33/2 37/15 38/22
 43/10 45/19 46/11 48/20 57/2 57/14
 58/22 58/24 60/1 64/15 68/14 68/19
 69/5 77/6 77/14 77/19
mean [9]  18/21 19/6 20/7 22/10 45/10
 45/17 49/25 50/5 54/11
means [9]  3/5 11/12 31/24 43/11 46/1
 53/1 53/6 54/12 76/10
mechanic's [11]  6/14 11/4 11/5 11/7
 11/11 12/4 12/15 20/20 24/13 70/25
 73/17
mechanical [1]  1/22
mechanics [1]  13/4
mediate [1]  72/3
mediation [2]  72/1 72/1
mediator [1]  71/24
meet [3]  4/2 47/3 59/13
men [1]  5/17
mention [3]  2/23 17/10 24/10
mentioned [1]  9/2 13/24
mere [1]  47/24
merely [2]  12/4 75/5
Merit [1]  79/4
merits [6]  7/9 19/3 20/15 21/6 22/7
 26/16
mess [1]  19/25
met [8]  4/5 20/14 20/23 29/5 29/16
 29/21 55/13 66/22
microphone [1]  44/13
middle [1]  34/10
might [6]  11/9 16/21 59/11 59/12 60/2
 69/5
MILLICENT [2]  1/19 2/16
million [43]  6/4 6/12 6/21 7/12 7/12 11/5
 11/12 12/16 12/19 13/4 13/4 14/3 15/7
 21/1 21/3 21/8 21/10 22/21 22/22 22/23
 22/24 23/1 23/3 24/12 31/19 36/3 36/6
 36/14 37/4 37/12 42/11 42/18 42/22
 65/23 65/25 65/25 66/6 70/22 70/24
 71/14 76/24 76/25 77/2
millions [3]  24/18 39/18 76/23

mind [7]  29/9 31/8 35/17 44/8 44/10
 44/11 44/12 44/16
minimal [1]  65/19
mismanaged [1]  62/24
mismanagement [2]  62/18 63/2
misreading [1]  27/23
misused [1]  21/20
moment [5]  6/15 16/24 25/3 38/12 45/2
Monday [1]  67/8
monetary [4]  4/8 66/24 67/1 69/9
money [34]  11/13 15/19 15/20 15/23
 15/23 15/24 16/15 16/24 17/14 17/24
 17/24 23/4 23/12 23/19 24/4 24/10
 24/12 24/24 27/14 31/9 33/3 34/12
 34/18 37/2 38/1 38/5 62/20 62/22 63/22
 65/9 70/21 71/16 76/17
month [1]  9/5
months [2]  11/9 43/5
months' [1]  36/24
moot [1]  10/3
more [21]  5/16 10/25 13/24 13/24 15/8
 15/15 23/4 26/22 26/23 28/10 37/2 44/6
 53/20 54/6 62/22 68/3 68/14 71/2 74/14
 74/14 77/15
Moreover [1]  47/15
mortgage [1]  14/3
most [2]  31/14 63/20
motions [2]  5/1 5/3
mouth [1]  34/14
move [2]  12/23 15/4
moving [6]  3/18 7/8 14/22 15/5 40/9 55/6
Mr [3]  28/25 72/6 73/8
Mr. [48]  4/15 4/16 10/16 19/21 28/22
 28/25 32/11 34/19 35/14 35/22 36/11
 36/20 38/17 38/24 39/11 40/16 42/25
 43/3 44/18 50/6 55/3 55/4 55/5 56/6
 57/23 59/6 59/10 61/6 65/23 65/23
 66/18 67/3 67/10 70/17 71/17 71/20
 72/6 72/10 72/20 73/1 73/4 73/5 73/5
 73/9 75/15 76/22 77/3 77/6
Mr. Bookhout [2]  4/16 35/22
Mr. Chaiken [10]  10/16 19/21 28/22
 28/25 72/6 72/10 73/1 75/15 76/22 77/3
Mr. Chaiken's [1]  72/20
Mr. Connolly [1]  55/3
Mr. Hasselwander [13]  32/11 34/19
 35/14 36/11 36/20 38/17 38/24 39/11
 40/16 42/25 43/3 73/4 73/5
Mr. Hoffman [4]  4/15 59/6 67/3 67/10
Mr. Rhea [2]  59/10 66/18
Mr. Rogers [2]  73/5 73/9
Mr. Stanley [13]  44/18 50/6 55/4 55/5
 56/6 57/23 61/6 65/23 65/23 70/17
 71/17 71/20 77/6
much [6]  22/8 53/7 70/9 77/13 78/3 78/6
multiple [1]  49/20
must [1]  22/17
mutual [1]  71/3
my [19]  3/15 3/20 4/19 8/14 8/20 16/11
 47/23 48/22 49/10 55/12 55/12 56/9
 56/17 57/4 65/17 68/19 77/24 79/5 79/9

## N

N.A [2]  1/3 2/7
nature [1]  42/20
near [1]  44/13
necessary [3]  23/10 23/11 50/21
need [14]  26/20 26/20 44/3 44/13 51/4
 52/3 58/24 63/9 68/13 68/14 71/4 74/1
 71/10 78/1

needed [1]  26/20
needless [1]  40/20
negotiated [1]  53/4
neither [4]  3/10 4/1 29/21 66/21
nervous [3]  59/24 59/25 60/3
never [18]  8/1 9/14 9/23 9/25 24/4 30/3
 30/4 30/6 34/7 35/17 39/3 49/4 50/4
 51/21 58/1 58/11 65/8 76/13
new [2]  7/4 14/14
next [3]  15/12 22/12 50/22
ninety [2]  14/6 14/8
no [58]  1/6 2/23 3/19 6/11 6/12 6/20
 7/10 10/5 10/5 11/1 12/20 12/21 13/7
 14/18 19/5 19/13 19/15 19/20 20/18
 23/2 23/17 23/17 24/14 25/12 27/11
 33/4 34/15 34/22 35/16 36/17 39/24
 40/15 43/19 44/2 44/10 47/8 47/11 48/2
 48/6 48/6 49/7 49/11 49/17 49/18 51/10
 51/13 51/15 62/15 62/23 63/1 63/10
 63/10 63/10 69/21 70/21 70/23 71/9
 72/3
nobody [8]  29/5 30/13 30/13 51/16
 51/17 52/19 58/20 69/5
none [2]  24/25 71/1
nonpayment [1]  60/12
normally [1]  16/23
not [137]  21/1 21/9 21/10 58/14 65/24
 65/24 66/12
note [7]  21/1 21/9 21/10 58/14 65/24
 65/24 66/12
notes [3]  56/10 57/10 58/4
nothing [6]  23/8 27/8 28/11 70/7 70/19
 77/15
notice [17]  9/3 9/4 10/9 10/21 13/16
 13/20 14/6 14/20 15/10 16/16 16/22
 17/2 26/1 28/10 30/12 35/7 56/21
notified [1]  32/9
notify [3]  34/23 34/25
notwithstanding [1]  65/7
now [27]  3/16 4/10 6/17 6/18 8/4 10/22
 14/10 14/22 15/9 17/7 17/25 19/6 20/21
 21/24 29/9 30/2 31/2 36/13 38/9 45/8
 48/18 55/18 62/21 64/1 64/10 67/22
 74/23
nowhere [2]  11/22 52/7
number [10]  10/4 10/6 27/22 47/21 48/1
 48/2 49/3 51/24 55/17
numbers [2]  65/21 66/3
numerous [4]  6/8 25/8 25/13 39/7

