**UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**AUSTIN DIVISION**

| | | |
|---|---|---|
| **PNC BANK, N.A. COLUMBIA** | § | |
| **HOUSING SLP CORPORATION, and** | § | |
| **2013 TRAVIS OAK CREEK, LP** | § | |
| | § | |
| **Plaintiffs,** | § | **Case No. 1:17-cv-584-RP-ML** |
| | § | |
| **v.** | § | |
| | § | **consolidated with** |
| | § | **Case No. 1:17-cv-560-RP** |
| **2013 TRAVIS OAK CREEK GP, LLC,** | § | |
| **2013 TRAVIS OAK CREEK** | § | |
| **DEVELOPER, INC.,** | § | |
| **CHULA INVESTMENTS, LTD.,** | § | |
| **and RENE O. CAMPOS** | § | |
| | § | |
| **Defendants.** | § | |

## PLAINTIFFS' MOTION TO DISMISS ALL OF DEFENDANTS' COUNTERCLAIMS

Pursuant to Federal Rules of Civil Procedure 9(b), 12(b)(1), and 12(b)(6), PNC Bank, N.A. ("**PNC**") and Columbia Housing SLP Corporation ("**Columbia**") (collectively the "**Plaintiffs**") respectfully submit this Motion to Dismiss (the "**Motion**") all counterclaims brought by Defendants 2013 Travis Oak Creek GP, LLC (the "**First GP**") and 2013 Travis Oak Creek Developer, Inc. (the "**Developer**," and, collectively with the First GP, the "**Counterclaimants**") in their Answer to First Amended Complaint and Certain Defendants' Counterclaim (the "**Counterclaim**") [ECF Doc. No. 78].

# TABLE OF CONTENTS

Page

I.   INTRODUCTION ........................................................................................................1

II.  LEGAL STANDARDS ..............................................................................................2

    A.   Standard Under Rule 12(b)(1). ....................................................................2

    B.   Standard Under Rule 12(b)(6). ....................................................................2

III. BACKGROUND AND PROCEDURAL HISTORY ..........................................3

    A.   The Partnership Dispute. ..............................................................................3

    B.   Procedural History. .......................................................................................4

IV.  ARGUMENT AND AUTHORITIES .....................................................................5

    A.   Counts I, II, III, IV, and VII-B: Counterclaimants Lack Standing to Assert
        Putative Partnership Claims. ........................................................................6

        1.   Fiduciary duty should be dismissed under Rule 12(b)(1). ..........................8
        2.   Breach of contract should be dismissed under Rule 12(b)(1). ....................8
        3.   Fraud should be dismissed under Rule 12(b)(1). ........................................9
        4.   The 12 U.S.C. §1972 claim should be dismissed under
            Rule 12(b)(1). ............................................................................................10
        5.   Declaratory judgment should be dismissed under Rule 12(b)(1). .............11

    B.   The Counterclaim Fails to Allege a Plausible Claim that Rises to the Level
        of Fraud Under Rule 12(b)(6) and Fails to Do So With Particularity Under
        Rule 9(b). ....................................................................................................12

    C.   The Counterclaim Fails to State a Plausible Claim for Breach of Contract. .........17

    D.   The Developer's Claim Under the Texas Theft Liability Act Is Barred by
        the Parties' Agreements. ..............................................................................19

    E.   The Counterclaim Fails to State a Plausible Claim for Breach of Fiduciary
        Duty. ............................................................................................................21

    F.   Counterclaimants Fail to Plausibly Allege "Tying" Under the BHCA. ...............23

    G.   Counterclaimants' Claims for "Unjust Enrichment" and Promissory
        Estoppel Are Legally Insufficient and Are Barred by the Parties' Express
        Agreements. .................................................................................................25

    H.   Counterclaimants' Claim for Conspiracy Must Be Dismissed Because All
        of the Predicate Tort Claims Fail. ...............................................................28

    I.   Counterclaimants' Numerous Requests for Declaratory Judgment Are
        Improper. .....................................................................................................29

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*AON Props., Inc. v. Riveraine Corp.*,
  No. 14-96-00229-CV, 1999 WL 12739 (Tex. App.—Houston [14th Dist.] 1999,
  no pet.) ..................................................................................................................21

*Apani Sw., Inc. v. Coca–Cola Enters., Inc.*,
  300 F.3d 620 (5th Cir. 2002) ...............................................................................28

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009)............................................................................................2, 3

*Baker v. Great N. Energy, Inc.*,
  64 F. Supp. 3d 965 (N.D. Tex. 2014) ...................................................................15

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007)................................................................................................2

*Cadle Co. v. Neubauer*,
  562 F.3d 369 (5th Cir.2009) ..................................................................................2

*Carroll v. Fort James Corp.*,
  470 F.3d 1171 (5th Cir. 2006) .............................................................................13

*Cates v. Int'l Tel. & Tel. Corp.*,
  756 F.2d 1161 (5th Cir. 1985) ...............................................................................7

*City of Waco v. Kleinfelder Central, Inc.*,
  2016 WL 5854290 (W.D. Tex. Oct. 6, 2016).......................................................29

*Collin Cnty. v. Homeowner's Ass'n for Values Essential to Neighborhoods*,
  915 F.2d 167 (5th Cir. 1990) ...............................................................................11

*Collins v. Morgan Stanley Dean Witter*,
  224 F.3d 496 (5th Cir. 2000) .................................................................................3

*Doss v. Homecoming Fin. Network, Inc.*,
  210 S.W.3d 706 (Tex. App.—Corpus Christi 2006, pet. denied)..........................26

*Dubinsky v. Mermart, LLC*,
  595 F.3d 812 (8th Cir. 2010) .................................................................................7

*Elizondo v. James*,
  5:15-CV-358 RP, 2015 WL 12733412 (W.D. Tex. May 27, 2015) .......................13

*First Union Nat. Bank v. Richmont Capital Partners I, L.P.*,
    168 S.W.2d 917 (Tex. App.—Dallas 2005, no pet.)...................................................27

*Flaherty & Crumrine Preferred Income Fund, Inc. v. TXU Corp.*,
    565 F.3d 200 (5th Cir. 2009) ....................................................................................12

*Fortune Prod. Co. v. Conoco, Inc.*,
    52 S.W.3d 671 (Tex. 2000)........................................................................................27

*Galvez v. Tornado Bus Co.*,
    No. 05-13-00993-CV, 2015 WL 1730175 (Tex. App.—Dallas Apr. 15, 2015, pet.
    denied).........................................................................................................................26

*Gonzalez v. De Leon*,
    No. 04–14–00751–CV, 2015 WL 5037396 (Tex. App.—San Antonio Aug. 26,
    2015, pet. dism'd) .......................................................................................................22

*Gonzalez v. Denning*,
    394 F.3d 388 (5th Cir. 2004) .....................................................................................19

*Heldenfels Bros., Inc. v. City of Corpus Christi*,
    832 S.W.2d 39 (Tex. 1992)........................................................................................26

*Highland Capital, Inc. v. Frankling Nat. Bank*,
    350 F.3d 558 (6th Cir. 2003) ...........................................................................11, 23, 24

*In re Kellog Brown & Root*,
    166 S.W.3d 732 (Tex. 2005)......................................................................................27

*Leasehold Expense Recovery, Inc. v. Mothers Work, Inc.*,
    331 F.3d 452 (5th Cir. 2003) .....................................................................................29

*Lifesize, Inc. v. Chimene*,
    A. No. 1:16-CV-1109-RP, 2017 WL 1532609 (W.D. Tex. Apr. 26, 2017) ..............2

*Lujan v. Defendants of Wildlife*,
    504 U.S. 555 (1992)......................................................................................................2

*Massey v. Armco Steel Co.*,
    652 S.W.2d 932 (Tex. 1983).......................................................................................28

*McKinney/Pearl Restaurant Partners, L.P. v. Metro. Life Ins. Co.*,
    241 F. Supp. 3d 737 (N.D. Tex. 2017) ...............................................................13, 29

*Meadows v. Hartford Life Ins. Co.*,
    492 F.3d 634 (5th Cir. 2007) .....................................................................................28

*Montez v. Dep't of Navy*,
   392 F.3d 147 (5th Cir. 2004) ..................................................................2, 3, 11

*Nauslar v. Coors Brewing Co.*,
   170 S.W.3d 242 (Tex. App.—Dallas 2005, no pet.)..........................................7, 8

*New England Co. v. Bank of Gwinnett Cnty.*,
   891 F. Supp. 1569 (N.D. Ga. 1995) ................................................................23

*Nordic Bank PLC v. Trend Grp., Ltd.*,
   619 F. Supp. 542 (S.D.N.Y. 1985)......................................................23, 24, 25

*R.M. Dudley Constr. Co. v. Dawson*,
   258 S.W.3d 694 (Tex. App.—Waco 2008, pet. denied)........................................26

*Ramming v. United States*,
   281 F.3d 158 (5th Cir. 2001) ...........................................................................2

