**AMENDED AND RESTATED**

**AGREEMENT OF LIMITED PARTNERSHIP OF**

**2013 TRAVIS OAK CREEK, LP**

**MAY 23, 2014**

4837-4545-8969.4

PLAINTIFFS_00008456

TABLE OF CONTENTS

Page

ARTICLE I
NAME AND BUSINESS

1.1.    Name ........................................................................................................... 1

1.2.    Place of Business; Registered Agent ......................................................... 1

1.3.    General and Limited Partners; Time of Admission and/or Withdrawal .... 1

1.4.    Purposes ...................................................................................................... 1

1.5.    Term ............................................................................................................ 2

ARTICLE II

DEFINITIONS ........................................................................................................ 2

ARTICLE III
CAPITAL

3.1.    Capital Contributions of the General Partner ........................................... 15

3.2.    Capital Contributions of the Limited Partner ........................................... 15

3.3.    Capital Account ......................................................................................... 18

3.4.    Interest ....................................................................................................... 18

3.5.    Tax Credit Covenants, Duties and Obligations; Adjustments to Capital Contributions ........... 18

3.6.    Security Interest ........................................................................................ 21

ARTICLE IV
ALLOCATION OF PROFIT AND LOSS; DISTRIBUTIONS

4.1.    Allocation of Net Profit and Net Loss ...................................................... 21

4.2.    Distribution of Net Cash Flow .................................................................. 23

4.3.    Allocation of Net Profit on Sale ............................................................... 24

4.4.    Allocation of Net Loss From Sale ............................................................ 24

4.5.    Distribution of Net Cash Proceeds From a Sale or Refinancing .............. 24

4.6.    Revaluation of Partnership Property ......................................................... 25

4.7.    Consent to Allocations and Distributions ................................................. 25

4.8.    Allocations and Distributions Within a Class ........................................... 25

4.9.    Miscellaneous ........................................................................................... 25

ARTICLE V
PURCHASE OF LIMITED PARTNERS' INTERESTS

5.1.    Right To Require Repurchase .................................................................... 27

5.2.    Purchase Price ........................................................................................... 29

5.3.    Notice ........................................................................................................ 29

ARTICLE VI
RIGHTS, POWERS AND DUTIES OF GENERAL PARTNER

6.1.    Powers ....................................................................................................... 29

6.2.    Restrictions on Authority of General Partner ........................................... 30

CONFIDENTIAL

PLAINTIFFS_00008457

| | | |
|---|---|---|
| 6.3. | Single Purpose Entity | 32 |
| 6.4. | [Reserved] | 33 |
| 6.5. | Duties, Covenants, Obligations, Representations and Warranties | 33 |
| 6.6. | Limitation on Liability; Indemnification | 40 |
| 6.7. | Development Duties, Covenants and Obligations | 41 |
| 6.8. | Development and Other Fees | 43 |
| 6.9. | Environmental Matters | 45 |
| 6.10. | Partnership Manager and Tax Matters Partner | 46 |
| 6.11. | Property Manager | 47 |
| 6.12. | Transactions With Lenders, Agencies and Affiliates of the SLP or the ILP | 49 |
| 6.13. | Applied Amounts | 50 |

ARTICLE VII
RIGHTS AND LIMITATIONS OF LIMITED PARTNERS

| | | |
|---|---|---|
| 7.1. | Limited Assessment | 50 |
| 7.2. | No Right To Manage; Right To Inspect | 50 |
| 7.3. | Priority | 51 |
| 7.4. | Death, Disability, etc. of a Limited Partner | 51 |
| 7.5. | Meetings | 51 |
| 7.6. | Proposal and Adoption of Amendments Generally | 51 |
| 7.7. | Special Rights of the Limited Partners | 52 |
| 7.8. | Extraordinary Limited Partner Expenses | 56 |
| 7.9. | Limited Partners as Lenders | 56 |
| 7.10. | Sale; Purchase Option and Right of First Refusal | 57 |

ARTICLE VIII
TRANSFER BY LIMITED PARTNERS

| | | |
|---|---|---|
| 8.1. | Compliance With Securities Laws | 59 |
| 8.2. | Transfer and Substitution | 59 |
| 8.3. | Status of Transferee | 59 |
| 8.4. | SLP Consent | 60 |

ARTICLE IX
CHANGES AMONG GENERAL PARTNERS

| | | |
|---|---|---|
| 9.1. | Withdrawal | 60 |
| 9.2. | Obligation To Continue | 61 |
| 9.3. | Withdrawal of All General Partners | 61 |
| 9.4. | Interest of General Partner After Permitted Withdrawal | 61 |
| 9.5. | SLP Consent | 62 |

ARTICLE X
ACCOUNTING, RECORDS & FINANCIAL REPORTING

4837-4545-8969.4

CONFIDENTIAL

PLAINTIFFS_00008458

| | | |
|---|---|---|
| 10.1. | Books and Records | 62 |
| 10.2. | Books of Account | 62 |
| 10.3. | Fiscal Year | 62 |
| 10.4. | Special Basis Adjustments | 62 |
| 10.5. | Bank Accounts | 62 |
| 10.6. | Accountants | 62 |
| 10.7. | Construction Draws, Audits, Tax Filings and Compliance | 62 |
| 10.8. | Insurance | 67 |
| 10.9. | Operating and Capital Expenditure Budgets | 67 |
| 10.10. | Other Management Reporting, Miscellaneous | 68 |
| 10.11. | Reporting Defaults | 68 |
| 10.12. | Elections | 69 |
| 10.13. | General Terms and Provisions of Article X | 69 |
| 10.14. | Compliance With Other Interested Parties | 69 |

### ARTICLE XI
### TERMINATION AND DISSOLUTION

| | | |
|---|---|---|
| 11.1. | Dissolution | 69 |
| 11.2. | Distribution of Assets | 70 |

### ARTICLE XII

| | | |
|---|---|---|
| AGENCY REGULATIONS | | 70 |

### ARTICLE XIII
### MISCELLANEOUS

| | | |
|---|---|---|
| 13.1. | Notices | 71 |
| 13.2. | Entire Agreement | 71 |
| 13.3. | Joint and Several Obligations | 71 |
| 13.4. | Consents and Approvals | 71 |
| 13.5. | Headings | 71 |
| 13.6. | Certain Provisions | 71 |
| 13.7. | Saving Clause | 71 |
| 13.8. | Pronouns and Plurals | 71 |
| 13.9. | Binding Agreement | 71 |
| 13.10. | Remedies Not Exclusive | 71 |
| 13.11. | Counterparts | 71 |
| 13.12. | Governing Law, Jurisdiction and Venue | 72 |
| 13.13. | No Third-Party Beneficiary | 72 |

EXHIBIT 1 REAL PROPERTY DESCRIPTION
EXHIBIT 2 PARTNERS' CAPITAL CONTRIBUTIONS AND INTERESTS

EXHIBIT 3  GENERAL PARTNER'S FUNDING CERTIFICATE

iii

4837-4545-8969.4

EXHIBIT 4 PLANS AND SPECIFICATIONS

EXHIBIT 5 AGREEMENT OF GUARANTY

EXHIBIT 6 REQUIRED INSURANCE

EXHIBIT 7 FORM OF TRANSFER AMENDMENT

EXHIBIT 8 PROJECT FORECAST

EXHIBIT 9 FORM OF ACCOUNTANT'S ADDENDUM

EXHIBIT 10 FORM OF QUARTERLY STATUS REPORT

4837-4545-8969.4

CONFIDENTIAL

PLAINTIFFS_00008460

**AMENDED AND RESTATED**
**AGREEMENT OF LIMITED PARTNERSHIP OF**
**2013 TRAVIS OAK CREEK, LP**

**THIS AMENDED AND RESTATED AGREEMENT OF LIMITED PARTNERSHIP** (this "**Agreement**") is entered into as of May 23, 2014, by and among **2013 TRAVIS OAK CREEK GP, LLC**, a Texas limited liability company (the "General Partner"), **RENE O. CAMPOS**, in his individual capacity (the "**Original Limited Partner**"), **PNC BANK, NATIONAL ASSOCIATION**, a national banking association (the "**ILP**"), and **COLUMBIA HOUSING SLP CORPORATION**, an Oregon corporation (the "**SLP**").

W I T N E S S E T H :

WHEREAS, the Partnership was originally formed as a limited partnership under the laws of the State pursuant to the Original Certificate and Original Agreement; and

WHEREAS, this Agreement is entered into to amend and restate the Original Agreement to (i) admit the ILP and SLP as Limited Partners, (ii) provide for the withdrawal of the Original Limited Partner and (iii) set out more fully the rights, obligations, and duties of the General Partner and the Limited Partners.

NOW, THEREFORE, the parties agree to the continuation of the Partnership as a limited partnership pursuant to the Partnership Act upon the following terms and conditions which amend, restate and supersede those set forth in the Original Agreement. Capitalized terms shall have their meanings set forth in Article II.

**ARTICLE I**

**NAME AND BUSINESS**

1.1.    <u>Name</u>.  The name of the Partnership continues to be 2013 Travis Oak Creek, LP, and the federal tax identification number for the Partnership is 46-1682109.

1.2.    <u>Place of Business; Registered Agent</u>.  The principal place of business of the Partnership in the State is located at the address so identified in the Schedule, or such other place as the General Partner may hereafter designate upon written notice to the Limited Partners.  The Partnership's registered agent for service of process in the State shall be as identified in the Schedule.

1.3.    <u>General and Limited Partners; Time of Admission and/or Withdrawal</u>.

(a)    The names and addresses of the Partners are as set forth on <u>Exhibit 2</u>.

(b)    The ILP and the SLP shall be deemed to be admitted to the Partnership as such as of the Closing Date.

(c)    The Original Limited Partner hereby acknowledges the return of its capital contributions to the Partnership and withdraws from the Partnership and hereby represents that the Original Limited Partner's spouse, if any, has been notified of such withdrawal and return of capital contributions and further represents that neither the Original Limited Partner nor their spouse, if any, has any interest in or claims against the Partnership as a partner thereof or as a spouse thereof.

(d)    Any Partner admitted after the Closing Date in accordance with this Agreement shall be deemed to have been admitted to the Partnership as of the first day of the calendar month during which such Partner is admitted.

1.4.    <u>Purposes</u>.  The only purposes of the Partnership are to acquire, construct and/or rehabilitate as applicable, own, develop, operate, maintain, manage, lease, sell, mortgage or otherwise dispose of the Project.  The

1

4837-4545-8969.4

PLAINTIFFS_00008461

Project shall be operated in accordance with Section 42 of the Code and applicable Lender and Agency requirements taking into account the overriding obligation to ensure the availability of Tax Credit to the Partnership as provided herein.

      1.5.    <u>Term</u>.  The Partnership shall continue until the Termination Date.

<strong>ARTICLE II</strong>

<strong>DEFINITIONS</strong>

<u>Accountant Addendum</u> means the addendum to the engagement letter entered into between the Partnership and the Accountants, the form of which is attached as <u>Exhibit 9</u>.

<u>Accountants</u> means the firm so identified in the Schedule, or such other certified public accountant firm with expertise in partnership tax and accounting and Section 42 of the Code as may be engaged by the General Partner at the expense of the Partnership and with the Consent of the SLP, which Consent shall not be unreasonably withheld.

<u>Actual Tax Credit</u> means, with respect to any Fiscal Year, the total amount of Tax Credit properly reported and available to be claimed by the Partnership and the ILP on the respective federal information and income tax returns for that Fiscal Year, and allowed to the Partnership and the ILP, taking into account any adjustments thereto by the Internal Revenue Service.

<u>Additional Credit</u> shall have the meaning set forth in Section 3.5(c).

<u>Adjustment Amount</u> shall have the meaning described in Section 3.5.

<u>Affiliate</u> means as to any Person (a) any other Person directly or indirectly controlling, controlled by or under common control with such initial Person, (b) any other Person controlling 10% or more of the outstanding voting securities of such initial Person, (c) any officer, director, trustee, manager, managing member or general partner of such initial Person, and (d) if such initial Person is an officer, director, trustee, manager, managing member or general partner of any company or entity, any other company or entity for which such Person acts in any such capacity.

<u>Affiliate Loan</u> means any loan or advance made to the Partnership by the General Partner, Developer or Guarantor and Affiliates thereof.

<u>Agency</u> means the Tax Credit Agency, and any other government or regulatory agency providing financial assistance or regulatory oversight to the Project or the Partnership.

<u>Agency Set-Aside Test</u> means the set-aside test whereby at least 18 of the units in the Project must be occupied by individuals with income equal to no more than 30% of area median income, as adjusted for family size, at least 70 of the units in the Project must be occupied by individuals with income equal to no more than 50% of area median income, as adjusted for family size, at least 85 of the units in the Project must be occupied by individuals with income equal to no more than 60% of area median income, as adjusted for family size and at least 9 units in the Project must be special needs units as defined by the Tax Credit Agency.

<u>Agreement</u> means this Amended and Restated Agreement of Limited Partnership, as it may be amended from time to time.

<u>AIA</u> means the American Institute of Architects.

<u>ALTA Survey</u> means a survey of the Project prepared in accordance with 2011 surveying standards of the American Land Title Association and the American Congress on Surveying and Mapping and certified to the Partnership, the ILP and the SLP and otherwise in form and substance satisfactory to the SLP.

2

4837-4545-8969.4

CONFIDENTIAL PLAINTIFFS_00008462

Ancillary Income means any type of underwritten revenue (as specified in Exhibit 8) which is received by the Partnership and is not residential rental income.

