# UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
## AUSTIN DIVISION

| | | |
|---|---|---|
| **PNC BANK, N.A. COLUMBIA** | § | |
| **HOUSING SLP CORPORATION, and** | § | |
| **2013 TRAVIS OAK CREEK, LP** | § | |
| | § | |
| **Plaintiffs,** | § | **Civil Action No. 1:17-cv-584-RP-ML** |
| | § | |
| **v.** | § | |
| | § | **consolidated with** |
| **2013 TRAVIS OAK CREEK GP, LLC,** | § | **Case No. 1:17-cv-560-RP** |
| **2013 TRAVIS OAK CREEK** | § | |
| **DEVELOPER, INC.,** | § | |
| **CHULA INVESTMENTS, LTD.,** | § | |
| **and RENE O. CAMPOS** | § | |
| | § | |
| **Defendants.** | § | |

## 2013 TRAVIS OAK CREEK GP, LLC AND TRAVIS OAK DEVELOPER, INC.'S RESPONSE TO PLAINTIFFS' MOTION TO DISMISS COUNTERCLAIMS

# TABLE OF CONTENTS

I.  INTRODUCTION ................................................................................................1

II.  LEGAL STANDARDS .......................................................................................2

    A.  Standard Under Rule 12(b)(6) ...............................................................2

    B.  Standard Under Rule 12(b)(1) ...............................................................2

III.  BACKGROUND FACTS ....................................................................................3

    A.  The Parties, the Project, and the Partnership ........................................3

    B.  The documents executed in connection with Project financing.............4

    C.  Development and construction are successfully completed, but stucco
        defects require extensions of Final Delivery Date for the Mortgage Loan.............6

    D.  The PNC Parties decide to use the stucco issue to force payment of
        punitive fees or obtain the forfeiture of the Oak Creek Parties' rights and
        interests ...................................................................................................7

IV.  ARGUMENT AND AUTHORITIES .................................................................12

    A.  The Oak Creek Parties have standing to assert the Counterclaims.......12

        1.  The Oak Creek Parties' claims are not Partnership claims.......12

        2.  The Oak Creek Parties' have the right to assert the Partnership's
            fraud and promissory estoppel claims derivatively ...................14

    B.  The Counterclaims state plausible claims for breach of contract .........16

        1.  The purported Forfeiture was caused by the PNC Parties' breaches
            of their contractual duties e........................................................17

            (a)  The purported Events of Default on which the PNC Parties
                purported to base the Forfeiture were caused by the PNC
                Parties' breaches of the LP Agreement...........................17

            (b)  By improperly using their wrongful termination of the
                Forward Commitment as a basis for the purported
                Forfeiture, the PNC Parties' breached the LP Agreement............19

            (c)  PNC Bank breached the LP Agreement by seeking recourse
                against the GP for the alleged default under the Delivery
                Assurance Certificate caused the purported Events of
                Default...............................................................................21

2.     Facts stated in the Counterclaims do not establish the removal of Oak Creek GP was proper under the LP Agreement ................................22

    (a)     The allegations about the G407 certificate do not establish a proper forfeiture ..........................................................................23

    (b)     Nothing in the Counterclaims admits a failure to meet the Final Construction Completion deadline ......................................24

    (c)     The Counterclaims' allegations about the stucco remediation and the Weis claims/lien do not establish an Event of Default .....................................................................26

3.     The Counterclaim state a claim for the repudiation and breach of the GP Note ................................................................................28

C.     The Counterclaims state a claim for breach of fiduciary duties the PNC Parties owed to Oak Creek GP ....................................................28

1.     The PNC Parties owed fiduciary duties to Oak Creek GP ........................28

D.     The Counterclaims state a cause of action for violation of 12 U.S.C. § 1972 ................................................................................31

E.     The Counterclaims state a cause of action for theft of services ............................33

F.     The Counterclaims state a cause of action for conspiracy ....................................34

G.     The Counterclaims state a cause of action for unjust enrichment ........................35

H.     The Counterclaims state a cause of action for fraud ............................................36

I.     The Counterclaims state a cause of action for estoppel ........................................37

J.     Declaratory Judgment is proper ..........................................................................37

V.     CONCLUSION ................................................................................................38

# TABLE OF AUTHORITIES

**Page**

CASES

*Ashcroft v. Iqbal,*
    556 U.S. 662 (2009)..................................................................................... 2

*Backes v. Misko,*
    486 S.W.3d 7 (Tex. App.—Dallas 2015, pet. denied) ..................................... 32

*Bank One, Texas, N.A. v. Stewart,*
    967 S.W.2d 419 (Tex. App.—Houston [14th Dist] 1998, no pet.)................... 18

*Bell Atlantic Corp v. Twombly,*
    550 U.S. 544 (2007)..................................................................................... 2

*Bott v. J.F. Shea Co.,*
    388 F.3d 530 (5th Cir. 2004) ............................................................... 23, 24

*Bracton Corp. v. Evans Const. Co.,*
    784 S.W.2d 708, 710 (Tex. App.—Houston [14th Dist.] 1990)......................23

*Cates v. International Tel. and Tel. Corp.,*
    756 F.2d 1161 (5th Cir. 1985) ...................................................................... 15

*CBIF Ltd. P'ship v. TGI Friday's Inc.,*
    2017 WL 1455407 (Tex. App. Apr. 21, 2017) .............................................. 27

*Collins v. Morgan Stanley Dean Witter,*
    224 F.3d 496 (5th Cir. 2000) ....................................................................... 23

*Daugherty v. State,*
    387 S.W.3d 654 (Tex. Crim. App. 2013)....................................................... 32

*Erickson v. Pardus,*
    551 U.S. 89 (2007)....................................................................................... 2

*Ernst & Young, L.L.P. v. Pac. Mut. Life Ins. Co.,*
    51 S.W.3d 573 (Tex. 2001)........................................................................... 31

*Eun Bok Lee v. Ho Chang Lee,*
    411 S.W.3d 95 (Tex. App.—Houston [1st Dist] 2013, no pet.) ....................... 33

*Fairfield Fin. Grp. Inc. v. Gawerc,*
    814 S.W.2d 204 (Tex.App.—Houston [1st Dist.] 1991, no writ)......................23

*FPL Energy, LLC v. TXU Portfolio Mgmt. Co., L.P.,*
    426 S.W.3d 59 (Tex. 2014)........................................................................... 19

*Griffin v. Box,*
    85 F.3d 625 (5th Cir. 1996) .................................................................................. 14, 15

*Guerrero-McDonald v. Nassour,*
    516 S.W.3d 198 (Tex. App.—Eastland 2017, no pet.) .................................... 13

*Hall v. Douglas,*
    380 S.W.3d 860 (Tex. App.—Dallas, no pet.) .................................................. 12

*Hernandez v. Gulf Grp. Lloyds,*
    875 S.W.2d 691 (Tex. 1994) ................................................................................. 16

*Howell v. Kelly,*
    534 S.W.2d 737 (Tex. App.—Houston [1st Dist.] 1976), no writ ................... 23

*In Interest of C. M. V.,*
    479 S.W.3d 352 (Tex. App.—El Paso 2015, no pet.) ...................................... 31

*In re Dallas Roadster, Ltd.,*
    846 F.3d 112 (5th Cir. 2017) ............................................................................... 16

*In re Fisher,*
    433 S.W.3d 523 (Tex. 2014) ................................................................................. 12

*Jerry L. Starkey, TBDL, L.P. v. Graves,*
    448 S.W.3d 88 (Tex. App.—Houston [14th Dist.] 2014, no pet.) .................. 13

*Lisbon Contractors, Inc. v. United States,*
    828 F.2d 759 (Fed. Cir. 1987) .............................................................................. 23

*Longview Const. & Dev., Inc. v. Loggins Const. Co.,*
    523 S.W.2d 771 (Tex. Civ. App.—Tyler 1975, writ dism'd by agreement) .................. 16

*Lujan v. Defs. of Wildlife,*
    504 U.S. 555 (1992) ................................................................................................. 3

*Lujan v. National Wildlife Federation,*
    497 U.S. 871 (1990) ................................................................................................. 3

*McBeth v. Carpenter,*
    565 F.3d 171 (5th Cir. 2009) ............................................................................... 25

*New England Co. v. Bank of Gwinnett County,*
    891 F. Supp. 1569 (N.D. Ga. 1995) ................................................................... 29

*O'Shea v. Int'l Bus. Mach. Corp.,*
    578 S.W.2d 844 (Tex. Civ. App.—Houston [1st Dist.] 1979, writ ref'd n.r.e.) .............. 16

*Skinner v. Switzer,*
    562 U.S. 521 (2011) ................................................................................................. 2

*Spokeo, Inc. v. Robins,*
    136 S. Ct. 1540 (2016), *as revised* (May 24, 2016) .................................... 2, 3

*Strebel v. Wimberly*,
    371 S.W.3d 267 (Tex. App.—Houston [1st Dist] 2012, pet. denied)............................. 25

*Swerdloff v. Miami Nat. Bank*,
    584 F.2d 54 (5th Cir. 1978) .................................................................................... 30, 31

*Taub v. Houston Pipeline Co.*,
    75 S.W.3d 606 (Tex. App.—Texarkana 2002, pet. denied) ...................................... 22, 24

*Tenneco Inc. v. Enter. Prod. Co.*,
    925 S.W.2d 640 (Tex. 1996).......................................................................................... 23

*Trevino & Assocs. Mech., L.P. v. Frost Nat. Bank*,
    400 S.W.3d 139 (Tex. App.—Dallas 2013, no pet.)....................................................... 33

*Turner v. Lieutenant Driver*,
    848 F.3d 678 (5th Cir. 2017) ........................................................................................... 2

*Ulico Cas. Co. v. Allied Pilots Ass'n*,
    262 S.W.3d 773 (Tex. 2008).......................................................................................... 23

*W&T Offshore, Inc. v. Apache Corp.*,
    2014 WL 198492 (S.D. Tex. 2014), *aff'd* 644 F. App'x 349 (5th Cir. 2016) ................ 24

*Wellogix, Inc. v. Accenture, LLP*,
    788 F. Supp. 2d 523 (S.D. Tex. 2011) ........................................................................... 32

## STATUTES

12 U.S.C. §1972......................................................................................................... 12, 29

Fed. R. Civ. P. 12 ............................................................................................................ 2

Fed. R. Civ. P. 7 ............................................................................................................ 23

Fed. R. Civ. P. 8 .............................................................................................................. 2

## OTHER AUTHORITIES

1970 U.S. Code Cong. & Admin. News., p. 5535 ......................................................... 30

## I.      INTRODUCTION

This case arises out of a predatory scheme by counter-defendants PNC Bank, N.A. ("PNC Bank") and Columbia Housing SLP Corporation ("Columbia") (the "PNC Parties") to wrongfully misappropriate the rights and interests of 2013 Travis Oak Creek GP, LLC ("Oak Creek GP") and 2013 Travis Oak Creek Developer, Inc. ("Oak Creek Developer") (the "Oak Creek Parties") held in connection with 2013 Travis Oak Creek L.P. (the "Partnership").  The Oak Creek Parties' counterclaims (the "Counterclaims") assert claims for injuries to the Oak Creek Parties resulting from the PNC Parties' breach of contractual and legal duties owed directly by the PNC Parties to the Oak Creek Parties.

