# UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
### AUSTIN DIVISION

| | | |
|---|---|---|
| **PNC BANK, N.A. COLUMBIA** | § | |
| **HOUSING SLP CORPORATION, and** | § | |
| **2013 TRAVIS OAK CREEK, LP** | § | |
| | § | |
| **Plaintiffs,** | § | **Case No. 1:17-cv-584-RP-ML** |
| | § | |
| **v.** | § | |
| | § | **consolidated with** |
| | § | **Case No. 1:17-cv-560-RP** |
| **2013 TRAVIS OAK CREEK GP, LLC,** | § | |
| **2013 TRAVIS OAK CREEK** | § | |
| **DEVELOPER, INC.,** | § | |
| **CHULA INVESTMENTS, LTD.,** | § | |
| **and RENE O. CAMPOS** | § | |
| | § | |
| **Defendants.** | § | |

## PLAINTIFFS' REPLY IN SUPPORT OF THEIR
## MOTION TO DISMISS ALL OF DEFENDANTS' COUNTERCLAIMS

PNC Bank, N.A. ("**PNC**") and Columbia Housing SLP Corporation ("**Columbia**") (together, the "**Plaintiffs**") respectfully submit this Reply in support of their Motion to Dismiss (the "**Motion**") [ECF Doc. No. 85] all of the counterclaims brought by Defendants 2013 Travis Oak Creek GP, LLC (the "**First GP**") and 2013 Travis Oak Creek Developer, Inc. (the "**Developer**," and, collectively with the First GP, the "**Counterclaimants**") in their Answer to First Amended Complaint and Certain Defendants' Counterclaim (the "**Counterclaim**") [ECF Doc. No. 78].

# TABLE OF CONTENTS

Page

I.    BRIEF INTRODUCTION ...................................................................................1

II.   REPLY .............................................................................................................1

    A.    Counterclaimants Seek to Piggyback Partnership Claims by Masking Them as "Direct" Claims. .......................................................................1

        1.    Counterclaimants Have No Standing to Bring Direct Partnership Claims. ...........................................................................1

        2.    Counterclaimants Have No Standing to Bring Derivative Claims. ............5

    B.    Counterclaimants Fail to Plausibly State Claims for Breach of Contract...............6

        1.    The Breach of Contract Claims Are Not Actionable. ..................................6

        2.    PNC's Actions Were Justified Under and Permitted by the Forward Commitment...............................................................................7

        3.    Counterclaimants Do Not Plausibly Allege a Breach of the Partnership Agreement for "Seeking Recourse Against the GP." ..............9

        4.    The Facts Acknowledged in the Counterclaim Establish that Multiple Events of Default Occurred.........................................................10

    C.    Counterclaimants Fail to State a Claim for Breach of Fiduciary Duty.................14

    D.    Counterclaimants Fail to State a Claim for Violation of 12 U.S.C. § 1972...........15

    E.    Counterclaimants Fail to State a Cause of Action for Theft of Services. ..............18

    F.    Counterclaimants Fail to State a Cause of Action for Unjust Enrichment or for Promissory Estoppel...............................................................................19

    G.    Counterclaimants Fail to State a Cause of Action for Fraud. ...............................20

    H.    Counterclaimants Are Not Entitled to the Declaratory Relief They Seek. ............20

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*AON Props., Inc. v. Riveraine Corp.*,
  No. 14-96-00229-CV, 1999 WL 12739 (Tex. App.—Houston [14th Dist.]
  1999, no pet.) ....................................................................................................14

*Bank One, Texas, N.A. v. Stewart*,
  967 S.W.2d 419 (Tex. App.—Houston [14th Dist.] 1998, pet denied) ....................................7

*Bott v. J.F. Shea Co.*,
  388 F.3d 530 (5th Cir. 2004) .......................................................................................12, 13

*Collins v. Morgan Stanley Dean Witter*,
  224 F.3d 496 (5th Cir. 2000) ........................................................................................8

*Davis v. DRFF Trust 2015-1*,
  5:15–CV–880 RP, 2016 WL 8257126 (W.D. Tex. Jan. 6, 2016)..........................................6, 7

*Davis v. First Nat'l Bank of Westville*,
  868 F.2d 206 (7th Cir. 1989) ........................................................................................16

*Dubinsky v. Mermart, LLC*,
  595 F.3d 812 (8th Cir. 2010) .........................................................................................1

*In re Fisher*,
  433 S.W.3d 523 (Tex. 2014).........................................................................................2

*Guerrero-McDonald v. Nassour*,
  516 S.W.3d 198 (Tex. App.—Eastland 2017, no pet.) ....................................................2, 3

*Hall v. Douglas*,
  380 S.W.3d 860 (Tex. App.—Dallas 2012, no pet.).........................................................2

*Heldenfels Bros., Inc. v. City of Corpus Christi*,
  832 S.W.2d 39 (Tex. 1992)..........................................................................................19

*Highland Capital, Inc. v. Franklin Nat. Bank*,
  350 F.3d 558 (6th Cir. 2003) ....................................................................................17, 18

*In re Kellog Brown & Root*,
  166 S.W.3d 732 (Tex. 2005).......................................................................................19

*Martin v. Fed. Nat. Morg. Ass'n*,
  814 F.3d 315 (5th Cir. 2016) .......................................................................................13

*Muirfield (Delaware), L.P. v. Pitts, Inc.*,
    17 F. Supp. 2d 600 (W.D. La. 1998) ..................................................................................7

*New England Co. v. Bank of Gwinnett Cnty.*,
    891 F. Supp. 1569 (N.D. Ga. 1995) ..................................................................................16

*Paragon Resources, Inc. v. Nat'l Fuel Gas Distrib. Corp.*,
    695 F.2d 991 (5th Cir. 1983) ............................................................................................13

