UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| PNC BANK, N.A., COLUMBIA HOUSING SLP CORPORATION, and 2013 TRAVIS OAK CREEK, LP | § § § § | |
| Plaintiffs, | § § | Case No. 1:17-cv-584-RP-ML |
| v. | § § § | consolidated with |
| | § | Case No. 1:17-cv-560-RP |
| 2013 TRAVIS OAK CREEK GP, LLC, 2013 TRAVIS OAK CREEK DEVELOPER, INC., CHULA INVESTMENTS, LTD., and RENE O. CAMPOS | § § § § § § | |
| Defendants. | § | |

### PLAINTIFFS' RESPONSE TO THE FIRST GP'S [SECOND] MOTION TO APPOINT A RECEIVER

Plaintiffs PNC Bank, N.A. ("**PNC**"), Columbia Housing SLP Corporation ("**Columbia**"), and 2013 Travis Oak Creek, LP (the "**Partnership**") (collectively the "**Plaintiffs**") respectfully submit this Response to the [Second] Motion to Appoint Receiver [ECF Doc. No. 120] (the "**Motion**") filed by Defendant 2013 Travis Oak Creek GP, LLC (the "**First GP**").

Once again, the First GP asks this Court to disrupt the Partnership's affairs by way of unmerited extraordinary relief. The Motion is just the latest in a string of similar filings, each with the same, unstated but obvious goal: using the Court to prevent the First GP's *affiliates* (the "**Chase Guarantors**") from having to honor their guaranty of the Partnership's construction loan originally made to the Partnership by JPMorgan Chase Bank, N.A. ("**Chase**"). There are many reasons why the Court should not—and cannot under longstanding legal standards—grant such extraordinary relief. The Motion should be denied.

## I.     BACKGROUND AND PROCEDURAL HISTORY

On or about May 23, 2014, PNC and Columbia, as limited partners, and the First GP, as the original general partner, entered into the Amended and Restated Agreement of Limited Partnership of 2013 Travis Oak Creek, LP (the "**Partnership Agreement**"). [*See* ECF Doc. No. 72 at 6 (Partnership Agreement § 1.3).] The Partnership Agreement is the Partnership's governing document. The purpose of the Partnership is to develop, construct, and operate a low-income housing multifamily apartment complex located in Austin, Texas, known as the Lucero Apartments (the "**Property**").

Under the Partnership Agreement, PNC and Columbia were originally positioned as limited partners overseeing their investment. *See id.* §§ 1.3; 6.1; 7.1–7.2. The First GP was to manage, oversee, and ensure the successful construction and ongoing operation of the Project. *See id.* §§ 6.1, 6.5 & 6.7. Importantly, the Partnership Agreement provided that if the First GP failed to fulfill its contractual obligations, then an "**Event of Default**" would occur, which by the parties' agreement would empower Columbia to remove and replace the First GP. *See id.* § 7.7.

Based on the First GP's numerous Events of Default—which threatened the essential purpose of the Partnership—on June 7, 2017, Columbia exercised its contractual right to remove

and replace the First GP as the Partnership's general partner. [ECF Doc. No. 72-3 at 175 (Plaintiffs' Exhibit 11).] When the First GP flatly refused to relinquish control of the Partnership and instead interfered with Columbia's contractual right to perform as general partner, this litigation ensued.

After listening to a full day of evidence and two subsequent hours of oral argument, the Court found a substantial likelihood that the First GP committed multiple Events of Default that threatened the purpose of the Partnership, and entered a preliminary injunction prohibiting the removed First GP from interfering with Columbia's role as the sole general partner in the Partnership. [*See* ECF Doc. No. 73.]

Throughout the injunction hearing, Plaintiffs pledged that, if Defendants were barred from obstructing Columbia's role as successor general partner, Plaintiffs would do what they had to do to protect the Property from imminent foreclosure. [*See* ECF Doc. No. 84, Transcript of Preliminary Injunction Hearing, November 21, 2017 at 19:20–20:2.] On October 3, 2017, Plaintiffs made good on this promise: Chase and PNC entered into a Sale and Assignment Agreement whereby PNC agreed to purchase the outstanding loan used to construct the Lucero Apartments complex in the original principal amount of $26 million (the "**Chase Construction Loan**"). On October 12, 2017, that sale closed, and Chase executed an Assignment of Deed of Trust and Other Loan Documents in favor of PNC. *See* **Exhibit A**, Assignment. The Chase Construction Loan was supported by a Guaranty of Payment and Completion dated May 23, 2014 (the "**Chase Guaranty**") executed by the Chase Guarantors—Rene O. Campos, 2013 Travis Oak Creek Developer, Inc., Chula Investments, Ltd., and Eureka Multifamily Group, LP—for the benefit of Chase. These Chase Guarantors consist of the First GP's controlling owner and affiliates. *See* **Exhibit B**, Chase Guaranty. The Chase Guaranty contains an explicit

