IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| PNC BANK, N.A., COLUMBIA HOUSINGSLP CORPORATION, and 2013 TRAVIS OAK CREEK, LP,<br><br>Plaintiffs,<br><br>v.<br><br>2013 TRAVIS OAK CREEK, GP, LLC, 2013 TRAVIS OAK CREEK DEVELOPER,INC., CHULA INVESTMENTS, LTD., and RENE O. CAMPOS,<br><br>Defendants. | § § § § § § § § § § § § § § § § | 1:17-cv-584-RP<br><br>(*consolidated with* 1:17-cv-560-RP) |
| 2013 TRAVIS OAK CREEK, GP, LLC and 2013 TRAVIS OAK CREEK, LP,<br><br>Plaintiffs,<br><br>v.<br><br>PNC BANK., N.A. and COLUMBIA HOUSING SLP CORPORATION,<br><br>Defendants. | § § § § § § § § § § § § § § | |

## MOTION TO ENFORCE SETTLEMENT AGREEMENT

2013 Travis Oak Creek, LP and 2013 Travis Oak Creek, GP, LLC and Rene O. Campos, ("Movants" or the "Eureka Parties") file this Motion to Enforce Settlement Agreement, and respectfully show as follows:

**Procedural History and Relevant Facts**

A. **Relevant Procedural History.**

1. On June 8, 2017, PNC Bank and Columbia Housing filed this lawsuit in the United States District Court for the Northern District of Texas against 2013 Travis Oak Creek GP, LLC (the "First GP"), 2013 Travis Oak Creek Developer, Inc. ("Developer"), Chula Investments, Ltd. ("Chula"), and Rene O. Campos ("Campos") (collectively, "Defendants") (Compl., Dkt. 1).

2. On June 10, 2017, PNC Bank and Columbia Housing amended their complaint to add the Partnership – 2012 Travis Oak Creek, LP (the "Partnership") as a plaintiff. (Am. Compl., Dkt. 9).[1]

3. On June 12, 2017, Plaintiffs moved for preliminary injunctive relief, seeking, among other things, an order enforcing their right to remove the First GP as the general partner and to enjoin the First GP from interfering with Columbia Housing's exercise of its rights as the new general partner.

4. On July 22 and 25, 2017, the Court held an evidentiary hearing on Plaintiffs' preliminary injunction motion, and on August 2, 2017, the Court granted Plaintiffs' motion for a preliminary injunction, finding that the First GP was removed as general partner from the Partnership and enjoining Defendants and all persons acting in active concert with them from "taking any action that interferes with Columbia Housing SLP Corporation's singular exercise of its role, authority, powers, control, rights, duties, obligations, or privileges as general partner of 2013 Travis Oak Creek, LP." (Dkt. 73 at 27).

5. The injunction remained in force and effect from August 2, 2017, through the date of the Court's final judgment October 7, 2019 (Dkt. 203) during which time the First GP (the

---

[1] The Partnership is 2013 Travis Oak Creek, Ltd. When this suit was filed, the PNC party-plaintiffs took the position that they had removed the First GP, and taken over control of the Partnership and its GP, for all purposes.

general partner as controlled by the Eureka Parties) was prohibited from, at Plaintiffs' request no less, "taking any action that interferes with Columbia Housing SLP Corporation's singular exercise of its role, authority, powers, control, rights, duties, obligations, or privileges as general partner of 2013 Travis Oak Creek, LP."

6. During this suit, Defendants were actually concerned about whether Columbia Housing SLP Corporation was properly and adequately performing what the injunction declared was its singular exercise of its role, authority, powers, control, rights, duties, obligations, or privileges as general partner of 2013 Travis Oak Creek, LP, and they sought the appointment of a receiver to perform certain obligations, and any others that might have required performance that was not occurring through Columbia Housing SLP Corporation. The Court had already observed [Doc. 73, p. 20] "[t]here is some evidence in the record suggesting that PNC and Columbia Housing may not have always had the Partnership's best interests at heart."  (Dkt. 120) In their motion Defendants expressed their concerns that the PNC Bank controlled replacement general partner was not acting in the best interests of the entire Partnership and explained[2]:

