## UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
## AUSTIN DIVISION

| | | |
|---|---|---|
| PNC BANK, N.A. and | § | |
| COLUMBIA HOUSING SLP | § | |
| CORPORATION, as partners in | § | |
| 2013 TRAVIS OAK CREEK, LP, and | § | |
| 2013 TRAVIS OAK CREEK, LP | § | |
| | § | |
| Plaintiffs, | § | Civil Action No. 1:17-cv-584-RP-ML |
| v. | § | (Consolidated with |
| | § | Case No. 1:17-cv-560-RP) |
| 2013 TRAVIS OAK CREEK GP, LLC, | § | |
| 2013 TRAVIS OAK CREEK | § | |
| DEVELOPER, INC., | § | |
| CHULA INVESTMENTS, LTD., and | § | |
| RENE O. CAMPOS, | § | |
| | § | |
| Defendants. | § | |

## PLAINTIFFS PNC BANK, N.A. AND COLUMBIA HOUSING SLP CORPORATION'S MOTION TO ENFORCE SETTLEMENT AGREEMENT

Plaintiffs PNC Bank, N.A. ("PNC Bank") and Columbia Housing SLP Corporation ("Columbia") (collectively, the "PNC Parties") file this Motion to Enforce Settlement Agreement Against Defendants 2013 Travis Oak Creek GP, LLC (the "General Partner"), 2013 Travis Oak Creek Developer, Inc. ("Developer"), Chula Investments, Ltd. ("Chula"), and Rene O. Campos ("Campos"), as well as 2013 Travis Oak Creek, LP (the "Partnership"), (collectively, the "Eureka Parties") as follows:

## INTRODUCTION

Many of the obligations under the parties' Settlement Agreement have been performed and are not at issue. Both sides agree that the Settlement Agreement remains in full effect, and is a valid and enforceable agreement. Indeed, both sides seek to enforce its obligations regarding certain tax credits. The Eureka Parties have failed to effectuate the PNC Parties' receipt of certain tax credits for years 2015 ($596,279) and 2016 ($1,999,800), and have failed to

indemnify the PNC Parties for the losses they sustained as a result of non-delivery of those forecasted tax credits.  As a result, the PNC Parties have suffered damages of $2,596,079.

Further, as required under the Settlement Agreement, the Eureka Parties also executed a "Tax Credit Compliance, Guaranty and Indemnity Agreement" (the "Tax Credit Guaranty"), under which they *guaranteed* payment of Forecasted Tax Credits for 2015 and 2016 to the PNC Parties. While the accounting firm CohnReznick has calculated the "Indemnity Amount" of $2,596,079, the Eureka Parties have failed to pay the Indemnity Amount to the PNC Parties.

Accordingly, the PNC Parties respectfully request the Court to sever the parties' claims for enforcement of the Settlement Agreement into a new case[1], and enter an order:

(1)  finding that the Eureka Parties have breached the Settlement Agreement;

(2)  finding that the Eureka Parties have breached the Tax Credit Guaranty;

(3)  awarding the PNC Parties damages resulting from those breaches in the amount of $2,596,079;[2]

(4)  awarding the PNC Parties their reasonable and necessary attorneys' fees; and

(5)  awarding the PNC Parties pre- and post-judgment interest, as well as any other relief to which they are justly entitled.

## I.  FACTS

### a.  The Partnership and the Forecasted Tax Credits.

1.  On or about May 23, 2014, the PNC Parties, as the original limited partners, and the General Partner, as the original general partner, entered into an Amended and Restated

---

[1] Final Judgment was entered in this case on October 7, 2019.  (Dkt. 203) (dismissing all claims with prejudice and stating "[a]s no other claims remain to resolve, the Court renders Final Judgment pursuant to Federal Rule of Civil Procedure 58.").  Neither side seeks to relitigate the claims resolved by that Final Judgment, and no grounds exist to amend it. Accordingly, the PNC Parties respectfully request that the current claims between the parties be severed under Rule 21 into a new case, in which a judgement adjudicating those claims can be entered.

[2] In the event that the Court determines that the Eureka Movants' claim against the PNC Parties for the 2019 tax credits in the amount of $1,402,359.75 (set forth in the Eureka Parties' Motion to Enforce, Dkt. 209) is valid, the Court should offset that amount against the PNC Parties' claims, and enter a judgment for the PNC Parties and against the Eureka Parties in the amount of $1,193,719.27.

Agreement of Limited Partnership of 2013 Travis Oak Creek, LP (the "Partnership Agreement"). App. 9.  The purpose of the Partnership was to acquire, construct, develop, and operate an affordable housing apartment complex located in Austin, Texas, more commonly known as the Lucero Apartments (the "Project").

2.      Among other things, the Partnership Agreement anticipated that various low income housing tax credits would be available to the Partnership. App. 31 (Partnership Agreement at 18).  The Partnership Agreement specifically set forth the Forecasted Tax Credit for each year, from 2015 to 2025:

| Forecasted Tax Credit | 2015 | $596,279 |
| | 2016-2024 | $1,999,800 |
| | 2025 | $1,403,521 |

App. 90 (Partnership Agreement, Schedule).

3.      Pursuant to the Partnership Agreement, PNC Bank was to receive "the full amount of the Forecasted Tax Credit."  App. 14, 31  (Partnership Agreement at 1, 18).