## O

o'clock [1]  68/11
OAK [3]  1/7 1/7 2/8
oath [2]  22/4 70/18
obligated [1]  71/18
obligation [14]  42/24 44/21 44/23 48/11
 50/19 53/12 53/21 53/22 53/23 60/17
 60/17 60/19 62/4 67/13
obligations [3]  14/18 44/21 50/16
obtain [1]  30/20
obvious [3]  30/20 42/20
obviously [3]  3/2 10/6 20/2
OCC [2]  15/6 16/18
occasions [2]  38/20 40/25
occupancy [1]  52/10
occupied [2]  43/8 52/9
occur [4]  19/15 54/10 54/13 75/16
occurred [11]  2/24 5/6 5/7 28/11 28/18
 29/14 32/15 38/16 40/7 57/1 65/8
occurrence [1]  28/9
occurs [1]  18/3

## O

oddly [1] 30/3
off [5] 10/10 22/10 67/23 68/3 75/7
offered [1] 35/22
OFFICIAL [2] 1/24 79/5
oh [5] 13/10 30/17 36/16 53/2 56/23
okay [27] 7/18 11/23 45/6 45/20 47/24
48/3 49/12 49/22 50/11 53/12 53/19
59/9 60/5 60/22 62/9 63/3 63/13 65/17
65/18 66/2 67/12 69/1 69/4 69/5 69/14
69/25 75/20
old [1] 7/21
once [6] 10/20 23/13 28/22 58/9 62/4
76/14
one [58] 3/16 3/22 4/4 5/4 5/4 5/16 6/8
6/11 7/2 8/5 8/7 10/4 10/6 10/25 11/24
18/25 20/2 22/5 24/13 26/19 26/20
26/22 27/11 28/10 31/17 33/17 33/17
39/25 41/19 44/20 47/7 47/21 48/1 49/8
49/23 50/9 51/24 52/2 54/7 55/17 57/25
58/20 60/16 61/10 63/12 65/15 66/13
67/2 67/14 68/9 71/23 73/8 73/12 74/21
75/11 75/15 75/18 76/5
ongoing [1] 6/17
only [30] 7/1 7/4 7/5 7/6 13/23 15/10
15/25 16/12 26/19 33/17 36/21 42/16
49/10 52/12 53/17 55/18 55/22 61/3
61/6 61/8 61/8 62/15 63/23 64/10 64/11
66/7 67/2 69/23 72/9 74/7
open [2] 2/4 53/21
opening [5] 55/12 55/12 59/6
operate [4] 17/21 25/1 25/23 60/21
operation [1] 5/9
operative [1] 19/13
opportunities [1] 28/12
opportunity [6] 16/13 30/15 32/13 36/16
38/11 43/20
opposed [1] 27/24
opposite [2] 12/11 56/17
options [1] 14/18
Oracle [9] 17/18 17/19 17/20 18/1 18/2
20/7 24/5 24/7 26/12
order [8] 6/21 29/19 41/13 47/3 60/21
70/14 72/25 77/24
original [45] 5/8 6/9 6/19 7/3 8/4 11/2
11/13 12/22 13/16 14/12 14/13 14/16
14/21 17/15 18/14 19/8 22/22 23/5
24/22 25/15 25/19 26/6 26/9 27/9 27/12
27/20 28/11 28/15 28/16 36/12 39/18
41/12 46/14 48/13 50/16 55/9 55/23
60/19 61/14 62/19 68/8 70/19 71/5
75/14 76/6
originally [1] 42/6
other [30] 2/17 6/1 14/19 16/15 17/1
25/7 26/9 27/9 31/18 36/19 36/25 37/17
37/20 40/25 41/3 41/21 42/11 49/8
49/21 49/23 54/24 57/16 57/17 58/21
59/6 67/2 67/24 69/9 77/9 77/10
others [1] 2/9
our [15] 2/21 5/12 10/11 18/4 23/23 26/2
36/19 44/22 57/9 62/16 64/1 64/3 64/11
72/25 73/22
ours [1] 17/4
oust [1] 62/7
ousted [1] 69/15
out [37] 9/12 10/9 12/6 13/15 19/19
21/16 22/1 25/22 26/3 32/18 32/22
34/13 36/6 36/7 36/9 37/7 37/8 39/2
46/3 47/9 51/4 52/25 59/10 60/1 60/8
60/23 60/25 64/6 64/7 65/13 65/14 66/1
69/9 69/10 72/6 72/9 76/18
69/1 72/20 72/16 73/3
outcome [1] 71/21
outside [2] 25/1 76/16
outstanding [1] 33/20 58/23
over [13] 7/21 18/6 23/9 34/7 34/11 36/3
44/5 47/17 54/16 62/23 69/24 71/11
77/16
overall [1] 59/8
overstate [1] 16/8
owe [1] 15/24
owed [2] 34/12 42/22
owing [1] 60/13
own [5] 11/13 28/16 36/15 37/11 37/12
owner [3] 15/12 46/5 46/14
ownership [1] 30/8