*Regus Mgmt. Grp., LLC, v. IBM*,
   No. Civ. A. 3:07-cv-1799-B, 2008 WL 2434245 (N.D. Tex. June 17, 2008) .........29

*Rio Grande Royalty Co., Inc. v. Energy Transfer Partners, L.P.*,
   620 F.3d 465 (5th Cir. 2010) .........................................................................13

*Siddiqui v. Fancy Bites, LLC*,
   504 S.W.3d 349 (Tex. App.—Houston [14th Dist.] 2016, pet. denied) ...............7, 8

*Smith v. Tower Loan of Miss., Inc.*
   216 F.R.D. 338 (S.D. Miss. 2003) ...................................................................15

*Stable Energy, L.P. v. Kachina Oil & Gas, Inc.*,
   52 S.W.3d 327 (Tex. App.—Austin 2001, no pet.) .............................................27

*Stewart Family Funeral Home, Ltd. v. Funeral Directors' Life Ins. Co.*,
   410 F. Supp. 2d 514 (E.D. Tex. 2006) ..............................................................12

*Strebel v. Wimberly*,
   371 S.W.3d 267 (Tex. App.—Houston [1st Dist.] 2012, pet. denied)....................21

*Swerdloff v. Miami Nat. Bank*,
   584 F.2d 54 (5th Cir. 1978) ...........................................................................23

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
   551 U.S. 308 (2007).......................................................................................3

*Tex. Mut. Ins. Co. v. Wood Energy Grp., Inc.*,
   604 F. Supp. 2d 942 (W.D. Tex. 2009)..............................................................29

*Tilton v. Marshall*,
    925 S.W.2d 672 (Tex. 1996) ...................................................................................................28

*Vantage Trailers, Inc. v. Beall Corp.*,
    567 F.3d 745 (5th Cir. 2009) .................................................................................................30

*Wellogix, Inc. v. Accenture, LLP*,
    788 F. Supp. 2d 523 (S.D. Tex. 2011) ...................................................................................20

*Wesolek v. Layton*,
    871 F. Supp. 2d 620 (S.D. Tex. 2012) ................................................................................6, 7

*Williams v. Countrywide Home Loans, Inc.*,
    504 F. Supp. 2d 176 (S.D. Tex. 2007) ...................................................................................15

**Statutes**

12 U.S.C. § 1972 ................................................................................................................. *passim*

12 U.S.C. § 1972(1) ....................................................................................................................11

28 U.S.C. § 2801 .........................................................................................................................11

Tex. Bus. Org. Code § 153.402 ...................................................................................................6

Tex. Bus. Org. Code § 152.209 ...................................................................................................6

Tex. Bus. Org. Code § 153.103 .................................................................................................22

Tex. Penal Code § 31.04(a) .......................................................................................................20

**Rules**

Fed. R. Civ. P. 8 .....................................................................................................................2, 20

Fed. R. Civ. P. 9(b) .........................................................................................................12, 13, 17

Fed. R. Civ. P. 12(b)(1) ................................................................................................1, 2, 3, 11

Fed. R. Civ. P. 12(b)(6) ..................................................................................................3, 7, 13

## I.     INTRODUCTION

This case primarily concerns a dispute among former partners regarding the removal of the First GP as the original general partner in 2013 Travis Oak Creek, LP (the "**Partnership**"). The Counterclaim touts nine separate causes of action, including numerous sub-claims, and further requests nine different declarations from the Court. In short, it is a hope-something-sticks sort of pleading that throws the kitchen sink at Plaintiffs.

Yet not one cause of action is viable. The Court should dismiss all of Counterclaimants' causes of action because (i) Counterclaimants lack standing to bring most claims and (ii) Counterclaimants have otherwise failed to state a claim upon which relief can be granted.

*First*, the counterclaims sounding in breach of fiduciary duties to *the Partnership*, fraudulent misrepresentations made *to the Partnership*, breach of promises to make capital contributions *to the Partnership*, breach of agreements between the *Partnership* and third parties, unlawful tying of loans *to the Partnership* borrower to other banking services, and demanding an exorbitant non-delivery fee *from the Partnership*—if they exist at all—belong exclusively to the Partnership. Because Counterclaimants lack standing to assert these claims, they should be dismissed with prejudice under Rule 12(b)(1).

*Second*, Counterclaimants' allegations sounding in breach of fiduciary duty, breach of contract, unjust enrichment, and promissory estoppel fail to state a viable claim because they contravene the terms of the parties' Partnership related agreements. Counterclaimants cannot use artful (or even inartful) pleading to avoid their own contracts.

*Third*, despite its length and furious tone, the Counterclaim sets forth only conclusory or facially implausible assertions. In particular, a number of Counterclaimants' allegations sounding in breach of contract, fraud, theft of service, anticompetitive "tying" under 12 U.S.C. § 1972, and

declaratory judgment allege facts that are insufficient to satisfy the basic elements of those requests for relief. With respect to the fraud claim specifically, Counterclaimants not only fail to plead a viable cause of action, they also fail to plead a fraud case with particularity.

## II.     LEGAL STANDARDS

### A.     Standard Under Rule 12(b)(1).

Standing is an indispensable component of subject matter jurisdiction and may be challenged under Rule 12(b)(1). *Lujan v. Defendants of Wildlife*, 504 U.S. 555, 560 (1992). "Standing requires, at a minimum, three elements: injury in fact, a 'fairly traceable' causal link between that injury and the defendant's conduct, and the likelihood that the injury will be 'redressed by a favorable decision.'" *Cadle Co. v. Neubauer*, 562 F.3d 369, 371 (5th Cir.2009) (quoting *Lujan*, 504 U.S. at 560–61). "There are three avenues for a movant to demonstrate a lack of jurisdiction: (1) on the face of the complaint alone; (2) the complaint supplemented by undisputed facts in the record; and (3) the complaint supplemented by undisputed facts and the court's resolution of disputed facts." *Lifesize, Inc. v. Chimene*, A. No. 1:16-CV-1109-RP, 2017 WL 1532609, at *3 (W.D. Tex. Apr. 26, 2017) (citing *Montez v. Dep't of Navy*, 392 F.3d 147, 149 (5th Cir. 2004)). The burden of demonstrating jurisdiction rests with Counterclaimants—the parties invoking it. *See Ramming v. United States*, 281 F.3d 158, 161 (5th Cir. 2001).

### B.     Standard Under Rule 12(b)(6).

*Twombly* and *Iqbal* require that a complaint contain sufficient facts that, if accepted as true, state a claim to relief that is plausible on its face. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). Rule 8 requires more than unadorned accusations, "labels and conclusions," "a formulaic recitation of the elements of a cause of action," or "naked assertion[s]" devoid of "further factual enhancement." *Id.* "A claim has facial plausibility when the plaintiff pleads

factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

### III.   BACKGROUND AND PROCEDURAL HISTORY

**A.   The Partnership Dispute.**

On or about May 23, 2014, PNC and Columbia, as limited partners, and the First GP, entered into the Amended and Restated Agreement of Limited Partnership of 2013 Travis Oak Creek, LP (the "**Partnership Agreement**"). *See* **Exhibit A**, Partnership Agreement at 1.[1] The Partnership Agreement is the governing document of the Partnership and as such, is the heart of this lawsuit. *See id.* The purpose of the Partnership is to develop, construct, and operate a low-income housing multifamily apartment complex located in Austin, known as the Lucero Apartments (the "**Project**").

Under the Partnership Agreement, the First GP was the Partnership's original general partner, and PNC and Columbia were limited partners overseeing their investment with no fiduciary duty to the First GP or the Partnership. *See id.* §§ 1.3; 6.1; 7.1–7.2. The First GP was to manage and oversee the construction and ongoing operation of the Project. *See id.* §§ 6.1, 6.5 & 6.7. The Developer, which also signed the Partnership Agreement, was to carry out the development of the Project in return for development fees under a written Development Agreement. *See* **Exhibit B**, Development Agreement. Importantly, the Partnership Agreement provided that if the First GP failed to fulfill its contractual obligations, then an "**Event of**

---

[1] Plaintiffs have attached to this Motion the contracts that control the relations between the Plaintiffs and Defendants, as well as a small number of other operative documents, that are directly referred to and relied upon in the Counterclaim. The Court may consider these documents in the resolution of any factual questions under Rule 12(b)(1). *Montez v. Dept. of Navy*, 392 F.3d 147, 149 (5th Cir. 2004). Further, because all of these documents are directly referred to in and central to the Counterclaim, the Court may also consider them under Rule 12(b)(6) as well. *See, e.g.*, *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322–23 (2007); *Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496, 498–99 (5th Cir. 2000).

**Default**" would occur, which would empower Columbia to remove and replace the First GP. *See* Ex. A § 7.7.

This Court has already found a substantial likelihood that the First GP committed multiple Events of Default. [ECF Doc. No. 73]. On June 7, 2017, Columbia exercised its right to remove and replace the First GP as the Partnership's general partner. When the First GP flatly refused to relinquish control of the Partnership and instead interfered with Columbia's right to perform as general partner, this litigation ensued.