Applicable Percentage means the percentage defined in Section 42(b) of the Code.

Applied Amounts shall have the meaning given to it in Section 6.13.

Architectural Contract means the agreement so identified in the Schedule entered into by and between the Partnership and the Project Architect.

Breakeven Operations means, for any specified period, the Operating Revenues (based on actual Project operations rather than underwritten) equal or exceed Operating Expenses (based on actual Project operations rather than underwritten), mandatory Debt Service, and any other obligation payable during such period under any of the Project Documents.

Bridge Loan means the loan so identified in the Schedule.

Builder means the company so identified in the Schedule.

Capital Account shall have the meaning given in Section 3.3.

Capital Contribution means the amount of money or the fair market value of other property contributed to the Partnership by a Partner as provided in Article III.

Capital Expenditures means customary and reasonable costs and expenses incurred by the Partnership in connection with certain major repairs, replacements and improvements of the Project which are normally capitalized under generally accepted accounting principles, including, but not limited to, the performance of work to the roofs, chimneys, gutters, downspouts, paving, curbs, ramps, driveways, balconies, porches, patios, exterior walls, exterior doors and doorways, windows, elevators, interior walls, appliances, carpeting, painting, vinyl flooring, plumbing, plumbing fixtures, countertops, cabinets, water heaters, electrical systems, electrical fixtures, clubhouse repairs, pool, spa, landscaping, fences, gates, parking areas, carports, garages, sidewalks, light fixtures, shingles, woods, bricks, stucco, security systems, smoke detectors, stairs, boilers, laundry room, window treatments, bath vanities, bathtubs and mechanical and HVAC equipment.

Carryover Allocation means a valid issuance of an allocation of Tax Credit to the Partnership in the amount set forth in the Schedule made pursuant to Section 42(h)(1)(E) of the Code.

Change in Law means an amendment to the Code or Treasury Regulations that is applicable to the Partnership and that provides for a change in the amount of the Tax Credit or that substantially changes the requirements for qualifying for the Tax Credit in a manner which Tax Counsel determines cannot be satisfied by the Partnership.

City Mortgage Loan means the loan so identified in the Schedule.

Closing Date means the date of this Agreement or, if later, the date the ILP and SLP are admitted to the Partnership.

Code means the Internal Revenue Code of 1986, as amended.

Completion Date means the date as identified in the Schedule.

Compliance Period shall have the meaning defined in Section 42(i) of the Code.

Consent means prior written approval in accordance with Section 13.4.

3

CONFIDENTIAL               PLAINTIFFS_00008463

Construction Consultant means the firm so identified in the Schedule.

Construction Contract means the agreement so identified in the Schedule.

Construction Loan means the loan so identified in the Schedule.

Construction Draw shall have the meaning set forth in Section 10.7(a)(2).

Controlling Interest means the power to direct the management and policies of any Person as a result of holding directly or indirectly whether through the ownership of voting securities, by contract or otherwise (which shall include, without limitation, the Person(s) with the largest share of voting rights in such Person).

Cost Certification means the written certification of the Accountants, in form and substance reasonably satisfactory to the SLP, as to the itemized amounts of the construction and/or acquisition and rehabilitation costs, as applicable, together with all other development costs of the Project and the Eligible Basis and Applicable Percentage pertaining to each building in the Project.

Credit Adjuster Obligation shall have the meaning set forth in Section 3.5(b).

Credit Period shall have the meaning defined in Section 42(f)(1) of the Code.

Debt Service means principal, interest and other recurring charges and fees required to be paid monthly (but excluding monthly funding of the Replacement Reserve Account and escrows for taxes and insurance which are includible as Operating Expenses), quarterly or annually in connection with any Permitted Loan if payment is not contingent on available Net Cash Flow.

Debt Service Coverage means Operating Revenue less Operating Expenses expressed as a percentage of all mandatory Debt Service (including pro forma monthly principal and interest payments on the Permitted Loan if the month under consideration is prior to commencement of principal and amortization on the Permitted Loan or for any monthly period that the Partnership has agreed to a forbearance with any Lender). For the purposes of the foregoing calculation, actual Debt Service shall be modified to reflect the maximum possible monthly debt service payment amounts during the life of the relevant Permitted Loan (absent default or maturity), even if such maximum amounts are not then accruing or being charged.

Deferred Development Fee shall have the meaning set forth in Section 6.8(a).

Delivery Percentages means the percentages on the Schedule.

Developer means the entity so identified in the Schedule.  In the event that there is more than one Developer, then the term "Developer" will include all such Developers.

Development Agreement means the agreement so identified in the Schedule.

Development Completion Obligation shall bear the meaning set forth in Section 6.7(j).

Development Costs means, at any point in time, all costs, liabilities and expenses associated with acquiring, constructing/rehabilitating, developing or operating the Project, including, but not limited to, those costs reflected in the Project Forecast and including payment of the Development Fee (net of any Deferred Development Fee), which have been incurred to (i) acquire the Project, (ii) achieve Final Construction Completion, (iii) remedy any defects in the construction of the Project and/or any variance in construction from the Plans and Specifications that is discovered within one (1) year after initial occupancy of all of the dwelling units or should have been discovered within such time period and is actually discovered not later than three (3) years after initial occupancy of all of the dwelling units, (iv) achieve Stabilized Occupancy (including all Operating Expenses and Debt Service attributable to the period prior to achievement of Stabilized Occupancy), (v) fund the reserves (including, without limitation, the

4

CONFIDENTIAL                                                     PLAINTIFFS_00008464

reserves specified in Section 6.5(c) herein) and escrows required hereunder and (vi) achieve Mortgage Loan Commencement.

Development Fee means the fee described in Section 6.8(a).

Development Funds means, at any point in time, the aggregate of (i) proceeds of the Permitted Loan and Capital Contributions which have been funded to the Partnership, (ii) Operating Revenue of the Partnership and (iii) available insurance proceeds of the Partnership, but only to the extent the foregoing are permitted to be used to satisfy Development Costs.

Distributions means any money or other property distributed to Partners with respect to their interests in the Partnership without consideration therefor, but shall not include any payments permitted by Section 6.8.

DRO Notice shall have the meaning set forth in Section 11.2.

Economic Occupancy means, for a given period of time, the actual gross rental revenues (including payments under the HAP Contract) received from the Project less rent concessions, rebates and credit loss divided by contracted rents under written leases.

8609 Application Filing means the filing by the Partnership of all required documents with the Tax Credit Agency for purposes of the 8609 Issuance, which documents must be reasonably satisfactory to the SLP.

8609 Issuance means the valid issuance by the Tax Credit Agency of Internal Revenue Service Form(s) 8609 for each residential building in the Project.

Eligible Basis shall have the meaning set forth in Section 42(d) of the Code.

Environmental Laws means all local, state, and federal laws, ordinances, regulations, orders, and reported state or federal court decisions thereunder relating to: environmental protection, the use, storage, generation, production, treatment, emission, release, discharge, remediation, removal, disposal, or transport of any Hazardous Substance, or any other environmental matter, including, but not limited to, any of the following statutes:

| | |
|---|---|
| (a) | Federal Resource Conservation and Recovery Act of 1976, as amended, 42 U.S.C. §§ 6901-6991k; |
| (b) | Federal Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended, 42 U.S.C. §§ 9601-9675; |
| (c) | Federal Clean Air Act, as amended, 42 U.S.C. §§ 7401-7642; |
| (d) | Federal Hazardous Material Transportation Control Act of 1970, as amended, 42 U.S.C. §§ 1801-1812; |
| (e) | Federal Clean Water Act of 1977, as amended, 33 U.S.C. §§ 1251-1387; |
| (f) | Federal Insecticide, Fungicide, and Rodenticide Act, as amended, 7 U.S.C. §§ 136-136y; |
| (g) | Federal Toxic Substances Control Act, 15 U.S.C. §§ 2601-2671; |
| (h) | Federal Safe Drinking Water Act, 42 U.S.C. §§ 300f-300i-26; |
| (i) | Federal Atomic Energy Act, 42 U.S.C. §§ 2011-2297g-4; |
| (j) | Federal Occupational Safety and Health Act of 1970, as amended, 19 U.S.C. §§ 651 et seq.; and |
| (k) | Federal Oil Pollution Act of 1990, as amended, 33 U.S.C. §§ 2701 et seq. |

Environmental Reports means those certain reports so identified in the Schedule.

Event of Bankruptcy means, with respect to the Partnership, a Guarantor, or a Person with a Controlling Interest in the General Partner (i) the voluntary or involuntary filing of a petition in bankruptcy by or against any of the foregoing parties under the Bankruptcy Code (11 U.S.C. §§ 1101 et seq.), as amended, or any successor statute thereto, or the commission of an act of bankruptcy (except if the filing of the petition in bankruptcy or act of bankruptcy is susceptible to cure or dismissal and is so cured or dismissed within sixty (60) days of the filing or act thereof); (ii) the voluntary or involuntary commencement of an assignment for the benefit of creditors, a

4837-4545-8969.4

CONFIDENTIAL

PLAINTIFFS_00008465

receivership or other insolvency proceeding pursuant to state law or as determined by court proceedings; or (iii) with respect to any General Partner, any of the following:

        (a)      The making of an assignment for the benefit of creditors or the filing of a voluntary petition in bankruptcy by any General Partner;

        (b)      The filing of an involuntary petition in bankruptcy against any General Partner which is not dismissed within sixty (60) days after filing or the adjudication of a General Partner as a bankrupt or insolvent;

        (c)      The filing by any General Partner of a petition or answer seeking for such General Partner any reorganization, arrangement, composition, readjustment, liquidation, dissolution or similar relief under any statute, law or rule;

        (d)      The filing by any General Partner of an answer or other pleading admitting or failing to contest the material allegations of a petition filed against such General Partner in any proceeding of a nature described under subparagraph (c) above;

        (e)      The seeking, consenting to or acquiescing in the appointment of a trustee, receiver or liquidator by any general partner, manager, or managing member of a General Partner or of all or a substantial part of such General Partner's properties;

        (f)      The commencement of a proceeding against any General Partner seeking reorganization, arrangement, composition, readjustment, liquidation, dissolution or similar relief under any statute, law or rule not dismissed within sixty (60) days after commencement of the proceeding;

        (g)      The appointment, without a General Partner's consent, of a trustee, receiver or liquidator, either of such General Partner or of all or a substantial part of such General Partner's properties, which is not vacated or stayed on or before the sixtieth (60th) day after such appointment and, if stayed, is not vacated on or before the sixtieth (60th) day after expiration of the stay;

        (h)      The admission by any General Partner of its inability to pay its debts as they become due; or

        (i)      Any General Partner becoming "insolvent" by the taking of any action or the making of any transfer or otherwise, as insolvency is or may be defined pursuant to the Bankruptcy Code, the Uniform Fraudulent Transfers Act, any similar state or federal act or law, or the ruling of any court.

    Event of Default shall have the meaning set forth in Section 7.7(a).

    Event of Withdrawal shall have the meaning set forth in Section 9.1.

    Exit Taxes means the amount of applicable federal income taxes, state income taxes, sales and franchise taxes, transfer fees and related government assessments payable by the partners/owners of the ILP (taking into account all applicable deductions and credits attributable to such taxes in each taxing jurisdiction) in connection with a specified sale of the Project or liquidation of the Partnership, in each case assuming each such partner is a corporation that is not a closely-held corporation, pays taxes at the highest applicable marginal tax rate generally applicable to corporations and is not subject to the alternative minimum tax, and taking into consideration, on a reiterative basis, the payment of such Exit Taxes as part of such sale or liquidation.

    Extended Low Income Housing Use Commitment means the agreement by and between the Tax Credit Agency and the Partnership which meets the requirements of Section 42(h)(6) of the Code and Rev. Rul. 2004-82.

    50% Construction Completion shall mean the first time 50% of the construction and/or rehabilitation of the Project is physically completed including completion of all grading and site work (other than paving, parking, sidewalks and landscaping) in accordance with the Plans and Specifications as determined by the Project Architect

6

CONFIDENTIAL

PLAINTIFFS_00008466

and confirmed in writing by the Construction Consultant pursuant to an inspection report and the related construction costs associated with such stage of completion have been incurred and paid for pursuant to funded draw requests submitted to and approved by the SLP.

Final Construction Completion means construction and/or rehabilitation of the Project, as applicable, has been completed without lien (unless such liens have been bonded over to the satisfaction of the SLP) or defect in accordance with the Plans and Specifications based on the receipt and acceptance by the SLP of each of the following items:

(a)     an "AIA Form G704 Certificate of Substantial Completion" issued by the Project Architect with a copy of any punch list items not yet completed;

(b)     a final inspection report by the Construction Consultant acceptable to the SLP and confirming:

(1)     all incomplete punch list items do not exceed 2% of the fixed price set forth in the Construction Contract, and

(2)     the punch list items can be completed in the ordinary course of business;

(c)     final unconditional certificates of occupancy (or local equivalent) for all units in the Project;

(d)     final lien waivers from the Builder and from each subcontractor with contracts of $300,000 or more engaged to complete work on the Project conditioned only to the extent payment has not been received on any incomplete punch list items or to the extent that payment will be received from the equity Installment that will be funded in connection with Final Construction Completion;

(e)     evidence, reasonably satisfactory to the SLP, that an amount equal to not less than 150% of the expected costs to complete all outstanding punch list items has been held back from the current Installment funding solely as an escrow for such costs; and

(f)     evidence of radon test results satisfactory to the SLP, but only to the extent the Property is located in a Radon Zone 1 or 2.