In their Motion to Dismiss All of Defendants' Counterclaims, Dkt. #85, (the "Motion"), the PNC Parties argue the Counterclaims should be dismissed for failure to state a claim and for lack of standing.  With regard to stating claims, the Counterclaim sets forth detailed factual allegations sufficient to support the causes of action alleged.  In arguing otherwise, the PNC Parties: 1) overlook fiduciary obligations that arise when limited partners actively participate in the management of a limited partnership; 2) read select contractual provisions out of context while ignoring others; and 3) selectively quote from the Counterclaims to misleadingly assert that the Counterclaims say one thing when they actually say another.

The PNC Parties mistakenly argue that the legal and contractual obligations on which the Counterclaims are based belong solely to the Partnership and therefore the Oak Creek Parties lack standing.  This argument ignores the legal and contractual duties the PNC Parties owed directly to the Oak Creek Parties and the unique injuries (distinct from any injury to the Partnership) suffered by the Oak Creek Parties that undergird the Counterclaims.  If duties owed to a partner are breached and the partner suffers an injury unique to it, the law is clear—the partner has standing to assert the claim.  The injured partner also is permitted to assert claims

1

derivatively when necessary to protect the partnership from the failure of the acting control partner to do so.   And contrary to the PIC Parties' wishful assertion, there has been no determination that Oak Creek GP is no longer a partner in the Partnership or that it or its affiliates have forfeited any rights or interests in the Partnership, other than the right to act as the operating general partner while the Court's preliminary injunction is in effect.

For these and other reasons discussed more fully below, the Motion should be denied. Alternatively, if the Court determines there is any deficiency in the Counterclaims, the Oak Creek Parties request leave to amend the Counterclaims to address the deficiency.

## II.    LEGAL STANDARDS

### A.    Standard Under Rule 12(b)(6)

Federal Rule of Civil Procedure 8(c) requires a claimant make only a "short and plain statement of the claim showing [he] is entitled to relief."   "Specific facts are not necessary; the statement need only 'give the defendant fair notice of what the. . . claim is and the grounds upon which it rests.'"   *Erickson v. Pardus*, 551 U.S. 89, 93 (2007) (quoting *Bell Atlantic Corp v. Twombly*, 550 U.S. 544, 555 (2007)).   In conducting this threshold inquiry, the court "must accept as true all of the factual allegations contained in the complaint" *Id.*   If the alleged facts, taken as true "state a claim to relief that is plausible on its face," the motion to dismiss should be denied.   *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).   That is, the alleged facts must only "allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged" in order to defeat a motion to dismiss for failure to state a claim.   *Turner v. Lieutenant Driver*, 848 F.3d 678, 685 (5th Cir. 2017) (quoting  *Iqbal*, 556 U.S. at 678)).

### B.    Standard Under Rule 12(b)(1)

The party invoking the jurisdiction of a federal court bears the burden of establishing standing.   *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016), *as revised* (May 24, 2016).   To

establish standing, a claimant must show that he "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Id.*; *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992). "At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss [the court will] 'presum[e] that general allegations embrace those specific facts that are necessary to support the claim'" *Lujan*, 504 U.S. at 561 (quoting *Lujan v. National Wildlife Federation*, 497 U.S. 871, 889 (1990)).

## III.    BACKGROUND FACTS

### A.    The Parties, the Project, and the Partnership

This case involves a series of transactions entered into for the purpose of developing, constructing, and operating an affordable housing project in Austin, Texas (the "Project") upon real property that was owned by an affiliate of Oak Creek Developer's key principal, Rene Campos and Eureka Holdings, Inc. (collectively, the "Eureka Entities"). CC ¶ 1.[1]  The Project required approval of numerous governmental entities (federal, state, and local), an approved developer, and third party financing. *Id.* The Project would generate tax credits to a qualified tax credit investor. *Id.*

The Eureka Entities have considerable experience developing and operating affordable housing projects throughout the United States. They satisfied the requirements of an approved developer, and secured all necessary federal, state, and local approvals. *Id.* at ¶ 2. The Eureka Entities also sought financing for the Project and a qualified tax credit investor interested in obtaining equity in the Project in order to benefit from the valuable tax credits. *Id.* Typically, the lender and tax credit investor in this type of project are separate entities but, in this case, PNC

---

[1]   CC refers to the Counterclaims, Dkt. #78.

Bank introduced itself to the Eureka Entities as both prospective lender and tax credit investor. *Id.* The Eureka Entities elected to transact with PNC Bank acting in both capacities instead of the typical structure in reliance on PNC Bank's representation that it was a "one-stop shop," and that it could be counted on to act as a good partner. *Id.* at ¶ 3.

The Partnership was formed to develop, own, and operate the Project. On May 23, 2014, the Oak Creek Parties and the PNC Parties executed the Amended and Restated Agreement of Limited Partnership of 2013 Travis Oak Creek, LP ("LP Agreement"). *See* Ex. A.[2] As contemplated in the LP Agreement, (i) the Eureka Entities would contribute the Project's real property to the Partnership in exchange for a subordinated promissory note; (ii) Oak Creek Developer would develop the Project for fees to be paid on a deferred basis; (iii) another Eureka affiliate would manage the property under a management agreement; and (iv) Oak Creek GP would retain an equity and profits interest in the Partnership, advance Project development costs to be reimbursed on a deferred basis under a promissory note, and serve as the Partnership's general partner. CC ¶ 5. For a 99% interest in the Partnership, the PNC Parties committed to make capital contributions totaling $18,698,130 in four installments. Ex. A §3.2.

**B.    The documents executed in connection with Project financing**

On May 23, 2014, PNC Bank (as lender) and Oak Creek GP (on behalf of the Partnership) executed a Forward Commitment for Fixed Rate Mortgage Loan not to exceed $27,300,000 under the Fannie Mae DUS Product Line (the "Forward Commitment"). CC ¶ 6. Pursuant to the Forward Commitment, PNC Bank committed to loan up to $27,300,000 to the Partnership (the "Mortgage Loan") subject to numerous conditions. *See* Ex. C § E. PNC Bank further committed to lock the interest rate for the Mortgage Loan within five days of execution of

---

[2]    "Ex. A, B-D" refers to exhibits to the Motion.  Exhibit I is a document referenced in the Counterclaims and submitted with this response.

the Forward Commitment (the "Rate Lock"), again subject to numerous conditions.  *Id.* § C-D.
PNC Bank's commitment under the Forward Commitment would expire by its terms if the
closing of the Mortgage Loan "d[id] not occur at least thirty (30) days prior to the Final Delivery
Date, which date [was] subject to extension of up to six (6) months by PNC in its sole and
absolute discretion."  *Id.* § L.1.  The Final Delivery Date was defined as 24 months following
execution of the Forward Commitment, or May 23, 2016.  *See id.* at Exhibit A-2.

Simultaneously, Oak Creek GP executed a Delivery Assurance Certificate on behalf of
the Partnership, under which the Partnership agreed to close the Mortgage Loan "not less than 30
days prior to the Final Delivery Date on the terms set forth in" the Forward Commitment.  Ex. D
§ 1.  The Partnership also provided a "Good Faith Deposit" of $819,000, one-third of which was
to be held by Fannie Mae and the rest by PNC Bank.  *See id.* §3(a).  In the event the Mortgage
Loan was not made by the Final Delivery Date, the Partnership agreed to pay to Fannie Mae and
PNC Bank a "Non-Delivery Fee," calculated according to a formula in Exhibit C to the
certificate.  *See id.* § 4.  PNC Bank agreed that its sole recourse for the Non-Delivery Fee was
against the Partnership's real property assets.  *Id.* § 11.

PNC Bank entered also into a May 23, 2014 trade confirmation (the "MBS Trade
Confirmation) to sell mortgage-backed securities ("MBS") backed by the Mortgage Loan to
affiliate PNC Capital Markets LLC ("PNC Capital Markets").  CC ¶ 7; Ex. I.  The Oak Creek
Parties had no access to the MBS Trade Confirmation until late 2016 or early 2017.  CC ¶ 7.

Finally, and on the same day, the Limited Partnership and JPMorgan Chase Bank, N.A.
("Chase") entered into a construction loan agreement pursuant to which Chase agreed to loan
$26,000,000 to the Partnership (the "Chase Loan").  *See* PNC Bank N.A.'s, Columbia Housing
SLP Corporation's, and Travis Oak Creek, L.P.'s First Amended Complaint, Dkt. #9 (the

"Complaint") ¶ 13.   The Chase Loan was secured by a mortgage on the Limited Partnership property and guaranteed by Oak Creek Developer and Rene Campos.   Repayment of the loan was due on or before May 23, 2017.  *Id.*

### C. Development and construction are successfully completed, but stucco defects require extensions of Final Delivery Date for the Mortgage Loan

With the Partnership's construction loan in place and long term financing committed, the Oak Creek Parties successfully completed development and construction of the Project on a timely basis.  CC ¶ 16.   Certificates of occupancy were issued, and the buildings were fully occupied by early 2016.  CC ¶ 16.   Punch-list work remained, and Oak Creek GP was attempting to resolve outstanding contract issues with the general contractor on the Project, Weis Construction ("Weis").  *Id.*   Given these lingering issues, in May 2016, Oak Creek GP exercised its option to extend the Final Delivery Date for the Mortgage Loan by six months, to November 30, 2016.  For the extension, PNC Bank and Fannie Mae received $106,000 in fees.  *Id.* ¶ 34.