*Parsons Steel, Inc. v. First Alabama Bank of Montgomery*,
    679 F.2d 242 (11th Cir. 1982) ..........................................................................................16

*Sgroe v. Wells Fargo Bank, N.A.*,
    941 F. Supp. 2d 731 (E.D. Tex. 2013) ..............................................................................12

*Siddiqui v. Fancy Bites, LLC*,
    504 S.W.3d 349 (Tex. App.—Houston [14th Dist.] 2016, pet. denied) ...............................4

*Stewart Family Funeral Home, Ltd. v. Funeral Directors' Life Ins. Co.*,
    410 F. Supp. 2d 514 (E.D. Tex. 2006) ................................................................................3

*Strebel v. Wimberly*,
    371 S.W.3d 267 (Tex. App.—Houston [1st Dist.] 2012, pet. denied) ..........................14, 15

*Swerdloff v. Miami National Bank*,
    584 F.2d 54 (5th Cir. 1978) .........................................................................................17, 18

**Statutes**

12 U.S.C. § 1972 ...........................................................................................................15, 18

12 U.S.C. § 1972(1)(A) .........................................................................................................16

12 U.S.C. § 1972(1)(C) .........................................................................................................16

12 U.S.C. § 1972(1)(D) .........................................................................................................15

12 U.S.C. § 1972(1)(E) .........................................................................................................15

TEX. BUS. ORG. CODE § 153.103 ...........................................................................................15

TEX. BUS. ORG. CODE § 153.401 .............................................................................................5

TEX. BUS. ORG. CODE § 153.402 .............................................................................................5

TEX. BUS. ORG. CODE § 153.403 .............................................................................................5

# I.    BRIEF INTRODUCTION

A central issue before the Court is whether the removed general partner may sue either directly or derivatively for alleged partnership claims. Texas law is clear that the removed general partner may not. Counterclaimants also assert numerous, kitchen sink claims without a plausible or rational basis. Additionally, Counterclaimants' response (the "**Response**") relies upon an unsupported factual narrative that is not expressed in or reasonably inferred from the Counterclaim. For these reasons, the Counterclaim should be dismissed.

# II.    REPLY

## A.    Counterclaimants Seek to Piggyback Partnership Claims by Masking Them as "Direct" Claims.

### 1.    *Counterclaimants Have No Standing to Bring Direct Partnership Claims.*

Contrary to the arguments in their Response, Counterclaimants lack standing to pursue a number of their claims because they belong to the Partnership. While Counterclaimants discuss general legal principles, they provide little or no response to most of the standing arguments raised in the Motion to Dismiss. *See* Response at 12–14.

Counterclaimants do not contest the fact that they lack the Plaintiffs' required contractual consent to bring any claims on behalf of the Partnership, as required by the Partnership Agreement. *See* Ex. A. § 6.2(h); p. 3 & § 13.4 (definition of "Consent"). Because they never pleaded any such consent, they have no authority to bring Partnership claims. *See Dubinsky v. Mermart, LLC*, 595 F.3d 812, 818–19 (8th Cir. 2010).

In hopes of circumventing this legal dead end, Counterclaimants frantically argue that as a one-time investor or partner in the Partnership, the value of their interest in the Partnership has been diminished by Plaintiffs' acts or omissions. *See* Response at 12–13. But under Texas law, "a partner does not have standing to sue for injuries to the partnership that merely diminish the

value of that partner's interest." *Guerrero-McDonald v. Nassour*, 516 S.W.3d 198, 205 (Tex. App.—Eastland 2017, no pet.) (quoting *Hall v. Douglas*, 380 S.W.3d 860, 873–74 (Tex. App.— Dallas 2012, no pet.). Instead, the partner "must be personally aggrieved in order to have standing to bring a claim individually." *Id.* (citing *Hall*, 380 S.W.3d at 874).

Counterclaimants' own cases illustrate this point. For example, in *Guerrero-McDonald v. Nassour*, a Texas court of appeals held that a limited partner lacked standing to pursue claims related to the misuse or mismanagement of limited partnership funds or that were related to the alleged failure of the general partner to make or to request additional capital contributions to the limited partnership. *See* 516 S.W.3d at 208. The only claim that survived was for breach of the partnership agreement for failure to pay a consulting fee that was unique to the limited partner. *See id.* at 208–09. Similarly, in *Fisher*, the Texas Supreme Court held that a limited partner had standing to pursue a *defamation* claim regarding statements made about him personally and claims related to a payment of $1 million that he personally made to the limited partnership and that the other partners did not make. *In re Fisher*, 433 S.W.3d 523, 527–28 (Tex. 2014).

Here, with respect to the claims identified in the Motion to Dismiss, the First GP is seeking to recover damages for generalized injuries to the Partnership as a whole. For example, the First GP seeks to recover for Plaintiffs' alleged failure as limited partners to provide "more favorable [loan] terms to the Partnership;" PNC's alleged failure to "fund installments of capital contributions" to the Partnership; and PNC's "breaching the Forward Commitment" between the Partnership and PNC "by terminating it in violation of Section M(1)," among other similar allegations. *See* Counterclaim ¶¶ 69, 72, & 76.

With respect to its fraud claims, the First GP attempts to recover for various purported misrepresentations made to the First GP in its capacity as a general partner in the Partnership.

*See id.* ¶¶ 83–85. For example, the First GP was acting solely on behalf of the Partnership with respect to negotiations over a second extension of the Forward Commitment. *See* ECF Doc. No. 72.6 (Plaintiffs' Ex. 31). It lacks standing to assert a direct claim regarding any "misrepresentation" as to those negotiations. Additionally, numerous requests for declaratory relief are related to Partnership management, including fees owed under and the legal status of contracts between PNC and the Partnership to which the First GP is not party. *See id.* ¶ 117.b–f.