waiver of subrogation clause, such that the Chase Guarantors cannot pay the Chase Guaranty and then recover subrogation for same against the Partnership. *See id.* § 19.

On November 4, 2017, PNC filed suit on the Guaranty in state court in Travis County, Texas, which was improperly removed to this Court by in-state Defendants. *See, e.g.*, *Smethers v. Bell Helicopter Textron, Inc.*, No. 6-16-cv-58, 2017 WL 1277512, at *3 (S.D. Tex. Apr. 4, 2017) ("As [a] forum-resident defendant, the purpose of the statute … is not served by allowing such gamesmanship to stand."). A Motion to Remand is now pending in that case. [Case No. 1:17-cv-01081-RP ECF Doc. No. 7.]

## II. LEGAL STANDARD

"Under [Rule 66], the appointment of a receiver can be sought by anyone showing an *interest in certain property* or *a relation to the party in control or ownership thereof* such as to justify conservation of the property by a court officer." *Netsphere, Inc. v. Baron*, 703 F.3d 296, 305 (5th Cir. 2012) (quotation omitted) (emphasis added). "Receivership is an extraordinary remedy that should be employed with the utmost caution and is justified only where there is a clear necessity to protect a party's interest in property, legal and less drastic equitable remedies are inadequate, and the benefits of receivership outweigh the burdens on the affected parties." *Id.* (quotation omitted). "Even if a reasonable basis exists for believing there are benefits to the court and the parties to imposing a receivership … resort to that remedy may be inappropriate." *Id.*

Further, Texas law provides that "a court that has jurisdiction over the property and business of a domestic entity … may appoint a receiver for the entity's property and business if … (1) in an action by an owner or member of the domestic entity," the applicant establishes that one of several conditions is satisfied. *See* TEX. BUS. ORG. CODE § 11.404. Such a receiver is appointed for the purpose of "rehabilitating" the domestic entity. *See id.* This is in contrast to a

request to appoint a receiver over specific property of the entity. *See id.* § 11.403. Under additional Texas law, a receiver may be appointed only if "(1) circumstances exist that are considered by the court to necessitate the appointment of a receiver to conserve the property and business of the domestic entity and avoid damage to interested parties; (2) all other requirements of law are complied with; and (3) the court determines that all other available legal and equitable remedies, including the appointment of a receiver for specific property of the domestic entity under Section 11.402(a), are inadequate." *Id.* § 11.404(b); *see also id.* § 11.403(b).

### III.   ARGUMENT AND AUTHORITIES

**A.   The First GP Lacks Standing to Request the Appointment of a Receiver to Operate the Partnership.**

The First GP lacks standing to request that the Court appoint a receiver to manage the Partnership and its property. Under Texas law, to have standing to request appointment of a rehabilitative receiver, the applicant must be an *owner* or *creditor* of the entity. TEX. BUS. ORG. CODE § 11.404(a).[1]

The Partnership Agreement provides for the role of general partner—now Columbia as successor general partner—and one or more limited partners—now PNC as the sole limited partner. [*See* ECF Doc. No. 72 at 6 (Partnership Agreement § 1.3).] The Partnership Agreement does not create a "General Partner Emeritus" role for the removed First GP, or otherwise allow the First GP to hold on as a general or other partner once removal occurs.

The First GP is no longer an owner in the Partnership, and it has not alleged or established that it is a bona fide creditor of the Partnership.[2] As previously briefed at length to

---

[1] The First GP's request that a receiver be appointed to "[m]anage and operate … the Partnership" and to "cure the … [Chase default]" is manifestly for purposes of "rehabilitation."