> The appointment of a receiver will protect the Partnership and its property, ensure the Partnership meets is obligations and acts in accordance with the Partnership Agreement. TOCGP has grave concerns that give rise to this request. As the Court is aware, TOCGP is still a partner in the Partnership, having forfeited no interests. As the Court also is aware, the PNC Parties have sued TOCGP in this case to force its repurchase of the PNC Parties' interests in the Partnership, so they may exit the Partnership. TOCGP has offered to repurchase those interests for the price set forth in the provision of the Partnership Agreement that sets the purchase price, but PNC and Columbia demand a substantially greater price, and thus will not sell. Assuming such a repurchase nevertheless may occur in the future, TOCGP is concerned about what the Partnership's and its property's condition will look like as a result of the PNC Parties' interim mismanagement, and their ongoing self-dealing in lieu of managing the same as the fiduciary they claim to be A receiver can alleviate these concerns.

---

[2] It is noteworthy that neither before nor after the injunction was entered by the Court, the PNC parties never secured approval from any government agency, including HUD or the Texas Department of Housing and Community Development, to take over control of this HUD property/tax credit development.

**MOTION TO ENFORCE SETTLEMENT AGREEMENT**                                                                  **PAGE 3**

Plaintiffs opposed the appointment of a receiver and the request for one was denied by the Court. (Dkt. 18)

7. Plaintiffs and Defendants entered into a settlement agreement effective February 18, 2019. A true and correct copy of the original settlement agreement and its first and second amendments, are produced in the Appendix, respectively, under Tabs 3-5.

8. On January 8, 2019, the Court abated this case at the request of the parties (Dkt. 193) to allow for the complicated transactions and due diligence contemplated by the settlement agreement to be performed and to allow a closing of the settlement to occur, which did not occur until on or about September 30, 2019.

9. Following the settlement closing, the parties filed a joint stipulation of dismissal (Dkt. 202) which read as follows:

> The Parties have reached a settlement of this matter. The Parties stipulate to the dismissal **with prejudice** of all of their claims and counterclaims in this case and request that the Court enter an order dismissing all such claims and counterclaims with prejudice in the form attached hereto as **Exhibit A**. This stipulation of dismissal is without prejudice to the Parties' reserved rights to enforce their settlement agreement, if and as may be necessary, in this Court.

10. The Court entered a final judgment (Dkt. 203) retaining jurisdiction over the case to enforce the settlement agreement. Following the settlement agreement breach described below, Defendants moved to reopen the case on December 1, 2021. (Dkt. 204) Plaintiffs opposed the motion (Dkt. 205) and informed the Court as follows:

> Respondents also intend to assert a claim for breach of the settlement agreement against certain Movants and others in the amount of approximately $2.6 million regarding 2015 and 2016 tax credits that Respondents did not receive in accordance with the settlement agreement. Simply put, the Court cannot now enter a second final judgment resolving these new claims in this closed case. The parties' new claims should be heard in a new action. For these reasons, the Motion should be denied.

11.     Plaintiffs have not asserted any claims of the nature described in their opposition to Defendants' motion to reopen, in this or any other case.

12.      The Court granted Defendants' motion to reopen on November 18, 2022 (Dkt. 207) ordering Defendants to file any motion to enforce they planned to file by December 2, 2022, a date that was extended to December 16, 2022, by agreement, as confirmed in a text order from the Court.

**B.  The PNC Parties breach of the settlement agreement.**

13.     The settlement agreement involves the Eureka Parties' purchase of the PNC Parties' rights and interests in the Partnership including certain rights to benefit from tax credits obtained after year-end 2018, while the PNC Parties retained all tax credits through year-end 2018, that were received in time for them to be claimed on the benefitting PNC Party's tax return. *See*, Settlement Agreement; *see also*, Section 3 of the First Amendment to Settlement Agreement and Section 4 of the Second Amendment; Appendix, Tabs 3-5.

14.     The settlement breach complained of by Movants here, involves the PNC Parties' failure and refusal to pay the Partnership, for certain tax credits that were issued as required by the Settlement Agreement or its amendments, delivered to the PNC Parties, and used by the PNC Parties when 8609's were issued on March 29, 2021.  Declaration of J. Kirk Standly, paragraphs 7-9; Appendix, Tab 7.