**b.  The Litigation, the Settlement Agreement, and the Tax Credit Guaranty.**

4.      The PNC Parties filed the underlying lawsuit in 2017 against the General Partner, Campos, Developer and Chula for breach of the Partnership Agreement and related guaranties. (Dkt. 1).  The PNC Parties also sought a declaratory judgement that the General Partner had been properly replaced by Columbia as general partner of the Partnership due to certain defaults, and a preliminary injunction prohibiting the General Partner, Campos, Developer and Chula from interfering with Columbia's exercise of its powers as the new general partner.  (Dkt. 9).

5.      After an evidentiary hearing in July 2017, the Court found that the PNC Parties would likely succeed on their claims for breach, and entered a preliminary injunction against the General Partner, Developer, Chula, and Campos, (1) finding that the General Partner was

properly removed as general partner of the Partnership and (2) prohibiting them from interfering with Columbia's right to act as general partner.  (Dkt. 73, August 2, 2017 Order).

6.    The General Partner and Developer then alleged a host of counterclaims against the PNC Parties.  (Dkt. 78).  On September 28, 2018, the Court granted the PNC Parties' Motion to Dismiss, and dismissed seven of the nine counterclaims.  (Dkt. 136).

7.    In December 2018, near the conclusion of discovery, the PNC Parties filed a Motion for Summary Judgment to dispose of the General Partner and Developer's remaining counterclaims.  (Dkt. 188).

8.    In February 2019, while the PNC Parties' Motion for Summary Judgment was pending, the PNC Parties and the Eureka Parties, together with two Eureka affiliates, entered into the Settlement Agreement, which called for a due diligence period and then a closing transaction effectuating the sale of the Partnership.  App. 168 (Settlement Agreement).

9.    Under the Settlement Agreement, the PNC Parties agreed to assign their interests in the Partnership to the Eureka Settlement Agreement Parties[3] in exchange for a payment of $44 million, certain tax credits, certain indemnifications and guarantees, broad releases, and various other agreements.  App. 168-75.

10.    The parties subsequently entered into two amendments to the Settlement Agreement.  App. 208; App. 214.

11.    After an extended due-diligence period, the settlement transaction closed on or about September 27, 2019:  the Eureka Settlement Agreement Parties paid the purchase price, the PNC Parties assigned their partnership interests, and the parties executed the additional documents required under the Settlement Agreement.  App. 5 (Hasselwander Aff. ¶ 9).

---

[3] The Settlement Agreement defines the Eureka Settlement Agreement Parties to include:  the General Partner, Developer, Chula, Campos, and their affiliates Eureka Multifamily Group, LP, and 2007 Travis Heights, LP.  App. 176-77, 180.

12.     Pertinent here, those additional settlement documents included: (1) a Tax Credit Compliance, Guaranty, and Indemnity Agreement (the "Tax Credit Guaranty") executed by the Eureka Parties, and their affiliate Travis Oak Creek Partner, LLC (App. 220); and (2) a Full and Final Mutual Release and Discharge executed by the Eureka Parties, and their affiliates Travis Oak Creek Partner, LLC, Eureka Multifamily Group, L.P., and 2007 Travis Heights, LP.  App. 249.

13.     On October 4, 2019, as a result of the Settlement Agreement and the Tax Credit Guaranty, the parties filed a Stipulation of Dismissal of All Claims and Counterclaims.  (Dkt. 202).  On October 7, 2019, the Court entered a Final Judgment, retaining jurisdiction "to enforce the parties' settlement agreement and resolve any disputes related to it."  (Dkt. 203).

**c.  <u>Breach of the Settlement Agreement</u>**

14.     Pursuant to the Settlement Agreement, the Eureka Settlement Agreement Parties agreed that they, among other things:

> ***shall*** effectuate the issuance of the Tax Credit to the Partnership and to ***effectuate Investment Partner's[[4]] (or its designee's(s')) right to receive, own and benefit fully from the Retained Tax Credit*** . . . .

App. 170 (Settlement Agreement § 2) (emphasis added).

15.     The Settlement Agreement defined the "Retained Tax Credit" as "all Tax Credits associated with all tax years through the end of 2018." App. 168 (Settlement Agreement at 1).

16.     Additionally, the Eureka Parties agreed to indemnify the PNC Parties for any damages that the PNC Parties may incur as a result of a failure to deliver the 2015 and 2016 tax credits to the PNC Parties:

---

[4] The Settlement Agreement defines the "Investment Partner" as (Plaintiff) PNC Bank, N.A. *See* App. 180 (Settlement Agreement, Schedule A).

> 11. Post-Closing Indemnification. **The Partnership and the Eureka Parties shall defend, hold harmless, and indemnify the PNC Parties from any and all Claims** … **including, without limitation**, **any and all** lawsuits, proceedings, claims, causes of action, **liabilities and damages arising out of or relating in any way to** the Partnership, the Property, **the Tax Credit <u>(including, without limitation, any damages a PNC Party may incur as a result of a failure to deliver any part of the anticipated Tax Credit</u>**, … as well as any claims, lawsuits or proceedings of any nature brought by any third-party, the Partnership, or any of the Eureka Parties against any of the PNC Parties (collectively, the "**Eureka Indemnification**"). This provision shall survive the consummation of the Transaction.

App. 174 (Settlement Agreement § 11) (emphasis added).  As used in the Settlement Agreement, the term "anticipated Tax Credit" is defined to specifically include the "Forecasted Tax Credit." App. 170 (Settlement Agreement § 2).