## P

p.m [5] 1/13 2/5 67/4 68/11 78/8
page [12] 44/20 50/18 50/18 50/20
50/22 52/25 53/16 58/3 58/13 58/13
74/6 74/18
Page 41 [1] 50/20
Page 42 [3] 44/20 50/18 53/16
Page 54 [2] 58/3 58/13
Page 7 [2] 74/6 74/18
pages [1] 79/8
paid [2] 3/9 42/24
Pamela [4] 1/24 79/3 79/18 79/18
papers [1] 55/20
paragraph [1] 50/19
paramount [2] 5/15 5/21
parentheses [1] 43/14
part [6] 21/5 25/4 44/22 48/20 50/1
61/25
partial [1] 55/18
partially [1] 15/25
particular [9] 33/20 33/23 36/9 40/16
51/23 52/16 53/25 55/6 60/3
parties [19] 2/4 2/17 7/5 27/5 27/19 28/6
28/8 28/15 29/11 29/23 46/4 48/17 53/4
53/24 59/16 59/17 69/13 71/25 72/13
parties' [3] 25/4 25/7 25/18
partner [68] 5/8 6/19 7/3 8/4 14/18 15/17
17/15 19/8 19/9 19/24 21/21 21/21
21/23 22/24 23/15 23/18 23/21 23/22
23/23 24/17 25/9 25/16 25/19 25/21
26/7 27/7 27/20 28/9 28/12 36/4 36/15
37/6 37/13 38/22 39/1 39/2 39/6 39/8
41/13 41/20 46/14 48/13 50/17 50/20
50/23 55/9 55/23 56/9 60/19 61/14
62/12 62/19 62/21 64/8 67/22 68/2 68/8
71/5 71/8 71/9 71/9 71/10 71/15 71/18
72/8 72/12 72/15 72/17
partners [6] 37/11 40/10 61/19 62/16
62/24 69/24
partners' [1] 14/14
partnership [106]
partnership's [1] 17/16
partnerships [1] 23/9
parts [1] 3/18
party [19] 5/4 5/4 18/8 18/12 24/8 29/16
29/21 30/8 37/20 37/24 41/22 47/2
51/21 55/17 64/6 66/22 69/2 69/20
75/10
passed [1] 43/24
past [5] 2/23 25/17 40/1 69/3 69/22
pay [11] 13/2 13/6 36/5 36/6 36/12
36/14 37/4 50/14 57/10 76/24 77/19
payable [1] 56/10
paying [1] 42/13
Payment [1] 12/18
peace [2] 69/2 69/2
peaceful [1] 5/9
pending [1] 66/17
penetration [1] 7/23
people [9] 3/3 26/2 53/2 65/1 65/2 65/3
65/3 69/7 77/17
percent [1] 12/17
perfect [1] 20/4
perfected [1] 61/18
perform [3] 16/23 60/15 72/11
perhaps [2] 31/16 63/20
perilous [1] 14/13
period [2] 32/18 50/25
permanent [4] 8/3 43/21 70/22 73/6
permit [1] 27/24
permits [1] 7/1
permitted [2] 11/25 72/11
person [2] 61/6 61/8
Personally [1] 20/16
perspective [1] 4/14
phase [1] 19/4
pick [2] 31/17 31/17
pile [1] 13/23
piled [1] 13/25
PITMAN [2] 1/12 79/11
place [6] 6/20 10/24 13/19 23/6 42/15
62/1
placed [1] 14/12
places [1] 74/3
plaintiff [11] 1/16 30/3 30/14 31/12 32/5
32/10 33/8 34/13 35/25 39/10 41/19
plaintiff's [1] 30/11
plaintiffs [4] 1/5 2/14 14/23 30/24
plan [7] 6/20 6/24 23/2 23/6 28/14 59/19
59/20
plans [8] 47/20 47/22 48/1 48/7 74/8
74/10 74/12 74/16
played [1] 75/14
please [4] 2/12 4/18 5/2 70/10
pledge [2] 23/25 68/10
pledged [1] 22/4
plenty [1] 30/14
plus [1] 12/17
PNC [33] 1/3 2/7 13/15 13/16 13/18
13/19 14/19 16/3 16/4 16/7 16/15 16/17
16/19 16/19 17/8 17/11 24/16 25/24
26/17 27/14 36/4 37/3 37/8 37/13 39/6
39/23 55/8 60/9 60/16 61/15 76/6 76/22
77/5
point [33] 3/6 4/18 6/7 9/7 10/3 10/25
13/23 16/12 19/12 21/11 26/11 32/21
33/1 34/25 35/1 35/6 35/10 36/22 42/10
44/20 45/24 55/11 61/19 62/25 63/12
63/13 64/19 66/16 68/20 69/3 69/21
74/14 77/14
pointed [2] 32/18 59/10
policy [5] 5/15 5/15 5/17 5/21 22/17
position [15] 3/1 3/11 21/20 24/23 32/2
34/15 38/18 50/3 52/9 57/24 61/10 67/5
68/14 68/16 77/18
possibility [3] 4/1 4/12 24/2
possible [2] 23/25 69/11
poster [1] 37/9
posting [3] 10/18 11/10 65/19
postmaturity [1] 15/7
potential [2] 30/5 72/22
pox [2] 4/3 22/11
practical [2] 16/17 22/2

**P**

practicality [2]  20/24 20/24
practice [1]  46/18
pray [2]  22/15 77/1
precisely [5]  47/14 48/12 51/9 52/14
  70/5
predevelopment [1]  58/17
preferring [2]  6/20 6/22
preliminary [4]  1/12 2/9 6/25 20/3
premise [1]  30/11
prepared [2]  35/23 77/17
prepares [1]  47/8
prerogative [1]  70/8
present [3]  2/4 44/3 79/6
presented [3]  38/25 39/5 51/17
preside [1]  77/16
presumably [2]  15/19 21/11 53/4
presume [1]  62/17
presumption [1]  50/2
pretending [1]  27/12
pretty [6]  20/6 33/1 33/1 33/2 52/16
  75/22
prevented [2]  32/6 67/16
preventing [1]  67/15
pricing [2]  9/10 10/2
prior [3]  3/6 50/24 69/19
probably [4]  3/19 4/11 53/23 66/23
problem [8]  16/15 38/11 38/24 40/20
  42/17 42/17 48/3 53/22
problems [8]  17/16 18/19 18/20 22/5
  24/10 24/15 24/18 67/5
proceed [1]  29/1
proceeded [1]  33/12
proceeding [1]  55/21
proceedings [5]  1/22 2/3 77/16 79/7 79/9
process [2]  37/9 41/12
produce [1]  12/11
produced [1]  1/22
program [1]  33/13
project [27]  11/5 14/14 14/15 31/21
  33/14 38/3 39/25 40/4 40/5 43/7 43/8
  43/9 43/12 43/24 45/9 45/18 46/1 46/21
  47/20 48/10 52/6 52/18 64/25 65/1
  73/12 74/20 75/15
projects [2]  40/1 40/2
promise [1]  12/24
promote [1]  16/3
prompt [2]  12/18 77/22
promptly [2]  44/22 50/20
prongs [1]  49/20
proof [7]  9/25 29/17 48/2 49/7 49/22
  52/8 63/1
proper [1]  52/4
property [11]  7/7 12/9 15/11 17/1 22/14
  25/22 25/23 26/2 31/9 67/24 68/4
proposal [1]  46/3
proposed [1]  46/6
proposing [3]  31/12 46/19 47/9
protect [2]  62/15 64/10
protections [2]  6/5 71/15
protests [1]  11/8
prove [6]  26/16 38/12 38/15 49/21 51/19
  51/20
proved [1]  60/13
proven [5]  23/5 33/16 48/6 49/12 51/21
provision [13]  31/25 33/9 33/12 34/1
  42/3 43/25 44/19 45/2 51/2 53/16 53/18
  54/6 58/19
provisions [2]  33/25 53/13
prudent [1]  14/4

public [7]  5/15 5/15 5/17 5/21 22/17
  26/2 26/2 26/3
pull [2]  8/5 75/7
pulling [1]  41/6
punch [4]  7/15 31/19 46/20 47/17
punch-list [1]  31/19
punitively [2]  55/8 55/9
purely [1]  72/23
purpose [4]  14/5 17/3 45/11 52/7
purposes [3]  46/2 60/6 62/9
pursuant [1]  58/23
pursue [3]  12/25 50/24 60/24
pursuing [1]  10/23
put [18]  3/1 5/24 11/12 23/4 24/12 24/13
  24/23 35/7 46/3 54/9 61/15 62/20 62/22
  64/12 66/1 72/25 76/25 77/1
putting [5]  6/19 8/5 22/3 23/12 27/22

**Q**

qualify [1]  17/3
quantity [1]  12/17
question [15]  8/20 13/15 17/20 19/10
  19/11 24/3 29/4 29/15 32/5 45/9 51/16
  54/22 65/11 69/4 77/10
questioning [1]  58/6
questions [3]  4/23 28/23 66/12
quickly [1]  72/9
quite [3]  29/24 40/5 66/18
quo [10]  25/2 25/6 25/17 25/18 25/20
  25/25 69/13 69/15 69/18 69/19
quote [4]  5/11 5/16 36/23 36/23
quoting [1]  29/8