**B.   Procedural History.**

On June 8, 2017, PNC and Columbia filed a lawsuit in the U.S. District Court for the Northern District of Texas against the First GP, the Developer, and related parties alleging claims for breach of contract, suit on guaranty, and breach of fiduciary duty, and seeking a declaratory judgment that the First GP was removed as the Partnership's general partner and been replaced by Columbia. [ECF Doc. No. 1] (the "**First-Filed Action**"). The First-Filed Action was later transferred to this Court. [ECF Doc. No. 17].[2]

An evidentiary hearing on the parties' cross-motions for preliminary injunction was held on July 21, 2017. On August 2, 2017, the Court found that Plaintiffs have a substantial likelihood of establishing multiple Events of Default by the First GP at a trial on the merits and enjoined the First GP from interfering with Columbia's singular exercise of its rights as the Partnership's new general partner. [ECF Doc. No. 73]; *see also* [ECF Doc. No. 75] (injunction bond).

---

[2]   On June 9, 2017, the First GP filed an Original Petition against PNC and Columbia for injunctive relief and appointment of a receiver over the Partnership in state court in Travis County, Texas, which was removed to this Court. [Case No. 1:17-cv-560, ECF Doc. No. 2] (the "**Second-Filed Action**"). On June 19, 2017, the Court consolidated the two pending federal court cases.

# IV.  ARGUMENT AND AUTHORITIES

To aid the Court in navigating Plaintiffs' grounds for dismissal below, the following chart

summarizes the bases upon which Plaintiffs seek dismissal as to each counterclaim alleged:

| Claim | Rule 12(b)(1) | Rule 12(b)(6) | Rule 9(b) |
|---|---|---|---|
| **Count I: Breach of Fiduciary Duty** | | | |
| As to duties *to the Partnership* | ✔ | ✔ | |
| As to duties *to the First GP* | | ✔ | |
| **Count II: Breaches of Contract** | | | |
| Partnership Agreement §§ 7.2, 3.2 & 6.2(d) | ✔ | | |
| Partnership Agreement §§ 7.7, 7.7, 5.1, & 9.1 | | ✔ | |
| Forward Commitment § M(1) | ✔ | | |
| Delivery Assurance Certificate § 11 | ✔ | | |
| **Count III: Fraud** | | | |
| Representations as to the identity of the "MBS Investor" | ✔ | ✔ | ✔ |
| Failure to disclose a purported internal loan modification opportunity | ✔ | ✔ | ✔ |
| Consent to the Arbor loan | ✔ | ✔ | ✔ |
| **Count IV: Violations of 12 U.S.C. § 1972** | | | |
| Extension of Forward Commitment "conditioned upon" agreement to accept Bridge Loan | ✔ | ✔ | |
| Conditioning "permanent mortgage loan" upon "provision by [the First] GP of development services" | ✔ | ✔ | |
| "Tying" of unidentified extension of credit on condition that "GP shall not obtain some other credit or service from competitor" | ✔ | ✔ | |
| "Tying" of unidentified extension of credit and advancing or deferring payment of development fees | ✔ | ✔ | |
| **Count V: Theft of Service** | | | |
| Developer's development services | | ✔ | |
| **Count VI: Conspiracy** | | | |
| Based on any predicate tort | | ✔ | |

| Claim | Rule 12(b)(1) | Rule 12(b)(6) | Rule 9(b) |
|---|---|---|---|
| **Count VII-A[3]: Unjust Enrichment** | | | |
| For "exercise[] of self-help and engag[ing] in impermissible self-dealing" | | ✔ | |
| **Count VIII: Promissory Estoppel** | | | |
| Consent to the Arbor loan and the general contractor litigation | | ✔ | |
| **Count VII-B: Declaratory Judgment** | | | |
| Subparagraphs a, g, h & i | | ✔ | |
| Subparagraphs b, c, d, e & f | ✔ | | |

**A.     Counts I, II, III, IV, and VII-B: Counterclaimants Lack Standing to Assert Putative Partnership Claims.**

Counterclaimants' claims for breach of fiduciary duty, breach of contract, fraud, and for violation of 12 U.S.C. § 1972, as well as many of their requests for declaratory judgment, must be dismissed because Counterclaimants lack standing to assert claims that, if they exist at all, belong to the Partnership.

Under Texas law, there are only two ways for a partner to have standing to allege claims that belong to a limited partnership: (i) by "a general partner acting *with authority* … to bring suit *in the name of the limited partnership*," or (ii) derivatively by "[a] *limited partner* … on behalf of the limited partnership" if certain statutory prerequisites are met. *Wesolek v. Layton*, 871 F. Supp. 2d 620, 628 (S.D. Tex. 2012) (emphasis added); *see also* Tex. Bus. Org. Code §§ 152.209 & 153.402. The First GP is not the Partnership's general partner and, even if it were, it does not allege the requisite authorization to sue on the Partnership's behalf. Nor is the First GP a limited partner. The fact that the First GP claims that it has suffered damage to an equity or

---

[3] Counterclaimants titled both their claims for unjust enrichment and their request for declaratory relief as "Count VII." *See* Counterclaim pp. 40 & 42. For purposes of convenience, Plaintiffs will refer to these claims as Count VII-A and Count VII-B, respectively.

other investment interest in the Partnership will not satisfy Texas's statutory standing requirements. *See Wesolek*, 871 F. Supp. 2d at 631.

As to the limited partner ground, the Counterclaim does not allege that the First GP is a limited partner in the Partnership, and likewise, the Partnership Agreement does not indicate that the First GP is a limited partner. *See* Ex. A p. 1 & § 1.3; *see also* §§ 7.7(c) & 9.1(a)–(b).

As to the general partner ground, the First GP is not a general partner today. But even in the very unlikely event that the First GP returns as general partner someday, it still wouldn't have the necessary *authority* to bring such claims. The Partnership Agreement expressly requires Columbia's written consent to commence such claims on behalf of the Partnership. *See* Ex. A. § 6.2(h); p. 3 & § 13.4 (definition of "Consent"). It is self-evident that Columbia has never given any such consent, and the Counterclaim does not state otherwise. *See Dubinsky v. Mermart, LLC*, 595 F.3d 812, 818–19 (8th Cir. 2010) (affirming dismissal of lawsuit pursuant to Rule 12(b)(6) for failure to demonstrate that written consent was given to file suit as required by contract).

Further, the First GP lacks standing to obtain damages on its own account for derivative Partnership claims because those damages, if any, would belong exclusively to the Partnership. *See, e.g.*, *Cates v. Int'l Tel. & Tel. Corp.*, 756 F.2d 1161, 1181 (5th Cir. 1985) (applying Texas law) ("[A]ny claims for damages which [plaintiff] suffered by reason of diminution in value of his partnership interest, or his share of partnership income … do not afford [plaintiff] … a separate, individual cause of action."); *Siddiqui v. Fancy Bites, LLC*, 504 S.W.3d 349, 361–62 (Tex. App.—Houston [14th Dist.] 2016, pet. denied) ("[T]o the extent that [plaintiffs] seek to recover individually on claims for … damages sustained by [the] [limited partnership], they would lack standing to assert such claims."); *Nauslar v. Coors Brewing Co.*, 170 S.W.3d 242,

249–50 (Tex. App.—Dallas 2005, no pet.). The Counterclaim alleges the following direct claims for damages or other relief, but which are actually Partnership claims in disguise.

### 1.      Fiduciary duty should be dismissed under Rule 12(b)(1).

The Counterclaim improperly attempts to recover in the name of the First GP based on breaches of a fiduciary duty that the Counterclaim alleges PNC and Columbia owed directly to the Partnership. Counterclaim ¶ 63 ("The ability to control the Partnership's actions … imposed a fiduciary duty upon PNC Bank and Columbia that both owed to the Partnership []."); *Id.* ¶ 64 ("PNC Bank and Columbia … never had any intention of acting in the best interest of the Partnership, or in accordance with the fiduciary duty owed to it."). These words implicate a direct claim for losses arising from duties owed *to the Partnership*. As a matter of Texas law, the breach of fiduciary duty count must be dismissed as it alleges a claim for breach of a duty to the Partnership but alleges a direct claim for damages to the First GP. *See Siddiqui*, 504 S.W.3d at 361–62; *Nauslar*, 170 S.W.3d at 249–50.[4]

### 2.      Breach of contract should be dismissed under Rule 12(b)(1).

A number of the alleged "breaches of contract" that Counterclaimants identify are actually Partnership claims that they nevertheless seek to bring in their own name:

- breaching Partnership Agreement § 7.2 by "interfering with the GP's … opportunity ... [to get] more favorable [loan] terms to the Partnership" (*id.* ¶ 69);

- breaching Partnership Agreement § 3.2 by "refusing to fund installments of capital contributions … and/or by conditioning the funding of the same" (*id.* ¶ 70);

---

[4] And, as noted above, the Counterclaim doesn't allege that Columbia consented to the First GP bringing any such claims on the Partnership's behalf, as required under the Partnership Agreement and Texas law.