Final Determination shall have the meaning set forth in Section 6.7(k).

First Mortgage Loan means the loan so identified in the Schedule.

Fiscal Year means the fiscal year of the Partnership, as determined in accordance with Section 10.3.

Forecasted Tax Credit shall have the meaning set forth in the Schedule.

Funding Certificate means the certification of the General Partner, the form of which is attached hereto as Exhibit 3. The Funding Certificate shall be delivered with respect to all Installments (including draws of First Installment proceeds) following closing.

General Partner means the entity so identified in the recitals of this Agreement and any other Person or Persons who succeed it in its capacity as a general partner of the Partnership, and any additional general partner of the Partnership admitted as provided herein. If at any time the Partnership shall have more than one general partner, the term "General Partner" shall mean each such general partner.

GP Predevelopment Loan means the loan so identified in the Schedule.

4837-4545-8969.4

CONFIDENTIAL                                    PLAINTIFFS_00008467

Governmental Regulations means all present and future statutes, regulations, rules, ordinances, codes, licenses, requirements, resolutions, policy statements, standards and orders (including, without limitation, those relating to land use, subdivision, permitting, building code, zoning, environmental, toxic or hazardous waste, occupational health and safety, mold, water, earthquake, hazard reduction and building and fire codes) of any federal, state or local authority, and all applicable judicial, administrative and regulatory decrees, judgments and orders relating to the ownership, construction, alteration, rehabilitation, maintenance, use, operation, sale or other disposition of the Project.

Guarantor means each party so identified in the Guaranty in the capacity as guarantor of the obligations of the General Partner and Developer.  If at any time there shall be more than one such guarantor, the term "Guarantor" shall mean each such guarantor.

Guaranty means the Agreement of Guaranty executed by the Guarantor and of even date herewith, the form of which is attached hereto as Exhibit 5.

HAP Contract shall mean the contract so identified in the Schedule.

Hazardous Substance means any hazardous mold or fungus, and any other hazardous or toxic substance, material or waste which is regulated by any local governmental authority, the state in which the Property is located or the United States government.  The term "Hazardous Substance" shall include, without limitation, any material or substance which is (A) defined as a solid waste, hazardous waste, extremely hazardous waste, restricted hazardous waste, toxic waste, radioactive material or substance, or a hazardous substance under the laws of the state or locality in which the Property is located or any regulations or orders now promulgated or hereinafter promulgated thereunder, or (B) designated or becomes designated as a "hazardous substance" pursuant to any Environmental Laws.  Notwithstanding anything herein to the contrary, Hazardous Substance shall not include items used in the ordinary course of operation of a multifamily residential property, so long as such use is in compliance with the applicable law.

HUD shall mean the United States of America acting through the Department of Housing and Urban Development.

ILP means the entity so identified in the recitals of this Agreement, and those Persons who replace it as Substitute Limited Partner(s).

Incentive Management Fee shall have the meaning set forth in Section 6.8(d).

Indemnitees means, collectively, the ILP and the SLP, their respective Affiliates, partners, members, shareholders, directors, officers, managers, agents, representatives and employees, and each of their successors and assigns.

Installment(s) shall have the meaning set forth in Section 3.2.

Investor Services Fee shall have the meaning set forth in Section 6.8(b).

Lender means any Person who makes a Permitted Loan to the Partnership for so long as such loan remains outstanding.

Licenses and Permits means (A) all zoning and other licenses, permits, certificates of occupancy, approvals, dedications, subdivision maps and entitlements required, issued, approved or granted by any Agency or otherwise required in connection with the Project; (B) documents pertaining to any and all development rights and other intangible rights, titles, interests, privileges and appurtenances owned by the Partnership and in any way related to or used in connection with the Project; and (C) all licenses, consents, easements, rights of way and approvals required from private parties and required in connection with the operation, development and the construction and/or rehabilitation of the Project.

8

CONFIDENTIAL

PLAINTIFFS_00008468

Limited Partner means any ILP, SLP or Substitute Limited Partner.

Low Income Unit shall have the meaning set forth in Section 42(i)(3) of the Code.

Minimum Set-Aside Test means the set-aside test selected by the Partnership pursuant to Section 42(g) of the Code whereby at least 40% of apartment units in the Project must be occupied by individuals with income equal to no more than 60% of area median income, as adjusted for family size.

Mortgage Loan Commencement means the first date on which all of the following shall have occurred:

      (a)    Following Final Construction Completion and lease-up of the Project, the Lender has determined the final principal amount and maturity date of the Permitted Loan, which principal shall not exceed that which would result in a Debt Service Coverage of not less than 120% for ninety (90) days prior to commencement as confirmed in writing by the SLP;

      (b)    All interest which shall have accrued during construction of the Project under any Permitted Loan shall have been either paid or capitalized and added to the principal amount due thereunder;

      (c)    All fees due and payable to the Lender by the Partnership have been paid;

      (d)    Written evidence reasonably satisfactory to the SLP indicating full repayment of the Construction Loan and the lien securing the Construction Loan has been discharged;

      (e)    The Bridge Loan has been repaid in full; and

      (f)    Evidence the conditions to closing and funding the First Mortgage Loan, as set forth in the First Mortgage Loan Documents, have been satisfied.

Net Cash Flow means Operating Revenue less (a) Operating Expenses (including Replacement Reserve Account required amounts), (b) Debt Service and (c) Capital Expenditure payments to the extent not paid from any applicable reserve or other source in the Project Budget.

Net Cash Proceeds means the net cash (including collection of both principal and interest on any deferred payments) received by the Partnership from a Sale or Refinancing, after payment of all expenses related thereto.

Net Loss means the net loss of the Partnership from its activities, other than a Sale, as determined in accordance with the regulations under Section 704(b) of the Code using the method of accounting used by the Partnership for regular federal income tax purposes.

Net Loss From Sale means the net loss of the Partnership recognized from a Sale, as determined in accordance with the regulations under Section 704(b) of the Code using the method of accounting used by the Partnership for federal income tax purposes.

Net Profit means the net profit of the Partnership from its activities, other than a Sale, as determined in accordance with the regulations under Section 704(b) of the Code using the method of accounting used by the Partnership for regular federal income tax purposes.

Net Profit From Sale means the net profit of the Partnership recognized from a Sale, as determined in accordance with the regulations under Section 704(b) of the Code using the method of accounting used by the Partnership for regular federal income tax purposes.

ODG Cap means the amount provided in the Schedule.

ODG Period means the period commencing on Stabilized Occupancy and ending on the ODG Period End Date.

4837-4545-8969.4

CONFIDENTIAL

PLAINTIFFS_00008469

ODG Period End Date means the first day upon which, for a period of two (2) consecutive quarters (commencing not earlier than six (6) months prior to the 60-month anniversary of Stabilized Occupancy), the achievement of the following for each such quarters: (a) monthly Debt Service Coverage of 120% or greater, (b) monthly average physical occupancy of at least 90% of the units by tenants (who must be Qualified Tenants in the case of the Low Income Units) paying contract rents under written leases, and (c) monthly average Economic Occupancy of at least 80%; provided the balance in the Operating Reserve Account must be an amount not less than the Operating Reserve Amount on the last day of such two (2) consecutive quarter period.  For purposes of the foregoing calculations, the calculation of Debt Service Coverage shall be based on then current Project operations, provided that such operations accurately reflect historic operating history and trends, current actual taxes and insurance, and an economic vacancy of 5% gross potential rents.  Evidence of ODG Period End Date shall be subject to review and reasonable approval by the SLP to confirm that the calculations conform to the requirements herein.

100% Occupancy Date means the first date upon which not less than 100% of the Low Income Units shall have been leased to and physically occupied at least once by Qualified Tenants at rents meeting the requirements of the Rent Restriction Test, provided that on the "100% Occupancy Date" not less than 93% of the units in the Project shall be physically occupied by tenants (who must be Qualified Tenants in the case of Low Income Units).  Evidence of the eligibility of each tenant shall have been provided to and approved by the SLP on a tenant certification form (which form shall include a copy of each tenant's executed lease) approved by the SLP in accordance with Section 10.7(b) and, if required, by each Lender and Agency.

Operating Deficit means for any period the total amount by which (i) the sum of the Partnership's Operating Expenses and Debt Service exceeds (ii) Operating Revenue during such period.

Operating Deficit Obligations shall bear the meaning set forth in Section 4.9(e).

Operating Expenses means for a specified period (using the accrual basis of accounting and ensuring that costs and expenses are paid on a current basis) all of the costs and expenses incident to the ownership and operation of the Project in accordance with the provisions of this Agreement, including, without limitation, monthly deposits required to fund the Replacement Reserve Account and required deposits to fund any other reserves required hereunder or by any Lender or Agency, reasonable monthly reserves for real estate taxes (based on the appraisal district's full assessed value of the Project once fully completed), and insurance premiums, costs of maintenance (including any deferred maintenance) and utilities, costs of administration of the Partnership (including the fees of the Accountants), all property management fees, supportive service expenses, leasing fees, compliance monitoring fees, all sales, excise and other taxes payable by the Partnership (but excluding income taxes of the Partners) and all other costs, expenses, and payments by the Partnership (except as actually reimbursed by tenants) in connection with the ownership, management, leasing, operation, and administration of the Project and/or any other assets of the Partnership; provided, however, that Operating Expenses shall exclude depreciation and other non-cash charges, Debt Service, initial funding or replenishment of the Operating Reserve Account, Development Costs, and any other fees or payments contingent on available Net Cash Flow or that are paid from a permitted reserve already included in the calculation of Operating Expenses.  For purposes of determining Stabilized Occupancy, all Operating Expenses will be calculated for each month on an individual expense line-item basis at the higher of (i) actual monthly operating expense for such line item, or (ii) the annual "Base Expenses" outlined in the Project Forecast for such line item divided by 12.  If the Lender requires a reappraisal, the SLP reserves the right to adjust the "Base Expenses" accordingly.  Furthermore, the SLP shall adjust Operating Expenses on a line-item basis in its discretion to reflect a ratable share of any seasonal expenses.  Notwithstanding the foregoing adjustments to Operating Expenses, the SLP shall use actual expenses with respect to the following expense line items:

(a)      real estate taxes, provided such taxes reflect the appraisal district's assessed value and tax rates of the fully completed Project;

(b)      insurance, provided that the actual expense reflects a monthly prorated share of the annual premium and the insurance premiums reflect insurance coverages for the Project complying in all respects with the requirements of Section 6.5(b) and Exhibit 6; and

10

CONFIDENTIAL                                    PLAINTIFFS_00008470

(c)      property management fees, provided the actual expense is no less than 2.72% of monthly Operating Revenue.

Operating Reserve Account means the reserve account required pursuant to Section 6.5(c)(2).

Operating Reserve Amount means the amount stated on the Schedule.

Operating Revenue means actual collected rental revenue (except Section 8 payments and voucher certificates payable by the U.S. Department of Housing and Urban Development and rural development rental subsidies provided by the U.S. Department of Agriculture which will be included on an accrual basis) received from the operations of the Project, plus all collected Ancillary Income and the proceeds of any rental loss insurance paid to the Partnership.  Operating Revenue shall exclude Net Cash Proceeds, Capital Contributions, proceeds of any Permitted Loan, insurance or condemnation proceeds (except rental loss insurance), tenant security and other deposits (unless forfeited in accordance with the tenant's lease), prepaid items of income (provided, such prepaid items shall no longer be considered prepaid on or after the date in which payment of such item is due), and interest income not available for distribution.  For purposes of determining Stabilized Occupancy, the SLP shall adjust Operating Revenue in its discretion to:

(a)      exclude rent which is paid by any tenant of a Low Income Unit who is not a Qualified Tenant which is in excess of rents charged for comparable Low Income Units;

(b)      adjust rental income by any concessions or other incentives at the Project;

(c)      reflect economic vacancy (physical vacancy and bad debt) at the higher of actual or 5% of gross potential rents;

(d)      unless otherwise included in the Limited Partners' underwriting, reduce actual gross potential rental income on each residential unit to the extent any rental subsidy, voucher payment or other excess rent or subsidy exceeds the lesser of (i) rents being charged to other non-rent assisted units of similar size in the Project and (ii) low income restrictions required by the Minimum Set-Aside Test, the Agency Set-Aside Test, the Rent Restriction Test, any rent restriction required by any applicable federal, state or local subsidy program, and/or any restrictive covenant or regulatory agreement; provided that the foregoing shall not be deemed to exclude income relating to the HAP Contract, as such income was included in the Limited Partner's underwriting; and

(e)      reduce actual gross potential rental income on each residential unit to the extent any accrued rental subsidy payment has not been subsequently collected or the unpaid subsidy exceeds three months of subsidy payment for such residential unit.

Original Agreement means the agreement so identified in the Schedule.

Original Certificate means the certificate so identified in the Schedule.

Original Limited Partner means the Person so identified in the recitals of this Agreement in the capacity as an original limited partner of the Partnership, withdrawing as such pursuant to this Agreement.

Out-Of-Balance means at any point in time that Development Costs for the Project exceed available Development Funds.

Partner means any General Partner or Limited Partner.

Partnership means the limited partnership continued under this Agreement.

Partnership Act means the applicable limited partnership act of the State.

Partnership Management Fee shall have the meaning set forth in Section 6.8(c).