In late summer and early fall of 2016, Oak Creek GP discovered latent construction defects, including defective stucco.  *Id.* ¶ 18   Section 6.7(i) of the LP Agreement required Oak Creek GP "to diligently pursue remediation of any construction related issues prior to the expiration of the warranty period under the Construction Contract."   Ex. A, §6.7(i). Accordingly, Oak Creek GP informed the PNC Parties of the issues and received their approval to pursue remediation under Weis's warranty.  CC at ¶ 18.  When Weis refused to remediate the stucco under its warranty, the PNC Parties suggested Oak Creek GP engage lawyers and take any necessary action to resolve contractor-related issues, calling the problem the "GP's problem to solve," but indicating the full support of the PNC Parties.  *Id.* ¶ 19.

Without more information about how the stucco defect would be remediated, Oak Creek GP was unable to sign closing documents Fannie Mae required in connection with the Mortgage

Loan, without violating various representations and warranties in the standard form documents.. *Id.* ¶ 18.  Consequently, Oak Creek GP began exploring options for closing the Mortgage Loan with the Weis dispute pending.  *Id.* ¶ 20.

PNC Bank, as lender, was amenable to an approach that would address the Partnership's issues and allow for a closing in November 2016.  On September 7, 2016, Abi Tobun, who happened to be an executive with both PNC Capital Markets and PNC Bank, wrote an email to other PNC Bank employees confirming that "we" have been working on ways to lower the rate on "the Oak Creek transaction" to bring it more in line with current market rates to improve marketability as "we get closer to settle date" (i.e., the anticipated November 2016 delivery of the MBS security to PNC Capital Markets).  *Id.*  The concept was to increase the loan amount by approximately $2.7 million and decrease the interest rate, all at no cost to the Partnership.  *Id.* The increased loan proceeds plus capital contributions due from the PNC Parties would have funded a reserve to cover construction deficiencies while the Partnership pursued a warranty action against Weis.  *Id.*  Tobun confirmed that Fannie Mae and PNC Underwriting (i.e., PNC Bank as a lender) did not object to this concept.  *Id.* The concept would have made it possible to close the Mortgage Loan closed in November of 2016.

### D.     The PNC Parties decide to use the stucco issue to force payment of punitive fees or obtain the forfeiture of the Oak Creek Parties' rights and interests

Despite this consensus, in complete disregard of the Partnership's best interests, and unbeknownst to the Oak Creek Parties at the time, the PNC Parties (acting as limited partners) objected to this solution and blocked its implementation.  As Tobun stated in his email, "the tax credit investor (Don's area)[3] are concerned with the borrower taking additional proceeds despite

---

[3]   Don is Don Geffin, who heads PNC Bank's tax credit investor group and managed PNC Bank's role as partner in the Partnership.

the lower debt service." *Id.* ¶ 24.  Tobun stated, "We are exploring another option with Don's group which is to get some release of reserves due to the deal having more cash flow from the reduced rate but not getting much traction.  Their push back is that the deal works as is and as such they are not inclined to take on additional debt which will increase the risk to the tax credit investor." *Id.*

The stated concern about risk of additional debt was clearly a pretext, given PNC Parties' subsequent offer to approve the increased loan on the condition that the additional loan proceeds be used to pay PNC Bank fees rather than to address the ongoing stucco issues. *See id.* ¶ 25.  As this and other events played out, it became apparent that the PNC Parties, as limited partners, were not motivated by the best interests of the Partnership.  Instead, they demanded unreasonable, punitive fees if such a loan closing was delayed.

As a result, when the Partnership needed, and Oak Creek GP requested, a second six-month extension of the Forward Commitment's Final Delivery Date, PNC Bank demanded a $2,013,375 fee for the extension. *Id.* ¶¶ 34-35.  This outrageous fee was nearly twenty times the $106,000 PNC Bank had charged for the first six-month extension. *See id.*  Unable to justify the fee and unwilling to explain how it was calculated, PNC Bank representatives told Oak Creek GP that the MBS Investor was now a third party whom PNC Bank could not identify and did not control, that this unnamed third party was demanding the punitive fees as a condition to an extension, and that PNC Bank was not privy to the methodology used to calculate the fee. *See id.* ¶ 27.  None of this was true.  PNC Capital Markets was still the MBS Investor and PNC Bank clearly knew this as PNC Capital Market's responsible executives also worked for PNC Bank. *See id.* ¶30.  Under those executives' leadership and direction, PNC Capital Markets and PNC Bank conspired to demand the payment of penalties that were not owed. *See id.* ¶ 26.

Based on these false representations and under duress, Oak Creek GP agreed on the Partnership's behalf to the payment of the penalties in a side letter with PNC Bank and Fannie Mae dated November 14, 2017 (the "Side Letter"). *Id.* ¶ 35. The Side Letter required the Partnership to pay Fannie Mae a substantially similar fee to the one it had previously paid for a six-month extension, plus the exorbitant MBS Investor Extension fees. *Id.* Oak Creek GP executed the Side Letter and paid the first installment of the punitive fees under protest, but with a full reservation of rights. *Id.* For its consent, Fannie Mae was fully paid.

After obtaining the extension, Oak Creek GP continued to try to find a way to close the Mortgage Loan while Oak Creek GP's efforts to enforce the Partnership's valid warranty rights against Weis continued. *Id.* ¶¶ 36-40. Ignoring the Partnership's best interests, the PNC Parties would not consent to close the Mortgage Loan without payment of punitive fees for the benefit of the unnamed MBS Investor, who the PNC Parties knew to be PNC Capital Markets. *Id.* ¶ 39.

When it became apparent that PNC Bank would not seek a loan closing resolution in the best interests of the Partnership, Oak Creek GP refused to fund the second punitive fee installment under the Side Letter. *Id.* On January 21, 2017, PNC Bank terminated the Forward Commitment, citing non-payment of the MBS Investor Extension fees as the sole reason for the termination. *Id.* ¶ 41. This was not a proper basis for a Forward Commitment termination, and PNC Bank's subsequent reliance on such a Forward Commitment termination as a purported Event of Default constituted a breach of the LP Agreement. *See infra* at 19-21.

PNC Bank then used its wrongful termination of the Forward Commitment to demand Oak Creek GP fund a Non-Delivery Fee of more than $7 million, which PNC Bank alleged the Partnership now owed under the Delivery Assurance Certificate. *Id.* ¶ 42. The demanded fee was a liquidated damage that was not reasonably related to any damages suffered by PNC Bank.

It was punitive and therefore unenforceable.  *See infra*  at 21-22.   Even representatives of PNC Bank acknowledged that the Partnership's refusal to pay the $7 million was fully defensible and that exposure did not exceed $1 million.  *Id.* ¶ 44.  But the PNC Parties nevertheless continued to demand that Oak Creek GP pay the fee to PNC Bank, ignoring the  Delivery Assurance Certificate provision under which PNC Bank agreed to look solely to the Partnership's real estate assets for payment if a Non-Delivery Fee was due and owing.  Ex. D §11.

In January 2017, the stucco contractor sued Weis seeking payment for the  defective stucco work, and Weis in turn filed a lien against the Project and sued the Partnership, Oak Creek GP, and others for payment of the retainage amount the Partnership properly withheld in connection with the warranty dispute.  CC ¶ 46.   This action was a direct consequence of the PNC Parties' direction to Oak Creek GP to take such action as was necessary to protect the Partnership's interests with respect to its warranty claims against Weis, rather than paying Weis. And, in furtherance of this approved plan, the PNC Parties expressly consented to the Partnership "answering the lawsuit and filing appropriate counterclaims that are in the best interests of the Partnership."  *Id.* ¶ 52.

Ignoring the direct consequences of their own wrongful conduct and authorizations, on February 28, 2017, the PNC Parties gave notice of the following alleged Events of Defaults:

- Failure to cause the Partnership to comply with its obligations under the Forward Commitment, that was terminated for failure to pay the MBS Investor Extension Fees;

- Default of PNC Bank's bridge loan as a result of the termination of the Forward Commitment; and

- Failing to cause the general contractor's mechanic's lien affecting the Property to be cured and removed from title.

*Id.* ¶ 50.  Contrary to the PNC Parties' assertions, these occurrences were: 1) either not defaults; 2) excused by the PNC Parties' various breaches and consents; or 3) otherwise waived by the PNC Parties, or the PNC Parties were estopped to complain about them.  *See infra* at 16-26.

PNC Bank also actively frustrated Oak Creek GP's efforts to arrange financing to replace the PNC Bank Mortgage Loan and pay off the Chase Loan.  Oak Creek GP negotiated a bridge loan from Arbor Commercial Mortgage that would have allowed for the timely payment of the Chase Loan in full, and provided additional capital for the Partnership on a reserve basis pending resolution of the warranty claim against Weis (the "Arbor Loan").  *Id.* ¶ 53.  On April 24, 2017, the PNC Parties purported to consent to the Arbor Loan subject to "the Limited Partners' receipt of the final documents evidencing the Proposed Financing."  *Id.* As the PNC Parties knew, however, Arbor was concerned about PNC Bank's wrongful claim for the $7 million Non-Delivery Fee and PNC Bank's refusal to fund its capital contributions.[4]  *Id.* ¶ 54.  PNC Bank refused to withdraw its improper Non Delivery Fee claim or comply with its capital funding obligations, conditioning capital contributions on Oak Creek GP resolving the Non-Delivery Fee issue. *Id.* ¶ 55-57.  Therefore, the PNC Parties effectively blocked a closing of the Arbor Loan that was otherwise imminent.  *Id.* ¶ 57.

On June 7, 2017, the PNC Parties notified Oak Creek GP that they were removing it as general partner based on the alleged defaults set forth in their letter of February 27, 2017, and a Notice of Reservation of Rights issued by Chase on May 23, 2017.  *Id.* ¶ 58.  In the removal notice the PNC Parties also asserted that the putative removal constituted an event of withdrawal by Oak Creek GP from the Partnership resulting in the relinquishment by all the Oak Creek

---

[4] Arbor was also concerned about the Weis lien; however,  Oak Creek GP had arranged to obtain a bond at its full and sole financial risk, with no risk to the PNC LPs.  CC ¶ 54.