Similarly, with respect to the alleged breach of Section 7.2 of the Partnership Agreement, the Counterclaim alleges only that PNC and Columbia "interfere[d] with [the First GP]'s right to modify the terms of the loan to be provided by PNC Bank to the Partnership … ." *See* Counterclaim ¶ 69. This is a Partnership claim because it relates solely to an agreement between the *Partnership* and PNC, not the First GP. *See Muirfield (Delaware), L.P. v. Pitts, Inc.*, 17 F. Supp. 2d 600, 608 (W.D. La. 1998). It is not an alleged injury suffered solely by the First GP, and the First GP has no standing to assert this claim.

With respect to Section 3.2 of the Partnership Agreement, PNC's supposed failure to make a capital contribution is a Partnership claim that Counterclaimants have no standing to assert. *See Guerrero-McDonald*, 516 S.W.3d at 209. A capital contribution is made to the Partnership, not to the First GP. Thus, only the Partnership has standing to bring such a claim.

With respect to their requests for breach of contract and for declaratory relief as to the Non-Delivery Fee under the Forward Commitment, Counterclaimants cite to no case in which any person had standing to argue that a contract to which they were not a party was improperly terminated. *See Stewart Family Funeral Home, Ltd. v. Funeral Directors' Life Ins. Co.*, 410 F. Supp. 2d 514, 516–17 (E.D. Tex. 2006) (holding nonparty to agreement lacked standing to seek declaration related to its interpretation). The Response affirmatively shows that these are

Partnership claims, alleging that "the Non-Delivery Fee was never legally enforceable against the Partnership" and that "PNC Bank … failed to lend a penny to the Partnership." *See* Response at 21–22. Counterclaimants are not a party to the Forward Commitment, and they do not show or even argue that they are intended third party beneficiaries of that agreement. They have no standing to assert claims for its alleged breach.

And again, as to allegedly "seeking recourse" against the First GP for failure to pay the Non-Delivery Fee under the Forward Commitment, the First GP cannot pursue that claim because it concerns a contract to which only the Partnership, and not the First GP, is a party. The First GP has no standing to assert such claims.

Further, to the extent that the Counterclaim alleges that PNC Bank and Columbia had fiduciary duties that they "owed to the Partnership" and that they "never had any intention of acting in the best interest of the Partnership, or in accordance with the fiduciary duty owed to it," the First GP is attempting to bring a claim belonging to the Partnership that it lacks standing to assert. *See* Counterclaim ¶¶ 63–64.[1] Under Texas law, the First GP lacks standing to pursue a claim for breach of fiduciary duty owed to the Partnership. *See, e.g.*, *Siddiqui v. Fancy Bites, LLC*, 504 S.W.3d 349, 361–62 (Tex. App.—Houston [14th Dist.] 2016, pet. denied).

The common thread in all these claims that the First GP is seeking to recover in its own right for injuries to the Partnership generally, not to the First GP individually. The First GP's own cases illustrate that only when the injury is truly unique to a partner can it allege a direct

---

[1] Counterclaimants wrongly accuse Plaintiffs of omitting words from their quotation of the breach of fiduciary duty allegations. Plaintiffs have moved to dismiss the claims of breach of fiduciary duties to the Partnership for lack of standing and to the First GP for failure to state a claim. Rationally, Plaintiffs quoted only the relevant portions of Counterclaimants' allegations as to each ground for dismissal.

claim against the other partners. The First GP lacks standing to assert Partnership claims, and the Court should dismiss them under Rule 12(b)(1).

    2.    *Counterclaimants Have No Standing to Bring Derivative Claims.*

In the Response, Counterclaimants allege, *for the first time*, that their claims for fraud and promissory estoppel are derivative claims. The problems with this belated assertion are threefold.

**First,** Counterclaimants have no standing to bring a derivative claim on behalf of the Partnership. Texas law does not permit "deposed general partners" to bring derivative claims. Instead, it only provides for derivative suits by a current *limited partner*. TEX. BUS. ORG. CODE § 153.401–.402. "In a derivative action, the plaintiff must be a limited partner *when the action is brought* and: (1) the person must have been a limited partner at the time of the transaction that is the subject of the action … ." *Id.* § 153.402 (emphasis added). There is no suggestion whatsoever in the Counterclaim that the First GP (and certainly not that the Developer) has ever been a limited partner in the Partnership. Further, the Partnership Agreement affirmatively shows that this has never been the case. *See* ECF Doc. No. 86, p.1 & § 1.3.

**Second¸** under Texas law, "[i]n a derivative action, the complaint must contain with particularity: (1) the effort, if any of the plaintiff to secure initiation of the action by a general partner; or (2) the reasons for not making the effort." *Id.* § 153.403. There are no such allegations in the Counterclaim. Indeed, the Counterclaim does not allege that that there was any effort to secure initiation of action by the general partner or set forth any reasons for not making an effort. Indeed, it does not appear that the Counterclaimants actually intended to allege any derivative claims at all.

**Third**, Counterclaimants cannot allege, for the first time, that their counterclaims are derivative claims in a Response to a Motion to Dismiss. "[W]hen considering a motion to dismiss, the Court generally only relies on the allegations made in the pleadings, and does not

base its decision on allegations raised for the first time in … the response." *Davis v. DRFF Trust 2015-1*, 5:15–CV–880 RP, 2016 WL 8257126, at *3 (W.D. Tex. Jan. 6, 2016) (quotation omitted). Because the Response alleges, for the first time, that Counterclaimants' fraud and promissory estoppel claims are derivative, the Court should not consider this argument. These claims should be dismissed.

**B.     Counterclaimants Fail to Plausibly State Claims for Breach of Contract.**

   *1.     The Breach of Contract Claims Are Not Actionable.*

   Counterclaimants spend much of their Response making factual arguments about their breach of contract claims without any citing to any documents. This post hoc narrative fails to address most of the breach of contract arguments raised in the Motion to Dismiss.