[2] Any new allegations in this regard made by Defendants in their Reply brief should not be given serious consideration by the Court. Defendants were required to establish standing and

the Court, the First GP committed numerous, longstanding Events of Default that threatened the core purpose of the Partnership. As a result, on June 7, 2017, Columbia exercised its right to remove the First GP as the general partner. Pursuant to the terms of the Partnership Agreement, "[i]f, after an Event of Default that is not timely cured as set forth herein, [Columbia] elects to remove a General Partner, then such a removal shall occur automatically and without further action by any Partner upon the giving of notice thereof by [Columbia Housing] to the Partners." [ECF Doc. No. 73 at 15]. Further, "such General Partner shall automatically cease to be Partner of the Partnership and … shall automatically and without notice or action of the Partners, relinquish to [Columbia] … such General Partner's entire economic interest in the Partnership." *Id.* at 15–16. Thus, the Notice of Removal immediately and irrevocably removed the First GP as a partner in the Partnership; no event has occurred that would in any way allow the First GP to be readmitted, and it retains no ownership or economic interest in the Partnership of any kind.

On August 2, 2017, the Court entered an Order granting Plaintiffs' Motion for Preliminary Injunction, expressly finding that "2013 Travis Oak Creek, GP, LLC was removed as general partner of 2013 Travis Oak Creek, LP," and enjoining the First GP and its co-defendants from interfering with Columbia's "singular exercise of its role, authority, powers, control, rights, duties, obligations, or privileges as general partner of 2013 Travis Oak Creek, LP." [ECF Doc. No. 73 at 27.]

Because the Court has already found that Plaintiffs will likely succeed on their claims that the First GP committed multiple Events of Default under the Partnership Agreement and that Columbia properly exercised its contractual right to remove the First GP as general partner—

---

entitlement to relief in their Motion. *United States v. Jackson*, 426 F.3d 301, 304 n.2 (5th Cir. 2005) ("Arguments raised for the first time in a reply brief … are waived."); *Cullum v. Diamond A Hunting, Inc.*, Civ. Ac. No. SA–07–CA–76–FB, 2009 WL 10669503, at *3 n.4 (W.D. Tex. Oct. 2, 2009).

which automatically resulted in the First GP's withdrawal as a partner—the First GP lacks standing to request the appointment of a receiver. The Court's findings in the August 2, 2017 Order are the law of the case and are binding on the parties unless the Court enters an order to the contrary. *See, e.g.*, *Loumar, Inc. v. Smith*, 698 F.2d 759, 762 (5th Cir. 1983).

As a matter of law, the Court cannot consider the First GP's request to appoint a receiver because it is no longer a partner (i.e., an owner) in the Partnership and has no standing under either Tex. Bus. Org. Code § 11.404(a) or federal law. A different result would require the Court to rewrite the Partnership Agreement. *See, e.g.*, *Fortis Benefits v. Cantu*, 234 S.W.3d 642, 647, 649 (Tex. 2007) (declining to "judicially rewrite the parties' contract").

**B.     No Grounds Exist for the Appointment of a Receiver.**

Further, there are no grounds supporting the appointment of a receiver—for several reasons.

*First*, as a matter of equity, the First GP's motion on its face has little to do with promoting the Partnership's interests. Instead, it is a rather transparent attempt to avoid the Chase Guarantors' liability on the Chase Guaranty. By seeking a Court-ordered refinance, the First GP is trying to railroad through an action that would likely result in discharge of the Chase Guaranty. *See, e.g.*, *Moayedi v. Interstate 35/Chisam Road, L.P.*, 438 S.W.3d 1 (Tex. 2014) (payment in full is a defense to demand for payment under a guaranty). That would deprive the Partnership of a significant backstop for full payment of the Chase Construction Loan debt, leaving it holding the bag for the full amount. Thus, in reality, the First GP is seeking the appointment of a receiver solely for the benefit of its *affiliates*, not the Partnership in which it holds no interest. A Court-ordered refinance would financially *injure* the Partnership—not help it. But it was the First GP that defaulted under the Chase Construction Loan and exposed the Partnership's principal asset to imminent foreclosure by Chase. [*See* ECF Doc. No. 73 at 22–23.]

The First GP is yet again attempting to use the Court to extricate itself and its affiliates from liability created by the First GP's own actions.