15.     Pursuant to the First Amendment to Settlement Agreement, Section 3, and Section 4 of the Second Amendment to Settlement Agreement, following the closing of the settlement and issuance of the tax credits, the PNC Parties had an obligation to pay the Partnership for the 2019 Tax Credits that CohnReznick, the Partnership's designated accountants, allocated to the PNC Parties.  That amount was $1,499,850.00.  Accordingly, the payment amount due is $1,402,359.75

($1,499,850.00 X $.935/per credit). Such obligation of the PNC Parties was further confirmed by Section 4 of the Second Amendment to Settlement Agreement. The 2019 Tax Return allocating the Credits was received by the IRS on June 28, 2021. Therefore the 30-day period referenced in Section 3 of the Amendment would be July 28, 2021. Declaration of J. Kirk Standly, paragraphs 8-10.

16. On July 7, 2021, demand was made on the PNC Parties to pay and they have failed and refused to pay the $1,402,359.75 to the Partnership. Declaration of J. Kirk Standly, paragraphs 8-10.

## Argument and Authorities

**A. The PNC Parties breached the settlement agreement by failing and refusing to purchase the 2019 tax credits as required by Section 3 of the First Amendment to the Settlement Agreement.**

There is no dispute that the settlement agreement is binding and enforceable and that Movants are parties to it, entitled to enforce it or to obtain relief for a breach or breaches by the PNC Parties. *E.g., McAllen Hospital, L.P. v. Lopez*, 576 S.W.3d 389, 392 (Tex. 2019).

There is evidence before the Court that the Eureka Parties performed all of their obligations under the Settlement Agreement, where the PNC Parties have not, including both their obligation to pay the Partnership for the delivered 2019 tax credits, and their prior failure to use commercially reasonable efforts to obtain the issuance of all forecasted tax credits during the pendency of the parties' settlement agreement, and while PNC Party Columbia Housing SLP Corp. was the Partnership's acting general partner. *See,* Declaration of Kirk Standly, paragraphs 5-10.

The 2019 tax credits were issues and allocated to the PNC Parties, who indisputably used them without paying for them. *See* Appendix, Tab 7. Pursuant to the First Amendment to Settlement Agreement, Section 3, and Section 4 of the Second Amendment to Settlement

Agreement, following the closing of the settlement and issuance of the tax credits, the PNC Parties have an obligation to pay the Partnership for the 2019 Tax Credits that CohnReznick, the Partnership's designated accountants, allocated to the PNC Parties. That amount was $1,499,850.00. Accordingly, the payment amount due is $1,402,359.75 ($1,499,850.00 X $.935/per credit). Such obligation of the PNC Parties was further confirmed by Section 4 of the Second Amendment to Settlement Agreement. The 2019 Tax Return allocating the Credits was received by the IRS on June 28, 2021. Therefore the 30-day period referenced in Section 3 of the Amendment would be July 28, 2021. Declaration of J. Kirk Standly, paragraph 7-10.

On July 7, 2021, demand was made on the PNC Parties to pay and they have failed and refused to pay the $1,402,359.75 to the Partnership. Declaration of J. Kirk Standly, paragraph 10; Appendix, Tab 8.

If the PNC Parties, having accepted and claimed the 2019 tax credits without paying for them, are not ordered to pay the required price of them that is due to the Partnership, they will be unjustly enriched. Unjust enrichment allows the party not paid, to recover the reasonable value of what it delivered to the non-paying party who is obligated to pay, but fails and refuses to do so despite accepting the benefits of the transaction. *E.g., Heldenfels Bros. v. City of Corpus Christi*, 832 S.W.2d 39, 41 (Tex. 1992)

The Court should enforce the Settlement Agreement by requiring the PNC Parties to pay the Partnership, the $1,402,359.75 that it has failed and refused to pay since due and owing in July of 2021, along with pre-judgment interest and attorney's fees.

**B. The Retained Tax Credits were issued after the Settlement Closing and any delay in obtaining such issuance was a result of the PNC Parties' failure to pursue such issuance during the lawsuit, and during the settlement period, when Columbia Housing SLP Corporation was the partnership's acting general partner and contractually obligated to do so.**

Section 3.5 of the parties' partnership agreement (*see* Appendix supporting this motion, Tab 2) required the General Partner to timely ensure the receipt of forecasted tax credits in the transaction such that, according to Section 3.5(a)(6), "8609 Issuance shall occur by December 31st of the year following the first year of the Credit Period, unless the delay is caused by the Agency and the General Partner is using commercially reasonable efforts to obtain the same."