17.    The Forecasted Tax Credits for 2015 ($596,279) and 2016 ($1,999,800) total $2,596,079.  App. 90 (Partnership Agreement, Schedule).

18.    The PNC Parties have performed or tendered performance of their obligations under the Settlement Agreement, including by, among other things, assigning their general and limited partnership interests in the Partnership to the Eureka Settlement Agreement Parties' control, executing other documents, and dismissing the lawsuit.  App. 5 (Hasselwander Aff. ¶ 10); *see, e.g.,* App. 234 (Assignment of General Partner / Limited Partner Interests); (Dkt. 202, Stipulation of Dismissal of All Claims and Counterclaims).

19.    The Eureka Settlement Agreement Parties failed to effectuate the PNC Parties' right to receive, own and benefit fully from the tax credits with respect to the Project for the years 2015 and 2016, including the Forecasted Tax Credits.   App. 6 (Hasselwander Aff. ¶ 17).

20.    By the time the Eureka Settlement Agreement Parties and the Partnership obtained issuance of the tax credits from the Texas Department of Housing and Community

Affairs on March 29, 2021, the Partnership's Accountants determined that it was too late for the Partnership to claim the tax credits for 2015 or 2016. App. 6 (Hasselwander Aff. ⁋ 18); *see* (Dkt. 210 at 218).

21.     The Eureka Parties also failed to indemnify the PNC Parties for the damages they have suffered relating to failure to deliver the tax credits for the years 2015 and 2016, including the Forecasted Tax Credits, to PNC and/or Columbia. App. 6 (Hasselwander Aff. ⁋ 19).

22.     As a result of the Eureka Parties' breaches of the Settlement Agreement, the PNC Parties have suffered actual damages of $2,596,079. App. 6 (Hasselwander Aff. ⁋ 20).

23.     After failing to deliver the 2015 and 2016 tax credits, in July 2021 Mr. Kirk Standly (on behalf of the Eureka Parties) reached out to David Hasselwander to inquire about the 2019 tax credits. On July 16, 2021, David Hasselwander wrote to Brian King of Eureka:

> I am glad that the Eureka Parties reached out regarding the Tax Credits. PNC was surprised to receive this request since the Partnership's accountants recently confirmed that the 2015 and 2016 tax credits were not delivered according to the Partnership Documents and the Settlement Agreement. … These credits have not been delivered and the partnership's accountants have determined that these credits will now not be able to be claimed. There is no mention of the 2015 and 2016 tax credits in Kirk's email.
>
> Have you given any thought as to a solution for the Tax Credits that will not be delivered? I am not sure it makes sense for Eureka to pay PNC approximately $2.6MM in undelivered 2015 and 2016 credits and PNC pay Eureka approximately $1.5MM for the 2019 tax credits.

App. 282.    Though Mr. King initially responded that he would "review and get back" to Mr. Hasselwander, he did not do so. App. 7 (Hasselwander Aff. ⁋ 26).

**d.  Breach of the Tax Credit Guaranty.**

24.     Pursuant to the Settlement Agreement, the PNC Parties and the Eureka Parties also executed the Tax Credit Guaranty. App. 174 (Settlement Agreement § 12.c); App. 221,

232-33 (Tax Credit Guaranty at 2, 13-14).

25.    Thereunder, the Eureka Parties guaranteed payment of the "Indemnity Amount" to the PNC Parties, defined as follows:

> Indemnity Amount shall mean the sum of (i) **the amount of the Tax Credit Shortfall**; (ii) the interest and penalties payable by the limited partners of the Withdrawing Partners and/or other Indemnitees as a result of the Tax Credit Shortfall; (iii) the third party fees, costs and expenses incurred by the Withdrawing Partners and/or other Indemnitees in connection with . . . enforcing the terms of this Agreement. . . . .

App. 221 (Tax Credit Guaranty § 1, "Indemnity Amount") (emphasis added).

26.    In turn, the Tax Credit Guaranty defined "Tax Credit Shortfall":

> Tax Credit Shortfall shall mean ***any non-delivery or shortfall with respect to any Forecasted Tax Credits** associated with all tax years through the end of 2019* or the disallowance or recapture of any Allocated Tax Credit at any time. There may be any number of Tax Credit Shortfalls.

App. 222 (Tax Credit Guaranty § 1, "Tax Credit Shortfall") (emphasis added).  Thus, a Tax Credit Shortfall includes any non-delivery of the Forecasted Tax Credits through the end of 2019.

27.    The Tax Credit Guaranty also set forth the procedure for calculation of the Indemnity Amount:

> 2.1 Calculation of Indemnity Amount. ***In the event of a Shortfall Determination**, **the Indemnitees shall cause the Accountant to prepare a calculation of the Indemnity Amount*. . . .

App. 222 (Tax Credit Guaranty § 2.1) (emphasis added).

28.    A "Shortfall Determination" begins the calculation process, defined as "***a written determination**, audit or other report **of the accountants for the Project** which **evidences that a Tax Credit Shortfall has occurred** . . . .*"  App. 222 (Tax Credit Guaranty § 1, "Shortfall Determination") (emphasis added).