**R**

raise [3]  8/12 39/8 55/16
raised [9]  4/19 4/23 8/16 8/17 8/18 8/22
  29/15 35/25 55/12
rather [8]  6/22 11/11 31/7 34/14 36/3
  36/7 40/8 50/13
read [3]  17/19 77/5 77/6
reads [2]  24/19 24/20
ready [1]  61/17
real [4]  17/4 17/18 51/23 70/3
reality [4]  37/24 37/24 39/24 42/19
really [13]  6/10 16/24 30/2 39/17 45/5
  46/1 51/22 59/7 59/8 63/21 63/24 71/1
  71/24
Realtime [1]  79/5
reason [9]  14/5 15/17 17/6 30/19 30/19
  55/17 59/5 60/10 64/24
reasonable [2]  66/7 69/10
reasons [1]  18/10
recall [5]  36/24 38/18 44/18 50/6 55/4
receipt [3]  49/3 49/5 51/13
received [2]  51/16 51/17
receiver [12]  6/15 6/16 12/25 13/1 68/25
  70/13 70/19 70/24 70/25 71/3 71/7
  71/19
receivership [9]  12/24 69/23 70/4 70/5
  70/13 70/16 70/21 70/22 71/22
receiving [1]  16/16
recitation [1]  38/17
record [3]  2/12 19/2 79/9
recorded [2]  1/22 79/6
records [1]  10/15
recover [2]  34/18 72/22
red [1]  9/12
reduced [1]  79/7
refer [1]  45/1
referring [1]  55/2

reflected [1]  39/5
reflecting [1]  39/20
refused [3]  32/19 39/16 48/16
regain [1]  65/8
regard [8]  19/14 21/14 29/5 29/16 36/21
  46/15 51/25 61/9
regarding [3]  43/4 49/7 72/18
regardless [1]  31/10
Registered [1]  79/4
regulations [1]  16/18
rehabilitation [1]  43/12
reiterate [1]  2/22
related [3]  3/23 50/24 61/14
relationship [4]  3/6 25/4 65/3 65/4
relevant [1]  33/20
reliance [1]  33/11
relief [15]  4/2 9/6 18/11 19/1 19/19 21/2
  21/5 21/12 26/23 29/5 59/4 66/4 66/22
  66/24 67/1
relinquish [2]  57/21 57/22
relinquishment [3]  55/25 56/1 57/21
relish [1]  38/10
rely [4]  30/25 33/12 34/24 43/4
remainder [1]  8/19
remained [1]  11/7
remaining [1]  16/11
remains [4]  11/9 12/20 46/21 51/6
remarks [2]  59/6 66/14
remedial [1]  63/16
remediate [1]  48/13
remediated [2]  53/24 53/25
remediation [3]  44/22 50/24 51/7
remedied [1]  51/4
remedies [2]  10/23 15/3
remedy [3]  17/12 25/9 25/14
remember [4]  26/19 58/6 72/18 75/21
removal [15]  5/7 6/9 9/4 9/4 13/17 13/21
  14/6 14/20 20/5 26/1 28/10 55/23
  55/24 56/21 57/19
remove [4]  17/14 25/15 57/9 76/6
removed [1]  55/9
removing [1]  25/9
RENE [2]  1/8 2/18
repaid [1]  66/1
repeat [1]  18/16
reply [2]  10/11 10/17
report [1]  74/11
REPORTER [5]  1/24 79/4 79/4 79/5
  79/5
reports [2]  7/21 74/9
represent [1]  29/20
represented [3]  28/6 40/17 46/14
repurchase [5]  39/13 39/14 56/22 64/3
  64/11
reputation [3]  65/5 65/6 65/8
request [4]  6/14 26/5 56/22 59/4
requested [1]  9/9
require [5]  8/3 20/4 27/25 39/17 65/19
required [9]  10/22 15/12 16/5 27/9 36/14
  52/22 54/7 61/11 74/4
requirement [1]  41/25
requirements [1]  76/5
requires [4]  5/17 13/18 15/10 40/17
reserve [5]  11/1 12/20 12/21 24/13 61/3
reserves [1]  13/7
resolution [2]  70/1 77/23
resolve [6]  33/19 35/18 36/16 60/2 60/18
  70/2
resolved [3]  4/8 35/15 35/19
resolving [1]  40/9

R
resources [5]  3/5 18/7 18/12 24/8 24/9
respectfully [1]  53/17
respective [1]  3/12
respond [1]  66/14
response [2]  10/12 48/21
responsibilities [1]  23/18
responsibility [2]  14/16 71/10
restore [1]  25/24
result [4]  8/1 26/25 31/3 31/5
results [1]  31/14
reviewed [1]  76/3
rewrite [1]  6/2 27/21
rewriting [1]  24/23
RHEA [4]  1/18 2/16 59/10 66/18
rhetorical [1]  7/16
right [44]  3/16 3/17 5/4 6/17 7/15 7/16
 8/15 13/14 17/11 17/14 17/21 17/23
 18/17 19/25 20/3 20/4 20/6 20/6 21/4
 21/7 21/16 21/17 22/18 26/7 35/20
 37/17 37/21 38/7 38/9 43/10 48/24
 55/22 56/8 57/10 57/25 60/16 61/3 68/1
 69/25 72/8 73/18 73/24 76/6 76/7
rights [18]  19/8 19/23 27/13 27/13 27/16
 40/23 55/25 56/4 56/5 56/13 56/14 57/6
 57/9 57/18 57/21 57/22 58/23 76/9
risk [3]  13/17 61/13 61/15
RMR [1]  1/24 79/18
road [2]  20/11 24/11 70/15
Rob [2]  2/13 22/19
ROBERT [3]  1/12 1/16 79/11
Rogers [2]  73/5 73/9
role [6]  7/4 23/23 24/17 25/20 26/8
 28/18
room [3]  3/3 16/9 72/5
RP [1]  1/6
rule [1]  3/21
ruling [3]  23/20 23/22 78/4
run [4]  4/9 26/2 34/12 65/2
running [2]  23/9 23/14 58/2
rush [2]  13/20 13/20

S
s/Pamela [1]  79/18
sabotage [3]  30/25 31/1 31/20
sacred [1]  5/20
said [47]  17/3 20/24 26/12 33/18 34/16
 34/19 36/5 36/20 37/21 41/9 43/11
 43/15 44/20 45/6 46/11 51/10 53/5 53/6
 54/25 56/15 56/17 56/18 56/22 57/3
 57/4 57/12 57/15 57/15 58/8 58/20 60/3
 60/18 62/18 63/11 64/17 65/23 65/23
 67/12 67/25 69/14 70/3 70/17 72/14
 73/9 73/11 74/15 77/21
same [15]  16/18 16/19 17/18 17/20 18/4
 19/6 20/9 26/17 39/20 45/9 48/11 50/17
 73/9 74/13 79/7
SAN [1]  1/25
sand [1]  6/20
sat [1]  32/17
satisfaction [1]  4/25
satisfied [2]  6/9 55/1
satisfying [1]  15/6
save [3]  7/6 7/7 14/19
saw [1]  8/4
say [54]  4/3 8/25 9/11 11/11 11/17 11/22
 11/23 12/2 12/5 12/6 12/10 12/11 12/25
 19/2 19/16 22/12 29/4 30/16 33/3 34/22
 35/11 35/17 36/16 37/3 41/19 43/17
 45/15 46/19 47/3 51/12 51/18 53/2