- breaching Partnership Agreement § 6.2(d) by "putatively consenting to … [the Partnership's] clos[ing] a loan with Arbor Commercial Mortgage" (*id.* ¶ 72);

- breaching "the Forward Commitment [between the Partnership and PNC Bank] by terminating it in violation of Section M(1)" (*id.* ¶ 76); and

- breaching § 11 "of the Delivery Assurance Certificate [between the Partnership and PNC Bank] by seeking recourse against the [First] GP" (*id.* ¶ 77).

Each of these assertions tries to recover for alleged losses to the Partnership. The first three items each relate to a benefit to be conferred on the Partnership in the form of "more favorable terms"; the funding of capital installments; and a potential loan between the Partnership and a third party. The final two items each directly allege a breach of an agreement between the Partnership and a third party. *See* **Exhibit C**, Forward Commitment; **Exhibit D**, Delivery Assurance Certificate.

Counterclaimants cannot recover damages on a direct claim in their own name for injuries *to the Partnership*, and they certainly cannot sue for the alleged breach of contracts between the Partnership and PNC to which neither Counterclaimant is a party.[5] Each of the allegations above for breach of contract is at best a Partnership claim and must be dismissed.

### 3. Fraud should be dismissed under Rule 12(b)(1).

Counterclaimants' cause of action for fraud seeks damages for losses exclusively based on alleged misrepresentations made *to the First GP* while acting solely in its capacity as a general partner in and on behalf of that entity, including:

- "False[ly] represent[ing] … the identity of the MBS Investor to induce [the First] GP to pay PNC Bank the MBS Investor Extension fees … that it never would have agreed to

---

[5] Further, the Counterclaim does not allege that Columbia consented to the First GP commencing this claim on behalf of the Partnership as required by the Partnership Agreement.

pay … to secure *an extension of the loan closing that the Partnership needed*" (Counterclaim ¶ 83);[6]

- "Fail[ing] to disclose to [the First] GP that [Plaintiffs] … interfered with the … favorable loan modification opportunity" for the *Partnership* (*id.* ¶ 84); and

- "Misrepresent[ing] to [the First] GP that [Plaintiffs] consent to [the First] GP's pursuit of the Arbor Commercial Mortgage loan and to [the First] GP defending the general contractor's claim" (*id.* ¶ 85).

Each of these alleged "misrepresentations" concerns the First GP's actions *on the Partnership's behalf*. Even as alleged, the First GP received each of those representations in its capacity as a general partner of the Partnership, not for itself. The Partnership paid the MBS Investor Extension fees, not the First GP. *See id.* ¶ 34. The Partnership as borrower was the purported beneficiary of the "loan modification opportunity," not the First GP. *Id.* ¶¶ 22–23. And the Partnership was the entity (through its general partner) allegedly pursuing the supposed Arbor loan and defending the general contractor's claim. *Id.* ¶ 53. In short, each of these items relates solely to supposed statements to *the Partnership* regarding its affairs.[7] Accordingly, the First GP cannot recover damages for itself based on an alleged fraud against the Partnership.

### 4.   The 12 U.S.C. §1972 claim should be dismissed under Rule 12(b)(1).

The alleged violations of 12 U.S.C. § 1972 in the Counterclaim would have to be brought in the Partnership's name. To establish a claim under the Bank Holding Company Act ("**BHCA**"), a plaintiff must establish that "(1) the bank imposed an anti-competitive tying arrangement, that is, it conditioned the extension of credit upon the borrower's obtaining or

---

[6] *See also id.* p. 14 ("… but *the Partnership* needed to extend the closing date of the PNC Bank mortgage loan.").

[7] And the Counterclaim doesn't allege that Columbia gave the First GP its consent to bring a claim on behalf of the Partnership based on those statements.

offering additional credit, property or services to or from the bank or its holding company; (2) the arrangement was not usual or traditional in the banking industry; and (3) the practice conferred a benefit on the bank." *Highland Capital, Inc. v. Frankling Nat. Bank*, 350 F.3d 558, 565 (6th Cir. 2003). It is a basic requirement that the person *seeking an extension of credit* must bring the claims. *See* 12 U.S.C. § 1972(1).

The First GP was not the putative borrower of PNC—the Partnership was. *See, e.g.*, Counterclaim ¶ 6. The First GP never sought an extension of credit from PNC on its own behalf. *See id.;* Ex. C.[8] However, the Counterclaim does not purport to raise any claim in the name of the Partnership; rather it alleges only direct claims that the First GP lacks standing to bring. *See, e.g.*, Counterclaim ¶¶ 91–94.[9] Thus, all of the 12 U.S.C. § 1972 claims must be dismissed.

### 5.    Declaratory judgment should be dismissed under Rule 12(b)(1).

Many of the grounds on which the First GP seeks a declaratory judgment impact only *the Partnership's* rights. Under the federal Declaratory Judgment Act, a court "may declare rights or legal relations of any interested party." 28 U.S.C. § 2801.[10] The First GP seeks declarations that:

- The "non-delivery fee" owed by the Partnership, based on *the Partnership's* default under the Forward Commitment between *the Partnership* and PNC, is a non-recourse debt for which PNC's sole remedy is against *the Partnership's* real property;

---

[8] As noted above, Rule 12(b)(1) permits the parties and Court to rely on extrinsic evidence. *See Montez*, 392 F.3d at 149.

[9] Again, it also lacks any allegation that Columbia consented to bringing this claim.

[10] "A party's interest is an adverse legal interest within the meaning of the Declaratory Judgment Act when it relates to a case of actual controversy within the court's jurisdiction." *Collin Cnty. v. Homeowner's Ass'n for Values Essential to Neighborhoods*, 915 F.2d 167, 170 (5th Cir. 1990) (quotation omitted) (holding that county lacked standing to bring declaratory judgment suit regarding subject matter of potential dispute between other parties). "The Declaratory Judgment Act is remedial only. It 'enlarged the range of remedies available in the federal courts but did not extend their jurisdiction.'" *Id.* (quoting *Skelly Oil v. Phillips Petroleum Co.*, 339 U.S. 667, 671 (1950)).

- The non-delivery fee is not a reasonable estimate of PNC's damages against *the Partnership* and is therefore an unenforceable penalty against *the Partnership*;

- PNC wrongfully terminated the Forward Commitment with *the Partnership*;

- *The Partnership* does not owe the non-delivery fee because there was no breach of the Forward Commitment by *the Partnership*; and

- PNC suffered no damages as a result of *the Partnership's* failure to originate the loan under the Forward Commitment.

*See* Counterclaim ¶ 117.b–f. But the First GP is not an "interested" party to disputes concerning the Forward Commitment because it is not a party to that agreement. *See Stewart Family Funeral Home, Ltd. v. Funeral Directors' Life Ins. Co.*, 410 F. Supp. 2d 514, 516–17 (E.D. Tex. 2006). Because it is not a party to the Forward Commitment (and does not allege otherwise), the First GP lacks standing to seek these declarations from the Court.

Further, because the Counterclaimants could never allege facts that would give them standing to bring Partnership claims as direct claims, the Counterclaimants could not amend their pleading to fix these issues. Therefore, these claims should be dismissed with prejudice.

**B.      The Counterclaim Fails to Allege a Plausible Claim that Rises to the Level of Fraud Under Rule 12(b)(6) and Fails to Do So With Particularity Under Rule 9(b).**

To state a claim for fraud, a party must not only plead facts sufficient to set forth a plausible claim under Rule 12(b)(6), it must also plead any allegation of fraud with particularity. Fed. R. Civ. P. 9(b). The Fifth Circuit strictly interprets Rule 9(b), requiring the plaintiff to "specify the statements contended to be fraudulent, identify the speaker, state when and where the statements were made, and explain why the statements were fraudulent." *Flaherty & Crumrine Preferred Income Fund, Inc. v. TXU Corp.*, 565 F.3d 200, 207 (5th Cir. 2009). Simply put, Rule 9(b) requires a plaintiff to answer the *newspaper-questions*: "to plead enough facts to

illustrate the 'who, what, when, where, and how' of the alleged fraud." *Elizondo v. James*, 5:15-CV-358 RP, 2015 WL 12733412, at *1 (W.D. Tex. May 27, 2015) (quoting *Carroll v. Fort James Corp.*, 470 F.3d 1171, 1174 (5th Cir. 2006)). Such alleged facts must establish with particularity: (1) a misrepresentation that (2) the speaker knew to be false or made recklessly (3) with the intention to induce the plaintiff's reliance, followed by (4) actual and justifiable reliance (5) causing injury. *See, e.g.*, *McKinney/Pearl Restaurant Partners, L.P. v. Metro. Life Ins. Co.*, 241 F. Supp. 3d 737, 764 (N.D. Tex. 2017) (quoting *Rio Grande Royalty Co., Inc. v. Energy Transfer Partners, L.P.*, 620 F.3d 465, 468 (5th Cir. 2010)).