11

CONFIDENTIAL      PLAINTIFFS_00008471

Partnership Manager means the Partner designated to perform certain management services as provided in Section 6.10.

Permitted Loan means the loan(s) so identified in the Schedule and any other financing for which the SLP has provided Consent. At any time when there is more than one Permitted Loan, the term "Permitted Loan" as used herein shall refer to each such Permitted Loan (individually and collectively, as circumstances may require).

Person means an individual, proprietorship, trust, estate, partnership, joint venture, association, corporation, limited liability company, limited liability partnership or other entity.

Placement In Service means the placement in service of all dwelling units in the Project for purposes of Section 42 of the Code.

Placement In Service Date means the date as identified in the Schedule.

Plans and Specifications means all plans and specifications or scope of work (for rehabilitations only) for the Project prepared by the Project Architect and/or Builder, as applicable, reviewed by the Construction Consultant, and approved by the SLP, a listing of which is attached hereto as Exhibit 4 including Qualifications and Clarifications included in the Construction Contract. Unless it has received Consent from the SLP, the General Partner shall not permit the Builder to use any other plans and specifications to build the Project and all change orders, revisions and other modifications (other than the Qualifications and Clarifications included in the Construction Contract) shall not become part of the Plans and Specifications unless the Consent of the SLP has been received in accordance with Section 10.7.

Prime Rate means the "prime rate" of interest as published in *The Wall Street Journal* from time to time.

Project means the Property, together with the improvements existing or to be constructed or rehabilitated on the Property.

Project Architect means the firm so identified in the Schedule, or such other architect for the Project as may be selected by the Partnership with the Consent of the SLP.

Project Budget means the final detailed budget for the development and construction/rehabilitation of the Project which is reflected in the sources and uses section of the Project Forecast as said budget may be modified with the Consent of the SLP and, to the extent required under any Permitted Loan, each Lender.

Project Documents means all documents, instruments and agreements that the Partnership is bound to comply with and which have previously received the Consent of the SLP and shall include, but is not limited to, the Permitted Loan documents and other agreements entered into by the Partnership with any Lender or Agency, the Guaranty, the Development Agreement, the Property Management Agreement, the Plans and Specifications, the Architectural Contract, the Construction Contract, the Project Budget, the HAP Contract, Extended Low Income Housing Use Commitment and all material documents relating to the construction, development and operation of the Project and by which the Partnership is bound, as amended or supplemented from time to time.

Project Forecast means the financial forecast attached hereto as Exhibit 8.

Property means the real property described on Exhibit 1 attached hereto.

Property Management Agreement means the agreement by and between the Partnership and the Property Manager providing for the management of the Project.

Property Manager means the party so identified in the Schedule, and its successors and assigns, which has contracted or will contract with the Partnership to manage the Project.

Qualified Basis shall have the meaning defined in Section 42(c) of the Code.

12

CONFIDENTIAL

Qualified Tenants means tenants meeting the income and eligibility requirements imposed by Section 42 of the Code, the Agency Set-Aside Test and the Tax Credit Agency.

Quarterly Status Report shall bear the meaning set forth in Section 10.7(c)(1)(iv).

Refinancing means the refinancing or obtaining of any loan secured by Partnership property, other than the refinancing of or the obtaining of the Permitted Loan.

Relinquished Interests shall bear the meaning set forth in Section 9.1.

Rent Restriction Test means the test under Section 42 of the Code pursuant to which the gross rent, including utility allowances, charged to tenants of each Low Income Unit in the Project is not allowed to exceed 30% of the qualifying income levels of such tenants and the applicable area median income levels under the Minimum Set-Aside Test.

Rental Subsidy Reserve Account shall mean the reserve account required pursuant to Section 6.5(c)(3).

Replacement Reserve Account means the account established in accordance with Section 6.5(c)(1).

Reporting Damages shall bear the meaning set forth in Section 10.11.

Reporting Default shall bear the meaning set forth in Section 10.11.

Sale means the sale, exchange, condemnation or similar eminent domain taking, casualty or other disposition of all or any portion of the Project which is not in the ordinary course of business, and the sale of easements, rights of way or similar interests in the Property or any other similar items which in accordance with the accounting methods used by the Partnership are attributable to capital; provided, however, that Sale shall not refer to any transaction to the extent gain or loss is not recognized, or is elected not to be recognized, under any applicable section of the Code.

Schedule means the Schedule attached hereto.

Seller Loan means the loan so identified in the Schedule.

Service Contracts shall bear the meaning set forth in Section 6.5(aa).

SLP means the entity so identified in the recitals of this Agreement, and any Person who becomes an SLP as provided herein, in its capacity as a limited partner of the Partnership.

Stabilized Occupancy means, for the period of three (3) consecutive months commencing immediately prior to Mortgage Loan Commencement, the achievement of (a) monthly Debt Service Coverage of 120% (or such greater Debt Service Coverage if necessary to achieve a projected 120% Debt Service Coverage throughout the Compliance Period), (b) monthly average physical occupancy of at least 90% of the units by tenants (who must be Qualified Tenants in the case of the Low Income Units) paying contract rents under written leases, and (c) monthly average Economic Occupancy of at least 80%. Evidence of Stabilized Occupancy shall be subject to the reasonable review and approval by the SLP to confirm that the calculations conform to the requirements herein.

State means the state in which the Partnership was formed.

Subordinated Loan means any loan made by the General Partner (or by the Guarantor for a General Partner obligation) to the Partnership as provided herein, but specifically excludes the GP Predevelopment Loan and the Seller Loan.

Substitute Limited Partner means a Person admitted to the Partnership as a Substitute Limited Partner pursuant to Article VIII.

13

4837-4545-8969.4

PLAINTIFFS_00008473

Supplemental Limited Partner means the holder of an interest in the Partnership designated as an interest of a Supplemental Limited Partner pursuant to Section 9.4.

Tax Counsel means the law firm selected by the SLP to serve as tax counsel for the Limited Partner.

Tax Credit means the low income housing tax credit pursuant to Section 42 of the Code which is anticipated to be available to the Partnership.

Tax Credit Agency means the authorized agency of the state in which the Property is located with respect to the allocation and monitoring of Tax Credit.

Tax Credit Price means the amount provided in the Schedule.

Tax Dispute shall bear the meaning set forth in Section 6.10(b)(5).

Tax Matters Partner means the General Partner designated as the tax matters partner of the Partnership for purposes of Code Section 6231(a)(7)(B) or the designated successor, as described in Section 6.10.

10% Test Certification means the written certification of the Accountants, indicating the Partnership had incurred capitalizable costs with respect to the Project of at least 10% of the Partnership's reasonably expected basis in the Project as of the Placement In Service Date.  The 10% Test Certification shall be accompanied by detailed calculations and supporting documentation reasonably acceptable to the SLP and Tax Counsel and, to the extent available, written confirmation from the Tax Credit Agency that the 10% test has been satisfied.

Termination Date means December 31, 2100, unless the Partnership is otherwise earlier dissolved and terminated by law or in accordance with the provisions of this Agreement.

Timing Adjuster Additional Credit shall have the meaning set forth in Section 3.5(c)(2).

Title Policy means an owner's extended title insurance policy or an endorsement thereto issued to the Partnership pursuant to title commitment no. 82913000800A with an effective date not earlier than the Closing Date, in the insured amount of at least $56,328,130 from Chicago Title of Texas, LLC, as agent for Chicago Title Insurance Company evidencing the Partnership's ownership of the Project subject only to such exceptions, conditions, exclusions, or stipulations as shall be satisfactory to the SLP, in its reasonable discretion, and including to the extent available in the State, non-imputation, Fairway, survey/identicality, comprehensive, environmental liens, mechanic's liens, maximum loss, access, location, contiguity, separate tax lot, subdivision, future advance and such other endorsements as shall be required by the SLP in its reasonable discretion, with such policy and such endorsements being acceptable to the SLP, in its reasonable discretion, both as to form and as to content. Affirmative coverage will be required for any easement which cannot be plotted on the survey.  All "pre-printed" or "standard" exceptions must be deleted from the Title Policy and any property tax exceptions should be limited to taxes that are "not yet due and payable."  Any tenant's rights exception must contain a qualification that such rights are "to leaseholds of parties in possession, as tenants only, under unrecorded leases."

Title Policy Update means a date-down endorsement of the Title Policy bearing a then-current effective date and the deletion of all standard survey exceptions unless previously provided, and, if necessary, a current ALTA Survey showing the location of any easements appearing on such date-down endorsement; provided, however, that to the extent the Property is located in a state in which date-down endorsements are unavailable, a "title report" or "title update" shall be required.

Transfer Amendment means, if applicable, an amendment to this Agreement evidencing a transfer by the ILP of its interest in the Partnership, the form of which is attached hereto as Exhibit 7.

Treasury Regulations means the regulations promulgated under the Code.

4837-4545-8969.4

CONFIDENTIAL

PLAINTIFFS_00008474

## ARTICLE III

## CAPITAL

3.1.    Capital Contributions of the General Partner.  On or prior to the Closing Date, the General Partner has made Capital Contributions totaling $100 to the Partnership.  The General Partner shall be obligated to make additional Capital Contributions to the Partnership in an amount equal to amounts owed on each Affiliate Loan on the maturity date thereof.  The General Partner shall also be obligated to make additional Capital Contributions to the Partnership no later than the 13th anniversary of Final Construction Completion in the event that any portion of the Development Fee remains unpaid on such date as further described in Section 6.8.  In no event shall the General Partner make any additional Capital Contributions to the Partnership without the Consent of the SLP except as otherwise required herein.

3.2.    Capital Contributions of the Limited Partner.

(a)    Capital Contributions.  Except as otherwise provided in Section 3.5, the ILP's obligation to make Capital Contributions shall be limited to $18,698,130.  The SLP's obligation to make Capital Contributions shall be limited to $10, which shall be contributed on behalf of the SLP by the ILP as part of the First Installment.  The SLP shall reimburse the ILP for such Capital Contribution.  The ILP's Capital Contributions shall be due and payable in Installment(s) as follows:

(1)    $2,804,720 (the "**First Installment**") shall be paid on an "as needed" draw basis (which may be a single draw) in accordance with Section 10.7, with the first draw paid on or about the Closing Date and subsequent draws paid within ten (10) business days of a draw request submitted by the General Partner in accordance with Section 10.7, that indicates the Partnership has paid or incurred Development Costs in the amount requested to be disbursed from such Installment.

(2)    $11,443,256 (the "**Second Installment**") shall be paid on an "as needed" draw basis in accordance with Section 10.7 after the prior Installment has been fully disbursed and within ten (10) business days after receipt and acceptance by the SLP of evidence that each of the following conditions has been satisfied:

(i)    Final Construction Completion;

(ii)    as-built ALTA Survey; and

(iii)    permanent property insurance bound in accordance with Exhibit 6;

(iv)    10% Test Certification;

(v)    Title Policy Update;

(vi)    Full funding of amounts intended to be drawn on the Construction Loan and full funding of the Seller Loan, the GP Predevelopment Loan and the City Mortgage Loan;

(vii)    Evidence the Bridge Loan will be fully paid upon funding of the Second Installment; and

(viii)    January 5, 2016.

Upon satisfaction of the above conditions, the Second Installment shall be funded first to repay the Bridge Loan in full in accordance with the terms of the Bridge Loan documents and notwithstanding any other condition or restriction otherwise set forth in this Agreement or any default occurring hereunder.  Said capital shall be paid by the ILP directly to the Bridge Lender on behalf of the Partnership.  In no event shall any portion of the Second Installment be used to satisfy any obligation of the Partnership until the Bridge Loan is repaid in full.

15

4837-4545-8969.4

 PLAINTIFFS_00008475

(3)      $3,982,702 (the "**Third Installment**") shall be paid after the prior Installment has been fully disbursed and within ten (10) business days after receipt and acceptance by the SLP that each of the following conditions have been satisfied:

   (i)      Stabilized Occupancy;

   (ii)     Mortgage Loan Commencement;

   (iii)    satisfactory completion of all punch list items previously determined at Final Construction Completion, as certified by the Project Architect and verified in writing by the Construction Consultant, and receipt of all final unconditional lien waivers from the Builder and all subcontractors;

   (iv)     permanent property insurance bound in accordance with Exhibit 6;

   (v)      100% Occupancy Date;

   (vi)     Cost Certification;

   (vii)    Title Policy Update;

   (viii)   8609 Application Filing; and

   (ix)     April 5, 2016.

(4)      $467,453 (the "**Final Installment**") shall be paid after the prior Installment has been fully disbursed and within ten (10) business days after receipt and acceptance by the SLP that each of the following conditions have been satisfied:

   (i)      8609 Issuance;

   (ii)     Final Determination has been made by the SLP in accordance with Section 6.7(k) and all Development Completion Obligations, if any, have been satisfied by the General Partner and/or Developer;

   (iii)    delivery of the Partnership's tax return and Schedule K-1 thereto for the first year of the Credit Period to the ILP;

   (iv)     recordation of the Extended Low Income Housing Use Commitment; and

   (v)      Title Policy Update.