Parties of their respective rights and interests with respect to the Partnership. *Id.* The PNC Parties further demanded the repurchase of their limited partnership interests by Oak Creek GP. *Id.* The next day they filed this lawsuit seeking to enforce the alleged repurchase obligation and for judgment validating their putative removal and corresponding relinquishment claims. *Id.* When Arbor learned of these events, it withdrew its commitment to make the bridge loan. Consequently, the Chase loan default was left without a cure.[5]

## IV.    ARGUMENT AND AUTHORITIES

### A.    The Oak Creek Parties have standing to assert the Counterclaims

#### 1.    The Oak Creek Parties' claims are not Partnership claims

In arguing that the Oak Creek Parties lack standing to pursue the Counterclaims, the PNC Parties assume, incorrectly and without any analysis, that all of the Oak Creek Parties' claims belong to the Partnership and thus devote the entirety of their briefing on standing to an argument that any claims belonging to the Partnership can only be brought by the general partner, acting with authority, or a limited partner suing derivatively.  With the exception of the fraud and promissory estoppel claims, this core assumption is wrong.  Other than the fraud and promissory estoppel claims, the Oak Creek Parties are not seeking to recover damages to the Partnership or based on the diminution of the value of their Partnership interests as a result of an injury to the Partnership as a whole.  Instead, both Oak Creek Parties seek to recover damages unique to them resulting from breaches of duties owed directly to them. *See infra* at 28-31.

The PNC Parties owed the following duties directly to the Oak Creek Parties:  (i) a duty to perform under the LP Agreement to which both the Oak Creek Parties and the PNC Parties

---

[5]   It is noteworthy that, as of this filing, the Chase loan default has not been resolved by the PNC Parties despite assurances or pledges they made to the Court that they would resolve the same without a payment.

bound themselves; (ii) fiduciary duties arising from the PNC Parties' assumption of such duties as a matter of law; and (iii) duties owed to Oak Creek GP as a customer under 12 U.S.C. §1972. These duties are discussed more fully below.  *See infra*  28-31.  For breaches of these duties owed directly to them, the Oak Creek Parties have standing to sue for resultant damages unique to them.  Cases involving claims by partners distinguish between "injuries to the partnership that merely diminish the value of [a] partner's interest"—for which a partner *does not* have standing to sue—and injuries "personal to [the partner] himself"—for which a partner *does* have standing to sue.  *In re Fisher*, 433 S.W.3d 523, 527 (Tex. 2014).  In other words, to determine whether a partner has standing to sue, courts "focus on the nature of the alleged injury."  *Hall v. Douglas*, 380 S.W.3d 860, 874 (Tex. App.—Dallas, no pet.).  Where a partner has been "personally aggrieved," he has standing to sue.  *In re Fisher*, 433 S.W.3d at 527.

In *Fisher*, the Texas Supreme Court held that a limited partner had standing to assert claims for mismanagement of a limited partnership because his alleged damages for "loss of earning capacity, lost profits, loss of income, damage to credit reputation, [and] lost investments" were unique to him.  433 S.W.3d at 527. Similarly, in *Jerry L. Starkey, TBDL, L.P. v. Graves*, the court held that a general partner had standing to assert a claim for breach of a partnership agreement that entitled the general partner to compensation because the "breach of that duty did not harm the partnership; it harmed [the partner]."  448 S.W.3d 88, 99 (Tex. App.—Houston [14th Dist.] 2014, no pet.).  In *Guerrero-McDonald*, the court held  a limited partner had standing to bring breach of contract claims—including that other limited partners had breached the partnership agreement by failing to pay her an agreed-upon consulting fee and failed to loan her money under a note she had executed—because these breaches "diminished the value of [her] interest in the limited partnership exclusively, rather than the value of the limited

partnership generally." *Guerrero-McDonald v. Nassour*, 516 S.W.3d 198, 209 (Tex. App.—Eastland 2017, no pet.).

The Counterclaims seek damages that are unique to the Oak Creek Parties.[6]  Specifically, the Oak Creek Parties seek damages they have suffered from the PNC Parties' wrongful acts wrongful acts that caused the purported forfeiture, including the purported loss of the Oak Creek GP's rights to distributions of Partnership cash flow, the purported termination of the Oak Creek GP's $1,000,000 promissory note, and the Oak Creek Developer's $5.175 million in deferred development (the "Forfeiture").  These are not damages suffered by the diminution in the value of a Partnership interest or share of Partnership income due to injury suffered by the Partnership as a whole.  Motion 6-8.  These damages are unique to the Oak Creek Parties, suffered by them personally; thus they have standing to assert the associated claims.

### 2. The Oak Creek Parties' have the right to assert the Partnership's fraud and promissory estoppel claims derivatively

To the extent the Oak Creek Parties are asserting fraud and promissory estoppel claims belonging to the Partnership, the Oak Creek Parties have the right to assert the claims derivatively.  Contrary to the PNC Parties' assertions, the Court's Preliminary Injunction Order did not finally resolve whether Oak Creek GP may bring claims on behalf of the Partnership.  *See* Dkt. #73 at 25 (stating that "Oak Creek is right to worry that a possible consequence of this

---

[6] To argue that Oak Creek GP is asserting claims solely for the PNC Parties' breach of fiduciary duties to the Partnership, the PNC Parties selectively edit language quoted from the Counterclaims in a highly misleading way. For example, they claim that Counterclaims "implicate a direct claim for losses arising from duties owed to the Partnership" based on the following quote from the Counterclaims, which omits wording as indicated by the brackets: "The ability to control the Partnership's actions . . . imposed a fiduciary duty upon PNC Bank and Columbia that both owed to the Partnership []," citing CC ¶ 63.  The words the PNC Parties omitted from the brackets are "and GP."   The sentence as it actually appears in the Counterclaims reads as follows: "The ability to control the Partnership's actions . . . imposed a fiduciary duty upon PNC Bank and Columbia that both owed to the Partnership and GP."

lawsuit is forfeiture of its interests in the Partnership, but it will not forfeit those interests simply as a consequence of the Court issuing a preliminary injunction").  A determination that the Oak Creek GP was improperly removed would necessarily allow it to bring claims on behalf of the Partnership.  Unless the Court rules that the PNC Parties properly deposed Oak Creek GP (which they did not), Oak Creek GP is not precluded from maintaining claims on behalf of the Partnership.

Further, the PNC Parties' argument that Oak Creek GP cannot pursue partnership claims after its wrongful removal as general partner reflects a misunderstanding of the law and contravenes the notions of fairness and justice underlying the Texas Business Organizations Code.[7]  When, as here, the ability to bring derivative suits on behalf of a partnership (or corporation) is contested, Texas law relies on the equitable principles underlying derivative suits in general.  Those principles permit entities typically bereft of the ability to bring derivative suits—such as limited partners or, as here, deposed general partners—to bring suit when the controlling entities have no incentive to sue.  According to the Fifth Circuit, "[t]he majority of courts that have considered this question [ ] allowed derivative suits by limited partners [who typically cannot bring suit] when general partners [who typically can bring suit] either would not sue or were unlikely to sue because of a conflict of interest."  *Griffin v. Box*, 85 F.3d 625, at*6 (5th Cir. 1996) (not designated for publication) (collecting authorities).  The appellate court reasoned that:

> [I]n a proper case-one where the controlling partners, for improper, ulterior motives and not because of what they in good faith believe to be the best interests

---

[7]   As the Court has observed, whether or the extent to which Oak Creek GP is a partner or has relinquished its ownership interests is a question to be determined on the merits.  It's potentially temporary replacement as the Partnership's operating general partner pending such a determination does not divest it of its status, interests or rights as a partner.

> of the partnership, decline to sue on a valid, valuable partnership cause of action which it is advantageous to the partnership to pursue-***Texas law would afford some remedy to the minority partner or partnership interest owner other than merely a damage or accounting suit against the controlling partners***, at least where the latter would not be reasonably effective to protect the substantial rights of the minority.

*Id.* (quoting *Cates v. International Tel. and Tel. Corp.*, 756 F.2d 1161, 1178 (5th Cir. 1985))

(emphasis added).  In this case, the Court has already observed:

> There is some evidence in the record suggesting that PNC and Columbia Housing may not have always had the Partnership's best interests at heart.  Oak Creek argues that PNC engaged in troublesome self-dealing and used the construction defects and consequent obstacles to the Partnership's ability to secure permanent financing as an opportunity to extract substantial fees from the Partnership.  Some of this alleged conduct may give rise to viable claims against PNC.

Order , Dkt. #73, p. 20.

The PNC Parties cannot completely insulate themselves from liability after taking actions that harmed the Partnership and general partner simply by installing themselves as general partner.  They are not only unlikely to assert these claims given their own interest—they have already demonstrated they will not.  Because Oak Creek GP is the only entity in a position to bring claims concerning the PNC Parties' fraud and unfulfilled promises, the Court should not dismiss those claims, even if they are derivative in nature.[8]

### B.  The Counterclaims state plausible claims for breach of contract

As discussed below, the Counterclaims clearly state claims that the PNC Parties breached contractual duties they owed to the Oak Creek Parties and those breaches caused the purported Forfeiture giving rise to the Oak Creek Parties' unique losses.  Moreover, contrary to argument in the Motion, the Counterclaims do not admit facts that establish the propriety of the Forfeiture.

---

[8]  Assuming the Court determines the Oak Creek Parties may not assert partnership claims, the Oak Creek Parties note that the only purely derivative claims asserted are for fraud and promissory estoppel.  *See infra* 36-37.

1.    **The purported Forfeiture was caused by the PNC Parties' breaches of their contractual duties**

    (a)    **The purported Events of Default on which the PNC Parties purported to base the Forfeiture were caused by the PNC Parties' breaches of the LP Agreement**

The Counterclaims are premised on the fact that the purported Forfeiture was wrongful because it was the natural and foreseeable—in fact, intended—result of the PNC Parties' breaches of the LP Agreement (as well as breaches of fiduciary and legal duties discussed infra at 28-31).  Specifically, the PNC Parties' breaches of their own contractual duties (including the duty not to interfere with Oak Creek GP's performance) caused the purported Events of Default on which the PNC Parties based the Forfeiture.