   With respect to Section 3.2 of the Partnership Agreement, the Counterclaim both implausibly ignores the conditions precedent in the Partnership Agreement to providing those capital contributions—while *admitting* that some of those conditions haven't been fulfilled. For example, Final Construction Completion is a condition of both the Second Installment and the Third Installment of capital contributions. *See* ECF Doc. No. 86 §§ 3.2(a)(2)–(a)(3). But the Counterclaim admits that stucco defects exist that, under the terms of the Partnership Agreement, prevented the First GP from achieving Final Construction Completion. *See id.* p. 7; Answer ¶ 14. Certainly, nothing in the Counterclaim would, even if taken as true, establish that PNC is responsible for the First GP's failure to remedy such defects by the Partnership Agreement's March 1, 2016 construction completion deadline.

   With respect to the alleged breach of Section 6.2(d), Plaintiffs were entitled under the Partnership Agreement to condition their consent to the purported Arbor loan in any way they chose. Indeed, "Consent" means "prior written approval in accordance with Section 13.4" which is in "the sole discretion of the ILP or the SLP." ECF Doc. No. 86 & 88 (Ex. A p. 3 & § 13.4).

Counterclaimants cannot plausibly state a claim for failure to give a consent that was in Plaintiffs' sole and absolute discretion to give.

Finally, with respect to the implied contractual duty of cooperation, Counterclaimants misread the law. Such a duty is not present in every contract, only where it is *necessary*. *E.g.*, *Bank One, Texas, N.A. v. Stewart*, 967 S.W.2d 419, 434 (Tex. App.—Houston [14th Dist.] 1998, pet denied). Further, "***Texas law does not favor implied covenants***." *Id.* (emphasis added). "The Court looks beyond the written agreement to imply a covenant only if necessary to effectuate the intention of the parties as disclosed by the contract as a whole, but not to make the contract fair, wise, or just." *Id.* "An implied covenant is necessary to effectuate the parties' intentions only if the obligation is so clearly within the contemplation of the parties that they deemed it unnecessary to express it." *Id.* (quotation omitted).

Not only does the Counterclaim fail to plead facts that establish that the implied covenant was necessary under the Partnership Agreement, the Counterclaim contains no mention of any claim for breach of this alleged duty. *See, e.g.*, *Davis*, 2016 WL 8257126, at *3 (refusing to consider claim raised for first time in Response to Motion to Dismiss). Thus, Counterclaimants cannot rely on this implied covenant because they raise it for the first time in their Response.

> 2.    *PNC's Actions Were Justified Under and Permitted by the Forward Commitment.*

As set forth at length in the Motion to Dismiss, the First GP was not a party to the Forward Commitment, which was solely between the Partnership and PNC. *See* ECF Doc. No. 92 at 1, 19–20. The First GP has no standing to complain about breaches of that agreement. *See, e.g.*, *Muirfield*, 17 F. Supp. 2d at 608 (holding that claim for breach of agreement between partnership and a third party is not a direct claim).

Further, with respect to the "Side Letter fees" issue, Counterclaimants continue to mischaracterize its contents. The so-called side letter *modified* the Forward Commitment—it was

not a separate agreement. The "Side Letter" (i.e., the **Second Extension Modification**")
modified the "Delivery Date" under the Forward Commitment by extending it another six
months in exchange for the required payment of monthly extension fees. *See* ECF Doc. No. 72.6
(Plaintiffs' Ex. 31), Second Extension Modification.[2] The Forward Commitment provided that it
could "be terminated by PNC at is option upon (a) the failure by the Borrower to comply with
any of the terms and conditions of this Commitment … to the extent any such failure is not cured
within thirty (30) days." ECF Doc. No. 92 § M.1. The term "Commitment" included the Delivery
Assurance Certificate attached to the Forward Commitment. *See id.* p. 1 (incorporating letter as
well as all exhibits thereto). In turn, the Delivery Assurance Certificate provided that "Borrower
agrees to close the Permanent Mortgage Loan with DUS Lender … not less than 30 days prior to
the Final Delivery Date on the terms set forth in the [Forward] Commitment." *Id.* at 31 (Ex. D. to
Forward Commitment). Because the Forward Commitment did not provide for a second
extension of the Delivery Date, a modification in the form of the Second Extension Modification
was necessary. *See id.* § L (providing for a single "extension of up to six (6) months"). Thus, the
Second Extension Modification conditioned the extension of the Delivery Date on payment of
certain fees, with each month of the extension conditioned on payment of that month's
associated extension fee. *See* ECF Doc. No. 72.6 at 1–2.

It is undisputed that the Partnership did not close on the permanent mortgage loan under
the Forward Commitment (which would have paid off the Chase Construction Loan) by the
Forward Commitment's stated deadline or by the Forward Commitment's stated first extension
deadline. *See* Counterclaim ¶ 39. It is also undisputed that the Partnership failed to pay all of the

---

[2] The Court may consider the contents of the Second Modification Extension because it is
directly referred to in and central to the Counterclaim. *See, e.g.*, *Collins v. Morgan Stanley
Dean Witter*, 224 F.3d 496, 498–99 (5th Cir. 2000).

fees required under the Second Extension Modification to permit the extension of the Delivery Date. *See id.* ¶ 40. Accordingly, PNC sent a Notice of Default to the Partnership dated December 27, 2016. ECF Doc. No. 96.3 (Exhibit G to Motion to Dismiss). When the Partnership failed to cure this default within 30 days, PNC sent a Notice of Termination as provided by the Forward Commitment. ECF Doc. No. 96.4 (Exhibit H to Motion to Dismiss).