*Second*, as it promised the Court it would, PNC intervened and prevented the foreclosure on the Chase Construction Loan by purchasing it from Chase in full. It did so specifically to protect the Partnership and the low income tenants who reside at the Lucero Apartments complex, not the Chase Guarantors. PNC has not served a Notice of Foreclosure on the Partnership. Instead, it has prudently pursued payment of the Chase Construction Loan in full from the Chase Guarantors, who waived subrogation against the Partnership. *See* Ex. B § 19. Further, as a result of the First GP's removal, the Partnership is now a wholly owned subsidiary of PNC and its affiliate, Columbia, and the Partnership's financials are effectively consolidated with PNC's own, meaning that PNC has no impetus to foreclose on its own equity investment. Unlike Chase, PNC is not just a third party lender with a loan that went into default (and, thus, triggering regulatory scrutiny); as an owner of more than 99% of the interests in the Partnership, PNC is in a qualitatively different position from a regulatory point of view. Finally, PNC's situation is also different than Chase's was because PNC acquired the Chase Construction Loan when it was already a nonperforming asset; i.e., the default had *already* occurred.

As a result of these factors, PNC is not in the same position as Chase. It would not be in PNC's best interest to foreclose against the Partnership, as it would threaten PNC's ownership interest as well as the affordable housing aspect of the project. There is no danger of any imminent injury to the Partnership precisely because PNC has fulfilled its promise to the Court and purchased the Chase Construction Loan in full. [*See* ECF Doc. No. 84, Transcript of Preliminary Injunction Hearing, November 21, 2017 at 19:20–20:2.] Thus, the Partnership does not face any harm that would necessitate the appointment of a receiver, as required by Texas law.

*See* TEX. BUS. ORG. CODE § 11.404(b). In fact, the Lucero Apartments complex is continuing to operate normally, and PNC is actively working to address the numerous issues that the First GP created during its unhealthy tenure as the original general partner.

***Third***, the First GP has failed to give the Court the entire story regarding its quest for a court-ordered refinance of the Chase Construction Loan. By happenstance, the First GP filed its related Motion to Clarify or Modify Preliminary Injunction [ECF Doc. No. 103] on the *same day* that notice was sent to the First GP's attorney informing him of PNC's demand for payment under the Chase Guaranty. *See* **Exhibit C**, Notice to Chase Guarantors. If, as Plaintiffs' counsel expressly requested at the time, the First GP had waited 24 hours to file that motion, it would have known that PNC had already prevented the foreclosure. Having suddenly found itself with egg on its face by claiming to the Court that PNC had not acted to stop Chase from foreclosing, even though PNC quite clearly had, the First GP pivoted in its Reply, suddenly arguing that PNC should be required to *refinance* the Chase Construction Loan rather than just prevent the foreclosure. [*See* ECF Doc. No. 119.] Now, the First GP is trying the same belt and suspenders tactic with its (second) request for appointment of a receiver.[3]

Contrary to the First GP's claims, PNC never promised that it would immediately refinance the Chase Construction Loan, particularly if it was not in the Partnership's best interest to do so. Instead, PNC promised the Court that it would avoid foreclosure on the Chase Construction Loan. [*See* ECF Doc. No. 84, Transcript of Preliminary Injunction Hearing, November 21, 2017 at 19:20–20:2; 126:21–126:25.] That task has been accomplished in full, with no thanks from the First GP. By paying tens of millions of dollars to purchase the Chase Construction Loan, with no assurance that it will ever be repaid by the Chase Guarantors, PNC

---

[3] A single motion for such extraordinary relief in a lawsuit is rare enough; repeated requests for a receiver every six months is practically unheard of.

averted an imminent foreclosure against the Partnership's primary asset.[4] *See* Ex. B. The exact amount that PNC paid for the Chase Construction Loan is patently irrelevant.[5]

***Fourth***, even if Columbia wanted to refinance the Chase Construction Loan, the First GP's own defaults under the Partnership Agreement have made this scenario unlikely. In particular, since Columbia was allowed to fulfill its role as the general partner, it has retained consulting experts to evaluate the physical condition of the Lucero Apartments complex. Unfortunately, those experts' preliminary assessment is that the issues facing the Property, including the stucco defects, are much *worse* than the First GP had previously revealed. The related dispute with Weis Builders, the Partnership's general contractor—originally selected and overseen during construction by the First GP—is another significant obstacle.[6] And the First GP does not in its Motion establish that a receiver could in fact refinance the Chase Construction Loan. But, even if the Partnership were able to refinance the Chase Construction Loan, that is not a valid ground for appointing a receiver. Whether to refinance the Chase Construction Loan or pursue the Chase Guarantors for the First GP's default is ultimately up to Columbia, as general partner, to make in the best interests of the Partnership, not for the First GP, as a *former* partner, to second guess in the best interests of its affiliates.