When this suit was by the PNC Parties on June 8, 2017, the 8609's had not issued yet with regard to any of the forecasted tax credits even if they should have, pursuant to the express language of Section 3.5. Presumably because the First GP was engaged in commercially reasonable efforts to obtain the tax credits in accordance with Section 3.5, or because the delay in issuance was attributable to the Agency, when the suit was filed, despite raising a myriad of other breach allegations against the First GP, Plaintiffs never asserted a breach of Section 3.5 in this suit, which it would have had to do had there been a breach by the First GP of any of the Section 3.5 obligations.

The injunction entered by this Court took effect from August 2, 2017 and while it was in effect through September or October of 2019, the First GP (the original general partner controlled by the Eureka Parties) was excused from performance of any Section 3.5 obligations, and in fact prohibited from "taking any action that interferes with Columbia Housing SLP Corporation's singular exercise of its role, authority, powers, control, rights, duties, obligations, or privileges as general partner of 2013 Travis Oak Creek, LP." Thus, any Section 3.5 obligations were assigned

to Columbia Housing SLP Corp.—the New GP and acting general partner under the Partnership Agreement, via entry of the injunction.

The Settlement Agreement including its amendments, defined the Retained Tax Credit to be all available tax credits through year-end 2018, which the PNC Parties were entitled to receive post-closing. *See*, Appendix Tab 4, Section 3 and Tab 5, Section 4. In accordance with Section 12(c) of the Settlement Agreement (Appendix Tab 3) entitled "Closing Deliverables", the parties were required to deliver documentation showing the Retained Tax Credit (due the PNC Parties) and the Tax Credits allocable to the Eureka Parties after the calendar year 2018, shall be effective. The parties accordingly closed, but not until having satisfied themselves that the tax credits were still effective.

Section 4 of the Settlement Agreement (Appendix Tab 3), entitled "Operations of the Partnership During the Pendency of Transaction", obligated the PNC Parties to operate the Partnership in the ordinary course, pursuant to the Partnership Agreement pending closing of the settlement and a transfer of control. Coupled with the injunction's obligations, Columbia Housing SLP Corporation, while the general partner, was obligated to pursue the issuance of all forecasted tax credits until the settlement closed and a transfer of control occurred, using the commercially reasonable efforts, as defined in Section 3.5 of the Partnership Agreement (Appendix Tab 2), to do so.

There is no evidence of which Defendants are aware, showing that while the injunction was in effect, and while the settlement agreement was in effect pending closing, Plaintiffs took any action to perform the general partner's obligations to apply for and obtain tax credits or the issuance of 8609's. In fact, according to TDHCA in February of 2019, the PNC Parties had reached out to TDHCA while the injunction was in force, and were given a list of items needed to

obtain tax credits that were issuable through what are called IRS form 8609's, but after receiving a list of TDHCA requirements, the PNC Parties never followed up. *See* TDHCA email, February 22, 2019, Appendix, Tab 6.

Section 2(b) of the Settlement Agreement is perhaps, most important. Discussing the post-closing obligations of the parties with regard to pursuing the issuance of the tax credits, it states in conclusion, as follows:

> For the avoidance of doubt, the PNC Parties and the Eureka Parties acknowledge that (i) the Eureka Parties shall use all commercially reasonable efforts to effectuate the issues of the Tax Credit and (ii) nothing in this Agreement shall modify the obligation of the general partner under the Partnership Agreement with respect to the Tax Credit. This provision shall survive the termination of the Transaction and/or Closing.

Section 2(b) (Appendix, Tab 3) might have required the Eureka Parties to use commercially reasonable efforts after the closing to effectuate the issuance of the Tax Credit, which they did, but only if Columbia Housing SLP Corporation, the general partner once the injunction was entered, had satisfied its Partnership Agreement obligation to pursue them, using commercially reasonable efforts. (Appendix, Tab 2, Section 3.5).

Accordingly, when the PNC Parties failed to comply with their Settlement Agreement, Section 4 obligations, and their Section 3.5 Partnership Agreement Obligations, by not engaging in commercially reasonable efforts to obtain the required 8609's when they were required to, they materially breached both the Partnership Agreement and the Settlement Agreement, which breaches were expressly not excused by or because of the post-closing obligation of the Eureka parties, to pursue such issuance.