29.     Here, the "accountants for the Project" are CohnReznick, LLP.    App. 4 (Hasselwander Aff. ⁋ 4).

30.     Moreover, in addition to the guaranty above, the Eureka Parties agreed to indemnify the PNC Parties for any losses or liabilities incurred by the PNC Parties arising from a breach of the Tax Credit Guaranty:

> 5.2 <u>Indemnification</u>. Without limiting any other indemnification obligations of the Indemnitors set forth in this Agreement, the Settlement Agreement or the Partnership Agreement, the Indemnitors[5] shall indemnify, defend and hold harmless the Indemnitees from and against, and shall upon demand reimburse the Indemnitees for any and all losses, claims, liabilities, damages, injunctive relief, injuries to person, property or natural resources, costs, actions or causes of action, fines, penalties, judgments, taxes, charges, assessments, damages (excluding any consequential damages), costs and expenses (including reasonable attorneys' fees and expenses), of every kind and nature whatsoever, whether direct or indirect, realized, suffered or incurred by or imposed upon the Indemnitees arising in whole or in part from the breach of any of the representations, warranties or covenants of this Agreement.

App. 226 (Tax Credit Guaranty § 5.2).

31.     On January 4, 2022, the PNC Parties emailed CohnReznick, seeking confirmation that the PNC Parties did not receive the Forecasted Tax Credits for 2015 and 2016:

> As you know, PNC did not receive the forecasted tax credits that were to be delivered to it for tax years 2015 and 2016. I understand from our prior conversations this was because it was too late for the partnership to amend its tax returns for those years. ***I need to confirm the shortfalls between the amounts actually received by PNC (zero) and the forecasted tax credits*** associated with those years per the 2013 Travis Oak Creek, LP partnership agreement ***are in the amounts of $596,279 for 2015 and $1,999,800 for 2016. Can you please confirm?***

App. 258-59 (Hasselwander email to Hudgens dated January 4, 2022) (emphasis added).

32.     On January 5, 2022, CohnReznick confirmed:

---

[5] The Tax Credit Guaranty defined the "Indemnitors" to mean: the Partnership, the General Partner, Developer, Chula, Campos, and their affiliate Travis Oak Creek Partner, LLC.  App. 221.

> _**Yes,**_ based on the amended and restated LPA from 2014, the forecasted tax credits for 2015 were $596,279 and for 2016 were $1,999,800.

App. 258 (Hudgens email to Hasselwander dated January 5, 2022) (emphasis added).

33.     This writing from CohnReznick—evidencing that the PNC Parties did not receive the Forecasted Tax Credits for 2015 or 2016—constituted a Shortfall Determination.

34.     The Eureka Parties agreed that, once a Shortfall Determination occurred, the Indemnity Amount would be calculated as follows:

> 2.1 Calculation of Indemnity Amount. In the event of a Shortfall Determination, _**the Indemnitees shall cause the Accountant to prepare a calculation of the Indemnity Amount**_. The Indemnitees and Indemnitors _**shall provide the Accountant with all of the information necessary to calculate the Indemnity Amount**_. The Accountant shall make an initial non-binding calculation of the Indemnity Amount and shall deliver copies thereof to the Indemnitors and Indemnitees pursuant to the notice provisions of Section 6.2 of this Agreement. _**The Indemnitors and Indemnitees shall have thirty (30) days from receipt of the initial calculation to provide additional information and written argument to the Accountant**_. The Accountant shall consider such additional information (_**if it is timely submitted during such thirty (30)-day period**_) and shall thereafter make a final calculation of the Indemnity Amount and deliver the same to the Indemnitors and Indemnitees. _**Such final calculation shall be final, binding and non-appealable with respect to the Indemnitors, the Indemnitees and all other parties, absent manifest error.**_

App. 222 (Tax Credit Guaranty & Indemnity Agreement § 2.1) (emphasis added).

_35._     After the January 5, 2022 Shortfall Determination, the PNC Parties (as Indemnitees) then sent a letter to CohnReznick to "cause the Accountant to prepare a calculation of the Indemnity Amount" as set forth in Section 2.1.  App. 7 (Hasselwander Aff. ¶ 22); App. 260 (Hasselwander February 9, 2022 Letter to CohnReznick).  A copy of the letter and enclosures was also sent to the Eureka Parties and their counsel. _Id._

10

36.    On May 3, 2022, CohnReznick sent the PNC Parties and the Eureka Parties its calculation of the Indemnity Amount, stating that the "**Indemnity Amount is equal to: $2,596,079.00**":

| | | 2015 | | 2016 | | Total (2015-2016) | |
|---|---|---|---|---|---|---|---|
| | | Forecasted* | Actual | Forecasted* | Actual | Forecasted* | Actual |
| (i) | Tax Credit | $ 596,279.00 | $ - | $ 1,999,800.00 | $ - | $ 2,596,079.00 | $ - |
| (ii) | Interest & Penalties | $ - | $ - | $ - | $ - | $ - | $ - |
| (iii) | Third Party Fees, Costs, & Expenses | $ - | $ - | $ - | $ - | $ - | $ - |
| (iv) | Tax Liability | $ - | $ - | $ - | $ - | $ - | $ - |
| =sum(i-iv) | **Total Indemnity Amount** | $ 596,279.00 | $ - | $ 1,999,800.00 | $ - | $ 2,596,079.00 | $ - |

*Forecasted amounts taken from PNC Travis Oak Creek LPA Executed.pdf

Per section 2.1 of the Tax Credit Compliance, Guaranty and Indemnity Agreement, Indemnity Amount is equal to:    $    2,596,079.00

App. 262-63 (Hudgens email to Gibson and Standly dated May 3, 2022 and attachments thereto).

37.    Pursuant to Section 2.1, if the Eureka Parties disagreed with the Indemnity Amount of $2,596,079.00, they had 30 days (until June 2, 2022) "to provide additional information and written argument to the Accountant." App. 222 (Tax Credit Guaranty § 2.1).