60/22 62/5 62/14 62/17 63/8 63/10
64/20 66/20 66/24 67/6 67/7 67/9
68/13 69/7 69/20 70/8 70/17 71/11
73/18 76/1 76/12 77/14
saying [22]  19/10 22/10 38/4 40/23 41/2
 43/4 45/5 47/24 48/16 49/11 53/6 55/16
 56/25 57/16 62/11 63/25 64/9 67/10
 68/6 71/1 72/10 74/15
says [27]  5/14 5/16 6/11 8/7 8/7 11/13
 11/17 18/1 22/17 24/5 24/7 43/15 47/4
 47/9 49/5 50/20 50/23 53/9 57/22 69/17
 72/6 72/16 73/1 73/5 74/11 74/12 76/22
scenario [2]  9/2 54/4
scope [1]  21/12
second [12]  4/19 9/8 9/9 9/12 9/16 10/1
 16/24 18/6 20/2 22/3 44/17 74/21
Secondly [1]  32/17
Section [2]  56/1 57/22
secure [2]  30/15 61/16
see [13]  4/6 4/9 9/6 10/20 19/10 19/22
 37/19 49/15 58/14 61/20 75/9 76/13
 76/23
seek [4]  5/5 21/13 44/22 77/22
seeking [5]  9/6 12/15 19/19 59/3 63/16
seeks [2]  5/8 27/21
seem [1]  3/4
seems [4]  6/19 55/10 55/15 69/4
seen [1]  67/14
segment [2]  17/19 22/13
self [4]  4/6 14/9 21/14 36/4
self-deal [1]  36/4
self-dealing [1]  21/14
self-effectuating [1]  14/9
self-executing [1]  4/6
seller [5]  21/9 21/10 58/4 58/14 58/16
seller's [1]  21/1
selling [1]  15/11
sells [1]  15/12
sends [1]  47/8
sense [4]  3/9 11/21 13/1 23/4
sent [6]  10/9 13/16 14/6 72/9 72/10
 72/13
sentence [1]  54/9
serious [2]  4/23 27/17
served [1]  27/15
serving [1]  26/24
SESSION [1]  2/1
set [6]  10/10 11/1 11/2 13/7 41/12 52/25
settled [1]  6/18
several [2]  11/18 74/3
severity [1]  65/16
shall [6]  5/18 5/20 5/20 50/20 54/10
 54/13
shape [1]  22/8
ship [1]  37/18
Shorthand [1]  79/3
shot [1]  31/18
should [9]  24/17 28/17 32/25 42/19
 42/24 46/23 65/19 66/23 72/7
shouldn't [2]  19/20 41/3
show [2]  61/6 67/17
showing [2]  20/14 26/15
shown [2]  24/14 54/16
shy [1]  23/13
side [3]  6/1 18/22 37/20
sides [1]  34/14
sign [1]  46/25
signatures [2]  75/10 75/11
signed [16]  6/12 8/2 8/6 8/8 9/10 10/5
 25/25 33/18 45/15 45/15 46/17 46/24

47/3 47/11 49/4 77/25
signing [2]  8/23 46/2
simply [10]  30/16 31/3 31/14 33/17 36/1
 37/8 38/17 39/10 40/10 41/7
since [4]  3/24 9/5 75/13 75/15
single [1]  14/5
sinister [1]  42/20
sir [1]  58/7
sit [4]  7/21 11/18 39/20 59/14
situation [18]  14/13 18/4 20/11 30/24
 32/6 34/13 35/4 36/21 37/10 41/16
 42/13 47/14 51/9 59/9 60/2 60/18 69/8
 69/24
six [2]  11/9 36/24
six-months' [1]  36/24
skill [4]  18/7 18/12 24/7 24/9
skilled [1]  77/17
Slow [1]  13/9
SLP [2]  1/4 2/8
small [1]  17/19
so [71]  2/20 3/1 3/2 4/12 4/15 4/25 9/25
 10/4 10/20 11/17 11/19 11/24 13/10
 13/14 14/5 14/12 15/14 15/19 15/21
 15/23 16/23 17/5 18/3 20/1 20/21 20/25
 22/5 22/19 28/14 29/12 30/2 30/9 35/2
 36/1 42/13 43/2 43/15 43/24 44/25
 47/11 48/6 48/20 49/1 50/11 52/6 52/15
 53/1 54/6 56/22 56/23 58/18 59/16 60/2
 60/6 60/16 62/12 62/14 62/14 62/21
 63/7 64/6 65/11 66/13 66/16 67/16 70/3
 73/16 73/20 75/9 77/11 78/3
so-called [1]  73/16
Solomon [1]  77/18
solve [9]  17/24 18/19 18/20 22/5 24/3
 24/10 24/11 27/16 67/5
solvent [1]  37/19
solving [1]  67/20
some [14]  3/6 8/22 8/22 19/14 36/13
 36/22 44/6 44/7 51/4 57/12 71/3 71/12
 72/4 75/15
somebody [2]  53/1 67/17
somehow [1]  36/14
someone [2]  43/2 71/25
something [15]  3/10 3/16 5/14 10/12
 21/8 22/6 29/8 30/12 41/2 42/24 51/7
 60/2 60/24 62/9 62/10
somewhere [5]  19/4 38/7 56/12 58/11
 58/12
soon [1]  78/5
sophisticated [2]  27/19 28/5
sorry [5]  8/17 13/10 14/7 25/10 25/11
sort [10]  2/20 3/12 3/20 4/13 4/13 15/21
 19/21 21/11 21/14 69/9
sorted [2]  21/16 22/1
sorts [2]  21/15 33/15
sought [1]  30/25
Southwest [1]  5/12
speak [1]  34/13
specific [4]  45/2 54/6 58/10 74/11
specifically [6]  53/1 53/20 57/24 58/14
 77/7 77/7
specifications [3]  47/20 47/23 48/7
specs [5]  48/1 74/8 74/10 74/12 74/16
speculation [2]  59/11 59/12
squandered [1]  22/22
stand [5]  38/19 67/3 68/15 69/2 70/17
standard [5]  18/15 20/10 20/14 20/23
 26/14
stands [1]  19/6
Stanley [14]  44/18 50/6 55/4 55/5 56/6

**S**

Stanley... [9]  57/23 61/6 65/23 65/23
  70/17 71/17 71/20 74/1 77/6
start [5]  5/2 24/22 24/22 50/19 69/22
started [3]  22/10 28/19 29/7
state [1]  59/6
stated [1]  77/7
statement [2]  76/15 76/23
STATES [2]  1/1 79/11
status [11]  25/2 25/6 25/17 25/18 25/20
  25/25 50/11 69/13 69/15 69/18 69/19
statutory [1]  12/3
stay [3]  23/20 23/21 23/21
steal [2]  35/4 36/12
stenography [1]  1/22
stenotype [1]  79/7
step [4]  10/18 17/15 27/6 52/2
still [5]  7/21 27/12 35/20 51/3 62/23
stop [8]  7/3 14/10 21/24 23/23 26/6
  26/10 27/9 43/10
stopped [2]  26/4 68/8
straightforward [1]  26/18
straw [2]  14/2 14/4
strength [1]  15/22
stress [1]  18/11
strong [1]  50/2
stuc [1]  7/19
stucco [2]  7/13 7/19 47/18 52/1
stuff [1]  73/11
subject [8]  16/18 16/18 17/6 48/18 59/22
  64/1 64/4 64/11
submit [7]  41/5 43/18 54/15 54/15 65/20
  66/6 70/4
submitted [1]  34/9
subpoena [1]  30/16
Subsection [1]  58/14
substance [1]  48/10
substantial [59]  6/13 7/9 7/10 7/11 8/13
  9/14 9/19 9/24 10/4 14/22 19/3 20/14
  20/17 20/18 22/7 26/15 28/1 28/4 28/7
  29/17 31/24 32/1 32/7 33/16 33/19
  33/22 34/15 34/24 35/8 38/12 38/16
  39/9 41/23 41/25 45/12 45/24 46/6
  46/10 46/19 47/1 47/10 48/9 49/6 50/12
  51/3 51/5 53/19 54/3 65/13 65/20 70/23
  73/2 73/6 73/10 74/4 74/24 74/20 75/6
substantially [7]  45/6 45/10 48/10 52/6
  52/19 52/20 53/7
substantiate [1]  52/22
substantiated [1]  52/21
succeed [1]  28/9
succeeded [2]  7/2 26/7
success [11]  7/9 19/3 22/7 26/15 29/17
  33/16 33/22 38/13 38/16 39/10 65/14
successful [3]  31/20 39/22
succession [3]  5/5 6/24 28/14
successor [1]  25/21
such [4]  23/17 23/17 31/13 64/13
suddenly [3]  36/25 37/2 73/24
sue [4]  27/10 27/13 63/11 69/9
suffer [1]  72/7
suffice [1]  26/21
sufficient [1]  15/9
suggest [2]  33/10 53/17
suggested [2]  37/25 56/12
suggesting [2]  45/18 56/7
suggestion [1]  52/8
suggests [1]  68/7
suing [1]  63/22
summary [2]  2/20 19/4