The Counterclaim does not state a claim upon which relief can be granted for fraud as required by Rule 12(b)(6), or with the particularity required by Rule 9(b). Specifically, it fails to "specify the statements contended to be fraudulent," "identify the speaker," or state "why the [alleged] statements were fraudulent." Instead, it contains only general allegations that "PNC Bank made false representations" and that "PNC Bank and Columbia failed to disclose … ." *See* Counterclaim ¶¶ 83–85.[11] This is insufficient to meet the particularity requirement of Rule 9(b).

Further, for the reasons set forth below as to each of the three "misrepresentations" that Counterclaimants allege, the Counterclaim fails to state a claim that could plausibly rise to the level of fraud.

***First***, the Counterclaim implausibly alleges that "PNC Bank made false representations to [the First] GP concerning the identity of the MBS Investor to induce [the First] GP to pay the MBS Investor Extension fees … ." This is not a viable allegation because (a) the identity of the

---

[11] Although the Counterclaim contains a list of representations from a particular phone call, none of them is the same as the representations set forth in the fraud claim itself. *Compare* Counterclaim ¶ 38, *with* ¶¶ 83–85.

"MBS Investor" was in fact disclosed; (b) the First GP suffered no injury resulting from this representation; and (c) the Counterclaim does not adequately allege causation.

The MBS Investor's identity was disclosed because the Delivery Assurance Certificate attached to the Forward Commitment, which *the First GP signed* on behalf of the Partnership, explicitly identifies the "MBS Investor" as PNC Capital Markets, LLC and also discloses the basic terms of its involvement in the transaction. *See* Ex. D at Recital B & p. S-1. The First GP's allegation that Plaintiffs did not disclose the MBS Investor's identity is plainly false. In fact, the Counterclaim even alludes to that fact when it admits that Counterclaimants suspected that the MBS Investor was affiliated with PNC—which by itself eliminates the causation, injury, and justifiable reliance elements of fraud. *See id.* ¶ 33. The actual disclosure of the MBS Investor's identity eliminates them all.

Further, the Counterclaim provides no basis for concluding that the First GP was injured by relying on any statement related to the MBS Investor's identity. *See* Counterclaim ¶ 83. Despite Counterclaimants' loose language on the issue ("… to induce *[the First] GP* to pay the MBS Investor Extension fees … ," *see id.* ¶ 83 (emphasis added)), the Counterclaim elsewhere admits that it was *the Partnership*, and not the First GP, that paid the extension fees to the MBS Investor. *See id.* ¶ 30 ("[The First] GP understood that the Partnership would have to pay fees in extending the Forward Commitment … ."). Therefore, the Counterclaim does not allege any injury to the First GP arising out of this alleged misrepresentation.

Additionally, the Counterclaim also wholly fails to explain how, even if true, a "misrepresentation" regarding the identity of the MBS Investor could ever plausibly cause any injury. In essence, the Counterclaim suggests that if the First GP had known the MBS Investor was PNC Capital Markets, LLC (which, again, it did), then the Partnership would have

inexplicably been excused from complying with the MBS Investor's requirements for obtaining a second extension of the Forward Commitment. That proposition is facially implausible. Under the express terms of the Forward Commitment, if the Partnership did not sign an agreement to pay additional fees to extend the Forward Commitment, it would have gone into default. *See id.* ¶¶ 33–34; Ex. C § L.1; Ex. D at Recital C & § 1. Further, there is no legal support for the idea that the MBS Investor's affiliate relationship with PNC, as lender, could without more cause any injury to the First GP (or anyone else, for that matter). *See, e.g.*, *Smith v. Tower Loan of Miss., Inc.* 216 F.R.D. 338, 360 (S.D. Miss. 2003) (rejecting claim for fraudulent and deceptive practices against lender based upon alleged failure to disclose affiliate relationship of insurer, noting disclosure of basic terms of transaction and lack of any injury from nondisclosure of affiliate relationship). Therefore, the MBS Investor's identity is immaterial.

*Second*, the Counterclaim doesn't set forth a plausible claim for "failing to disclose to [the First] GP that [PNC or Columbia] had interfered with the September 2016 favorable loan modification opportunity … ." *See id.* ¶ 84. In particular, the Complaint does not explain how PNC, as a lender, had a duty to disclose any internally discussed—but never offered—putative loan term modifications to the First GP. A fraud claim based upon an alleged omission is actionable only if the actor had a legal duty to disclose. *E.g.*, *Baker v. Great N. Energy, Inc.*, 64 F. Supp. 3d 965, 974–75 (N.D. Tex. 2014). It is well-settled under Texas law that lenders do not owe fiduciary duties of disclosure to borrowers. *E.g.*, *Williams v. Countrywide Home Loans, Inc.*, 504 F. Supp. 2d 176, 192–93 (S.D. Tex. 2007). Moreover, the First GP and the Developer waived any right to pursue such claims under the express terms of the Partnership Agreement:

> [T]he SLP, the ILP and their respective partners and Affiliates shall *have no liability* to the Partnership, the General Partner, or the Developer, as a result of any such loans … [and] each further agree that the SLP, the ILP, PNC Bank and their respective

> partners and Affiliates may … (ii) discuss matters related to the
> Project and the Partnership and share or disclose information with
> Lenders … and any such disclosures and discussions are expressly
> permitted and agreed to and **shall not constitute a breach of any**
> **duty or obligation, fiduciary or otherwise,** owed to the
> Partnership, the General Partner, the Developer, or any Affiliate
> thereof by the SLP, the ILP, …, or PNC Bank.

*See* Ex. A § 6.12 (emphasis added). Thus, the Counterclaim attempts to set forth a claim based

on a "failure to disclose" discussions that were expressly permitted by the parties' agreements.

Indeed, both the First GP and the Developer signed the Partnership Agreement. *See id.* p. 73.

There is no plausible factual or legal basis in the Counterclaim for inferring that PNC violated

any "duty to disclose" internal discussions concerning hypothetical loan modifications.

*Third*, the Counterclaim fails to state a claim for "misrepresent[ing] to [the First] GP that

[PNC and Columbia] consented to [the First] GP's pursuit of the Arbor Commercial Mortgage

loan and to GP defending the general contractor's claim … ."[12]

As to the *Arbor loan consent*, the Counterclaim doesn't show misrepresentation,

causation, or justifiable reliance. That consent was expressly conditioned on receipt of final

Arbor loan documents. *See* Ex. E. The Counterclaim doesn't (and couldn't) allege that this

prerequisite was performed. Further, the Counterclaim doesn't explain how this conditional

consent "misrepresented" anything, or how the First GP justifiably relied on that alleged consent

to its detriment. Since the Partnership was the anticipated borrower, the Counterclaim fails to

demonstrate how *the First GP* was injured by receiving that consent on the Partnership's behalf.

As to the **consent to defend** the lawsuit against the Partnership filed by Weis Builders,

the Counterclaim fails to state how this was a "misrepresentation" or how it could have caused

---

[12] Both of the alleged consents are in writing and referred to in the Counterclaim. *See* **Exhibit E**,
April 24, 2017 Letter from Kathleen Wu (conditional consent to Arbor financing); **Exhibit F**,
March 22, 2017 Email from Kathleen Wu (consent to answering lawsuit).

the First GP any injury. Columbia removed the First GP as a general partner in part because the Weis Builders litigation, which seeks judicial foreclosure of the Weis lien, was a material threat to the Partnership, and therefore constituted an Event of Default under the Partnership Agreement; not because the First GP *filed an answer to the lawsuit*. *See* Counterclaim ¶ 50. Further, the Counterclaim cannot plausibly allege facts to show that the consent to file an answer *caused* the First GP to default under the Partnership Agreement because the Weis Builders litigation had already been filed. It is implausible to suggest that Columbia had any realistic choice but to consent to defending the Weis litigation when the only other option was judicial foreclosure of Weis's lien against the Partnership's main asset.

In conclusion, none of the alleged "misrepresentations" or "failures to disclose" set forth above are sufficient to plausibly state a claim for fraud. Additionally, the Counterclaim does not answer the newspaper questions; to wit, Counterclaimants fail to identify who made the alleged misrepresentations, what specific statements were fraudulent, and how those acts constituted fraud as required by Rule 9(b). Moreover, for the reasons set forth above, these misrepresentations are not legally actionable because they fail to adequately allege the other necessary elements of a fraud claim. Thus, because a viable claim could not arise from these representations, the First GP's fraud claim should be dismissed with prejudice.