(b)      General Conditions to Capital Contributions.   Notwithstanding satisfaction of the conditions in Section 3.2(a), the ILP shall have no obligation to fund an Installment or any portion thereof as follows:

(1)      Unless the funding conditions to all previous Installments continue to be satisfied.  If a funding condition is not satisfied at the time an Installment is contributed, such condition shall be a condition to the subsequent Installment or draw.  No funding condition shall be waived with respect to any Installment unless a written notice expressly waiving such condition is issued by the SLP to the General Partner;

(2)      Unless the SLP has received and accepted the Funding Certificate executed by the General Partner (which shall be accepted if such certificate is in the form and substance as the certificate attached hereto as Exhibit 3);

16

4837-4545-8969.4

PLAINTIFFS_00008476

(3)     Unless all construction and development work completed as of the date of any funding request shall have been done in accordance with the Plans and Specifications;

(4)     If a Transfer Amendment has been requested, the General Partner has not provided the SLP with its (and its Affiliates) signature pages thereto, provided, that the Transfer Amendment is substantially in the form attached hereto as Exhibit 7;

(5)     If any reports or insurance required by Article X have not been submitted to and accepted by the SLP;

(6)     If any Event of Default has occurred and is continuing;

(7)     If a Lender or Agency has (i) failed to timely fund any portion of any Permitted Loan or grant to the Partnership when due, (ii) provided notice of a default under any financing document entered into with the Partnership, or (iii) provided a notice of denial or termination of any financing commitment to the Partnership;

(8)     If the Project is Out-Of-Balance (as determined by the Lender or SLP); or

(9)     If any Adjustment Amount has not been satisfied (or will not be satisfied from the requested Installment) whether or not the payment or cure period provided herein has lapsed.

(c)     <u>Funding Priority of Each Installment</u>.  Each Installment shall be funded in accordance with the following requirements:

(1)     The SLP and the ILP shall have the right to offset any Installment with any unpaid Adjustment Amount, Investor Services Fees, Reporting Damages and any other amounts levied by the SLP or ILP in accordance with this Agreement; and

(2)     (A) Any portion of the First Installment funded at Closing shall be funded by the ILP to the Partnership by depositing all such funds with the title company for disbursement to the Partnership and any remaining funds not disbursed by the title company to the Partnership shall be deposited into a Partnership bank account established with the Construction Lender, which bank account shall be subject to a security interest in favor of the Construction Lender (the "Construction Escrow"); (B) any portion of the First Installment funded after Closing pursuant to a construction draw request shall be funded by the ILP to the Partnership by depositing all such funds into the Construction Escrow; and (C) any portion of the Second Installment shall be funded by the ILP directly to the Bridge Lender on behalf of the Partnership and any remaining funds after the full repayment of the Bridge Loan shall be deposited into the Construction Escrow, with all Installments or portions thereof funded only upon:

(i)     approval by the SLP pursuant to Section 10.7, and

(ii)    approval by each Lender and any Agency with approval rights thereover, including satisfaction of any draw conditions as may be imposed by any Lender or Agency.

(d)     Notwithstanding the conditions in this Section 3.2, if the Partnership has incurred third party obligations which could be satisfied from the proceeds of an unfunded Installment, then, in the sole discretion of the Limited Partners, such Installment or any portion thereof may be advanced to the Partnership or disbursed directly to pay such outstanding third party obligations of the Partnership, provided in all events such advances or disbursements shall be treated as capital contributions to the Partnership.  Any such advance of an Installment by the Limited Partners shall accrue simple (not compounded) interest at an annual rate equal to the Prime Rate plus 4% commencing on the date on which such Installment proceeds or portion thereof is advanced and ending upon satisfaction of the conditions for such Installment.

17

CONFIDENTIAL     PLAINTIFFS_00008477

3.3.  Capital Account.  A capital account shall be maintained for each Partner (a "**Capital Account**"). The Capital Accounts shall be determined and maintained in accordance with Treasury Regulation Section 1.704-1(b)(2)(iv).

3.4.  Interest.  Except as may be explicitly provided in this Agreement, no Partner shall be entitled to interest on a Capital Contribution or Capital Account.

3.5.  Tax Credit Covenants, Duties and Obligations; Adjustments to Capital Contributions.

(a)  Tax Credit Covenants, Duties and Obligations.  The General Partner shall, or shall cause the Partnership to, timely satisfy each of the following covenants, duties and obligations pertaining to the Tax Credit:

(1)  The General Partner shall ensure that the ILP receives the full amount of the Forecasted Tax Credit (as may be adjusted pursuant to Section 3.5), including, but without limitation: (i) making an election to begin the Credit Period for each building in the Project in the year Placement In Service occurs unless the Consent of the SLP is received to defer the beginning of the Credit Period, (ii) ensuring the rental of Low Income Units to Qualified Tenants, including renting the next available unit to a Qualified Tenant if any Low Income Unit becomes nonqualifying, (iii) obtaining tenant certifications and recertifications as required pursuant to Section 10.7, (iv) leasing all dwelling units in the Project under leases having original terms of not less than six (6) months, and (v) complying with all of the Tax Credit Agency's compliance monitoring procedures.

(2)  The Partnership shall timely submit all applications, cost certifications, 10% test certifications, elections and filings necessary and appropriate to qualify for the maximum amount of the Tax Credit. If temporary and/or final Treasury Regulations have been issued relating to Tax Credit, the General Partner shall execute an amendment to this Agreement to comply with such regulations, if requested to do so by the SLP, to ensure the maximum availability of Tax Credit to the Partnership and the ILP.

(3)  The Project will be constructed and operated in conformance with the Tax Credit application, including any amendments thereto approved by the Tax Credit Agency and the SLP, and other documents submitted to the Tax Credit Agency.

(4)  The allocation of Tax Credit is not pursuant to the "non-profit set-aside" provisions of Section 42 of the Code.

(5)  Carryover Allocation occurred by December 31, 2013.  8609 Issuance shall occur by December 31st of the year following the first year of the Credit Period unless the delay is caused by the Agency and the General Partner is using commercially reasonable efforts to obtain the same.

(6)  The Partnership's basis in the Project (including costs attributable to land and depreciable basis which are not eligible for the Tax Credit) as of the date no later than the earlier of (a) the date required by the Tax Credit Agency and (b) the twelve (12) month anniversary of the Carryover Allocation will exceed 10% of the Partnership's reasonably expected basis in the Project as of the Placement In Service Date.  The General Partner shall provide a draft of the 10% Test Certification to the SLP at least twenty (20) days prior to the earlier of (a) and (b).  General Partner covenants it will not file the 10% Test Certification with the Tax Credit Agency until the draft 10% Test Certification has been approved by the SLP and Tax Counsel in their reasonable discretion; except that the General Partner shall be permitted to file the 10% Test Cost Certification with the Tax Credit Agency if the SLP and/or Tax Counsel have not responded to the draft documents by the deadline for submission to the Tax Credit Agency.

(7)  The Partnership will properly incur and capitalize costs in connection with the construction and/or rehabilitation and development of the Project in an amount needed to generate sufficient Eligible Basis to support the Forecasted Tax Credit (as may be adjusted pursuant to Section 3.5).

18

CONFIDENTIAL

(8)     No portion of the Development Fee shall be allocable to services that relate to items not includable in Eligible Basis and 20% of such Development Fee shall be earned as of the date hereof. All services relating to the acquisition of the Project, the organization of the Partnership, the syndication of interests in the Partnership, and obtaining permanent financing of the Project were and/or will be performed exclusively by the General Partner in its capacity as a General Partner.

(9)     No grants or federal subsidies (within the meaning of Section 42(i)(2)(A) of the Code) will be received by the Partnership.

(10)    No portion of the cost of the acquisition, construction or operation of the Project has been (or will be) funded with obligations the interest on which is exempt from taxation under Section 103 of the Code.

(11)    The Project has no commercial space.

(12)    The General Partner shall submit to the SLP the completed final draft of the Extended Low Income Housing Use Commitment at least ten (10) business days prior to the required date for execution and recording thereof, and shall obtain the Consent of the SLP prior to executing and recording the same. Notwithstanding the foregoing the General Partner may file the Extended Low Income Housing Commitment by the deadline therefor under Section 42 if the SLP has not provided a timely response.

(13)    The Project shall satisfy the Minimum Set-Aside Test and the Rent Restriction Test by the end of the first year of the Credit Period and throughout the balance of the Compliance Period and the Agency Set-Aside Test for the time period required by the Agency.

(14)    The Partnership will rent the Low Income Units only to Qualified Tenants and in compliance with any additional restrictions set forth in the Project Documents. The General Partner will promptly advise the ILP and the SLP if any Low Income Unit is rented to a non-qualifying tenant.

(15)    The Project is located in an area designated by HUD as a "qualified census tract" or "difficult development area" for the purpose of computing Eligible Basis of the Project.

(b)     <u>Downward Adjustments to Capital Contributions.</u>

(1)     <u>Downward Basis Adjuster.</u> If at any time at or prior to 8609 Issuance the SLP determines in its reasonable judgment that the ILP will not be eligible to be allocated the aggregate amount of Forecasted Tax Credit during the Credit Period (the aggregate amount of such shortfall being referred to herein as the "**8609 Credit Shortfall Amount**"), then (a) the Capital Contribution obligation of the ILP shall be reduced by an amount (an "**Adjustment Amount**") equal to the product of (i) the 8609 Credit Shortfall Amount and (ii) the Tax Credit Price and (b) the Forecasted Tax Credit for each Fiscal Year shall thereafter be adjusted to mean 99.99% of the total amount of Tax Credit allocated and available to the Partnership over the Credit Period, assuming for these purposes that the Delivery Percentages do not change regardless of the actual delivery schedule.

(2)     <u>Downward Timing Adjuster.</u> In the event that the ILP is entitled to claim Tax Credit for 2015, 2016 and/or 2017 with respect to the Project in an amount less than the Forecasted Tax Credit for such year (after the Forecasted Tax Credit is revised to take into account any adjustment made pursuant to Section 3.5(b)(1) and/or Section 3.5(c)(1), as applicable) as the result of a later-than-anticipated delivery of Tax Credit and the shortfall will be deferred pursuant to Section 42(f)(2)(B) of the Code, then (a) the Capital Contribution obligation of the ILP will be reduced by an amount (an "**Adjustment Amount**") equal to the difference between (i) the shortfall in the Forecasted Tax Credit to the ILP in 2015, 2016 and/or 2017 and (ii) the present value of the increase in the Forecasted Tax Credit for Fiscal Year 2025, 2026 and/or 2027 to the ILP computed as of December 31, 2015, 2016 and/or 2017, as applicable, attributable to the shortfall in Tax Credit for Fiscal Year 2015, 2016 and/or 2017 using a discount factor of 10% compounded annually and (b) the Forecasted Tax Credit shall be correspondingly updated.

(3)     <u>Compliance, Recapture and 2/3rd Adjuster.</u> If, with respect to any year during the Compliance Period, the Actual Tax Credit allocated to the Limited Partner is, will be or was less than the Forecasted

4837-4545-8969.4

CONFIDENTIAL

PLAINTIFFS_00008479

Tax Credit (after the Forecasted Tax Credit has been revised in accordance with Section 3.5), for any reason, including, but not limited to, any breach of any of the covenants, duties or obligations set forth in Section 3.5(a), any reduction in Qualified Basis and/or Eligible Basis, any application of 2/3rds credits, any further delay in the timing and delivery of Tax Credit beyond what is provided for in Section 3.5(b)(2) (regardless of whether such Tax Credit may be available in later years) and/or any disallowance or recapture of any Tax Credit, then the Capital Contribution obligation of the ILP shall be reduced by an amount (an "**Adjustment Amount**") equal to (a) the shortfall in Forecasted Tax Credit for such year, plus (b) the amount of any Tax Credit previously allocated to the ILP that is recaptured or otherwise disallowed (to the extent not otherwise taken into account in determining the Adjustment Amount pursuant to this subsection), plus (c) the amount of interest and penalties payable by the ILP (or its Partners) as a result of such shortfall or recapture such calculation to be made assuming that each limited partner of the ILP used all of the Tax Credit allocated to such limited partner in the year of allocation and that each such limited partner was subject to interest at the rate set forth in Section 6621(a)(2) of the Code and the penalty for understatement of tax set forth in Section 6662(d) of the Code, plus (d) an amount sufficient to pay any tax liability (calculated at an assumed tax rate of 40%) owed by the ILP (or its partners) resulting from the receipt of the amounts specified in the foregoing clauses (a), (b) and (c) and this clause (d).  The General Partner shall require the Accountants to make their determination of the amount of the Actual Tax Credit with respect to each year of the Credit Period within thirty (30) days following the end of such Fiscal Year.

(4)     *Payment of Adjustment Amounts.*  Any Adjustment Amount shall be applied to the Installment or portion thereof next due to be paid by the ILP (other than the portion of the Second Installment required to be paid to the Bridge Loan), with any portion of such Adjustment Amount in excess of the amount of such Installment then being applied to the next succeeding Installment(s), provided that if no further Installments remain to be paid or if the Adjustment Amount exceeds the sum of the amounts of the remaining Installments, then the General Partner shall immediately make a Capital Contribution to the Partnership in the amount of the entire Adjustment Amount or the balance of the Adjustment Amount, as the case may be (a "**Credit Adjuster Obligation**"), and the entire Credit Adjuster Obligation shall be immediately distributed to the ILP and shall neither constitute nor be limited by Net Cash Flow or Net Cash Proceeds.  Provided, if the Accountants determine that the Capital Contribution and distribution contemplated by the immediately preceding sentence, or applying any Adjustment Amount against the ILP's next due Installments, would at any time prevent the ILP from being allocated 99.99% of Net Losses, Net Losses From Sale, and Tax Credit, then the General Partner shall pay such portion of the Credit Adjuster Obligation as is determined by the Accountants to be necessary to avoid the reallocation directly to the ILP as a payment for damages (and the remaining portion of the Credit Adjuster Obligation shall be applied to the next due Installment or contributed by the General Partner as a Capital Contribution, as provided in the immediately preceding sentence).