The PNC Parties allegedly base the purported Forfeiture on the termination of the Forward Commitment, the existence of the Weis lien, and Chase's default allegation and reservation of rights.  Complaint ¶¶20, 24; Ex. B-D.  None of these events would have occurred, however, had the PNC Parties not breached their contractual obligations.  As discussed below, their breaches of Sections 3.2, 7.2, 6.2(d) of the LP Agreement prevented Oak Creek GP from closing a modified Mortgage Loan in November 2016 and from later closing financing that would have mooted the Forward Commitment, paid the retainage and/or bonded over the lien, and paid off the Chase Loan.  Because the PNC Parties' breaches caused the events on which they based the forfeiture, their assertion of forfeiture breached Sections 7.1 and 7.9.

The Counterclaims sufficiently allege a breach of Section 3.2.  Section 3.2 requires PNC Bank to make capital contributions in accordance with an agreed schedule.  The Counterclaims specifically allege that PNC Bank failed to make the required capital contributions.  CC ¶ 29. The Motion does not dispute that the Counterclaims allege that PNC Bank failed to comply with the provision, and therefore breached the contract.  Instead, the Motion asserts that this is an

obligation owed to the Partnership and not Oak Creek GP; yet, in the LP Agreement, the PNC Parties expressly committed to the Oak Creek Parties that they would make these capital contributions, so the duty was clearly owed to the Oak Creek Parties.

The Counterclaims also state a claim for breach of Section 6.2(d), which requires the PNC Parties' consent before Oak Creek GP can borrow money.  The PNC Parties breached this provision by conditioning their consent to the Arbor loan on the Partnership paying the punitive Non-Delivery Fee that, as discussed *infra* at 21-22, was improper charged on a recourse basis and admittedly not owed.  Again, the Motion does not dispute that the Counterclaims properly allege that the PNC Parties breached this LP Agreement obligation.

Finally, the Counterclaims properly allege a breach of Section 7.2, which provides, "Except as specifically provided in this Agreement, no Limited Partner shall take part in, or interfere in any manner with the management, control, conduct or operation of the Partnership." Ex. A § 7.2.  The Counterclaims allege facts establishing a breach of this provision; specifically, that the PNC Parties interfered with Oak Creek GP's management, control, conduct and operation of the Partnership by secretly intervening in negotiations with PNC Bank as a lender[9] and later by sabotaging the Arbor loan through improper demands for punitive fees the PNC Parties knew were unwarranted and wrongfully declaring defaults and the Forfeiture.  Again, the Motion does not dispute that the PNC Parties breached this provision.

---

[9]   In the context of their argument for dismissal of the fraud Counterclaims, the PNC Parties argue that their involvement in the negotiations and interference with PNC Bank about proposed modified loan terms was authorized by language in Section 6.12 providing that it would not be "a breach of any duty or obligation, fiduciary or otherwise" for the PNC Parties to share or disclose information about the Partnership to PNC Bank and their other affiliates or to discuss Partnership matters with them.  This language does not apply here.  Actively negotiating and interfering with a transaction goes far beyond the disclosure or sharing of information or the discussion of matters.

In addition to their express, the PNC Parties breached their implied contractual duty not to interfere with Oak Creek GP's performance under the LP Agreement.  In addition to their contractual duty not to interfere, the PNC Parties breached the implied duty of cooperation.  "A duty to cooperate is implied in every contract in which cooperation is necessary for performance of a contract."  *Bank One, Texas, N.A. v. Stewart*, 967 S.W.2d 419, 434 (Tex. App.—Houston [14th Dist] 1998, no pet.).  That duty "requires that a promisee may not hinder, prevent, or interfere with the promisor's ability to perform his duties under an agreement." *Id.*  "[W]here one party to a contract, by wrongful interference prevents the other party from performing, such action by the party at fault constitutes a breach of the agreement." *Longview Const. & Dev., Inc. v. Loggins Const. Co.*, 523 S.W.2d 771, 779 (Tex. Civ. App.—Tyler 1975, writ dism'd by agreement).  This kind of breach "not only [ ] excuse[s] performance by the injured party, but also entitle[s] him to recover any damages sustained." *Id.*; *see also O'Shea v. Int'l Bus. Mach. Corp.*, 578 S.W.2d 844, 846 (Tex. Civ. App.—Houston [1st Dist.] 1979, writ ref'd n.r.e.). (noting that, generally, "performance is excused when a party to a contract prevents the other party from performing").

Because the circumstances on which they purported to base an alleged forfeiture were caused by the PNC Parties' own prior breaches of their duties and obligations under the LP Agreement, the Forfeiture was improper and therefore also breached Sections 7.1 and 7.7 of the LP Agreement.

> **(b)     By improperly using their wrongful termination of the Forward Commitment as a basis for the purported Forfeiture, the PNC Parties' breached the LP Agreement**

The Counterclaim also alleges a valid claim based on PNC Bank's allegation that the termination of the Forward Commitment was an Event of Default justifying removal of Oak Creek GP and Forfeiture under the terms of the LP agreement.  See CC ¶¶ 76.  PNC Bank

terminated the Forward Commitment under Section M.1 based on the failure of the Partnership to pay fees allegedly due under the Side Letter.  Yet, Section M.1 did not authorize PNC Bank to terminate the Forward Commitment for non-payment of Side Letter fees.  Section M.1 permitted termination only upon the failure by the Partnership to comply with any terms and conditions of the commitment and the Fannie Mae Guidelines or bankruptcy of the Partnership, Oak Creek GP, or any guarantor.  Ex. C §M.1  None of these grounds for termination existed.  At most, PNC Bank had a claim for damages under the Side Letter, not a right to terminate the Forward Commitment when any installments putatively due thereunder were not paid.

Because PNC Bank's termination of the Forward Commitment was wrongful, the PNC Parties' use of the termination as a basis for the purported Forfeiture was improper, making the Forfeiture a breach of Sections 7.1 and 7.7 of the LP Agreement .  See CC ¶ 76.  Moreover, even assuming the Forward Commitment termination was proper (which it was not), nothing in the LP Agreement provides that a breach or termination of the Forward Commitment is an Event of Default.[10]  For this additional reason, the purported Forfeiture based on the termination of the Forward Commitment was improper under the LP Agreement.

Finally, the fact that the Oak Creek Parties were not parties to the Forward Commitment does not defeat their claim for a declaration that the Forward Commitment was wrongfully terminated.  The Oak Creek Parties do not need to be parties to the particular agreement to be "interested parties" under 28 U.S.C. §2201.  *See Collin County, Tex. v. Homeowners Assoc. for*

---

[10]    Termination of the Forward Commitment could not have been a default under Section 7.7(a)(7) of the LP Agreement.  Section 7.7(a)(7) requires a default under a "Permitted Loan." The Forward Commitment is not a "Permitted Loan" as that term is defined in Article II; i.e., a "loan(s) so identified in the Schedule and any other financing for which the SLP has provided Consent."  Ex. A at 12 & Schedule.  Notably, the Forward Commitment is not a loan or financing.  It is a commitment to provide financing at a later date.

*Values Essential to Neighborhoods*, 915 F.2d 167, 170-71 (5th Cir. 1990) (noting that "only parties with legal interests threatened in an actual controversy have standing to sue under the Declaratory Judgment Act" and that "party's interest is an adverse legal interest within the meaning of the Declaratory Judgment Act when it relates to "a case of actual controversy within [the court's] jurisdiction").  Here, because the PNC Parties used the termination of the Forward Commitment as a basis for avoiding their contractual obligations to the Oak Creek Parties under the LP Agreement, the Oak Creek Parties have standing to request the declaration sought.

        **(c)**      **PNC Bank breached the LP Agreement by seeking recourse against the GP for the alleged default under the Delivery Assurance Certificate caused the purported Events of Default**

In their Motion, the PNC Parties do not dispute that the Counterclaims sufficiently allege PNC Bank's breach of the Delivery Assurance Certificate by seeking recourse against Oak Creek GP of an obligation that PNC Bank agreed in Section 11 was non-recourse.  Ex. D §11  Although the Oak Creek Parties were not parties to the Delivery Assurance Certificate, PNC Bank used its wrongful demand that Oak Creek GP pay the Non-Delivery Fee to interfere with Oak Creek GP's management of the Partnership's affairs with respect to resolving construction  issues and obtaining financing after PNC Bank wrongfully terminated the Forward Commitment.  That interference violaged the PNC Parties' obligations under the LP Agreement that gives rise to a claim under the LP Agreement to which the Oak Creek Parties were parties.

In addition to being improperly asserted against Oak Creek GP, and on a recourse basis, the demand was never legally enforceable against the Partnership, Oak Creek GP, or anyone else.  The Non-Delivery Fee is a liquidated damage.  To be enforceable, liquidated damages must be rationally related to actual damages.  *FPL Energy, LLC v. TXU Portfolio Mgmt. Co., L.P.*, 426 S.W.3d 59, 72 (Tex. 2014).  Here, PNC Bank could never explain how a $7 million fee—

representing 25% of the principal amount of the $27.3 million loan that PNC Bank had committed to make but never funded—reasonably estimated the damages PNC Bank suffered when it failed to lend a penny to the Partnership.  It certainly was not a sum PNC Bank was required to pay to the MBS Investor when it demanded payment.  The MBS Trade Confirmation[11] only required PNC Bank to pay a Non-Delivery Fee from funds actually received from the Partnership. *See* Ex. I.  Absent payment by the Partnership, PNC Bank had no obligation to pay the MBS Investor beyond the good faith deposit (less the portion of that deposit payable to Fannie Mae).   A Non-Delivery Fee of $7 million could never be a reasonable estimate a damage ***actually*** suffered by PNC Bank.  In demanding payment, PNC Bank was simply acting as a volunteer on behalf of its affiliate.

For these reasons, PNC Bank's demands for payment were improper under the Delivery Assurance Certificate, as were the PNC Parties' use of those improper demands to interfere with Oak Creek GP's performance of its duties under the LP Agreement.  This conduct breached Section 7.2 of the LP Agreement as well as the implied duty to cooperate.  Again, the claim is for an injury unique to the Oak Creek Parties—the purported Forfeiture.  Moreover, for the same reasons discussed above with respect to the Forward Commitment, the Oak Creek Parties have standing to assert claims for declaratory relief in addition to their claim for damages.