PNC cannot plausibly have breached the Partnership Agreement by following the terms of the Forward Commitment (as modified by the Second Extension Modification). Counterclaimants may not *like* the fact that the Partnership agreed to these terms, but it did. *See id.* at 4. They cannot plausibly claim that PNC did anything that it was not contractually permitted to do. Their assertion that the terms that PNC offered in order to agree to a second extension were too pricey is not a legally viable argument. Their argument that PNC wrongfully terminated the Forward Commitment because of the Partnership's failure to pay fees that the Partnership agreed to (through the First GP) for the second extension is wholly implausible.

3.    *Counterclaimants Do Not Plausibly Allege a Breach of the Partnership Agreement for "Seeking Recourse Against the GP."*

There is also no plausible claim against PNC for "seeking recourse" for the Non-Delivery Fee against the First GP. The Response argues that Counterclaimants can assert a cause of action on this theory, even though the Non-Delivery Fee remains unpaid and the First GP has not been sued to recover that amount. At most, the Counterclaim alleges that the First GP received notice in its capacity as the general partner in the Partnership that PNC would seek to recover that fee. However, simply notifying the Partnership of a partnership debt and requesting payment prior to seeking recourse against the real property collateral is not actionable. Moreover, the failure of the First GP to pay the Non-Delivery Fee was not one of the grounds upon which Columbia based its removal of the First GP as general partner. *See* ECF Doc. No. 72.3 at 175–76 (Plaintiffs' Exhibit

11) & 182–83 (Plaintiffs' Exhibit 12). Counterclaimants' alleged injuries have nothing to do with the Non-Delivery Fee. For these reasons, they cannot plausibly allege a claim based on "seeking recourse" against the First GP.

       4.    *The Facts Acknowledged in the Counterclaim Establish that Multiple Events of Default Occurred.*

       Each of Counterclaimants' causes of action alleging (i) breach of Sections 7.7 and 9.1 of the Partnership Agreement; (ii) repudiation of the "GP Note," and (iii) "repudiation" of the payment of Development Fees is not viable because their own pleading acknowledges that the First GP defaulted under the Partnership Agreement.

       Despite admitting facts establishing that multiple Events of Default occurred under Section 7.7(a) of the Partnership Agreement, the Response spends nearly 6 pages arguing that Counterclaimants should be permitted to sidestep the consequences of those defaults by pointing the finger at PNC over some innocuous act. As the Court has previously noted:

> On the one hand, any step which PNC and Columbia Housing take to help [the First GP] remediate a default and defend the interests of the Partnership, [the First GP] construes as consent to a default and waiver of any rights thereby triggered. On the other hand, in those instances where PNC and Columbia Housing have declined to help clean up the mess, [the First GP] argues their conduct suggests unclean hands. The limited partners are thus stuck in a double bind … .

ECF Doc. No. 73 at 21. So, too, here.

       *First*, the First GP cannot set forth any plausible argument with respect to its failure to achieve Final Construction Completion. Final Construction Completion required that, by March 1, 2016 (the "**Completion Date**"), the First GP achieve the "construction and/or rehabilitation of the Project … without lien … or defect … and receipt and acceptance by the SLP of … an 'AIA Form G704 Certification of Substantial Completion' issued by the Project Architect." ECF Doc. No. 86 (Ex. A at 7).

**PLAINTIFFS' REPLY IN SUPPORT OF THEIR MOTION TO DISMISS ALL OF DEFENDANTS' COUNTERCLAIMS—Page 10**

The First GP has admitted facts that establish that Final Construction Completion never occurred because the stucco defects exist and because the project architect never issued a final G704 Certificate of Substantial Completion. *See* Answer ¶ 14; Counterclaim ¶¶ 21–22. This is sufficient to prevent the First GP from achieving Final Construction Completion as defined in the Partnership Agreement. *See* ECF Doc. No. 86 (Ex. A at 7). Further, the Partnership Agreement's requirement that the First GP diligently pursue remediation of construction defects does not alter the plain language of the definition of "Final Construction Completion." *See* Response at 27. The Partnership Agreement is clear that there must be no defects as of the Completion Date. Remediation of defects was required to have occurred *prior* to that time.

Counterclaimants resort to implausible attempts to blame Plaintiffs for their own failures. They place most of their emphasis on the plainly erroneous contention that a final G704 Certificate of Substantial Completion was issued. While the Court must take well-pleaded facts as true, it need not give any weight to statements that are directly contradicted by the relevant documents. Here, the referenced Certificate clearly says "DRAFT" at the top; is not actually signed by the project architect; has the words "To Be Determined" on the amount needed to complete work that is incomplete or defective; and has no signatures from the Contractor or Owner. *See* ECF Doc. No. 72.9 (Defendants' Exhibit No. 61). As the Court has recognized, "[The First GP] .. argues that the circulation of this incomplete draft somehow constitutes issuance of a certificate of substantial completion. ***It does not***." ECF Doc. No. 73 at 12 (emphasis added). The Court should reject this implausible claim.

Similarly, the Response argues that the facts in the Counterclaim are sufficient to support a finding of waiver based on inference. Under Texas law, "[i]ntent is the key element in establishing waiver, but the law on waiver distinguishes between a showing of intent by actual

renunciation and a showing of intent based on inference." *Sgroe v. Wells Fargo Bank, N.A.*, 941 F. Supp. 2d 731, 748 (E.D. Tex. 2013) (quotations omitted). "Where waiver is based on inference, it is the burden of the party who is to benefit … to produce conclusive evidence that the opposite party unequivoca[lly] manifested its intent to no longer assert its claim." *Id.* (quotations omitted).

Here, the Counterclaim does not allege any facts that would permit a reasonable inference that Plaintiffs unequivocally manifested an intent to no longer assert the First GP's failure to achieve Final Construction Completion. To the contrary, despite an extended period to cure that default, the problems with the stucco continued to multiply over time: the Partnership failed to cure the stucco issues; Weis Builders filed a $3.2 million construction lien against the Partnership; and Weis Builders filed suit against the Partnership seeking to foreclose on that lien and collect the allegedly unpaid amounts. *See* Counterclaim ¶¶ 22, 28, 46. Far from demonstrating waiver, at best the Counterclaim shows that Plaintiffs gave the First GP an opportunity to correct its defaults but, when it couldn't, Plaintiffs removed the First GP for the string of defaults resulting from its failure to achieve Final Construction Completion. The First GP would like to treat these defaults as separate when, in reality, they are ongoing links in the same chain of events. Counterclaimants have failed to plead sufficient facts that, even if accepted as true, would give rise to a plausible claim of intentional waiver.