***Fifth***, the repurchase provisions in the Partnership Agreement to which the First GP refers have nothing to do with whether a receiver should be appointed. Those provisions provide

---

[4] Further, preventing foreclosure by Chase also protected the "Seller Note"—a $7.25 million loan held by an affiliate of the First GP in a subordinated lien position.

[5] In any event, the amount that PNC paid was substantially the same as the total amount due and owing on the Chase Construction Loan, including interest, fees, and costs; PNC stands to obtain no windfall from its purchase of that loan.

[6] And true to Plaintiffs' word, Columbia is working towards a reasonable resolution of the Weis lawsuit. But even if the Weis lawsuit cannot be resolved, Columbia will not allow Weis to foreclose on the Weis lien.

that, upon an Event of Default, PNC and Columbia may demand that the First GP repurchase their entire interests in the Partnership at a predetermined price. [ECF Doc. No. 72-3 at 32–34 (Partnership Agreement §§ 5.1, 5.2).] Such a demand was included in the June 7, 2017 Notice of Removal. [*Id.* at 175–81 (Plaintiffs' Exhibit 11).] The First GP refused to comply with that demand. Under the terms of the Partnership Agreement, the First GP's requirement to consummate the repurchase matured and expired 30 days after the demand was made. [*See id.* at 34 (Partnership Agreement § 5.3) ("The full amount of the purchase price set forth in Section 5.2 shall be paid by the General Partner … at the conclusion of the thirty (30) day notice period.")]. Upon the First GP's request, PNC and Columbia provided a number for the repurchase price to the First GP. They also requested some evidence of the First GP's actual ability to pay the repurchase price—a request that was also refused.

Plaintiffs *have not* sued the First GP seeking specific performance of the repurchase obligation. Instead, the Amended Complaint provides that demand for repurchase was made pursuant to Article V of the Partnership Agreement and that the First GP failed to timely comply with that demand. [ECF Doc. No. 9 ¶¶ 26–28, 40–43.] The First GP's failure to consummate a repurchase is merely one cause, and a measure of, Plaintiffs' damages. But the repurchase itself is no longer on the table. The Partnership Agreement does not provide the First GP an unending, irrevocable right to purchase PNC's and Columbia's interests in the Partnership. It unambiguously provides that the purchase price must be paid on the 30th day after demand is made. [ECF Doc. No. 72-3 at 34 (Partnership Agreement § 5.3).] For these reasons, there is no cause to appoint a receiver because the First GP suddenly believes that consummating the repurchase would have been a prudent course of action *five months* after that option expired.

| | |
|---|---|
| Dated: January 3, 2018. | By: /s/ *Robert M. Hoffman*<br>Robert M. Hoffman<br>Texas Bar No. 09788200<br>robhoffman@andrewskurth.com<br>James C. Bookhout<br>Texas Bar No. 24087187<br>jamesbookhout@andrewskurth.com<br>**ANDREWS KURTH KENYON LLP**<br>1717 Main Street, Suite 3700<br>Dallas, Texas 75201<br>Telephone:   (214) 659-4400<br>Facsimile:   (214) 659-4401<br><br>David P. Whittlesey<br>Texas Bar No. 00791920<br>dwhittlesey@andrewskurth.com<br>**ANDREWS KURTH KENYON LLP**<br>111 Congress Avenue, Suite 1700<br>Austin, Texas 78701<br>Telephone:   (512) 320-9200<br>Facsimile:   (512) 320-9292<br><br>**ATTORNEYS FOR PLAINTIFFS PNC BANK, N.A., COLUMBIA HOUSING SLP CORPORATION, AND 2013 TRAVIS OAK CREEK, LP** |

## CERTIFICATE OF SERVICE

I certify that on January 3, 2018, a copy of the foregoing document was served on all counsel of record via the Court's CM/ECF facilities.

/s/ *Robert M. Hoffman*
Robert M. Hoffman