In fact, this failure to comply with both agreements by the PNC Parties is a first material breach of the Settlement Agreement, which was followed by the PNC Parties' second breach, their failure to pay for the post-2018 tax credits, when they were delivered. [W]hen one party to a

contract commits a material breach of that contract, the other party is discharged or excused from further performance." *Mustang Pipeline Co., Inc. v. Driver Pipeline Co., Inc.*, 134 S.W.3d 195, 196 (Tex. 2004); accord, *Bartush-Schnitzius Foods, Inc. v. Cimco Refrigeration, Inc.*, 518, S.W.3d 432, 437 (Tex. 2017).

While Section 2(b) required the Eureka Parties to use commercially reasonable efforts to effectuate the issuance of the Tax Credit post-closing of the settlement, the failure of the PNC Parties' to previously pursue the issuance of the Tax Credit pre-closing, as required by Section 4 of the Settlement Agreement ( and the injunction and Section 3.5 of the Partnership) excused the Eureka Parties' post-closing obligations to pursue issuance of the tax credits, although the Eureka Parties engaged in commercially reasonable efforts nevertheless, and secured issuance of the Tax Credits and related 8609's. See Appendix, Tab 7.

In any event, the failure of the PNC Parties' to, prior to the settlement closing, to pursue the issuance of the Tax Credit, as required by Section 4 of the Settlement Agreement (and the injunction and Section 3.5 of the Partnership) precludes the PNC Parties from complaining about the timing of the issuance of the 8609's, following the Eureka Parties' efforts to cause such issuance, which occurred in March of 2021. Estoppel by contract prevents a party from denying the terms of a valid or fully executed contract unless the contract is set aside by fraud, accident or mistake. *Coffey v. Singer Asset Fin. Co.,* 233 S.W.3d 559, 569-70 (Tex. App.–Dallas 2007, no pet.). The PNC Parties are estopped to argue that the Eureka Parties are somehow responsible for the timing of the issuance of the Tax Credits, and any inability of the PNC Parties to realize their value with regard to the 2015 or 2016 tax credits, or any others, as their argument would ignore their contractual obligations and failure to comply with them, when those obligations were enforceable, breached and never set aside in any manner. *Id.*

Alternatively, the PNC Parties waived the right to argue that the Eureka Parties are responsible for the timing of the issuance of the Tax Credits. In order to show waiver, a party must prove an intentional relinquishment of a known right that is either made expressly or indicated by conduct that is inconsistent with an intent to claim the right. *Ulico Cas. Co. v. Allied Pilots Ass'n*, 262 S.W.3d 773, 778 (Tex. 2008). The PNC Parties knowingly relinquished their right to rely upon the Eureka Parties' parties' performance of any Partnership Agreement Section 3.5 obligations, or obligations to perform them under Section 2(b) of the Settlement Agreement, when they pursued and obtained injunctive relief, and then failed to perform the Section 3.5 obligations when they were required by Section 4 of the Settlement Agreement to do so, before the settlement agreement closed.

## Conclusion

The Court should enter an amended final judgment enforcing the settlement agreement, requiring the PNC Parties to pay the Partnership for the 2019 tax credits, with interest, and further awarding the Eureka Parties their reasonable and necessary attorney's fees incurred in presenting and litigating this motion, along with such other relief the Eureka Parties may show themselves to be entitled to be awarded.

Respectfully submitted,

*/s/ Kenneth B. Chaiken*
Kenneth B. Chaiken
State Bar No. 04057800
kchaiken@chaikenlaw.com

Robert L. Chaiken
State Bar No. 04057830
rchaiken@chaikenlaw.com

**CHAIKEN & CHAIKEN, P.C.**
5717 Legacy Drive, Ste. 250
Plano, Texas  75024-4246
Ph.:     (214) 265-0250
Fax:    (214) 265-1537

**ATTORNEYS FOR THE EUREKA SETTLEMENT PARTIES**

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing document was served upon all counsel of record via the Court's electronic filing system, on this 16th day of December, 2022.

*/s/ Kenneth B. Chaiken*
Kenneth B. Chaiken