38.    The Eureka Parties provided no additional information or argument to CohnReznick before the June 2, 2022 deadline. App. 7 (Hasselwander Aff. ¶ 24). As a result, the Eureka Parties waived any objection to CohnReznick's calculation of the Indemnity Amount.

39.    Instead, on July 11, 2022, Brian King of Eureka Holdings sent an email to CohnReznick instructing them "to NOT finalize or transmit any of the requested indemnity work for 2013 Travis Oak Creek, LP." App. 280-81.

40.    The Eureka Parties have not paid the Indemnity Amount (calculated by CohnReznick as $2,596,079) to PNC or Columbia. App. 8 (Hasselwander Aff. ¶ 27).

## IV.  ARGUMENT AND AUTHORITIES

### a. <u>Motion to Enforce Settlement Agreement Standard</u>

If "[n]either party disputes whether a valid agreement exists", an "action to enforce a settlement agreement is analogous to an action for breach of contract." *UBEO Bus. Services,*

*LLC v. DOCUmation, Inc.*, 1:18-CV-415-RP, 2019 WL 5105451, at *3 (W.D. Tex. Jan. 14, 2019) (Pitman, J.).  "The construction and enforcement of settlement agreements is governed by principles of state law applicable to contracts."  *Id.* (citing *Lockette v. Greyhound Lines, Inc.*, 817 F.2d 1182, 1185 (5th Cir. 1987).  "Like any other breach of contract claim, a claim for breach of settlement agreement is subject to the established procedures of pleading and proof." *Castrellon v. Ocwen Loan Servicing, L.L.C.*, 721 Fed. Appx. 346, 350–51 (5th Cir. 2018) (emphasis added) (quoting *Ford Motor Co. v. Castillo*, 279 S.W.3d 656, 663 (Tex. 2009)).

As a matter of procedure, "a Motion to Enforce may be construed as a sufficient pleading to raise a cause of action for breach of contract, but the Court cannot enforce the agreement without a full determination of the relevant facts and circumstances via summary judgment or trial; to do so would deprive [the d]efendant of due process."  *Yosemite Auto (Shanghai) Co., Ltd. v. JRS Metals, Inc.*, No. 4:15-CV-1641, 2016 WL 4435437, at *3 (S.D. Tex. Aug. 23, 2016). Accordingly, the issues raised through the PNC Parties' instant Motion to Enforce should be evaluated under the summary judgment standard,[6] or through an evidentiary hearing.  In the event the Court does not believe that the issues herein are appropriate for resolution via summary judgment, the PNC Parties respectfully request an evidentiary hearing.

**b.  The PNC Parties' Claim for Breach of the Settlement Agreement.**

"Under Texas law, a plaintiff alleging breach of contract must show '(1) the existence of a valid contract; (2) performance or tendered performance by the plaintiff; (3) breach of the

---

[6] The summary judgment standard is well known:  "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(a).  "The party moving for summary judgment bears the initial burden of 'informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrates the absence of a genuine issue of material fact.'"  *Clark v. Southwest Airline Co*., No. 1:16–CV–910–RP, 2017 WL 4853794 at *3 (W. D. Tex. Oct. 26, 2017).  The burden then shifts to the nonmoving party to establish the existence of a genuine issue for trial.  *Id.*  The non-movant must set forth specific facts to do so, and may not rely upon mere allegations or denials.  *Dunham v. Wainwright*, No. A-15-CA-1018-RP, 2017 WL 571515, at *2 (W.D. Tex. Feb. 13, 2017).

contract by the defendant; and (4) damages to the plaintiff resulting from that breach.'" *UBEO Bus. Services, LLC*, 2019 WL 5105451, at *3. (quoting *Villarreal v. Wells Fargo Bank, N.A.*, 814 F.3d 763 (5th Cir. 2016)).   Here, the undisputed evidence establishes that there is no genuine issue of material fact with respect to any of these elements.

    1.  *The Settlement Agreement is a valid contract*.

There is no dispute that the PNC Parties and the Eureka Parties entered into the Settlement Agreement, which is a valid contract.  App. 168 (Settlement Agreement).

    2.  *The PNC Parties have performed under the Settlement Agreement*.

The PNC Parties have performed their obligations under the Settlement Agreement by, among other things, executing:

- the Assignment of General Partner / Limited Partner Interests, assigning their rights in the Partnership to the Eureka Settlement Agreement Parties' control (App. 234);

- the Assignment of Construction Deed of Trust and Other Loan Documents (App. 238);

- the Release of Mortgage Lien (App. 244);

- the Full and Final Mutual Release and Discharge (App. 249); and

- the Stipulation of Dismissal of All Claims and Counterclaims (Dkt. 202).

Accordingly, there is no genuine issue of material fact regarding the PNC Parties' performance under the Settlement Agreement.

The Eureka Parties may argue that the PNC Parties have not fully performed their obligations under the Settlement Agreement because they have not made a payment to the Eureka Parties for the 2019 tax credits.  However, at the time the PNC Parties' purported obligation to pay the Eureka Parties $1,402,359.75 for the 2019 tax credits arose in July 2021, the Eureka Parties already owed $2,596,079 *to the PNC Parties* regarding the 2015 and 2016 tax credits.  Due to the offset, there has never been an unfulfilled payment obligation due from the

PNC Parties to the Eureka Parties.