supersedeas [2]  72/20 72/21
supplemental [1]  80/8
support [1]  9/3
supposed [3]  43/24 51/25 71/16
Supreme [2]  5/11 5/13
sure [8]  25/12 39/12 44/8 44/8 53/14
  60/19 64/2 75/22
surrounding [2]  63/14 63/18
survive [2]  37/16 37/23
sworn [2]  22/4 23/25
system [1]  26/14

**T**

Tab [3]  74/23 75/1 75/2
table [2]  3/13 3/14
take [22]  7/13 13/19 16/20 18/3 23/6
  23/23 24/15 31/10 34/15 35/3 36/18
  38/11 40/10 50/20 60/8 61/24 63/25
  64/3 65/15 65/22 75/4 76/18
taken [1]  19/23
takes [1]  16/22
taking [4]  15/5 23/9 23/18 23/19
talk [12]  14/23 17/7 20/23 20/24 30/4
  30/5 40/12 40/12 41/23 43/2 54/24 71/6
talked [3]  17/9 44/19 55/14
talking [6]  47/18 59/15 65/21 66/8 71/24
  71/24
talks [2]  59/18 59/18
technical [2]  52/16 73/3
teed [1]  61/16
tell [9]  3/22 31/18 33/2 42/21 42/25
  49/24 58/24 59/14 78/1
tenants [1]  7/25
tens [1]  24/18
tense [1]  25/17
term [2]  31/21 43/25
terminated [3]  60/9 60/10 60/11
terminating [1]  61/25
termination [1]  60/11
terms [7]  6/3 20/22 27/22 41/17 52/17
  52/17 70/25
test [1]  49/20
testified [6]  50/7 55/5 55/5 61/1 71/20
  73/4
testify [1]  74/1
testifying [1]  69/2
testimony [6]  30/15 35/24 36/24 39/24
  42/23 44/18
TEXAS [10]  1/1 1/25 5/10 5/11 5/13
  5/15 15/10 22/17 41/9 79/12
than [18]  5/16 6/22 11/11 14/19 15/9
  22/8 26/10 27/9 31/18 34/15 36/3 36/7
  40/8 50/13 57/16 58/21 71/4 77/16
thank [14]  2/19 4/17 4/21 7/17 28/20
  28/21 28/24 70/9 70/11 75/24 77/12
  77/13 78/3 78/6
that [495]
that's [99]
their [63]  3/3 5/19 7/14 7/21 8/24 9/1
  10/2 10/11 10/23 11/8 11/13 12/12
  15/17 15/22 18/24 19/16 19/23 20/24
  21/8 21/10 29/11 29/16 30/21 33/11
  34/14 35/12 36/4 36/15 37/16 37/17
  38/1 38/17 39/13 39/14 39/24 40/18
  40/18 40/23 42/14 42/20 50/3 52/14
  55/10 55/20 56/21 56/22 57/6 57/17
  57/19 58/23 60/24 60/25 61/1 62/4 63/6
  63/24 66/22 67/21 67/22 73/25 76/8
  76/10 76/15
them [34]  2/17 4/19 10/1 15/23 18/16

18/16 19/8 21/6 23/14 24/18 24/25
25/25 26/24 26/24 32/3 33/4 34/23 35/6
40/23 41/2 54/23 57/16 64/3 66/4 66/13
67/14 67/15 67/15 67/16 67/24 68/2
68/8 68/15 68/17 76/17
then [63]  4/6 4/6 4/8 6/16 8/17 8/18 8/20
  10/11 11/3 11/23 14/1 18/8 19/4 19/5
  19/24 29/13 30/12 30/25 31/2 32/4 33/6
  34/5 34/8 34/10 34/12 34/25 35/16 39/5
  39/19 40/22 41/21 43/4 43/13 43/25
  47/6 49/4 49/16 49/22 51/11 54/9 54/11
  57/25 58/9 58/18 58/24 60/16
  60/18 61/20 61/20 62/2 62/5 63/8 66/20
  68/2 68/19 72/6 72/15 73/4 73/8 73/8
  74/17 76/3
there [88]
there's [35]  3/25 7/12 8/1 10/5 15/8 19/2
  19/2 20/17 20/19 23/3 24/9 26/22 26/23
  28/11 33/4 33/9 33/22 34/3 37/2 40/15
  44/2 48/1 48/10 49/7 50/2 51/15 54/16
  57/21 64/1 63 65/23 65/24 66/2 70/18
  70/23 77/15
therefore [3]  5/21 47/11 60/14
these [46]  3/21 5/1 5/3 7/19 8/1 13/7
  14/17 16/25 17/12 17/16 17/23 18/19
  18/20 18/23 19/14 20/8 20/12 22/5
  22/20 23/5 23/8 24/10 24/15 24/18 28/5
  31/13 34/3 35/25 38/18 39/3 44/7 45/24
  47/18 52/15 52/25 62/7 63/14 64/2
  64/25 64/25 65/1 66/3 71/25 74/9 74/9
  74/12
they [267]
they're [32]  10/22 14/10 18/19 18/23
  20/5 21/7 34/21 36/15 39/22 45/4 45/5
  55/16 56/25 56/25 58/21 59/2 59/2 59/3
  61/22 61/23 62/11 63/8 63/24 65/2 65/2
  65/3 66/7 68/1 68/10 71/1 71/20 75/11
they've [19]  20/25 21/2 24/13 33/17 34/7
  40/1 40/2 40/23 51/10 57/12 57/15
  62/18 65/5 65/6 66/8 66/8 66/9 75/14
  75/14
thing [24]  3/17 5/16 7/15 16/7 22/11
  23/17 23/17 26/17 26/22 33/17 33/17
  45/9 61/3 63/21 65/15 66/7 67/3 67/14
  67/23 68/23 69/12 73/3 73/9 74/19
things [24]  3/21 3/22 13/22 16/23 21/14
  23/19 24/4 27/7 35/20 35/21 38/6 44/12
  45/24 49/3 50/9 57/13 59/21 67/25
  68/15 69/6 71/4 71/17 74/12 76/4
think [33]  4/10 4/11 4/24 5/24 6/1 8/24
  20/1 20/16 21/1 22/11 22/19 27/24 28/1
  29/3 44/19 49/18 49/25 50/1 50/18
  54/20 54/22 54/23 55/2 55/2 56/3 58/24
  60/12 62/24 66/17 66/18 69/17 75/7
  77/10
thinking [2]  3/23 69/23
third [5]  9/16 11/3 18/8 57/14 72/13
this [186]
those [32]  4/4 8/22 9/2 12/16 16/23
  18/10 18/25 21/15 21/25 23/7 23/19
  23/24 33/25 34/20 37/14 37/16 38/6
  38/11 38/15 38/20 42/13 43/5 43/6 55/6
  55/7 56/13 56/14 57/12 57/18 59/20
  68/15 76/4
though [3]  11/15 11/17 21/4
thought [9]  3/25 9/25 67/6 67/6 67/7
  67/7 67/8 67/9 67/10
thousand [2]  9/16 72/24
thousands [1]  16/4
threat [1]  14/22