## C.     The Counterclaim Fails to State a Plausible Claim for Breach of Contract.

Counterclaimants fail to state a plausible claim for breach of §§ 7.1, 7.7, 5.1, and 9.1 of the Partnership Agreement or for anticipatory repudiation of certain fees and debts. In sum, each of these supposed breaches arises from the underlying allegation that Columbia improperly removed the First GP as the general partner of the Partnership. If that removal was proper, all of the resulting claims for breach necessarily fail.

The Counterclaim (and the Answer to which it is a part) admit sufficient facts to establish that the First GP was properly removed as the original general partner. In particular, the Counterclaimants "admit that the stucco installation at the Property requires remediation, which will cost money, and that Weis Builders has brought claims against the Partnership for non-payment of retainage sums, which sum is the subject of a lien by Weis against the Property." *See* Answer ¶ 14. Further, they admit that a fully executed G407 Certificate of Substantial Completion was never issued by the project architect, as required to achieve Final Construction Completion. *See* Counterclaim ¶¶ 21–22; Ex. A p. 7. The Counterclaim does not contain any facts sufficient to infer a legal excuse for these Events of Default.

As has been previously fully briefed to the Court, *see* [ECF Doc. Nos. 10, 18 & 69], Section 7.7 of the Partnership Agreement provides that, upon an Event of Default, Columbia was empowered to remove the First GP as the general partner in the Partnership. These "Events of Default" include the failure to achieve Final Construction Completion by the Completion Date of March 1, 2016 and the breach of any of the General Partner's obligations under the Partnership Agreement. *See* Ex. A § 7.7(a)(2), (a)(6).

Because it admits facts sufficient to establish that multiple Events of Default occurred, the First GP cannot plausibly state a claim for breach of contract based on its removal as general partner. The Court has previously ruled that Sections 7.7 and 9.1 of the Partnership Agreement are valid and enforceable remedies. *See* Doc. No. 73 at 18. The fact that Columbia exercised rights under these sections is legally insufficient to state a claim for breach of contract. Further, no amendment could plausibly allege otherwise. The Court should dismiss these claims for breach of contract with prejudice.

Similarly, because the Counterclaim admits facts that give rise to Events of Default, the First GP cannot complain that PNC or Columbia have repudiated a $1 million promissory note to the First GP (the "**GP Note**") and the Developer cannot complain about nonpayment of $5.175 million in development fees. *See* Counterclaim ¶¶ 79–80. As alleged in the Counterclaim, both of these purported repudiations arise from the First GP's removal as the original general partner. *See id.* But Counterclaimants cannot assert a breach of contract based on the First GP's removal in compliance with a Partnership Agreement to which they both agreed. Because they admit facts that establish that Events of Default occurred, they cannot plausibly complain of the consequences that follow.

Moreover, with respect to the GP Note, the Counterclaim does not plausibly allege facts constituting repudiation. Under Texas law, to establish anticipatory repudiation of a contract, a plaintiff must demonstrate (1) an absolute repudiation of the obligation; (2) a lack of a just excuse for the repudiation; and (3) damage to the non-repudiating party. *E.g.*, *Gonzalez v. Denning*, 394 F.3d 388, 394 (5th Cir. 2004). But here, the GP Note is only mentioned twice in the entire Counterclaim. *See* Counterclaim ¶¶ 14 & 79. In neither location does it allege facts sufficient to plausibly show that the Partnership has *absolutely repudiated* the GP Note. Instead, the Counterclaim merely contains that conclusory assertion in the cause of action itself. *See id.* ¶ 80. This is not enough to plausibly state a claim, and it must therefore be dismissed.

**D.      The Developer's Claim Under the Texas Theft Liability Act Is Barred by the Parties' Agreements.**

The Counterclaim also fails to state a plausible claim under the Texas Theft Liability Act ("**TTLA**") for theft of services. To state a claim for theft of services under the TTLA, a plaintiff must show that: (1) the plaintiff was the provider of services; (2) the defendant unlawfully obtained services in violation of certain sections of the Penal Code; and (3) the plaintiff sustained

damages as a result of the theft. *Wellogix, Inc. v. Accenture, LLP*, 788 F. Supp. 2d 523, 542 (S.D. Tex. 2011). To succeed on a theft of services claim, a plaintiff must additionally show that the defendant intended to avoid payment for services that he knew were provided only for compensation and must also establish one of four specific statutory grounds. TEX. PENAL CODE § 31.04(a); *Wellogix*, 788 F. Supp. 2d at 543. That is, the Plaintiff must prove that a *crime* occurred to recover under the TTLA.

The Counterclaim fails to allege any of the four additional grounds required by Tex. Penal Code § 31.04(a). *See* Counterclaim ¶¶ 98–100. To comply with the pleading standard required by Rule 8(a), the Counterclaim would have to give Plaintiffs fair notice of the statutory grounds for the TTLA claim. It doesn't, and it should therefore be dismissed.

Further, the Counterclaim improperly attempts to turn an ordinary breach of contract action into one under the TTLA. But that is not enough—the claimant must also prove that a *crime* occurred. Here, even if the Developer could establish that the First GP's removal was improper, its remedy would be for breach of contract for refusal to pay development fees, not for the commission of a crime. The Counterclaim contains no facts sufficient to infer such an action.

Moreover, the express terms of the parties' agreements bar this claim: upon an "Event of Default," the Developer lost its right to Development Fees. *See* Ex. A §§ 7.7(c)(4) ("Any and all rights and claims of the General Partner or any of its Affiliates[13] … for fees … and other payments owed by the Partnership shall terminate … ."). As discussed above, the Counterclaim admits facts sufficient to establish that an "Event of Default" occurred and that the First GP was properly removed as the general partner.

---

[13] "Affiliates" includes any "Person … controlled by or under common control with such initial Person." *See* Ex. A, p. 2. The Developer is admittedly under common control with the First GP. *See* Counterclaim ¶¶ 1–2, 5.

For these reasons, it is implausible to claim that, by resorting to a contractually permissible remedy, PNC or Columbia performed a criminal act. The claim for "Theft of Service" should be dismissed with prejudice.

**E.   The Counterclaim Fails to State a Plausible Claim for Breach of Fiduciary Duty.**

The Counterclaim fails to state a plausible claim for breach of fiduciary duty because it does not contain any facts sufficient to demonstrate that PNC and Columbia—as limited partners—owed fiduciary duties to the First GP or, for that matter, the Partnership.

Under Texas law, limited partners in a limited partnership generally *do not* owe any fiduciary duties to the limited partnership or to the general partner. *Strebel v. Wimberly*, 371 S.W.3d 267, 279 (Tex. App.—Houston [1st Dist.] 2012, pet. denied); *AON Props., Inc. v. Riveraine Corp.*, No. 14-96-00229-CV, 1999 WL 12739, at *23 (Tex. App.—Houston [14th Dist.] 1999, no pet.). This feature is what makes them "limited" partners. In extreme cases, a limited partner owes fiduciary duties when it exercises control over the limited partnership "in a way that justifies the recognition of such duties … ." *Strebel*, 371 S.W.3d at 279. "[I]t is not the party's status as a limited partner that gives rise to fiduciary duties; rather those duties exist by virtue of the additional relationship [as a person controlling or managing the affairs of the limited partnership]." *Id.*

The Counterclaim bases the alleged imposition of a fiduciary duty entirely on PNC's and Columbia's supposed "control" over the Partnership. *See* Counterclaim ¶¶ 11–12, 63. The *only* fact that the Counterclaim alleges with respect to this "control" is that "the Partnership Agreement gives Columbia active control over the Partnership … by requiring Columbia's consent for Partnership actions." *Id.* ¶¶ 11–12. The Counterclaim admits that such consent was in Columbia's "sole and absolute discretion" and that the Partnership Agreement does not impose a "standard [on Columbia] that involves the best interests of the partners and the Partnership." *Id.*

As a matter of law, the contractual requirement that Columbia provide consent before the First GP could take certain actions on behalf of the Partnership is insufficient to impose a fiduciary duty on a limited partner. Indeed, Texas law provides a wide range of actions that a limited partner can take without constituting control of the limited partnership, including "consulting with or advising a general partner on any matter" and "proposing, approving, or disapproving, by vote or otherwise" a laundry list of items, including "any [] matter stated in the partnership agreement." TEX. BUS. ORG. CODE § 153.103. Further, Columbia's consent rights are inherently consistent with its role as an investor. As in all such investments, the limited partners had consent rights that protected their capital contributions, which comprise essentially 100% of the equity funding for the Partnership. *See* Ex. A §§ 3.1, 3.2 & Exhibit 2.[14]

Moreover, as admitted in the Counterclaim, the Partnership Agreement expressly grants sole management and control of the partnership to the First GP and prohibits the limited partners from interfering with that control. *See* Ex. A §§ 6.1 & 7.2; Counterclaim ¶ 12. These provisions are sufficient under Texas law to establish that a general partner controls the limited partnership. *See Gonzalez v. De Leon*, No. 04–14–00751–CV, 2015 WL 5037396, at *6 (Tex. App.—San Antonio Aug. 26, 2015, pet. dism'd) (citing similar provisions for that proposition).