(5)     Notwithstanding anything to the contrary contained in this Agreement, the General Partner shall not be responsible: (i) for the ILP's inability to utilize any Tax Credit allocated to it; (ii) for any recapture of Tax Credit arising solely as a result of the ILP's sale, transfer or assignment of its interest in the Partnership; or (iii) to the extent that any Credit Adjuster Obligation is solely attributable to a Change in Law.  Any portion of a Credit Adjuster Obligation solely attributable to a Change in Law shall be payable to the ILP pursuant to Section 4.2 and Section 4.5.

(c)     Upward Adjustments to Capital Contributions.

(1)     Upward Basis Adjuster.  In the event that the Partnership receives an amount of Tax Credit with respect to the Project in addition to the aggregate of the Forecasted Tax Credit, as updated as provided herein (such additional amount being referred to hereinafter as the "**Additional Credit**"), the ILP agrees that it will make additional Capital Contributions to the Partnership in an amount equal to the product of the Tax Credit Price and the aggregate Additional Credit allocable to the ILP over the Credit Period.  Upon any application of this Section 3.5(c)(1), the Forecasted Tax Credit for each year shall be redefined to mean 99.99% of the total amount of Tax Credit, including the Additional Credit to be allocated and available to the Partnership over the Credit Period, assuming for these purposes that the Delivery Percentages do not change regardless of the actual delivery schedule.  Notwithstanding the foregoing, there shall be no additional Capital Contributions due under this Section 3.5(c)(1) unless the increase is supported by appropriate documentation and by a certification of the Accountants, all in form and substance reasonably acceptable to the SLP, and the support documentation shall have been received by the SLP no later than the three-year anniversary of the Closing Date.

20

4837-4545-8969.4

CONFIDENTIAL

PLAINTIFFS_00008480

(2)      Upward Timing Adjuster.  In the event that the Partnership allocates on Schedule K-1 to Form 1065 to the ILP Tax Credit for 2015 in an amount greater than the Forecasted Tax Credit (after the Forecasted Tax Credit is revised to take into account any adjustment made pursuant to Section 3.5(b)(1) and/or 3.5(c)(1)) as the result of an earlier-than-anticipated delivery of Tax Credit (such additional amount being referred to hereinafter as the "**Timing Adjuster Additional Credit**"), the ILP agrees that it will make additional Capital Contributions to the Partnership in an amount equal to the present value of the Timing Adjuster Additional Credit computed as of December 31, 2015, of receiving the Timing Adjuster Additional Credit on December 31, 2025 using a discount factor of 10% compounded annually.  Upon any application of this Section 3.5(c)(2), the Forecasted Tax Credit shall be correspondingly updated.

(3)      In no event will the ILP be obligated to make additional Capital Contributions pursuant to Section 3.5(c) in an amount in excess of 10% of the total Capital Contributions set forth in Section 3.2(a).  Any additional Capital Contributions determined pursuant to Section 3.5(c) shall be added to the Final Installment or such earlier date determined by the ILP in its sole discretion; and provided, further, that if the Final Installment has been paid, then the entire amount of such additional Capital Contributions shall be made by the ILP to the Partnership within thirty (30) days after the determination of the amount thereof.

3.6.      Security Interest.

(a)      Each of the ILP and the SLP hereby grants to the Partnership a security interest in their respective interests in the Partnership, together with all of their right, title and interest in and to the Tax Credits, any tax credits available pursuant to Section 48 of the Code, all comparable state or local tax credit or tax incentives available to be allocated by the Partnership to the ILP and/or the SLP, all tax benefits and other property rights and distributions, and all of the proceeds and products thereof that would be available for distribution or allocation to the ILP and/or the SLP, on account of such interests, and all payments due or paid to the ILP and/or the SLP or any of either of their Affiliates by the Partnership as fees, returns of capital, distributions, repayments of loans or advances or for any other purpose, all in order to secure the ILP's obligations to fund the Installments of its Capital Contributions hereunder, and all on the express condition that the Partnership assign such security interests to PNC Bank, National Association as contemplated in Section 3.6(c) and Section 3.6(d).  The General Partner shall register the pledge of the ILP's and the SLP's interests in the Partnership to the Partnership, as set forth in this Section 3.6, upon the books of the Partnership.  The security interests granted under this Section 3.6 shall terminate automatically upon repayment in full of the Bridge Loan.

(b)      The General Partner hereby consents to the pledge by the ILP and the SLP of their Partnership interests to the Partnership, as set forth in Section 3.6(a).

(c)      The Partners hereby consent to the pledge by the General Partner of its Partnership interest to PNC Bank, National Association and consent to the assignment of Capital Contribution proceeds by the Partnership to PNC Bank, National Association and to the assignment by the Partnership to PNC Bank, National Association of the Partnership's security interests in the Partnership interests of the ILP and the SLP, as set forth in Section 3.6(a).

(d)      The Partners hereby consent to the pledge by the Partnership and the General Partner of all of their respective right, title and interest in and to the Tax Credits, any tax credits available pursuant to Section 48 of the Code, all comparable state or local tax credit or tax incentives available to the Partnership, the Project or the Partners thereof, all tax benefits and other property rights and distributions, and all of the proceeds and products thereof that would be available for distribution or allocation to any of the Partners of the Partnership.

## ARTICLE IV

## ALLOCATION OF PROFIT AND LOSS; DISTRIBUTIONS

4.1.      Allocation of Net Profit and Net Loss.

(a)      Except as otherwise provided herein, all Net Profit and Net Loss, and each item of income, gain, loss, deduction and/or credit, shall be allocated 0.01% to the General Partner and 99.99% to the ILP.

21

4837-4545-8969.4

(b)     In no event shall any Partnership loss or deduction, or item thereof, be allocated to the ILP or the SLP if, or to the extent, such allocation would cause or increase a deficit balance in such Limited Partner's Capital Account (in excess of any limited dollar amount of such deficit balance that such Limited Partner is obligated to restore under Treasury Regulation Section 1.704-1(b)(2)(ii)(c)) or pursuant to a DRO Notice, if applicable, as of the end of the Partnership taxable year to which such allocation relates, unless such loss, deduction or item constitutes a "nonrecourse deduction" as defined in Treasury Regulation Section 1.704-2(c).  For purposes of this limitation, each such Limited Partner's share (determined in accordance with Treasury Regulation Section 1.704-2(g)(1)) of the Partnership's "minimum gain," as defined in Treasury Regulation Section 1.704-2(d), shall be treated as an amount that such Limited Partner is obligated to restore.  Any loss or deduction to such a Limited Partner, the allocation of which is disallowed by the foregoing restriction, shall be reallocated first to other Limited Partners, to the extent such allocation is not limited by this subparagraph, and then to the General Partner.

(c)     In determining the extent to which an allocation of loss or deduction (other than an allocation attributable to nonrecourse debt) would otherwise reduce a Limited Partner's Capital Account below zero for purposes of Section 4.1(b), such Limited Partner's Capital Account shall first be reduced (but only for purposes of this subparagraph) for:

(1)     any allocations of loss and deduction that, as of the end of such Fiscal Year, reasonably are expected to be made to such Limited Partner under Sections 704(e)(2) and 706(d) of the Code and Treasury Regulation Section 1.751-1(b)(2)(ii); and

(2)     any cash distributions that, as of the end of such Fiscal Year, reasonably are expected to be made to such Limited Partner, to the extent that such distributions exceed offsetting increases to such Limited Partner's Capital Account that reasonably are expected to occur during (or prior to) the Fiscal Years in which such distributions reasonably are expected to be made.

For purposes of determining the amount of expected distributions and Capital Account increases described above, the rules of Treasury Regulation Section 1.704-1(b)(2)(ii)(d) shall apply.

(d)     In the event there is a net decrease in Partnership "minimum gain" (as defined in Treasury Regulation Section 1.704-2(d)) during any Partnership taxable year, each Partner will be allocated items of income and gain, including gross income if necessary (in such year and, if necessary, subsequent years), in proportion to, and to the extent of, such Partner's share of the net decrease in Partnership minimum gain before any other allocation of Partnership items for such taxable year.  A Partner is not subject to this mandatory allocation of income or gain to the extent that any of the exceptions provided in Treasury Regulation Section 1.704-2(f)(2)-(5) apply.  Such allocations pursuant to this subsection shall be in accordance with Treasury Regulation Section 1.704-2(f).  This provision is a "minimum gain chargeback" within the meaning of Treasury Regulation Section 1.704-2(f) and shall be construed as such.

(e)     If the ILP or the SLP unexpectedly receives an adjustment, allocation, or distribution described in any of subdivisions (4), (5), and (6) of Treasury Regulation Section 1.704-(b)(2)(ii)(d) for any Fiscal Year which causes or increases a deficit balance in such Limited Partner's Capital Account in excess of any limited dollar amount of such deficit that such Limited Partner is obligated to restore, as adjusted in the manner provided in or is deemed obligated to restore, under Treasury Regulation Sections 1.704-1(b)(2)(ii)(c), 1.704-2(g) and 1.704-2(i), such Limited Partner shall be allocated items of Partnership income and gain (consisting of a pro rata portion, in accordance with the deficit Capital Account balances of all Limited Partners, of each item of Partnership income, including gross income, and gain for such year) in an amount and manner sufficient to eliminate such Limited Partner's deficit Capital Account balance as quickly as possible.  This provision is a "qualified income offset" within the meaning of Treasury Regulation Section 1.704-1(b)(2)(ii)(d)(3) and shall be construed as such.

(f)     In the event there is a decrease in "partner nonrecourse debt minimum gain" (as defined in Treasury Regulation Section 1.704-2(i)) during any Partnership taxable year, each Partner shall be allocated items of income and gain (including gross income) in proportion to and to the extent of such Partner's share of the net decrease in partner nonrecourse debt minimum gain.  A Partner is not subject to this Section 4.1(f) to the extent that any of the exceptions provided in Treasury Regulation Section 1.704-2(i)(4) applied consistently with Treasury Regulation Section 1.704-2(f)(2)-(5) apply.  All allocations pursuant to this Section 4.1(f) shall be in accordance

22

4837-4545-8969.4

                                        PLAINTIFFS_00008482

with Treasury Regulation Section 1.704-2(i). This provision is a "partner nonrecourse debt minimum gain chargeback" within the meaning of Treasury Regulation Section 1.704-2(i)(4) and shall be interpreted as such.

(g)     Nonrecourse Deductions shall be allocated 99.99% to the ILP and 0.01% to the General Partner.

(h)     Net Profit and Net Loss and specific items of income, gain, loss, deduction and/or credit shall be allocated to a Partner only for that portion of the Fiscal Year for which such Person is a Partner in accordance with applicable Treasury Regulations.

4.2.     Distribution of Net Cash Flow. Net Cash Flow shall only be distributed in accordance with this Agreement, the Project Documents and any applicable Lender or Agency requirement and only with the Consent of the SLP (which Consent shall not be unreasonably withheld to the extent the proposed distribution is in accordance with the foregoing). Net Cash Flow shall not be distributed prior to Stabilized Occupancy. Upon the achievement of Stabilized Occupancy and only if the SLP determines that the Project Budget is not Out-of-Balance and there are no outstanding Development Completion Obligations, cumulative Net Cash Flow (up to the lesser of: (A) $350,000 and (B) 10% of effective gross income from Closing until Stabilized Occupancy) may be released and distributed to the General Partner as an incentive lease-up fee, but only to the extent permitted by HUD, the First Mortgage Lender, the City Loan Lender and the Tax Credit Agency, provided that there is no uncured Event of Default outstanding or other current or anticipated cash shortage; provided, further, to the extent the cumulative Net Cash Flow described above would be sufficient to satisfy any outstanding Development Completion Obligations, such cumulative Net Cash Flow may be released and distributed to the General Partner as an incentive lease-up fee less the amount of any outstanding Development Completion Obligation with such difference being applied toward the satisfaction of the Development Completion Obligation. Thereafter commencing upon Stabilized Occupancy, Net Cash Flow shall be distributed annually in the order set forth below within forty-five (45) days after the end of each Fiscal Year, but only to the extent permitted by HUD, the City Loan Lender, the First Mortgage Lender and the Tax Credit Agency, and provided that there is no uncured Event of Default outstanding or other current or anticipated cash shortage. For each Fiscal Year following Stabilized Occupancy, Net Cash Flow (including Net Cash Flow accumulated from all Fiscal Years prior to Stabilized Occupancy and not distributed to the General Partner as an incentive lease-up fee pursuant to this paragraph) shall be distributed in the following order:

(a)     To the ILP as payment of the Investor Services Fee and then to any other amounts owed to the ILP, the SLP or any Affiliates thereof;

(b)     If the balance in the Operating Reserve Account is below the Operating Reserve Amount, to the replenishment of such account until the balance is restored to the Operating Reserve Amount;

(c)     To the Developer as payment of the Deferred Development Fee until payment in full, second, to the repayment of the GP Predevelopment Loan, and third, to the repayment of the Seller Loan;

(d)     To payment of the Partnership Management Fee (including any unpaid amounts accumulated from prior years);

(e)     To the ILP, an amount equal to 40% of the taxable income allocated to the ILP with respect to such year and any amount which would have been distributed under this subclause in any prior year but for there being insufficient Net Cash Flow to do so;

(f)     To the General Partner for any fees, debts or liabilities owed to it (or to the Guarantors as reimbursement of advances made to satisfy General Partner obligations hereunder), including repayment of Subordinated Loans; and

(g)     To payment of the Incentive Management Fee;

(h)     Any remaining Net Cash Flow shall be distributed 10% to the ILP and 90% to the General Partner.