2. **Facts stated in the Counterclaims do not establish the removal of Oak Creek GP was proper under the LP Agreement**

The PNC Parties argue that the Counterclaims admit the following facts that are "sufficient to establish [Oak Creek] GP was properly removed as the original general partner":

---

[11]    In the Motion (at p. 15), the PNC Parties incorrectly argue that the MBS Investor had the right or ability to require the Partnership to pay it fees under the Forward Commitment—an argument that ignores the fact that the MBS Investor was neither a party to the Forward Commitment nor otherwise in privity, of any kind, with the Partnership or Oak Creek GP.

(i) a fully executed G407 Certificate of Substantial Completion was never issued; (ii) "stucco installation at the Property requires remediation, which will cost money, and that Weis Builders has brought claims against the Partnership for non-payment of retainage sums, which sum is the subject of a lien by Weis against the Property;" and (iii) Final Construction Completion was not achieved by the March 1, 2016 Completion Date.  *See* Motion at 18.  This argument fails because the Motion misstates facts alleged in the Counterclaims, facts admitted do not constitute Events of Default supporting the Forfeiture, and/or the argument ignores the PNC Parties' conduct excusing any conceivable default arising from the facts alleged in the Counterclaims.[12]

> **(a)**      **The allegations about the G407 certificate do not establish a proper forfeiture**

The PNC Parties first misrepresent the Counterclaims by asserting that in paragraphs 21-22 of the Counterclaims, the Oak Creek Parties "admit that a fully executed G407 Certificate of Substantial Completion was never issued by the project architect, as required to achieve Final Construction Completion."  Motion at 18.  This is not correct.  The Counterclaims specifically state that it is a "fact that the Project architect had issued form G704."  CC ¶ 21.  The Counterclaims in no way admit that the certificate was never issued.

---

[12]   It should be noted that it is the PNC Parties' burden to prove that Events of Default occurred. "The burden of proving . . . any default or refusal to perform on the part of the [counter]plaintiff that would excuse the performance by the [counter]defendant is on the party who seeks to avoid the contract or excuse a failure to perform it on that ground."  *Howell v. Kelly*, 534 S.W.2d 737 (Tex. App.—Houston [1st Dist.] 1976), no writ); *see also Bracton Corp. v. Evans Const. Co.*, 784 S.W.2d 708, 710 (Tex. App.—Houston [14th Dist.] 1990) (defendant had burden to prove plaintiff's prior breach of contractual provision that would excuse defendant's performance); *Lisbon Contractors, Inc. v. United States*, 828 F.2d 759 (Fed. Cir. 1987) (the burden of proof is on the owner terminating contractor for material breach even if owner is designated as defendant in litigation).

**(b)      Nothing in the Counterclaims admits a failure to meet the Final Construction Completion deadline**

The PNC Parties cite no admission in the Counterclaims that would establish a failure by Oak Creek GP to meet the Final Construction Completion deadline.  Instead, they assert that their briefing in opposition to the preliminary injunction establishes an alleged failure to achieve Final Construction Completion by the March 1, 2016.   Motion at 18.   That briefing relies on evidence not properly before this Court on the pending Motion, and the PNC Parties' reliance on these materials is not proper.  The Court may consider only the four corners of the Counterclaims and any documents referred to therein.  *See* Fed. R. Civ. P. 7(a); *Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496, 498–99 (5th Cir. 2000).   There is nothing in the Counterclaims that could be construed as an admission that Final Construction Completion was not achieved by the contractual deadline.

Even assuming for the sake of argument that the Final Construction Completion deadline was not met, the facts alleged in the Counterclaims are sufficient to support a finding that the PNC Parties waived, and are estopped from relying on, Final Construction Completion as a basis for a claimed forfeiture.  "Waiver is the intentional relinquishment of a right actually known, or intentional conduct inconsistent with claiming that right."  *Ulico Cas. Co. v. Allied Pilots Ass'n*, 262 S.W.3d 773, 778 (Tex. 2008).   Waiver of a contractual right can be established through (1) express renunciation of a known right; (2) a duration of silence or inaction sufficient to show the intent to yield a known right; or (3) through express or implied consent to nonconforming conduct.  *Bott v. J.F. Shea Co.*, 388 F.3d 530, 534 (5th Cir. 2004);  *Tenneco Inc. v. Enter. Prod. Co.*, 925 S.W.2d 640, 643 (Tex. 1996); *Fairfield Fin. Grp. Inc. v. Gawerc*, 814 S.W.2d 204, 209 (Tex.App.—Houston [1st Dist.] 1991, no writ).

A party's "intentional conduct inconsistent with claiming [a contractual] right" and "silence and inaction, for so long a period as to show an intention to yield the right" support a finding that a party has waivedt.  *Bott v. J.F. Shea Co.*, 388 F.3d 530, 534 (5th Cir. 2004); *W&T Offshore, Inc. v. Apache Corp.*, 2014 WL 198492, at *16 (S.D. Tex. 2014), *aff'd* 644 F. App'x 349 (5th Cir. 2016).  In *Bott* a contract required the defendant to provide the plaintiff with a certificate of insurance before commencing construction project.  *Id.* at 532.  The defendant gave the plaintiff two nonconforming certificates.  *Id.* at 533.  Months later, an accident implicated insurance coverage.  In a subsequent suit, the plaintiff argued that the defendant breached the contract by not acquiring insurance that met the contract's requirements.  The Fifth Circuit held that the plaintiff waived the insurance requirement "by its [s]ilence and inaction, for so long a period as to show an intention to yield the right."  *Id.* at 534.

Had the Final Construction Completion deadline been missed, then the Event of Default would have been known to the PNC Parties as of March 1, 2016.  The PNC Parties never identified the alleged failure to meet that deadline in any notice to the Oak Creek Parties or as a basis for the Forfeiture.  Instead, after March 1, 2016, the PNC Parties continued to treat the LP Agreement as a binding obligation and actually extracted $200,000 in fees and the continued performance by Oak Creek GP of its obligations under the LP Agreement, including the obligation to secure permanent financing, to address the construction remediation issue and corresponding litigation, and to continue to operate the project.  The first time the PNC Parties raised Final Construction Completion as an alleged default was in their pleadings in this case, which were filed more than 15 months after the supposed default is alleged to have occurred.  Original Complaint, Dkt. #1 at ¶¶ 14, 19.  The PNC Parties' conduct in continuing to operate under the LP Agreement, and in failing to assert Final Construction Completion as an Event of

Default for over a year, waived their right to rely on an failure to meet the deadline as a basis to claim a forfeiture of any kind by Oak Creek GP and any of its affiliates.

Similarly, "[e]quitable estoppel precludes the person estopped, because of that person's act, conduct, or silence, from asserting a right which he or she otherwise would have." *Taub v. Houston Pipeline Co.*, 75 S.W.3d 606, 624 (Tex. App.—Texarkana 2002, pet. denied). By remaining silent for fifteen months, and continuing to accept Oak Creek GP's services and financial contributions as general partner, the PNC Parties are estopped from asserting any right they may have based on the alleged failure to meet the deadline. Likewise, quasi-estoppel applies, and the PNC Parties are estopped to claim forfeiture as a remedy, to Oak Creek GP's disadvantage or otherwise. *Lopez v. Munoz, Hockeman & Read LLP,* 22 S.W.3d 857, 864 (Tex. 2000).[13]

> ### (c)   The Counterclaims' allegations about the stucco remediation and the Weis claims/lien do not establish an Event of Default

Without any explanation, the PNC Parties assert that the Oak Creek Parties have admitted an Event of Default by admitting in their answer "that stucco installation at the Property requires remediation, which will cost money, and that Weis Builders has brought claims against the Partnership for non-payment of retainage sums, which sum is the subject of a lien by Weis against the Property." Motion at 18. Contrary to the PNC Parties unexplained assertion, the quoted statement does not admit any Event of Default.

- **Stucco problems**: The fact that stucco problems require remediation at a cost is not an Event of Default. In fact, the LP Agreement recognizes that warranty

---

[13]   As noted supra at n. 12, it is the PNC Parties' burden to prove a default by the Oak Creek Parties, and the Oak Tree Parties have properly asserted waiver and estoppel as affirmative defenses to the PNC Parties' claims that events of Default occurred. CC ¶ 5. It should also be noted that the defense of equitable estoppel is distinct from the cause of action for promissory estoppel.

claims for defective construction may arise and specifically requires Oak Creek GP to "diligently pursue remediation of any construction related issues prior to the expiration of the warranty period under the Construction Contract."  Ex. A, § 6.7(i).

- **The Weis suit**: Litigation against the Partnership can only be an Event of Default if that the lawsuit (i.e., the fact that it was pending) "materially or adversely affect[ed] the operation of the Partnership or the Project" or "the ability of the General Partner or Guarantor to perform their obligations" or "prevent[ed] Final Construction Completion or Mortgage Loan Commencement in substantial conformity with the Project Documents."  Nothing in the Counterclaims or the relevant record establishes that the Weis suit had such a material or adverse effect. See Ex. A § 6.15(x).

- **The lien**: Only liens not "created or permitted by the Project Documents" triggers an Event of Default.  The Weis lien was permitted by the Construction Contract, which is included within the definition of Project Documents.  Ex. A § Art. 2. Therefore, the filing of the lien was not an event of default.

The Counterclaim's allegations regarding these issues contain no admissions that Events of Default occurred.

Moreover, the Counterclaims allege facts sufficient to establish that the PNC Parties directed to Oak Creek GP's vigorous pursuit of the warranty claims, which necessarily led to the Weis suit and the lien, and once the suit and lien were filed, the PNC Parties consented to Oak Creek GP's pursuit of a defense and counterclaim as opposed to a settlement or payment to Weis.  As a result, the PNC Parties have waived any the right, or are otherwise estopped from asserting that the suit or lien are an Event of Default supporting the claimed forfeiture.   *Lopez v. Munoz, Hockeman & Read LLP,* 22 S.W.3d 857, 864 (Tex. 2000) (quasi-estoppel equitably prevents party from asserting right that is inconsistent with a prior position and assertion of the inconsistent right disadvantages other party); *Taub v. Houston Pipeline Co.*, 75 S.W.3d 606, 624 (Tex. App.—Texarkana 2002, pet. denied) ("Equitable estoppel precludes the person estopped, because of that person's act, conduct, or silence, from asserting a right which he or she otherwise would have.").