Counterclaimants reliance on *Bott v. J.F. Shea Co.* is misplaced. In that case, a contractor waived a subcontractor's contractual requirement to provide a certificate of insurance naming the contractor as an additional insured when it accepted the full performance of all benefits under the contract and paid it in full despite receiving two noncompliant insurance certificates. 388 F.3d 530, 531–33 (5th Cir. 2004).

**PLAINTIFFS' REPLY IN SUPPORT OF THEIR MOTION TO DISMISS ALL OF DEFENDANTS' COUNTERCLAIMS—Page 12**

This case could hardly be more distinct. Unlike in *Bott*, there are no facts in the Counterclaim that, even if taken as true, would plausibly show that Plaintiffs fully performed the Partnership Agreement despite the Events of Default or that they accepted the draft Certificate of Substantial Completion as a final one.[3] *See, e.g.*, *Martin v. Fed. Nat. Morg. Ass'n*, 814 F.3d 315, 317 (5th Cir. 2016) (holding that bank did not waive its right to accelerate loan by accepting payments from borrower for 16 months after default prior to exercising that right). Instead, they exercised their right to remove the First GP as general partner.

***Second***, the First GP also again implausibly argues that the Weis lien was somehow permitted by the Construction Contract and that, therefore, it was not a breach of the Partnership Agreement. The Court has already held that, as a matter of contract interpretation, "[t]he Construction Contract neither creates nor permits any mechanic's lien. Rather, the Weiss mechanic's lien is created by and was filed pursuant to the relevant portions of the Texas Constitution and the Texas Property Code." *See* ECF Doc. No. 73 at 14. "The interpretation of a contract is a question of law, not fact" unless the contract is ambiguous. *Paragon Resources, Inc. v. Nat'l Fuel Gas Distrib. Corp.*, 695 F.2d 991, 995 (5th Cir. 1983) (quotation omitted) There is nothing ambiguous about any of these agreements—the First GP's failure to prevent the filing of the Weis lien is an Event of Default under the Partnership Agreement. *See* ECF Doc. No. 87 (Ex. A §§ 6.5(w), 7.7(a)(6)).

***Third***, the Weis lawsuit against the Partnership also constituted an Event of Default. *See id.* §§ 6.5(x), 7.7(a)(6). The argument that a suit to foreclose on the Partnership's primary asset based on a $3.2 million lien is not material or did not have an adverse effect on the Partnership is

---

[3] Where it actually discusses the issue, the Counterclaim does not identify any act by which PNC intentionally chose to waive the failure to obtain a Certificate of Substantial Completion. *See* ECF Doc. No. 78, Counterclaim ¶¶ 21, 31.

not plausible. Indeed, the Court has already expressly rejected this interpretation of the parties' agreement. *See* ECF Doc. No. 73 at 15.

Finally, with regard to the "estoppel" theory, the Counterclaim does not identify any position that Plaintiffs have ever taken that was inconsistent with the relief that they now seek. It does not claim that Plaintiffs stated that they would not seek to remove the First GP as general partner or that they would waive any of the defaults. Instead, the First GP argues that, in giving the First GP a chance to cure its defaults—which it spectacularly failed to do—Plaintiffs were estopped from exercising any remedy for those defaults, even as the Partnership was descending into foreclosure and a likely cessation of operations. This is not a plausible argument, and the Court should not indulge it.

For these reasons, the facts admitted in the Counterclaim affirmatively establish that the First GP allowed multiple Events of Default to occur. Because this is true, Counterclaimants cannot assert any claim based on its removal as general partner under Sections 7.7 and 9.1 of the Partnership Agreement; for the "repudiation" of the GP Note or payment of Developer Fees; or any related request for declaratory relief.

## C.     Counterclaimants Fail to State a Claim for Breach of Fiduciary Duty.

The Counterclaim fails to state a claim for breach of a fiduciary duty owed to the First GP. Contrary to the First GP's arguments, the Counterclaim does not plead sufficient facts to permit it to put the question of fiduciary duty before a jury because the Counterclaim does not *plausibly* show that Plaintiffs ever owed fiduciary duties to the First GP.

Under Texas law, limited partners owe fiduciary duties in the rarest of circumstances. *See, e.g.*, *Strebel v. Wimberly*, 371 S.W.3d 267, 279 (Tex. App.—Houston [1st Dist.] 2012, pet. denied); *AON Props., Inc. v. Riveraine Corp.*, No. 14-96-00229-CV, 1999 WL 12739, at *23 (Tex. App.—Houston [14th Dist.] 1999, no pet.). A limited partner owes a fiduciary duty *only*

when it exercises control over the limited partnership to such an extent that it justifies the imposition of such duties. *Strebel*, 371 S.W.3d at 279.

Counterclaimants point solely to provisions in the Partnership Agreement requiring one or more of Plaintiffs' consent. But the Counterclaim contains absolutely no allegations sufficient to show that the First GP did not actually exercise authority over the construction and operation of the Lucero Apartments complex or the operations of the Partnership. Essentially, the First GP is seeking a determination from the Court that Plaintiffs' consent rights are, as a matter of law, sufficient to give rise to fiduciary duties on the part of the limited partners. They cite the Court to no authority in support of this sweeping proposition.