Regardless, the PNC Parties have certainly substantially performed under the Settlement Agreement through the actions above.  As the Fifth Circuit has held:

> Under Texas law, and the law of most jurisdictions, a party may bring suit on a contract and recover even if his performance is less than literal and complete so long as performance has been "substantial." Substantial performance means performance of the essential elements of a contract, provided that the defects in performance do not prevent the parties from accomplishing the purpose of the contract.

*Matador Drilling Co., Inc. v. Post*, 662 F.2d 1190, 1193–95 (5th Cir. 1981) (internal citations omitted); *see Schweiger v. USAA Fed. Sav. Bank*, No. SA-17-CV-00660-OLG, 2017 WL 6503660, at *4 (W.D. Tex. Dec. 18, 2017) (applying substantial performance to claim for breach of settlement agreement); *Patel v. Ambassador Drycleaning Co., Inc.*, 86 S.W.3d 304, 306–07 (Tex. App.—Eastland 2002, no pet.) ("We hold that the doctrine of substantial performance is applicable to settlement agreements."). To the extent the Eureka Parties argue that the PNC Parties' performance of the Settlement Agreement is not literal and complete regarding the 2019 tax credits (which the Eureka Parties value at $1,402,359.75), the PNC Parties' performance of the Settlement Agreement has nevertheless been substantial.  Any defect in the PNC Parties' performance has not prevented the parties from accomplishing the purpose of the Settlement Agreement:  the sale of the Partnership, transfer of control of the Partnership, mutual releases, and dismissal of the claims in the litigation.  According, there is no genuine issue as to whether the PNC Parties have performed the essential elements of the Settlement Agreement.

### 3. *Breaches of the Settlement Agreement by the Eureka Parties*.

There is no genuine issue of material fact as to whether the Eureka Parties breached the Settlement Agreement regarding the tax credits for 2015 and 2016.

First, Section 2 of the Settlement Agreement requires the Eureka Parties to "effectuate"

the PNC Parties' "right to receive, own and benefit fully from the Retained Tax Credit," which specifically included "all Tax Credits associated with all tax years through the end of 2018." Settlement Agreement at 1, 3. The Eureka Parties failed to effectuate the PNC Parties' right to receive, own, and benefit fully from the tax credits for 2015 and 2016. App. 6 (Hasselwander Aff. ⁋ 17).

Second, Section 11 of the Settlement Agreement requires the Eureka Parties to:

> ***defend, hold harmless, and indemnify the PNC Parties from any and all Claims*** (except as set forth in Paragraph 9 with respect to the PNC Parties' separate counsel expense if the PNC Parties elect to do so), ***including, without limitation, any and all*** lawsuits, proceedings, claims, causes of action, ***liabilities and damages arising out of or relating in any way to*** the Partnership, the Property, ***the Tax Credit (including, without limitation, any damages a PNC Party may incur as a result of a failure to deliver any part of the anticipated Tax Credit***, . . . .

App. 174 (Settlement Agreement § 11) (emphasis added). The "anticipated Tax Credit" specifically includes the "Forecasted Tax Credit" as stated in the Partnership Agreement. App. 170 (Settlement Agreement § 2). It is undisputed that there was a "failure to deliver" the Forecasted Tax Credits for 2015 and 2016 to the PNC Parties. App. 6 (Hasselwander Aff. ⁋⁋ 17-8); *see* App. 258 (Hudgens email to Hasselwander dated January 5, 2022); App. 263 (CohnReznick calculation). However, the Eureka Parties have not indemnified the PNC Parties for the damages they suffered regarding the failure to deliver the Forecasted Tax Credits for 2015 and 2016. App. 6 (Hasselwander Aff. ⁋ 19).

*4. Damages to the PNC Parties Resulting from the Breaches.*

With respect to the damages resulting from the Eureka Parties' breaches of Sections 2 and 11, it is undisputed that the Forecasted Tax Credits for 2015 ($596,279) and 2016 ($1,999,800) had a combined value of $2,596,079. App. 90 (Partnership Agreement, Schedule).

Due to the Eureka Parties' failure to "effectuate" the PNC Parties' "right to receive, own and benefit fully" from those tax credits, the PNC Parties have suffered damages of $2,596,079. App. 6 (Hasselwander Aff. ¶ 20).   Likewise, due to the Eureka Parties' failure to indemnify the PNC Parties for the non-delivery of the Forecasted Tax Credits for 2015 and 2016, the PNC Parties have suffered damages totaling $2,596,079.  *Id.*

**c.  The PNC Parties' Claim for Breach of the Tax Credit Guaranty.**

There is no genuine issue of material fact with respect to any of the of elements of the PNC Parties' claim for breach of the Tax Credit Guaranty.

*1.  The Tax Credit Guaranty is a valid contract.*

There is no dispute that the PNC Parties and the Eureka Parties entered into the Tax Credit Guaranty, which is a valid contract.  App. 220, 232 (Tax Credit Guaranty at 2, 13-14).

*2.  The PNC Parties have performed under the Tax Credit Guaranty*.

The PNC Parties have performed their obligations under the Tax Credit Guaranty by, among other things, entering into the Settlement Agreement and assigning their partnership interests.  App. 5 (Hasselwander Aff. ¶ 12); App. 234 (Assignment of General Partner / Limited Partner Interests); *see* App. 220 (Tax Credit Guaranty at 1) ("The Withdrawing Partners were unwilling to enter into the Settlement Agreement and assign their respective partnership interests unless the Indemnitors . . .  furnish to the Indemnitees the guaranties, indemnities and agreements set forth herein.").