**T**

threatens [1]  14/4
three [6]  8/16 13/23 14/23 17/24 18/10 75/10
threw [1]  25/21
through [9]  32/10 32/13 37/1 42/6 42/23 44/4 59/4 76/3 76/4
throughout [2]  37/9 41/12
thrown [1]  26/3
tied [1]  39/1
time [20]  10/8 18/8 24/9 32/17 34/25 35/6 35/10 36/22 42/10 44/3 45/22 45/23 55/13 57/14 63/6 68/24 72/4 74/13 76/7 76/12
times [1]  3/24
timing [1]  6/14
title [4]  11/7 11/10 11/18 22/25
today [9]  7/22 22/9 22/9 29/14 32/23 40/6 67/9 69/4 70/6
together [7]  3/7 6/4 23/16 27/2 27/3 71/13 71/25
told [9]  10/1 10/13 16/22 34/19 44/11 57/14 60/1 61/9 68/11
too [1]  17/2
took [2]  10/21 14/16
top [1]  8/6
totality [2]  54/20 60/4
Totally [3]  69/10 69/10 69/11
toward [2]  15/4 15/5
towards [1]  10/24
trajectory [3]  10/21 10/23 28/13
transaction [1]  28/7
transcript [2]  1/12 1/22
transcription [1]  1/22
transpired [1]  36/1
TRAVIS [5]  1/7 1/7 2/8 7/7 16/12
tri [2]  47/2 75/10
tri-party [2]  47/2 75/10
trial [7]  21/3 21/4 22/1 22/5 27/11 27/14 72/22
tried [2]  21/6 72/2
true [7]  16/1 18/22 26/17 56/19 57/7 69/18 79/8
try [4]  8/4 14/19 35/4 50/8
trying [9]  14/10 36/2 43/2 43/3 59/15 59/20 60/1 61/5 61/23
TUESDAY [1]  1/13
tune [1]  39/18
turn [3]  50/22 62/5 71/23
turned [1]  9/12
turns [3]  65/13 65/14 73/24
twice [2]  23/13 56/18
two [7]  4/4 10/6 18/3 18/6 26/23 27/18 48/2
typewritten [1]  79/7
typical [1]  72/18
Typically [1]  72/24

**U**

ultimately [2]  4/7 21/13
unambiguous [1]  31/21
unbonded [2]  11/10 12/20
uncertainty [1]  68/17
unclean [5]  9/11 9/25 36/7 37/10 37/14
under [47]  5/10 5/15 8/2 10/2 10/17 11/15 11/20 12/17 14/15 17/12 17/23 18/15 18/17 22/4 23/8 23/16 25/14 25/18 26/1 26/8 36/13 38/19 40/3 41/9 43/21 44/23 48/11 48/12 49/20 49/20 50/17 50/25 52/13 57/17 57/20 58/19

59/12 60/13 60/14 64/8 70/18 73/24 74/1
U.S [1]  79/11
understand [6]  4/22 20/21 20/21 30/22 41/24 54/22
understanding [3]  5/18 8/14 18/2
underwriting [4]  75/25 76/2 76/4 76/5
underwrote [1]  61/2
undisputed [4]  6/10 7/11 10/7 11/4
unfair [1]  28/11
unfortunate [1]  35/3
unfortunately [1]  40/7
UNITED [2]  1/1 79/11
unknown [1]  12/17
unless [3]  36/5 36/18 37/4
unlike [1]  7/22 27/14
unravel [1]  4/7
unring [1]  19/22
unsafe [1]  7/24
unsigned [4]  28/2 45/19 49/9 52/21
until [12]  8/12 17/1 32/18 32/19 35/24 35/24 46/25 48/4 55/8 75/16 77/23 77/24
unwilling [2]  64/7 76/8
unwind [1]  64/19
up [27]  6/22 6/23 11/2 11/12 11/19 13/7 13/17 13/23 13/25 14/17 19/5 20/2 24/12 24/13 34/14 38/19 38/20 41/13 61/16 62/25 66/10 66/11 67/17 67/25 76/25 77/2 77/14
upon [13]  6/25 25/8 25/13 28/9 29/12 30/1 31/1 33/11 33/12 34/24 35/6 43/4 46/6
upset [1]  25/19
us [31]  2/18 6/19 10/1 10/16 18/20 21/6 23/7 24/4 24/23 24/25 32/6 34/23 34/25 35/7 35/12 40/20 42/12 61/6 62/7 63/25 63/25 64/2 72/6 72/9 72/10 73/22 76/19 77/3 77/24 78/1 78/1
use [4]  17/14 27/17 40/22 41/2
used [6]  14/8 19/21 19/21 28/3 46/2 52/7
using [3]  1/22 12/14 75/11
usual [1]  46/18
utmost [1]  5/18
utterly [1]  31/3

**V**

valid [3]  11/14 27/22 31/11
value [3]  17/14 18/6 38/1
valued [1]  36/25
various [1]  40/18
versus [1]  2/8
very [33]  4/23 5/14 8/7 10/12 14/5 17/6 20/9 29/24 31/1 31/21 32/6 36/11 40/14 42/12 47/15 48/11 50/22 53/1 55/12 55/12 55/13 64/24 68/24 70/9 72/8 73/14 74/2 74/11 77/13 77/15 77/15 78/3 78/6
violation [2]  62/4 64/21
virtue [1]  61/25
voluntarily [1]  5/20

**W**

waits [1]  17/1
waive [7]  32/17 41/2 42/2 50/11 76/6 76/7 76/9
waived [5]  33/8 40/23 54/19 73/24 74/1
waiver [5]  12/11 27/25 33/7 41/24 63/17
waivers [1]  74/22
waiving [1]  50/10