For these reasons, the Counterclaim fails to plausibly allege that either PNC or Columbia ever owed fiduciary duty to the First GP. Further, the First GP couldn't amend that claim to plausibly impose fiduciary duties on PNC or Columbia based on any provision of the Partnership Agreement. The Court should therefore dismiss this claim with prejudice.

---

[14] Far from being "unprecedented," if such consent rights were sufficient to impose a fiduciary duty on a limited partner, it would put tens of thousands of similar investments at risk throughout the United States in a variety of different industries where limited partnerships are commonly used, from real estate to oil and gas exploration.

**F.      Counterclaimants Fail to Plausibly Allege "Tying" Under the BHCA.**

The Counterclaim fails to allege a claim under for "tying" under 12 U.S.C. § 1972. To state a claim under the BHCA, a plaintiff must allege that (i) a bank conditioned the extension of credit upon ***the borrower's*** obtaining or offering additional credit, property or services to or from the bank or its holding company; (ii) the arrangement was not usual or traditional in the banking industry; and (iii) the practice conferred a benefit on the bank. *Highland Capital, Inc. v. Frankling Nat. Bank*, 350 F.3d 558, 565 (6th Cir. 2003). Additionally, the plaintiff must have suffered damages from the alleged tying. *See Swerdloff v. Miami Nat. Bank*, 584 F.2d 54, 60 (5th Cir. 1978). The "tied" service or product must be ***separate*** and ***unrelated*** to the primary extension of credit. *See, e.g.*, *New England Co. v. Bank of Gwinnett Cnty.*, 891 F. Supp. 1569, 1573–74 & n.1 (N.D. Ga. 1995). Further, "[a] bank's attempt to protect its investment by requiring that a borrower purchase or provide something usually provided in connection with a loan does not violate the BHCA." *Nordic Bank PLC v. Trend Grp., Ltd.*, 619 F. Supp. 542, 556 (S.D.N.Y. 1985).

Here, the first alleged "tying" is between PNC's extension of credit to the Partnership in the form of the Forward Commitment and the Bridge Loan. *See* Counterclaim ¶ 91.[15] Because these were both loans that were necessary and customary to accomplishing the same real estate development, the two loans are obviously related to each other. And, the Counterclaim does not contain any facts that, if true, would establish that PNC expressly *conditioned* the offer of the Forward Commitment on the Partnership's acceptance of the Bridge Loan (or vice versa) or that the offer of these two loans in the same real estate development transaction was unusual or suspect in the banking industry. *See id.* To the contrary, the Counterclaim expressly states that

---

[15] The Bridge Loan is essentially undescribed in the entire Counterclaim, and should therefore be disregarded.

the First GP *wanted* to do business with PNC because it was a "'one-stop shop' for providing the financing, tax credit purchasing, and equity the Eureka Entities needed." *See id.* ¶ 3. In any event, the First GP is not the borrower for either loan, and neither of these extensions of credit was made to the First GP. *See id.* ¶¶ 6, 29. Thus, the First GP sustained no direct injury. This claim does not set forth sufficient facts to plausibly show each of the elements of tying claim.

The second alleged "tying" is between "the extension of the permanent mortgage loan"—presumably, the Forward Commitment—and the First GP's alleged provision of development services. *See id.* ¶ 92. The Forward Commitment and the development of the Project are both self-evidently related to each other and were both, at one time, considered important to constructing the Lucero Apartments complex. And again, the permanent mortgage loan was an extension of credit *to the Partnership*, while *the Developer* performed development services. *See id.* ¶ 6, 75. The basic elements of a "tying" claim under the BHCA require that it is *the borrower* that receives both the extension of credit and that must obtain or offer the "tied" services. *See Highland Capital*, 350 F.3d at 565; *Nordic Bank*, 619 F. Supp. at 556. In this case, the First GP alleges that the Partnership received an extension of credit that was tied to *the First GP*'s provision of services. This is not a plausible "tying" claim.

The third alleged "tying" is between an unidentified extension of credit by PNC and the alleged "abuse" of PNC's role as limited partner to block the Partnership from consummating the purported Arbor bridge loan. But the Counterclaim doesn't plausibly allege that PNC ever demanded that the Partnership refrain from obtaining a loan from Arbor. *See id.* ¶ 53. In fact, it alleges the opposite: that PNC and Columbia gave consent to *pursue* the Arbor loan (subject to a prerequisite that never materialized). *See id.*; *see also* Ex. E. At best, the Counterclaim contains the conclusory allegation that PNC would not "allow [the First] GP to

close the loan," but fails to allege sufficient facts to show that Arbor was actually willing to do so. *See id.* ¶¶ 53–57. The Counterclaim also fails to plausibly allege that PNC took any action whatsoever to prevent the Partnership from closing on the Arbor loan.[16] In any event, at best Counterclaimants have pleaded a Partnership claim since the Partnership was the Arbor loan's putative borrower. They have alleged no independent, direct injury.

Finally, the fourth alleged "tying" is between yet another unidentified extension of credit from PNC and the specious idea that PNC requested an extension of credit from the First GP. *See id.* ¶ 94. Whatever the unnamed extension of credit from PNC was, it strains credulity to allege that a request from PNC (assuming that there was one) that the First GP defer receipt of contractual development fees (that were owed to the Developer) or other fees or compensation constituted an extension of credit to PNC by *the borrower*—i.e., the Partnership. And a request for additional security or undertakings in connection with a loan does not violate the BHCA. *See, e.g.*, *Nordic Bank*, 619 F. Supp. at 556. Again, the First GP creates a mismatch in trying to tie a nebulous extension of credit to the Partnership to some action by the First GP.

For these reasons, even assuming *arguendo* that the First GP has standing to bring direct claims in its own name for anti-competitive "tying" under the BHCA, each of the alleged bases fails to satisfy the elements necessary to state a plausible claim for relief.

### G.     Counterclaimants' Claims for "Unjust Enrichment" and Promissory Estoppel Are Legally Insufficient and Are Barred by the Parties' Express Agreements.

There are two main reasons why these equitable claims are not viable. ***First***, there is no generalized claim for "unjust enrichment" under Texas law, as opposed to a claim in quantum

---

[16]  In fact, the First GP, appears to claim that the Arbor loan wouldn't close because PNC wouldn't waive conditions precedent in the Partnership Agreement and advance free money to bail the First GP out of the mess it had created. *Compare id.* ¶¶ 54–55 (claiming failure to fund capital contributions), *with* Ex. A. § 3.2 (conditions on capital contributions, including achievement of "Final Construction Completion" and "receipt of all … lien waivers").

meruit for benefits received, absent a contract, under circumstances that give rise to an obligation to repay. *E.g.*, *Galvez v. Tornado Bus Co.*, No. 05–13–00993–CV, 2015 WL 1730175, at *10 (Tex. App.—Dallas Apr. 15, 2015, pet. denied); *R.M. Dudley Constr. Co. v. Dawson*, 258 S.W.3d 694, 703 (Tex. App.—Waco 2008, pet. denied); *Doss v. Homecoming Fin. Network, Inc.*, 210 S.W.3d 706, 709 n.4 (Tex. App.—Corpus Christi 2006, pet. denied).[17] Under Texas law, an unjust enrichment theory is proper where "one person has obtained a benefit from another by fraud, duress, or the taking an undue advantage." *Heldenfels Bros., Inc. v. City of Corpus Christi*, 832 S.W.2d 39, 41 (Tex. 1992). But the cause of action "is not a proper remedy merely because it might appear expedient or generally fair that some recompense be afford for an unfortunate loss … or because the benefits to the person sought to be charged amount to a windfall." *Id.* (quotation omitted).

Here, the unjust enrichment claim alleges a generic theory that "PNC Bank and Columbia have sought and exercised self-help and engaged in impermissible self-dealing … through their above-described acts and omissions constituting fraud, breach of fiduciary duty and violations of statutes." *See* Counterclaim ¶ 106. In addition to being wholly duplicative of these other counts, this is precisely the type of "expedient" relief of which the Texas Supreme Court has specifically disapproved. *See Heldenfels*, 832 S.W.2d at 41. Instead of identifying a specific benefit conferred, Counterclaimants merely allege that PNC and Columbia have been unjustly benefitted by reference to vague "self-help" and "self-dealing" and "fraud, breach of fiduciary duty, and violations of statutes."[18] At its core, the Counterclaim alleges that Plaintiffs did something unfair, and that Counterclaimants should therefore be permitted to recover damages based on those

---

[17] Although a number of Texas cases use the terms quantum meruit and unjust enrichment interchangeably, it is clear that the cases are discussing a claim arising out of quasi-contract. *See, e.g.*, *Galvez*, 2015 WL 1730175 at *10.

[18] The Counterclaim is silent as to the identification of these purported statutes.

unfair acts. This is insufficient to state a claim for unjust enrichment (i.e., quantum meruit) under Texas law.