4837-4545-8969.4

CONFIDENTIAL

PLAINTIFFS_00008483

In no event shall more than 90% of Net Cash Flow distributable to Partners for any year be paid or distributed to the General Partner and the foregoing distributions shall be modified to the extent necessary so that the General Partner will receive no more than 90% of such Net Cash Flow, after (c) above, in any year.

4.3.    <u>Allocation of Net Profit on Sale</u>.  Subject to allocations required by Sections 4.1(d), 4.1(e), 4.1(f), and 4.1(g), any Net Profit realized by the Partnership as a result of any of the transactions described in Section 4.5 shall be allocated to the Partners (after having given effect to charges and credits to Capital Accounts resulting from allocations pursuant to Section 4.1 for the Fiscal Year in which the gain is recognized for federal income tax purposes, and to all distributions for such year under Section 4.2 but before giving effect to any distributions under Section 4.5) as follows and in the following order:

(a)    First, if any of the Partners have negative balances in their Capital Accounts, to such Partners on a pro rata basis in proportion to such negative balances until such negative balances have been eliminated.

(b)    Second, any remaining gain shall be allocated so that the Capital Accounts of all Partners equal as nearly as possible the amount of cash each Partner would receive if the aggregate amount of all Capital Account balances were cash available to be distributed pursuant to Section 4.5 (other than distributions to pay debts, fund reserves and pay fees).

4.4.    <u>Allocation of Net Loss From Sale</u>.  Any Net Loss From Sale shall be allocated as follows:

(a)    First, if the Capital Account of any Partner or Partners is a positive number, such loss shall be allocated to those Partners whose Capital Accounts are positive in proportion to the positive balances of each of them, until the balance of each such Partner's Capital Account is equal to zero.

(b)    Then, subject to Section 4.1(b), any remaining loss shall be allocated to the Partners as Net Losses are allocated under Section 4.1.

4.5.    <u>Distribution of Net Cash Proceeds From a Sale or Refinancing</u>.  Except as provided in Section 11.2 in the event of a liquidating distribution, the Net Cash Proceeds shall be distributed and applied in the following order of priority:

(a)    To the payment or provision for payment of the expenses of liquidation and the debts and liabilities of the Partnership then due, excluding obligations to any Partner (but including PNC Bank, National Association as lender) or Affiliates thereof.

(b)    As agreed to between the General Partner and the SLP, to the setting up of a reserve reasonably necessary for any contingent, conditional, or unmatured liabilities or obligations of the Partnership; provided, however, that said reserves shall be for the purpose of disbursing for the payment of any of the aforementioned contingencies and, at the expiration of such period as the SLP and the General Partner shall deem advisable, for the purpose of distributing the balance remaining thereafter as provided for hereinafter.

(c)    To the payment of any accrued but unpaid Investor Services Fees and to any other amounts owed to the ILP, the SLP, or any Affiliates thereof.

(d)    To the ILP, an amount equal to the Exit Taxes and any amounts due to the ILP pursuant to Section 7.7(h) with respect to tax consequences resulting from forgiveness of the Seller Loan and/or GP Predevelopment Loan.

(e)    To the Developer as payment of the Deferred Development Fee until payment in full, second, to the repayment of the GP Predevelopment Loan, and third, to the repayment of the Seller Loan;

(f)    To the payment of any accrued but unpaid Partnership Management Fee (including any unpaid amounts cumulated from prior years) and to any other amounts owed to the General Partner (or to the

24

4837-4545-8969.4

 PLAINTIFFS_00008484

Guarantors as reimbursement or repayment of advances made to satisfy General Partner obligations under this Agreement), including repayment of Subordinated Loans.

(g)  Finally, any remaining Net Cash Proceeds shall be distributed 10% to the ILP, 0.01% to the SLP and 89.99% to the General Partner.

4.6.  <u>Revaluation of Partnership Property</u>.  Upon the occurrence of (i) a contribution of money or property to the Partnership (after the Closing Date) by a new or existing Partner as consideration for an interest in the Partnership, (ii) a distribution of money or property by the Partnership to a retiring or continuing Partner as consideration for an interest in the Partnership, or (iii) the liquidation of the Partnership, the respective Capital Accounts of all Partners shall be adjusted to reflect a revaluation of Partnership property on the books of the Partnership in the following manner:

(a)  Such adjustments must be based on the fair market value of the property on the date of adjustment;

(b)  The adjustments must reflect the manner in which the unrealized income, gain, loss or deduction inherent in such property (that has not been reflected in the Capital Accounts of the Partners previously) would be allocated among the Partners under this Article IV if there were a taxable disposition of such property for such fair market value on the adjustment date;

(c)  Thereafter, the Capital Accounts of the Partners are adjusted in accordance with Treasury Regulation Section 1.704-1(b)(2)(iv)(g) for allocations to them of depreciation, depletion, amortization and gain or loss, as computed for book purposes, with respect to such property; and

(d)  Thereafter, the Partners' distributive shares of depreciation, depletion, amortization and gain or loss, as computed for tax purposes, with respect to such property shall be determined so as to take account of the variation between the adjusted tax basis and the book value of such property in the same manner as under Section 704(c) of the Code and the Treasury Regulations thereunder and Treasury Regulation Section 1.704-1(b)(4)(i).

4.7.  <u>Consent to Allocations and Distributions</u>.  Each Partner expressly consents to the methods set forth in this Article IV for determining the allocations and distributions of Net Profit, Net Loss, Net Profit From Sale, Net Loss From Sale and Distributions.

4.8.  <u>Allocations and Distributions Within a Class</u>.

(a)  <u>Allocations and Distributions Among Limited Partners</u>.  Whenever Net Profit or Net Loss, Net Profit From Sale, Net Loss From Sale or any item of income, gain, loss, deduction or credit is allocated or an item of cash is distributed to a class of Limited Partners, without regard to the capital account balances of the members of such class, such Net Profit, Net Loss or item shall be allocated or distributed to all members of such class of Limited Partners (treating for purposes hereof the ILP and SLP as separate classes of Limited Partners) in proportion to the amounts of their respective Capital Contributions.

(b)  <u>Allocations and Distributions Among General Partners</u>.  If there should be at any time more than one General Partner, any Net Profit or Net Loss, Net Profit From Sale, Net Loss From Sale or any item of income, gain, loss, deduction or credit shall be allocated and each item of cash shall be distributed, between or among the General Partners as a class, pro rata in accordance with the ratio of the percentage interests of the members of such class, as set forth on <u>Exhibit 2</u>.

4.9.  <u>Miscellaneous</u>.

(a)  <u>Guaranteed Payments</u>.  Notwithstanding anything to the contrary in this Article IV, to the extent that any amounts which are paid or accrued to a Partner for services or for the use of capital by the

CONFIDENTIAL

PLAINTIFFS_00008485

Partnership are treated as distributions of Partnership income to the Partners receiving such payment, an equal amount of gross income of the Partnership shall be specially allocated to such Partner.

(b)   <u>Tax Elections</u>.  Except as otherwise expressly provided in this Agreement, any federal, state or local tax elections relating to such allocations shall be made by the General Partner with the Consent of the ILP in such manner as will be most advantageous to the ILP so long as such elections are not materially inconsistent with the purposes of the Partnership as set forth in this Agreement.

(c)   <u>Creditors</u>.  Except as otherwise expressly provided in this Agreement, a creditor who makes any loan to the Partnership, including any nonrecourse loan, shall not have or acquire at any time as a result of making such loan any interest in the profits, capital or property of the Partnership other than as a secured creditor if such loan is secured by Partnership assets.

(d)   <u>Imputed Interest</u>.  In the event that there is a determination that interest on any loan between a Partner and the Partnership is imputed at a rate higher than the rate actually charged on such loan, the excess income or deduction of the Partnership attributable to such imputed interest shall be allocated solely to that Partner to whom or from whom such loan was made.

(e)   <u>Special Allocation of Operating Deficit Obligation</u>.  If (1) the General Partner advances funds to the Partnership pursuant to Section 6.5(d) or otherwise advances funds to or makes loans to the Partnership for purposes of paying operating expenses of the Partnership or, if the Partnership incurs losses from extraordinary events which are not recovered from insurance, or if funds are advanced from the Operating Reserve Account, the amount, if any, of funds contributed to such reserve by the General Partner or its Affiliates or otherwise (collectively, "**Operating Deficit Obligations**") in respect of any Partnership taxable year, and (2) the Accountants determine that the ILP will likely have an adjusted Capital Account deficit in any year during the Credit Period in excess of the sum of the ILP's share of Partnership minimum gain plus any amount of its negative Capital Account that the ILP has agreed to restore, then, to the extent of such projected excess deficit Capital Account, the calculation and allocation of Net Profit and Net Loss pursuant to Section 4.1(a) shall be adjusted as follows: first, an amount of deduction attributable to the Operating Deficit Obligations consisting of operating expense deductions and not cost recovery deductions shall be allocated to the General Partner, and, second, all remaining deductions and all gross revenues shall be allocated as provided in Section 4.1; provided that the General Partner shall be specially allocated an amount of gross income (before Net Profit and Net Loss are computed under Section 4.1) equal to the amount of any principal repayment in any year of a Subordinated Loan or any repayment or return of a General Partner Capital Contribution (but in no event shall the aggregate amount of gross income allocated pursuant to this clause exceed the aggregate amount of deductions or losses allocated to the General Partner under this Section 4.9(e)).

(f)   <u>Distributions In-Kind</u>.  With respect to assets distributed in kind to the Partners in liquidation or otherwise, (1) any unrealized appreciation or unrealized depreciation in the values of such assets shall be deemed to be Net Profit From Sale and Net Loss From Sale realized by the Partnership immediately prior to the liquidation or other distribution event, and (2) such Net Profit From Sale and Net Loss From Sale shall be allocated to the Partners in accordance with Sections 4.3 and 4.4, and any property so distributed shall be treated as a distribution of an amount in cash equal to the excess of its fair market value over the outstanding principal balance of and accrued interest on any debt by which such property is encumbered.  For purposes of this Section 4.9(f), "unrealized appreciation" or "unrealized depreciation" shall mean the difference between the fair market value of such assets, taking into account the fair market value of the associated financing (but subject to Section 7701(g) of the Code), and the Partnership's adjusted basis for such assets as determined under Treasury Regulation Section 1.704-1(b).  This Section 4.9(f) is intended to provide a rule for allocating unrealized gains and losses upon liquidation or other distributions, and nothing contained in this Section 4.9(f) or elsewhere herein is intended to treat or cause such distributions to be treated as sales for value.  The fair market value of such assets shall be determined by an appraiser to be selected by the General Partner and the SLP.  Any dispute as to the fair market value shall be submitted to a committee composed of three (3) MAI or SRE appraisers, one chosen by the General Partner, one chosen by the SLP, and the third chosen by the other two so chosen.  The proceedings of such committee shall conform to the rules of the American Arbitration Association, as far as appropriate, and its decision shall be final and binding upon the parties hereto and any successor General Partner.

4837-4545-8969.4

CONFIDENTIAL                                                                                         PLAINTIFFS_00008486

(g)     Additional Interest.  To the extent that interest is imputed on the unpaid balance of Development Fee, but is not paid, the deduction attributable to such unpaid interest shall be allocated to the General Partner.

(h)     Reportable Transactions.  The Partnership and its Partners shall be permitted to disclose to any and all Persons, without limitation of any kind, the "tax treatment and tax structure" (as defined in Treasury Regulation Section 1.6011-4(c)) of the transaction contemplated by this Agreement and all materials of any kind (including opinions or other tax analyses) relating to such tax treatment and tax structure.  The General Partner will promptly notify the Partners of any "reportable transaction" under Treasury Regulation Section 1.6011-4 in which the Partnership shall engage.  The General Partner hereby notifies the other Partners that the transactions provided for in this Agreement may constitute a "reportable transaction".

(i)     Special Allocation With Respect to Donations, Grants and Similar Items.  Any taxable income of the Partnership resulting from the receipt of donations, contributions (including income arising from recharacterization of any Capital Contribution, debt or financing), grants, substantial modification, cancellation or forgiveness of any Partnership indebtedness, subsidies and similar items will be allocated 100% to the General Partner.  Further, in the event any financing provided to the Project is recharacterized as a grant and required for federal income tax purposes to be recognized as taxable income, any income arising from such characterization shall be allocated to the General Partner and the General Partner agrees to cause the Accountants to prepare and file federal and state income tax returns that are consistent with this allocation provision.  The General Partner agrees to recognize the allocation of income from any grant on its respective federal and state income tax returns, and the General Partner and Guarantors jointly and severally agree to indemnify and hold the ILP harmless from the reduction in tax benefits and the income tax consequences attributable to any recharacterization of any financing as a grant and any income that is required to be allocated to the ILP or loss in tax benefits sustained by the ILP as a result of any grant, this special allocation notwithstanding.  Such special allocation of income to the General Partner related to grants includes, but is not limited to, an allocation of income for state franchise or income tax purposes, and the indemnification obligation set forth herein shall be construed to encompass any adverse state franchise or income tax consequences of allocation of income to any Limited Partner.