Therefore, the Counterclaims properly allege a breach of contract claims and contain no admissions that defeat the cause of action.

>    **3.    The Counterclaim state a claim for the repudiation and breach of the GP Note**

Because the putative removal of Oak Creek GP as general partner breached the LP Agreement, the allegation of Forfeiture also was wrongful.  The PNC Parties have repeatedly asserted (including in the Motion) that the right to payment under the GP Note has been forfeited.  By contending that Oak Creek GP's rights under the GP Note are forfeited, they have repudiated the GP Note.

>    **C.    The Counterclaims state a claim for breach of fiduciary duties the PNC Parties owed to Oak Creek GP**

The PNC Parties move to dismiss the Oak Creek Parties' claim for breach of fiduciary duty solely on the basis that the PNC Parties allegedly owed no such duties.  They do not challenge that the Oak Creek Parties' have alleged sufficient facts to show that the PNC Parties' conduct was sufficient to constitute a breach of fiduciary duty, assuming such a duty existed (which it did).

>    **1.    The PNC Parties owed fiduciary duties to Oak Creek GP**

"[A] party's status as a limited partner does not insulate that party from the imposition of fiduciary duties that arise in a way that justifies the recognition of such duties." *Strebel v. Wimberly*, 371 S.W.3d 267, 279 (Tex. App.—Houston [1st Dist] 2012, pet. denied).  More specifically, when an entity, like the PNC Parties, "serves in a dual capacity as a limited partner and as a person controlling or managing the affairs of a limited partnership, it is not the party's status as a limited partner that gives rise to fiduciary duties, rather those duties exist by virtue of the additional relationship … in which capacity that person controls or manages the business of

the partnership." *Id.*; *see also McBeth v. Carpenter*, 565 F.3d 171 (5th Cir. 2009) (holding that limited partners can owe fiduciary duties).

The LP Agreement grants the PNC Parties extraordinary control over the management of the Partnership.  While the LP Agreement purports to grant the general partner broad authority (e.g., to cause the Partnership to acquire or sell assets, borrow money, mortgage Partnership assets, and defend compromise or litigate or compromise claims by or against the Partnership), the agreement severely curtails this authority by requiring the PNC Parties' consent before the general partner can exercise this authority (with the exception of certain *de minimus* actions involving less than $10,000).  *See* Ex. A §6.2.  It is the control the PNC Partners exercised— authorized or not—that subjects them to fiduciary duties to both the Partnership and their partner, Oak Creek GP.  *Id.*

Provisions throughout the LP Agreement reflect the parties' understanding that the PNC Parties would owe fiduciary duties. *See* Ex. A §6.12 (providing that certain actions will not breach fiduciary duties owed by the PNC Parties); §7.1 (same); §7.3 (absolving only lenders that are limited partners in the ILP (i.e., PNC Bank, as opposed to the Partnership) of fiduciary duties while not absolving PNC Bank acting as both lender and partner in the Partnership).

The LP Agreement permitted the PNC Parties to control through the process of approving or disapproving of actions proposed by Oak Creek GP.  However, PNC Bank acted beyond the control granted in the LP Agreement by actively interfering with Oak Creek GP's authority when it secretly injected itself in the September 2016 negotiations with PNC Bank, acting as lender, about a modification of the Mortgage Loan terms that only Oak Creek GP was authorized to actually negotiate.  Instead of providing approval or disapproval as limited partners, the PNC Parties usurped control over the process.  Their active negotiation and ultimate control over the

process of obtaining a favorable loan is an additional basis for imposing fiduciary duties on the PNC Parties to the Partnership's remaining partner.

The PNC Parties actually recognized that they could face liability arising out of the conflicted nature of their involvement as both partner in the Partnership and as lender to the Partnership.  Section 6.12 of the LP Agreement states, "The General Partner acknowledges that its decision to cause the Partnership to deal with PNC Bank [and other affiliates of the PNC Parties] shall be made based upon the General Partner's good faith determination that such dealings are in the best interest of the Partnership and in accordance with the General Partner's rights and powers under the terms of this Agreement."  By wrongfully injecting themselves into and controlling loan modification negotiations without Oak Creek GP's knowledge, the PNC Parties usurped Oak Creek GP's right to make a good faith determination in the best interests of the Partnership.  The PNC Parties circumvented the mechanism by which they might have insulated themselves from liability arising out of their conflicted position by breaching the fiduciary duties they assumed through their conduct and unauthorized exercise of control.

Indeed, it is hard to imagine how a limited partner could have *more* control over a Partnership than the PNC Parties did here.  In any event, whether the PNC Parties' control over the Partnership gave rise to fiduciary duties to Oak Creek GP and the Partnership is ultimately a question for the jury and not to be resolved on a motion to dismiss.  *See CBIF Ltd. P'ship v. TGI Friday's Inc.*, 2017 WL 1455407, at *20 (Tex. App. Apr. 21, 2017) ("The jury found, and appellants do not challenge on appeal, that [the limited partner] exerted dominant operating control over the affairs of [the limited partnership].").

Because a jury could easily conclude that the PNC Parties undertook, assumed, or otherwise owed fiduciary duties to the Partnership and their partner, Oak Creek GP, the PNC

Parties' motion to dismiss the claims for breaches of fiduciary duty should be denied.[14] Having assumed fiduciary duties to the Partnership, the PNC Parties owed duties of loyalty, good faith and care to the Partnership and their partner, Oak Creek GP.  The Counterclaim alleges more than sufficient facts to establish that the PNC Parties owed and breached these duties when exercising their control over the Partnership.  *See supra* at 7-12.

    **D.**    **The Counterclaims state a cause of action for violation of 12 U.S.C. § 1972**

Plaintiffs' efforts to dismiss the anti-tying claims are based on two premises, both incorrect.  First, Plaintiffs argue that the services they tied together – the promises of the Forward Commitment with the extension of the bridge loan and the provision of development services – are too related to be tying under the statute.  Motion at 29.  Plaintiffs apparently concocted this argument based on one of three examples of illegal tying given in a 1995 out of circuit district court case, even though the other examples (in the same footnote) do not impose this "related" standard.   Second, Plaintiffs argue that it was the developer entities or the Partnership and not Oak Creek GP who received any credit from PNC Bank, so  Oak Creek GP did not suffer injury from any tying.  This is an overly narrow reading of what constitutes a customer under the BHCA.

Plaintiffs rely on *New England Co. v. Bank of Gwinnett County*, 891 F. Supp. 1569 (N.D. Ga. 1995) for the proposition that under the BHCA "the 'tied' service or product must be separate and unrelated to the primary extension of credit."  Motion at 29.  They specifically cite the first footnote, which provides that

> [t]he act proscribes anti-competitive ties which condition the extension of credit on a condition designed to increase the economic power of the bank, and to reduce competition.  **Such a tie can manifest itself in many different forms.**

---

[14] As mentioned above, The PNC Parties do not argue that they did not breach their fiduciary duties, only that Columbia and PNC owed no duties.  *See* Motion at 21-23.

The bank can refuse to extend credit unless the consumer agrees to purchase a separate, unrelated bank service (a quintessential tie); the bank can condition the extension of credit on the consumer providing the bank with a specific product or service unrelated to the extension of credit (a reciprocal tie); or the bank can condition the extension of credit on the consumer's agreement not to engage in any transactions with one of the bank's competitors (an exclusive dealing arrangement). **A tie can manifest itself in a number of other ways, but the touchstone for actionability under the anti-tying provision of the BHCA is that the arrangement be designed to lessen competition or increase the economic power of the creditor bank.**

*Id.* at 1573-74 n.1 (emphases added). Though the court was emphasizing that an illegal tie under the BHCA can take many forms, Plaintiffs apparently misunderstood the court to be limiting illegal tying under the BHCA to two of the three examples it listed. The PNC Parties are wrong that the extensions of credit at issue in this case are too "related" to lead to liability under the BHCA. Indeed, in *Swerdloff v. Miami Nat. Bank*, the Fifth Circuit reversed summary judgment on a tying claim involving a pre-emptive demand for collateral on the loan at issue, which was "sufficient to allege that the bank required the customer to do an act not related nor usually provided in connection with a loan." 584 F.2d 54, 59-60 (5th Cir. 1978).[15]

Plaintiffs also cannot avoid liability because some of its tying behavior did not directly touch Oak Creek GP. Plaintiffs essentially argue that GP is not a customer under the Act and cannot recover. But courts in this Circuit emphasize that the appropriate definition of customer is broad. "The economic realities of ownership and control must be considered in determining who is a 'customer' within the meaning of [the BHCA] if the purpose of the Act is to be accomplished." *Swerdloff*, 584 F.2d at 58 (quoting 1970 U.S. Code Cong. & Admin. News., p. 5535). The court in *Swerdloff* concluded that "the owners of 100% of the stock of a corporation

---

[15]   In evaluating a motion to dismiss, the Court is not required to nor may it accept the PNC Parties' unsupported argument that conditioning both loans—the Forward Commitment's contemplated mortgage loan and the Bridge Loan—upon each other, was not unusual or suspect in the banking industry. The Court is required to accept as true the Oak Creek Parties' detailed allegations that it was both unusual and suspect. CC ¶¶ 8, 13, 89,91-94.

who have been required individually to guarantee the corporation's loan must be considered just as much 'customers' of the bank as the corporation through which they do business for the purposes of the provisions of the" BHCA.  *Id.* at 59.  Just because the corporation in *Swerdloff* agreed to the initial loan, that the defendant bank then made a demand on the corporation's owners – who were not direct customers – did not absolve the lender of liability under the BHCA.