Counterclaimants ignore the provisions of Texas law expressly stating that "consulting with or advising a general partner on any matter" and "proposing, ***approving, or disapproving***, by vote or otherwise … ***any [] matter stated in the partnership agreement***" does not constitute the exercise of control over the limited partnership. TEX. BUS. ORG. CODE § 153.103 (emphasis added). In fact, they chose not to address them in the Response. The Court should follow the express provisions of Texas law, rather than the First GP's invitation to mischaracterize consent rights as "control."

**D.    Counterclaimants Fail to State a Claim for Violation of 12 U.S.C. § 1972.**

With respect to the counterclaims under 12 U.S.C. § 1972 of the Bank Holding Company Act (the "**BHCA**"), Counterclaimants' Response misses the mark entirely.

***First,*** Counterclaimants ignore the fundamental problem that, with respect to the last two "tying" claims under 12 U.S.C. §§ 1972(1)(D) and (E), the Counterclaim doesn't even identify the alleged extension of credit to which it refers. *See* Counterclaim ¶¶ 93–94. The Counterclaim merely parrots back the exact language from the statute it cites. This is another example of the

First GP's attempt to raise every conceivable claim, no matter how ill-fitting.[4] Under the federal pleading standard, the First GP cannot plausibly assert claims under those provisions if it does not identify the alleged factual basis for that claim. These claims should be dismissed.

**Second**, with respect to the first two "tying" claims under §§ 1972(1)(A) and (C), Counterclaimants ignore the actual arguments in the Motion to Dismiss. Rather than suggesting that the First GP can never be a customer under the BHCA, Plaintiffs maintain that the (a) the First GP does not plausibly allege that it was damaged by any purported "tying" and (b) the First GP fails to identify an extension of credit and an *unrelated* transaction that were "tied" together in an anticompetitive manner such that it violates the BHCA. *See, e.g.*, *Parsons Steel, Inc. v. First Alabama Bank of Montgomery*, 679 F.2d 242, 245 (11th Cir. 1982) ("[T]he [BHCA] was only intended to prohibit intentionally anti-competitive banking practices, and Congress deliberately attempted to limit the statute's potentially expansive reach."); *Davis v. First Nat'l Bank of Westville*, 868 F.2d 206, 207 (7th Cir. 1989) ("Unless the 'unusual' banking practice is shown to be an anti-competitive tying arrangement principally designed to enhance the bank's market power, it does not fall within the scope of the [BHCA]'s prohibitions."); *New England Co. v. Bank of Gwinnett Cnty.*, 891 F. Supp. 1569, 1573–74 & n.1 (N.D. Ga. 1995).

The Counterclaim contains no allegation that the First GP was *damaged* by either the purported "tying" of the permanent mortgage loan under the Forward Commitment and the "Bridge Loan" or the permanent mortgage loan and the First GP's "provision of development services." *See* Counterclaim ¶¶ 91–92. Again, the Counterclaim admits that the First GP came to PNC because it was a "'one-stop shop' for providing the financing, tax credit purchasing, and equity the Eureka Entities needed." *See id.* ¶ 3. There is no suggestion that the First GP was

---

[4] Moreover, the Counterclaim appears to get subsections (1)(D) and (1)(E) backwards, quoting the language from one subsection with respect to the other. *See* Counterclaim ¶¶ 93–94.

forced to do something that it didn't want to do, just an after-the-fact attempt to turn a potentially mutually beneficial investment relationship into a federal claim.

Further, the Counterclaim does not allege facts sufficient to support an inference that an actionable "tying" occurred. The First GP misreads the import of *Swerdloff v. Miami National Bank*. In that case, the owners of the corporation were personal guarantors of the bank's loan to the corporation. *See* 584 F.2d 54, 58 (5th Cir. 1978).[5] The bank informed the owners that it would not honor its agreement to extend credit to the corporation unless the owners transferred 51% of the capital stock in that corporation to another one of the bank's customers. *See id.* at 57. The owners contended that because they refused to transfer their stock, the bank terminated the financing arrangement, which forced the corporation out of business and into bankruptcy. *See id.* In *Swerdloff*, the extension of credit, which the owners personally guaranteed, and the shares that the owners were supposed to transfer, were "tied" requirements of the same parties. Consistent with this holding, it is essential to a claim under the BHCA that "the *borrower* must be prevailed upon to agree to the additional product or service, lest credit be denied." *Highland Capital, Inc. v. Franklin Nat. Bank*, 350 F.3d 558, 567 (6th Cir. 2003) (emphasis added).

Here, there are no such facts alleged. The First GP does not claim that it ever sought only a single extension of credit from PNC and that it was forced to accept PNC's equity investment. Instead, it admits that it needed these equity contributions to complete the Project. *See* Counterclaim ¶ 3. And, the Developer, which the Response does not even argue was a "customer" under the BHCA, and not the First GP, was contractually required to provide the development services. *See* ECF Doc. No. 91. Further, the Counterclaim admits that the entire

---

[5] The Response argues in a footnote that the Court is required to accept the "detailed allegations" that providing a "Bridge Loan" with the Forward Commitment was unusual and suspect. On the contrary, the only allegations in this regard are wholly conclusory and therefore should be disregarded. *See* Counterclaim ¶¶ 15, 91.

*purpose* of the loan and the equity investment was to *allow* the First GP to develop the Lucero Apartments project, not to force it to do so. Indeed, Counterclaimants are suing PNC, in part, because they still want to (i) collect Developer Fees; (ii) require PNC to make *additional* equity contributions to the Partnership; and (iii) have the First GP reinstated as the general partner in the Partnership. *See* Counterclaim ¶¶ 70, 75, 80.