*3.  Breach of the Tax Credit Guaranty by Defendants*.

Under the Tax Credit Guaranty, the Eureka Parties independently *guaranteed* that the PNC Parties would receive the Forecasted Tax Credits for 2015 and 2016:

> 2.2  Guaranty of Indemnity Amounts.  The Indemnitors hereby agree to guaranty payment of an amount equal to the **Indemnity**

> **Amount** (the "Indemnity Payment") to the Indemnitees in full no later than thirty (30) days of receipt of the final calculation of the Indemnity Amount from the Accountant. If an Indemnity Payment is not paid within such period, it shall bear interest at the rate per annum shown from time to time as the "Prime Rate" in The Wall Street Journal, Eastern Edition, plus 4%, from and after receipt of the final calculation of the Accountant.

App. 222-23 (Tax Credit Guaranty § 2.2)  The Tax Credit Guaranty defines the "Indemnity Amount" to include "the amount of the Tax Credit Shortfall."  App. 221 (Tax Credit Guaranty § 1, "Indemnity Amount").  In turn, the Tax Credit Guaranty defines Tax Credit Shortfall to mean "***any non-delivery or shortfall with respect to any Forecasted Tax Credits** associated with all tax years through the end of 2019* or the disallowance or recapture of any Allocated Tax Credit at any time."  App. 222 (Tax Credit Guaranty § 1, "Tax Credit Shortfall").

The Eureka Parties also agreed to a process for calculating the Indemnity Amount.  The process begins upon the occurrence of a "Shortfall Determination", defined as "*a written determination*, audit or other report of *the accountants for the Project* which *evidences* that *a Tax Credit Shortfall has occurred*."  *Id.* (definition of Shortfall Determination).  It is undisputed that the "accountants for the Project" are CohnReznick, LLP.  App. 4 (Hasselwander Aff. ⁋ 4).  CohnReznick's January 5, 2022 confirmation that the 2015 and 2016 Forecasted Tax Credits were not received constitutes a Shortfall Determination.  App. 258.

It is also undisputed that CohnReznick has calculated the Indemnity Amount as $2,596,079.  On February 9, 2022, the PNC Parties sent a letter asking CohnReznick to perform the calculation of the Indemnity Amount pursuant to Section 2.1.  App. 260-61.  A copy of the letter and enclosures was also sent to the Eureka Parties and their counsel.  *Id.*

On May 3, 2022, CohnReznick sent the PNC Parties and the Eureka Parties its calculation, stating "**Indemnity Amount is equal to: $2,596,079.00**":

| | | 2015 | | | 2016 | | | Total (2015-2016) | |
|---|---|---|---|---|---|---|---|---|---|
| | | Forecasted* | Actual | | Forecasted* | Actual | | Forecasted* | Actual |
| (i) | Tax Credit | $ 596,279.00 | $ - | $ | 1,999,800.00 | $ - | $ | 2,596,079.00 | $ - |
| (ii) | Interest & Penalties | $ - | $ - | $ | - | $ - | $ | - | $ - |
| (iii) | Third Party Fees, Costs, & Expenses | $ - | $ - | $ | - | $ - | $ | - | $ - |
| (iv) | Tax Liability | $ - | $ - | $ | - | $ - | $ | - | $ - |
| =sum(i-iv) | **Total Indemnity Amount** | $ 596,279.00 | $ - | $ | 1,999,800.00 | $ - | $ | **2,596,079.00** | $ - |

*Forecasted amounts taken from PNC Travis Oak Creek LPA Executed.pdf

Per section 2.1 of the Tax Credit Compliance, Guaranty and Indemnity Agreement, Indemnity Amount is equal to:     $     2,596,079.00

App. 262-63 (Hudgens email to Gibson and Standly dated May 3, 2022, and attachments).

In the event that the Eureka Parties disagreed with CohnReznick's calculation of the $2,596,079 Indemnity Amount, the Eureka Parties had 30 days to provide additional information and written argument to CohnReznick:

> The Indemnitors and Indemnitees ***shall have thirty (30) days from receipt of the initial calculation to provide additional information and written argument to the Accountant***. The Accountant shall consider such additional information (***if it is timely submitted during such thirty (30)-day period***) and shall ***thereafter*** make a final calculation of the Indemnity Amount and deliver the same to the Indemnitors and Indemnitees. . . .

App. 222 (Tax Credit Guaranty § 2.1) (emphasis added).  **However, the Eureka Parties provided no such additional information or argument to CohnReznick by the deadline**. App. 7 (Hasselwander Aff. ¶ 24).  Accordingly, CohnReznick's calculation of the $2,596,079.00 Indemnity Amount is now "final, binding and non-appealable with respect to the Indemnitors, the Indemnitees and all other parties."  App. 222 (Tax Credit Guaranty § 2.1).

Despite CohnReznick's calculation of the Indemnity Amount, and the Eureka Parties' receipt of the same, the Eureka Parties have not paid the Indemnity Amount to the PNC Parties. App. 8 (Hasselwander Aff. ¶ 27).  Accordingly, the Eureka Parties have breached the Tax Credit Guaranty by failing to pay the Indemnity Amount to the PNC Parties.