walked [1]  68/24
want [21]  4/25 9/10 9/11 9/10 5/11 10/14 10/14 10/15 10/25 16/8 16/10 18/11 30/4 31/5 34/17 34/17 44/16 45/2 62/11 64/1 68/6 69/22 73/18 73/21
wanted [7]  3/19 9/1 22/2 39/14 54/24 61/3 66/13
wants [4]  27/11 30/3 64/6 76/22
warranty [15]  34/2 34/9 43/22 44/4 48/14 48/17 50/15 50/25 51/7 52/1 52/13 52/14 53/21 53/22 54/1
was [161]
wasn't [11]  39/12 39/13 41/25 46/24 48/4 49/19 52/8 52/19 75/25 76/4 77/18
watch [3]  39/21 40/3 71/11
water [1]  7/22
way [27]  6/3 7/5 7/13 23/16 23/25 30/6 31/13 31/15 35/8 45/21 45/25 47/12 47/19 49/8 49/19 49/23 51/18 51/21 53/24 56/13 64/19 68/7 69/23 70/8 72/2 72/3 74/17
ways [7]  39/4 41/1 41/5 41/17 42/9 43/3 66/25
we [216]
we'll [3]  11/11 78/4 78/4
we're [53]  2/17 9/5 16/24 20/6 21/4 21/9 21/9 22/4 22/24 23/3 23/3 23/4 23/12 23/15 23/15 23/21 24/1 27/2 30/17 32/23 35/11 35/17 36/5 36/17 36/17 37/3 39/23 40/6 42/9 46/19 47/9 50/5 51/9 59/7 59/8 62/8 62/21 62/23 63/8 64/9 64/9 65/21 66/19 67/4 67/15 69/3 69/20 69/22 71/8 71/16 76/24 76/24 77/1
we've [16]  17/17 18/18 20/23 22/4 22/21 22/25 36/21 42/16 45/10 47/18 54/16 60/10 64/4 72/17 76/13 77/25
week [2]  2/22 78/1
weekend [1]  67/8
weeks [1]  43/5
Weis [6]  12/14 13/4 48/15 73/20 74/16 76/25
well [36]  11/21 11/23 12/25 18/22 20/1 21/12 22/10 29/24 30/23 31/16 33/6 35/11 39/20 41/19 49/9 51/12 52/23 52/24 54/25 56/21 56/24 60/18 62/6 63/1 64/2 64/15 65/15 66/14 67/15 68/19 69/14 72/5 73/1 77/15 77/15 77/17
went [3]  11/19 72/1 72/1
were [43]  2/3 7/19 10/2 15/21 18/23 19/5 19/20 20/8 26/3 28/6 30/21 32/11 32/12 32/23 33/2 34/24 35/20 35/21 36/2 36/11 38/21 39/1 39/2 43/23 50/9 50/13 52/24 51/25 52/12 53/2 60/1 60/13 61/10 63/7 63/15 66/17 67/22 67/25 68/3 68/12 73/20 76/8 77/4
weren't [2]  42/1 55/7
WESTERN [2]  1/1 79/12
what [163]
what's [6]  41/15 47/17 49/13 56/19 61/22 64/21
whatever [13]  2/17 2/20 27/13 46/4 53/19 56/14 60/20 63/25 64/4 64/12 66/5 66/12 69/16
when [49]  5/19 6/23 13/3 13/6 15/8 17/9 21/23 23/9 24/7 25/6 26/3 26/4 26/16 27/17 28/3 30/8 31/4 32/9 34/14 36/25 37/2 37/10 37/11 38/2 40/12 40/22 40/25 41/1 44/25 45/11 48/16 50/7

**W**

when... [17]  51/20 52/3 52/4 52/6 53/15
55/13 57/23 59/12 62/20 62/24 67/3
68/15 69/12 69/15 69/20 74/8 76/12
where [23]  19/4 24/23 29/14 30/24 33/5
34/13 36/21 36/23 37/10 40/19 42/8
42/9 42/13 42/19 50/19 53/21 54/4
58/24 64/8 67/4 69/24 75/7 77/16
Whereupon [1]  78/7
wherewithal [7]  21/7 24/2 24/14 62/6
66/8 66/9 68/10
whether [41]  8/21 18/23 19/11 20/17
24/21 29/4 29/13 29/22 31/10 31/24
31/25 32/5 32/24 33/7 33/8 33/9 33/10
33/25 34/2 34/11 34/12 35/2 35/3 39/12
39/14 46/5 48/18 49/11 49/15 49/19
51/5 51/15 51/17 54/17 57/7 57/8 58/22
63/14 63/15 66/21 66/21
which [61]  2/25 4/2 5/6 5/16 6/4 6/8 7/10
9/3 9/8 9/18 9/20 10/15 11/12 12/8
14/19 15/16 17/18 21/1 22/3 23/7 24/19
28/10 28/18 28/18 29/4 29/14 29/15
31/3 31/7 31/21 32/18 36/6 36/18 36/19
41/21 43/23 44/19 45/25 46/1 47/25
48/18 49/4 50/1 50/15 51/25 52/1 52/2
59/7 60/7 60/12 61/24 62/4 63/17 65/11
67/3 70/7 70/18 72/2 74/21 75/6 75/7
while [2]  48/25 70/3
who [17]  18/8 18/13 24/8 30/14 39/22
40/13 40/13 47/7 58/5 58/6 61/6 65/1
65/2 65/3 69/25 69/25 73/16
whole [10]  21/19 36/8 37/7 37/20 38/2
38/8 50/3 53/12 64/18 64/23
why [22]  6/15 7/11 8/25 13/23 15/18
15/20 16/17 20/3 20/5 20/8 22/19 38/13
39/8 39/16 45/20 46/17 46/24 47/6 50/5
52/25 54/9 62/21
will [38]  3/5 3/16 3/22 4/1 4/19 4/20 6/7
7/6 15/2 15/2 17/2 20/11 21/13 21/15
21/19 22/1 26/25 27/1 30/7 36/23 37/19
38/6 38/7 38/18 44/18 53/9 55/4 59/16
65/9 65/17 66/6 66/20 68/16 69/21 72/5
74/21 75/20 78/3
will -- well [1]  72/5
WILLIAM [1]  1/18
willing [1]  50/11
wine [1]  7/22
winning [1]  40/4
wish [2]  42/11 77/18
withdraw [1]  62/8
withdrawal [3]  55/24 57/20 69/16
within [3]  16/22 48/13 69/10
without [5]  9/13 43/13 43/15 60/24 73/6
witness [3]  61/8 70/17 73/4
WJE [1]  74/8
won't [5]  4/25 25/22 77/11 77/25 78/2
word [5]  8/7 22/16 27/17 27/22 39/25
words [5]  14/9 17/1 37/17 49/21 57/17
work [8]  3/12 11/24 22/19 33/14 50/14
59/16 60/1 78/4
worked [1]  68/21
working [3]  59/17 59/20 78/1
workmanship [2]  47/21 47/22
works [2]  45/21 47/14
world [1]  68/17
worse [3]  7/24 9/4 13/22
worth [1]  3/23
would [80]
wouldn't [6]  26/13 36/12 37/15 61/15
68/17 71/2

wresting [1]  30/7
wrestle [1]  30/11
writing [1]  68/9
written [3]  22/16 27/19 57/20
wrong [8]  5/5 16/8 58/2 64/20 65/12
65/14 74/13 74/15
wrongful [2]  72/19 72/24
wrongfully [3]  60/9 61/25 65/9
wrote [1]  59/18

**Y**

yeah [2]  13/11 63/8
year [3]  7/21 66/2 73/13
years [3]  11/18 17/25 24/11
yes [11]  7/17 8/14 21/22 29/2 29/6 30/17
45/20 57/11 58/3 73/18 73/23
yesterday [1]  32/23
yet [4]  31/5 36/15 42/25 67/1
you [245]
you'll [3]  21/18 38/8 58/14
you're [20]  3/11 15/18 19/7 20/22 22/18
30/8 32/22 37/10 37/11 38/5 38/9 43/25
49/14 53/5 57/2 66/4 66/11 69/12 73/17
73/22
you've [15]  9/7 15/20 18/16 31/23 43/3
43/4 43/7 43/8 43/8 43/15 57/14 57/15
59/19 64/6 64/24
your [68]  2/14 3/12 3/14 3/17 4/2 4/4 4/5
4/11 4/13 4/17 4/22 4/23 5/1 5/24 10/15
13/23 14/22 15/25 17/17 19/12 21/11
21/20 22/11 24/3 24/16 25/2 26/11
26/19 26/22 28/5 28/17 28/20 29/1 29/4
31/18 36/1 37/11 37/12 37/18 37/22
37/25 39/16 42/8 43/7 43/17 48/21
53/12 56/7 56/19 58/3 59/22 60/19
64/17 64/22 65/20 66/14 66/16 68/14
68/16 68/23 69/4 70/11 70/12 72/11
73/21 74/17 74/23 77/10
yourself [1]  69/8
yourselves [2]  69/8 77/23
Yup [1]  69/1

**Z**

zero [1]  75/11