***Second***, both the unjust enrichment and promissory estoppel claims are barred by the express terms of the Partnership Agreement and the Development Agreement. Under Texas law, an action for unjust enrichment (i.e., quantum meruit) or promissory estoppel cannot be brought when an express contract covers the materials, services, or promises at issue. *E.g.*, *In re Kellog Brown & Root*, 166 S.W.3d 732, 740 (Tex. 2005) (quantum meruit); *Stable Energy, L.P. v. Kachina Oil & Gas, Inc.*, 52 S.W.3d 327, 336 (Tex. App.—Austin 2001, no pet.) (promissory estoppel). "The doctrine of unjust enrichment does not operate to rescue a party from the consequences of a bad bargain, and the enrichment of one party at the expense of the other is not unjust where it is permissible under the terms of an express contract." *First Union Nat. Bank v. Richmont Capital Partners I, L.P.*, 168 S.W.2d 917, 938 (Tex. App.—Dallas 2005, no pet.). "The effect of written contracts on claims for unjust enrichment is one of law." *Fortune Prod. Co. v. Conoco, Inc.*, 52 S.W.3d 671, 683 (Tex. 2000).

Here, all of the alleged acts are covered by the express terms of the Partnership Agreement and the Development Agreement. As discussed above, the Partnership Agreement establishes the rights and duties of the parties; sets forth grounds for removal of the First GP; and provides a list of consequences that follow from that removal. *See, e.g.*, Ex. A §§ 6.1, 6.5, 6.7, 7.2, 7.7, & 9.1. Both agreements also expressly provide for the compensation and benefits that the First GP and the Developer may be entitled to and when the rights to those benefits could be lost through default on their obligations. *See, e.g.*, Ex. A §§ 4.2, 7.7, 9.1; Ex. B §§ 1, 2, 4. In particular, the Partnership Agreement clearly spells out that the Developer loses the right to

collect development fees after the removal of its affiliate, the First GP, as general partner. *See* Ex. A §§ 6.7(j), 6.8(a) & 7.7(c)(4); *see also* Ex. B § 5.

Further, as to the allegedly "promised consents" in the promissory estoppel claim, the Partnership Agreement expressly covers the consents required for the First GP to take certain actions on behalf of the Partnership and provides that consent may be given or withheld in Columbia's discretion. *See* Ex. A § 6.2. Further, the face of the consents shows that they don't contain any open-ended promises like the ones alleged in the Counterclaim. *See* Exs. E & F.

In effect, Counterclaimants are trying to use their causes of action for "unjust enrichment" and promissory estoppel as backdoors to circumvent or excuse them from the express terms of their written agreements. Such claims are not cognizable under Texas law.

## H. Counterclaimants' Claim for Conspiracy Must Be Dismissed Because All of the Predicate Tort Claims Fail.

Under Texas law, civil conspiracy is a derivative tort for imposing joint and several liability and is not an independent claim for damages. *Meadows v. Hartford Life Ins. Co.*, 492 F.3d 634, 640 (5th Cir. 2007) (applying Texas law). Thus, to prove conspiracy, a plaintiff must establish one or more unlawful, overt acts as a basis, among other elements. *Apani Sw., Inc. v. Coca–Cola Enters., Inc.,* 300 F.3d 620, 635 (5th Cir. 2002) (quoting *Massey v. Armco Steel Co.,* 652 S.W.2d 932, 934 (Tex. 1983)). Thus, "[i]f a plaintiff fails to state a separate underlying claim on which the court may grant relief, then a claim for civil conspiracy necessarily fails." *Meadows*, 492 F.3d at 640 (citing *Tilton v. Marshall*, 925 S.W.2d 672, 681 (Tex. 1996)). A conspiracy claim cannot be based on breach of contract because it's not a tort. *See, e.g.*, *Leasehold Expense Recovery, Inc. v. Mothers Work, Inc.*, 331 F.3d 452, 463 (5th Cir. 2003) (applying Texas law).

For the reasons set forth above, Counterclaimants have failed to set forth any viable tort claim, including for breach of fiduciary duty or fraud. To the extent claims under the TTLA, for "unjust enrichment," promissory estoppel, or under 12 U.S.C. § 1972 constitute torts (as opposed to statutory or equitable claims), those also fail. Because Counterclaimants have failed to state a claim for a predicate tort, their claim for conspiracy should be dismissed.

## I.     Counterclaimants' Numerous Requests for Declaratory Judgment Are Improper.

Finally, the Counterclaimants' numerous requests for declaratory judgment should be dismissed because they do not request types of relief for which declaratory judgment is appropriate.

Under the federal Declaratory Judgment Act, courts reject requests for declaratory relief concerning matters that will be resolved as part of the plaintiff's claims. *City of Waco v. Kleinfelder Central, Inc.*, 2016 WL 5854290, at *9 (W.D. Tex. Oct. 6, 2016). A "declaration is unnecessary [where the] [p]laintiff has already placed the issues relevant to [d]efendant's counterclaim before the Court." *Id.* (citing cases).[19] If "a request for declaratory judgment adds nothing to an existing suit, it need not be permitted." *McKinney/Pearl*, 241 F. Supp. 3d at 775. Thus, "courts regularly reject declaratory judgment claims that seek resolution of matters that will already be resolved as part of the claims in the lawsuit." *Regus Mgmt. Grp., LLC, v. IBM*, No. Civ. A. 3:07-cv-1799-B, 2008 WL 2434245, at *2 (N.D. Tex. June 17, 2008).

The First GP unnecessarily and improperly requests declaratory relief that PNC and Columbia have wrongfully, improperly, or unjustifiably acted to remove the First GP; that the First GP remains a partner in the Partnership; and that neither the First GP nor its affiliates have

---

[19] Because the operation of the Declaratory Judgment Act is procedural, federal courts apply the federal statute, even in a diversity case. *E.g.*, *Tex. Mut. Ins. Co. v. Wood Energy Grp., Inc.*, 604 F. Supp. 2d 942, 948 n.2 (W.D. Tex. 2009).

forfeited or relinquished any rights or economic interests in the Partnership. *See* Counterclaim ¶ 117.g-i. These requests are the mirror image of claims for breach of contract and requests for declaratory relief set forth in Plaintiffs' Amended Complaint. Any disputed issues of fact as to these matters will inevitably be resolved on Plaintiffs' claims for breach of the Partnership Agreement, all of which put the First GP's failures, the occurrence of "Events of Default," and Columbia's removal of the First GP at issue. Thus, the First GP's requests for declaratory judgment are superfluous and should be dismissed.

Finally, the First GP's request for a declaration that it does not owe the non-delivery fee under the Forward Commitment improperly seeks relief based on hypothetical facts. *See, e.g.*, *Vantage Trailers, Inc. v. Beall Corp.*, 567 F.3d 745, 748 (5th Cir. 2009). The Counterclaim contains no facts that would, if true, demonstrate that PNC has demanded that the First GP personally pay that fee, as opposed to the Partnership. *See* Counterclaim ¶¶ 43 & 117.a. As on so many other issues, the Counterclaim pays lip service to the payment of the fee by the "First GP." But the actual notices it refers to are addressed to *the Partnership*, not the First GP. *See* **Exhibit G**, Notice of Default Under Forward Commitment; **Exhibit H**, Notice of Termination of Forward Commitment. Further, the First GP does not show that it would suffer any injury from *the Partnership's* payment of the non-delivery fee. The First GP cannot state a plausible request for declaratory relief since the matter exclusively affects the Partnership. Therefore, the First GP cannot request this hypothetical declaratory relief.

For these reasons, the Counterclaim does not set forth any cognizable request for declaratory judgment, and it should therefore be dismissed.

Dated: September 28, 2017.

By: /s/ *Robert M. Hoffman*
Robert M. Hoffman
Texas Bar No. 09788200
robhoffman@andrewskurth.com
James C. Bookhout
Texas Bar No. 24087187
jamesbookhout@andrewskurth.com
ANDREWS KURTH KENYON LLP
1717 Main Street, Suite 3700
Dallas, Texas 75201
Telephone:   (214) 659-4400
Facsimile:    (214) 659-4401

David P. Whittlesey
Texas Bar No. 00791920
dwhittlesey@andrewskurth.com
ANDREWS KURTH KENYON LLP
111 Congress Avenue, Suite 1700
Austin, Texas 78701
Telephone:   (512) 320-9200
Facsimile:    (512) 320-9292

**ATTORNEYS FOR PLAINTIFFS
PNC BANK, N.A., COLUMBIA HOUSING SLP
CORPORATION, AND 2013 TRAVIS OAK
CREEK, LP**

## CERTIFICATE OF SERVICE

I certify that on September 28, 2017, a copy of the foregoing document was served on all counsel of record via the Court's CM/ECF facilities.

/s/ *Robert M. Hoffman*
Robert M. Hoffman