(j)     Distributions.  Except as otherwise provided in this Agreement, each Partner shall look solely to the assets of the Partnership for all distributions and for such Partner's share of Net Profit or Net Loss and shall have no recourse therefor (upon dissolution or otherwise) against the General Partner or the Limited Partners, except, however, that this limitation shall not impair the right of the Partnership to enforce its rights against a General Partner or a Limited Partner.  No Partner shall have any right to demand or receive property other than money upon dissolution and termination of the Partnership.

**ARTICLE V**

**PURCHASE OF LIMITED PARTNERS' INTERESTS**

5.1.     Right To Require Repurchase.  The Limited Partners shall have the right to require the General Partner to purchase the ILP's and the SLP's respective interests in the Partnership upon the occurrence of any one of the following events:

(a)     Agency or Lender Disapproval.  At any time after the Closing Date, any Agency or Lender does not grant consent, if such consent is so required, to an amendment of this Agreement intended to transfer the ILP's or SLP's interest in the Partnership and/or admit the SLP or its designee as a substitute or additional General Partner pursuant to this Agreement.

(b)     Construction.  Any of the following construction-related conditions shall be triggered:

(1)     Construction-related work on the Project does not occur for more than a thirty (30) consecutive day period;

(2)     50% Construction Completion shall not have occurred by May 1, 2015; or

4837-4545-8969.4

CONFIDENTIAL                                                                 PLAINTIFFS_00008487

(3)      Placement in Service shall not have occurred by December 31, 2015; or

(4)      Final Construction Completion shall not have occurred by the earlier of (i) the date by which construction completion is required by any Lender, as such date may be extended in accordance with the Permitted Loan documents, and (ii) the Completion Date.

(c)      <u>Financing</u>.  Prior to Stabilized Occupancy, any of the following shall have occurred:

(1)      a default shall have been declared by any Lender which default shall not have been cured within any applicable cure period;

(2)      a non-judicial foreclosure of the Project has been completed or judicial proceedings shall have commenced to collect on any Permitted Loan or a foreclosure proceeding shall have commenced with respect to any mortgage and such proceedings shall not have been dismissed within sixty (60) days; or

(3)      any financing commitment of any Lender or Agency to provide a Permitted Loan or any rate lock relating thereto shall expire or be in default, modified, terminated or withdrawn and not reinstated or replaced within sixty (60) days with comparable terms which shall have received the Consent of the SLP and, if required, the approval of any other Agency or Lender.

(d)      <u>Stabilization</u>.

(1)      Stabilized Occupancy has not occurred by the two (2) year anniversary of Final Construction Completion;

(2)      Achievement of monthly Breakeven Operations for a three (3) consecutive month period has not occurred by the one (1) year anniversary of Final Construction Completion; or

(3)      Mortgage Loan Commencement has not occurred by the earlier of (i) the date required in the Permitted Loan documents, including any Permitted Loan commitment, and (ii) the 36-month anniversary of the date of this Agreement.

(e)      <u>Noncompliance With Tax Credit Requirements</u>.  Any of the following Tax Credit-related requirements shall be triggered:

(1)      [Reserved].

(2)      10% Test Certification shall not have occurred by the earlier of (i) the date required by the Tax Credit Agency and (ii) twelve (12) months after the Carryover Allocation is executed by the Tax Credit Agency and evidence thereof shall not have been delivered to the SLP within thirty (30) days of the earlier of said dates;

(3)      Placement In Service has not occurred by the earlier of any date required by the Agency or the Placement in Service Date and evidence thereof shall not have been delivered to the SLP within thirty (30) days of the earlier of said dates;

(4)      Cost Certification shall not have been delivered to the SLP within ninety (90) days of Placement in Service;

(5)      8609 Issuance shall not have occurred and evidence thereof shall not have been delivered to the SLP by December 31st of the year following the first year of the Credit Period unless the delay is caused by the Agency and the General Partner is using commercially reasonable efforts to obtain the same;

4837-4545-8969.4

CONFIDENTIAL                                                                    PLAINTIFFS_00008488

(6)     a valid Extended Low Income Housing Use Commitment as required pursuant to Section 42 of the Code has not been executed and recorded prior to December 31st of the first year of the Credit Period and evidence thereof shall not have been delivered to the SLP within thirty (30) days of said date;

(7)     the Actual Tax Credit is less than 80% of the Forecasted Tax Credit (other than with respect to the first year of the Credit Period (so long as adjusters are paid as provided in Section 3.5); or

(8)     The Partnership fails to meet the Minimum Set-Aside Test or the Agency Set-Aside or the rents charged to tenants in dwelling units designated to meet the Minimum-Set-Aside Test or the Agency Set-Aside Test fail to meet the Rent Restriction Test prior to the end of the first year of the Credit Period, or at any time thereafter through the Compliance Period the Partnership fails to cause 80% of the Low Income Units to meet the foregoing tests.

(f)     <u>General Partner or Guarantor Breach</u>.  Prior to funding the Final Installment, an Event of Default occurs and is not cured within any applicable notice or cure period.

5.2.     <u>Purchase Price</u>.  The purchase price of the Limited Partners' partnership interests shall be an amount equal to (i) all Capital Contributions previously paid by the Limited Partners to the Partnership, plus (ii) interest on such Capital Contributions at an annual interest rate of 10% calculated from the date each Capital Contribution was paid through the payment date of the purchase price; plus (iii) the amount of costs and expenses incurred by any Limited Partner in connection with the repurchase; plus (iv) any amount the ILP is obligated to fund or repay under the Bridge Loan; less (v) the value of any Tax Credit previously allocated to the ILP and not subject to recapture, the value of which shall be the lesser of the Tax Credit Price or $1.00.  The Partnership and General Partner shall also be obligated to provide a full release of the Limited Partners from any further obligation to make Capital Contributions and an indemnification against any claims of creditors of the Partnership.

5.3.     <u>Notice</u>.  Within five (5) days of the occurrence of an event in Section 5.1, the General Partner shall give notice of the event to the SLP; provided that the delivery or receipt of such notice is not a condition to the effectiveness of the rights and remedies hereunder.  No purchase shall be required until the ILP or the SLP shall have given the Partnership and General Partner thirty (30) days' written notice demanding the repurchase.  The full amount of the purchase price as set forth in Section 5.2 shall be paid by the General Partner to the ILP and the SLP at the conclusion of the thirty (30) day notice period.  The Partnership hereby guarantees the obligation of the General Partner under this Article V.

## ARTICLE VI

## RIGHTS, POWERS AND DUTIES OF GENERAL PARTNER

6.1.     <u>Powers</u>.  The General Partner shall be responsible for the management of the Partnership business.  Subject to Section 6.2 and any other specific provisions contained in this Agreement, the General Partner shall have all authority, rights and powers generally conferred by law, including the authority, rights, and powers of a general partner in a partnership without limited partners, and shall have all authority, rights and powers which they deem necessary or appropriate to effect the purposes of the Partnership, including, but not limited to, the following:

(a)     To acquire, hold, sell, transfer, assign, lease or otherwise deal with any real, personal, or mixed property, interest therein or appurtenance thereto.

(b)     To borrow money or incur any purchase money mortgage or similar obligations and, if security is required therefor, to mortgage or subject to any other security device any portion of the assets of the Partnership, including any assets acquired with the proceeds of such borrowing, to obtain replacements of any mortgage or other security device, and to prepay, in whole or in part, refinance, increase, modify, consolidate or extend any mortgage or other security device and including, specifically, the authority, right, and power to borrow money for working capital purposes to acquire, rehabilitate and operate the Project and to engage in related activities.

29

CONFIDENTIAL                                                    PLAINTIFFS_00008489

(c)     To purchase, at Partnership expense, liability and other insurance to protect the Partnership business and property.

(d)     Subject to Section 6.8, to employ, contract and deal with Persons (including any Partner or Affiliate of any Partner) in connection with the management, operation, and disposition of the Partnership business and assets, on such terms as the General Partner shall determine.

(e)     To establish reserve funds pursuant to Section 6.5 to provide for future requirements of the Project.

(f)     To bring or defend, pay, collect, compromise, arbitrate, resort to legal action or otherwise adjust claims or demands of or against the Partnership.

(g)     To pay as a Partnership expense any and all expenses associated with the formation of the Partnership and the development, construction and/or rehabilitation as applicable, organization, and operation of the Project.

(h)     To deposit, withdraw, pay, retain and distribute the Partnership's funds in a manner consistent with the provisions of this Agreement.

(i)     To require in any or all Partnership contracts that the General Partner shall not have any personal liability thereon but that the Person contracting with the Partnership shall look solely to the Partnership and its assets for satisfaction.

(j)     To execute, acknowledge and deliver any and all instruments, including the Project Documents available at closing, to effectuate the foregoing.

(k)     To cause the Partnership to accept the grant of a security interest in the Partnership interests of the ILP and SLP pursuant to Section 3.6(a) and to assign those security interests to the Bridge Lender pursuant to Section 3.6(c).

6.2.     <u>Restrictions on Authority of General Partner</u>.  The General Partner shall be bound by all Project Documents.  In addition, without the prior Consent of the SLP, no General Partner shall:

(a)     Dissolve or wind up the Partnership, or cause or permit the occurrence of any event that would have the foreseeable result of the voluntary or involuntary dissolution of the Partnership whether under this Agreement or otherwise.

(b)     Sell, exchange, lease (other than lease of dwelling units to individual tenants as required hereunder), mortgage, pledge or otherwise transfer any of the assets of the Partnership except for mortgages, assignments and pledges of collateral required with respect to the Permitted Loan.

(c)     Change the nature or purposes of the Partnership's business.

(d)     Borrow money (except for the Permitted Loan closed on or before the date hereof, the Bridge Loan, the Seller Loan, the GP Predevelopment Loan, and the Subordinated Loans and other Partner loans permitted under this Agreement) or refinance, recast, modify or extend any loan to the Partnership or which affects or is secured by the assets of the Partnership, except that the General Partner shall have the right and power without such Consent to borrow additional funds on behalf of the Partnership to meet current cash needs of the Partnership, provided such amounts so borrowed that are outstanding at any given time under this clause (d) shall not exceed $10,000 and such amounts are not used to repay (i) any obligations owed to the General Partner, Developer or Guarantor or any Affiliate of any such Persons or (ii) any obligations which are to be paid by the General Partner, Developer or Guarantor or any Affiliate of any such Persons;

30

CONFIDENTIAL

(e)     Borrow from the Partnership or commingle Partnership funds with funds of any other Person.

(f)     Rent apartments in the Project in such a manner that the Project would not meet the requirements of the Minimum Set-Aside Test, the Agency Set-Aside Test or the Rent Restriction Test.

(g)     On behalf of the Partnership, (i) file or cause to be filed a voluntary petition in bankruptcy under the Bankruptcy Code or (ii) file or cause to be filed a petition or answer seeking any reorganization, arrangement, composition, readjustment, liquidation, dissolution or similar relief under any statute, law or rule.

(h)     Cause the Partnership to commence, settle, compromise, mediate or otherwise relinquish any claim (actual or prospective), or to release, waive or diminish any material Partnership rights in any litigation or arbitration matter involving a claim of in excess of $10,000, or to do so as to any claim regardless of amount against the General Partner, Guarantor, Developer, Builder or Property Manager or any Affiliate thereof.

(i)     Cause the Partnership to close or convert or refinance any loan, including any Permitted Loan.

(j)     Amend any Project Document, or permit any party thereunder to waive any provision thereof, to the extent that the effect of such amendment or waiver: (i) would be to eliminate, diminish, or defer any obligation or undertaking of the Partnership, the General Partner, the Developer or the Guarantor, or any of their Affiliates, that accrues, directly or indirectly, to the benefit of, or provides additional security or protection to, the ILP (notwithstanding that the ILP is neither a party to nor an express beneficiary of such provision or was not a Partner when such provision became effective), or (ii) might have a material adverse effect on the Project, the Partnership or the Limited Partners.

(k)     Except as provided in Section 3.6, pledge or assign any of the Capital Contributions of the ILP or the proceeds thereof.

(l)     Following Final Construction Completion of the Project, construct any new capital improvements, or replace any existing capital improvements if construction or replacement would substantially alter the use or value of the Project.

(m)     Acquire any real property in addition to the Property (other than easements or similar rights necessary or customary for the development and operation of the Project).

(n)     Cause the Partnership to make any loan or advance to any Person (other than accounts receivable in the ordinary course of business from Persons other than the General Partner and Affiliates thereof).

(o)     Permit the merger or termination of the Partnership.

(p)     Lease the Property in such a manner as to cause the Property or any part thereof to be treated as "tax-exempt use property" within the meaning of Section 168(h) of the Code.

(q)     Take any action or fail to take any action which would cause the recapture or reduction of the Tax Credit under Section 42(g) of the Code.

(r)     Enter into any agreement (exclusive of the Project Documents entered into on or about the Closing Date or third-party service contracts for maintenance, landscaping, security and other service providers necessary to maintain operations of the Project with terms not exceeding one year, a tree maintenance agreement (anticipated to be for a term of five years) required for tree mitigation as required for the site plan permit, and agreements with cable, date, and phone providers (which are anticipated to exceed one year in term) which benefits or burdens (i) the Project or the Partnership, or its assets, or (ii) the property of a third party (including the separate property of the General Partner, Guarantor, or Developer, or their respective Affiliates).

31

4837-4545-8969.4