The situation here is the same.  Because Oak Creek GP had the right to control the Partnership at the times that Plaintiffs tied the Forward Commitment to the extension of the Bridge Loan and *vice versa*, and further tied its extension and credit upon Oak Creek GP[16] not pursuing credit for the Partnership from any non-PNC source, Oak Creek GP can recover under the BHCA the same as the corporate controllers in *Swerdloff*.  Likewise, Oak Creek GP had the right to control the Partnership when PNC Bank tied the extension of the Forward Commitment to the developer's (another entity controlled by Oak Creek GP) provision of additional services on credit (*i.e.*, deferring payment), and Oak Creek GP had the right to control the Partnership when PNC Bank blocked the extension of the Arbor loan to the Partnership after terminating the Forward Commitment.  Oak Creek GP is sufficiently a customer for each of these transactions, and Plaintiffs cannot avoid liability under the BHCA by invoking a narrow definition of "customer."  *See Swerdloff*, 584 F.2d at 59.

### E.     The Counterclaims state a cause of action for theft of services

The Counterclaims state a cause of action for theft of services under the Texas Theft Liability Act ("TTLA").  A claim for theft of services under the TTLA requires that: "(1) the plaintiff had a possessory right to property or was the provider of services; (2) the defendant

---

[16]   Under the LP Agreement, Oak Creek GP was the only party who could pursue financing for the Partnership.

unlawfully appropriated property or unlawfully obtained services in violation of [Texas Penal Code §31.04]; and (3) the plaintiff sustained damages as a result of the theft." *Wellogix, Inc. v. Accenture, LLP*, 788 F. Supp. 2d 523, 542 (S.D. Tex. 2011).  Section 31.04 requires a showing that (1) the defendant had the intent to avoid payment for a service the defendant knew was provided only for compensation; and (2) acting with that intent, the defendant intentionally or knowingly (3) secured the other person s performance of a service (4) by deception.  *Daugherty v. State*, 387 S.W.3d 654, 657 (Tex. Crim. App. 2013).

Oak Creek GP provided managerial services to the Partnership, services for which the PNC Parties knew Oak Creek GP was to be compensated. CC ¶ 14.  When the PNC Parties decided to cease acting for the interests of the Partnership and to instead burden Oak Creek GP with fee and penalty demands, to in turn use the non-payment of the same to claim a forfeiture of all Oak Creek Parties' interests and payment rights, the PNC Parties showed they did not intend to compensate Oak Creek GP for its services as general partner.  *See* CC ¶¶ 24, 27, 30-35, 38-41, 44.  Nevertheless, they led Oak Creek GP to believe they were amenable to restructuring the Project's financing, and thereby secured Oak Creek GP's ongoing services as general partner until the PNC Parties purported to remove it, take control of the Partnership, and assert the Forfeiture.  *See*  CC ¶¶38, 53.

### F.    The Counterclaims state a cause of action for conspiracy

The Counterclaims sufficiently allege a claim for conspiracy.  In Texas, a civil conspiracy requires "(1) two or more persons; (2) an object to be accomplished; (3) a meeting of the minds on the object or course of action; (4) one or more unlawful, overt acts; and (5) damages as a proximate result."  *Backes v. Misko*, 486 S.W.3d 7, 27 (Tex. App.—Dallas 2015, pet. denied).  The Oak Creek Parties have shown that the PNC Parties worked together to usurp control of the Partnership and wrongfully strip the Oak Creek Parties of their rights and

interests related to the Partnership.   The PNC Parties have done this through unlawfully breaching their fiduciary duties to the Partnership and Oak Creek GP in order to wrongfully remove Oak Creek GP and purported cause the Forfeiture.

### G.   The Counterclaims state a cause of action for unjust enrichment

The Counterclaims state a cause for unjust enrichment.   "Unjust enrichment occurs when a person has wrongfully secured a benefit or has passively received one which it would be unconscionable to retain."  *Eun Bok Lee v. Ho Chang Lee*, 411 S.W.3d 95, 111–12 (Tex. App.—Houston [1st Dist] 2013, no pet.).   "A person is unjustly enriched when he obtains a benefit from another by fraud, duress, or the taking of an undue advantage."  *Id.*   "As a remedy based on quasi-contract principles, unjust enrichment is unavailable when a valid, express contract governing the subject matter of the dispute exists."  *Id.*   While unjust enrichment is unavailable when a valid, express contract governs the subject matter of the dispute, a party may recover under the unjust enrichment theory when one person has obtained a benefit from another by fraud, duress, or the taking of an undue advantage.  *See Pope v. Garrett*, 211 S.W.2d 559, 560, 562 (Tex. 1948); *Austin v. Duval*, 735 S.W.2d 647, 649 (Tex. App.—Austin 1987, writ denied). When an express contract does exist, if the evidence does not show that the contract covers the subject matter leading to the improper enrichment, then the factfinder may determine whether a party may recover under the equitable theory.  *Eun Bok Lee*, 411 S.W.3d at 113.

The Oak Creek Parties have asserted unjust enrichment claims that are not predicated upon the PNC parties' taking undue advantage of an express contract, but instead are predicated upon the PNC parties' fraud, breach of fiduciary duty and multiple statutory violations.  See CC ¶¶ 82-96, 105-107.   As alleged by The Oak Creek Parties, the PNC parties were unjustly enriched by their false representations concerning the identity of the MBS Investor and the alleged fees being demanded to secure an extension, by their violations of 12 U.S.C. § 1972, and

by knowingly breaching the fiduciary duties that arose once the PNC Parties began to exercise control over the business operations of the Partnership.

### H.     The Counterclaims state a cause of action for fraud

To support its claim for fraud, the Oak Creek parties must show that the PNC parties (1) made a false material representation; (2) knowing the representation was false when made or with reckless disregard for its truth or falsity; (3) intending to induce action by the Oak Creek parties in reliance on the representation; and (4) that the Oak Creek Parties did justifiably rely on that representation to their detriment.  *Ernst & Young, L.L.P. v. Pac. Mut. Life Ins. Co.*, 51 S.W.3d 573, 578 (Tex. 2001).  The Counterclaims allege sufficient facts to support an action for fraud.[17]  The PNC Parties represented that the MBS Investor demanding the MBS Extension Fees was unknown third party over whom PNC Bank had no control.  CC ¶ 37.  PNC Bank was aware this statement was false, as the same executives worked for both PNC Bank and PNC Capital Markets.  *Id.* ¶30.  By disclaiming knowledge of or influence over the MBS Investor, PNC Bank sought to induce Oak Creek GP to commit the Partnership to payment of punitive fees it would otherwise have rejected.  Had Oak Creek GP known the MBS Investor was PNC Capital Markets, it would not have agreed to the Side Letter or paid the first installment of the MBS Extension fee.  By committing to the Side Letter and paying the first installment, Oak Creek GP caused the Partnership to incur additional liability and expense.

---

[17]   The PNC Parties reliance on the fact that the Forward Commitment identified PNC Capital Markets as the MBS Investor in May of 2014 does not mean that the Oak Creek Parties should have known that PNC Capital Markets was the MBS Investor in the fall of 2016.  PNC Capital Markets' position could have been transferred in the intervening two years, which the PNC Parties suggested had occurred by their misrepresentations.

I.      **The Counterclaims state a cause of action for estoppel**

The Oak Creek Parties have alleged a claim for promissory estoppel for breaches of promises not covered under the terms of the contract.  The elements of a promissory estoppel claim are (1) a promise, (2) foreseeability of reliance thereon by the promisor, and (3) substantial detrimental reliance by the promise.  *Trevino & Assocs. Mech., L.P. v. Frost Nat. Bank*, 400 S.W.3d 139, 146 (Tex. App.—Dallas 2013, no pet.).

The PNC Parties initially indicated their consent to Oak Creek GP obtaining alternative financing for the Partnership through Arbor.  CC ¶ 53.  Oak Creek GP reasonably relied on this consent and did not seek another source of financing, believing the PNC Parties would facilitate a closing on the Arbor loan.  The PNC Parties ultimately refused to give final consent to the Arbor loan, and Oak Creek GP did not have time to arrange another alternative before the Chase Loan went into default.  Had the PNC Parties not indicated their consent, Oak Creek GP would have sought financing elsewhere.  The PNC Parties' promises resulted in the Partnership being unable to secure financing to avoid a default on the Chase Loan, and, as a consequence, the Partnership's assets are at risk of foreclosure.

J.      **Declaratory Judgment is proper**

The requests for declaratory relief asserted by the Oak Creek Parties (CC ¶¶ 116-117) are not mirror images of the PNC Parties' breach of contract and declaratory judgment claims, as set forth in their Amended Complaint, and instead they seek much broader relief, including relief that is beyond the scope of any relief to be adjudicated by those claims.

The Counterclaims include multiple pleaded facts that, if true, demonstrate that the PNC Parties have demanded that Oak Creek GP pay the non-recourse non-delivery fee, as opposed to the Partnership paying it. See CC ¶¶ 38-39, 42-44, 45, 55, 60, 70, 76-77, 85 and 117.

## V.   CONCLUSION

As demonstrated above, the Motion should be denied.

Date:  October 31, 2017                    Respectfully submitted,


                                           */s/ Karl Stern*
                                           Karl S. Stern
                                           State Bar No. 19175665
                                           karlstern@quinnemanuel.com
                                           QUINN EMANUEL URQUHART
                                                & SULLIVAN, LLP
                                           711 Louisiana Street, Suite 500
                                           Houston, Texas 77002
                                           (713) 221-7000
                                           (713) 221-7100 (Facsimile)

                                           Kenneth B. Chaiken
                                           State Bar No. 04057800
                                           kchaiken@chaikenlaw.com
                                           CHAIKEN & CHAIKEN, P.C.
                                           Legacy Town Center III
                                           5801 Tennyson Parkway
                                           Plano, Texas 75024
                                           (214) 265-0250 telephone
                                           (214) 265-1537 facsimile

                                           William S. Rhea
                                           State Bar No. 16807100
                                           brhea@dbc.com
                                           DuBOIS, BRYANT & CAMPBELL, LLP
                                           303 Colorado Street, Suite 2300
                                           Austin, TX 78701
                                           (512) 457-8000
                                           (512) 457-8008 (Facsimile)

                                           *Attorneys for 2013 Travis Oak Creek GP, LLC,*
                                           *2013 Travis Oak Creek Developer, Inc., Chula*
                                           *Investments, Ltd. and Rene O. Campos*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that the foregoing document was served on all counsel of record via the Court's electronic filing system on this 31st day of October, 2017.


*/s/ Karl Stern*
Karl Stern