Finally, the Counterclaim does not plead facts showing that the First GP itself is a party to two "tied" transactions that are actionable under § 1972. As established in *Highland Capital*, the extension of credit must be conditioned upon the *borrower's* acceptance of the tied extension of credit or service, which must be ***unrelated*** to the primary extension of credit. *See* 350 F.3d at 567. Here, the various transactions were related to the same low income housing development, and the First GP wasn't required to accept an extension of credit to purchase unrelated property or to provide development services that it wasn't intending to provide anyway (and, in any event, the Developer provided those services, not the First GP). Indeed, the First GP was not a borrower, only ever held a 0.01% interest in the borrower, and was never party to two different, unrelated transactions with PNC made for an anticompetitive purpose. Under *Swerdloff*, the fact that both the credit transactions and the provision of development services were related to the Partnership is insufficient to state a claim under the BHCA.

The First GP essentially argues that any transaction in which PNC is both a lender and an investor involving a low income housing development is a *per se* violation of these sections of the BHCA. This is not (and could not be) the law. For all the reasons set forth above and in the Motion to Dismiss, the First GP fails to assert a claim under 12 U.S.C. § 1972.

**E.     Counterclaimants Fail to State a Cause of Action for Theft of Services.**

The Counterclaim still fails to state a claim for violation of the Texas Theft Liability Act (the "**TTLA**"). As set forth in the Motion to Dismiss, Counterclaimants have failed to allege any

of the four grounds required by Texas Penal Code § 31.04(a), which is a required element of and thus fatal to their claim. *See* Counterclaim ¶¶ 98–100. Further, the Counterclaim does not allege any facts sufficient to show that PNC and Columbia committed a *crime*, rather than an alleged breach of contract. All the Counterclaim asserts is that Columbia exercised its right to remove the First GP for numerous Events of Default under the terms of the Partnership Agreement. Even if this were improper under the Partnership Agreement, there are no facts alleged that would turn this into a criminal action. The facts alleged in the Counterclaim are not sufficient to state a claim under the TTLA, and Counterclaimants cannot supplement these facts by making additional assertions in their Response.

**F.**   **Counterclaimants Fail to State a Cause of Action for Unjust Enrichment or for Promissory Estoppel.**

The Response's arguments concerning the unjust enrichment and promissory estoppel claims fail for at least two reasons:

*First*, the Response's own words confirm that the unjust enrichment claim is duplicative of the other claims for "fraud, breach of fiduciary duty and multiple statutory violations." *See* Response at 35. Unjust enrichment is not a generic, "me too" claim that may be tacked onto other claims to right any perceived wrong. *See Heldenfels Bros., Inc. v. City of Corpus Christi*, 832 S.W.2d 39, 41 (Tex. 1992). Moreover, to the extent it is based on these other claims, if they are not actionable, then the unjust enrichment claim too must fail.

*Second*, both the unjust enrichment and promissory estoppel claims are addressed by the express terms of the parties' agreements. Under Texas law, this makes them unviable. *E.g.*, *In re Kellog Brown & Root*, 166 S.W.3d 732, 740 (Tex. 2005). All of the Counterclaim's allegations as to these claims relate to whether Plaintiffs were permitted to take the actions that they did

under the Partnership Agreement (and, to a much lesser extent, the Development Agreement). Thus, these claims fail as a matter of law.

## G.      Counterclaimants Fail to State a Cause of Action for Fraud.

As to fraud, Counterclaimants do not address the arguments raised in the Motion to Dismiss. Instead, they concentrate on a new interpretation of the Counterclaim, arguing that, although they indisputably knew that the MBS Investor was an affiliate of PNC, its position "could have been transferred" prior to the time of the Second Extension Modification. *See* Response at 36 & n.17. However, the Counterclaim contains no such allegation.

Moreover, the First GP asserts no facts demonstrating that the MBS Investor's identity is material or that the First GP reasonably relied on the MBS Investor's identity to its detriment. The Counterclaim admits that the First GP "suspected" that the MBS Investor was PNC's affiliate. *See* Counterclaim ¶ 33. And even under the First GP's alleged facts, it agreed to the Second Extension Modification on the Partnership's behalf without being sure who the MBS Investor was. Further, the MBS Investor's identity is irrelevant to the fact that the Forward Commitment did not provide for a second extension and that a modification was required to allow for one. Regardless of the identity of the MBS Investor, the only possible outcome was the same: either the Partnership reached such an agreement, or it would default on the Forward Commitment (as eventually occurred).

## H.      Counterclaimants Are Not Entitled to the Declaratory Relief They Seek.

Finally, the Response fails to address the arguments raised in the Motion to Dismiss as to the requests for declaratory relief in any detail. In particular, they fail to dispel the conclusion that they are duplicative of relief requested in Plaintiffs' own claims and that they are duplicative of Counterclaimants' own claims. Plaintiffs respectfully refer to the Court to the arguments raised in the Motion to Dismiss under both Rules 12(b)(1) and 12(b)(6).

Dated: November 20, 2017.

By: /s/ *Robert M. Hoffman*
Robert M. Hoffman
Texas Bar No. 09788200
robhoffman@andrewskurth.com
James C. Bookhout
Texas Bar No. 24087187
jamesbookhout@andrewskurth.com
**ANDREWS KURTH KENYON LLP**
1717 Main Street, Suite 3700
Dallas, Texas 75201
Telephone:   (214) 659-4400
Facsimile:    (214) 659-4401

David P. Whittlesey
Texas Bar No. 00791920
dwhittlesey@andrewskurth.com
**ANDREWS KURTH KENYON LLP**
111 Congress Avenue, Suite 1700
Austin, Texas 78701
Telephone:   (512) 320-9200
Facsimile:    (512) 320-9292

**ATTORNEYS FOR PLAINTIFFS
PNC BANK, N.A., COLUMBIA HOUSING SLP
CORPORATION, AND 2013 TRAVIS OAK
CREEK, LP**

## CERTIFICATE OF SERVICE

I certify that on November 20, 2017, a copy of the foregoing document was served on all counsel of record via the Court's CM/ECF facilities.

 /s/ *Robert M. Hoffman*
Robert M. Hoffman