The Eureka Parties have also breached the Tax Credit Guaranty by—after receipt of CohnReznick's calculation of the Indemnity Amount—instructing CohnReznick "to NOT

finalize or transmit any of the requested indemnity work for 2013 Travis Oak Creek, LP."  App. 281.  The Eureka Parties agreed that the Accountant would calculate the Indemnity Amount, and to the process by which the Indemnity Amount would be calculated. However, after receiving CohnReznick's calculation, the Eureka Parties refused to abide by those agreements.  For example, the Eureka Parties agreed that the Indemnity Amount "shall be determined by the Accountants as described in Section 2 of this Agreement."  App. 221 (definition of Indemnity Amount).   The Eureka Parties also agreed that the Accountant would be "selected *by Indemnitees*" (the PNC Parties), and agreed to CohnReznick as an option.  *Id.* (definition of Accountant).    Further, the Eureka Parties agreed that "[t]he Indemnitees and Indemnitors shall provide the Accountant with all of the information necessary to calculate the Indemnity Amount." App. 222 (Tax Credit Guaranty § 2.1).   The Eureka Parties' instruction to CohnReznick to "NOT finalize" the Indemnity Amount is a breach of these provisions, and thwarts the entire purpose of the agreements to an Accountant and a process.[7]

### 4. *Damages to the PNC Parties Resulting from the Breach*.

As noted above, the Tax Credit Guaranty defines the Indemnity Amount as "the amount of the Tax Credit Shortfall" plus interest.  App. 221.  In turn, "Tax Credit Shortfall" is defined as "any non-delivery or shortfall with respect to any Forecasted Tax Credits associated with all tax years through the end of 2019."  App. 222.   The calculation of the Indemnity Amount is straightforward:  the amount of the Forecasted Tax Credits, minus the amount of such tax credits

---

[7] The Eureka Parties may argue that CohnReznick designating its May 3, 2022 Indemnity Amount calculation as a "final calculation" is a condition precedent to the Eureka Parties' obligation to pay it.  First, there is no language in the Tax Credit Guaranty that would make such occurrence a condition precedent under Texas law.  Second, even if CohnReznick designating its calculation of the Indemnity Amount a "final calculation" *were* considered a condition precedent to the Eureka Parties' obligation to pay the Indemnity Amount, Texas law is clear that the Eureka Parties cannot escape their liability by *preventing* the condition from occurring:  "It is elementary that one who prevents or makes impossible the performance of a condition precedent upon which his liability under a contract is made to depend cannot avail himself of its nonperformance." *Sharifi v. Steen Auto., LLC*, 370 S.W.3d 126, 146 (Tex. App.—Dallas 2012, no pet.) (quoting *II Deerfield Ltd. P'ship v. Henry Bldg., Inc.*, 41 S.W.3d 259, 265 (Tex. App.-San Antonio 2001, pet. denied)).

received by the PNC Parties. It is undisputed that the Forecasted Tax Credits for 2015 ($596,279) and 2016 ($1,999,800) total $2,596,079. App. 90. It is also undisputed that the PNC Parties did not receive any of the Forecasted Tax Credits for 2015 or 2016. App. 6 (Hasselwander Aff. ¶¶ 17-8).; *see* App. 258 (Hudgens email to Hasselwander dated January 5, 2022); App. 263 (CohnReznick calculation). Thus, the correct calculation of the Indemnity Amount is exactly the calculation performed by CohnReznick: $2,596,079 - $0 = $2,596,079. App. 263.

Because the Indemnity Amount is $2,596,079.00, the Eureka Parties' breach of not paying the Indemnity Amount to the PNC Parties (or, alternatively, by instructing CohnReznick "to NOT finalize or transmit any of the requested indemnity work") has caused the PNC Parties to suffer damages in the amount of $2,596,079.00. *See* App. 283.

## V. REQUEST FOR ATTORNEY'S FEES

Pursuant to §§ 38.001, *et seq.*, of the Texas Civil Practice & Remedies Code and the Tax Credit Guaranty § 6.1, the PNC Parties are entitled to recover, and hereby seek, their reasonable attorney's fees in asserting the claims for breach set forth herein.

## VI. CONCLUSION

Accordingly, the PNC Parties respectfully request the Court to sever the parties' claims for enforcement of the Settlement Agreement into a new case, and enter an order:

(1) finding that the Eureka Parties have breached the Settlement Agreement;

(2) finding that the Eureka Parties have breached the Tax Credit Guaranty;

(3) awarding the PNC Parties damages resulting from those breaches in the amount of $2,596,079;

(4) awarding the PNC Parties their reasonable and necessary attorneys' fees; and

(5) awarding the PNC Parties pre- and post-judgment interest, as well as any other relief to which they are justly entitled.

Dated: January 13, 2023.                 By:  /s/ Grayson L. Linyard
                                              John T. Gerhart., Jr.
                                              jgerhart@huntonAK.com
                                              Grayson L. Linyard
                                              glinyard@huntonAK.com
                                              HUNTON ANDREWS KURTH LLP
                                              1445 Ross Avenue, Suite 3700
                                              Dallas, Texas 75202-2799
                                              Telephone: (214) 468-3327
                                              Fax: (214) 880-0011

                                              **ATTORNEYS FOR PLAINTIFFS
                                              PNC BANK, N.A. AND COLUMBIA HOUSING
                                              SLP CORPORATION**

## CERTIFICATE OF SERVICE

I hereby certify that on January 13, 2023, I served the foregoing on all counsel of record registered with the Court's ECF system, by electronic service via the Court's ECF transmission facilities.

                                               /s/ Grayson L. Linyard
                                              Grayson L. Linyard